UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                    :
ENRIQUE AFRICA, *individually and on behalf of all*     :     21-CV-1419 (JMF)
*others similarly situated*,                            :
                                                    :
                        Plaintiff,                  :     **ECF CASE**
                                                    :     **Electronically Filed**
        -v-                                         :
                                                    :
JIANPU TECHNOLOGY INC. et al.,                      :
                                                    :
                        Defendants                  :
                                                    :
------------------------------------------------------------------X

## MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANT JIANPU TECHNOLOGY INC.'S
## <u>MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT</u>

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Scott D. Musoff
Robert A. Fumerton
Vincent M. Chiappini
Argirios J. Nickas
One Manhattan West
New York, New York 10001
Phone: (212) 735-3000

*Attorneys for Defendant Jianpu Technology Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF FACTS ....................................................................................................3

1.    BACKGROUND ...................................................................................................3

2.    JIANPU'S DISCLOSURES DURING THE CLASS PERIOD ......................................3

      a.    Jianpu Disclosed the Risks Relating to Its Loan Business ......................................3

      b.    Jianpu Disclosed the Risks Relating to Its Credit Card Business ...........................4

      c.    Jianpu Disclosed the Risks Relating to Databook ....................................................5

3.    SUBSEQUENT EVENTS .......................................................................................6

      a.    In March 2019, CCTV Airs Story on Improper Lending Practices .........................6

      b.    A Databook Subsidiary Is Investigated by the Chinese Authorities ........................7

      c.    Jianpu Uncovers and Discloses Misconduct in Its Credit Card Business ................8

4.    THIS ACTION .....................................................................................................9

ARGUMENT .......................................................................................................................9

I.    PLAINTIFF FAILS TO PLEAD ANY ACTIONABLE MISREPRESENTATION
      OR OMISSION ..................................................................................................10

      A.    Plaintiff Fails to Plead Any Material Misrepresentation or Omission
            Regarding Jianpu's Loan Business .........................................................................10

      B.    Plaintiff Fails to Plead Any Material Misrepresentation or Omission
            Regarding Jianpu's Credit Card Business ...............................................................13

      C.    Plaintiff Fails to Plead Any Material Misrepresentation or Omission
            Regarding Databook ................................................................................................15

II.    PLAINTIFF FAILS TO PLEAD SCIENTER ............................................................18

      A.    Plaintiff Fails to Plead Motive and Opportunity .....................................................18

      B.    Plaintiff Fails to Plead Conscious Misbehavior or Recklessness ...........................20

1.    Plaintiff Fails to Plead Scienter for the Loan Business Claim....................20

2.    Plaintiff Fails to Plead Scienter for the Credit Card Business Claim ........21

3.    Plaintiff Fails to Plead Scienter for the Databook Claim...........................23

III.    PLAINTIFF FAILS TO PLEAD LOSS CAUSATION ...................................................24

CONCLUSION.................................................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Acito v. IMCERA Group, Inc.*,
 47 F.3d 47 (2d Cir. 1995)..................................................................................................15

*Altayyar v. Etsy, Inc.*,
 242 F. Supp. 3d 161 (E.D.N.Y. 2017), *aff'd*, 731 F. App'x 35 (2d Cir. 2018).......... *passim*

*Asay v. Pinduoduo Inc.*,
 No. 20-1423, 2021 WL 3871269 (2d Cir. Aug. 31, 2021) .................................................11

*In re AT&T/DirecTV Now Securities Litigation*,
 480 F. Supp. 3d 507 (S.D.N.Y. 2020)................................................................................11

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
 493 F.3d 87 (2d Cir. 2007)............................................................................................3, 18

*In re Bayou Hedge Fund Litigation*,
 534 F. Supp. 2d 405 (S.D.N.Y. 2007), *aff'd sub nom. South Cherry Street, LLC v.
 Hennessee Group LLC*, 573 F.3d 98 (2d Cir. 2009)...........................................................22

*Board of Trustees of the City of Ft. Lauderdale General Employees' Retirement System v.
 Mechel OAO*,
 811 F. Supp. 2d 853 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO*,
 475 F. App'x 353 (2d Cir. 2012) ......................................................................................20

*Cortina v. Anavex Life Sciences Corp.*,
 No. 15-CV-10162 (JMF), 2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) ........................19

*In re Deutsche Bank Aktiengesellschaft Securities Litigation*,
 No. 16 Civ. 3495 (AT) (BCM), 2017 WL 4049253 (S.D.N.Y. June 28, 2017),
 *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d
 Cir. 2018) .....................................................................................................................11, 17

*Dura Pharmaceuticals, Inc. v. Broudo*,
 544 U.S. 336 (2005)....................................................................................................24, 25

*Fait v. Regions Financial Corp.*,
 655 F.3d 105 (2d Cir. 2011)........................................................................................13, 17

*Jackson v. Abernathy*,
 960 F.3d 94 (2d Cir. 2020)..........................................................................................21, 22

*Janbay v. Canadian Solar, Inc.*,
No. 10 Civ. 4430 (RWS), 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ...................21, 24

*In re Jumei International Holding Ltd. Securities Litigation*,
No. 14cv9826, 2017 WL 95176 (S.D.N.Y. Jan. 10, 2017)..................................................1

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001)..................................................................................... *passim*

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005)...........................................................................................24

*Lighthouse Financial Group v. Royal Bank of Scottish Group, PLC*,
No. 11 Civ. 398 (GBD), 2013 WL 4405538 (S.D.N.Y. Aug. 5, 2013), *aff'd*, 783
F.3d 383 (2d Cir. 2015)..................................................................................................24

*In re Magnum Hunter Resources Corp. Securities Litigation*,
26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).......... *passim*

*In re Merrill Lynch & Co.*,
273 F. Supp. 2d 351 (S.D.N.Y. 2003), *aff'd sub. nom Lentell v. Merrill Lynch &
Co.*, 396 F.3d 161 (2d Cir. 2005).....................................................................................3

*In re New Energy Systems Securities Litigation*,
66 F. Supp. 3d 401 (S.D.N.Y. 2014)...............................................................................25

*Oklahoma Firefighters Pension & Retirement System v. Student Loan Corp.*,
951 F. Supp. 2d 479 (S.D.N.Y. 2013)..............................................................................25

*In re Qudian Inc. Securities Litigation*,
No. 17-CV-9741 (JMF), 2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019) .........................18

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)......................................................................................10, 19

*San Leandro Emergency Medical Group Profit Sharing Plan v. Phillip Morris Cos.*,
75 F.3d 801 (2d Cir. 1996)..............................................................................................14

*In re Satyam Computer Services Ltd. Securities Litigation*,
915 F. Supp. 2d 450 (S.D.N.Y. 2013)...............................................................................21

*Schaffer v. Horizon Pharma PLC*,
No. 16-CV-1763 (JMF), 2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ...................... *passim*

*Schuler v. NIVS Intellimedia Technology Group, Inc.*,
No. 11 Civ. 2484 (KMW) (FM), 2013 WL 944777 (S.D.N.Y. Mar. 12, 2013) ................24

*In re Segue Software, Inc. Securities Litigation*,
106 F. Supp. 2d 161 (D. Mass. 2000) ..................................................................................23

*Singh v. Cigna Corp.*,
918 F.3d 57 (2d Cir. 2019)...................................................................................................9

*Slayton v. American Express Co.*,
604 F.3d 758 (2d Cir. 2010)...............................................................................................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)................................................................................................18, 20, 23

*In re UBS AG Securities Litigation*,
No. 07 CIV. 11225 (RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*,
752 F.3d 173 (2d Cir. 2014).....................................................................................12, 15, 22

*Ulbricht v. Ternium S.A.*,
No. 18-CV-6801 (PKC) (RLM), 2020 WL 5517313 (E.D.N.Y. Sept. 14, 2020)..............17

*In re XP Inc. Securities Litigation*,
No. 20-cv-1502 (BMC), 2021 WL 861917 (E.D.N.Y. Mar. 8, 2021) ...............................17

Defendant[1] Jianpu Technology Inc. ("Jianpu" or the "Company") respectfully submits this memorandum of law in support of its motion to dismiss the Amended Class Action Complaint (the "Complaint" or "AC")[2] pursuant to Rules 8(a), 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure and Section 101(b) of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(2) (the "PSLRA").

