# EXHIBIT K

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Enrique Africa, Individually and On Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br>  v.<br><br>JIANPU TECHNOLOGY INC., DAVID YE, and YILÜ (OSCAR) CHEN,<br><br>       Defendants. | Case No. 1:21-cv-01419-JMF<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

**TABLE OF CONTENTS**

I.    NATURE OF THE ACTION AND OVERVIEW ............................................................. 1

II.   JURISDICTION AND VENUE ...................................................................................... 4

III.  PARTIES ......................................................................................................................... 4

IV.  SUBSTANTIVE ALLEGATIONS ................................................................................. 6

     A.    Background and the Company's Business............................................................ 6

     B.    Jianpu Touts Its Purported Compliance With Industry Best Practices And Boasts Of A Purported Association With Its Regulator: It Does So While Marketing Financial Products In Contravention To Chinese Law ........................................ 8

     C.    The Truth About the Company's Loan Segment Is Revealed ............................... 9

     D.    The Fraudulent Scheme To Inflate Revenue In The Company's Credit Card Segment......................................................................................................... 15

     E.    The Truth Related to the Company's Credit Card Segment Fraud Begins to Emerge ........................................................................................................... 16

     F.    During The Same Quarter That Loan Segment Revenue Peaked, Inflated Revenue In The Credit Card Segment Began To Accelerate Rapidly — Suggesting Purposeful Manipulation.............................................................................. 21

     G.    The Databook Fraud ....................................................................................... 22

     H.    The Databook Fraud Is Revealed.................................................................... 24

V.   MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD............................................................................................................ 28

     A.    Statements related to the First Quarter 2018.................................................... 28

     B.    Statements related to the Second Quarter 2018 ............................................... 31

     C.    Statements related to the Third Quarter 2018 .................................................. 35

     D.    Statements related to the Fourth Quarter 2018 ................................................ 37

     E.    Statements related to the First Quarter 2019.................................................... 43

     F.    Statements related to the Second Quarter 2019 ............................................... 45

     G.    Statements related to the Third Quarter 2019 .................................................. 48

H. Statements related to the Fourth Quarter and Full Year 2019 ............................ 51

VI. CLASS ACTION ALLEGATIONS .................................................................................. 53

VII. UNDISCLOSED ADVERSE FACTS .............................................................................. 55

VIII. LOSS CAUSATION ......................................................................................................... 56

IX. ADDITIONAL SCIENTER ALLEGATIONS ................................................................ 57

X. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) .................................................................................................... 58

XI. NO SAFE HARBOR ........................................................................................................ 60

XII. FIRST CLAIM ................................................................................................................. 61

XIII. SECOND CLAIM ............................................................................................................ 64

XIV. PRAYER FOR RELIEF .................................................................................................. 65

JURY TRIAL DEMANDED .................................................................................................... 65

ii

Lead Plaintiff Enrique Africa ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following based upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by Jianpu Technology Inc. ("Jianpu" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued and disseminated by Jianpu; (c) interviews of persons with knowledge of the Company; and (d) review of other publicly available information concerning Jianpu.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired Jianpu American Depositary Shares ("ADSs" or "shares") between May 29, 2018 and February 16, 2021, inclusive (the "Class Period"). Plaintiff pursues claims against Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Jianpu purports to be the leading independent open platform for discovery and recommendation of financial products in China. The Company touts its proprietary technology that provides search results and recommendations tailored to each user's financial needs and credit profile.

3. The fraud here involves a scheme to overstate revenue through various improper and unlawful means, including undisclosed related party transactions that lacked business substance and eventually resulted in the restatement of years of financial statements. It also involves false statements about the Company's compliance with applicable regulations as well as the source of Jianpu's revenue generation within various line items on the Company's income statement.

1

4.     On March 15, 2019, Chinese state media reported various unlawful activities in which the Company was engaged related to its lending recommendation business. Two days later, the Company admitted to the conduct and issued an apology.

5.     Following this news, Jianpu's stock fell $6.48 per share,[1] or 12.86% (using post-reverse split prices) on heavy volume on March 15, 2019. The Company's stock price continued its decline by $1.60 or 3.64% on the following trading day, March 18, 2019.

6.     As a result of the unlawful conduct exposed by Chinese media on March 15, 2019, the Company later revealed on May 28, 2019 that its mobile app would remain suspended from certain major app stores through June. The Company further revealed this "downward trend" of the loan recommendation business would impact new user acquisition momentum.

7.     Following all this news, Jianpu's stock fell $2.64 per share, or 6.95% on heavy volume on May 28, 2019.

8.     On June 15, 2020, the Company filed a Notification of Late Filing on Form 12b-25 with the SEC, in which it stated that it could not timely file its Form 20-F for the fiscal year ended December 31, 2019 (the "2019 20-F"). In the notification, it further stated that the Company was "in the process of conducting an internal review of certain matters relating to transactions between the Company and third-party business entities" and that the Audit Committee "is working closely with its advisors to complete the review in a timely manner."

9.     On this news, the Company's share price fell $0.67, or 9.5%, to close at $6.39 per share on June 15, 2020, on unusually heavy trading volume.

10.     On February 16, 2021, Jianpu announced the results of its review into "transactions carried out by the Credit Card Recommendation Business Unit" with third-party

---

[1] All prices herein reflect the change to the ADS ratio effective on or about October 30, 2020, which had the same effect as a one-for-eight reverse ADS split.

business entities. The Company concluded that previously reported revenue and associated expenses had been inflated due to "certain transactions [that] involved third-party agents (including both upstream agents and downstream suppliers) with undisclosed relationships and some transactions [that] lacked business substance." Jianpu stated that it "anticipates the total amount of overstated revenue for the fiscal years 2018 and 2019 to be approximately, RMB 90 million and RMB 164 million, respectively, representing approximately 4.5% and 10.1% of the total revenue previously reported."

11. On this news, the Company's share price fell $0.60, or 13%, to close at $3.94 per share on February 16, 2021, on unusually heavy trading volume.

12. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that certain of the Company's transactions carried out by the Credit Card Recommendation Business Unit involved undisclosed relationships or lacked business substance; (2) that, as a result, Jianpu's revenue and costs and expenses for fiscal 2018 and 2019 were overstated; (3) that there were material weaknesses in Jianpu's internal controls over financial reporting; (4) that the Company's fiscal 2018 Form 20-F was reasonably likely to be restated; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

13. Defendants also made materially false and/or misleading statements, as well as failed to disclose material adverse facts about, the Company's lending recommendation practices and that an undisclosed criminal investigation into the Company's data collection practices began in September 2019, but was not disclosed until April 30, 2021.

3

14. As a result of Defendants' scheme and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

15. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

18. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

19. Plaintiff, as set forth in his previously filed certification (Dkt. No. 17-2), incorporated by reference herein, purchased Jianpu shares during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

20.     Defendant Jianpu is incorporated under the laws of the Cayman Islands with its principal executive offices located in Beijing, China. Jianpu's ADSs trade on the New York Stock Exchange ("NYSE") under the symbol "JT."

21.     Defendant David Ye ("Ye") was a Co-Founder of the Company, and was the Company's Chief Executive Officer ("CEO") and Board Chair at all relevant times. Ye has 20 years of experience in operations and management of internet business and consumer financial institutions in China and the United States. Ye started his career as a risk data analyst at Capital One Financial Corporation's risk strategy and analysis team in 1998, and later worked as a credit risk manager at Global Credit Assurance & Consulting team, where he managed statisticians and data analysts at the acquisition marketing team of Capital One's Under Served Markets group from 2000 to 2004. Ye holds a bachelor's degree in engineering from Hunan University in China and a master's degree in finance from George Washington University.

22.     Defendant Yilü (Oscar) Chen ("Chen") was the Company's Chief Financial Officer ("CFO") at all relevant times. Chen began his career within the auditing department of KPMG, where he worked for three years. Chen joined the Company's Board of Directors on or around May 28, 2019.

23.     Defendants Ye and Chen (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material

non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that Defendants made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background and the Company's Business

24.    Jianpu purports to be the leading independent open platform for discovery and recommendation of financial products in China. In short, the Company purports to be an online matchmaker between customers looking for various financial products (*e.g.*, a loan or a credit card) and the providers of those products (like banks, credit card issuers, and peer-to-peer investors). The Company touts its proprietary technology that provides search results and recommendations tailored to each user's financial needs and credit profile.

25.    Jianpu's most well-known brand is its online platform "Rong360" in China. Rong360 functions as a marketplace, connecting users with financial service providers by: (i) allowing users to access information on loan, credit card, and wealth management products; (ii) recommending loans and credit cards to individual users; and (iii) helping financial service providers target users with specific financial needs or credit profiles.

26.    The Company's revenues are primarily generated from fees charged to financial service providers via the Rong360 platform for recommendation services. Jianpu charges financial service providers on a "cost-per-action" basis for loan products (based upon the completion of a loan application) and on a "cost-per-success" basis for credit card products (based upon the issuance of a credit card).

27.    One type of financial service provider found on Rong360 is a peer-to-peer ("P2P") lender, which is a common and prevalent feature of the consumer finance market in

China. P2P lending, or online lending, is generally considered to be a method of debt financing that directly connects borrowers, whether they are individuals or companies, with lenders – like if someone wanted to loan money to their neighbor. The benefit of P2P lending is that there is no middleperson. So if someone wanted to loan his or her neighbor money and charge 7%, they could do so via a P2P platform, instead of depositing that money into a bank and earning 2%, while the bank charges the neighbor 9% and keeps the 7% spread for itself.

28.    According to the China Banking Regulatory Commission, in late 2017, P2P platforms were asked to register with local authorities by June 2018. The China Banking Regulatory Commission has now merged with China's insurance regulator to become the China Banking and Insurance Regulatory Commission.

29.    Other types of financial institutions found on Rong360 include traditional banks and credit card issuers.

30.    Jianpu reports revenue from its various businesses in three different reporting line items on its income statement: (1) revenue from recommendation services for loans (hereinafter "the Loan Segment"); (2) revenue from recommendation services for credit card services (hereinafter "the Credit Card Segment"); and (3) revenue from advertising, marketing, and other services (hereinafter "the Advertising Segment"). The Advertising Segment includes revenue recognized from the Company's variable interest entity ("VIE") stake in Databook Tech. Ltd. ("Databook") and entities affiliated with and/or owned by Databook, including Databook subsidiaries Hangzhou Scorpion Technology Co., Ltd., Hangzhou Magnet Technology Co., Ltd., and Databook (HK) Limited (collectively "Databook"). The Company acquired Databook in June 2018 for RMB 204.5 million.

7

31. After Databook was acquired in June 2018, Jianpu recorded RMB 121.3 million of intangible assets and RMB 147.3 million of goodwill on its balance sheet as of the period ending June 30, 2018, for a total asset increase of RMB 268.6 million for an asset that was acquired for RMB 204.5 million. The Company carried these balances on its balance sheet from the time of the Databook transaction through the end of the Class Period.

32. Databook purports to be engaged in "in optimizing data-driven risk management decisions" by offering "a suite of products and services helping financial service providers to enhance their risk management capabilities."

33. What Databook really did—until it was shut down due in part to criminal convictions—was unlawfully collect various forms of personal information from its users.

