## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL GUTTENTAG, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:21-cv-01419-JMF |
| Plaintiff, | |
| v. | |
| JIANPU TECHNOLOGY INC., DAVID YE, and YILÜ (OSCAR) CHEN, | |
| Defendants. | |

## ENRIQUE AFRICA'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................ 1

II.    STATEMENT OF FACTS ........................................................................... 3

    A.     Loan Segment Business .................................................................... 3

    B.     Credit Card Business........................................................................ 4

    C.     Databook ........................................................................................... 6

III.   APPLICABLE LEGAL STANDARDS DISFAVOR DISMISSAL ................................. 7

IV.   THE AMENDED COMPLAINT ALLEGES FALSITY ...................................................... 7

    A.     Defendants Made False Statements About The Company's Credit Card Segment 8

         1.     The Company's Restatement Constitutes an Admission that its Financial Results Were Materially False When They Were Issued ........................... 8

         2.     In Addition to the Restatement, Jianpu's Failure to Disclose Related Party Transactions Creates Another Independent Basis for Finding Falsity........ 9

    B.     Defendants Made False and Misleading Statements About The Loan Segment.. 10

    C.     Defendants Made False Statements About The Company's Databook Segment . 12

    D.     Defendants' Purported Warnings Do Not Immunize Their Conduct ................... 13

V.    PLAINTIFF SUFFICIENTLY ALLEGES SCIENTER .................................................. 15

         1.     Undisclosed Related Party Transactions Support a Strong Inference of Scienter ................................................................................................. 16

         2.     That The Accounting Violations Were Used Both to Manipulate Revenue and Meet Revenue Guidance Independently Evince Conscious Misbehavior ........................................................................................ 18

         3.     Internal Control Deficiencies Contribute to a Strong Inference of Scienter ............................................................................................... 20

         4.     The Resignation of Board Member Fan Yuanyuan Supports Scienter..... 21

         5.     Scienter is Further Supported by the Government Investigations Here ... 21

         6.     Scienter is Sufficiently Alleged When Viewed Holistically..................... 22

VI.    PLAINTIFF ADEQUATELY ALLEGES LOSS CAUSATION ...................................... 23

VII.    CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

CASES

*Altayyar v. Etsy, Inc.*,
    242 F. Supp. 3d 161 (E.D.N.Y. 2017) ...................................................................................... 14

*Asay v. Pinduoduo Inc.*,
    No. 20-1423, 2021 WL 3871269 (2d Cir. Aug. 31, 2021) ...................................................... 14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................................................. 7

*Batwin v. Occam Networks, Inc.*,
    No. CV 07-2750 CAS (SHX), 2008 WL 2676364 (C.D. Cal. July 1, 2008) ........................... 21

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................................................. 7

*Brown v. China Integrated Energy, Inc.*,
    875 F. Supp. 2d 1096 (C.D. Cal. 2012) .................................................................................... 9

*Caiafa v. Sea Containers Ltd.*,
    525 F. Supp. 2d 398 (S.D.N.Y. 2007)....................................................................................... 8

*City of Livonia Employees' Ret. Sys. v. Wyeth*,
    284 F.R.D. 173 (S.D.N.Y. 2012) ............................................................................................ 24

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012)..................................................................................... 15

*City of Providence v. Aeropostale, Inc.*,
    No. 11 Civ. 7132 (CM) (THK), 2013 WL 1197755 (S.D.N.Y. Mar. 23, 2013)...................... 12

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)................................................................................................................ 23

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003).................................................................................................... 23

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)................................................................................................................ 23

*Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017)................................................................................. 8, 21

*Freudenberg v. E\*Trade Financial Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)................................................................................. 14

*Friedman v. Rayovac Corp.*,
295 F. Supp. 2d 957 (W.D. Wisc. 2003)............................................................................. 12

*Gruber v. Gilbertson,*
No. 16CV9727, 2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018)................................................. 25

*Gruber v. Gilbertson*,
No. 16CV9727, 2019 WL 4439415 (S.D.N.Y. Sept. 17, 2019) ............................................... 25

*Hall v. The Child. Place Retail Stores. Inc.*,
580 F. Supp. 2d 212 (S.D.N.Y. 2008)................................................................................. 20

*Hoexter v. Simmons*,
140 F.R.D. 416 (D. Ariz. 1991) ......................................................................................... 25

*In re AOL Time Warner, Inc. Sec. and ERISA Litig.*,
381 F. Supp. 2d 192 (S.D.N.Y. 2004)........................................................................... 16, 19

*In re AT&T/DirecTV Now Sec. Litig.*,
480 F. Supp. 3d 507 (S.D.N.Y. 2020)................................................................................. 13

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)............................................................................... 8, 9

*In re BISYS Sec. Litig.*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005).................................................................................. 9

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
No. 17-CV-4846 (WFK), 2020 WL 1950783 (E.D.N.Y. Apr. 22, 2020)................................... 14

*In re Bristol Myers Squibb Co. Sec. Litig.*,
586 F. Supp. 2d 148 (S.D.N.Y. 2008)........................................................................... 22, 24

*In re Cannavest Corp. Sec. Litig.,*
307 F. Supp. 3d 222 (S.D.N.Y. 2018)................................................................................. 20

*In re Cardinal Health Inc. Sec. Litig.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006) ............................................................................... 18

*In re Carter-Wallace, Inc. Sec. Litig.*,
220 F.3d 36 (2d Cir. 2000)............................................................................................... 16

iv

*In re Commtouch Software Ltd. Sec. Litig.*,
No. C 01-00719 WHA, 2002 WL 31417998 (N.D. Cal. July 24, 2002) ..................................... 8

*In re DRDGOLD Ltd. Sec. Litig.*,
472 F. Supp. 2d 562 (S.D.N.Y. 2007)................................................................................... 8

*In re Gentiva Sec. Litig.*,
932 F. Supp. 2d 352 (E.D.N.Y. 2013) ................................................................................ 24

*In re Henry Schein, Inc. Sec. Litig.*,
2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) ..................................................................... 23

*In re Initial Pub. Offering Sec. Litig.*,
383 F. Supp. 2d 566 (S.D.N.Y. 2005)................................................................................... 7

*In re Intuitive Surgical Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014) ................................................................................. 20

*In re ITT Educ. Servs., Sec. Litig.*,
34 F. Supp. 3d 298 (S.D.N.Y. 2014)................................................................................... 22

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
26 F. Supp. 3d 278 (S.D.N.Y. 2014)................................................................................... 14

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
78 F. Supp. 3d 1215 (N.D. Cal. 2015) ............................................................................... 10

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010)............................................................................................... 11

*In re OSG Sec. Litig.*,
12 F. Supp. 3d 622 (S.D.N.Y. 2014)................................................................................... 20

*In re Providian Finan. Corp. Secs. Litig.*,
152 F. Supp. 2d 814 (E.D. Pa. 2001) ................................................................................. 22

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)................................................................................................. 18

*In re Sears, Roebuck Co. Sec. Litig.*,
291 F. Supp. 2d 722 (N.D. Ill. 2003) ................................................................................. 17

*In re Symbol Techs., Inc. Sec. Litig.*,
No. 05-CV-3923, 2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013) ............................................ 21

*In re Symbol Techs., Inc. Sec. Litig*,
 No. 05–CV–3923 (DRH)(AKT), 2015 WL 3915477 (E.D.N.Y. June 25, 2015)..................... 24

*In re Van der Moolen Holding N.V. Sec. Litig*.,
 405 F. Supp. 2d 388 (S.D.N.Y. 2005)................................................................................. 11

*In re Veeco Instruments, Inc. Sec. Litig*.,
 235 F.R.D. 220 (S.D.N.Y. 2006) ............................................................................... 14, 18, 21

