UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                       :

ENRIQUE AFRICA, *individually and on behalf of all*   :
*other similarly situated*,   :
                                         :

                   Plaintiff,    :        21-CV-1419 (JMF)
                                         :

          -v-                    :        OPINION AND ORDER
                                         :

JIANPU TECHNOLOGY INC. et al.,   :
                                         :

                  Defendant.    :
                                         :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

     In this putative class action, Lead Plaintiff Enrique Africa brings securities fraud claims against Jianpu Technology Inc. ("Jianpu" or the "Company"), and two of Jianpu's executives, David Ye and Yilü (Oscar) Chen (the "Individual Defendants). The operative Amended Complaint alleges that, between May 29, 2018, and February 16, 2021, Defendants made material misstatements and omissions regarding all three of the Company's business segments, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5. Defendants now move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Amended Complaint. For the reasons that follow, Defendants' motion is GRANTED, and the Amended Complaint is dismissed.

## BACKGROUND

     The following facts, which are taken from the Amended Complaint, documents it incorporates, and matters of which the Court may take judicial notice, are construed in the light most favorable to Plaintiff. *See, e.g.*, *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 152 (2d Cir.

2013); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (stating that the court may consider "legally required public disclosure documents filed with the SEC").

Jianpu is a company incorporated in the Cayman Islands with its principal executive offices in China; its American Depositary Shares trade on the New York Stock Exchange.  ECF No. 46 ("Am. Compl."), ¶ 20.  Jianpu operates an online platform, Rong360, that connects consumers with financial service providers in China.  *Id.* ¶¶ 24-25.  Rong360 offers three types of services: (1) loan recommendation services (the "Loan Segment"), (2) credit card recommendation services (the "Credit Card Segment"), and (3) advertising and marketing services (the "Advertising Segment").  *Id.* ¶¶ 25-26, 30.  Africa alleges securities violations with respect to each segment of the Company, so the Court will discuss each in turn.

## A.  The Loan Segment

Jianpu's Loan Segment connects borrowers with financial service providers and facilitates loan applications.  *Id.* ¶ 24; ECF No. 49-1 ("Prospectus"), at 112.  One method of lending on the Loan Segment is peer-to-peer ("P2P") lending; it connects borrowers directly to lenders without the need for a bank or other middleman.  Am. Compl. ¶ 27.  Jianpu screens all financial service providers, including P2P lenders, before listing their products on Rong360, but the Company has acknowledged that it has only "limited control over the quality of the financial products and the services provided by financial service providers."  Prospectus 20.

Africa brings claims based on several statements the Individual Defendants made about the Loan Segment to investors during earnings calls.  First, during the Company's first quarter 2018 earnings call, Ye noted that Jianpu had "beefed up our quality control process, conducting a new round of internal review [i]n December and removed the noncompliant financial products from our platform."  Am. Compl. ¶¶ 34, 107.  During the same call, Ye also stated that the

Company recognized "the positive side of [government] regulation" and believed that it would "see growth for the rest of the year." *Id.* ¶¶ 35, 110.  In the next earnings call, Chen told investors that the Company had a "very stringent and strict onboarding process" for P2P lenders and that it "only work[s] with the top P2P guys, focusing on providing individual consumer loans to the consumer, not the noncompliant P2P platforms." *Id.* ¶¶ 36, 119.  Finally, during both the third and fourth quarter 2018 earnings calls, Chen emphasized that China had arrived at a "more stabilized regulatory outlook" and a "healthier regulatory framework," which were leading to a "solid recovery" in the lending market.  *Id.* ¶¶ 37, 132.

In addition to these statements about the regulatory framework and Jianpu's compliance with it, the Company is alleged to have made several relevant statements about the Loan Segment's growth and overall revenues.  For example, in a press release issued on May 29, 2018, announcing financial results for the first quarter of 2018, Jianpu stated that its loan applications had grown by 21% as compared to the first quarter of 2017; it noted further that the total revenue for recommendation services — of which the Loan Segment was a component — had increased by 131% as compared to the same period in 2017.  *Id.* ¶ 103.  The company released similar growth figures for the second quarter and for 2018.  *Id.* ¶¶ 38, 112.

On March 15, 2019, China Central Television ("CCTV") aired a program exposing improper and illegal business practices in the consumer loan industry.  *Id.* ¶ 39.  The segment included a Rong360 employee, who stated that customers on the Company's platform were sometimes required "to make a purchase before a loan would be released . . . [because] Rong360 receives a higher commission after the customer makes such a purchase." *Id.* ¶ 40.  An unnamed consumer quoted on the show described this requirement as a disguised "hidden interest rate[]." *Id.*  In addition, the program profiled another Rong360 customer, a "Mr. Wang," who allegedly

incurred a debt of over RMB 100,000 from a "predatory loan" that he had found on Rong360. *Id.* ¶ 41.  Finally, the television program described an illegal short-term loan "promoted by Rong306" — the "714 Missile" — that imposed "sky high" interest rates, sometimes exceeding 1000% annually.  *Id.* ¶¶ 42-43.  The Amended Complaint, however, does not identify consumers who found such loans on the Rong360 platform or lenders who offered them there.  *Id.*[1]

After the CCTV program aired, Jianpu's stock fell 12.86%; the next day, it declined another 3.64%.  *Id.* ¶¶ 5, 48, 51.  In response, Jianpu suspended further downloads of its mobile application and issue a press release stating that, despite its stringent screening standards, it could not "rule out the possibility that the quality of the financial products and the services provided by financial service providers are not in full compliance with applicable laws and regulations at all times."  *Id.* ¶¶ 4, 49-50.  Chen predicted that the Loan Segment would experience a "downward trend, and indeed, the Company's overall revenue for the second quarter 2019 was 42-45% lower than the reported revenue for first quarter 2019.  *Id.* ¶¶ 53, 59.  Additionally, a member of the Company's Board of Directors stepped down.  *Id.* ¶ 54.[2]  Finally, Ye informed investors on May 28, 2019, that the Company had adopted stricter policies for financial service providers, had engaged a consultant to recommend best practices, and strove to "lead the initiative of introducing and promoting higher industry standards."  *Id.* ¶¶ 60-61, 144.

