UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                  :

ENRIQUE AFRICA, *individually and on behalf of all others similarly situated*,      :    21-CV-1419 (JMF)

                                  :

              Plaintiff,          :    **ECF CASE**
                                  :    **Electronically Filed**

                                  :

          -v-              :    **ORAL ARGUMENT REQUESTED**

                                  :

JIANPU TECHNOLOGY INC. et al.,       :

                                  :

             Defendants        :

-------------------------------------------------------------------X

<br>

# MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANTS'
## <u>MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT</u>

<br><br>

                             SKADDEN, ARPS, SLATE,
                               MEAGHER & FLOM LLP
                             Scott D. Musoff
                             Robert A. Fumerton
                             Vincent M. Chiappini
                             Argirios J. Nickas
                             One Manhattan West
                             New York, New York 10001
                             Phone: (212) 735-3000

                             *Attorneys for Defendants*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ......................................................................................................... 3

1.    BACKGROUND ............................................................................................................ 3

2.    JIANPU'S DISCLOSURES DURING THE CLASS PERIOD ....................................... 4

    a.    Jianpu Disclosed the Risks Relating to Its Loan Business ................................... 4

    b.    Jianpu Disclosed the Risks Relating to Its Credit Card Business ........................... 5

    c.    Jianpu Disclosed the Risks Relating to Databook ................................................ 6

3.    SUBSEQUENT EVENTS ............................................................................................. 7

    a.    In March 2019, CCTV Airs A Story on Improper Lending Practices ..................... 7

    b.    A Databook Subsidiary Is Investigated by the Chinese Authorities ........................ 7

    c.    Jianpu Uncovers and Discloses Misconduct in Its Credit Card Business ............... 8

4.    THIS ACTION .............................................................................................................. 9

ARGUMENT ........................................................................................................................... 11

I.    PLAINTIFF FAILS TO PLEAD ANY ACTIONABLE MISREPRESENTATION ........ 11

    A.    No Actionable Misrepresentation Regarding Jianpu's Credit Card
        Segment ............................................................................................................ 11

    B.    No Actionable Misrepresentation Regarding Jianpu's Advertising
        Segment ............................................................................................................ 17

II.    PLAINTIFF FAILS TO PLEAD SCIENTER ............................................................... 21

    A.    Plaintiff Fails to Plead Motive and Opportunity ................................................. 21

    B.    Plaintiff Fails to Plead Conscious Misbehavior or Recklessness .......................... 22

        1.    Plaintiff Fails to Plead Scienter for the Credit Card Claim ....................... 22

        2.    Plaintiff Fails to Plead Scienter for the Advertising Segment Claim ........ 24

III.    PLAINTIFF FAILS TO PLEAD LOSS CAUSATION ................................................. 24

CONCLUSION ..................................................................................................................25

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Altayyar v. Etsy, Inc.*,
242 F. Supp. 3d 161 (E.D.N.Y. 2017), *aff'd*, 731 F. App'x 35 (2d Cir. 2018)............15, 21

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007).......................................................................................3, 21

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)......................................................................................................20

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005)......................................................................................................25

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009).........................................................................................24

*Fait v. Regions Financial Corp.*,
655 F.3d 105 (2d Cir. 2011).........................................................................................19

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001).............................................................................21, 22, 24

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005).........................................................................................24

*In re Magnum Hunter Resources Corp. Securities Litigation*,
26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015)..................24

*In re Merrill Lynch & Co.*,
273 F. Supp. 2d 351 (S.D.N.Y. 2003), *aff'd sub nom. Lentell v. Merrill Lynch &
Co.*, 396 F.3d 161 (2d Cir. 2005)....................................................................................3

*Oklahoma Firefighters Pension & Retirement System v. Student Loan Corp.*,
951 F. Supp. 2d 479 (S.D.N.Y. 2013).............................................................................25

*In re Qudian Inc. Securities Litigation*,
No. 17-CV-9741 (JMF), 2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019) ..........................18

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)...........................................................................................11

*San Leandro Emergency Medical Group Profit Sharing Plan v. Phillip Morris Cos.*,
75 F.3d 801 (2d Cir. 1996).............................................................................................17

iii

*In re Sanofi Securities Litigation*,
    155 F. Supp. 3d 386 (S.D.N.Y. 2016)...................................................................18

*Schaffer v. Horizon Pharma PLC*,
    No. 16-CV-1763 (JMF), 2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ............11, 17, 21, 24

*Schuler v. NIVS Intellimedia Technology Group, Inc.*,
    No. 11 Civ. 2484(KMW)(FM), 2013 WL 944777 (S.D.N.Y. Mar. 12, 2013) ..................25

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019)..........................................................................................11

*South Cherry Street, LLC v. Hennessee Group LLC*,
    573 F.3d 98 (2d Cir. 2009).........................................................................................22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...................................................................................................21

*In re UBS AG Securities Litig.*,
    No. 07 Civ. 11225(RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014)...............................................................................................................23

*Ulbricht v. Ternium S.A.*,
    No. 18-CV-6801 (PKC) (RLM), 2020 WL 5517313 (E.D.N.Y. Sept. 14, 2020)..............19

*In re XP Inc. Securities Litigation*,
    524 F. Supp. 3d 23 (E.D.N.Y. 2021) ........................................................................18, 19

## STATUTES

15 U.S.C. § 78u-4(b)(2) ......................................................................................................1

## RULES

Fed. R. Civ. P. 8(a) ............................................................................................................1

Fed. R. Civ. P. 9(b) ............................................................................................................1

Fed. R. Civ. P. 12(b)(6).......................................................................................................1

iv

Defendants Jianpu Technology Inc. ("Jianpu" or the "Company"), David Ye, and Yilü (Oscar) Chen (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Second Amended Class Action Complaint (the "Second Amended Complaint" or "SAC")[1] pursuant to Rules 8(a), 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure and Section 101(b) of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(2) (the "PSLRA").

### PRELIMINARY STATEMENT

Unable to cure the numerous pleading deficiencies identified in this Court's opinion dismissing the First Amended Complaint ("FAC"), Plaintiff's Second Amended Complaint entirely abandons one of the three claims initially asserted (claims relating to Jianpu's Loan Segment), and repeats the same insufficient allegations and flawed theories already rejected by this Court with respect to the other two claims (relating to Jianpu's Credit Card Segment and Advertising Segment). In fact, Plaintiff's latter two claims are bolstered only by a handful of speculative and irrelevant allegations that are belied by the very documents on which Plaintiff relies and which do nothing whatsoever to remedy the substantive issues that warranted dismissal of all of Plaintiff's claims in the first instance. At bottom, the SAC confirms that Plaintiff cannot state a claim for securities fraud, and seeks only to penalize Jianpu for lacking the clairvoyance to predict subsequent events that were unknown to the Company at the time of the relevant disclosures.