## PRELIMINARY STATEMENT

This putative securities fraud action improperly seeks to penalize Jianpu for failing to disclose information that, by Plaintiff's own admission, was not known to the Company at the time of the relevant disclosures. Jianpu is a Beijing-headquartered company that connects lenders and borrowers through its Internet platform. Jianpu does not offer any financial products of its own, but charges fees to third-party financial service providers (banks, credit card issuers, and other financial institutions) in exchange for recommending their products and services to qualified users on Jianpu's platform. Since its initial public offering ("IPO") in November 2017, Jianpu has accurately and fully disclosed the risks it faces as a young financial technology company and the potential consequences that may result if the disclosed risks materialize—*e.g.*, its lack of control over third parties, undetected fraud by its employees, internal controls weaknesses, unforeseen outcomes from its investments or acquisitions, and data privacy issues.

Ignoring these disclosures, Plaintiff cobbles together federal securities claims based on three unrelated incidents over a two-year period: (1) the alleged revelation in March 2019 that

---

[1]  Plaintiff also asserts claims against Jianpu's CEO David Ye and CFO Yilü (Oscar) Chen (the "Individual Defendants"), neither of whom have been served. However, the Court may still dismiss the Complaint in its entirety. *In re Jumei Int'l Holding Ltd. Sec. Litig.*, No. 14cv9826, 2017 WL 95176, at *1 n.1, *6 (S.D.N.Y. Jan. 10, 2017).

[2]  A true and correct copy of the Complaint is attached as Exhibit K to the Declaration of Robert A. Fumerton, dated September 3, 2021, exhibits to which are otherwise cited herein as "Ex. __." Pincites for all exhibits reference the original pagination at the bottom of the page. All internal quotation marks and citations are omitted, and all emphases in quotations are added, unless otherwise indicated.

certain third-party lenders utilizing Jianpu's platform engaged in unlawful practices; (2) the Audit Committee's investigation that found that a number of rogue employees in Jianpu's Credit Card Business falsified transactions to inflate their sales commissions; and (3) Jianpu's acquisition of a stake in Databook Tech. Ltd. ("Databook") whose subsidiary, Hangzhou Scorpion, was later found guilty by the Chinese authorities of unlawful data collection practices.  As explained below, Plaintiff's federal securities claims fail for at least three independent reasons.

First, Plaintiff fails to plead a material misrepresentation or omission.  For each of his three claims—regarding Jianpu's Loan Business, Credit Card Business, and Databook—Plaintiff fails to plead any facts, much less facts with particularity, that would render the Company's statements false or misleading at the time they were made.  Jianpu extensively disclosed, in its IPO prospectus and each annual report, the precise risks that later materialized, and Plaintiff fails to allege facts suggesting Jianpu could or should have disclosed the alleged underlying misconduct any earlier than it did.

Second, Plaintiff fails to plead particularized facts giving rise to the requisite strong inference of scienter.  Plaintiff does not allege that any concrete benefit accrued to any member of Jianpu's senior management.  Nor does Plaintiff allege facts sufficient to establish recklessness or conscious misbehavior—he does not identify a single confidential witness, document, meeting or other specific fact that would indicate anyone whose intent could be imputed to Jianpu knew or should have known of the allegedly unlawful conduct prior to the relevant disclosures.  Far from establishing scienter, the Complaint's factual allegations instead offer a more cogent and compelling non-fraudulent inference:  that Jianpu, like its peers in the financial technology industry, was engaged in a never-ending battle to root out bad actors, and timely disclosed and remediated shortcomings as they were identified.

<u>Third</u>, and finally, Plaintiff's claims should be dismissed for failure to plead loss causation because Plaintiff fails to allege that his loss was caused by the materialization of concealed risks.

<b>STATEMENT OF FACTS[3]</b>

**1. BACKGROUND**

Operating under the brand name "Rong360," Jianpu connects lenders and borrowers in China through its Internet platform. (Ex. A, IPO Prospectus, at 1.) Jianpu does not offer financial products of its own. Instead, the Company generates revenues from the fees that it charges third-party financial service providers for recommending their products and services to users accessing Jianpu's platform. (Ex. B, 2017 Annual Report, at 40.) Jianpu launched its IPO on the New York Stock Exchange in November 2017. At that time, just prior to the commencement of the Class Period, over 2,700 financial service providers availed themselves of Jianpu's platform to offer over 234,000 financial products—*e.g.,* consumer loans, credit card services, and wealth management products—to Jianpu's online users. (*Id.* at 40, 44.)

**2. JIANPU'S DISCLOSURES DURING THE CLASS PERIOD**

**a. Jianpu Disclosed the Risks Relating to Its Loan Business**

Jianpu's Loan Business provides recommendation services to potential lenders and helps connect them with qualified borrowers. (Ex. A at 83.) Jianpu generates Loan Business revenue by charging these financial services providers a pre-agreed "fixed price" for each recommendation. (*Id.* at 83–84.) "After the users or borrowers submit applications for the recommended products to the financial service providers, [Jianpu] do[es] not maintain any obligations" to the financial

---

[3] The facts set forth herein are drawn from the allegations in the Complaint and documents attached as exhibits or incorporated into the Complaint by reference, matters of which judicial notice may be taken, and documents integral to the complaint. *In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 356 (S.D.N.Y. 2003), *aff'd sub. nom Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005). The Court may also consider "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

3

service provider.  (*Id*.)  In its IPO prospectus and in each of its annual reports, Jianpu disclosed to investors and potential investors this feature of its business model and the associated risks:

> ***Although we have established standards to screen financial service providers before listing their products on our platform*** . . . ***we have limited control over the quality of the financial products and the services provided by financial service providers*** . . . . Due to the large number of financial products listed on our platform and the extensiveness of our financial service provider network, it is extremely difficult for us to monitor and ensure the product and service quality of financial service providers on our platform at any given time.

(Ex. A at 16; Ex. B at 8; Ex. C, 2018 Annual Report, at 8.)  Jianpu also warned investors of the potential consequences if financial service providers on its platform are found to have violated "any PRC laws or regulations":  "***we may be jointly liable***," "may face, among others, ***regulatory warnings, correction orders, condemnation, fines and criminal liability***," and "may have to ***remove financial products from our platform or terminate relationship[s] with financial service providers***."  (Ex. A at 23; Ex. B at 10; Ex. C at 11.)