**B.      Jianpu Touts Its Purported Compliance With Industry Best Practices And Boasts Of A Purported Association With Its Regulator: It Does So While Marketing Financial Products In Contravention To Chinese Law**

34. Throughout the Class Period, Defendants boasted of the Company's compliance with applicable Chinese regulatory rules. For instance, on the Q1 2018 earnings call, Ye noted that the Company "beefed up our quality control process, conducting a new round of internal review on December and removed the noncompliant financial products from our platform." Ye also noted that loan volume on the Rong360 platform had slowed during Q1 2018 in part due to the Company's "adjustments to ensure regulatory compliance."

35. And not only did Defendants tout compliance, they also described the regulatory environment as a positive factor. For example, in the Q1 2018 earnings call on May 29, 2018, during the question-and-answer portion of the call, Ye further stated that "[a]nd we actually see the positive side of the regulation, some of the banks and nonbank finance companies, they're actually able to take the opportunities to grow, they are a retail business or like credit cards and

summary loan business. So on the regulatory side, we see the worst is behind and we will see the growth for the rest of this year."

36.     On the next quarter's earnings call, which took place on August 27, 2018, Chen represented that the Company had a ***"very stringent and strict onboarding process"*** and that "we only work with the top P2P guys, focusing on provide individual consumer loans to the consumer, ***not the noncompliant P2P platforms***."[2]

37.     Then, on the third quarter 2018 earnings call, which took place on November 19, 2018, in response to an analyst's question about what was contributing to the expected rebound in loan activities underpinning management's fourth quarter guidance—Chen once again stated that "for this fourth quarter, not only the seasonality, we're also seeing the easing of the tightening policy and also more stabilized regulatory outlook will also contribute to our fourth quarter loan volume, credit card volume, and as a result, the revenue."

38.     As the Company touted its purported efforts to ensure regulatory compliance, it also reported strong revenue growth within both the Credit Card and Loan Segments. For instance, during an earnings call discussing fourth quarter 2018 and full year results on February 25, 2019, Chen boasted of the Company's loan application volume and fee-per-loan application increases  -- the combination of which purportedly drove a 14% year-over-year increase in revenue within the Company's Loan Segment during 2018.

**C.     The Truth About the Company's Loan Segment Is Revealed**

39.     On March 15, 2019, Rong360 was featured on "CCTV 315 Night", a program produced by the Chinese state broadcaster China Central Television. CCTV 315 Night is a two-hour show that airs annually on March 15 (hence the "315" in 315 Night). March 15 also

---

[2] Unless otherwise noted, all emphasis is added.

happens to be China's Consumer Right's Day, which is why the state-run broadcast exposes improper and/or illegal business practices that target Chinese consumers.

40.     During the 2019 airing of CCTV 315 Night, broadcasters detailed examples of when Rong360 required a customer to make a purchase before a loan would be released from Rong360's system. CCTV cited a Rong360 staff member who said that the reason for the required purchase is that Rong360 receives a higher commission after the customer makes such a purchase. But for the consumers who make such purchases, they operate as hidden interest rates "in disguised form" according to one of the Rong360 victims quoted.

41.     CCTV 315 Night also told the story of a Mr. Wang who had been victimized by a predatory loan he found through Rong360. Due to the interest-upon-interest from the loan, Mr. Wang incurred debt in excess of RMB 100,000. To collect from Mr. Wang, debt collectors contacted his children's teacher, and Mr. Wang's son came home and asked his father if he owed money to others because his teacher had asked him about it at school.

42.     The March 15, 2019 CCTV 315 Night airing exposed illegal online loans promoted by Rong360. These particular loans were referred to as "714 Missile" because they were typically due in seven or 14 days (*i.e.*, the "714") and the reference to "missile" denoted the loans' "sky high" interest rates.

43.     The 2019 CCTV 315 Night disclosed that borrowers on Rong360's platform were not informed of the loan's hidden fees and interest rates that at times pushed the annual percentage rate *to over 1000%,* well above China's statutory maximum interest rate of 36% for consumer loans.[3]

---

[3] China's statutory interest rate cap had been 36% between 2015 and August 20, 2020, when China's Supreme People's Court lowered the ceiling to four times that of China's benchmark

44.     CCTV 315 Night gave another example of a woman who borrowed RMB 7,000 from an online lending platform that promised a low monthly interest rate of 0.6%. But when she failed to repay the loan, she was informed that the overdue interest was at least 5% per day. The woman also claimed that she received death threats from debt-collection agencies. She ended up borrowing from other similar platforms and owing as much as RMB 500,000 in just three months.

45.     Other victims discussed on CCTV 315 Night included a Mr. Zhong, who was so distraught over the unexpected interest and fees that he was reported to have committed suicide by poisoning himself. It was also reported that Mr. Zhong's descendants still receive constant messages asking when the loan is going to be repaid.

46.     Another victim, a 27-year-old woman named Ms. Fan, reportedly drowned herself in a river because the platform she found her 714 Missile loan was sending nude pictures of her to a mass audience to try to compel payment.

47.     CCTV 315 Night also reported that the 714 Missile businesses "know about their illegal practices."

48.     Following the CCTV 315 Night—which aired on Friday evening China time but was known during the trading day in New York on March 15, 2019—Jianpu's stock fell $6.48 per share, or 12.86% (using post-reverse split prices) on heavy volume on March 15, 2019.[4]

49.     On Sunday March 17, 2019, the Company issued a press release and took responsibility for its conduct that was reported by CCTV, including by voluntarily suspending any further downloads of its mobile apps.

---

loan prime rate. At the time of the August 20, 2020 ruling, the one-year private loan ceiling was 15.4%.

[4] Because China is 12 hours ahead of East Coast time, the March 15 2019 CCTV 315 Night was viewed before trading opened in New York on March 15, 2019 Eastern Standard Time.

11

50. The March 17, 2019 press release stated that:

> Although the Company implements stringent standards to screen financial services providers before listing their products on its platform, *we cannot rule out the possibility that the quality of the financial products and the services provided by financial services providers are not in full compliance with applicable laws and regulations at all times*.
>
> In response to the CCTV Report, Jianpu has promptly organized internal resources to thoroughly review its business practice, *including the voluntarily suspension of further downloads of its mobile apps* on major mobile app stores in order to identify any inappropriate conduct that could adversely affect consumer rights, and to take remediation measures with respect to any inappropriate activity that may be found on the Company's platform.
>
> The Company hopes to be open and transparent of its findings and remediation measures. Going forward, the Company is committed to continuing to remain as an independent open platform and providing reliable services to users and financial service providers impartially.

51. Following this news, Jianpu's stock continued its decline by $1.60 or 3.64% on the following trading day, which was March 18, 2019.

52. As consumer awareness grew from the resulting publicity associated with CCTV 315 Night, revenue from the Company's Loan Segment peaked and would later implode.

53. For instance, when the Company reported its first quarter 2019 results on May 28, 2019, which were the first financial results following the CCTV report, the Company revealed that the mobile app remained suspended through early May, and that a full launch would not be possible until June 2019. As a result, the Company guided second quarter revenue to RMB 360 – RMB 380 million, which was 42-45% lower than the RMB 654.9 million[5] that the Company reported in the first quarter 2019.

---

[5] As then reported. The restated Q1 2019 revenue figure was RMB 618.3 million.

12

54. The Company also announced that Board of Directors Member Fan Yuanyuan was stepping down and would be replaced by CFO Chen.

55. Following all this news, Jianpu's stock fell $2.64 per share, or 6.95% on heavy volume on May 28, 2019.

56. Given the foreseeable challenge that the Company would have in restoring revenue to the Loan Segment, and with Defendant Chen now part of the Board of Directors, Defendants focused their attention on expanding their existing fraudulent scheme to boost revenue within the Company's Credit Card Segment,[6] which accelerated each quarter following the first quarter of 2019. Indeed, on the May 28, 2019 earnings call, Ye noted that first quarter revenue in the Credit Card segment grew about 17% year-over-year, and that the Company expected that the Credit Card segment growth would be higher during the second half of the year and that "as a team, we know – *we don't have any concern about the credit card business growth for the rest of this year*."

57. Following the first quarter of 2019, the combination of the exposure from the CCTV 315 Night exposé along with the Company's subsequent admission of the conduct discussed therein, contributed to a swift and sharp blow to the Company's Loan Segment revenue. As shown below, Q1 2019 -- the quarter during which the Company's unlawful loan practices were revealed -- represented the high-water mark for Jianpu's Loan Segment revenue.

---

[6] To be clear, Defendants' scheme to engage in related party transactions designed to inflate its Credit Card revenue began during the first quarter 2018, though the magnitude accelerated following the CCTV 315 Night revelations about the Company's Loan Segment.

**Figure 1**



58.     This sudden implosion within the Company's Loan Segment created an urgent need, and thus a strong motive, for Defendants to boost revenue within the Company's Credit Card Segment.

59.     Indeed, on the Company's May 28, 2019 earnings call discussing Q1 2019 results,[7] Chen observed that even though the Loan Segment would see "some downward trend," he still assured investors that "we are seeing continued growth of our credit card business and also the – our marketing and advertising services and other services [*i.e.*, Databook]." Chen continued "These 2 lines, we -- I think both year-over-year and quarter-over-quarter we should be able to contribute -- we should able to drive the growth."

60.     And on the same earnings call, Ye also assured investors about the Company's "stricter platform policies for financial service providers" and he separately discussed the Company's purported aim to "lead the initiative of introducing and promoting higher industry standards and best practices."

---

[7] Which was the next earnings call following the CCTV 315 Night report.

14

61.     Ye also gave the false impression that Jianpu sought to become a compliant industry participant, including by touting a misleading association between Jianpu and its financial regulators:

> As a follow-up to the airing of CCTV 315, we completed our internal review of systems, products and processes. Our mobile app were made available, again, in early May on some application stores and we expect a full launch in June. In the meantime, we continue to drive certain self-imposed improvements to our internal processes such **as adopting more stringent turnaround boarding process, while adhering to a stricter platform policies for financial service providers**. We have engaged a global consulting firm to assist us in the review of our business process, [conduct] industry studies and recommend best practices.
>
> *   *   *
>
> And at the same time, our regulatory technology, or reg tech team also ***won a few important mandates*** to help local Chinese financial regulators establishing assistance to monitor financial products and service online. ***Being recognized*** on our platform model and market position ***by the regulators***, we will continue to contribute and **lead the initiative of introducing and promoting higher industry standards and best practices**.

62.     As the truth would later show, at the same time that the Company assured investors it was promoting higher standards and adopting stricter policies on its platform, it was simultaneously inflating its revenue through nondisclosed related party transactions in its Credit Card Segment – and this scheme actually accelerated beginning in the first quarter of 2019.

**D.     The Fraudulent Scheme To Inflate Revenue In The Company's Credit Card Segment**

63.     Around the same time that the Company's Loan Segment revenue began to peak, investors began to attach more importance to Jianpu's Credit Card segment. For instance, roughly two weeks before the CCTV 315 Night report, analysts at J.P. Morgan upgraded their view of Jianpu's shares from Neutral to Overweight in a March 1, 2019 report ("the J.P. Morgan

Upgrade"). Part of the reason for the J.P. Morgan Upgrade was because J.P. Morgan's analysts saw Jianpu's revenue mix shifting to "more defensive credit card recommendation business."