*In re VeriSign, Inc*.,
 No. C 02-02270 JW(PVT), 2005 WL 88969 (N.D. Cal. Jan. 13, 2005)................................... 25

*In re Vivendi Universal, S.A. Sec. Litig*.,
 No. 02CIV5571RJHHBP, 2009 WL 10695884 (S.D.N.Y. Apr. 6, 2009) ............................... 23

*Institutional Investors Grp. v. Avaya, Inc.*,
 564 F.3d 242 (3d Cir. 2009)................................................................................................... 22

*Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd*.,
 620 F.3d 137 (2d Cir. 2010)................................................................................................... 10

*Lentell v. Merrill Lynch & Co.*,
 396 F.3d 161 (2d Cir. 2005)................................................................................................... 23

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
 797 F.3d 160 (2d Cir. 2015)................................................................................................... 23

*Luce v. Edelstein*,
 802 F.2d 49 (2d Cir. 1986)..................................................................................................... 25

*Matrixx Initiatives, Inc. v. Siracusano*,
 563 U.S. 27 (2011)............................................................................................................. 7, 16

*McCurdy v. S.E.C.*,
 396 F.3d 1258 (D.C.Cir.2005) ............................................................................................... 16

*McIntire v. China MediaExpress Holdings, Inc.,*
 927 F. Supp. 2d 105 (S.D.N.Y. 2013)..................................................................................... 21

*McKenna v. SMART Techs. Inc.*,
 2012 WL 1131935 (S.D.N.Y. Apr. 3, 2012)........................................................................... 12

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
 164 F. Supp. 3d 568 (S.D.N.Y. 2016)..................................................................................... 13

*Metz v. U.S. Life Ins. Co. in the City of New York*,
   662 F.3d 600 (2d Cir. 2011)...................................................................................... 7

*Meyer v. Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014)...................................................................................... 11

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)................................................................................. 15, 18

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
   No. 18 CIV. 9848 (PGG), 2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020) ............... 2, 13, 14, 15

*Pirnik v. Fiat Chrysler Automobiles, N.V.,*
   No. 15-CV-7199 (JMF), 2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016).............................. *passim*

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
   No. 1:16-CV-3591-GHW, 2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) ......................... 21, 23

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
   645 F. Supp. 2d 210 (S.D.N.Y. 2009)...................................................................... 24

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)...................................................................................... 14

*Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*,
   No. 8:07-cv-1952-T-26MAP, 2009 WL 3853592 (M.D. Fla. Mar. 30, 2009) ......................... 22

*Ross v. Abercrombie & Fitch Co.*,
   257 F.R.D. 435 (S.D. Ohio 2009) ............................................................................. 24

*Schaffer v. Horizon Pharma PLC*,
   No. 16-CV-1763 (JMF), 2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ..................................... 14

*SEC v. China Ne. Petroleum Holdings, Ltd.*,
   27 F. Supp. 3d 379 (S.D.N.Y. 2014)............................................................................. 9, 10, 16

*SEC v. Das*,
   2010 WL 4615336 (D. Neb. Nov. 4, 2010) .................................................................. 10

*S.E.C. v. Stanard*,
   No. 06 CIV 7736(GEL), 2009 WL 196023 (S.D.N.Y. Jan. 27, 2009) ..................................... 16

*Sharette v. Credit Suisse Int'l*,
   127 F. Supp. 3d 60 (S.D.N.Y. 2015).......................................................................... 23

*Take–Two Interactive Sec. Litig.,*
    551 F. Supp. 2d 247 (S.D.N.Y.2008) ..................................................................................... 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ...................................................................................................... 15, 16

*United States v. Mount Sinai Hosp.,*
    256 F. Supp. 3d 443 (S.D.N.Y. 2017) .................................................................................. 22

*Varghese v. China Shenghuo Pharm. Holdings, Inc.,*
    672 F. Supp. 2d 596 (S.D.N.Y. 2009) ........................................................................... 8, 13, 21

*Wilson v. LSB Indus., Inc.,*
    No. 15CIV7614RAGWG, 2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018) ............................... 24

STATUTES

15 U.S.C. §78u-4(b)(1)(B) ............................................................................................................ 7

15 U.S.C. §78u-4(b)(2) .............................................................................................................. 15

Lead Plaintiff Enrique Africa ("Africa" or "Plaintiff") hereby opposes Defendants'[1] Motion to Dismiss The Amended Class Action Complaint ("the AC").[2]

## I.    INTRODUCTION

This is a textbook securities fraud case involving Jianpu, a Chinese company, with U.S. listed American Depositary Shares ("ADSs" or "shares") brought on behalf of a class that bought shares between May 29, 2018 and February 16, 2021, inclusive (the "Class Period"). The fraud here involves, among other things, a scheme to overstate revenue through various improper and unlawful means, including undisclosed related party transactions that lacked business substance and eventually led to the restatement of years of financial statements. Defendants designed these nondisclosed sham transactions to boost revenue and meet the Company's guidance and analysts' forecasts. While Defendants were executing their revenue enhancing scheme, they also recklessly disregarded rampant ongoing unlawful conduct (both civil and criminal) at the Company, which eventually led to the Company writing down the entire value of a major subsidiary. Once such facts surfaced, rather than face investors, Defendants severed all communications and refused to hold earnings calls. As a result of the fraud, Jianpu's shares plummeted in value, falling from $50.40 per ADS on March 14, 2019, the day before the first corrective disclosure, to just $3.94 per ADS on the last day of the Class Period.

Despite these facts, Defendants moved to dismiss the AC under three elements of the Securities Exchange Act of 1934 ("Exchange Act"): (1) the purported failure to plead a false statement (Mot. at 10-18); (2) the purported failure to plead scienter (Mot. at 18-23); and (3) the

---

[1] Defendants Jianpu Technology Inc. ("Jianpu" or the "Company"), Chief Executive Officer ("CEO") David Ye ("Ye"), and Chief Financial Officer ("CFO") Yilü (Oscar) Chen ("Chen") are collectively "Defendants."

[2] Citations to Defendants' Memo of law in support of their Motion to Dismiss (Dkt. No. 47) are cited as "Mot._" and referred to as "the Motion."

1

purported failure to plead loss causation (Mot. at 24). Defendants' Motion, however, fails for several reasons.

First, Defendants' falsity argument, which comprises the bulk of their Motion, is easily extinguished by a robust body of case law, in this circuit and others, holding that a restatement of the type here constitutes an admission of earlier false statements of material fact, and thus establishes falsity as a matter of law. *See infra*, § IV.A.1. Even so, rather than concede falsity, Defendants pretend Plaintiff pleaded a different case and reiterate similar points to those made in the securities case brought against them based on the Securities Act of 1933 ("Securities Act") in the Southern District of New York—including that they purportedly warned of various risks.[3] Judge Gardephe rejected Jianpu's arguments then, and this Court should do the same now.

Second, Defendants' scienter argument is equally eviscerated by well-pleaded facts establishing recklessness, including that they: (1) manipulated revenue to meet analyst forecasts; (2) engaged in undisclosed related party transactions that lacked substance; (3) lacked internal controls and recklessly failed to remedy such deficiencies; (4) had a board member resign; (5) concealed ongoing government investigations; and (6) predicted the effects of their scheme *ex ante*, but once the truth emerged, sheepishly refused to host earnings calls. *See infra*, § V.1— V.6.

Third, and finally, Defendants advance a long-shot class certification argument disguised as a loss causation pleading issue (Mot. at 24). Their argument is premature, and wrong on the merits in any event. Defendants' stock dropped after the truth was revealed and Africa and the Class were damaged. At the pleading stage, nothing more is required.

In sum, the Court should deny Defendants' Motion, and this one is not a close call.