---

[1]     The Amended Complaint describes other consumers profiled on the CCTV program, *see* Am. Compl. ¶¶ 44-46, but none of them are reported to have used Rong360 to find loans. Accordingly, those allegations have no bearing on the alleged misrepresentations or omissions by Defendants in this case.

[2]     The Amended Complaint does not specify when the Director stepped down but implies that it was in 2019, after the CCTV program aired.  Africa indicates in his memorandum of law that the date was May 28, 2019.  *See* Pl.'s Opp'n 21.

**B.  The Credit Card Segment**

Jianpu's Credit Card Segment recommends credit cards to consumers.  *Id.* ¶¶ 25, 30.  On earnings calls each quarter beginning with the first quarter of 2018, the Individual Defendants described the growth of their Credit Card Segment.  For example, they stated that, in the first quarter of 2018, the credit card volume grew approximately 400% as compared to the same period the prior year; it then grew approximately 6.7% in the second quarter of 2018.  *Id.* ¶¶ 103, 112.  During the third quarter of 2018, credit card volume increased by approximately 81.8% as compared to the same period the prior year, and the average fee per credit card increased by 47.7%, *id.* ¶ 122; the growth trend continued for the fourth quarter of 2018, and for all four quarters of 2019, *id.* ¶¶ 66, 125, 141, 146, 152, 158.

In several earnings statements, the Company noted that the revenues it received from credit card recommendation services increased "due to the increase in both credit card volume and average fee per credit card," and that it was continuing to see "very sharp growth momentum" in its Credit Card Segment, "with 25 credit card banks" on the Rong360 platform.  *Id.* ¶¶ 125, 128; *see also id.* ¶ 130.  During the earnings call for the fourth quarter of 2018, Chen stated that the Segment comprised about 40% of the Company's total revenue.  *Id.* ¶ 136.  During the earnings call for the first quarter of 2019, Ye stated that the Company did not "have any concern about the credit card business growth for the rest of this year."  *Id.* ¶ 56.  Similarly, during the earnings call for the second quarter of 2019, Ye stated that the growth of its Credit Card Segment was "outpacing peers," despite a "relatively slower" credit card market.  *Id.* ¶ 66.

In its 2018 Form 20-F filed with the SEC, Jianpu affirmed the previously reported 2018 financials, disclosed four related-party transactions, and identified a "material weakness" related to the Company's lack of expertise with U.S. Generally Accepted Accounting Principles

("GAAP") and insufficient internal controls over financial reporting.  *Id.* ¶¶ 138-39.  But Jianpu also described efforts to improve its compliance with applicable regulations.  In particular, the Company reported that it had established GAAP reporting and internal control teams, *id.* ¶¶ 139, 144, and as of the second quarter of 2019, had implemented improved processes for "onboarding," "monitoring," and "supervis[ing]" the financial service providers on its platform, *id.* ¶ 149.

On April 30, 2020, Jianpu announced that it would be filing its 2019 Form 20-F forty-five days late, relying on an SEC Order permitting public companies to delay filing if they could not meet the deadlines due to COVID-19.  *Id.* ¶ 160.  Instead of filing a late Form 20-F, however, the Company filed a Notification of Late Filing on June 15, 2020, informing the SEC that the Company's Audit Committee was "in the process of conducting an internal review of certain matters relating to transactions between the Company and third-party business entities."  *Id.* ¶ 67. The same day, Jianpu's share price fell 9.5%.  *Id.* ¶ 69.

Jianpu released the results of its audit review on February 16, 2021.  *Id.* ¶ 72.  The Company announced that the Credit Card Segment had conducted transactions with third parties that had "undisclosed relationships" and transactions that "lacked business substance."  *Id.*  In addition, it stated that certain employees in the Segment had been involved in these questionable transactions and had "improperly altered supporting documents that were provided to the Company's external auditor."  *Id.*  (The Company had previously disclosed, in its Prospectus, that some of its employees "may be corrupted and participate in fraudulent or otherwise illegal activities."  Prospectus 24.)  At the same time, the review determined that no member of senior management had known about the questionable transactions other than one business unit head, who was terminated.  Am. Compl. ¶ 72.  Jianpu announced that it would restate its 2018

financials and that "investors must exercise caution" with respect to its 2019 financial statements. *Id.* ¶ 73. Following this announcement, share prices fell 13%. *Id.* ¶ 74.

On April 30, 2021, Jianpu finally filed its 2019 Form 20-F, which disclosed certain material weaknesses related to the Credit Card Segment. *Id.* ¶ 75. Specifically, the Company stated that it lacked "effective controls . . . to prevent and detect misstatements," which resulted in "overstated revenue, cost[s] and expenses" in its financial statements for the Credit Card Segment. *Id.* It further described a "failure to design and implement controls . . . related to pre-approval of and complete and accurate disclosures of related party transactions," resulting in "inaccurate disclosures" in connection with the 2018 related-party transactions. *Id.* The restated revenue for the Credit Card Segment in 2018 was RMB 61.1 million less than the Company had previously disclosed; the restated revenue for 2019 was RMB 163.7 million less. *Id.* ¶ 76.

## C. The Advertising Segment

In June 2018, the Company acquired a 65% stake in Databook Technology Ltd. ("Databook") — a company that provided products to assist "financial service providers . . . enhance their risk management capabilities" — and its subsidiaries as part of its Advertising Segment. *Id.* ¶¶ 30-32, 113. Jianpu recorded the total asset value of Databook as RMB 268.6 million. *Id.* ¶¶ 30-31. On the Company's earnings call for the fourth quarter of 2018, Chen noted that the revenue for the overall Advertising Segment increased 152% in 2018. *Id.* ¶ 134. In September 2019, however, Chinese authorities began a criminal investigation into Hangzhou Scorpion Co., Ltd., a subsidiary of Databook, for the unauthorized storage of user accounts and passwords. *Id.* ¶¶ 30, 84. On December 9, 2019, in its announcement of third quarter 2019 earnings, Jianpu disclosed an impairment of RMB 250.3 million and did not record revenue for Databook during the third or fourth quarter of 2019. *Id.* ¶¶ 85, 91, 95. Jianpu explained this

impairment as "primarily reflect[ing] the impairment of goodwill and intangible assets related to a subsidiary acquired in 2018 due to adverse development of its business and change of the relevant industry background and market conditions." *Id.* ¶ 86.  That day, Jianpu's share price fell 5.2%.  *Id.* ¶ 87.