Jianpu is a Beijing-headquartered company that connects users and financial service providers through its Internet platform. Since its initial public offering ("IPO") in November 2017,

---

[1] A true and correct copy of the Second Amended Complaint is attached as Exhibit A to the Declaration of Robert A. Fumerton, dated January 27, 2023, exhibits to which are otherwise cited herein as "Ex. __." Pin cites for all exhibits reference the original pagination at the bottom of the page. All internal quotation marks and citations are omitted, and all emphases in quotations are added, unless otherwise indicated.

Jianpu has accurately and fully disclosed the risks it faces as a young financial technology company and the potential consequences that may result if the disclosed risks materialize—*e.g.*, its lack of control over third parties, undetected fraud by its employees, internal controls weaknesses, unforeseen outcomes from its investments or acquisitions, and data privacy issues. Jianpu has also proactively investigated allegations of employee misconduct and potential shortcomings in internal controls, and timely disclosed its findings to investors.  In February 2021, Plaintiff initiated this Action based on three unrelated incidents disclosed by Jianpu over a two-year period:  (1) the alleged revelation in March 2019 that certain third-party lenders utilizing Jianpu's platform engaged in unlawful practices; (2) the Audit Committee's investigation that found that some rogue employees in Jianpu's Credit Card Segment falsified transactions to inflate their sales commissions; and (3) Jianpu's acquisition of a stake in Databook Tech. Ltd. ("Databook") whose subsidiary, Hangzhou Scorpion, was later found guilty by the Chinese authorities of unlawful data collection practices.

In September 2022, this Court dismissed all of Plaintiff's claims.  Two years after the initial filing of this Action, Plaintiff filed the instant SAC, abandoning his first claim relating to Jianpu's Loan Segment, and, remarkably, repeating the very same allegations already rejected by this Court regarding Jianpu's Credit Card Segment and Databook, aided by nothing more than rank speculation and irrelevant, post-Class Period developments that have no bearing on the substance of his remaining claims.  For the reasons explained below and in the Court's earlier opinion dismissing the FAC, the SAC should be dismissed in its entirety—now with prejudice.

First, Plaintiff fails to plead a material misrepresentation or omission.  The SAC ignores this Court's holding that the vast majority of statements Plaintiff challenges with respect to the Credit Card Segment were simply not materially misleading.  Plaintiff now speculates that the

Audit Committee's independent investigation revealed undisclosed related-party transactions involving a company partially owned by the wife of Jianpu's CEO, but this accusation lacks any basis in reality and is plainly contradicted by the very disclosures on which the SAC relies. With respect to Plaintiff's Advertising Segment claims, Plaintiff merely repeats the same allegations already rejected by this Court, and adds a spattering of irrelevant and vague allegations that plainly fail to meet particularity requirements.

Second, Plaintiff resorts to the same generic claims that this Court and numerous others in this Circuit have repeatedly rejected as insufficient to establish scienter. His new allegation that Defendants must have known of misconduct in the Credit Card Segment due to the alleged involvement of a company partially owned by the wife of Jianpu's CEO is, once again, refuted by the very sources he cites, and thus adds nothing to his bare and deficient allegations.

Third, and finally, Plaintiff's claims should be dismissed for failure to plead loss causation, not only because Plaintiff fails to allege that his loss was caused by the materialization of concealed risks, but also because the timing of his trades demonstrates that he cannot establish any loss.

**STATEMENT OF FACTS[2]**

**1.     BACKGROUND**

Jianpu is a company incorporated in the Cayman Islands with its principal executive offices in China and whose American Depository Shares are traded on the New York Stock Exchange. Operating under the brand name "Rong360," Jianpu connects users and financial service providers in China through its Internet platform. (Ex. B, IPO Prospectus, at 1.) Jianpu does not offer

---

[2]    The facts set forth herein are drawn from the allegations in the Complaint and documents attached as exhibits or incorporated into the Complaint by reference, matters of which judicial notice may be taken, and documents integral to the complaint. *See In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003), *aff'd sub nom. Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005). The Court may also consider "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

financial products of its own.  Instead, it generates revenues from the fees that it charges third-party financial service providers for recommending their products and services to users accessing Jianpu's platform.  (Ex. C, 2017 Annual Report, at 40.)

As the Company repeatedly disclosed to investors, to comply with Chinese laws and regulations, Jianpu conducts its operations in China through Beijing Rongdiandian Information Technology Co., Ltd. ("RDD") and other affiliated Chinese entities, which are referred to in the Company's public disclosures as its variable interest entities ("VIEs").  (Ex. D, 2018 Annual Report, at 22–23; Ex. E, 2019 Annual Report, at 31–32.)  In accordance with U.S. GAAP, Jianpu consolidates the financials of RDD and its other VIEs.  (Ex. D at 22; Ex. E at 31–32.)  With respect to RDD, Jianpu disclosed that:

> RDD is 40% owned by the appointed family member of our chief executive officer, Mr. Daqing (David) Ye, 40% owned by Mr. Jiayan Lu, who is our chief operating officer, and 20% owned by Mr. Caofeng Liu, who is our chief technology officer. (Ex. D at 24; Ex. E at 32.)

In accordance with SEC regulations, Jianpu also separately reports material related-party transactions.  (*See, e.g.*, Ex. E at 103.)

## 2.    JIANPU'S DISCLOSURES DURING THE CLASS PERIOD

### a.    Jianpu Disclosed the Risks Relating to Its Loan Business

Jianpu's Loan Business generates revenue by charging financial service providers a "fixed price" for recommending their loans or financial products to qualified borrowers.  (Ex. B at 83-84.)  "After the users or borrowers submit applications for the recommended products to the financial service providers, [Jianpu] do[es] not maintain any obligations" to the financial service provider.  (*Id.*)  Jianpu repeatedly disclosed this business model and the associated risks:

> *Although we have established standards to screen financial service providers before listing their products on our platform . . . we have limited control over the quality of the financial products and the services provided by financial service providers . . . .* Due to the large number of financial products listed on our platform

and the extensiveness of our financial service provider network, it is extremely difficult for us to monitor and ensure the product and service quality of financial service providers on our platform at any given time.  (Ex. B at 20; Ex. C at 8; Ex. D at 8.)

Jianpu also warned investors of the potential consequences if financial service providers on its platform violate "any PRC laws or regulations": "We may be jointly liable," "may face, among others, regulatory warnings, correction orders, condemnation, fines and criminal liability," "may have to remove financial products from our platform or terminate relationship[s] with financial service providers," and "[a]s a result, *our business . . . financial performance and prospects could be materially and adversely affected*."  (Ex. B at 23; Ex. C at 10; Ex. D at 11.)