### b.      Jianpu Disclosed the Risks Relating to Its Credit Card Business

At the time of its IPO in 2017, Jianpu had a workforce of approximately 800 employees. (Ex. C at 85.)  As of December 2018, that number has grown to over 1,100 employees in fifteen Chinese cities.  (Ex. D, 2019 Annual Report, at 60, 99.)  Just like any large employer of a growing business, Jianpu could not guarantee that all of its employees would act lawfully and ethically at all times—a risk that Jianpu explicitly disclosed as follows:

> We are subject to fraudulent activity on our platform . . . . ***Certain of our own employees may be corrupted and participate in fraudulent or otherwise illegal activities***. ***Our resources, technologies, fraud detection tools and risk management system may be insufficient to accurately detect and timely prevent fraud and misconduct***.

(Ex. A at 20; Ex. B at 11; *see also* Ex. C at 12 (similar).)

Compounding its compliance challenge, as the Company also disclosed to investors, a "material weakness" had been identified in the Company's internal controls "relat[ing] to the lack

4

of sufficient competent financial reporting and accounting personnel." (Ex. A at 29; Ex. B at 15–16; Ex. C at 17.)  Although the Company was working to remediate these deficiencies, Jianpu told investors that it could not "assure [them] that we will be able to continue implementing these measures in the future, or that we will not identify additional material weaknesses or significant deficiencies in the future." (Ex. A at 29; Ex. B at 15–16; Ex. C at 17.)  "If we fail to maintain an effective system of internal control over financial reporting," the Company warned, "we may be unable to accurately report our financial results or prevent fraud." (Ex. A at 28; Ex. B at 15; Ex. C at 17.)  Jianpu specifically identified "material misstatements or restatements of its prior financial statements" as a potential consequence of the identified internal controls weaknesses:

> ***If we fail to achieve and maintain an effective internal control environment, we could suffer material misstatements in our financial statements and fail to meet our reporting obligations*** . . . . Additionally, ineffective internal control over financial reporting could expose us to increased risk of fraud or misuse of corporate assets . . . . ***We may also be required to restate our financial statements from prior periods***.

(Ex. A at 29; *see also* Ex. B at 16 (similar).)

### c.    Jianpu Disclosed the Risks Relating to Databook

In June 2018, Jianpu acquired a 65% stake in Databook, a data solutions company.  (AC ¶¶ 30–31.)  In addition to the usual plethora of risks that accompany any acquisition and which the Company disclosed in various public filings—"***investments or acquisitions may not yield the results we expect***" (Ex. C at 20)—the Company was explicit about the specific ***data privacy risks*** it was taking on as a result of its investment in a business that handles a large volume of potentially sensitive personal data:

> ***Any actual or perceived inappropriate usage or mishandling of private information and data on our platform could subject us to liabilities, negatively impact our reputation and deter users from using our platform***. . . .
>
> We cannot assure you that our existing privacy and personal protection system and technical measures will be  considered  sufficient  under  applicable  laws  and

regulations. . . . ***Any inability to adequately address privacy concerns, even if unfounded, or to comply with applicable privacy or data protection laws, regulations and privacy standards, could result in additional cost and liability for us***, damage our reputation, inhibit the use of our platform and harm our business.

(Ex. A at 23–24; Ex. B at 11; Ex. C at 12 (first emphasis in original).)

**3.    SUBSEQUENT EVENTS**

**a.    In March 2019, CCTV Airs Story on Improper Lending Practices**

On March 15, 2019, Chinese state broadcaster China Central Television ("CCTV") aired a program that purported to expose certain loan providers' allegedly improper lending practices, such as charging interest rates in excess of legally permissible limits.  (AC ¶¶ 39–47.)  Contrary to Plaintiff's suggestion that the broadcast focused on loans featured on Jianpu's platform, only ***two*** of the several-dozen lenders mentioned in the broadcast were alleged to have transacted the offending loans on Jianpu's platform.[4]  (Ex. E, CCTV Report Tr., at 1:58:51.)  Consistent with Jianpu's public disclosures that it does not offer its own financial products, an individual who self-identified as a Jianpu employee told the program interviewer that Jianpu "only recommends users" to the financial services offered by third-party providers.  (*Id.* at 1:59:12.)  Similarly, despite Plaintiff's assertion that "Rong360 required" users to make purchases before obtaining loans (AC ¶ 40), the broadcast alleged nothing of the sort.  It reported instead that these ***third-party financial service providers*** sometimes impermissibly bundled purchases with loans.  (Ex. E at 1:59:29.)

Nonetheless, following the CCTV broadcast, the Company "promptly organized internal resources to thoroughly review its business practices" and voluntarily suspended further downloads of its mobile apps "in order to identify any inappropriate conduct," including by third parties that abused Jianpu's platform to commit misconduct.  (AC ¶ 50; Ex. F, Mar. 17, 2019 Press

---

[4]    Similarly, contrary to Plaintiff's assertions (AC ¶¶ 44–47), the CCTV report did not attribute most of the predatory loan examples to products on Rong360 (*see* Ex. E, CCTV Report Tr., at 1:50:07 to 1:58:37).

Release, at 1.)  Tracking its prior disclosures (Ex. A at 16; Ex. B at 8; Ex. C at 8), Jianpu again reminded investors of the risks associated with its business model:

> Although the Company implements stringent standards to screen financial services providers before listing their products on its platform, we cannot rule out the possibility that quality of the financial products and the services provided by financial services providers are not in full compliance with applicable laws and regulations at all times.

(Ex. F at 1; AC ¶ 50.)

About two months later, on May 28, 2019, Jianpu announced that the aforementioned "review [of] its business practices" was complete, and that it expected to relaunch its mobile apps the following month.  (AC ¶ 61.)  The internal review did not uncover any violation of law or regulation by the Company, and no enforcement action was ever brought against the Company based on the allegations featured in the CCTV broadcast.  Plaintiff does not allege otherwise.

### b.    A Databook Subsidiary Is Investigated by the Chinese Authorities

In September 2019, over a year after the Company's initial investment in Databook, Chinese authorities initiated a criminal investigation of one of Databook's subsidiaries, Hangzhou Scorpion.  (AC ¶ 84.)  In December 2019, Jianpu disclosed in its Q3 2019 earnings release that it had recorded a RMB250.3 million ($38.6 million) impairment, which "primarily reflects the impairment of the goodwill and intangible assets related to a subsidiary acquired in 2018 due to adverse development of its business and change of the relevant industry background and market conditions."  (*Id.* ¶ 86; Ex. G, Q3 2019 Press Release, at 2.)  Nine months after this disclosure, in September 2020, Chinese authorities filed a criminal case against Hangzhou Scorpion.  (AC ¶ 92.)  In January 2021, a Chinese court entered judgment against Hangzhou Scorpion and two of its employees for improperly handling personal data, and Hangzhou Scorpion was fined RMB30 million ($4.3 million) and ordered to disgorge the same amount.  (*Id.* ¶ 93.)  Plaintiff does not allege that the judgment even mentioned Jianpu or Databook nor that it suggested Jianpu or any

of its directors or officers knew about or were involved in the underlying conduct by Hangzhou Scorpion.  (*Id.* ¶¶ 93–94.)