64. Perhaps sensing the importance that investors would attach to the Company's Credit Card Segment revenue, Defendants expanded their ongoing scheme to increase revenue in the Company's Credit Card Segment by entering into sham transactions with related parties.

65. And as Defendants increased the fictitious revenue booked through the nondisclosed scheme, the Company repeatedly focused investors' attention on its growing Credit Card Segment revenue.

66. For instance, on August 26, 2019, when the Company discussed quarterly results for the second quarter 2019, the Company held an earnings call wherein Ye again spotlighted the credit card segment, noting "We saw strong credit card revenue growth of 25% year-over year *outpacing peers, even though the credit card market was relatively slower first half of this year compared to the second half of 2018*." Ye further noted that "This growth reaffirms our capabilities to capture the evolving dynamics of the market."

### E. The Truth Related to the Company's Credit Card Segment Fraud Begins to Emerge

67. On June 15, 2020, the Company filed a Notification of Late Filing on Form 12b-25 with the SEC, in which it stated that it could not timely file its Form 20-F for the fiscal year ended December 31, 2019. In the notification, Jianpu further stated that:

> Jianpu Technology Inc. (the "Company") will not be able to file its Annual Report on Form 20-F for the fiscal year ended December 31, 2019 (the "Form 20-F") by June 15, 2020, as extended from the original due date of April 30, 2020 pursuant to an order issued by the U.S. Securities and Exchange Commission under Section 36 of the Securities Exchange Act of 1934 on March 4, 2020, as amended on March 25, 2020. The independent Audit Committee of the Company's Board of Directors, with the assistance of advisors, *is in the process of conducting an internal review of certain matters relating to transactions between the Company and third-party business entities*. The Audit Committee is working closely with its advisors to complete the review in a timely manner. The Company will not be

16

in a position to file its Form 20-F until the Audit Committee completes its review and the Company assesses the results of the review.

68. The above notification was a partial corrective disclosure of the related party transactions that overstated the Company's revenue.

69. On this news, the Company's share price fell $0.67, or 9.5%, to close at $6.39 per share on June 15, 2020, on unusually heavy trading volume.

70. On July 2, 2020, Jianpu announced that it had received a notice from NYSE Regulation that the Company was not in compliance with listing requirements due to the failure to timely file its 2019 20-F.

71. On January 5, 2021, Jianpu announced that the NYSE Regulation agreed "to provide the Company with an additional trading period through July 1, 2021, subject to reassessment on an ongoing basis, to complete and file the Company's Annual Report on Form 20-F for the year ended December 31, 2019."

72. On February 16, 2021, Jianpu announced the results of its review into "transactions carried out by the Credit Card Recommendation Business Unit" with third-party business entities. The Company concluded that previously reported revenue and associated expenses had been inflated due to "certain transactions [that] involved third-party agents (including both upstream agents and downstream suppliers) with undisclosed relationships and some transactions [that] lacked business substance." Specifically, in a press release stating that the review was "substantially complete," the Company stated, in relevant part:

### Summary of Findings

The following is a summary of the principal findings of the Review as of the date hereof. Unless otherwise indicated, the Review findings generally cover the fiscal years 2017 through 2019.

The Review found that certain transactions involved third-party agents (including both upstream agents and downstream suppliers) with undisclosed relationships,

17

and some transactions lacked business substance ("questionable transactions"). As a result, certain revenue and associated expenses were inflated or inaccurately recorded in the financial statements. *Evidence suggested that certain employees from the Credit Card BU may have known about or been involved in certain of the questionable transactions that resulted in inflated sales commissions to such employees. In relation to the questionable transactions, the Review found that certain employees improperly altered supporting documents that were provided to the Company's external auditor.*

Other than a business unit head-level employee who has since been terminated, the Review did not find any evidence that other members of senior management who supervised the Credit Card BU knew about or participated in any of the questionable transactions.

73. In the same press release, Jianpu stated that it would restate its financial statements for fiscal 2018 and that "investors must exercise caution" with respect to the previously reported fiscal 2019 financial information. Jianpu stated that it "anticipates the total amount of overstated revenue for the fiscal years 2018 and 2019 to be approximately, RMB 90 million and RMB 164 million, respectively, representing approximately 4.5% and 10.1% of the total revenue previously reported." Specifically, the Company stated:

*Follow-up Financial Impact Assessment*

The Company is assessing the overall financial impact of the questionable transactions on its financial statements, including the adjustment of the revenue recognized for the fiscal years 2018 and 2019 to net-based recognition and the reversal of certain revenue and the related costs and expenses. *The Company anticipates the total amount of overstated revenue for the fiscal years 2018 and 2019 to be approximately, RMB 90 million and RMB 164 million, respectively, representing approximately 4.5% and 10.1% of the total revenue previously reported by the Company for such years,* and the adjustment to overstated cost and expenses together with the reserve for potential credit loss to be approximately RMB 90 million and RMB 130 million for the fiscal years of 2018 and 2019, respectively, resulting in a minimal net profit impact for the fiscal year 2018 and RMB 34 million of net loss impact for the fiscal year 2019.

*The Company's consolidated financial statements for fiscal year 2018 will be restated accordingly; the previously issued audited financial statements for the fiscal year 2018 and the auditor's report can no longer be relied upon.* Moreover, investors must exercise caution when using the Company's previously announced unaudited financial information for the fiscal year 2019.

18

74. On this news, the Company's share price fell $0.60, or 13%, to close at $3.94 per share on February 16, 2021, on unusually heavy trading volume.

75. On April 30, 2021, the Company issued its Form 20-F for the year ended December 31, 2019. In it, the Company disclosed the following:

i. **The Company's September 30, 2019, impairment of various assets stemmed from a previously undisclosed government investigation into its Databook VIE:**

> In September 2019, the business of Databook was suspended and an investigation was conducted against Databook and certain of its employees by competent authorities in relation to the compliance of information collection or use. The Group therefore recorded a full impairment for goodwill, intangible assets, and an impairment for other assets attributable to the Databook, totaling RMB 254.7 million as of December 31, 2019.

ii. **The Company identified material weaknesses in internal control over three areas:**

> [O]ur management concluded that, as of December 31, 2019, we did not maintain effective internal control over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. GAAP.
>
> In the course of auditing our consolidated financial statements for the year ended December 31, 2019, we and our independent registered public accounting firm identified three material weaknesses in our internal control over financial reporting as of December 31, 2019. . .
>
> *One material weakness identified relates to our failure to design and implement effective controls with a sufficient level of precision to prevent and detect misstatements related to our credit card related business.* Specifically, the material weakness is a combination of control deficiencies, including: (i) lack of continuous and effective risk assessment and monitoring procedures on changes in the credit card related business, especially the increased proportion contributed by third-party

agents (including both upstream agents and downstream suppliers); (ii) inadequate review over engaging of third-party agents, and lack of effective acceptance procedures such as background information inspection to identify relationships between upstream agents and downstream suppliers and assessment of the qualification of these upstream agents and downstream suppliers; (iii) failure to properly preserve certain original transaction data and effectively perform reconciliation with financial information; (iv) lack of sufficient segregation of duties at certain control activities level; and (v) lack of effective review and analysis of business information to assess the impact on financial reporting. ***This material weakness has resulted in overstated revenue, cost and expenses in our financial statements***.

\* \* \*

A second material weakness identified relates to our failure to design and implement controls that have a sufficient level of precision related to pre-approval of and complete and accurate disclosures of related party transactions, ***which has resulted in inaccurate disclosures of certain related party transactions in 2018*** and could have a material effect on our financial statements.

\* \* \*

A third material weakness identified relates to the lack of sufficient competent financial reporting and accounting personnel with appropriate understanding of U.S. GAAP to design and implement formal period-end financial reporting policies and procedures, to address complex U.S. GAAP technical accounting issues, and to prepare and review our consolidated financial statements and related disclosures in accordance with U.S. GAAP and financial reporting requirements set forth by the SEC.

76. On the same day that the Company issued its 2019 20-F, it also issued a Form 6-K that disclosed additional details about the restatement, including quarterly data summarized immediately below.

20

| | 2018 | Q1 2019 | Q2 2019 | Q3 2019 | Q4 2019 | 2019 |
|---|---|---|---|---|---|---|
| | | *(In RMB 000s)* | | | | |
| Loan Segment revenue (previously reported) | 1,015,407 | 432,550 | 103,418 | 90,324 | 40,015 | 666,307 |
| As restated | 1,105,407 | 432,550 | 103,418 | 90,324 | 40,015 | 666,307 |
| Credit Card Segment revenue (previously reported) | 750,941 | 149,305 | 196,524 | 195,583 | 208,261 | 749,673 |
| As restated | 689,822 | 125,939 | 162,741 | 151,929 | 145,384 | 585,993 |
| Advertising Segment revenue (previously reported) | 245,494 | 73,004 | 62,341 | 37,595 | 41,389 | 214,329 |
| As restated | 216,647 | 59,794 | 45,551 | 37,595 | 40,487 | 183,427 |
| Total revenue (previously reported) | 2,011,842 | 654,859 | 362,283 | 323,502 | 289,665 | 1,630,309 |
| As restated | 1,921,876 | 618,283 | 311,710 | 279,848 | 225,886 | 1,435,727 |
| **Change in total revenue from previously reported** | **(89,966)** | **(36,576)** | **(50,573)** | **(43,654)** | **(63,779)** | **(194,582)** |

**F.      During The Same Quarter That Loan Segment Revenue Peaked, Inflated Revenue In The Credit Card Segment Began To Accelerate Rapidly — Suggesting Purposeful Manipulation**

77.      The Company's restated financials released on April 30, 2021, revealed that Defendants overstated the Company's revenue in the Company's Credit Card segment through related party transactions with increasing intensity each quarter beginning in the first quarter of 2019—when the Company's Loan Segment revenue dropped precipitously in response to the CCTV 315 Night expose as shown by Figure 2 below.

**Figure 2**



78. To be clear, the red line above is not *total* revenue from the credit card statement, which could increase or decrease based on underlying business fundamentals. Rather, the red line above represents the amount by which the Company later admitted to have **overstated** its revenue in its Credit Card Segment.

79. The above charts show that the farther Loan Segment revenue fell, the more that Credit Card Segment revenue grew through undisclosed sham related party transactions designed to boost revenue.

80. In fact, the Company would not have met its guidance targets for the periods ending June 30, 2019; September 30, 2019; or December 31, 2019 absent the inflated revenue that it recorded after engaging in the related party transactions that prompted the restatement.

| (in RMB millions) | Q1 2019 | Q2 2019 | Q3 2019 | Q4 2019 |
| --- | --- | --- | --- | --- |
| Previously Reported Revenue | 654.9 | 362.3 | 323.5 | 289.7 |
| Guidance | 600 – 630 | 360 – 380 | 300 – 320 | 240 – 260 |
| Restated Revenue | 618.3 | 311.7 | 279.8 | 225.9 |

81. According to CW1, a former Rong360 Credit Auditor from April 2017 through October 2019, the Company would normally verify the information provided by the financing company to determine whether the entity actually existed and operated, reducing the likelihood that the related party transactions were unknown to Defendants.