---

[3] *See Panther Partners Inc. v. Jianpu Tech. Inc.*, No. 18 CIV. 9848 (PGG), 2020 WL 5757628, at *12 -*16 (S.D.N.Y. Sept. 27, 2020) (rejecting multiple arguments that Jianpu disclosed a risk, noting "[t]hese disclosures are all framed as mere hypotheticals, however, and thereby imply that the risk of regulation is a theoretical one, rather than – as Plaintiff alleges – a risk that has already materialized in the marketplace. . . these vague disclosures are not sufficient").

## II.    STATEMENT OF FACTS

Jianpu purports to be the leading independent platform for discovery and recommendation of financial products in China. ¶ 2. It went public on the New York Stock Exchange ("NYSE") in November 2017 under the ticker "JT".  ¶ 20, Mot. at 3. Jianpu reports revenue in three reporting lines: (1) revenue from recommendation services for loans ("the Loan Segment"); (2) revenue from recommendation services for credit card services ("the Credit Card Segment"); and (3) revenue from advertising, marketing, and other services ("the Advertising Segment"). The Advertising Segment includes revenue recognized from the Company's variable interest entity ("VIE") stake in Databook Tech. Ltd. ("Databook") and entities affiliated with and/or owned by Databook.[4] ¶30. Both the Loan Segment and the Credit Card Segment operate on Jianpu's online platform "Rong360" in China, which purports to act as a matchmaker between customers looking for various financial products (*e.g.*, a loan or a credit card) on the one hand, and the providers of those products (like banks, credit card issuers, and peer-to-peer investors) on the other. ¶¶ 24-25.

The Company's revenues are primarily generated from fees charged to financial service providers via Rong360 for recommendations.

### A.  Loan Segment Business

The Loan Segment touted its purported regulatory compliance, saying it had "very stringent and strict onboarding process"(¶ 36), that it did not work with the "noncompliant P2P platforms"[5] (*Id.*), and that it "beefed up our quality control process, conducting a new round of internal review on December [2017] and removed the noncompliant financial products from our platform." ¶34.

---

[4] Including Databook subsidiaries Hangzhou Scorpion Technology Co., Ltd., Hangzhou Magnet Technology Co., Ltd., and Databook (HK) Limited (collectively "Databook")

[5] One type of entity on Rong360 is a peer-to-peer ("P2P") lender, which is a prevalent feature of the consumer finance market in China. P2P lending is an online method of financing that connects borrowers, *e.g.*, individuals or companies, with lenders. For example, if someone wanted to loan money to their neighbor, Rong360 could connect them.

CEO Ye also noted that loan volume on Rong360 had slowed during Q1 2018[6] in part due to the Company's "adjustments *to ensure regulatory compliance*." ¶ 34.

As the Company touted its purported regulatory compliance, it also reported strong revenue growth in its Loan Segment. For instance, during an earnings call discussing Q4 2018 and full year 2018 results on February 25, 2019, CFO Chen boasted of the Company's loan application volume and fee-per-loan application increases, the combination of which purportedly drove a 14% year-over-year increase in revenue for the Loan Segment during 2018. ¶ 38.

But the Company was not compliant, and neither were the platforms operating on Rong360 within the Loan Segment. *See e.g.*, ¶¶ 40-48. Instead, the Company's purported revenue growth came from unlawful practices that were unsustainable and a fundamental threat to the Company's business. Indeed, on March 15, 2019, a Chinese state-run broadcast called CCTV exposed improper and/or unlawful practices within the Company's Loan Segment. *See id*. Two days later, the Company admitted fault, apologized, and shut down its mobile application. ¶¶ 49-53.

This news had two effects: (1) it caused Jianpu's stock to slide on heavy volume (¶¶ 51, 55); and (2) it created a revenue vacuum that needed to be filled, which is when Defendants accelerated their overstatement of revenue in the Credit Card Segment. ¶¶ 58, 77-79.

### B. Credit Card Business

The implosion in the Loan Segment caused an urgent need, and thus strong motive, for the Company to offset the massive revenue shortfall. ¶58. Around the same time, investors began to attach more importance to Jianpu's Credit Card segment. For instance, roughly two weeks before the CCTV 315 Night report, analysts at J.P. Morgan upgraded their view of Jianpu's shares from Neutral to Overweight in a March 1, 2019 report ("the J.P. Morgan Upgrade"). Part of the reason

---

[6] References to Jianpu's fiscal years and quarters are cited as "FY" and "1Q," "2Q," "3Q," or "4Q" respectively.

4

for the J.P. Morgan Upgrade was that J.P. Morgan's analysts saw Jianpu's revenue mix shifting to "more defensive credit card recommendation business." ¶63.

Defendants also expressed steadfast confidence in the Credit Card Segment's ability to execute. ¶66. For instance, on the May 28, 2019 earnings call, CEO Ye noted that Q1 2019 revenue in the Credit Card Segment grew about 17% year-over-year, and that he expected Credit Card Segment growth to be higher during the second half of the year and that "as a team, *we know – we don't have any concern about the credit card business growth for the rest of this year*." ¶ 56. Similarly, on the same call, CFO Chen observed that even though the Loan Segment would see "some downward trend," he still assured investors that "we are seeing continued growth of our credit card business and also the – our marketing and advertising services and other services [*i.e.*, Databook]." ¶59. Chen continued "*[t]hese 2 lines*, we -- I think both year-over-year and quarter-over-quarter we should be able to contribute -- we *should be able to drive the growth*." *Id*.

Following such confident predictions, the Company hit its revenue forecasts, thanks to strong contributions from the Credit Card and Advertising Segments. For instance, on August 26, 2019, when the Company discussed quarterly results for Q2 2019, the Company held an earnings call wherein Ye again spotlighted the Credit Card Segment, noting "We saw strong credit card revenue growth of 25% year-over year *outpacing peers, even though the credit card market was relatively slower first half of this year compared to the second half of 2018*." Ye further noted that "[t]his growth reaffirms our capabilities to capture the evolving dynamics of the market." *Id*.

Once the truth was revealed, investors learned that 163.8 million RMB of the strong growth from the Credit Card Segment was not from increased card volume and fees as represented (*e.g.*, ¶¶ 125, 141), but from sham transactions that lacked business substance with nondisclosed related

parties. ¶¶ 72-73. And these sham transactions boosted revenue growth in just the right amount for the Company to hit its revenue guidance. ¶¶ 72-73,75-80.

### C. Databook

The Company's third reporting line, its Advertising Segment, includes revenue from Databook, which purports to be engaged in "in optimizing data-driven risk management decisions" by "helping financial service providers to enhance their risk management capabilities." ¶32. The Company bought Databook in June 2018 for RMB 204.5 million. ¶ 30.

During Q1 and Q2 2019, the Company's Advertising Segment grew 57.5% and 26.2% respectively, from the prior year (before it was restated). A material portion of the first half 2019 revenue growth reflected revenue from Databook. ¶ 82.

In September 2019, Databook subsidiary, Hangzhou Scorpion, was criminally investigated for the unauthorized storage of 21 million user accounts and passwords. ¶84. After Chinese investigators communicated the September 2019 criminal investigation into Databook to Defendants, the Company recorded a RMB 250.3 million impairment for the period ending September 30, 2019.[7] ¶85. During the third quarter 2019 press release, the Company gave only a vague explanation for its impairment, stating that it "primarily reflects the impairment of the goodwill and intangible assets related to a subsidiary acquired in 2018 due to adverse development of its business and change of the relevant industry background and market conditions" (¶88), but made no disclosure of the investigation as required under Generally Accepted Accounting Practices ("GAAP"). ¶¶97-101. Defendants also failed to disclose the investigation during the Company's Q4 2019 press release or earnings call held on March 23, 2020. ¶90.