On September 10, 2020, the Chinese government filed criminal charges against Hangzhou Scorpion.  *Id.* ¶ 92.  A few months later, on January 14, 2021, a court entered judgment against the company, imposed a fine of RMB 30 million, and ordered disgorgement of RMB 30 million in illegal proceeds.  *Id.* ¶¶ 93, 96.  No other entities owned by Jianpu, and no directors of officers of Jianpu, were charged in connection with the conduct.  *Id.* ¶ 96.  In its 2019 Form 20-F, released on April 30, 2021, Jianpu disclosed the criminal investigation of — and judgment against — the Databook subsidiary.  *Id.*  Jianpu further explained the accounting methodology it applied to recording the relevant revenues and impairment; specifically, the Company noted that it was applying Accounting Study Guide ("ASC") 855, reversed RMB 30 million in revenues from advertising, and recorded RMB 30 million as penalties.  *Id.*

## LEGAL STANDARDS

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *See Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018).  A court will not dismiss any claims unless the plaintiff has failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, one that contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  More specifically, the plaintiff must allege facts showing "more than a sheer possibility that a

defendant has acted unlawfully." *Id.* A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Further, if the plaintiff "ha[s] not nudged their claims across the line from conceivable to plausible, [those claims] must be dismissed." *Id.* at 570.

Because Africa alleges securities fraud, he must also satisfy the heightened pleading requirements of both Rule 9(b), which requires that the circumstances constituting fraud be "state[d] with particularity," Fed. R. Civ. P. 9(b), and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(2), which requires that scienter — that is, a defendant's "intention to deceive, manipulate, or defraud" — also be pleaded with particularity, *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks omitted). To satisfy Rule 9(b), a plaintiff generally "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). To satisfy the PSLRA, a complaint must, "with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 88 n.14 (2d Cir. 2017) (quoting 15 U.S.C. § 78u-4(b)(2)); *see In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 22 (S.D.N.Y. 2016) (noting that a plaintiff "must allege facts supporting a strong inference with respect to each defendant").

## DISCUSSION

Africa brings securities fraud claims under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5. Am. Compl. ¶¶ 194, 199. To state a claim that Defendants made material

misrepresentations or omissions in violation of Section 10(b) and Rule 10b-5, a plaintiff must

allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

connection between the misrepresentation or omission and the purchase or sale of a security; (4)

reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (internal quotation marks

omitted); *accord Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020).  To

state a control-person claim under Section 20(a), a plaintiff must, at a minimum, plead a

plausible "primary violation" of Section 10(b).  *See, e.g.*, *SEC v. First Jersey Sec., Inc.*, 101 F.3d

1450, 1472 (2d Cir. 1996).

 As a general matter, the PSLRA requires a plaintiff alleging securities fraud based on

misleading statements or omissions to "'demonstrate with specificity why and how' each

statement is materially false or misleading."  *In re AstraZeneca PLC Sec. Litig.*, 21-CV-722

(JPO), 2022 WL 4133258, at *6 (S.D.N.Y. Sept. 22, 2022) (quoting *Rombach*, 355 F.3d at 174).

A plaintiff must show, moreover, that the "misstatement was false *at the time it was made*."  *In*

*re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 517 (S.D.N.Y. 2014) (citing *San Leandro*

*Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812-13 (2d

Cir. 1996)).  Significantly, some alleged misstatements, like "expressions of puffery and

corporate optimism do not give rise to securities violations."  *Rombach*, 355 F.3d at 174; *see also*

*Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]s long as the public statements are

consistent with reasonably available data, corporate officials need not present an overly gloomy

or cautious picture of current performance and future prospects.").

 The PSLRA also provides a safe harbor for forward-looking statements.  *See* 15 U.S.C.

§ 78u-5(c).  Forward-looking statements are those that contain, among other things, "a projection

of revenues, income . . ., [or] earnings," "plans and objectives of management for future operations," or "a statement of future economic performance." *Id.* § 78u-5(i)(1).  A forward-looking statement is not actionable if it "is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (describing 15 U.S.C. § 78u-5(c)).  Finally, "subjective statements of opinion are generally not actionable as fraud." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 528 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).  Statements of opinion are only actionable "if they (1) were not honestly believed when made; (2) were supported by untrue facts; or (3) omit to mention facts that conflict with what a reasonable investor would take away from the statements themselves." *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 589 (S.D.N.Y. 2016) (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186, 190 (2015)).

Applying the foregoing standards here, the Court concludes that Africa's Section 10(b) and Rule 10b-5 claims fail for at least two independent reasons.  First, with two possible exceptions, he does not adequately plead a material misrepresentation or omission.  And second, he does not adequately allege scienter.  The Court will address each of these defects in turn.

## A.  Material Misrepresentations or Omissions

As above, the Court will address Africa's allegations of misrepresentations or omissions with respect to each of the Company's three business segments.

11

1. **Statements Regarding the Loan Segment**

Africa alleges two types of misrepresentations with respect to Jianpu's Loan Segment: those related to the Company's regulatory compliance and those related to the Segment's revenue.  But Africa fails to establish that these statements were false or material.

First, Africa fails to allege that the Individual Defendants' statements that the Company improved its processes for onboarding and monitoring lenders on its platform were actually false.  These include statements that Jianpu had "beefed up [its] quality control process," "removed the noncompliant financial products," and implemented a "very stringent and strict onboarding process."  Am. Compl. ¶¶ 34, 36, 107, 119.  Africa argues that these statements are false because, based on the reporting by CCTV, there was at least one identifiable consumer who had received a loan from Jianpu's platform that charged illegally high interest.  *Id.* ¶ 41; ECF No. 52 ("Pl.'s Opp'n") at 10.   But the fact that there were noncompliant providers on Rong360 does not mean that the Individual Defendants' statements regarding the Company's regulatory compliance measures were untrue when made.  *See In re Deutsche Bank Aktiengesellchaft Sec. Litig.*, 16-CV-3495 (AT), 2017 WL 4049253, at *6 (S.D.N.Y. June 28, 2017), *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellchaft*, 729 F. App'x 55, 59 (2d Cir. 2018) (summary order).  Africa alleges no facts showing that the Company did not "beef[] up its compliance processes or that it had not "removed . . . noncompliant financial products."  *See In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 379 (S.D.N.Y. 2004) ("Plaintiff alleges neither facts showing that the descriptions of the processes were false . . . nor facts showing that the processes were not followed.").  And the fact that, following the CCTV program, Jianpu suspended its mobile application, engaged a consultant to review its internal processes, and adopted stricter policies for financial services providers does not imply that the Individual Defendants' *prior* statements

about regulatory compliance were false when made.  *See In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 295 (S.D.N.Y. 2014) ("The fact that defendants recognized problems, announced that they were implementing effective controls and procedures, and then recognized more problems does not indicate that their statements were false at the time that they were made.").