> **b.    Jianpu Disclosed the Risks Relating to Its Credit Card Business**

At the time of its IPO in 2017, Jianpu had a workforce of approximately 800 employees. (Ex. D at 85.)  As of December 2018, that number had grown to over 1,100 employees in fifteen Chinese cities.  (Ex. E at 60, 99.)  Just like any large employer of a growing business, Jianpu could not guarantee that all of its employees would act lawfully and ethically at all times—a risk that Jianpu expressly disclosed as follows:

> We are subject to fraudulent activity on our platform . . . . *Certain of our own employees may be corrupted and participate in fraudulent or otherwise illegal activities*. *Our resources, technologies, fraud detection tools and risk management system may be insufficient to accurately detect and timely prevent fraud and misconduct*.  (Ex. B at 24; Ex. C at 11; *see also* Ex. D at 12 (similar).)

Compounding its compliance challenge, as the Company also disclosed to investors, a "material weakness" had been identified in the Company's internal controls "relat[ing] to the lack of sufficient competent financial reporting and accounting personnel."  (Ex. B at 29; Ex. C at 16; Ex. D at 17.)  Although the Company was working to remediate these deficiencies, Jianpu told investors that it could not "assure [them] that we will be able to continue implementing these measures in the future, or that we will not identify additional material weaknesses or significant

deficiencies in the future." (Ex. B at 29; Ex. C at 16; Ex. D at 17.) "If we fail to maintain an effective system of internal control over financial reporting," the Company warned, "we may be unable to accurately report our financial results or prevent fraud." (Ex. B at 28; Ex. C at 15; Ex. D at 17.) Jianpu specifically identified "material misstatements or restatements of its prior financial statements" as a potential consequence of the identified internal controls weaknesses:

> *If we fail to achieve and maintain an effective internal control environment, we could suffer material misstatements in our financial statements and fail to meet our reporting obligations* . . . . Additionally, ineffective internal control over financial reporting could expose us to increased risk of fraud or misuse of corporate assets . . . . *We may also be required to restate our financial statements from prior periods*. (Ex. B at 29; *see also* Ex. C at 16 (similar).)

### c.      Jianpu Disclosed the Risks Relating to Databook

In June 2018, Jianpu acquired a 65% stake in Databook, a data solutions company. (SAC ¶¶ 28–29, 136.) In addition to disclosing the usual plethora of risks that accompany any acquisition—*i.e.*, "*investments or acquisitions may not yield the results we expect*" (Ex. D at 20)—the Company was explicit about the specific *data privacy risks* it was taking on as a result of its investment in a business that handles a large volume of potentially sensitive personal data:

> *Any actual or perceived inappropriate usage or mishandling of private information and data on our platform could subject us to liabilities, negatively impact our reputation and deter users from using our platform*.
>
> . . . There are numerous laws regarding privacy and the storing, sharing, use, disclosure and protection of personally identifiable information and data. Specifically, *personally identifiable and other confidential information is increasingly subject to legislation and regulations in numerous domestic and international jurisdictions. PRC government authorities have enacted a series of laws and regulations relating to the protection of privacy and personal information* . . . We cannot assure you that our existing privacy and personal protection system and technical measures will be considered sufficient under applicable laws and regulations . . . . *Any inability to adequately address privacy concerns, even if unfounded, or to comply with applicable privacy or data protection laws, regulations and privacy standards, could result in additional cost and liability for us*, damage our reputation, inhibit the use of our platform and harm our business. (Ex. B at 23–24; Ex. C at 11; Ex. D at 12 (first emphasis in original).)

3.      **SUBSEQUENT EVENTS**

a.      **In March 2019, CCTV Airs A Story on Improper Lending Practices**

On March 15, 2019, Chinese state broadcaster China Central Television ("CCTV") aired a program that purported to expose certain loan providers' allegedly improper lending practices. (SAC ¶¶ 32–33.)  Plaintiff admits that the examples detailed in the program reflected unlawful conduct of *third parties*, as opposed to any unlawful conduct by the Company itself.  (SAC ¶ 33.)

Following the CCTV broadcast, Jianpu "promptly organized internal resources to thoroughly review its business practices" and voluntarily suspended further downloads of its mobile apps "in order to identify any inappropriate conduct," including by third parties, that abused Jianpu's platform to commit misconduct.  (SAC ¶ 36; Ex. F, Mar. 17, 2019 Press Release, at 1.) Two months later, on May 28, 2019, Jianpu announced that the "review of [its] systems, products and processes" was complete, and that it expected to relaunch its mobile apps the following month. (SAC ¶ 47.)  The internal review did not uncover any violation of law or regulation by Jianpu, and no enforcement action was ever brought against Jianpu based on the allegations featured in the CCTV broadcast.  Plaintiff does not allege otherwise.  Nevertheless, Jianpu disclosed that its Q2 2019 revenue decreased because of the CCTV report and the suspension of its mobile app.  (*Id.* ¶ 39.)

b.      **A Databook Subsidiary Is Investigated by the Chinese Authorities**

In September 2019, over a year after the Company's initial investment in Databook, Chinese authorities initiated a criminal investigation of one of Databook's subsidiaries, Hangzhou Scorpion.  (SAC ¶ 99.)  In December 2019, Jianpu disclosed in its Q3 2019 earnings release that it had recorded a RMB250.3 million ($38.6 million) impairment, which "primarily reflects the impairment of the goodwill and intangible assets related to a subsidiary acquired in 2018 due to adverse development of its business."  (SAC ¶¶ 100–01; Ex. G, Q3 2019 Press Release, at 2.)  Nine

7

months after this disclosure, in September 2020, Chinese authorities filed a criminal case against Hangzhou Scorpion.  (SAC ¶ 107.)  In January 2021, a Chinese court entered judgment against Hangzhou Scorpion and two of its employees for improperly handling personal data, and Hangzhou Scorpion was fined RMB30 million ($4.3 million) and ordered to disgorge the same amount.  (*Id.* ¶¶ 108–09.)  Plaintiff does not allege that the judgment even mentioned Jianpu or Databook nor that it suggested Jianpu or any of its directors or officers knew about or were involved in the underlying conduct by Hangzhou Scorpion.  (*Id.*)

Jianpu disclosed the above judicial proceedings and judgment, as well as their financial impact on the Company, in its 2019 20-F filed on April 30, 2021.  (*Id.* ¶ 111.)  Jianpu noted that, as first disclosed in its Q3 2019 Earnings Release over a year prior, it had already recorded a full impairment for goodwill, intangible assets, and other assets attributable to Databook.  (*Id.*; Ex. E at 26, F-45.)  Jianpu also disclosed that, given the recent court judgment, it "reversed" RMB30 million ($4.3 million) in Advertising Segment revenues (which include Databook revenues) to account for the disgorgement, and also recorded the other RMB30 million owed as penalties. (SAC ¶ 111; Ex. E at 26, 87.)  Jianpu further disclosed that the reversal was made under ASC 855, as "a first type subsequent event that provides additional evidence about conditions that existed at the date of the balance sheet as of December 31, 2019."  (SAC ¶ 111; Ex. E at F-45.)