Jianpu disclosed the above judicial proceedings and judgment, as well as their financial impact on the Company, in its 2019 Annual Report, filed on April 30, 2021.  (*Id.* ¶ 96.)  The Company noted that, as first disclosed in its Q3 2019 earnings release over a year earlier, it had already recorded a full impairment for goodwill, intangible assets, and other assets attributable to Databook. (Ex. D at 26, F-45; AC ¶ 96.)  The Company also disclosed that, in light of the recently entered court judgment, it reversed RMB30 million ($4.3 million) in Advertising Segment revenues (which include Databook revenues) to account for the disgorgement and recorded the RMB30 million penalties as an operating expense.  (Ex. D at 26, 87.)

c.      **Jianpu Uncovers and Discloses Misconduct in Its Credit Card Business**

Several months after Jianpu conducted an internal review into its business practices in the wake of the CCTV broadcast, the Company's Audit Committee initiated a separate internal investigation into the Company's Credit Card Business.  The Company disclosed this fact in a late filing notification filed on June 15, 2020, which stated that the Company could not timely file its 2019 Annual Report in part because "[t]he independent Audit Committee of the Company's Board of Directors, with the assistance of advisors, is in the process of conducting an internal review of certain matters relating to transactions between the Company and third-party business entities." (AC ¶ 67; Ex. H, June 15, 2020 Notice of Late Filing, at 1.)  Eight months later, on February 16, 2021, Jianpu announced the results of the independent internal investigation as follows:

> The Review found that certain transactions involved third-party agents (including both upstream agents and downstream suppliers) with undisclosed relationships, and some transactions lacked business substance ("questionable transactions"). As a result, certain revenue and associated expenses were inflated or inaccurately recorded in the financial statements. Evidence suggested that certain employees from the Credit Card BU may have known about or been involved in certain of the

8

questionable transactions that resulted in inflated sales commissions to such employees. In relation to the questionable transactions, the Review found that certain employees improperly altered supporting documents that were provided to the Company's external auditor.

> ***Other than a business unit head-level employee who has since been terminated, the Review did not find any evidence that other members of senior management who supervised the Credit Card BU knew about or participated in any of the questionable transactions***.

(Ex. I, Feb. 16, 2021 Press Release, at 1; AC ¶ 72.)

## 4.    THIS ACTION

A few days after the above February 16, 2021 announcement, a purported shareholder initiated this action, alleging that Jianpu failed to timely disclose the issues that the Audit Committee-led investigation subsequently uncovered about the Credit Card Business. (ECF No. 1.) On July 20, 2021, Lead Plaintiff filed his amended complaint. (ECF No. 46.) Although Lead Plaintiff did not purchase his shares until October 2020 (more than a year after the CCTV broadcast) and had sold all of his shares by February 16, 2021 (two months before Jianpu disclosed the judgment against Databook), he nonetheless added new claims on these topics. (AC ¶¶ 6, 13.)

## ARGUMENT

To state a claim under Section 10(b), Plaintiff must allege, among other things: (1) a material misstatement or omission; (2) scienter; and (3) loss causation. *See Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019). The PSLRA and Rule 9(b) require Plaintiff to plead these elements with particularity. *Schaffer v. Horizon Pharma PLC*, No. 16-CV-1763 (JMF), 2018 WL 481883, at *2 (S.D.N.Y. Jan. 18, 2018). As shown below, the Complaint should be dismissed because Plaintiff fails to plead any of these elements.

I.    **PLAINTIFF FAILS TO PLEAD ANY ACTIONABLE
      MISREPRESENTATION OR OMISSION**

To plead a material misstatement or omission, Plaintiff "must do more than say that the statements . . . were false and misleading; [he] must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).  Plaintiff does not do so with respect to any of the three unrelated categories of alleged misrepresentations.

   A.    **Plaintiff Fails to Plead Any Material Misrepresentation or
         Omission Regarding Jianpu's Loan Business**

Plaintiff's first claim is that Jianpu failed to disclose that certain third-party financial service providers offered "noncompliant financial products" on its platform and that Jianpu's "Loan Segment revenue was generated in part through unlawful and/or improper means."  (AC ¶¶ 106–12, 116, 119–22.)  This claim fails for several independent reasons.

First, Jianpu expressly disclosed the relevant risks relating to its loan recommendation business, foreclosing Plaintiff's claim as a matter of law.  *Schaffer*, 2018 WL 481883, at *8. Where, as here, a company "openly acknowledge[s]" the challenges it faces and "warn[s] investors of the . . . risk" that later occurs, its statements are not misleading, as "defendants cannot be held liable for failing to disclose something that they disclosed."  *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 180 (E.D.N.Y. 2017), *aff'd*, 731 F. App'x 35 (2d Cir. 2018).  Here, Jianpu disclosed that:

- it was "***subject to fraudulent activity on [its] platform***" (Ex. A at 20; Ex. B at 11; Ex. C at 12);

- it had thousands of financial service providers and hundreds of thousands of financial products on its platform and "[d]ue to the large number of financial products" had "***limited control over the quality of the financial products and the services provided***" and "***extreme[] difficult[y] . . . monitor[ing] and ensur[ing] the product and service quality of***" the financial service providers on its platform (Ex. A at 1, 16; Ex. B at 8, 40, 44; Ex. C at 8, 43, 46); and

- if any financial service providers violated PRC laws or regulations, the Company "***may be jointly liable***," "may face, among others, ***regulatory warnings, correction orders, condemnation, fines and criminal liability***," and "may have to ***remove financial products***

10

***from our platform or terminate relationship[s] with financial service providers***." (Ex. A at 19; Ex. B at 10; Ex. C at 11.)

Given these disclosures, no reasonable investor could have been misled about the risks concerning noncompliant financial products that allegedly later materialized. *See Altayyar*, 242 F. Supp. 3d at 177 (no misstatement where defendant "explicitly acknowledged that [its] compliance practices were imperfect, . . . that [it] could not 'control [its] sellers' and that [its] 'reputation [might] be harmed' if sellers 'engage[d] in illegal or unethical business practices'"); *Asay v. Pinduoduo Inc.*, No. 20-1423, 2021 WL 3871269, at *3 (2d Cir. Aug. 31, 2021) (affirming dismissal of Exchange Act claims where the defendant disclosed the risk of counterfeit products on its platform and it's "statements suggest[] caution (rather than confidence)").