**G.      The Databook Fraud**

82. During the first and second quarters of 2019, the Company's Advertising Segment revenue grew by 57.5% and 26.2% respectively, from the prior year (before it was restated). While the Company does not itemize its revenue recorded from Databook specifically within its income statement, for the reasons discussed below, it can be reasonably inferred that a material

22

portion of the first half 2019 revenue growth reflected, in part, revenue from Databook. This inference is reasonable because the Company acquired Databook in June 2018 (*i.e.*, the end of Q2 2018), and, as shown below in Figure 3, the periods that follow correspond with a meaningful increase in revenue compared to prior quarters (until Q3 2019 when the Company appears to have stopped booking revenue from Databook). The Company also disclosed in its 2018 20-F that RMB 46.7 million in revenue from Databook was reflected in its 2018 full year results.

**Figure 3**



83.     It is also evident by looking at Figure 3 that the third quarter 2019 and fourth quarter 2019 revenue from the Advertising Segment both: (a) dropped precipitously; and (b) was not materially restated, which is hard to square with how the Company booked its impairment of its Databook VIE.

## H.     The Databook Fraud Is Revealed

84.     Beginning in September 2019, Databook subsidiary, Hangzhou Scorpion, was criminally investigated for the unauthorized storage of 21 million user accounts and passwords. As part of that investigation, Databook had its computers seized.

85.     After the September 2019 criminal investigation into Databook was communicated by Chinese investigators, the Company recorded a RMB 250.3 million impairment[8] for the period ending September 30, 2019. This impairment was first disclosed on December 9, 2019, when the Company announced its third quarter 2019 earnings (for the period ending September 30, 2019).

86.     But during the third quarter 2019 press release, the Company gave only a vague explanation for its impairment, stating only that it "primarily reflects the impairment of the goodwill and intangible assets related to a subsidiary acquired in 2018 due to adverse development of its business and change of the relevant industry background and market conditions."

87.     On this news, Jianpu shares fell 5.2% to close at $11.76 per share on December 9, 2019.

88.     But even though the Company recorded an impairment that was roughly RMB 45 million more that it paid for Databook just 18 months earlier[9], the only explanation the Company gave for the impairment was that it "primarily reflects" an "adverse development of its business

---

[8] The third quarter 2019 press release for the period ending September 30, 2019, which was released on December 9, 2019, listed the Databook impairment as RMB 250.3 million on its statement of cash flows. However, in the 2019 20-F the Company reported in footnote 25 that the impairment was for RMB 254.7 million and was taken as of December 31, 2019, not September 30, 2019.

[9] As noted above, the Company acquired Databook for RMB 204.5 million but took an impairment for 250.3 million

and change of the relevant industry background and market conditions." In other words, the Company made no mention of the criminal investigation in the 3Q 2019 press release.

89.     The Company likewise made no disclosure that Databook was suspended for an investigation during the third quarter 2019 earnings call.

90.     Nor did the Company make any disclosure of the Databook investigation during the fourth quarter 2019 press release or earnings call on March 23, 2020.

91.     Even so, as shown above, it appears however, that the Company stopped recording revenue for Databook during the third and fourth quarter 2019.

92.     Chinese court filings establish that on September 10, 2020, the Databook investigation escalated, when People's Procuratorate of Xihu District, Hangzhou City filed a criminal case against Hangzhou Scorpion, Zhou Jiangxiang, and Yuan Dong.

93.     Roughly four months later, a judgment was entered against Databook subsidiary Hangzhou Scorpion Technology on January 14, 2021, wherein Hangzhou Scorpion was found guilty of committing "an infringement of citizens' personal information" and was sentenced to a fine of RMB 30 million.[10] On top of the fine, the January 14, 2021 order also required Hangzhou Scorpion to return the illegal proceeds of RMB 30 million in unlawful gains (akin to a disgorgement remedy).

94.     Zhou Jiangxiang and Yuan Dong, who were also charged in their individual capacities, were found guilty of the same "infringement of citizens' personal information" offense and sentenced to three years in prison. Zhou Jiangxiang and Yuan Dong were also ordered to pay fines of RMB 500,000 and RMB 300,000, respectively.

---

[10] The RMB 30 million fine leveled against Hangzhou Scorpion Technology matches the RMB 30 million fine that the Company disclosed in its 2019 20-F as being incurred against Databook.

95.     The combination of the facts above strongly suggest that the Company stopped recording revenue from Databook during the third quarter 2019 because: (a) after restating its 2019 financials, the Company made no change to its Advertising Segment revenue during the third quarter 2019, and only made a *de minimus* change to Advertising Segment revenue for fourth quarter 2019; and (b) the Advertising Segment revenue fell by 42% on average in the third and fourth quarter of 2019 from the first and second quarter of 2019, reflecting the absence of any Databook revenue.

96.     In footnote 25 within the 2019 20-F, released on April 30, 2021, the Company stated the following:

> As mentioned in Note 12, in September 2019, the business of Databook was suspended for an investigation conducted against Databook and certain of its employees by competent authorities in relation to the compliance of information collection or use. The Group therefore recorded a full impairment for goodwill, intangible assets, and an impairment for other assets attributable to the Databook, totaling RMB254.7 million as of December 31, 2019. The investigation of Databook initiated in 2019 has concluded in January 2021. Databook was imposed confiscation of gains of RMB30 million and also a fine of RMB30 million, total amount of RMB60 million was paid in January 2021, and certain employees of Databook have been charged with criminal liabilities, neither other entities of the Group nor directors or officers of the Company were involved.
>
> According to ASC 855, it's a first type subsequent event that provides additional evidence about conditions that existed at the date of the balance sheet as of December 31, 2019. ***Thus, the Group reversed RMB30 million in revenues of advertising, marketing and other services, recorded RMB30 million as penalties, and accrued additional current income tax expenses of RMB10.0 million in 2019***. As of December 31, 2019, the net assets of Databook included in the consolidated balance sheet of the Group (which are principally comprised of restricted cash and wealth management products, offset by accounts payable, tax payable, and accrued liabilities) was RMB22.3 million.

97.     On the accounting treatment of the impairment, Defendants portray the "reversals" to Databook's revenue not as restatement, but as a proper application of ASC 855, that

26

is – the Company was recording "a first type subsequent event [that purportedly occurred in January 2021] that provides additional evidence about conditions that existed at the date of the balance sheet as of December 31, 2019."[11]

98.     But ASC 855 has no application here and Defendants' accounting treatment related to the Databook investigation is improper under Generally Accepted Accounting Practices ("GAAP") because there is no indication that Defendants either: (a) accrued any reserves or expenses for any penalties during the third or fourth quarter of 2019; or (b) made appropriate disclosures under ASC 450 – which does apply here.

99.     Under ASC 450:

> Accrual of a loss contingency is required when (1) it is probable that a loss has been incurred and (2) the amount can be reasonably estimated.

*     *     *

> A loss contingency is recognized only when the likelihood of a future event's occurrence indicates that it is probable that a loss has occurred (assuming the loss contingency is also reasonably estimable). If the likelihood of a future event's occurrence is only reasonably possible, entities should provide appropriate disclosures as required under ASC 450-20-50, although loss accrual is not appropriate.

100.    Here, Defendants had a choice of either: (a) accruing a loss for the Databook investigation beginning in the third quarter of 2019; or (b) providing appropriate disclosure about the "possible" or "probable" loss (*i.e.*, the criminal investigation that led to the September 2019 Databook impairment). Defendants did neither and thus violated ASC 450.

101.    And while Defendants felt the September 2019 investigation was sufficiently serious such that the Company impaired its entire Databook asset in September 2019—suggesting a loss was not just "possible" or "probable," but it was inevitable—Defendants still made

---

[11] *See* April 30, 2021 20-F update and the April 30, 2021 6-K.

insufficient disclosure under ASC 450 regarding the existence of the criminal investigation. Accordingly, Defendants violated GAAP with respect to the Databook investigation and subsequent revenue reversal within the Advertising Segment.

102. And similar to the nondisclosed related party transactions in the Credit Card Segment, Defendants' improper accounting treatment of the Databook investigation also helped the Company meet its total revenue guidance, as shown below.

| (in RMB millions) | Q1 2019 | Q2 2019 | Q3 2019 | Q4 2019 |
|---|---|---|---|---|
| Previously Reported Revenue | 654.9 | 362.3 | 323.5 | 289.7 |
| Revenue Guidance | 600 – 630 | 360 – 380 | 300 – 320 | 240 – 260 |
| Restated Revenue | 618.3 | 311.7 | 279.8 | 225.9 |
| Databook revenue later "reversed" from criminal conduct | **13.2** | **16.8** | **--** | **.902** |

## V. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

103. The Class Period begins on May 29, 2018. On that day, Jianpu announced its first quarter 2018 financial results in a press release that stated, in relevant part:

### A. Statements related to the First Quarter 2018

**First Quarter 2018 Operational Highlights:**

- Number of loan applications submitted through the Company's platform was approximately 12.1 million in the first quarter of 2018, representing an increase of approximately 21.0% from the prior-year period.

- Credit card volume, which is the measure of the number of credit cards the Company generate revenues from, reached approximately 1.5 million in the first quarter of 2018, representing an increase of approximately 400% from the prior-year period.

28

**First Quarter 2018 Financial Highlights:**

Total revenues for the first quarter of 2018 increased by 145% to RMB335.7 million (US$53.5 million) from RMB137.3 million in the same period of 2017.

Total recommendation services revenues for the first quarter of 2018 increased by 131% to RMB289.3 million (US$46.1 million) from RMB125.2 million in the same period of 2017.

Gross profit increased by 139% to RMB286.4 million (US$45.7 million) in the first quarter of 2018 from RMB119.9 million in the same period of 2017.

Non-GAAP adjusted net loss, which excluded share-based compensation expenses, decreased by 35.9% to RMB19.8 million (US$3.2 million) in the first quarter of 2018, from RMB30.9 million in the same period of 2017.

104. In the same press release, Ye also commented that "[w]ith greater clarity on the regulatory front, we witnessed a growing recovery in the online lending activities since March, following the Chinese New Year holiday, and believe the worst is now behind us. We will take advantage of the improving trend and are optimistic that a more structured and healthier regulatory framework will support a sustainable growth in the consumer credit market."

105. The above statements identified in ¶¶ 103-104 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors: (1) that certain material transactions carried out by the Company's Credit Card Segment involved undisclosed related party relationships and/or lacked business substance; (2) that, as a result, Jianpu's revenue and costs and expenses for fiscal 2018 and 2019 would be overstated; (3) that there were material weaknesses in Jianpu's internal control over financial reporting; (4) that the Company's fiscal 2018 Form 20-F was reasonably likely to be restated; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

106. The above statements identified in ¶¶ 103-104 were also materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose

29

that their Loan Segment revenue was generated in part through unlawful and/or improper means including: (i) improper collection tactics; and/or (ii) misleading sales practices designed to cause consumers to pay for unnecessary goods or services and that, as a result, there was a material undisclosed risk that once consumers learned the truth about the products available through Rong360, they would discontinue use of the platform and/or the platform would be suspended from operation.