---

[7] The Q3 2019 press release issued December 9, 2019, listed the Databook impairment as RMB 250.3 million on the Company's statement of cash flows. But in the 2019 20-F, the Company reported the impairment as RMB 254.7 million and taken as of December 31, 2019 (*i.e.*, Q4 2019), not September 30, 2019.

## III.   APPLICABLE LEGAL STANDARDS DISFAVOR DISMISSAL

In ruling on a motion to dismiss, the Court must "accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Metz v. U.S. Life Ins. Co. in the City of New York*, 662 F.3d 600, 602 (2d Cir. 2011). A complaint need only "contain sufficient factual matter ... to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[8] The facial plausibility requirement is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (complaint need only contain "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" supporting claims). Thus, a plaintiff need only "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Additionally, courts must "assess the legal feasibility of the complaint, not [] assay the weight of the evidence which might be offered in support thereof." *In re Initial Pub. Offering Sec. Litig.*, 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005).

To state a claim under § 10(b) of the Exchange Act and Securities and Exchange Commission ("SEC") Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission ("falsity"); (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-39 (2011).

## IV.   THE AMENDED COMPLAINT ALLEGES FALSITY

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a plaintiff adequately pleads falsity by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B).

---

[8] Unless otherwise indicated, all emphasis is added and all internal citations and quotations are omitted.

### A. Defendants Made False Statements About The Company's Credit Card Segment

#### 1.    The Company's Restatement Constitutes an Admission that its Financial Results Were Materially False When They Were Issued

As courts within this district have declared uniformly, "misreported financial data are clearly false statements of fact." *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 569 (S.D.N.Y. 2007). Indeed, "the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." *Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 544 (S.D.N.Y. 2017); *see also Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 410 (S.D.N.Y. 2007) (same).

"Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004); *see also Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 606 (S.D.N.Y. 2009) ("Misreported financial information clearly amounts to a false statement of fact."). Under GAAP, restatements are proper only to correct material errors in financial statements that existed *at the time the statements were issued*. *See, e.g.*, *Atlas*, 324 F. Supp. 2d at 486 ("the mere fact that financial results were restated is sufficient basis for pleading that those statements were false *when made*"); *In re Commtouch Software Ltd. Sec. Litig.*, No. C 01-00719 WHA, 2002 WL 31417998, at *7-*9 (N.D. Cal. July 24, 2002) ("a restatement is proper where an error has been made in a previously-issued financial statement . . . where there has been . . . oversight or misuse of facts that existed at the time the financial statements were prepared. . .. '[A]t that time' refers to the time of revenue recognition, not the time of the audit and restatement."). On February 16, 2021, Jianpu announced that it would restate its FY 2018 and 2019 results. ¶¶ 72-73.

Even a mere announcement of a company's intent to restate its financial results – without specifying the effect of the restatement on past financial results – is enough to establish falsity:

> The Complaint quotes from nearly every public filing and press release issued by BISYS during the Class Period and asserts that the restatement is an admission that these filings and press releases misrepresented BISYS' true financial condition. ***BISYS argues that these allegations are not sufficiently particularized because plaintiffs fail to specify which figures in the financial statements were false and to explain why those figures were misleading.***
>
> ***BISYS' argument, for the most part, is without merit***.  Pursuant to Generally Accepted Accounting Principles ("GAAP"), previously issued financial statements should be restated only to correct material accounting errors that existed at the time the statements were issued. . . .***The Complaint therefore alleges adequately that the financial statements and press releases issued during the Class Period were false to the extent they reported, discussed, or analyzed figures that subsequently were restated as well as any financial statistics derived from restated figures***.

*In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 437 (S.D.N.Y. 2005). Accordingly, "[n]either the PSLRA nor Rule 9(b) requires a plaintiff to reconstruct a company's financial affairs in greater detail than the corporation's own auditors were able to achieve." *Atlas*, 324 F. Supp. 2d at 487. Thus, just as in the many cases cited above, the Company's restatement here likewise establishes the falsity of its 2018 and 2019 financials as alleged throughout the AC.  ¶¶ 105, 114, 121, 123-24, 126-27, 129, 131, 137, 140, 142-3, 145, 147-8, 150, 151, 153-54, 159, 161.

## 2.   In Addition to the Restatement, Jianpu's Failure to Disclose Related Party Transactions Creates Another Independent Basis for Finding Falsity

Jianpu's failure to disclose related party transactions (¶¶ 3, 62, 68, 75, 77, 138) is itself an independent basis to demonstrate falsity. *See SEC v. China Ne. Petroleum Holdings, Ltd.*, 27 F. Supp. 3d 379, 391 (S.D.N.Y. 2014) (failure to disclose $59 million of related party transactions sufficient to plead material misstatement or omission); *Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1118 (C.D. Cal. 2012) (failure to disclose related-party transactions are adequate to plead falsity.). "[T]he absence of the related-party information from

9

[Defendants'] SEC filings necessitates the conclusion that those filings are misleading as a matter of law." *China Ne. Petroleum*, 27 F. Supp. 3d 379 at 391.[9]

### B. Defendants Made False and Misleading Statements About The Loan Segment

Throughout the Class Period, the Company made materially misleading statements about its Loan Segment's purported regulatory compliance with Chinese law. Indeed, CEO Ye stated that loan volume on Rong360 had slowed during Q1 2018 in part due to the Company's "adjustments *to ensure regulatory compliance*." ¶ 34. Months later, in late August 2018, CFO Chen assured investors that the Company had a *"very stringent and strict onboarding process*." ¶ 36. These statements were materially misleading given the many platforms on Rong360 that charged interest rates above China's regulatory cap or violated China's debt collections practices regulations. These issues were exposed roughly six months after Chen's August 2018 statements in the March 2019 CCTV Report and the Company's March 17, 2019 public admission and apology. ¶¶ 39-50. *See Pirnik v. Fiat Chrysler Automobiles, N.V.,* No. 15-CV-7199 (JMF), 2016 WL 5818590, at *7 (S.D.N.Y. Oct. 5, 2016) (finding falsity and scienter alleged for statement that "We are substantially in compliance with the relevant global regulatory requirements affecting our facilities and products", when "only months later," the defendant admitted to violating these very laws). *Pirnik*, 2016 WL 5818590, at *2; *cf*., *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd*., 620 F.3d 137, 143, n.13 (2d Cir. 2010) ("Depending on the problem, its existence in February 2008 may support an inference that it was present six months earlier. This is sufficient to raise [the plaintiffs'] right to relief above the speculative level.").

---

[9] *See also, e.g.*, *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1224 (N.D. Cal. 2015) (failure to disclose the related party nature of transactions "establishes the falsity of [defendant's] financial disclosures"); *SEC v. Das*, 2010 WL 4615336, at *3, *8 (D. Neb. Nov. 4, 2010) (failure to disclose $5.4 million of related party transactions sufficient to plead materiality because investors consider "management ethics and accountability").

Defendants complain that Plaintiffs "fail to allege that Jianpu knew of such conduct prior to the CCTV broadcast" (Mot. at 11). But "Plaintiffs do not need to show that the individual Defendants were personally involved with each [ ] violation or even aware of any particular violation." *Pirnik* 2016 WL 5818590, at \*7. Besides, Plaintiffs did allege Defendants' knowledge. *See* ¶ 47. CCTV was state-run: it was informed by the full surveillance, investigatory, and law enforcement powers of the Chinese Government. A reasonable inference is that such a broadcast would not assert Defendants' knowledge absent evidentiary support.

Finally, by putting the "the topic of the cause of its financial success at issue," Defendants triggered a duty to disclose all information that would render their statements not misleading. *See Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (holding that once a corporation makes "a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate").