*Pirnik v. Fiat Chrysler Automobiles, N.V.*, 15-CV-7199 (JMF), 2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016), on which Africa relies, Pl.'s Opp'n 10, is inapposite.  There, this Court determined that the defendants' statement that the company was "substantially in compliance with the relevant global regulatory requirements" was an actionable misrepresentation because, a few months later, the company disclosed "widespread noncompliance with those requirements." 2016 WL 5818590, at *5.  But nothing comparable occurred here.  The Company never admitted — and indeed, Africa does not allege — that it was generally noncompliant with relevant Chinese regulations.  At best, Africa alleges that a few loan providers on Jianpu's platform did not comply with regulations regarding interest rates.  Am. Compl. ¶¶ 40-43.  With no showing of falsity, Africa's claim for securities fraud on the basis of these statements must fail.

The other allegedly misleading statements Africa identifies with respect to the Loan Segment's regulatory compliance fail to state a claim for securities fraud because they are either inactionable puffery or forward-looking statements that fall within the PSLRA's safe harbor. *See, e.g.*, *In re Magnum Hunter Res. Corp.*, 26 F. Supp. 3d at 291 (explaining that "expressions of puffery and corporate optimism" are not actionable as securities fraud "because they are too general to cause a reasonable investor to rely upon them" (internal quotation marks omitted)). The Individual Defendants made a variety of statements regarding "the positive side of regulation," confirming that they only "work with the top P2P guys," and anticipating "growth

for the rest of the year."  Am. Compl. ¶¶ 35, 104, 108, 110, 119.  These are general statements,

evincing corporate optimism, rather than specific or material statements.  *See ECA, Loc. 134*

*IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 206 (2d Cir. 2009)

(identifying statements that the defendant company "set the standard for integrity" and focused

on "financial discipline" as "too general to cause a reasonable investor to rely upon them"

(internal quotation marks omitted)).  Similarly, Defendants' statements regarding the overall

regulatory framework in China, *see* Am. Compl. ¶¶ 37, 132, are general statements that do not

describe the Company's actions.  Africa therefore identifies no *material* misstatement regarding

the Company's regulatory compliance.

Moreover, Jianpu had previously warned investors about various risks related to its Loan

Segment, foreclosing Africa from arguing that the Individual Defendants misrepresented the

Company's regulatory compliance.  *See, e.g.*, *Schaffer v. Horizon Pharma PLC*, 16-CV-1763

(JMF), 2018 WL 481883, at *8 (S.D.N.Y. Jan. 18, 2018) (finding that the plaintiff failed to

allege actionable misrepresentations regarding the defendants' statements about their legal and

regulatory compliance where the defendants had previously warned that third parties may engage

in fraudulent or illegal activity); *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 180 (E.D.N.Y.

2017) (noting that warnings in the prospectus had apprised investors of possible risks that later

materialized), *aff'd*, 731 F. App'x 35 (2d Cir. 2018) (summary order).  Specifically, in its

Prospectus, Jianpu warned investors that it had "limited control over the quality of the financial

products and the services" on its platform and had difficulty monitoring the product and service

quality.  Prospectus 20.  Jianpu explicitly told investors that "[i]f users became dissatisfied with

the financial products . . . or the services of our financial service provider, our business,

reputation, financial performance[,] and prospects could be materially and adversely affected."

*Id.*  Put differently, Jianpu warned investors of the precise problem that materialized in March 2019.  Thus, Africa cannot now claim to have been misled by statements regarding the Loan Segment's regulatory compliance.

Africa further alleges that Jianpu's statements about the Loan Segment's revenues and growth were misleading because Jianpu failed to disclose that the revenue was generated in part through "improper collection tactics" and "misleading sales practices."  Am. Compl. ¶¶ 106, 109, 116, 121, 133; Pl.'s Opp'n 11.  As a result, Africa argues, "there was a material undisclosed risk" that customers would leave the platform or the platform would be suspended once those unlawful tactics and practices came to light.  Am. Compl. ¶ 106, 109, 116, 121, 133.  These statements, however, are not misleading for two reasons.  First, as described above, Jianpu explicitly disclosed such risks in its Prospectus.  Second, Africa cannot base a claim for securities fraud on historically accurate statements, such as the Company's statements regarding the Loan Segment's revenues and growth.  *See, e.g.*, *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 396, 404 (S.D.N.Y. 2016) ("[A] violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data."); *Altayyar*, 242 F. Supp. 3d at 179 (rejecting a substantially similar claim).

Finally, Africa's argument that the Company had a duty to disclose the unlawful practices of providers on its platform is also unavailing.  Africa claims that the Company put "the cause of the Company's success at issue" by stating that the Loan Segment's revenue was increasing due to higher volume and higher average fees per application.  Pl.'s Opp'n 11; Am. Compl. ¶¶ 132-33.  It is true that a company may trigger a duty to disclose information when it "puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices."  *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F.

Supp. 3d 568, 581 (S.D.N.Y. 2016) (internal quotation marks omitted).  But Africa's reliance on

that principle here fails for two reasons.  First, conclusory assertions aside, *see* Am. Compl.

¶¶ 116, 121, he makes no specific allegations that financial service providers' unlawful practices

were a "material" reason for the Loan Segment's increasing revenues.  *See Schiro v. Cemex,*

*S.A.B. de C.V.*, 396 F. Supp. 3d 283, 296-97 (S.D.N.Y. 2019).  And second, the statements at

issue described general trends in the Loan Segment's business (increasing volume of loan

applications, average fees per loan application, and the lending market "trending up").  Am.