### c.      Jianpu Uncovers and Discloses Misconduct in Its Credit Card Business

In a late filing notification submitted on June 15, 2020, the Company stated that it could not timely file its 2019 Annual Report in part because "[t]he independent Audit Committee of the Company's Board of Directors, with the assistance of advisors, is in the process of conducting an internal review of certain matters relating to transactions between the Company and third-party business entities."  (SAC ¶ 54; Ex. H, June 15, 2020 Notice of Late Filing, at 1.)  Notably, nothing in the Notice suggested that the transactions between Jianpu and third-party entities were related

8

party transactions.  Eight months later, on February 16, 2021, Jianpu announced the results of the independent internal investigation as follows:

> The Review found that certain transactions involved ***third-party agents*** (including both upstream agents and downstream suppliers) ***with undisclosed relationships***, and some transactions lacked business substance ("questionable transactions"). As a result, certain revenue and associated expenses were inflated or inaccurately recorded in the financial statements. Evidence suggested that certain employees from the Credit Card BU may have known about or been involved in certain of the questionable transactions that resulted in inflated sales commissions to such employees. In relation to the questionable transactions, the Review found that certain employees improperly altered supporting documents that were provided to the Company's external auditor.
>
> ***Other than a business unit head-level employee who has since been terminated, the Review did not find any evidence that other members of senior management who supervised the Credit Card BU knew about or participated in any of the questionable transactions***.  (Ex. I, Feb. 16, 2021 Press Release, at 1; SAC ¶ 59.)

As in the June 15, 2020 Notice, nothing in the February 2021 Press Release indicated that the "questionable transactions" identified in the internal investigation were related-party transactions.  (*Id*.)  Rather, the "undisclosed relationships" referred to the relationships between and among third parties, rather than relationships between Jianpu and its related parties.  (*Id*.)

Jianpu further disclosed the financial impact of these "questionable transactions" (Ex. H at 1; Ex. E at 8) and restated certain financial information in the 2019 20-F issued on April 30, 2021 (the "Restatement").

**4.     THIS ACTION**

Days after the February 16, 2021 announcement of the investigation's findings, a putative shareholder initiated this action, alleging that Jianpu failed to timely disclose the issues that the Audit Committee-led investigation subsequently uncovered about the Credit Card Segment.  (ECF No. 1.)  On July 20, 2021, Lead Plaintiff filed the First Amended Complaint.  (ECF No. 46.) Although Lead Plaintiff did not purchase his shares until October 2020 (more than a year after the

9

CCTV broadcast) and sold all his shares by February 16, 2021 (two months before Jianpu disclosed the Databook judgement), he included claims on these issues. (FAC ¶ 13.)

On September 3, 2021, Jianpu moved to dismiss the FAC, and on September 28, 2022, this Court granted Jianpu's motion in full without prejudice. In dismissing Plaintiff's Loan Segment claim, the Court held that Plaintiff failed to establish falsity, because "the fact that there were noncompliant providers on Rong360 does not mean that the . . . statements regarding the Company's regulatory compliance measures were untrue when made," and, in any event, Jianpu warned about the relevant risks. (Opinion, ECF No. 61 at 12–14 (hereinafter, "Op.").) Regarding the Credit Card Segment claim, the Court held that Plaintiff failed to plead the existence of any undisclosed related-party transaction it had a duty to disclose, failed to establish that most challenged statements were materially misleading, and failed to plead that any allegedly misstated financials were made with prior knowledge of their falsity. (*Id.* at 16–20.) With respect to the Advertising Segment claims, the Court held that Plaintiff failed to establish any duty by Jianpu to disclose the government investigation into Hangzhou Scorpion when Jianpu recorded the financial impairment in 2019, because at the time of that disclosure, the allegations remained uncharged and unadjudicated, and, in any event, such disclosure would not have provided new, material information to investors. (*Id.* at 21–22.) Finally, with respect to all of Plaintiff's claims, the Court held that failure to plead scienter provided an "independent reason" for dismissal. (*Id.* at 22.)

In granting leave to amend, the Court noted that "there is good reason to doubt that [Plaintiff] would be able to remedy the substantive issues . . . especially with respect to claims relating to the Loan and Advertising Segment." (*Id.* at 30.) Tellingly, in its SAC, Plaintiff abandoned all allegations of a material misrepresentation relating to the Loan Segment, alleging only that the decrease in Loan Segment revenue caused by the CCTV broadcast and voluntary

10

suspension of downloads motivated Jianpu to commit the alleged fraud in the Credit Card and Advertising Segments to make up for lost ground. (SAC ¶¶ 32, 42.) Because, as explained further below, Plaintiff fails to cure the pleading deficiencies identified by this Court, the SAC should be dismissed in its entirety with prejudice.

## ARGUMENT

To state a claim under Section 10(b), Plaintiff must allege, among other things: (1) a material misstatement or omission; (2) scienter; and (3) loss causation. *See Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019). The PSLRA and Rule 9(b) require Plaintiff to plead these elements with particularity. *Schaffer v. Horizon Pharma PLC*, No. 16-CV-1763 (JMF), 2018 WL 481883, at *2 (S.D.N.Y. Jan. 18, 2018). As shown below, the SAC should be dismissed because Plaintiff fails adequately to plead any of these elements.

## I.    PLAINTIFF FAILS TO PLEAD ANY ACTIONABLE MISREPRESENTATION

Unable to cure the fatal pleading deficiencies relating to his Loan Segment claim, Plaintiff abandons any allegation that Jianpu made any material misstatement or omission relating to this line of business, and alleges only that the Company made material misstatements and omissions relating to its Credit Card and Advertising Segments. (*See* SAC ¶¶ 133–76.) To plead a material misstatement or omission, Plaintiff "must do more than say that the statements . . . were false and misleading; [he] must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). Plaintiff does not do so with respect to any of his remaining categories of misrepresentation.

### A.    No Actionable Misrepresentation Regarding Jianpu's Credit Card Segment

Plaintiff alleges that Defendants failed to disclose certain related-party transactions in its Credit Card Segment, based primarily on Jianpu's announcement in February 2021 that an Audit Committee-led internal investigation into its Credit Card Segment "found that certain transactions

11

involved third-party agents (including both upstream agents and downstream suppliers) with undisclosed relationships, and some transactions lacked business substance ('questionable transactions')," which caused "certain revenue and associated expenses [to be] inflated or inaccurately recorded in the financial statements." (Ex. I at 1.) In dismissing the FAC, the Court observed that Plaintiff did "not allege *at all*, let alone with particularity, which individuals or entities were involved in the related-party transactions, when they occurred, or how much money the transactions entailed." (Op. at 17.) In other words, Plaintiff failed to identify a single related-party transaction that Defendants failed to disclose.

In an attempt to correct that pleading defect, Plaintiff now speculates that, "[w]hile Jianpu never clearly disclosed which related party prompted the restatement" following the internal investigation into its Credit Card Segment, Jianpu's disclosure of the investigation's findings "creates a strong inference that it was RDD, an entity that is 40% owned by CEO Ye's wife." (SAC ¶ 63.) Specifically, relying on naked speculation and a demonstrably false reading of Jianpu's disclosures, Plaintiff hypothesizes that "Related Party A"—a related party whose transactions were disclosed in Jianpu's SEC filings (Ex. E at 103)—"was a key beneficiary of the undisclosed related party transactions," and that "Related Party A appears to be RDD." (SAC ¶¶ 68, 72.) For several reasons, Plaintiff's gambit fails.