Second, Plaintiff fails to plead unlawful conduct on Jianpu's platform that would render its disclosures materially misleading. "A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false *at the time it was made*." *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, No. 16 Civ. 3495 (AT) (BCM), 2017 WL 4049253, at *5 (S.D.N.Y. June 28, 2017), *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018). Moreover, "[c]ourts have generally held that failure to disclose anecdotal incidents of improper sales tactics or other isolated employee misconduct is not material." *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 527 (S.D.N.Y. 2020). Here, all of the alleged conduct was carried out by third-party lenders, and Plaintiff alleges no facts, much less particularized facts, to show that the conduct was material or that Jianpu knew of such conduct prior to the CCTV broadcast. Indeed, many of Plaintiff's allegations regarding lending practices do not relate to Jianpu at all. Plaintiff describes four victims of predatory loans, but only ***one*** is alleged to have taken out his loan through Jianpu's platform. (AC ¶¶ 41, 44–46.) Even with respect to that one purported victim, the alleged conduct—"debt

11

collectors contact[ing] his children's teacher" and charging "interest-upon-interest" (*id.* ¶ 41)—is not alleged to have been carried out by Jianpu, but by third parties who, at some unknown time, consummated the loan on Jianpu's platform. *Schaffer*, 2018 WL 481883, at \*7 (no fraud where "[a]ll of the conduct alleged is on the part of the pharmacies, not [defendant]"). Plaintiff's sole allegation that Jianpu itself "required" borrowers to purchase products before issuing loans is contradicted by the CCTV broadcast, which stated only that some third parties offering products on Jianpu's platform required such purchases. (AC ¶ 40; Ex. E at 1:59:18.) The allegations all lack detail on "who, when, or how" the purported fraud was carried out, fail to show "the existence of a company-wide practice," and fall short of the heightened pleading standard. *Schaffer*, 2018 WL 481883, at \*8. Plaintiff does not allege when the alleged conduct took place, how frequently it occurred, or whether Jianpu could have disclosed anything more prior to the CCTV broadcast.

Finally, Plaintiff fails to connect any of the statements he challenges with the alleged fraud. *In re UBS AG Sec. Litig.*, No. 07 CIV. 11225 (RJS), 2012 WL 4471265, at \*31 (S.D.N.Y. Sept. 28, 2012) (requiring "connection between the illegal conduct and the [allegedly misleading] statements"), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014). Plaintiff asserts that Jianpu's Q1 to Q3 2018 financial statements were misleading, but does not plead that the alleged conduct—which in any case, was not carried out by Jianpu—occurred during those quarters. (AC ¶¶ 103, 106, 112, 116, 132.) Nor does Plaintiff allege that the financial data disclosed in these financial statements were inaccurate. *Schaffer*, 2018 WL 481883, at \*9 ("[I]t is well established that a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data."). Although Plaintiff also challenges five statements regarding regulatory compliance, they have nothing to do with the compliance issues allegedly revealed by the CCTV broadcast that is the crux of his Complaint.

12

(AC ¶¶ 104, 107–08, 110, 119.)  For example, some statements discuss regulatory changes for short-term microloans (*id.* ¶¶ 107, 110) and P2P loans (*id.* ¶ 119), but Plaintiff does not allege that any of the noncompliant loans allegedly offered on Jianpu's platform were short-term microloans or P2P loans.  Some statements do not even relate to Jianpu's own compliance, but to efforts by ***third parties*** to adjust to regulatory changes.  (*Id.* ¶¶ 108, 110.)  "Without a plausible allegation that [Jianpu] acted—or directed its employees . . . to act—improperly or illegally, [Jianpu's] statements concerning its compliance with laws [and] regulations . . . cannot have been misstatements." *Schaffer*, 2018 WL 481883, at \*8.  Others of these compliance-related statements are inactionable puffery (AC ¶ 107 ("we beefed up our quality control"); *id.* ¶ 119 ("we only work with the top P2P guys")), or are statements of opinion (*id.* ¶ 108 ("we believe the worst is now behind us"); *id.* ¶¶ 104, 110 (similar)), which are inactionable, where, as here, Plaintiff fails to plead "that the statement[s] w[ere] both objectively false and disbelieved by the defendant at the time." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011); *Altayyar*, 242 F. Supp. 3d at 173 (statement that "[o]ur community is made up of . . . responsible manufacturers" is puffery).

### B. Plaintiff Fails to Plead Any Material Misrepresentation or Omission Regarding Jianpu's Credit Card Business

Plaintiff bases his next misstatement claim on Jianpu's restatement of its Credit Card Business financials that had been inflated by rogue employees' misconduct, as later revealed by an internal investigation overseen by the Audit Committee.  (AC ¶¶ 67–81.)  Although Jianpu promptly disclosed this information in June 2020 and February 2021, Plaintiff asserts that these facts should have been disclosed earlier.  (*Id.* ¶¶ 67, 72.)  This claim fails for at least three reasons.

First, although Jianpu did not have a crystal ball and never claimed it did, the Company nonetheless warned investors of the precise risks Plaintiff claims were not disclosed (*id.* ¶¶ 103–05, 112, 114, 117–18, 122–31, 136–54, 158–61) and that later materialized, including the potential

13

for employee fraud, material weaknesses, and the restatement of financials.  Specifically, Jianpu

warned that:

- "*[c]ertain of our own employees may be corrupted and participate in fraudulent or otherwise illegal activities*. *Our resources, technologies, fraud detection tools and risk management system may be insufficient to accurately detect and timely prevent fraud and misconduct*" (Ex. A at 24; Ex. B at 11; Ex. C at 12);

- there were material weaknesses in internal controls, including a "lack of sufficient competent financial reporting and accounting personnel with appropriate understanding of U.S. GAAP" and SEC reporting requirements, and that "*we cannot assure you . . . we will not identify additional material weaknesses or significant deficiencies in the future*" (Ex. A at 29; Ex. B at 15–16; Ex. C at 17); and

- shortcomings in internal controls "*could expose us to increased risk of fraud or misuse of corporate assets and . . . [w]e may also be required to restate our financial statements from prior periods*."  (Ex. A at 29; Ex. B at 15–16; Ex. C at 17.)

These disclosures alone defeat Plaintiff's claims.  *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26

F. Supp. 3d 278, 295 (S.D.N.Y. 2014) (no falsity where "the company acknowledged that it might

'identify additional material weaknesses'"), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).

Second, Plaintiff's claim is classic fraud-by-hindsight pleading.  Plaintiff makes "no

showing that defendants' [statements] . . . were not based on the facts available to the company at

the time the statements were made." *San Leandro Emergency Med. Grp. Profit Sharing Plan v.*

*Phillip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996).  The Complaint nowhere alleges, much less

with particularity, that Jianpu could have known of the employee misconduct before the conclusion

of the independent internal investigation in or around February 2021.[5]  Nor does Plaintiff dispute

---

5   Plaintiff's reliance on his sole confidential witness (CW1) is misplaced.  (AC ¶ 81.)  Plaintiff alleges that "according to . . . a former Rong360 Credit Auditor," "the Company would normally verify the information provided by the financing company to determine whether the entity actually existed and operated" (*id.*), but Plaintiff fails to allege facts to "support the probability that a person in the position occupied by [CW1] would possess the information alleged," *Schaffer*, 2018 WL 481883, at *6, and CW1 provides no facts to suggest senior management had any involvement in or knowledge of the results of the verification process.  (AC ¶ 81.)  Nor does the existence of such a process indicate that Jianpu should have discovered this misconduct earlier, particularly since "the Review found that certain employees improperly altered supporting documents," and Plaintiff does not allege the questionable transactions involved non-existent entities.  (*Id.* ¶ 72.)

14

that the investigation "***did not find any evidence that other members of senior management . . . knew about or participated in any of the questionable transactions***." (AC ¶ 72.) These concessions are fatal to Plaintiff's claim, as Jianpu simply could not have disclosed facts unavailable to it at the time. *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.").