107. On May 29, 2018, Jianpu also hosted a conference call to discuss its Q1 2018 results. On the conference call within his prepared remarks, Ye stated "Responding to the regulation guidelines on short-term microloans, *we beefed up our quality control process, conducting a new round of internal review on December and removed the noncompliant financial products from our platform.*"

108. Ye continued in his prepared remarks during the Q1 2018 earnings call that:

> In the first quarter, we experienced a sequential decrease in loan application volume due to the combined factors of seasonality and the market adjustments *to ensure regulatory compliance*. Since early this year, we have seen *improved level of clarity on the regulatory front*. In December last year and in the first 2 months of this year, the industry has largely embraced and observed the impact of the shifting regulations. As we witnessed from the initiatives and the actions conducted by our financial service providers, the market has been recovering and *we believe the worst is now behind us*.

109. The above statements identified in ¶¶ 107-108 were materially false and/or misleading, and/or failed to disclose material adverse facts because: (1) Defendants did not remove noncompliant financial products as later revealed by the CCTV 315 Night detailing Rong360's "714 Missile" product which did not comply with applicable law in China; (2) Defendants failed to disclose that the Company's Loan Segment revenue was generated in part through unlawful and/or improper means including (i) improper collection tactics; and/or (ii)

misleading sales practices designed to cause consumers to pay for unnecessary goods or services and that, as a result, there was a material undisclosed risk that once consumers learned the truth about the products available through Rong360, they would discontinue use of the platform and/or the platform would be suspended from operation.

110.    Also on the Q1 2018 earnings call, Ye stated during the question and answer session that:

> And also, on the regulatory front, we probably will be asked that later, we definitely see the improved clarity and we see the continuing regulatory development in short-term microloan, but we definitely have -- actually, we see the dilemma that's still in the cap interest rate, et cetera, right? And TPG registration has been postponed. And we actually see the positive side of the regulation, some of the banks and nonbank finance companies, they're actually able to take the opportunities to grow, they are a retail business or like credit cards and summary loan business. So on the regulatory side, we see the worst is behind and we will see the growth for the rest of this year.

111.    The above statements identified in ¶ 110 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants noncompliant financial products exceeded the interest rate cap set by financial regulators as later revealed by the CCTV 315 Night detailing Rong360's "714 Missile" product which did not comply with applicable law in China and that fact makes Ye's statement that "on the regulatory side, we see the worse is behind us . . ."

**B.    Statements related to the Second Quarter 2018**

112.    On August 27, 2018, Jianpu announced its second quarter 2018 financial results in a press release that stated, in relevant part:

**Second Quarter 2018 Operational Highlights:**

- Number of loan applications submitted through the Company's platform was approximately 21.2 million in the second quarter of 2018, representing an increase of approximately 11.0% from the same period of 2017 and an increase of approximately 75.2% from the first quarter of 2018.

31

- Credit card volume, which is the measure of the number of credit cards the Company generates revenues from, was approximately 1.6 million in the second quarter of 2018, representing an increase of approximately 167% from the same period of 2017 and an increase of approximately 6.7% from the first quarter of 2018.

**Second Quarter 2018 Financial Highlights:**

- Total revenues for the second quarter of 2018 increased by 91.6% to RMB490.4 million (US$74.1 million) from RMB256.0 million in the same period of 2017.

- Total recommendation services revenues for the second quarter of 2018 increased by 86.2% to RMB441.0 million (US$66.6 million) from RMB236.9 million in the same period of 2017.

- Gross profit increased by 85.3% to RMB431.2 million (US$65.2 million) in the second quarter of 2018 from RMB232.7 million in the same period of 2017. Gross margin was 87.9% in the second quarter of 2018, compared with 85.3% in the first quarter of 2018.

- Net loss was RMB61.1 million (US$9.2 million) in the second quarter of 2018 and was RMB17.4 million in the same period of 2017. Net loss margin was -12.5% in the second quarter of 2018 compared with -6.8% in the same period of 2017. Non-GAAP adjusted net loss was RMB28.5 million (US$4.3 million) in the second quarter of 2018 and was RMB16.9 million in the same period of 2017. Non-GAAP adjusted net margin1 improved to -5.8% from -6.6% in the same period of 2017.

113. The Company also disclosed the following about its acquisition of Databook within the same press release:

**Acquisition of Subsidiary**

In June 2018, the Company completed the acquisition of 65% of equity interests in a China-based technology company specializing in optimizing data-driven risk management decisions. The acquired company offers a suite of products and services helping financial service providers to enhance their risk management capabilities. The consideration of the transaction consists of cash, ordinary shares of the Company and options to purchase the Company's ordinary shares. The total consideration is approximately RMB204 million, including cash portion of approximately RMB110 million, ordinary shares and options of the Company approximately RMB94 million.

32

114.    The above statements identified in ¶¶ 112-113 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors: (1) that certain material transactions carried out by the Company's Credit Card Segment involved undisclosed relationships or lacked business substance; (2) that, as a result, Jianpu's revenue and costs and expenses for fiscal 2018 and 2019 were overstated; (3) that there were material weaknesses in Jianpu's internal control over financial reporting; (4) that the Company's fiscal 2018 Form 20-F and/or fiscal 2019 20-F were reasonably likely to be restated; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

115.    The above statements identified in ¶ 113 were also materially false and/or misleading, and/or failed to disclose material adverse facts including that that Databook was engaged in pervasive and unlawful data collection practices that infringed on user's privacy rights and were thus: (a) reasonably likely to cause the Company's investment to be materially impaired once said data collection practices were revealed; and (b) likely to lead to unlawfully earned revenue from the Advertising Segment being disgorged.

116.    The above statements identified in ¶¶ 112-113 were also materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose that the Company's Loan Segment revenue was generated in part through unlawful and/or improper means including: (i) improper collection tactics; and/or (ii)  misleading sales practices designed to cause consumers to pay for unnecessary goods or services and that operated as undisclosed and unlawful embedded interest and, as a result, there was a material undisclosed risk that once consumers learned the truth about the products available through Rong360, they would discontinue use of the platform and/or the platform would be suspended.

117.   On the same day as the second quarter 2018 press release, management also held an earnings call wherein Ye and Chen were asked by Morgan Stanley analyst, Ran Xu, about the fees that Jianpu could charge the credit card issuers and the P2P lenders and about industry trends and the regulatory environment. Both Chen and Ye responded separately, and Chen's response including the following:

> Okay. Richard, regarding your second question about the P2P regulation, so our observation is that we see both risks and opportunities in the recent crackdown against the P2P companies. So starting the second quarter, so China's overall tightened credit and the monetary policy and I think the monetary policy and the resulting liquidity crunch I think, indirectly led to the crackdown of certain P2P platforms. But more importantly, we view that it's more important. It's more about the noncompliant P2P platform. The majority of the problematic P2P platforms who were not P2Ps by definition. Instead of serving as pure information platform, matching individual borrowers and the lenders, ***these platforms were directing funds to related parties forging assets or investing in larger ticket size assets with mismatched cash flows***. So that's where the risk are. So the closing down or crackdown of certain P2P platform led to a shortage of investor confidence and the funding supplier, which impacted the -- contributed to the part of the lending activities, particularly, the online part. But we view that this impact will be limited in the long run, as we observe that financial inclusion is still encouraged by the regulators and the P2P funds will stay -- P2P funds will -- in the future, the P2P funds will stay away from the mismatched assets and they're looking for smaller size and diversified assets. So the loan issued to the consumers and SMEs will be a perfect match. So although the overall P2Ps, the size of the overall P2P industry may shrink, but we see more focus and resources of funds will be put into the smaller size and diversified assets. For example, the individual loan -- the individual consumption loans or the SME loans. So -- okay.

118.   The above statements identified in ¶ 117 were materially false and/or misleading, and/or failed to disclose material adverse facts because Chen discussed noncompliant platforms that appeared on Rong360—for specifically engaging in nondisclosed related party transactions— while failing to disclose that *the Company* likewise had nondisclosed related party transactions that were generated through Rong360.

34

119.    Later in the Q&A session on the same second quarter 2018 earnings call, Chen was asked about the regulatory environment related to the P2P participants on Rong360. In response, Chen stated that "So we have a very stringent and strict onboarding process. ***So we only work with the top P2P guys,*** focusing on provide individual consumer loans to the consumers***, not the noncompliant P2P platforms***."

120.    The statements above in ¶ 119 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Revealed by the CCTV 315 Night, Rong360 did have noncompliant platforms available for selection by consumers. Thus, the above statement was either overtly false or, to the extent that the platforms referred to by CCTV 315 night were not P2P platforms, then the above statement was misleading.

121.    The above statements in ¶ 119 were also materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose that the Company's Loan Segment revenue was generated in part through unlawful and/or improper means including: (i) improper collection tactics; and/or (ii)  misleading sales practices designed to cause consumers to pay for unnecessary goods or services and that, as a result, there was a material undisclosed risk that once consumers learned the truth about the products available through Rong360, they would discontinue use of the platform.

### C.    Statements related to the Third Quarter 2018

122.    On November 19, 2018, Jianpu announced its third quarter 2018 financial results in a press release that stated, in relevant part:

**Third Quarter 2018 Operational and Financial Highlights:**

- Credit card volume was approximately 2.0 million in the third quarter of 2018, representing an increase of approximately 81.8% from the same period of 2017. The average fee per credit card increased by 47.7% to RMB103.59 (US$15.08) in the third quarter of 2018 from RMB70.13 in the third quarter of 2017. As a result, revenues for credit cards in the third

quarter of 2018 increased by 175% to RMB204.9 million (US$29.8 million) from RMB74.5 million in the same period of 2017.

\* \* \*

- Net loss was RMB53.5 million (US$7.8 million) in the third quarter of 2018, improved from net loss of RMB61.1 million in the second quarter of 2018. Net loss margin was -12.1% in the third quarter of 2018 compared with -12.5% in the second quarter of 2018.

\* \* \*

Revenues from recommendation services for credit cards increased by 197% to RMB183.5 million (US$26.7 million) in the third quarter of 2018 from RMB61.8 million in the third quarter of 2017, *due to the increase in both credit card volume and average fee per credit card*. Despite the slowdown of lending activities experienced in the third quarter of 2018, the consumer demand towards credit cards remained strong. Credit card volume for recommendation services in third quarter of 2018 was approximately 1.7 million, representing an increase of approximately 143% from the same period of 2017. The average fee per credit card for recommendation services increased to RMB106.10 (US$15.45) in the third quarter of 2018 from RMB90.40 in the same period of 2017.

123. The above statements identified in ¶ 122 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors: (1) that certain material transactions carried out by the Company's Credit Card Segment involved undisclosed relationships or lacked business substance and that undisclosed fact contributed to the increase in credit card revenue which Defendants failed to disclose as a contributing factor; (2) that, as a result, Jianpu's revenue and costs and expenses for fiscal 2018 and 2019 were overstated; (3) that there were material weaknesses in Jianpu's internal control over financial reporting; (4) that the Company's fiscal 2018 and 2019 Form 20-Fs were reasonably likely to be restated; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

36

124. The above statements identified in ¶ 122 were also materially false and/or misleading because they attributed the growth in the credit card segment to an exclusive set of factors -- an increase in volume and in the average fee per credit card, but failed to disclose that revenue in the Credit Card segment was also increased by nondisclosed related party transactions.