Here, Defendants stated that 2018 Loan Segment volume increased due to rising loan applications and higher loan fees (*see, e.g.*, ¶¶ 112, 117, 122) – thereby putting the cause of the Company's success at issue – without disclosing that Rong360 loans violated Chinese law and thus jeopardized the entire Rong360 platform. Defendants' statements were thus misleading. *See In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) (defendant triggered duty to disclose that revenue had been derived in part from unlawful activity by stating, "in exceedingly turbulent market circumstances we were able to maintain our second quarter result at almost the level we achieved in the first quarter.").

Defendants' puffery defense about their Loan Segment compliance statements (Mot at 13)

11

likewise fails. *See Pirnik*, 2016 WL 5818590, at \*6 (rejecting puffery argument related to purported substantial compliance with regulations). Indeed, "a statement is not immaterial as a matter of law simply because the speaker prefaces it with 'I believe' or 'I think.'" *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 990 (W.D. Wisc. 2003).[10]

### C. Defendants Made False Statements About The Company's Databook Segment

For the reasons discussed in § IV.A above, the Company's restatement of its Advertising Segment revenue likewise establishes falsity for the Databook Segment statements.

A criminal investigation into the Databook Segment began in September 2019. ¶84. Just a few months later, when the Company announced results for the period ending September 30, 2019, Defendants had sufficient information to purge *its entire Databook subsidiary* from its balance sheet, a fact they concede. ¶¶ 86-89, Mot. at 17. Thus, under GAAP, the Company had two choices: (a) accrue reserves for the expected liability; or (b) "provide appropriate disclosure" to investors. ¶¶ 98 – 99 (quoting ASC 450). Defendants did neither. ¶¶100-102. Defendants had a duty to make such a disclosure *during the third quarter 2019* because GAAP so required (¶¶98-101). In citing purported "adverse development of its business and change of the relevant industry background and market conditions" (¶¶ 86, 155), rather than a criminal investigation, Defendants put the cause of the Company's impairment at issue and thus triggered another duty to disclose the investigation into Databook. *See McKenna v. SMART Techs. Inc.*, 2012 WL 1131935, at \*13 (S.D.N.Y. Apr. 3, 2012) (where defendant's statement "put [a] question … 'in play,'" he is "required to make full disclosures to ensure the accuracy of [his statements]"). So when the Company "reversed" RMB30 million in prior period revenue (¶ 96), it established the falsity of

---

[10] *See also City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132 (CM) (THK), 2013 WL 1197755, at \*14 (S.D.N.Y. Mar. 23, 2013) (holding that statements that "[w]e feel very good about the product going forward" and "we have also been very excited about some of the fashion components . . . for spring" are actionable).

the earlier booked Databook revenue. *See Varghese*, 672 F. Supp. 2d at 606. Moreover, it also established that the facts which prompted the Databook impairment were the same as those that prompted the revenue "reversal," and thus support scienter as to the Databook statements. ¶¶ 98-99; *see Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 585 (S.D.N.Y. 2016) ("Plaintiffs have plausibly alleged that the Management Defendants were reckless in opting to misrepresent their exposure to civil and criminal liability.").[11]

### D.  Defendants' Purported Warnings Do Not Immunize Their Conduct

Defendants' overarching defense is, essentially, that because they purportedly warned of things like a *potential* restatement (Mot. 10-11,13-14), or that some employees *may* participate in various unspecified illegal activities (*Id.*), that somehow categorically immunizes Defendants from federal securities law. This assertion is not the law, and Defendants know this because it is substantially similar to an argument that they recently raised and lost before a different judge in this district. *See Jianpu*, 2020 WL 5757628, at *12 -*16 (rejecting Jianpu's argument that its risk disclosures immunized it from § 11 liability as a matter of law). Defendants' favored falsity defense fails here for at least three reasons.

***First***, Defendants' authority offers no broad shield of immunity of the sort that they advocate. *See* Mot. at 11 (citing *AT&T/DirecTV*, 480 F. Supp. 3d 507 at 527 (where isolated instances of fraudulent sales practices were found immaterial)). In *AT&T*, defendants argued that

---

[11] Defendants' authority spotlights the difference between isolated instances of misconduct and material malfeasance like that in Databook. *See* Mot. at 11; *In re AT&T/DirecTV Now Sec. Litig*., 480 F. Supp. 3d 507, 527 (S.D.N.Y. 2020) ("Nor do the securities laws impose 'a duty to disclose uncharged criminal conduct,' *unless such disclosure is necessary to ensure that their [other] statements are not misleading*."). For its part, *AT&T* relies on *Menaldi v. Och-Ziff*, which is the better analog. 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016). There, the district court held that "a corporation may be compelled to disclose uncharged wrongdoing if its statements are or become materially misleading in the absence of disclosure" *Menaldi*, 164 F. Supp. 3d 568 at 581. Here, Defendants impaired an entire asset's value in response to the Chinese government's investigation, which supports the inference that unlawful practices permeated the Databook operation—because an investigation into *isolated* privacy violations would not cause a write-off of an entire business. Thus, Defendants had a duty to disclose the uncharged conduct in September 2019 and accrue a liability under GAAP (¶¶ 97-101). *See id.*

isolated fraudulent conduct of its employees, which had no impact on the financial statements, did

not constitute fraud, and the district court agreed. Yet, unlike here, there was no restatement in

*AT&T*.[12] Restatements are, by definition, *material* misstatements as a matter of law. *Veeco*, 235

F.R.D. at 234 ("previously issued financial statements should be restated *only to correct material*

*accounting errors* that existed at the time the statements were originally issued").

    *Second*, Defendants' purported warnings were too general and never warned of the *specific*

*risk* of a material restatement that resulted *from nondisclosed sham transactions with related*

*parties*. *See* Mot. 14. The closest they came: "could expose us to increased risk of fraud or misuse

of corporate assets and . . . [w]e may also be required to restate our financial statements from prior

periods" (Mot. at 14) is, at best, a generic and theoretical expression of a risk insufficient to warn

of the fraud here. *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary

words about future risk cannot insulate from liability the failure to disclose that the risk has

transpired.").[13] "[T]hese vague disclosures are not sufficient." *Jianpu*, 2020 WL 5757628, at *15.

    *Third*, Defendants conflate warning of a future risk and making a false statement of present

or historical fact. *See* Mot. at 10 ("*if* any financial service providers"); 14 ("*could* expose us to

increased risk of fraud . . . *may* be required to restate"). "These disclosures are all framed as mere

hypotheticals, however, and thereby imply that the risk of [a restatement] is a theoretical one,

---

[12] Nor were there restatements in *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 180 (E.D.N.Y. 2017), *aff'd*, 731 F. App'x 35 (2d Cir. 2018); *Asay v. Pinduoduo Inc.*, No. 20-1423, 2021 WL 3871269, at *3 (2d Cir. Aug. 31, 2021); or *Schaffer v. Horizon Pharma PLC*, No. 16-CV-1763 (JMF), 2018 WL 481883, at *6 (S.D.N.Y. Jan. 18, 2018), relied on by Defendants at Mot. 11-13. Defendants' case that did have a restatement, *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 295 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015), had just a "modest" restatement that impacted less than five percent of the Defendants' income, and did not involve sham transactions. By contrast here, Defendants restated more than double that amount, at just under 12% of FY 2019 revenue. *See* ¶ 76.