Compl. ¶ 132.  The statements did not identify "specific factors or sources of revenue" that could

make them actionable.  *See Schiro*, 396 F. Supp. 3d at 297; *cf. In re Van der Moolen Holding*

*N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) (finding that statements describing

significant revenue generated by a majority-owned subsidiary without disclosing the subsidiary's

unlawful practices constituted actionable omissions).  In short, Africa does not plausibly allege

that the Company or the Individual Defendants had a duty to disclose any alleged improper

behavior by third parties using Jianpu's platform.

### 2.  Statements Regarding the Credit Card Segment

Africa alleges that Jianpu and the Individual Defendants misrepresented the factors

driving the Credit Card Segment's growth.  Specifically, he alleges that the Company failed to

disclose related-party transactions in the Credit Card Segment and that, because of that omission,

the Company's reported financials and the Individual Defendants' statements to investors were

materially false and misleading.  Am. Compl. ¶¶ 105, 114, 123, 126-27, 129, 131, 137, 140, 142,

145, 147-48, 150-51, 153-54, 159, 161; Pl.'s Opp'n 8-10.

As an initial matter, the mere fact that Jianpu did not disclose related-party transactions

does not demonstrate falsity.  *See* Pl.'s Opp'n 9.  The cases Africa cites to support his argument

to the contrary all contain allegations of related-party transactions that involved company executives.  *See, e.g.*, *SEC v. China Ne. Petrol. Holdings, Ltd.*, 27 F. Supp. 3d 379, 383-85 (S.D.N.Y. 2014) (related-party transactions involving an individual defendant and vice president of corporate finance of the defendant company); *Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1114 (C.D. Cal. 2012) (related-party transactions involving the son of the defendant company's CEO).  Here, Africa does not allege at all, let alone with particularity, which individuals or entities were involved in the related-party transactions, when they occurred, or how much money the transactions entailed.  Without these key facts, Africa fails to plead that the non-disclosure of the related-party transactions was material and, thus, an actionable omission.  *See Canez v. Intelligent Svcs. Corp.*, 19-CV-3949 (CLP), 2021 WL 3667012, at *9 (E.D.N.Y. Aug. 18, 2021) (granting a motion to dismiss where the plaintiff failed to allege that related-party transactions were material (citing *ECA*, 553 F.3d at 202)).

Alternatively, Africa alleges that Jianpu's and the Individual Defendants' omission of the related-party transactions was materially misleading in light of their other statements about the Credit Card Segment and the Company's regulatory compliance.  Am. Compl. ¶¶ 117-18, 122-31, 136-38, 140-54, 160-61.  Although securities laws do not impose a duty to disclose as a general matter, a corporation may trigger such a duty in three circumstances:

> (1) when a corporation puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices; (2) when a defendant makes a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring; and (3) when a defendant states an opinion that, absent disclosure, misleads investors about material facts underlying that belief.

*In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp 3d 528, 536 (S.D.N.Y. 2016) (cleaned up) (quoting *Menaldi*, 164 F. Supp. 3d at 581-82).  None of these circumstances were present here.

The first statement Africa takes issue with is Chen's acknowledgement that some P2P lenders were engaged in related-party transactions.  *Id.* ¶ 117.  But Africa alleges no facts showing that this statement triggered a duty to disclose the related-party transactions in the Credit Card Segment.  This statement does not put the success of the Credit Card Segment at issue; nor is it materially misleading to describe generally P2P lenders' related-party transactions and omit those happening in the Credit Card Segment.  *See Menaldi*, 164 F. Supp. 3d at 581. Therefore, this statement is not actionable as securities fraud.

Next, the allegedly misleading statements include Ye's announcement that the Credit Card Segment was "outpacing peers," with revenue growth of 25% year-over-year in 2019, and press releases identifying the reason for the growth in credit card revenue, namely an "increase in both credit card volume and average fee per credit card."  *Id.* ¶¶ 66, 122, 125, 141, 146, 152. Here, the Company was putting the reason for the success of the Credit Card Segment at issue. *See Menaldi*, 164 F. Supp. 3d at 583; *Schiro*, 396 F. Supp. 3d at 297.  But these statements are insufficient to trigger a duty to disclose any related-party transactions.  Indeed, they accurately reflect the Company's reported financials, and "an allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained, is insufficient to impose Section 10(b) liability."  *In re Virtus Inv. Partners*, 195 F. Supp. 3d at 537 (holding that statements attributing a company's revenue increase "primarily" to "an increase in average assets and an increase in average management fees" were not misleading even though a source of the company's revenue was unlawful).  As such, "[t]here appears to be nothing misleading" about the Company's statements.  *Id.*

Another set of allegedly misleading statements generally describe the Credit Card Segment's business success, recount historical facts, or discuss Jianpu's hopes for the future,

none of which are actionable.  *See Schaffer*, 2018 WL 481883, at *9.  For example, the Company

stated that "Jianpu successfully captured the shift of user demand and achieved remarkable

performance in the credit card recommendation services."  Am. Compl. ¶ 125.  Although these

statements described the Credit Card Segment's success in general terms, they were not specific

enough to put the reason for the Segment's success at issue, triggering a duty to disclose.  *See*

*Schiro*, 396 F. Supp. 3d at 297.  Instead, the statements are more akin to inactionable puffery.  So

too, the Company's statements about the steps it took to promote regulatory compliance across

its segments — for example, that its goal is to "lead the initiative of introducing and promoting

higher industry standards and best practices," Am. Compl. ¶ 144 — fail as inactionable puffery.

In addition, the Company's statements that it has "built a vibrant network of over 2,500 financial

institutions," including "25 credit card banks," *id.* ¶ 128, appear to be accurate.  Africa makes no

non-conclusory allegations that these statements were factually inaccurate or materially

misleading given the omission of the related-party transactions.  By the same token, the

Company's statement that it had adopted "more stringent" onboarding processes for its financial

service providers, Am. Compl. ¶¶ 61, 144, is not actionable because Africa alleges no facts

suggesting it was false.  Finally, Chen's statement that the credit card business — along with the

Advertising Segment — should be able to "drive the growth" in 2019, *id.* ¶ 59, falls "squarely

within the PSLRA's safe harbor for forward-looking statements."  *Schaffer*, 2018 WL 481883, at

*9.