First, Plaintiff fails to establish that the internal review of Jianpu's Credit Card Segment found *any* evidence of undisclosed related-party transactions. Critically, the February 2021 Press Release and Jianpu's financial disclosures discussing the review made no mention whatsoever that "related parties" or "related-party transactions," which are terms defined by SEC rules and regulations, were involved. As the SAC acknowledges, "[p]ursuant to FAS 57, related party transactions refers to those transactions between 'an enterprise and *its* principal owners,

12

management, or members of their immediate families,' and those between a company and *its* 'affiliates.'"   (SAC ¶ 79.)   Nothing in the February 2021 Press Release indicates that the independent investigation found evidence of undisclosed transactions between Jianpu and any of its related parties.   To the contrary, the announcement referred only to "*third-party agents* (including both upstream agents and downstream suppliers) *with undisclosed relationships*" between and among third parties, not between Jianpu and its "related parties."   (Ex. I at 1.) Similarly, in the 2019 20-F, among the internal control weaknesses uncovered by its investigation into its Credit Card Segment, Jianpu stated that it had "inadequate review over engaging of third-party agents, and lack of effective acceptance procedures such as background information inspection to identify *relationships between upstream agents and downstream suppliers*," confirming that the "undisclosed relationships" referenced in the February 2021 Press Release referred to relationships between and among third parties, not between Jianpu and its related parties.[3]   (SAC ¶ 59.)   Simply put, Plaintiff cannot show that the internal investigation related to *any* undisclosed related-party transaction at all, let alone with RDD in particular.

Second, even if Plaintiff could establish that the Restatement that followed the independent investigation of Jianpu's Credit Card Segment was due to undisclosed related-party transactions (he cannot), the SAC does not support his inferential leap that the related party in question was RDD.   Contrary to Plaintiff's assertions, Jianpu's disclosures make clear that RDD is not and cannot possibly be Related Party A.   (*See* SAC ¶ 63.)   As Plaintiff notes, Related Party A is a "*minority investee* of a company owned by two founders of the Company," but is not itself owned by the Company's co-founders.   (SAC ¶ 69; Ex. E at F-43.)   In contrast, RDD is one of Jianpu's

---

[3]   Although the 2019 20-F also noted a second, *separate* material weakness "relat[ing] to our failure to design and implement controls that have a sufficient level of precision related to pre-approval of and complete and accurate disclosures of related party transactions," the disclosure never stated that this material weakness was related to the Credit Card Segment or resulted in the Restatement.   (SAC ¶ 62.)

*variable interest entities* and is owned by the Company's two co-founders and the CEO's wife:

> RDD is 40% owned by the appointed family member of our chief executive officer, Mr. Daqing (David) Ye, 40% owned by Mr. Jiayan Lu, who is our chief operating officer, and 20% owned by Mr. Caofeng Liu,[4] who is our chief technology officer . . .

(Ex. D at 24; Ex. E at 32.)  Hence, the SAC and the sources on which it relies make clear that Related Party A and RDD are not and cannot be the same entity.

Jianpu's other disclosures confirm this same point.  Both before and after the Restatement, the financial figures relating to Jianpu's VIEs, including RDD, remained *the same*.  For example, in its 2018 20-F, Jianpu reported that total revenues attributable to its VIEs were RMB 183,003 ($26,617), net income was RMB 18,506 ($2,692), and cash and cash equivalents was RMB 14,665 ($2,133).  (Ex. D at F-13–14.)  Although Jianpu restated other 2018 financial figures in its 2019 20-F, these figures remained unchanged, confirming that transactions with RDD were unaffected by the Restatement.  (Ex. E at F-13.)

Worse, Plaintiff fails even to show that Related Party A, much less RDD, was in any way implicated by the Restatement.  Plaintiff seizes on the fact that Jianpu restated advertising and marketing expenses for Related Party A in its 2019 20-F to speculate that Related Party A must also have been implicated by the Restatement.  (SAC ¶ 71.)  But as Jianpu disclosed in its 2019 20-F, Related Party A's 2018 sales and marketing expenses previously disclosed in its 2018 20-F were *understated* by RMB 11.586 million.  (Ex. E at F-15.)  The 2019 20-F corrected those figures and adjusted them upwards.  (*Compare* Ex. D at F-36 (reporting RMB 40,167,000 in sales and marketing expenses charged by Related Party A) *with* Ex. E at F-43 (restating 2018 sales and marketing expenses charged by Related Party A as RMB 51,753,000).)  In contrast, with respect

---

[4]    Daqing (David) Ye, Jiayan Lu, and Caofeng Liu are all co-founders of the Company.  (Ex. D at 78; Ex. E at 92.)

14

to the Restatement that Plaintiff relies on as the "corrective disclosure," Jianpu disclosed that the "questionable transactions" caused associated expenses to be ***overstated*** by approximately RMB 90 million, requiring the Restatement to adjust them downwards.  (Ex. I at 1.)  These adjustments in different amounts, and in different directions—one up, the other down—further confirm that the Restatement did not relate to Related Party A.  (SAC ¶ 62.)

Third, with respect to Plaintiff's claim that Jianpu failed to disclose "that there were material weaknesses in Jianpu's internal control over financial reporting" and that financials could be restated as a result, (SAC ¶¶ 134, 137, 140, 143, 148, 155, 157, 162, 164, 168, 174), these claims fail because "[D]efendants cannot be held liable for failing to disclose something that they disclosed." *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 180 (E.D.N.Y. 2017) (citing *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003)), *aff'd*, 731 F. App'x 35 (2d Cir. 2018).  Here, Jianpu clearly warned that:

- "***[c]ertain of our own employees may be corrupted and participate in fraudulent or otherwise illegal activities. Our resources, technologies, fraud detection tools and risk management system may be insufficient to accurately detect and timely prevent fraud and misconduct***" (Ex. B at 24; Ex. C at 11; Ex. D at 12);

- there were material weaknesses in internal controls, including a "lack of sufficient competent financial reporting and accounting personnel with appropriate understanding of U.S. GAAP" and SEC reporting requirements, and that "***we cannot assure you . . . we will not identify additional material weaknesses or significant deficiencies in the future***" (Ex. B at 29; Ex. C at 15–16; Ex. D at 17); and

- shortcomings in internal controls "***could expose us to increased risk of fraud or misuse of corporate assets and . . . [w]e may also be required to restate our financial statements from prior periods.***" (Ex. B at 29; Ex. C at 15–16; Ex. D at 17 (similar).)