Finally, Plaintiff once again fails to allege the requisite "connection between the illegal conduct and the [allegedly misleading] statements." *In re UBS*, 2012 WL 4471265, at *31. Plaintiff challenges Jianpu's financial statements beginning Q1 2018, but fails to allege any facts in support of his conclusory claim that the underlying conduct began that quarter, or otherwise plead when such conduct began. (*See* AC ¶¶ 56 n.6, 103.) Plaintiff goes on to challenge several statements that are completely unrelated to the subsequently discovered employee misconduct. (*Id.* ¶ 117 (describing compliance of *P2P companies*, not Jianpu); *id.* ¶¶ 128, 136 (describing Jianpu's *network of financial institutions* and relative revenue contributions); *id.* ¶¶ 144, 149 (describing efforts to improve compliance in *Loan Business*); *id.* ¶ 160 (describing impact of COVID-19).) Moreover, several of these statements are inactionable opinions (*id.* ¶ 104 ("[we] believe the worst is now behind us")) or puffery (*id.* ¶ 130 ("scalability of our platform model and execution strength"); *id.* ¶ 144 ("higher industry standards and best practices"); *id.* ¶ 149 (similar)).

### C.     Plaintiff Fails to Plead Any Material Misrepresentation or Omission Regarding Databook

Next, Plaintiff claims that Jianpu failed to timely disclose that Databook's subsidiary, Hangzhou Scorpion, was subject to a criminal investigation beginning in September 2019 relating to the unauthorized storage of certain user data. As shown below, this claim also fails.

First, Plaintiff's claim is inactionable fraud-by-hindsight. Plaintiff claims that two statements Jianpu made in August 2018 and February 2019 regarding the Databook acquisition and Q4 2018 revenue were misleading because Jianpu failed to disclose at that time that Hangzhou Scorpion "was engaged in pervasive and unlawful data collection practices." (AC ¶¶ 113, 115, 134–35.) However, Plaintiff does not allege when the improper data collection practices began, whether they were ongoing at the time of the alleged misstatements, and when Jianpu learned of them. Indeed, even after the full scope of the Chinese government's investigation was disclosed, the Company's 2018 financials attributable to Databook were not restated (nor does Plaintiff allege they were required to be). (*Id.* ¶ 96.) Plaintiff thus fails to establish that the challenged disclosures, which predate even the September 2019 investigation (*id.* ¶ 84), were false at the time they were made.

Similarly, Plaintiff alleges that Jianpu should have accrued a loss for fines and penalties and specifically disclosed the alleged investigation into Hangzhou Scorpion when it disclosed the Databook impairment in its December 2019 Q3 2019 earnings release. (*Id.* ¶ 100, 155–157.) But Plaintiff cannot possibly contend that Jianpu was then required to record the specific fines and penalties that were levied against Hangzhou Scorpion in January 2021, ***over a year later***. (*Id.* ¶ 93.) Nor has Plaintiff alleged what Jianpu knew at the time it recorded the Q3 2019 impairment, including whether Hangzhou Scorpion was the subject of a criminal investigation. Instead, Plaintiff posits that Jianpu should have accrued a "loss contingency" or made disclosures about potential further loss, applying a different accounting standard (ASC 450) than the one the Company applied (ASC 855). (*Id.* ¶ 98.) But, Plaintiff's claim is nothing more than a disagreement with Jianpu's subjective accounting judgment, which are statements of opinion that are inactionable where, as here, Plaintiff fails to demonstrate that the statement was both false and

16

not honestly believed when made. *See Fait*, 655 F.3d at 110. Plaintiff merely asserts that further loss was "inevitable" (AC ¶¶ 99, 101), but the Complaint is devoid of factual allegations showing the Company's knowledge of who and what the Chinese authorities were investigating, whether the Company had sufficient information to form a belief as to whether the regulators' suspicions were sound or baseless, the Company's assessment of the likelihood that Hangzhou Scorpion or its employees would be held liable, and the Company's expected legal and financial exposure as a result. In the absence of these allegations, Plaintiff cannot show "that defendants' statements or omissions . . . were known to be false at the time made." *Magnum Hunter*, 26 F. Supp. 3d at 295.

Second, Plaintiff's claim fails because he cannot establish that Jianpu had a duty to disclose the allegedly omitted information. "[A] government investigation, without more, does not trigger a generalized duty to disclose." *In re XP Inc. Sec. Litig.*, No. 20-cv-1502 (BMC), 2021 WL 861917, at *9 (E.D.N.Y. Mar. 8, 2021). Indeed, Plaintiff avers that the Company "had a choice" whether or not to disclose the investigation, conceding that disclosure was not mandatory. (AC ¶ 100.) Nor did Jianpu's disclosure of the Q3 2019 impairment trigger such a duty. (*Id.* ¶ 156.) "[R]evealing one fact about a subject does not trigger a duty to reveal all facts on the subject," so long as what was revealed would not be so incomplete as to mislead. *See In re Deutsche Bank*, 2017 WL 4049253, at *7; *Ulbricht v. Ternium S.A.*, No. 18-CV-6801 (PKC) (RLM), 2020 WL 5517313, at *7 (E.D.N.Y. Sept. 14, 2020). Here, Jianpu recorded a full impairment of RMB250.3 million ($38.6 million) for "a subsidiary acquired in 2018 due to adverse development of its business." (AC ¶¶ 85–86.) This disclosure alerted investors to the relevant risks and financial consequences, and nothing more was required. *See In re XP*, 2021 WL 861917, at *10 (no duty to disclose investigation where defendants provided some notice of adverse events).

17

Finally, Jianpu warned of the precise risks that later materialized:  that "investments or acquisitions may not yield the results we expect"; that the "regulatory framework for privacy issues in China and worldwide is currently evolving and is likely to remain uncertain for the foreseeable future"; and that "***[a]ny actual or perceived inappropriate usage or mishandling of private information and data on our platform could subject us to liabilities*** . . . could result in additional cost and liability for us . . . and harm our business." (Ex. A at 23–24, 32; Ex. B at 11, 18; Ex. C at 12, 20); *In re Qudian Inc. Sec. Litig.*, No. 17-CV-9741 (JMF), 2019 WL 4735376, at *7 (S.D.N.Y. Sept. 27, 2019) (no misrepresentation where defendant "explicitly warned investors that the company could *not* assure investors that 'personnel will not engage in any misconduct'").

## II.    PLAINTIFF FAILS TO PLEAD SCIENTER

Plaintiff's claims should also be dismissed for the separate and independent reason that the Complaint completely fails to plead the scienter of anyone "whose intent could be imputed" to the Company.  *Altayyar*, 242 F. Supp. 3d at 182.  Under the PSLRA, Plaintiff must plead with particularity facts that "give rise to a strong inference of fraudulent intent." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).  "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314, (2007).  Scienter may be pled through particularized factual allegations showing either (i) a "motive and opportunity" to commit fraud, or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99.  Plaintiff fails on both counts.

### A.    Plaintiff Fails to Plead Motive and Opportunity

Plaintiff does not even attempt to allege any motive for his Loan Business or Databook claims.  His sole motive and opportunity theory relates to his Credit Card Business claim, and rests entirely on his allegation that the "sudden" drop in Loan Business revenue that occurred in Q1

18

2019 following the CCTV broadcast "created an urgent need, and thus a strong motive for Defendants to boost revenue within the Company's Credit Card Segment." (AC ¶ 58.)