### D. Statements related to the Fourth Quarter 2018

125. On February 25, 2019, Jianpu announced its fourth quarter and fiscal year 2018 financial results in a press release that stated, in relevant part:

**Fourth Quarter 2018 Operational and Financial Highlights:**

- Total revenues in the fourth quarter of 2018 increased by 67.3% to RMB742.1 million (US$107.9 million) from RMB443.7 million in the third quarter of 2018, and increased by 26.9% from RMB584.6 million in the same period of 2017.

- Credit card volume, was approximately 2.9 million in the fourth quarter of 2018, representing an increase of approximately 123% from the same period of 2017. The average fee per credit card increased to RMB105.51 (US$15.35) in the fourth quarter of 2018 from RMB102.34 in the fourth quarter of 2017. As a result, revenues for credit cards1 in the fourth quarter of 2018 increased by 136% to RMB310.6 million (US$45.2 million) from RMB131.8 million in the same period of 2017.

*     *     *

- Net income was RMB11.9 million (US$1.7 million) in the fourth quarter of 2018, compared with a net loss of RMB136.4 million in the same period of 2017 and a net loss of RMB53.5 million in the third quarter of 2018. Net income margin was 1.6% in the fourth quarter of 2018, compared with net loss margin of 23.3% in the same period of 2017 and net loss margin of 12.1% in the third quarter of 2018.

*Revenues from recommendation services for credit cards* increased by 144% to RMB289.1 million (US$42.1 million) in the fourth quarter of 2018 from RMB118.6 million in the fourth quarter of 2017, ***due to the increase in both credit card volume and average fee per credit card***. The consumer demand towards credit cards significantly increased, and Jianpu successfully captured the shift of user demand and achieved remarkable performance in the credit card recommendation services. Credit card volume for recommendation services in the fourth quarter of 2018 was approximately 2.6 million, representing a significant increase of approximately 136% from the same period of 2017. The average fee

37

per credit card for recommendation services increased to RMB112.05 (US$16.30) in the fourth quarter of 2018 from RMB104.49 in the fourth quarter of 2017.

126. The above statements identified in ¶ 125 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors: (1) that certain material transactions carried out by the Company's Credit Card Segment involved undisclosed relationships or lacked business substance and that undisclosed fact contributed to the increase in credit card revenue which Defendants failed to disclose as a contributing factor; (2) that, as a result, Jianpu's revenue and costs and expenses for fiscal 2018 and 2019 were overstated; (3) that there were material weaknesses in Jianpu's internal control over financial reporting; (4) that the Company's fiscal 2018 Form 20-F was reasonably likely to be restated; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

127. The above statements identified in ¶ 125 were also materially false and/or misleading because they attributed the growth in the credit card segment to an exclusive set of factors -- an increase in volume and in the average fee per credit card -- but failed to disclose that revenue in the Credit Card segment was also increased by nondisclosed related party transactions that lacked business substance.

128. During the February 25, 2019 earnings call discussing fourth quarter and full year 2018 results, Ye touted the Company's network of financial institutions within the Credit Card Segment:

> As of the end of 2018, **we have built a vibrant network of over 2,500 financial institutions** and have also strengthened our collaboration with all **5 of the largest state-owned national banks and 11 joint stock banks out of the 12 nationwide**.
>
> As mentioned above, our credit card recommendation businesses have achieved very sharp growth momentum, with the total number of credit card issued on our platform standing at more than 10 million. We have the

largest network of online credit card issuers **with 25 credit card banks on our platform**. Recently, we introduced our first cobranded credit card, featuring Jianpu RONG360's mascots deepening our collaboration with the bank.

129.    The above statements identified in ¶ 128 were materially false and/or misleading because Ye failed to disclose that within the financial institutions that he was tracking and enumerating and discussing with investors included undisclosed relationships and transactions that lacked business substance and that, as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

130.    Similarly, Chen also touted the strong results in the Credit Card Segment during his prepared remarks during the February 25, 2019 earnings call:

> Led by robust growth in our credit card business and solid recovery of loan recommendation services, our total recommendation services revenues reported a 20% year-over-year increase to RMB 659 million in the fourth quarter, mainly driven by a 144% year-over-year increase in credit card recommendation services, ***further illustrating the scalability of our platform model and execution strength***.
>
> Combining the credit card business from both recommendation services and advertising, ***we recorded credit card volume of approximately 3 million in the fourth quarter of 2018, representing a year-over-year increase of approximately 123%.***

131.    The above statements identified in ¶ 130 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors: (1) that certain material transactions carried out by the Company's Credit Card Segment involved undisclosed relationships or lacked business substance and that undisclosed fact contributed to the increase in credit card volume and revenue; (2) that, as a result, Jianpu's revenue for fiscal 2018 and 2019 were overstated; (3) that there were material weaknesses in Jianpu's internal control

39

over financial reporting; (4) that the Company's 2018  20-F and/or 2019 20-F were reasonably

likely to be restated; and (5) that, as a result of the foregoing, Defendants' positive statements

about the Company's business, operations, and prospects were materially misleading and/or

lacked a reasonable basis.

132.    Together with his statements about the Credit Card Segment, Chen also stated the

following about the Loan Segment during the February 25, 2019 earnings call:

> As David mentioned previously, loan application volumes experienced a meaningful
> sequential increase by around 86%. ***The average fee per loan application continues to
> grow to RMB 15 from RMB 14.5 in the third quarter 2018***. As a result, loan
> recommendation revenue reached RMB 370 million in the quarter, decreasing 14% year-
> over-year, while increasing approximately 92% from the preceding quarter. We believe
> that with a healthier regulatory framework, the overall lending market is in solid
> recovery, trending up towards -- heading into early 2019.

133.    The above statements identified in ¶ 132 were materially false and/or misleading,

and/or failed to disclose material adverse facts because Chen omitted that the average fee per loan

grew in part from unlawful and/or improper means including misleading sales practices designed

to cause consumers to pay for unnecessary goods or services and that, as a result, there was a

material undisclosed risk that once consumers learned the truth about the products available

through Rong360, they would discontinue use of the platform and/or the platform would be

suspended.

134.    Finally, on the Advertising Segment, Chen stated the following:

> Revenues from advertising and marketing services and other services increased by 152%
> to RMB 246 million in 2018, from RMB 97 million in the prior year, primarily due to an
> increase in the big data and risk management services, which increased 194% year-over-
> year as well as an increase in revenues from advertising services provided to credit card
> issuer and other advertisers.

135.    The above statements identified in ¶ 134 were materially false and/or misleading,

and/or failed to disclose material adverse facts including that that Databook was engaged in

40

pervasive and unlawful data collection practices that infringed on user's privacy rights and were thus: (a) reasonably likely to cause the Company's investment to be materially impaired once said data collection practices were revealed; and (b) likely to lead to unlawfully earned revenue from the Advertising Segment being disgorged.

136. During the Q&A portion of the February 25, 2019 earnings call, Defendants were asked by a Morgan Stanley analyst if they could provide a revenue breakdown by institution. In response, Chen stated the following:

> Okay, thank you, John, for your questions. So first question is regarding the revenue breakdown among the different financial -- different type of financial institutions. So as a practice, we always -- in the previous quarters I think we discussed this breakdown several times. So we will -- I will follow the same practice [to my best knowledge] to discuss the number.
>
> So firstly, in terms of -- so first, **I would give out the number of our total revenue breakdown**. So in the fourth quarter, we have **around 52% of our revenue coming from the banks**. So keep in mind, the majority of this part is contributed by the credit card. **So the total credit card is around 40% of total revenue in the fourth quarter**.
>
> So -- and then we will have the P2P part. I think everyone has a interest to know the number. **So as of the fourth quarter, the P2Ps contribute to around 16% of my total revenues**. **And then the remaining revenues comes from the nonbanking licensed financial institutions, including consumer finance company, microlending company and other license players.**

137. The above statements identified in ¶ 136 were materially false and/or misleading, and/or failed to disclose material adverse facts because Chen provided an enumerated list of institutions that contributed to Q4 2018 revenue but omitted that one source of revenue arose from undisclosed related party transactions that lacked business substance within the Company's Credit Card Segment and thus artificially inflated Q4 2018 revenue for the Credit Card segment and thus the Company overall.

41

138.    On April 23, 2019, Jianpu filed its Form 20-F for the period ended December 31, 2018, signed by Ye, affirming the previously reported financial results. As to related party transactions, the Company stated:

> For the year ended December 31, 2018, we generated revenues in the total amount of RMB105.5 million for the recommendation services to RONG360, RMB13.4 million for the advertising, marketing and other services to RONG360, and charged administrative expenses of RMB10.0 million to RONG360, including expenses related to operational, administrative, human resources, legal, accounting and internal control.
>
> For the year ended December 31, 2018, RONG360 charged us RMB4.6 million for the collection handling fee for the revenue amount billed to third parties through RONG360 by us.
>
> As of December 31, 2018, the balance arose from the aforementioned related party transactions and various operational payments made by RONG360 was RMB61.0 million. In addition, the accounts receivable billed through RONG360 amounted to RMB135.0 million as of December 31, 2018.
>
> We obtained contractual control of KTN from a company owned by two founders of our company in October 2018. The related consideration of RMB6.3 million has not been paid as of December 31, 2018.
>
> Another related party, investee of the company owned by two founders of our company, charged us RMB40.2 million of advertising and of marketing expenses for providing advertising and marketing service to us for the year ended December 31, 2018. The balance arose from the aforementioned transactions with this related party was RMB5.5 million.

139.    The 2018 20-F also stated that there was a material weakness in the Company's internal control over financial reporting. It stated:

> The material weakness identified relates to the lack of sufficient competent financial reporting and accounting personnel with appropriate understanding of U.S. GAAP to design and implement formal period-end financial reporting policies and procedures, to address complex U.S. GAAP technical accounting issues, and to prepare and review our consolidated financial statements and related disclosures in accordance with U.S. GAAP and financial reporting requirements set forth by the SEC.
>
> To remedy our identified material weakness, we have implemented and will continue to enhance and improve our internal control over financial reporting. In 2018, we have formed our U.S. GAAP reporting and internal control teams with

42

additional qualified accounting and reporting personnel who have appropriate knowledge and experience of U.S. GAAP and SEC reporting requirements, established standardized financial closing and reporting procedures, including oversight and clarifying reporting requirements for non-recurring or complex transactions, and implemented training programs for our accounting staffs. We plan to further enhance and improve our financial closing and reporting procedures, and training programs, especially training related to U.S. GAAP and SEC reporting requirements.

140.    The above statements identified in ¶¶ 138-139 were materially false and/or misleading, and/or failed to disclose material adverse facts including: (1) that certain material transactions carried out by the Company's Credit Card Segment involved undisclosed relationships or lacked business substance; (2) that, as a result, Jianpu's revenue and costs and expenses for fiscal 2018 were overstated; (3) that the Company's fiscal 2018 Form 20-F was reasonably likely to be restated; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### E.    Statements related to the First Quarter 2019

141.    On May 28, 2019, Jianpu announced its first quarter 2019 financial results in a press release that stated, in relevant part:

First Quarter 2019 Operational and Financial Highlights:

- Total revenues in the first quarter of 2019 increased by 95.1% to RMB654.9 million (US$97.6 million) from RMB335.7 million in the same period of 2018. . . .