[13]     *See also In re Blue Apron Holdings, Inc. Sec. Litig.*, No. 17-CV-4846 (WFK), 2020 WL 1950783, at *9 (E.D.N.Y. Apr. 22, 2020) ("If a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability. Indeed, the inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts."); *Freudenberg v. E*Trade Financial Corp.*, 712 F. Supp. 2d 171, 193 (S.D.N.Y. 2010) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

rather than – as Plaintiff alleges – a risk that has already materialized in the marketplace." *Jianpu*, 2020 WL 5757628, at \*12. Here, many of Defendants purported warnings came *after* their fraud transpired. For instance, by Defendants' own admission, the sham transactions in the Credit Card segment that eventually prompted the restatement were ongoing during 2018 and 2019 (¶73), and the improper practices in the Loan Segment continued until at least March 15, 2019 (¶¶ 39-40). So, for instance, a risk disclosure made in the Company's 2018 Form 20-F, filed on April 23, 2019, could not possibly warn of fraudulent practices that began in 2018 and continued into 2019 (*e.g.*, Mot. at 14, Ex. C, citing the Company's 2018 Form 20-F). Plaintiff has adequately alleged falsity.

## V.    PLAINTIFF SUFFICIENTLY ALLEGES SCIENTER

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). "Courts must consider the complaint in its entirety . . . [t]he inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323 (emphasis in original). A strong inference of scienter arises if, "[w]hen the allegations are accepted as true and taken collectively," a "reasonable person would deem the inference of scienter at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 324-26. Moreover, "at the motion to dismiss stage, a tie on scienter goes to the plaintiff." *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

In the Second Circuit, plaintiffs may establish scienter in one of two ways: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious behavior or recklessness." *Novak*

15

*v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). Circumstantial evidence supporting a "strong inference" of scienter can be shown by alleging facts showing "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant[s] or was so obvious that the defendant[s] must have been aware of it." *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (citation omitted). This standard can be met when a plaintiff alleges that defendants displayed "an egregious refusal to see the obvious, or to investigate the doubtful," *Pirnik*, 2016 WL 5818590, at *6. The AC teems with facts supportive of conscious behavior.[14]

### 1. Undisclosed Related Party Transactions Support a Strong Inference of Scienter

"As a threshold matter, while related-party transactions are not per se unlawful, we view them with 'extreme skepticism,' especially when they go undisclosed." *China Ne. Petroleum*, 27 F. Supp. 3d 379 at 389 (presence of undisclosed related party transactions supported inference of scienter) (citing *McCurdy v. S.E.C.*, 396 F.3d 1258, 1261 (D.C.Cir.2005)). "When a plaintiff pleads that a defendant raised shareholder money using misleading documents and then partook in a series of undisclosed related-party transactions, the inference that [the defendant] did so with fraudulent intent is not merely strong, it is inescapable."[15] *Id*. In particular, sham transactions of the type alleged here are powerful evidence of scienter. *See, e.g.*, *S.E.C. v. Stanard*, No. 06 CIV 7736(GEL), 2009 WL 196023, at *28 (S.D.N.Y. Jan. 27, 2009) (finding in a bench trial that transaction engineered to have an effect on balance sheet sufficient to prove scienter); *In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, 381 F. Supp. 2d 192, 226-27 (S.D.N.Y. 2004) (sham

---

[14] Defendants suggest that the Credit Card Segment motive undermines the AC. Mot. at 18-19. The Supreme Court has repeatedly declared, however, that the "absence of a motive allegation" is "not dispositive." *Matrixx*, 563 U.S. at 48; *Tellabs*, 551 U.S. at 325 ("the absence of a motive allegation is not fatal").

[15] Moreover, Defendants' concrete benefit standard (Mot. at 2) has been rejected by district courts in the Second Circuit, particularly in cases involving related party transactions. "Such a formalistic interpretation of the "concrete and personal benefit" standard is completely untenable." *China Ne. Petroleum*, 27 F. Supp. 3d 379 at 389.

transactions sufficient to plead scienter under PSLRA).

Here, such related party transactions are not just alleged,[16] they are alleged to have been overseen by the Company's audit committee, which, in turn, provided regular reports to the Board of directors, on which CEO Ye and CFO Chen both sit. ¶¶ 173-77. When Jianpu's financials were restated, it did not restate the representation within its 20-F that stated the audit committee is charged with "reviewing and approving all proposed related party transactions, as defined in Item 404 of Regulation S-K under the Securities Act" and that the audit committee "regularly reports to the board of directors." Thus, the reasonable inference is that either: (a) the related party transactions that prompted the restatement were likewise reviewed or approved by the Audit Committee and thus known to the Individual Defendants; or (b) the Individual Defendants were reckless in not reviewing such transactions. "Logically, defendants in their positions would be expected to have knowledge of the facts regarding the credit card portfolio at the time they were making statements about the portfolio or signing off on SEC filings." *In re Sears, Roebuck Co. Sec. Litig*., 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) (applying Second Circuit's scienter analysis and finding  "Plaintiffs have sufficiently alleged facts leading to a 'strong inference' of scienter."). Knowledge of the scheme is even more likely given Chen's August 27, 2018 statement that "[i]nstead of serving as pure information platform, matching individual borrowers and the lenders, *these platforms were directing funds to related parties forging assets or investing in larger ticket size assets with mismatched cash flows*" in reference to noncompliant firms on the Company's Loan Segment. In other words, in discussing Jianpu's Loan Segment, Chen described, in essence, *the very scheme* that was then ongoing in the Company's Credit Card Segment. ¶ 117. Such access to information supports the inference that Defendants knew, or should have known of, the

---

[16] See ¶¶ 3, 62, 68, 75, 77, 79, 80, 81, 102, 105, 118, 124, 127, 137, 138, 143, 145, 148, 151, 154, 169, 174.

fraudulent scheme in the Credit Card Segment. *See In re Scholastic Corp. Sec. Litig*., 252 F.3d 63, 74 (2d Cir. 2001); *Pirnik*, 2016 WL 5818590, at *6  ("Courts have approved of claims when plaintiffs 'have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.'") (*quoting Novak*, 216 F.3d 300 at 308).

### 2. That The Accounting Violations Were Used Both to Manipulate Revenue and Meet Revenue Guidance Independently Evince Conscious Misbehavior

Where, as here, "accounting manipulations involving premature revenue recognition ... are especially indicative of conscious misbehavior since such violations do not commonly occur inadvertently, but instead suggest a conscious decision to improperly recognize revenue." *Veeco*, 235 F.R.D. at 232; *see also In re Cardinal Health Inc. Sec. Litig*., 426 F. Supp. 2d 688, 725 (S.D. Ohio 2006) ("the Company improperly booked zero-margin sales as Operating Revenue to give investors the false and misleading impression Cardinal was achieving revenue growth," which supported scienter). Such manipulations exist here: in response to plunging revenue in the Loan Segment, the Company's restated financials show the Credit Card segment's revenue grew through sham transactions with increasing intensity each quarter beginning in Q1 2019, following the CCTV 315 Night expose. *See* Figure 2 ¶ 77, table beneath ¶ 76. In other words, the farther Loan Segment revenue fell, the more Credit Card Segment revenue grew through undisclosed sham transactions designed to offset the Loan Segment revenue implosion. *Id*.; ¶ 79. This increased credit card revenue was *just enough* for the Company to meet or exceed its overall revenue guidance during three of four quarters in 2019 (¶80), which would not have been the case absent

18

such fictious revenue,[17] further supporting scienter. *See AOL,* 381 F. Supp. 2d 192 at 240 (holding that manipulated revenue used to meet quarterly revenue targets suggested scienter). For the same reasons, scienter is also supportive as to the Company's Databook Segment because Defendants' improper revenue recognition also enabled Jianpu to hit its revenue guidance during 2019. ¶ 102

Defendants claim they lacked a crystal ball when it came to their Credit Card Segment. Mot. 13. Yet, the facts show they had exactly that: just before Defendants' scheme to increase revenue took off, Ye evinced remarkable prescience about the Company's future ability to hit its Credit Card forecasts. In May 2019, Ye said, "***we don't have any concern about the credit card business growth for the rest of this year***." ¶ 56. What happened next? By August, the Company saw 25% credit card revenue growth "outpacing peers, even though the credit card market *was relatively slower* first half of this year." ¶66. The strong growth and outperformance relative to its peers that CEO Ye predicted came *at exactly the same time* that fraudulently inflated revenue in the Credit Card Segment due to related party transactions accelerated (¶¶ 76-80).