Africa further argues that Jianpu's 2018 and 2019 financial records — which the

Company restated, Am. Compl. ¶¶ 73, 76 — qualify as material misstatements for purposes of

Section 10(b) and Rule 10b-5.  *See* Pl.'s Opp'n 8-9.[3]  Courts in this District have generally held

that "misreported financial data are . . . false statements of fact."  *In re DRDGOLD Ltd. Sec.*

*Litig.*, 472 F. Supp 2d 562, 569 (S.D.N.Y. 2007) (restatement due to accounting errors); *see also*

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 544 (S.D.N.Y. 2017).

Here, Jianpu restated its 2018 revenue for the Credit Card Segment, resulting in a decrease of

RMB 61.1 million, or approximately 8%, and then restated its 2019 revenue for the Credit Card

Segment, resulting in a decrease of RMB 163.7 million, or approximately 22%.  Am. Compl.

¶ 76.  These restatements are not so small as to be immaterial as a matter of law.  *Cf. In re*

*Magnum Hunter Res. Corp.*, 26 F. Supp. 3d at 295 (noting that a restatement that increased the

company's loss by less than 5% was of "modest size," undercutting any inference of fraud).  But,

even assuming that the financial restatement is a material misstatement, Africa fails, for reasons

the Court discusses below, to show that the Company misstated its financials with the requisite

scienter, thus defeating its securities-fraud claims based on these misstatements.

### 3.  Statements Regarding the Advertising Segment

Finally, Africa alleges several types of material misstatements or omissions with respect

to the Advertising Segment.  First, he argues that certain reported financial statements for the

Advertising Segment were false.  Jianpu restated the Advertising Segment revenue it initially

reported for 2018 and the first two quarters of 2019.  Am. Compl. ¶ 76; Pl.'s Opp'n 12.  Like the

Credit Card Segment financials, the restated financials may be material misstatements, but Africa

fails to raise a strong inference of scienter, as the Court will discuss below.  Africa further argues

that the statements Jianpu made regarding the purchase of Databook were false and misleading

---

[3]     Africa's related argument, that Jianpu's claim it needed to file its Form 20-F late due to
COVID-19 was a material misstatement, plainly fails.  Am. Compl. ¶¶ 160-61.  Africa does not
point to anything suggesting that this statement was untrue when made.

given the later impairment and suspension of the business.  Am. Compl. ¶¶ 31, 113, 115.  But Africa alleges no facts to suggest that the reported purchase price or valuation of Databook was false at the time Jianpu made the statements.  *See Schaffer*, 2018 WL 481883, at *9.  Because historically accurate statements are not actionable, *see, e.g.*, *In re Sanofi*, 155 F. Supp. 3d at 404, the reported financial statements fail to support a claim for securities fraud.

The main focus of Africa's allegations with respect to the Advertising Segment is the Company's failure to disclose that its subsidiary's subsidiary — Hangzhou Scorpion — was under criminal investigation.  Am. Compl. ¶¶ 84-86; Pl.'s Opp'n 12.  Shortly after the investigation began, in December 2019, Jianpu recorded an impairment for Databook, explaining that this "primarily reflect[ed] the impairment of goodwill and intangible assets" because of adverse developments in the business and market.  Am. Compl. ¶ 86.  Africa argues that this statement is false and misleading because the Company knew Databook's subsidiary was being investigated by Chinese authorities, but instead of disclosing that, gave a different explanation for the impairment.  *Id.* ¶ 88; Pl.'s Opp'n 12-13.  The problem with this argument is that Africa fails to establish that the Company had a duty to disclose any uncharged wrongdoing in 2019.

As an initial matter, "there is no duty to disclose a fact . . . merely because a reasonable investor would very much like to know that fact."  *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014).  Moreover, Africa makes no allegation that Hangzhou Scorpion's conduct "was the secret behind [the Company's] success," which would have triggered a duty to disclose the uncharged criminal conduct.  *In re XP Inc. Sec. Litig.*, 524 F. Supp. 3d 23, 38 (E.D.N.Y. 2021).  Jianpu also did not trigger a duty to disclose the government investigation when it informed investors about the impairment of Databook.  Although a company has "a duty to tell the whole truth" if it decides to "speak[] on an issue or topic," *Meyer*, 761 F.3d at 250,

Africa fails to show that any omission regarding the investigation was materially misleading, *see In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 616 (S.D.N.Y. 2017) ("[T]he question is whether, in light of [the] investigation, the statements Defendants chose to make were materially misleading." (cleaned up)).  Jianpu recorded the impairment once the investigation began, thus alerting investors to the possible financial implications.  Am. Compl. ¶ 85. Disclosing the investigation — which, as of December 2019, had not escalated to formal charges — would not have "significantly altered the 'total mix' of information available to an investor." *In re Lions Gate Ent. Corp.*, 165 F. Supp. 3d at 13 (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 232 (1988)).  Put differently, because Jianpu informed investors about the financial impairment, the uncharged criminal conduct of its subsidiary's subsidiary would not have provided new, material information to investors.  *See Richman v. Goldman Sachs Grp. Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012) ("[R]evealing one fact about a subject does not trigger a duty to reveal all facts on the subject, so long as what was revealed would not be so incomplete as to mislead." (internal quotation marks omitted)).  And, at the time Jianpu recorded the impairment, the investigation had not proceeded to formal criminal charges, and did not do so for another year.  Am. Compl. ¶ 92.  The Chinese court did not impose a fine until January 2021. Am. Compl. ¶ 93.  A company is not required to "accuse itself of wrongdoing," *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), or to predict the outcome of an investigation, *Richman*, 868 F. Supp. 2d at 273-74.  In short, Jianpu had no duty to disclose the investigation in December 2019, and thus its failure to do so is not actionable.