Finally, Plaintiff ignores the Court's previous holding that the majority of challenged statements were not misleading under the circumstances.  (Op. at 16–20.)  Instead of buttressing his claim with alternative theories, he simply challenges the ***same*** statements on the ***exact same bases***.  For example, the Court held that the Company's statement that its Credit Card Segment

15

was "outpacing peers" and its quarterly "press releases identifying the reason for the growth in credit card revenue," which "put[] the reason for the success of the Credit Card Segment at issue," were "insufficient to trigger a duty to disclose any related-party transactions" because "they accurately reflect the Company's reported financials, and an allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained, is insufficient to impose Section 10(b) liability." (*Id.* at 18.) Remarkably, the SAC alleges that these same statements were misleading for the same reason already rejected by this Court, namely, "they attributed the growth in the credit card segment to an exclusive set of factors." (*Compare* FAC ¶¶ 66, 122–24, 125–27, 136–37, 141–43, 146–48, 152–54 *with* SAC ¶¶ 52, 139–44, 151–52, 156–58, 161–63, 167–69.)

Similarly, the SAC alleges no facts or reason to disturb the Court's earlier holding that various statements that "generally describe the Credit Card Segment's business success, recount historical facts, or discuss Jianpu's hopes for the future" are inactionable because they were factually accurate, protected by the PSLRA's safe harbor for forward-looking statements, or "not specific enough to put the reason for the Segment's success at issue" and thus are inactionable puffery. (Op. at 18–20 & n.3.) The SAC offers nothing new to show falsity in the Company's statements regarding its "vibrant network of over 2,500 financial institutions," the "scalability of our platform model," its adoption of "more stringent onboarding processes" and "develop[ment] of industry standards and promot[ion] of industry best practice," or the need to file its Form 20-F late due to COVID-19. (*Id.* at 19; *compare* FAC ¶¶ 61, 128, 144, 160 *with* SAC ¶¶ 47, 145, 147, 159, 164, 175.) Nor does Plaintiff offer anything to challenge the correctness of the Court's holding that generic statements, including about Jianpu's goal to "lead the initiative of introducing and promoting higher industry standards and best practices," are puffery, (Op. at 19; *compare* FAC ¶¶ 125, 144 *with* SAC ¶¶ 142, 159), or that forward-looking statements about what Jianpu expected

16

would "drive the growth" in 2019 are protected by the PSLRA's safe harbor (Op. at 19; *compare* FAC ¶ 59 *with* SAC ¶ 45). *See also Schaffer*, 2018 WL 481883, at \*9.

With respect to Jianpu's financial statements, although "revenue for the fiscal years 2018 and 2019" were overstated—as Jianpu promptly disclosed following the conclusion of its independent investigation (SAC ¶ 60)—Plaintiff again makes "no showing that defendants' [statements] . . . were not based on the facts available to the company at the time the statements were made." *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996). The SAC makes no allegation whatsoever that Defendants knew of the employee misconduct in its Credit Card Segment prior to the conclusion of its independent investigation in or around February 2021. Nor does Plaintiff dispute Defendants' disclosure that the investigation "***did not find any evidence that other members of senior management . . . knew about or participated in any of the questionable transactions***." (SAC ¶ 59.) In any event, even if the later-restated financial data constituted a material misstatement—an issue which the Court did not directly reach in its earlier opinion (*see* Op. at 19–20)—Plaintiff's claim nonetheless fails because, as explained below, the SAC also fails to show the requisite scienter (infra § II.B.1).[5]

### B.  No Actionable Misrepresentation Regarding Jianpu's Advertising Segment

Plaintiff makes four sets of allegations regarding the Advertising Segment: (i) Jianpu made

---

[5]  Without any factual basis whatsoever, Plaintiff asserts that Jianpu's election of an auditor who could not be fully inspected by the PCAOB constituted "[a]dditional conduct that advanced Defendants' scheme" to conceal its related-party transactions. (SAC ¶ 4.) This bare allegation, which lacks any detail whatsoever on "who, when, or how" the auditor assisted in carrying out the purported fraud, does not save Plaintiff's claim. *Schaffer*, 2018 WL 481883, at \*8. Moreover, given Jianpu's repeated disclosures that its auditor "is located in and organized under the laws of, the PRC, which is a jurisdiction where the PCAOB has been unable to conduct inspections without the approval of the Chinese authorities," Plaintiff cannot allege a Section 10(b) claim based on Jianpu's choice of auditor. (Ex. C at 30, F-2; Ex. D at 32, F-2.) Plaintiff's other assertion that Jianpu's choice of auditor "ran afoul of the Holding Foreign Companies Accountable Act ('HFCAA') [and] may ultimately lead to Jianpu's shares being delisted" is irrelevant and has since been proven wrong by subsequent events. (SAC ¶ 4; *see id.* ¶ 126 n.15 (citing SEC rule stating de-listing risk only "once an issuer is identified as a Commission-Identified Issuer for two consecutive years."); Ex. J, *PCAOB Secures Complete Access to Inspect, Investigate Chinese Firms for First Time in History*, pcaobus.org (Dec. 23, 2022) (noting PCAOB secured complete access to Chinese audit firms).)

false and misleading statements regarding the purchase of Databook (SAC ¶¶ 29, 136, 138); (ii) Jianpu failed to timely disclose that Databook's subsidiary was under criminal investigation in September 2019 (*id.* ¶¶ 99–101); (iii) Jianpu violated GAAP with respect to the financial treatment of the investigation and the subsequent revenue reversals within the Advertising Segment (*id.* ¶¶ 111–17); and (iv) Jianpu violated Item 303 (*id.* ¶¶ 93–98).  As explained below, these claims fail.

The first allegation regarding the purchase of Databook was earlier dismissed by the Court, as "historical accurate statement[s] are not actionable," and Plaintiff "alleges no facts to suggest that the reported purchase price or valuation of Databook was false at the time Jianpu made the statements."[6]  (Op. at 20–21.) *See also In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016).  The SAC again simply regurgitates the same allegations that this Court previously rejected.