This theory is self-defeating, as the Complaint alleges that the misconduct in the Credit Card Business began in 2018—*before* the Q1 2019 drop in Loan Business revenue.[6] (*Id.* ¶ 56 n.6.) Moreover, the motivation to "sustain the appearance of corporate profitability" is "possessed by virtually all corporate insiders" and is insufficient to plead scienter. *Cortina v. Anavex Life Scis. Corp.*, No. 15-CV-10162 (JMF), 2016 WL 7480415, at *6 (S.D.N.Y. Dec. 29, 2016). Plaintiff cannot—as he must—"assert a concrete and personal benefit" to any of the Defendants. *Kalnit*, 264 F.3d at 139. He alleges no insider trading, stock sales, bonuses, or other compensation gains dependent on the fruits of the alleged misconduct. *See Rombach*, 355 F.3d at 177.

In contrast, the opposing inference of nonfraudulent intent—that the Company, like many of its peers in the fast-growing financial technology industry, was engaged in unceasing cat-and-mouse skirmishes to root out unscrupulous actors—is substantially more compelling than any inference of scienter. *Magnum Hunter*, 26 F. Supp. 3d at 297 ("[D]efendants were in a constant game of 'Catch up'—acknowledging the company's material weaknesses and disclosing their continued efforts to resolve them, only to learn of yet more."). Moreover, as Plaintiff acknowledges, after the CCTV broadcast, the Company "engaged a global consulting firm to assist us in the review of our business process." (AC ¶¶ 41, 61.) Plaintiff's theory that Defendants chose to "expand[] their existing fraudulent scheme to boost revenue within the Company's Credit Card Segment" at the same time that they voluntarily invited the scrutiny of external advisors defies

---

[6]    Unable to deny that the Credit Card misconduct predates the alleged motivating event, Plaintiff claims that "the magnitude [of the Credit Card misconduct] accelerated following the CCTV . . . revelations about the Company's Loan Segment." (AC ¶ 56 n.6.) But he fails to allege any facts in support of this claim. Plaintiff does not allege the amount by which Credit Card revenue was overstated in the quarters prior to Q1 2019, and thus fails to show that the fraud "increas[ed] [in] intensity" as compared with those earlier quarters. (*Id*. ¶ 77.)

common sense. (*Id.* ¶ 56.) Further, Plaintiff does not deny that after the Company discovered each instance of potential improper conduct, it disclosed the issue promptly and acted immediately to rectify it—a sign of prudence, not scienter. (*Id.* ¶¶ 49–50 (suspending downloads of its app after CCTV broadcast); *id.* ¶¶ 67–72 (investigation after learning of potential Credit Card Business issues); *id* ¶¶ 85–86, 91, 96 (prompt impairment and related accounting treatment for Databook).)

### B.   Plaintiff Fails to Plead Conscious Misbehavior or Recklessness

Because Plaintiff fails to establish motive, "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142. To establish recklessness, he must plead "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* This requires an allegation that Defendants had "knowledge of facts or access to information contradicting their public statements." *Id.* Plaintiff fails to make such a showing.

### 1.   Plaintiff Fails to Plead Scienter for the Loan Business Claim

Plaintiff's meager scienter allegations in support of his Loan Business claim amount to nothing more than a conclusory assertion that Defendants "must have known" of third parties' unlawful practices by virtue of their corporate positions. (AC ¶ 173 ("their associations with the Company . . . made them privy to confidential proprietary information").) However, "accusations founded on nothing more than a defendant's corporate position are entitled to no weight." *Bd. of Trs. of the City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 873 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012).

Moreover, Plaintiff's theory is not "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. The Complaint alleges only ***one*** instance in which such conduct was related to a third-party loan found through Jianpu's platform. (AC ¶ 41.) Plaintiff does not allege that this loan was known to any Jianpu employee, let alone

20

explain how Defendants would have learned of it in their corporate roles.  The more cogent and compelling inference is that Jianpu, as it repeatedly warned in its risk disclosures, lacked control over financial service providers and was unable to monitor and ensure the quality of every single one of the products on its platform "[d]ue to the large number of financial products listed on our platform and the extensiveness of our financial service provider network."[7]  (Ex. B at 8.)

### 2. Plaintiff Fails to Plead Scienter for the Credit Card Business Claim

Plaintiff admits that Jianpu's internal investigation "***did not find any evidence that other members of senior management . . . knew about or participated in any of the questionable transactions***" in its Credit Card Business.[8]  (AC ¶ 72.)  Notwithstanding this undisputed finding, Plaintiff asserts that, because Jianpu's procedures "reduc[ed] the likelihood that the related party transactions were unknown to Defendants," Defendants must have known, or were at least reckless in not knowing, about them.  (*Id.* ¶ 81; *see id.* ¶¶ 174–78.)  But allegations merely describing audit procedures are insufficient, because they "tie[] none of the scienter allegations to any Individual Defendant"—what they knew and when.  *Janbay v. Can. Solar, Inc.*, No. 10 Civ. 4430 (RWS), 2012 WL 1080306, at *11 (S.D.N.Y. Mar. 30, 2012); *see also In re Satyam Comput. Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 479 (S.D.N.Y. 2013) (no inference of scienter based on "Audit Committee's general oversight responsibilities").  Nor does the Company's failure to detect the misconduct through these procedures establish scienter.  It is well established that allegations

---

[7]     Plaintiff alleges that the CCTV broadcast "reported that the 714 Missile businesses 'know about their illegal practices'" (AC ¶ 47), but does not even allege that Jianpu was such a business, much less describe what the Company knew.  Plaintiff's allegation that Director Fan Yuanyuan, who is not a party to this action, resigned several months after the CCTV broadcast (*id.* ¶¶ 53–54) is also insufficient to plead scienter "absent additional factual allegations linking [his] resignation . . . to the alleged fraud." *In re UBS*, 2012 WL 4471265, at *18.

[8]     The Complaint does not allege that the lone business unit head-level employee who was terminated after the Audit Committee-led investigation evidences Jianpu's scienter, nor does Plaintiff "provide[] . . . connective tissue between [this] employee[] and the alleged misstatements." *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020). As the Company disclosure stated, this employee was promptly terminated upon the discovery of his misconduct.

based on imperfections in a company's compliance systems "fail[] to show that the defendants acted with fraudulent intent."[9] *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 417 (S.D.N.Y. 2007), *aff'd sub nom. S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98 (2d Cir. 2009).