- Credit card volume, was approximately 1.6 million in the first quarter of 2019, representing an increase of approximately 6.7% from the same period of 2018. The average fee per credit card increased to RMB105.92 (US$15.78) in the first quarter of 2019 from RMB95.20 in the same period of 2018. *As a result, revenues for credit cards in the first quarter of 2019 increased by 18.3% to RMB170.0 million (US$25.3 million) from RMB143.7 million in the same period of 2018*.

\*        \*        \*

43

- Net income was RMB18.7 million (US$2.8 million) in the first quarter of 2019, compared with a net loss of RMB57.1 million in the same period of 2018 and a net income of RMB11.9 million in the fourth quarter of 2018. Net income margin was 2.9% in the first quarter of 2019, compared with net loss margin of 17.0% in the same period of 2018 and net income margin of 1.6% in the fourth quarter of 2018.

Revenues from recommendation services for credit cards increased by 15.6% to RMB149.3 million (US$22.2 million) in the first quarter of 2019 from RMB129.2 million in the same period of 2018, *due to the increase in both credit card volume and average fee per credit card*. Credit card volume for recommendation services in the first quarter of 2019 was approximately 1.4 million, representing an increase of approximately 7.7% from the same period of 2018. The average fee per credit card for recommendation services increased to RMB106.45 (US$15.86) in the first quarter of 2019 from RMB97.15 in the same period of 2018.

142. The above statements identified in ¶ 141 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors: (1) that certain material transactions carried out by the Company's Credit Card Segment involved undisclosed relationships or lacked business substance and that undisclosed fact contributed to the increase in credit card revenue which Defendants failed to disclose as a contributing factor in the above press release; (2) that, as a result, Jianpu's revenue and costs and expenses for fiscal 2019 were overstated; (3) that there were material weaknesses in Jianpu's internal control over financial reporting; (4) that the Company's 2019 20-F was reasonably likely to be restated; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

143. The above statements identified in ¶ 141 were also materially false and/or misleading because they attributed growth in the Credit Card Segment to an exclusive set of factors -- an increase in volume and in the average fee per credit card -- but failed to disclose that revenue in the Credit Card Segment was also increased by nondisclosed related party transactions that lacked business substance.

44

144. On May 28, 2019, the Company also hosted an earnings call do discuss its financial results for the first quarter 2019. In his prepared remarks, Ye stated:

> As a follow-up to the airing of CCTV 315, we completed our internal review of systems, products and processes. Our mobile app were made available, again, in early May on some application stores and we expect a full launch in June. In the meantime, we continue to drive certain self-imposed improvements to our internal processes such **as adopting more stringent turnaround boarding process, while adhering to a stricter platform policies for financial service providers**. We have engaged a global consulting firm to assist us in the review of our business process, [conduct] industry studies and recommend best practices.
>
> \*   \*   \*
>
> And at the same time, our regulatory technology, or reg tech team also won a few important mandates to help local Chinese financial regulators establishing assistance to monitor financial products and service online. Being recognized on our platform model and market position by the regulators, we will continue to contribute and **lead the initiative of introducing and promoting higher industry standards and best practices**.

145. The above statements in ¶ 144 were materially false and/or misleading, and/or failed to disclose material adverse facts because at the same time that Ye assured investors of promoting higher standards and stricter policies, Defendants were simultaneously inflating the Company's revenue through nondisclosed related party transactions. Moreover, by claiming to "being recognized" by the Chinese regulators to monitor financial products, Defendants misleadingly implied that their own practices had somehow been endorsed by the Company's regulator, when in fact there were then existing material weaknesses in Jianpu's internal control over financial reporting.

### F.    Statements related to the Second Quarter 2019

146. On August 26, 2019, Jianpu announced its second quarter 2019 financial results in a press release that stated, in relevant part:

**Second Quarter 2019 Operational and Financial Highlights:**

- Credit card volume[] was approximately 1.9 million in the second quarter of 2019, representing an increase of approximately 18.8% from the same period of 2018. The average fee per credit card increased to RMB106.52 (US$15.522) in the second quarter of 2019 from RMB99.43 in the same period of 2018. *As a result, revenues for credit cards in the second quarter of 2019 increased by 24.5% to RMB201.5 million (US$29.4 million) from RMB161.8 million in the same period of 2018*.

\*     \*     \*

**First Six Months 2019 Operational and Financial Highlights:**

- Credit card volume was approximately 3.5 million in the first six months of 2019, representing an increase of approximately 12.9% from the same period of 2018. The average fee per credit card increased to RMB106.24 (US$15.48) in the first six months of 2019 from RMB97.39 in the same period of 2018. *As a result, revenues for credit cards in the first six months of 2019 increased by 21.6% to RMB371.5 million (US$54.1 million) from RMB305.5 million in the same period of 2018.*

\*     \*     \*

**Total revenues from recommendation services** decreased by 32.0% to RMB299.9 million (US$43.7 million) in the second quarter of 2019 from RMB441.0 million in the same period of 2018.

> *Revenues from recommendation services for credit cards* increased by 31.8% to RMB196.5 million (US$28.6 million) in the second quarter of 2019 from RMB149.1 million in the same period of 2018, *due to the increase in both credit card volume and average fee per credit card*. Credit card volume for recommendation services in the second quarter of 2019 was approximately 1.8 million, representing an increase of approximately 20.0% from the same period of 2018. The average fee per credit card for recommendation services increased to RMB108.14 (US$15.75) in the second quarter of 2019 from RMB99.47 in the same period of 2018.

\*     \*     \*

**Net loss** was RMB84.9 million (US$12.4 million) in the second quarter of 2019, compared with a net loss of RMB61.1 million in the same period of 2018. Net loss margin was -23.4% in the second quarter of 2019, compared with a net loss margin of -12.5% in the second quarter of 2018.

46

147. The above statements identified in ¶ 146 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors: (1) that certain material transactions carried out by the Company's Credit Card Segment involved undisclosed relationships or lacked business substance and that undisclosed fact contributed to the increase in credit card revenue that Defendants failed to disclose as a contributing factor in the above press release; (2) that, as a result, Jianpu's revenue and costs and expenses for fiscal 2019 were overstated; (3) that there were material weaknesses in Jianpu's internal control over financial reporting; (4) that the Company's 2019 20-F was reasonably likely to be restated; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

148. The above statements identified in ¶ 146 were also materially false and/or misleading because they attributed the growth in the credit card segment to an exclusive set of factors -- an increase in volume and in the average fee per credit card -- but failed to disclose that revenue in the Credit Card segment was also increased by nondisclosed related party transactions that lacked business substance.

149. Following its second quarter 2019 results, Ye made the following statement on the Company's August 26, 2019 earnings call:

> Before we go into the financials, we just want to continue our update following the [CCTV 315] event and the subsequent mobile application relaunch. As of the end of last week, our mobile apps are available on all App Store now. ***We took the time to conduct a comprehensive internal review and continuously drive certain self-imposed improvement internal processes regarding to FSP onboarding procedures and ongoing monitoring and supervision.*** We have implemented the necessary risk control to better protect the users from participating in products that are out of the scope in terms of industry standard. Being the leading player in this market, we have also been invited by the regulators to participate ***in developing industry standards and promoting industry best practice, including defining guidance for digital financial platform, corporate responsibility and products standard as well as consumer rights protection.***

47

150. The above statements identified in ¶ 149 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors: (1) that certain of the Company's transactions carried out by the Credit Card Segment involved undisclosed relationships or lacked business substance; (2) that, as a result, Jianpu's revenue and costs for fiscal 2018 and 2019 were overstated; (3) that there were material weaknesses in Jianpu's internal control over financial reporting; (4) that the Company's 2019 20-F was reasonably likely to be restated and the Company would not have achieved its revenue guidance for the periods ending September 30, 2019, or December 31, 2019; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

151. The above statements in ¶ 149 were also materially false and/or misleading, and/or failed to disclose material adverse facts because at the same time that Ye assured investors of promoting higher standards and stricter policies, Defendants were simultaneously inflating the Company's revenue through nondisclosed related party transactions. Moreover, by referring to being "invited" by the Chinese regulators to develop best practices, Defendants misleadingly implied that their conduct adhered to industry best practices, when in fact there were then existing material weaknesses in Jianpu's internal control over financial reporting and the Company was overstating revenue and expenses as a result of nondisclosed related party transactions.

### G. Statements related to the Third Quarter 2019

152. On December 9, 2019, the Company announced its third quarter 2019 financial results in a press release that stated, in relevant part:

**Third Quarter 2019 Operational and Financial Highlights:**

- Credit card volume for recommendation services[] was approximately 1.8 million in the third quarter of 2019, representing an increase of approximately 5.9% from the same period of 2018. The average fee per

48

credit card for recommendation services increased to RMB109.22 (US$215.28) in the third quarter of 2019 from RMB106.10 in the same period of 2018. As a result, revenues from recommendation services for credit cards increased by 6.6% to RMB195.6 million (US$27.4 million) in the third quarter of 2019 from RMB183.5 million in the same period of 2018.

\*     \*     \*

**First Nine Months 2019 Operational and Financial Highlights:**

- Credit card volume for recommendation services was approximately 5.0 million in the first nine months of 2019, representing an increase of approximately 8.7% from the same period of 2018. The average fee per credit card for recommendation services increased to RMB108.05 (US$15.12) in the first nine months of 2019 from RMB101.31 in the same period of 2018. *As a result, revenues from recommendation services for credit cards in the first nine months of 2019 increased by 17.2% to RMB541.4 million (US$75.7 million) from RMB461.8 million in the same period of 2018.*

\*     \*     \*

**Total revenues from recommendation services** decreased by 24.1% to RMB285.9 million (US$40.0 million) in the third quarter of 2019 from RMB376.9 million in the same period of 2018.

*Revenues from recommendation services for credit cards* increased by 6.6% to RMB195.6 million (US$27.4 million) in the third quarter of 2019 from RMB183.5 million in the same period of 2018, *due to the increase in both credit card volume and average fee per credit card*. Credit card volume for recommendation services1 in the third quarter of 2019 was approximately 1.8 million, representing an increase of approximately 5.9% from the same period of 2018. The average fee per credit card for recommendation services increased to RMB109.22 (US$15.28) in the third quarter of 2019 from RMB106.10 in the same period of 2018.

\*     \*     \*

**Net loss** was RMB352.5 million (US$49.3 million) in the third quarter of 2019, compared with a net loss of RMB53.5 million in the same period of 2018. The increase of net loss was primarily due to the impairment loss charged in this quarter.

49

153.     The above statements identified in ¶ 152 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors: (1) that certain of the Company's transactions carried out by the Credit Card Segment involved undisclosed relationships or lacked business substance; (2) that, as a result, Jianpu's revenue and costs for fiscal 2019 were overstated; (3) that there were material weaknesses in Jianpu's internal control over financial reporting; (4) that the Company's 2019 20-F was reasonably likely to be restated and the Company would not have achieved its revenue guidance for the period ending December 31, 2019; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

154.     The above statements identified in ¶ 152 were also materially false and/or misleading because they attributed the growth in the Credit Card Segment to an exclusive set of factors -- an increase in volume and in the average fee per credit card -- but failed to disclose that revenue in the Credit Card Segment was also increased by nondisclosed related party transactions.

155.     On December 9, 2019, the Company also stated that its impairment "primarily reflects the impairment of the goodwill and intangible assets related to a subsidiary acquired in 2018 *due to adverse development of its business and change of the relevant industry background and market conditions.*"

156.     The above statements identified in ¶ 155 were materially false and/or misleading, and/or failed to disclose material adverse facts for the reasons stated above in §IV.G–H.