The nonculpable inference Defendants concoct is that "rogue employees" (Mot. at 2), who were admittedly led by a business unit head (¶72), spearheaded a scheme—*whose effects Ye predicted*—to inflate revenue through deals with undisclosed related parties—that presumably benefit company executives and/or their families, not these supposed rogue employees—*in just the right amount to enable the Company to hit its revenue* forecasts.[18] Additionally, hitting corporate guidance is of no import to most employees (let alone "rogue employees"), but is of

---

[17] In Q1 2019, the Company still would have met its revenue guidance even after the restating, but would not have substantially exceeded it, as it did before the restatement. *See* ¶ 80 (showing previously reported revenue of RMB 654.9 million and restated revenue of RMB 618.3 million, versus initial guidance of RMB 600 – 630 million). For the rest of 2019, the Company met or exceeded its guidance range before the restatement, but missed even the low end of its range after the restatement.

[18] For instance, in Q2 2019, as originally reported, the Company hit its revenue forecast by just over 0.6% (¶ 80), whereas after the restatement it missed the same target by 13.5% (*Id.*). Similarly, in Q3 2019 the Company exceeded the high end of its forecast by just 1%, but after restating, missed the high end by 13.5% and the low end by 6.7%.

19

critical importance to the Individual Defendants. Defendants' theory is absurd.

The far more plausible inference is—just like the business unit head who was terminated because of the scheme (¶ 72)— CEO Ye and CFO Chen were likewise aware of the credit card scheme when they confidently predicted the Company would grow its Credit Card Segment revenue even facing industry headwinds. This inference is even more cogent and compelling when considering that: (1) Ye tracked new financial institutions added to the Company's platform as early as February 2019 (*See* ¶128, touting fact that 25 banks were present on the Credit Card platform); and (2) according to CW1–a former Rong360 Credit Auditor from April 2017 through October 2019–the Company would normally verify information provided by a platform company to verify it actually existed (¶81). In other words, if there were—as Defendants ask the Court to believe—a new entity created by "rogue employees," that spawned sufficient revenue growth for the Company to hit its revenue guidance, Ye and Chen would have known about it: they tracked and discussed new financial institutions added to the platform on earnings calls. *See* ¶¶ 128, 136 (discussing number of banks on credit card platform, and revenue breakdown among entities on the platform); *see also In re Intuitive Surgical Sec. Litig*., 65 F. Supp. 3d 821, 837-38 (N.D. Cal. 2014) (holding that allegations that defendants "tracked adverse events" and "closely monitored these reports" supported a strong inference of scienter).

### 3.  Internal Control Deficiencies Contribute to a Strong Inference of Scienter

"Courts in this District have repeatedly held that weak internal controls will support an inference of scienter." *In re Cannavest Corp. Sec. Litig.,* 307 F. Supp. 3d 222, 245 (S.D.N.Y. 2018); *see also In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 633 (S.D.N.Y. 2014) ("A lack of adequate internal controls may support the inference of scienter."); *Hall v. The Child. Place Retail*

*Stores. Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008); *Veeco*, 235 F.R.D. 220 at 232.[19]  Here, such internal control deficiencies were widespread and worsened over time. For instance, in the 20-F for the period ending December 31, 2018, signed by Ye, the Company identified material weakness in its internal controls related to financial reporting under GAAP. ¶ 139. In response to this issue, the Company promised to "enhance and improve our internal control over financial reporting" as a remedy. *Id*. Nevertheless, after a year of purportedly implementing such remedial steps, the Company *again* reported a nearly identical internal control deficiency, and even *added more* deficiencies. *Compare* ¶75(i) - (iii) with ¶ 139. Defendants' failure to remedy a known internal control weakness is itself further supportive of scienter. *Batwin v. Occam Networks, Inc.,* No. CV 07-2750 CAS (SHX), 2008 WL 2676364, at \*13 (C.D. Cal. July 1, 2008) (failure to correct internal control deficiencies gave rise to a strong inference of scienter).

### 4.  The Resignation of Board Member Fan Yuanyuan Supports Scienter

Board of Directors Member Fan Yuanyuan's May 28, 2019 resignation, which came shortly after the CCTV report, also supports scienter. ¶¶ 53-54; *Varghese*, 672 F. Supp. 2d 596, at 608 (resignation of a board member supported a strong inference of scienter); *McIntire v. China MediaExpress Holdings, Inc.,* 927 F. Supp. 2d 105, 126–27 (S.D.N.Y. 2013) (same). Indeed, "[t]he timing and circumstances" surrounding the resignation "also contribute[s] to the inference of scienter." *Fresno*, 268 F. Supp. 3d at 553.

### 5.  Scienter is Further Supported by the Government Investigations Here

The government scrutiny into the Loan Segment as reported by the CCTV report (¶53), and the criminal conviction in the Databook Segment (¶¶92-94) are yet more indicia of scienter.

---

[19] *See also Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, No. 1:16-CV-3591-GHW, 2020 WL 1877821, at \*14 (S.D.N.Y. Apr. 14, 2020) ("The Fund has plausibly pleaded that Defendants acted with scienter by attesting to the adequacy of their internal controls in the SOX certifications.") *In re Symbol Techs., Inc. Sec. Litig*., No. 05-CV-3923, 2013 WL 6330665, at \*10-11 (E.D.N.Y. Dec. 5, 2013) (same).

*See In re Bristol Myers Squibb Co. Sec. Litig*., 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008) (existence of DOJ investigation considered in scienter analysis).[20]

### 6. Scienter is Sufficiently Alleged When Viewed Holistically

Viewed holistically, the record is thick with well-pleaded facts supporting a strong inference of scienter, which is yet further supported by the Company severing all communications with investors.[21] ¶¶ 160, 179. On these facts, considering a government investigation into one segment, and government scrutiny of another, coupled with widespread restatements due in part to misconduct in a third segment, such stonewalling by Defendants is tantamount to invoking the Company's Fifth Amendment privilege, which can also support scienter in fraud actions. *Cf. United States v. Mount Sinai Hosp.*, 256 F. Supp. 3d 443, 451 (S.D.N.Y. 2017) (finding scienter and noting "Where it is appropriate to draw an adverse inference from a witness's invocation of the Fifth Amendment, the defendant can be found to have acted with the requisite scienter.").[22]

In sum, the fact that Defendants reported unlawful or unauthorized conduct in all three of its business segments, with one resulting in a criminal conviction and impairment of that segment's assets, supports a strong inference of scienter. ¶ 101; *In re Providian Finan. Corp. Secs. Litig*., 152 F. Supp. 2d 814 (E.D. Pa. 2001) (scienter sufficiently alleged because illegal practices were so extensive that individual defendants must have been aware of them).

---

[20] While the mere existence of a pending investigation is insufficient to show a strong inference of scienter, "[C]ourts have considered a governmental investigation as one piece of the puzzle when taking a holistic view of the purported facts as they relate to scienter." *See In re ITT Educ. Servs., Sec. Litig*., 34 F. Supp. 3d 298, 309 (S.D.N.Y. 2014) (considering pending investigations as evidence of scienter); *Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*, No. 8:07-cv-1952-T-26MAP, 2009 WL 3853592, at *7 (M.D. Fla. Mar. 30, 2009) ("Courts commonly hold that pending government investigations are relevant and provide notice of a possible fraud. . . and may not be ignored.").