## B.  Scienter

All of Africa's claims are subject to dismissal for a second, independent reason: failure to adequately plead scienter.  As noted above, the PSLRA requires a plaintiff to plead scienter —

that is, a defendant's "intention to deceive, manipulate, or defraud" — with particularity. *Tellabs*, 551 U.S. at 313 (internal quotation marks omitted).  To satisfy that requirement, a complaint must, "'with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *ATSI Commc'ns*, 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(2)). Moreover, a plaintiff must "allege facts supporting a strong inference with respect to *each* defendant."  *In re Lions Gate Ent. Corp.*, 165 F. Supp. 3d at 22 (emphasis added).  The "strong inference" must be "more than merely plausible or reasonable."  *Tellabs*, 551 U.S. at 314.  The necessary inquiry is "inherently comparative."  *Id.* at 323.  That is, the Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Id.* at 324.  A complaint alleging securities fraud will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.*

    In this Circuit, a plaintiff may satisfy the scienter pleading requirement in either of two ways: "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Commc'ns*, 493 F.3d at 99.  The former requires a plaintiff to allege that the defendant "benefitted in some concrete and personal way from the purported fraud."  *ECA*, 553 F.3d at 198 (internal quotation marks omitted).  The latter requires allegations of either actual intent or "conscious recklessness — *i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence."  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015).  More specifically, a plaintiff must allege conduct by a defendant that is, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the

standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal quotation marks omitted).  As a general matter, courts have approved of claims when plaintiffs "have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.  Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation."  *Novak*, 216 F.3d at 308.

## 1.  Motive and Opportunity

Africa's "motive and opportunity" arguments can be swiftly rejected.  Africa does not allege that any Defendant sold shares during the Class Period.  *See, e.g.*, *Rombach*, 355 F.3d at 177 (finding "no personal interest sufficient to establish motive" where the "[p]laintiffs [did] not allege that defendants sold stock or profited in any way during the relevant period").  Instead, he suggests that motive and opportunity are established because Defendants sought to hit their revenue targets despite declines in revenue from the Loan Segment.  *See* Am. Compl. ¶¶ 58, 80. It is well established, however, that "it is not sufficient to allege goals that are possessed by virtually all corporate insiders, such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability or the success of an investment."  *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (internal quotation marks omitted); *see also, e.g.*, *Cortina v. Anavex Life Scis. Corp.*, No. 15-CV-10162 (JMF), 2016 WL 7480415, at *6 (S.D.N.Y. Dec. 29, 2016) (finding no motive where "the company's financing was largely dependent on its stock price").  Put simply, because Africa fails to allege that Defendants received a "concrete and personal" benefit from the alleged scheme, he fails to demonstrate a cognizable motive.  *See ECA*, 553 F.3d at 198.

**2.   Conscious Misbehavior or Recklessness**

Africa's arguments with respect to the conscious-misbehavior-and-recklessness prong of the scienter test require more detailed discussion, but they too ultimately fall short.

**a.   Scienter for the Loan Segment Claims**

Africa's bare allegation of scienter with respect to the Loan Segment, *see* Am. Compl. ¶ 38, can be easily dismissed.  Africa makes no claim, conclusory or otherwise, that any Defendant knew about the unlawful practices of certain third-party financial services providers on its platform.  At best, he alleges that the CCTV program reported that businesses offering a certain type of unlawful loan (the 714 Missile) "knew about their illegal practices."  Am. Compl. ¶ 47; Pl.'s Opp'n 11.  Africa further states that Rong360 promoted the 714 Missile loans, but he provides no specific support for this claim.  Am. Comp. ¶ 42.  These statements do not allege, let alone with the requisite particularity, knowledge on the part of any Defendant.  Moreover, Africa's argues that the resignation of a board member following the CCTV program "supports scienter," Pl.'s Opp'n 21, but the explanation he provides to justify that inference is inadequate.  *See Venkataraman v. Kandi Techs. Grp., Inc.*, 20-CV-8082 (LGS), 2021 WL 4952260, at *5 (S.D.N.Y. Oct. 25, 2021) ("Absent other allegations regarding [the defendants'] culpable state of mind, [the CFO's] resignation does not support an inference of scienter.").  Accordingly, Africa fails to plausibly allege scienter with respect to any alleged misstatements about the Loan Segment.

**b.   Scienter for the Credit Card Segment Claims**

Africa's scienter arguments with respect to the Credit Card Segment are more detailed but ultimately unavailing as well.  First, he fails to plausibly allege that any Defendant actually knew about the undisclosed related-party transactions, which resulted in the Company restating

its 2018 and 2019 financial.  Instead, Africa contends that the Individual Defendants should have known about the transactions because the audit committee reports to the board of directors, of which the Individual Defendants were members.  Am. Compl. ¶¶ 176-77; Pl.'s Opp'n 17-18.  In addition, relying on information from a confidential witness, a former Credit Auditor for Rong360, Africa alleges that the Company typically verifies information that financing companies provide to ensure that the company is real and in operation.  Am. Compl. ¶ 81. According to Africa, this verification "reduc[es] the likelihood that the related party transactions were unknown to Defendants."  *Id.*  But these sorts of general allegations about the responsibilities of an audit committee, and what its members might have learned, are, at bottom, speculative and, thus, insufficient to show scienter.  *See In re Satyam Comp. Svcs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 479 (S.D.N.Y. 2013).

Africa attempts to bolster the inference of scienter by arguing that Jianpu manipulated its Credit Card Segment revenue to make up for falling revenue in the Loan Segment.  Pl.'s Opp'n 18-20.  With the initially reported revenue figures, the Company met its revenue targets for every quarter of 2019, but with the restated amounts, the Company was below its targets for three of the quarters.  Am. Compl. ¶ 80.  But Africa's argument is belied by his own Amended Complaint.  Africa contends that the Credit Card Segment's "revenue grew through sham transactions with increasing intensity each quarter beginning in Q1 2019," after the revenue from the Loan Segment fell.  Pl.'s Opp'n 18.  Africa further notes that Chen joined the Board of Directors on May 28, 2019, around the time that the overstated Credit Card Segment revenue "began to increase markedly."  Am. Compl. ¶ 177.  According to facts recounted in the Amended Complaint, however, the Credit Card Segment was growing quickly during 2018, prior to any issues with the Loan Segment.  *Id.* ¶¶ 103, 112, 122, 125.  The Credit Card Segment growth did

not, therefore, coincide with the drop in revenue from the Loan Segment.  More broadly, Africa does not provide any factual support to suggest that Defendants consciously decided "to improperly recognize revenue."  *In re Veeco Instruments, Inc. Sec. Litig*, 235 F.R.D. 220, 231 (S.D.N.Y. 2006).  Instead, the facts alleged suggest that Defendants reported what they thought to be accurate revenue statements.