With respect to the second allegation, regarding the criminal investigation against Hangzhou Scorpion, the Court already held that Plaintiff failed to establish that Jianpu had a duty to disclose any uncharged wrongdoing in 2019.  (Op. at 21–22.)  "[A] government investigation, without more, does not trigger a generalized duty to disclose." *In re XP Inc. Sec. Litig.*, 524 F. Supp. 3d 23, 37 (E.D.N.Y. 2021) (citation omitted).  The Court held that Plaintiff made no allegation that the misconduct "'was the secret behind [the Company's] success,' which would have triggered a duty to disclose the uncharged criminal conduct."  (Op. at 21 (quoting *XP*, 524 F. Supp. 3d at 38).)  Moreover, the impairment Jianpu recorded did not trigger a duty to disclose the investigation, because the impairment itself "alert[ed] investors to the possible financial

---

6   In addition, Jianpu warned of the precise risks relating to the purchase: that "investments or acquisitions may not yield the results we expect"; that the "regulatory framework for privacy issues in China and worldwide is currently evolving and is likely to remain uncertain for the foreseeable future"; and that "*[a]ny actual or perceived inappropriate usage or mishandling of private information and data on our platform could subject us to liabilities* . . . could result in additional cost and liability for us . . . and harm our business."  (Ex. B at 23–24, 32; Ex. C at 11, 18; Ex. D at 12, 20); *In re Qudian Inc. Sec. Litig.*, No. 17-CV-9741 (JMF), 2019 WL 4735376, at *7 (S.D.N.Y. Sept. 27, 2019) (finding no misrepresentation where defendant "explicitly warned investors that the company could *not* assure investors that 'personnel will not engage in any misconduct'" (emphasis in original)).

implications," and "[d]isclosing the investigation—which, as of December 2019, had not escalated to formal charges—would not have significantly altered the 'total mix' of information available to an investor." (Op. at 22 (citation omitted).) *See also XP*, 524 F. Supp. 3d at 37–38 (no duty to disclose investigation where defendants provided some notice of adverse events); *Ulbricht v. Ternium S.A.*, No. 18-CV-6801 (PKC) (RLM), 2020 WL 5517313, at *7 (E.D.N.Y. Sept. 14, 2020) ("[R]evealing one fact about a subject does not trigger a duty to reveal all facts on the subject, so long as what was revealed would not be so incomplete as to mislead." (alteration in original) (quoting *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012)). The SAC fails to grapple with any of these fatal deficiencies.

Plaintiff's third allegation is that Jianpu violated GAAP by failing to accrue a loss for potential fines and penalties resulting from the criminal investigation in its Q3 2019 Earnings Release in December 2019, and improperly reversing, instead of restating, revenues attributable to these fines and penalties in Jianpu's 2019 20-F. (SAC ¶¶ 113, 117.) The SAC fails to address the same legal deficiencies the Court's first opinion identified. First, as the Court observed (Op. at 22), at the time Jianpu recorded the impairment in December 2019, the investigation had not proceeded to criminal charges (SAC ¶ 107), and no fine was imposed until January 2021. (SAC ¶ 108.) Second, because Plaintiff pleads no particularized facts showing that Jianpu's accounting judgments—relating to the potential loss disclosed in its Q3 2019 Earnings Release and the actual loss disclosed in its 2019 20-F—were objectively false and not sincerely held when made, Plaintiff's disagreement with Jianpu's application of accounting rules is not a basis for a securities fraud claim.[7] *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011). Finally, to the

---

[7]    According to Plaintiff's own allegations, ASC 450, the accounting standard that Plaintiff claims Jianpu should have used, applies when "(1) it is probable that a loss has been incurred and (2) the amount can be reasonably estimated." (SAC ¶ 114.) Here, as in the FAC, Plaintiff alleges no facts to establish either. At most, he asserts,
*(cont'd)*

19

extent Plaintiff challenges the reversal of revenue in Jianpu's 2019 20-F, the reversal occurred on April 30, 2021, two months *after* the end of the Class Period.  (SAC ¶¶ 111–12.)

Plaintiff's fourth allegation that the Company violated Item 303 is the only arguably new addition to the SAC.  However, the SAC is completely devoid of factual support to show how Defendants violated Item 303.  (*Id.* ¶¶ 93–98, 217.)  Affixing a new legal label to the same legally insufficient factual allegations cannot save the SAC from dismissal.  To the extent Plaintiff suggests that Item 303 imposed a duty to disclose the investigation—though the SAC does not allege this expressly—this claim fails because Jianpu recorded an impairment which "primarily reflects the impairment of the goodwill and intangible assets related to a subsidiary acquired in 2018 due to adverse development of its business," (*id.* ¶¶ 100–01), thereby disclosing both a known uncertainty and its potential "material impact" on the business.  (*Id.* ¶ 95).  To the extent Plaintiff faults Jianpu for disclosing a November 2019 consumer data privacy Notice in its 2019 20-F issued in April 2021—a claim that is not clearly alleged in the SAC (*id.* ¶ 92)— Plaintiff also fails to state a claim, because this Notice would not have "significantly altered the 'total mix' of information made available," *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988), particularly in light of Jianpu's repeated disclosures that "personally identifiable and other confidential information is increasingly subject to legislation and regulation," "PRC government authorities have enacted a series of laws and regulations relating to the protection of privacy and personal information," and "*[a]ny actual or perceived inappropriate usage or mishandling of private information and data on our platform could subject us to liabilities* . . . could result in additional cost and liability for us . . . and harm our business."  (Ex. B at 23–24; Ex. C at 11; Ex.

---

in conclusory fashion, that such a loss was "inevitable," but provides no supporting facts—much less ones pled with particularity—about Jianpu's knowledge to support that allegation.  (*Id*. ¶¶ 99, 117.)  Plaintiff's allegations regarding the use of "little r" restatements does not alter the Court's earlier analysis.  (*Id*. ¶¶ 120–25.)

20

D at 12.)  Plaintiff's vague pleading also plainly fails to meet the PSLRA's particularity requirements.  *See Schaffer*, 2018 WL 481883, at \*2.

## II.    PLAINTIFF FAILS TO PLEAD SCIENTER

Plaintiff's claims should also be dismissed for the separate and independent reason that the Complaint completely fails to plead the scienter of anyone "whose intent could be imputed" to the Company.  *Altayyar*, 242 F. Supp. 3d at 182 (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)).  Under the PSLRA, Plaintiff must plead with particularity facts that "give rise to a strong inference of fraudulent intent."  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000)).  "To qualify as 'strong' . . . , an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).  Scienter may be pled through particularized factual allegations showing either (i) a "motive and opportunity" to commit fraud, or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI*, 493 F.3d at 99 (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168–69 (2d Cir. 2000)).  Plaintiff fails on both counts.

### A.    **Plaintiff Fails to Plead Motive and Opportunity**

Plaintiff doubles down on the flawed theory he alleged in the FAC:  that the "sudden" drop in Loan Business revenue that occurred in Q1 2019 "created an urgent need, and thus a strong motive, for Defendants to boost revenue within the Company's Credit Card Segment."  (SAC ¶ 44.)  According to Plaintiff, the inflation of Credit Card revenue was necessary for Jianpu to meet its revenue targets for Q1 through Q4 2019, (*id.* ¶ 88), and "the improper accounting treatment of the Databook investigation also helped the Company meet its total revenue guidance" (*id.* ¶ 118).

As this Court has already held, however, such general motives to meet revenue targets "can

be swiftly rejected," (Op. at 24), because "it is not sufficient to allege goals that are possessed by virtually all corporate insiders, such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability or the success of an investment." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009).

### B.    **Plaintiff Fails to Plead Conscious Misbehavior or Recklessness**

Because Plaintiff fails to establish motive, "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (citation omitted).    To establish recklessness, he must plead "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (citation omitted).    This requires an allegation that Defendants had "knowledge of facts or access to information contradicting their public statements." *Id.* (quoting *Novak*, 216 F.3d at 308).    Plaintiff fails to make such a showing.