Moreover, the inference of non-fraudulent intent is clearly more cogent and compelling than Plaintiff's theory of scienter. "One substantial competing inference this court may draw from these alleged facts is that [the company's procedures] would not have uncovered the fraud." *Id.* at 418. Plaintiff acknowledges that Jianpu's internal review found "that certain employees improperly altered supporting documents" in order to mask "undisclosed relationships." (AC ¶ 72.) Because the conflicted relationships and transactions were "undisclosed"—indeed, the misbehaving employees actively obstructed the discovery of their fraud through the spoliation of evidence—the Company would not and could not have uncovered these transactions in "verify[ing] the information provided by the financing company to determine whether the entity actually existed"; nor would the Audit Committee have uncovered them in "reviewing and approving all proposed related party transactions." (*Id.* ¶¶ 81, 174, 176–77; *see supra* n.5.) Instead of relying on corporate governance safeguards or standard auditing procedures, the Company, with the concurrence of the Audit Committee, initiated an investigation by external lawyers and forensic accountants to identify potential issues in the Credit Card Business—a decision that, as shown by subsequent events, was proven right and prudent. (Ex. I at 1.) "Ordering an investigation . . . was

---

[9]    Plaintiff also suggests scienter can be inferred because the Credit Card Business became an increasingly important aspect of Jianpu's business. (AC ¶ 63 ("investors began to attach more importance"); *id.* ¶ 65 ("growing Credit Card Segment"); *id.* ¶¶ 77–81.) However, the "naked assertion" that a product "was of such core importance to the Corporate Defendants that their senior officers must have known that the challenged statements were false" is "plainly insufficient to raise a strong inference of collective corporate scienter." *Jackson*, 960 F.3d at 99.

a prudent course of action that weakens rather than strengthens an inference of scienter." *Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010).[10]

### 3.    Plaintiff Fails to Plead Scienter for the Databook Claim

Plaintiff also fails to plead a strong inference of scienter for his Databook claim. As shown above, Plaintiff does not allege what the Company knew about the investigation against Hangzhou Scorpion and when (*supra* § I.C), let alone point to any contemporaneous documents or information that contradicted the Company's public disclosures. *Kalnit*, 264 F.3d at 142; *see also Schaffer*, 2018 WL 481883, at *13 (existence of a "government investigation[] cannot bolster allegations of scienter that do not exist"). In any event, absent "a clear duty to disclose" the investigation, a strong inference of scienter cannot be inferred. *Kalnit*, 264 F.3d at 143–44; (*see supra* § I.C.) Moreover, although Plaintiff claims that Jianpu should have accounted for the penalties and disgorgement against Hangzhou Scorpion in its Q3 2019 earnings release in December 2019 (AC ¶ 100), he concedes that they were not levied against Hangzhou Scorpion until ***over a year later*** in January 2021 after judgment was entered. (*Id.* ¶ 93.)

Nor is Plaintiff's theory "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. As with all of his claims, the Complaint demonstrates that Defendants promptly disclosed the potential or actual adverse outcomes, even before any duty to disclose was triggered. (AC ¶¶ 85–86, 91, 96.) Management's "candid and prompt . . . respon[se] to the reversal of revenues negates rather than supports any inference of scienter." *In re Segue Software, Inc. Sec. Litig.*, 106 F. Supp. 2d 161, 170 (D. Mass. 2000).

---

[10]    Although Plaintiff notes that the lack of "earnings calls" after Jianpu's Q4 2019 earnings were released in March 2020 meant "investors had no opportunity to question management," the Complaint makes clear that the reason for this "cessation" was the ongoing internal investigation that was first disclosed in June 2020. (AC ¶¶ 67, 179.)

## III.   PLAINTIFF FAILS TO PLEAD LOSS CAUSATION

Finally, Plaintiff also fails to plead loss causation—"the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).  To establish loss causation, Plaintiff must plead "both that the loss be foreseeable and that the loss be caused by the materialization of the concealed risk." *Id.* at 173.

Plaintiff fails to allege that he suffered any loss attributable to the materialization of the alleged risks.  To start, Plaintiff did not even purchase any ADSs until October 21, 2020 (ECF No. 17-3), *after* the purported disclosure of the Loan Business fraud in March 2019 (AC ¶¶ 39–55), the impairment relating to Databook disclosed in December 2019 (*id.* ¶¶ 86–87), and the announcement of the internal investigation into related-party transactions within the Credit Card Business in June 2020 (*id.* ¶ 67).  Hence, Plaintiff's loss cannot be traced to the revelation of these events (*id.* ¶ 67).[11]  Similarly, because Plaintiff sold all of his shares on February 16, 2021, *before* the full scope of the Databook investigation and impact on revenues was disclosed on April 30, 2021, he cannot "even 'conceivably' . . . prove loss causation" with respect to his Databook claim.[12]  *Schuler v. NIVS Intellimedia Tech. Grp., Inc.*, No. 11 Civ. 2484 (KMW) (FM), 2013 WL 944777, at *10 (S.D.N.Y. Mar. 12, 2013); *see Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) ("[A]s a matter of pure logic . . . if, say, the purchaser sells the shares . . . before the relevant truth begins to leak out, the misrepresentation will not have led to any loss.").

---

[11]  In any event, "[t]he announcement of an SEC subpoena or an internal investigation is itself insufficient to plead loss causation." *Janbay*, 2012 WL 1080306, at *15.

[12]  To the extent Plaintiff relies on Jianpu's 2019 Annual Report issued on April 30, 2021 as a corrective disclosure (AC ¶¶ 75–77, 93–98), his theory of loss causation fails for the additional reason that it occurred "*after* the close of the proposed class period" on February 16, 2021 and therefore "cannot be a corrective disclosure sufficient to establish loss causation." *Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp., PLC*, No. 11 Civ. 398 (GBD), 2013 WL 4405538, at *10 (S.D.N.Y. Aug. 5, 2013), *aff'd*, 783 F.3d 383 (2d Cir. 2015); (*see also* AC ¶ 1.)

In addition, although Plaintiff claims several earnings statements constitute corrective disclosures (AC ¶¶ 53–55, 86–87), the Complaint fails to disaggregate the purportedly relevant disclosures from the multitude of unrelated negative earnings factors including "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." *Dura*, 544 U.S. at 343. Similarly, Plaintiff ignores the "general downward trend" of Jianpu's stock from its November 16, 2017 IPO onward. *Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 503–04 (S.D.N.Y. 2013) (no loss causation where "company's stock price . . . fell consistently throughout the class period" and the "market had long absorbed the economic difficulties faced by the company"); (Ex. J, Jianpu Stock Price Chart, at 1; Ex. D at 10 ("rapidly evolving . . . regulatory framework . . . is also still evolving and will remain uncertain").)

Finally, the "materialization of a known risk, rather than the disclosure of a concealed one, is not a plausible theory of loss causation." *In re New Energy Sys. Sec. Litig.*, 66 F. Supp. 3d 401, 406 n.33 (S.D.N.Y. 2014). As shown above (*supra* § I), with respect to all three of Plaintiff's claims, Jianpu did not conceal any risks, but warned of the precise risks that later materialized. *Magnum Hunter*, 26 F. Supp. 3d at 300 (plaintiff failed to plead loss causation where defendant warned of precise risks, and later materialization of those risks "disclosed nothing new").[13]

## CONCLUSION

For the foregoing separate and independent reasons, the Complaint should be dismissed in its entirety with prejudice.

---

[13] Because Plaintiff fails to plead a primary violation under Section 10(b), his control person liability claims under Section 20(a) must fail as well. *See Schaffer*, 2018 WL 481883, at *15.

Dated: New York, New York
  September 3, 2021

Respectfully submitted,


/s/ Robert A. Fumerton
Scott D. Musoff
Robert A. Fumerton
Vincent M. Chiappini
Argirios J. Nickas
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Phone: (212) 735-3000
Fax:     (212) 735-2000
scott.musoff@skadden.com
robert.fumerton@skadden.com
vinnie.chiappini@skadden.com
argirios.nickas@skadden.com

*Attorneys for Defendant Jianpu Technology Inc.*