157.     The above statements identified in ¶ 155 were also materially false and/or misleading, and/or failed to disclose material adverse facts because (a) the cause for the impairment was a criminal investigation not "market conditions"; and (b) Databook was engaged

in pervasive and unlawful data collection practices that infringed on user's privacy rights and was actively under investigation by criminal authorities and were thus (c) reasonably likely to cause the Company's revenue within its Advertising Segment to be disgorged and/or fined.

### H. Statements related to the Fourth Quarter and Full Year 2019

158. On March 23, 2020, Jianpu announced its fourth quarter and full year 2019 financial results in a press release that stated, in relevant part:

Fourth Quarter 2019 Operational and Financial Highlights:

- Credit card volume for recommendation services[] was approximately 1.9 million in the fourth quarter of 2019, representing an increase of approximately 5.6% from the third quarter of 2019. The average fee per credit card for recommendation services increased to RMB110.21 (US$15.83) in the fourth quarter of 2019 from RMB109.22 in the third quarter of 2019. *As a result, revenues from recommendation services for credit cards increased by 6.5%* to RMB208.3 million (US$29.9 million) in the fourth quarter of 2019 from RMB195.6 million in the third quarter of 2019.

- Net loss was RMB6.6 million (US$0.9 million) in the fourth quarter of 2019, improved from a net loss of RMB352.5 million in the third quarter of 2019.

\* \* \*

**Total revenues from recommendation services** decreased by 62.3% to RMB248.3 million (US$35.7 million) in the fourth quarter of 2019 from RMB659.2 million in the same period of 2018.

*Revenues from recommendation services for credit cards* decreased by 27.9% to RMB208.3 million (US$29.9 million) in the fourth quarter of 2019 from RMB289.1 million in the same period of 2018, due to the decrease in both credit card volume and average fee per credit card. Credit card volume for recommendation services in the fourth quarter of 2019 was approximately 1.9 million, representing a decrease of approximately 26.9% from the same period of 2018. The average fee per credit card for recommendation services was RMB110.21 (US$15.83) in the fourth quarter of 2019, compared with RMB112.05 in the same period of 2018.

\* \* \*

51

**Net loss** was RMB6.6 million (US$0.9 million) in the fourth quarter of 2019, compared with a net income of RMB11.9 million in the same period of 2018.

159.     The above statements identified in ¶ 158 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors: (1) that certain of the Company's transactions carried out by the Credit Card Segment involved undisclosed relationships or lacked business substance; (2) that, as a result, Jianpu's revenue and costs for fiscal 2019 were overstated; (3) that there were material weaknesses in Jianpu's internal control over financial reporting; (4) that the Company's 2019 20-F was reasonably likely to be restated and the Company would not have achieved its revenue guidance for the period ending December 31, 2019; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

160.     On April 30, 2020, Jianpu stated that it elected to rely on the SEC Order issued on March 4, 2020, as amended on March 25, 2020, which provides for conditional relief to public companies that are unable to comply with filing requirements due to COVID-10. Specifically, the Company stated:

> The recent outbreak of COVID-19 has posed a significant impact on the Company's ability to file on a timely basis its Annual Report on Form 20-F for the year ended December 31, 2019 (the "Annual Report"), which is originally due to be filed on April 30, 2020 (the "Original Due Date"). Therefore, the Company has elected to rely on the conditional filing relief provided under the SEC Order. In accordance with the SEC Order, the Company plans to file the Annual Report no later than 45 days after the Original Due Date.

> Substantially all of the Company's operations are concentrated in China. In connection with the intensifying efforts to contain the spread of COVID-19, the Chinese government has taken a number of actions, which included extending the Chinese New Year holiday, quarantining individuals infected with or suspected of having COVID-19, restricting residents from travel, encouraging employees of enterprises to work remotely from home and cancelling public activities, among others. To cope with the impact and to protect its employees, the Company has also taken a series of measures, including, among others, the adoption of modified

52

operating hours, temporary closure of certain offices, remote working arrangements for its employees and more stringent workplace sanitation measures. Meanwhile, some of the Company's financial service providers, their agents and the Company's other business partners are experiencing disruptions to business operations and reduction in work efficiency. ***The foregoing factors have reduced the capacity and efficiency of the Company's operations, and resulted in difficulties with respect to information collection related to the preparation of the Annual Report, particularly certain subsequent information to verify the business conducted in 2019.*** As a result, the preparation of the Company's Annual Report has been delayed. The Company needs more time to collect, examine, analyze and compile the information, particularly certain subsequent information recently received from third parties, and to evaluate the impact of such information on the Company's consolidated financial statements and the Annual Report. Therefore, the preparation of the consolidated financial statements and related notes to be included in the Company's annual report on Form 20-F for the year ended December 31, 2019 is still in progress. As such, the Company has decided to rely on the SEC Order.

161. The above statements identified in ¶ 160 were materially false and/or misleading, and/or failed to disclose material adverse facts because: (1) Defendants failure to file its 20-F was unrelated to COVID but was instead related to its pervasive securities fraud including a scheme to boost revenue in its Credit Card Segment which prompted the restatement; (2) that certain of the Company's transactions carried out by the Credit Card Segment involved undisclosed relationships or lacked business substance; (3) that, as a result, Jianpu's revenue and costs and expenses for fiscal 2018 and 2019 were overstated; (4) that there were material weaknesses in Jianpu's internal control over financial reporting; (5) that the Company's fiscal 2018 20-F and 2019 20-F were reasonably likely to be restated; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## VI. CLASS ACTION ALLEGATIONS

162. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Jianpu shares between May 29, 2018 and February 16, 2021,

53

inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

163. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Jianpu's shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Jianpu shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Jianpu or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

164. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

165. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

166. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Jianpu; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

167.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VII.    UNDISCLOSED ADVERSE FACTS

168.    The market for Jianpu's shares was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Jianpu's shares traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Jianpu's shares relying upon the integrity of the market price of the Company's shares and market information relating to Jianpu and have been damaged thereby.

169.    During the Class Period, Defendants materially misled the investing public thereby inflating the price of Jianpu's shares, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading and through an undisclosed and deceptive scheme to inflate revenue through related party transactions.  The statements and omissions were materially false and/or misleading for the reasons set forth herein and because they failed to disclose

55

material adverse information and/or misrepresented the truth about Jianpu's business, operations, and prospects as alleged herein.

170. At all relevant times, the material misrepresentations and omissions and undisclosed scheme particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Jianpu's financial well-being and prospects and engaged in a scheme to do the same. These material misstatements and/or omissions and/or conduct had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's shares to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements and/or conduct during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's shares at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## VIII. LOSS CAUSATION

171. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

172. During the Class Period, Plaintiff and the Class purchased Jianpu's shares at artificially inflated prices and were damaged thereby. The price of the Company's shares significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

56

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

173.    As alleged herein, Defendants acted with scienter because Defendants: knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Jianpu, their control over, and/or receipt and/or modification of Jianpu's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Jianpu, participated in the fraudulent scheme alleged herein.

174.    Defendants were aware of the questionable related party transactions because in the 2018 20-F, signed by Defendant Ye, the Company stated that the audit committee, which is chaired by Denny Lee is responsible for "reviewing and approving all proposed related party transactions, as defined in Item 404 of Regulation S-K under the Securities Act."

175.    Under Item 404 of Regulation S-K, a registrant must "describe any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."  17 C.F.R. § 229.404(a).

176.    Also, according to the 2018 20-F, the audit committee regularly reports to the board of directors. The Company further stated that Mr. Lee, member of the audit committee, qualifies as an "audit committee financial expert."

177. Similarly, the 2019 20-F signed by Defendant Ye, likewise represented that the audit committee is responsible for "reviewing and approving all proposed related party transactions, as defined in Item 404 of Regulation S-K under the Securities Act" and that the audit committee regularly reports to the board of directors. Defendant Chen joined the Board of Directors on May 28, 2019, which coincided with the time that overstated revenue from the Company's Credit Card Segment began to increase markedly on a quarter-over-quarter and a year-over-year basis.

178. The 2019 20-F also identified three material weaknesses within the Company's internal controls, as more fully discussed above in ¶¶ 75 and 139.

179. Additionally, the Company stopped hosting earnings calls after its Q4 2019 earnings were released on Mar 23, 2020. This cessation means that following the Company's partial corrective disclosure on June 15, 2020, investors had no opportunity to question management about the reasons for the delayed filing, nor even about the nature of the related party transactions that prompted the overstated revenue and the eventual restatement of the Company's financials.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

180. The market for Jianpu's shares was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Jianpu's shares traded at artificially inflated prices during the Class Period. On March 4, 2019, the Company's share price closed at a Class Period high of $62.72 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's shares relying upon the integrity of the market price of Jianpu's shares and market information relating to Jianpu, and have been damaged thereby.

181.    During the Class Period, the artificial inflation of Jianpu's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Jianpu's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Jianpu and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's shares at such artificially inflated prices, and each of them has been damaged as a result.

182.    At all relevant times, the market for Jianpu's shares was an efficient market for the following reasons, among others:

(a)    Jianpu shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Jianpu filed periodic public reports with the SEC and/or the NYSE;

(c)    Jianpu regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Jianpu was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

183. As a result of the foregoing, the market for Jianpu's shares promptly digested current information regarding Jianpu from all publicly available sources and reflected such information in Jianpu's share price. Under these circumstances, all purchasers of Jianpu's shares during the Class Period suffered similar injury through their purchase of Jianpu's shares at artificially inflated prices and a presumption of reliance applies.

## XI. NO SAFE HARBOR

184. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Jianpu who knew that the statement was false when made.

## XII.   FIRST CLAIM

**Violation of Section 10(b) of The Exchange Act and
Rule 10b-5(a) -- (c) Promulgated Thereunder
Against All Defendants**

185.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

186.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) engage in nondisclosed related party transactions that lacked economic substance and were instead designed to boost revenue; and (iii) cause Plaintiff and other members of the Class to purchase Jianpu's shares at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

187.   Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for Jianpu's shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a)—(c). All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

188.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Jianpu's financial well-being and prospects, as specified herein.

61

189.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Jianpu's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Jianpu and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares during the Class Period.

190.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

191.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Jianpu's financial well-being and prospects from the investing public and supporting the artificially inflated price of its shares. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

192.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Jianpu's shares was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's shares were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the shares trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Jianpu's shares during the Class Period at artificially high prices and were damaged thereby.

193.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were unaware of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems

that Jianpu was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Jianpu shares, or, if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

194. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

195. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's shares during the Class Period.

## XIII. SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

196. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

197. Individual Defendants acted as controlling persons of Jianpu within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements

alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

198.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

199.    As set forth above, Jianpu and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## XIV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 20, 2021

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Raymond D. Sulentic II*
Robert V. Prongay
Ex Kano S. Sams II (*pro hac vice*)
Raymond D. Sulentic II (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

-and-

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 530
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
glinkh@glancylaw.com

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Attorneys for Plaintiff Enrique Africa*

66

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On July 20, 2021, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 20, 2021.

*s/ Raymond D. Sulentic II*
Raymond D. Sulentic II