[21] One month before announcing the Company could not file its 20-F on time, Defendants held their last earnings call. ¶¶ 160, 179. Ever since, Defendants held none, thereby depriving investors and analysts the opportunity to question management about the many revelations that would follow shortly thereafter. *Id.*

[22] At the very least, the content and context of Defendants' refusal to answer questions supports scienter. *See Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009).

## VI.    PLAINTIFF ADEQUATELY ALLEGES LOSS CAUSATION

"Loss causation [] is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). To adequately plead loss causation, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Loss causation "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent*, 343 F.3d at 197. "[C]ourts in this District have historically evaluated loss causation under the notice pleading standard of Rule 8." *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 80 (S.D.N.Y. 2015).[23] "A plaintiff's burden to plead loss causation is not a heavy one." *Plumbers & Pipefitters Nat'l Pension Fund v. Davis,* No. 1:16-CV-3591-GHW, 2020 WL 1877821, at *14 (S.D.N.Y. Apr. 14, 2020). Plaintiff has satisfied this burden here. ¶¶ 3-14, 24-161,171-72.

Defendants' factual arguments are inappropriate at the pleading stage. *See* Mot. at 25 (arguing Plaintiffs failed to disaggregate causes for stock drop). Whether multiple factors contributed to a stock drop cannot be decided on a motion to dismiss. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 189 (2d Cir. 2015). "The requirement, if any, to plead a causal link does not place on Plaintiffs a further pleading obligation to rule out other contributing factors or alternative causal explanations." *Id.*; *see also In re Vivendi Universal, S.A. Sec. Litig.*, No. 02CIV5571RJHHBP, 2009 WL 10695884, at *10, 15 (S.D.N.Y. Apr. 6, 2009) ("the chain of causation ... is a matter of proof at trial..."); *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011). Indeed, Defendants' own binding authority underscores the prematurity of their arguments. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) ("If the loss was

---

[23] *See also In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *25 (E.D.N.Y. Sept. 27, 2019) (collecting cases).

caused by an intervening event, the chain of causation ... *is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.*") (cited at Mot. 24).

Defendants are also incorrect that an investigation cannot constitute a partial corrective disclosure. Mot at 24, n. 11. *See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 385 (E.D.N.Y. 2013) (announcement of a governmental investigation into precise subject matter of the fraudulent practices can qualify as a partial corrective disclosure for purposes of loss causation).[24] Regardless, Jianpu's stock dropped on February 16, 2021 in response to the preliminary *results* of its investigation, not the *announcement* of it, in any event. ¶ 10.

Finally, Defendants' class certification argument (*See* Mot. at 24-25)—disguised as a pleading issue—is both off point and premature. *See City of Livonia Employees' Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 178 (S.D.N.Y. 2012) ("that [plaintiff] purchased shares after the [purported corrective disclosure] does not disqualify [plaintiff] from serving" as lead plaintiff); *Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 446 (S.D. Ohio 2009) ("It is not inconsistent with the pleadings for Plaintiff to have purchased stock after its price had been deflated by curative disclosures.").[25] Thus, Africa's individual trades have no bearing on loss causation for the class— particularly at the pleading stage—as any purported intra-class conflicts should be resolved later.[26]

---

[24] *See also Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 230 (S.D.N.Y. 2009) (rejecting argument that "the announcement of an investigation without more, is insufficient to plead loss causation" and finding loss causation sufficiently pleaded by such an occurrence); *Take–Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247 (S.D.N.Y.2008) (a single notice of an informal, non-public SEC investigation created an adequate causal connection to plead loss causation when coupled with a 7.5% stock drop.). The disclosures here establish that the "Amended Complaint links the announcement of the investigation to the purportedly fraudulent misconduct" and thus adequately pleads loss causation." *Bristol Myers*, 586 F. Supp. 2d 148 at 164.

[25] Defendants rely on *Schuler v. NIVS Intellimedia Tech. Grp., Inc.*, that confronted the "rare circumstance" where a lead plaintiff sold his shares before *the only* corrective disclosure in a class period. 2013 WL 944777, at *9-10. Here, there are *multiple* corrective disclosures, and it is undisputed that Africa purchased his shares during the Class Period and was damaged by at least one of them. Compare Mot. at 24 (discussing Africa's October 21, 2020 purchase and February 16, 2021 sale) with ¶ 10 (discussing a stock drop caused by a partial disclosure on February 16, 2021).

[26] *See, e.g.*, *Wilson v. LSB Indus., Inc.*, No. 15CIV7614RAGWG, 2018 WL 3913115, at *6 (S.D.N.Y. Aug. 13, 2018) ("that he did not hold [] securities throughout the entire class period does not render him atypical or inadequate because his claim relies on the same alleged course of conduct and theory of liability as other class members."); *In re Symbol*

Here, the fraud was gradually revealed over a series of partial corrective disclosures. First, on March 15, 2019, the CCTV report partially revealed the fraud in the Loan Segment, which was later confirmed by the Company's admission and apology. ¶¶ 5, 7. This news caused Jianpu's stock to drop. *Id*. Second, on June 15, 2020, the Company filed a notification indicating it could not timely file its Form 20-F and that it was reviewing certain transactions, which also caused its stock to drop. ¶ 9. Third, on February 16, 2021, the Company revealed the fraud in its Credit Card Segment by announcing a restatement, which again caused its stock to fall. ¶11. It is undisputed that Plaintiff bought his shares before the full revelation of the restatement and held them until February 16, 2021 (Mot. at 24), thereby damaging him. These allegations are more than sufficient at the pleading stage. *See Gruber v. Gilbertson,* No. 16CV9727, 2018 WL 1418188, at *7-9 (S.D.N.Y. Mar. 20, 2018) (finding plaintiff was "entitled to test his theories in discovery" after rejecting loss causation argument much like Jianpu's because it "verges on the absurd").

## VII.   CONCLUSION

For the above reasons, the Court should deny Defendants' Motion. However, if the Court were to find that any aspect of the AC is inadequate, it should grant leave to amend. *See Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) ("Complaints dismissed under Rule 9(b) for [failure to plead fraud with particularity] are almost always dismissed with leave to amend").

---

*Techs*, 2015 WL 3915477, at *7 ("Courts have ... repeatedly recognized that . . . the time at which particular class members purchased their securities. . . relate to damages and do not warrant denial of class certification."); *Gruber v. Gilbertson*, No. 16CV9727, 2019 WL 4439415, at *3 (S.D.N.Y. Sept. 17, 2019), *modified*, No. 16-CV-09727-JSR, 2021 WL 3524089 (S.D.N.Y. Aug. 10, 2021) ("Defendants arguments . . . are meritless. Differences in purchase date and the information relied on to make those purchases do not defeat typicality when the purchases were made during the class period."); *Hoexter v. Simmons*, 140 F.R.D. 416, 422 (D. Ariz. 1991) ("the fact that later purchasers may have relied on statements made after the last date on which Class representatives purchased shares would not prevent the claims of both groups of purchasers from being brought in one action"); *In re VeriSign, Inc*., No. C 02-02270 JW(PVT), 2005 WL 88969, at *4 (N.D. Cal. Jan. 13, 2005) ("Simply because certain class members were injured by misrepresentations that came *after* the Lead Plaintiffs had already acquired VeriSign stock does not mean that the Lead Plaintiffs cannot represent the class.") (italics in original).

25

Respectfully submitted,

DATED: October 18, 2021

**GLANCY PRONGAY & MURRAY LLP**

By:   _/s/ Ex Kano S. Sams II_
Robert V. Prongay
Ex Kano S. Sams II (*pro hac vice*)
Raymond D. Sulentic (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

-and-

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 530
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
glinkh@glancylaw.com

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Attorneys for Plaintiff Enrique Africa*

26

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On October 18, 2021, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 18, 2021.


*s/ Ex Kano S. Sams II*
Ex Kano S. Sams II