So too, Africa's argument that Jianpu's imperfect internal controls raise the inference of scienter fails.  Weak internal controls may be "probative of scienter," *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008), but Africa does not make any showing that the imperfect controls here amounted to more than negligence, *see Novak*, 216 F.3d at 312 (affirming that "consciousness reckless" is required for scienter, not merely "a heightened form of negligence").  Africa recounts Jianpu's disclosure that it did not have "effective controls" to "prevent and detect misstatements" in the Credit Card Segment, Am. Compl. ¶ 75, but he does not show that any Defendant disregarded red flags or otherwise acted recklessly, *see, e.g.*, *S. Cherry St., LLC*, 573 F.3d at 112; *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999).  Indeed, Africa alleges that the employees involved in the related-party transactions "improperly altered supporting documents that were provided to the Company's external auditor," Am. Compl. ¶ 72, making it even less likely that any Defendant knew about the related-party transactions when they made the statements at issue.[4]  In short, Africa proffers no allegations that any Defendant had access to nonpublic information, or recklessly disregarded such information, about the related-party transactions prior to disclosing them.  *See Novak*, 216 F.3d at 308.  As a result, the Amended Complaint

---

[4]     The fact that the Individual Defendants knew about related-party transactions with financial service providers as part of the Loan Segment, *see* Pl.'s Opp'n 17, also has no bearing on whether they knew about related-party transactions as part of the Credit Card Segment.

permits no inference that any Defendant knew or should have known that the 2018 and 2019

financials were false at the time — and thus, no strong inference of scienter.

  **c.  Scienter for the Advertising Segment Claims**

  Finally, Africa fails to raise a strong inference of scienter with respect to its Advertising

Segment claims.  First, he makes no non-conclusory allegations that Jianpu knew the financial

figures it reported in 2018 and 2019 — both the valuation of Databook and the revenue numbers

— were false at the time.  *See, e.g.*, Am. Compl. ¶ 135.  In fact, Africa does not even allege that

the Databook subsidiary was engaged in unlawful data privacy practices at the time of the

acquisition.  As with the restated financials for the Credit Card Segment, this defect is fatal to

Africa's claims.  Africa does not show that any Defendant had access to nonpublic facts about

the Databook subsidiary when the Company reported the purchase and valuation of Databook or

the financials for the Advertising Segment for 2018 and the first half of 2019.

  Additionally, Africa does not allege that any Defendant acted with the requisite scienter

when failing to disclose the existence of the Chinese government investigation into Hangzhou

Scorpion in 2019.  He contends that Jianpu violated GAAP in its accounting treatment of the fine

imposed in 2021, *see* Am. Compl. ¶¶ 97-101, but GAAP violations are insufficient to raise a

strong inference of scienter absent other "evidence of corresponding fraudulent intent."  *ECA*,

553 F.3d at 200 (quoting *Novak*, 216 F.3d at 309).  Africa points to two pieces of evidence, but

neither demonstrates fraudulent intent.  Contrary to Africa's argument, the mere fact of a

government investigation, particularly one into a subsidiary of Jianpu and not the company itself,

does not support an inference of scienter.  *See Cortina*, 2016 WL 7480415, at *8.  Africa also

purports to show that the revenue Jianpu later reversed from the Advertising Segment helped

Jianpu meet its revenue targets for each quarter of 2019.  Am. Compl. ¶ 102.  Again, however,

Africa does not provide any evidence that Jianpu or the Individual Defendants had access to nonpublic information about Hangzhou Scorpion's data privacy practices during the first and second quarters of 2019, *see Novak*, 216 F.3d at 308, so there is no basis to conclude that they did not believe the revenue for the Advertising Segment was true at the time Jianpu reported it. Moreover, Jianpu reversed no revenue for the third quarter of 2019 and minimal revenue for the fourth quarter.  Am. Compl. ¶ 102.  At that point, Jianpu had already recorded the impairment and stopped recording revenue from Databook.  Am. Compl. ¶¶ 85, 95.  Far from raising an inference that Jianpu was acting with an intent to defraud, this suggests that Jianpu accurately reported its revenue.

In sum, Africa does not adequately plead scienter and his claims must be dismissed.

## C.  Remaining Claims

Given the absence of a "primary violation," Africa's Section 20(a) "control person" claims against the Individual Defendants, Am. Compl. ¶¶ 196-99, fail as a matter of law as well, *see, e.g.*, *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co*., 28 F.4th 343, 356 (2d Cir. 2022).  In addition, although Defendants do not explicitly raise the issue in their motion, Africa's underdeveloped claim for scheme liability, Am. Compl. ¶¶ 185-95, fails because the Amended Complaint alleges misstatements and omissions, not "inherently deceptive conduct."  *In re AT&T/DirecTV Now Sec. Litig*., 480 F. Supp. 3d 507, 534 (S.D.N.Y. 2020).  The Second Circuit recently reaffirmed that "misstatements and omissions cannot form the 'sole basis' for liability under the scheme subsections."  *SEC v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022) (citing *Lentell v. Merrill Lynch & Co*., 396 F.3d 161 (2d Cir. 2005)).  In so holding, the Second Circuit emphasized that "[p]reserving distinctions between the subsections assures that private plaintiffs

remain subject to the heightened pleading requirements [of the PSLRA] for Rule 10b-5(b)

claims." *Id*. at 54.  Accordingly, Africa's scheme liability claim must be and is dismissed.

## CONCLUSION

For the reasons stated above, Africa's claims under the Exchange Act and SEC Rule 10b-

5 must be and are dismissed.  That leaves only the question of whether Africa should be granted

leave to amend his complaint.  Notably, Africa already had one opportunity to amend (following

Defendants' initial motion to dismiss), and although he has requested leave to amend again, he

does not identify any facts he would add.  Moreover, there is good reason to doubt that Africa

would be able to remedy the substantive issues identified above, especially with respect to his

claims relating to the Loan and Advertising Segments.  That said, mindful that leave to amend a

complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), and that

"[c]omplaints dismissed under Rule 9(b) are almost always dismissed with leave to amend,"

*Pasternack v. Shrader*, 863 F.3d 162, 175 (2d Cir. 2017) (internal quotation marks omitted), the

Court will grant Africa one final chance to amend.  Africa shall file any Second Amended

Complaint **within thirty days of the date of this Opinion and Order**.

The Clerk of Court is directed to terminate ECF No. 47.


SO ORDERED.

Dated: September 28, 2022
       New York, New York

_____
JESSE M. FURMAN
United States District Judge