### 1.    **Plaintiff Fails to Plead Scienter for the Credit Card Claim**

Once again, the SAC adds nothing new to supplement Plaintiff's insufficient allegations of conscious misbehavior and recklessness with respect to his Credit Card claim and merely repeats several of the same arguments already rejected by this Court.    For example, Plaintiff recycles his allegations regarding the responsibilities of the Audit Committee, and the account of a purported confidential witness regarding the Credit Card Segment's verification procedures for transactions facilitated through the platform.    (SAC ¶¶ 89, 189, 192–93.)    But as the Court already held, "these sorts of general allegations about the responsibilities of an audit committee, and what its members might have learned, are, at bottom, speculative and, thus, insufficient to show scienter."    (Op. at 26.)    Similarly, despite Plaintiff's claim that the Company was only able to meet its revenue targets because of inflated revenue in the Credit Card Segment, the SAC also admits that the misconduct in this Segment began in 2018—***before*** the Q1 2019 drop in Loan Segment revenue.    (SAC ¶¶ 42

22

n.4, 88.)  Hence, as this Court previously held, "[t]he Credit Card Segment growth did not . . . coincide with the drop in revenue from the Loan Segment," and Plaintiff's theory can be easily rejected in the face of the more compelling inference "that Defendants reported what they thought to be accurate revenue statements" at the time.  (Op. at 26–27.)  Finally, Plaintiff repeats his vague allegations of material weaknesses in the Company's internal controls, (SAC ¶ 194), ignoring this Court's holding that such allegations "do[] not show that any Defendant disregarded red flags or otherwise acted recklessly," and the fact that rogue employees "improperly altered supporting documents that were provided to the Company's external auditor," (*id.* ¶ 59), "mak[e] it even less likely that any Defendant knew about the related-party transactions" (Op. at 27).

Indeed, the ***only*** substantive allegation Plaintiff adds is contradicted by the very documents upon which he relies.  Plaintiff alleges that "Defendants were also aware of the related party transactions because the related party at issue is 40% owned by CEO Ye's wife."  (SAC ¶ 190.)  But, as shown above, Plaintiff's speculation that *any* related party, let alone RDD or Related Party A, was involved in the misconduct by third parties relating to the Credit Card Segment is based upon a misreading of Jianpu's disclosures and cannot support scienter.  (*Supra* § I.A.)  Moreover, this argument ignores Jianpu's disclosure—which Plaintiff does not allege was false—that the independent investigation "***did not find any evidence that other members of senior management . . . knew about or participated in any of the questionable transactions***."[8]  (SAC ¶ 59.)  The SAC thus fails to plead scienter with respect to Plaintiff's Credit Card Segment claim.

---

[8]  Plaintiff's allegations regarding the resignations of three officers and directors, none of whom is a party to this Action, add nothing.  (SAC ¶¶ 131–32, 196.)  The SAC contains no "additional factual allegations linking [these] resignation[s] . . . to the alleged fraud."  *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225(RJS), 2012 WL 4471265, at *18 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014).  Fan Yuanyuan resigned in May 2019—nearly ***two years prior*** to the conclusion of the Credit Card Segment investigation.  (SAC ¶ 40.)  Jiayan Lu and Qun Mi resigned over ***a year and a half after*** the conclusion of the investigation for unrelated reasons.  (*See* SAC ¶ 131 (alleging Lu resigned in June 2022 "to join a related party of the Company"); *id.* ¶ 132 (alleging Mi resigned in October 2022 due to "personal reasons").)

### 2.    **Plaintiff Fails to Plead Scienter for the Advertising Segment Claim**

Plaintiff also fails to raise a strong inference of scienter with respect to its Advertising Segment claims.  As the Court held (Op. at 28), Plaintiff makes no specific allegation that the 2018 and 2019 financials were known to be false when made; nor does he point to any contemporaneous documents or information that contradicted the Company's public disclosures.  *Kalnit*, 264 F.3d at 142.  Regarding the government investigation against Databook's subsidiary, absent a duty to disclose, a strong inference of scienter cannot be inferred.  *Id.* at 143–44; *Schaffer*, 2018 WL 481883, at *13 (existence of a "government investigation [] cannot bolster allegations of scienter that do not exist" (citation omitted)).  To the extent Plaintiff alleges that Jianpu violated GAAP with respect to the investigation and subsequent revenue reversal within the Advertising Segment (SAC ¶¶ 111–17), it is well-established that GAAP violations are insufficient to raise a strong inference of scienter absent other "evidence of corresponding fraudulent intent."  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 200 (2d Cir. 2009) (quoting *Novak*, 216 F.3d at 309).

## III.    PLAINTIFF FAILS TO PLEAD LOSS CAUSATION

Dismissal is also warranted because Plaintiff fails to plead loss causation, i.e., "that the loss [was] caused by the materialization of the concealed risk."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).  First, as shown above (supra § I), Plaintiff cannot show that his loss is attributable to a *concealed* risk, as Jianpu warned of the precise risks, including the weaknesses in internal controls, that later materialized.  *See In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 299–300 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).

Second, Plaintiff does not dispute that purchasing his shares *after* disclosure of the Credit Card Segment investigation and impairment relating to Databook—and selling his shares *before* disclosure of the full scope of the Databook investigation and its impact on revenues—renders it

24

impossible for him to prove loss causation. (*See* ECF No. 48 at 24; ECF No. 17-3.) Courts in this Circuit have routinely dismissed complaints on this basis at the pleading stage. *Schuler v. NIVS Intellimedia Tech. Grp., Inc.*, No. 11 Civ. 2484(KMW)(FM), 2013 WL 944777, at \*10 (S.D.N.Y. Mar. 12, 2013). In fact, some of the allegations, such as disagreements with Jianpu's accounting treatments of certain financials in its 2019 20-F issued in April 2021, concern post-Class Period developments, which could not have caused any damage to an investor who, like Plaintiff, sold shares before the end of the Class Period. (SAC ¶¶ 129–30.)

Finally, Plaintiff fails to disaggregate the purportedly relevant disclosures from the multitude of unrelated negative earnings factors including "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005); *see also Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 503–04 (S.D.N.Y. 2013) (no loss causation where "stock price . . . fell consistently throughout the class period" and the "market had long absorbed the economic difficulties faced by the company").

## CONCLUSION

For the foregoing separate and independent reasons, the Complaint should be dismissed in its entirety with prejudice.

25

Dated: New York, New York
    January 27, 2023

Respectfully submitted,


/s/ Robert A. Fumerton
Scott D. Musoff
Robert A. Fumerton
Vincent M. Chiappini
Argirios J. Nickas
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Phone:  (212) 735-3000
Fax:     (212) 735-2000
scott.musoff@skadden.com
robert.fumerton@skadden.com
vinnie.chiappini@skadden.com
argirios.nickas@skadden.com

*Attorneys for Defendants*