# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ENRIQUE AFRICA, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>JIANPU TECHNOLOGY INC., DAVID YE, and YILÜ (OSCAR) CHEN,<br><br>Defendants. | Case No. 1:21-cv-01419-JMF<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

# TABLE OF CONTENTS

I.     NATURE OF THE ACTION AND OVERVIEW ..................................................................1

II.    JURISDICTION AND VENUE..........................................................................................4

III.   PARTIES............................................................................................................................5

IV.   SUBSTANTIVE ALLEGATIONS .....................................................................................6

     A.    Background and the Company's Business .............................................................6

     B.    Unlawful Conduct About the Company's Loan Segment Is Revealed Which Prompts that Segment's Eventual Financial Issues ..................................................8

     C.    The Fraudulent Scheme To Inflate Revenue In The Company's Credit Card Segment ...............................................................................................................13

     D.    The Truth Related to the Company's Credit Card Segment Fraud Begins to Emerge................................................................................................................14

     E.    During The Same Quarter That Loan Segment Revenue Peaked, Inflated Revenue In The Credit Card Segment Began To Accelerate Rapidly — Suggesting Purposeful Manipulation ...................................................................................24

     F.    The Databook Fraud ..........................................................................................25

     G.    The Databook Fraud Is Revealed .......................................................................28

     H.    Post Class Period Events ....................................................................................35

V.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ...........................................................................................................37

     A.    Statements related to the First Quarter 2018 .......................................................37

     B.    Statements related to the Second Quarter 2018....................................................38

     C.    Statements related to the Third Quarter 2018......................................................40

     D.    Statements related to the Fourth Quarter 2018....................................................42

     E.    Statements related to the First Quarter 2019 .......................................................48

     F.    Statements related to the Second Quarter 2019....................................................50

     G.    Statements related to the Third Quarter 2019......................................................53

Case 1:21-cv-01419-JMF Document 64 Filed 02/27/23 Page 4 of 77

H. Statements related to the Fourth Quarter and Full Year 2019 ...............................55

VI. CLASS ACTION ALLEGATIONS .........................................................................58

VII. UNDISCLOSED ADVERSE FACTS.......................................................................59

VIII. LOSS CAUSATION .................................................................................................61

IX. ADDITIONAL SCIENTER ALLEGATIONS ..........................................................61

X. APPLICABILITY OF PRESUMPTION OF RELIANCE.........................................63

XI. NO SAFE HARBOR ................................................................................................64

XII. FIRST CLAIM .........................................................................................................65

XIII. SECOND CLAIM ....................................................................................................68

XIV. THIRD CLAIM ........................................................................................................71

XV. PRAYER FOR RELIEF ...........................................................................................72

Lead Plaintiff Enrique Africa ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following based upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by Jianpu Technology Inc. ("Jianpu" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued and disseminated by Jianpu; (c) interviews of persons with knowledge of the Company; and (d) review of other publicly available information concerning Jianpu.

## I.     NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Jianpu American Depositary Shares ("ADSs" or "shares") between May 29, 2018, and February 16, 2021, inclusive (the "Class Period"). Plaintiff pursues three claims against Defendants under the Securities Exchange Act of 1934 (the "Exchange Act"): (1) Section 10(b) of the Exchange Act and SEC Rule 10b-5(b); (2) Section 10(b) of the Exchange Act and SEC Rule 10b-5 (a) and/or (c); and (3) violation of Section 20(a) of the Exchange Act.

2.      Jianpu purports to be the leading independent open platform for discovery and recommendation of financial products in China. The Company touts its proprietary technology that provides search results and recommendations tailored to each user's financial needs and credit profile.

3.      The fraud here involves a scheme to overstate revenue through various improper and unlawful means, including structuring undisclosed related party transactions that lacked business substance to generate revenue in certain periods so that management could meet guidance. These undisclosed transactions had the effect of sending money to an entity that is 40%

1

owned by Jianpu's CEO's wife. Defendants' scheme eventually resulted in the restatement of years of financial statements. Defendants' deceptive acts also include electing accounting methods designed to draw less attention to their conduct, such as through the use of so-called "little r" restatements, that have similar effects to a traditional restatement.

4.     Additional conduct that advanced Defendants' scheme includes concealing the full nature of various related party transaction, including those of Jianpu's CEO's wife, who is a 40% owner of Beijing Rongdiandian Information Technology Co., LTD ("RDD"); and selecting an auditor who, according to the SEC, "cannot be inspected or investigated completely by the Public Company Accounting Oversight Board of the United States (the "PCAOB") to issue the audit opinion for its financial statements." By electing this auditor, Jianpu ran afoul of the Holding Foreign Companies Accountable Act (the "HFCAA"), which may ultimately lead to Jianpu's shares being delisted from all U.S. securities exchanges.

5.     The fraud here also involves false and misleading statements about the true source of Jianpu's revenue generation within its Credit Card Segment, as well as about the identity of the true owners of the related parties of the Company. The Company also made false and/or misleading statements about its Advertising Segment.

6.     On June 15, 2020, the Company filed a Notification of Late Filing on Form 12b-25 with the SEC, in which it stated that it could not timely file its Form 20-F for the fiscal year ended December 31, 2019 (the "2019 20-F"). In the notification, it further stated that the Company was "in the process of conducting an internal review of certain matters relating to transactions between the Company and third-party business entities" and that the Audit Committee "is working closely with its advisors to complete the review in a timely manner."

2

7.  On this news, the Company's share price fell $0.67, or 9.5%, to close at $6.39 per share on June 15, 2020, on unusually heavy trading volume, thereby damaging investors.

8.  On February 16, 2021, Jianpu announced the results of its review into "transactions carried out by the Credit Card Recommendation Business Unit" with third-party business entities. The Company concluded that previously reported revenue and associated expenses had been inflated due to "certain transactions [that] involved third-party agents (including both upstream agents and downstream suppliers) with undisclosed relationships and some transactions [that] lacked business substance." Jianpu stated that it "anticipates the total amount of overstated revenue for the fiscal years 2018 and 2019 to be approximately, RMB 90 million and RMB 164 million, respectively, representing approximately 4.5% and 10.1% of the total revenue previously reported." At the time, the Company did not clearly disclose that the related party relationships involved RDD, a company which is 40% owned by Jianpu's CEO's wife.

9.  On this news, the Company's share price fell $0.60, or 13%, to close at $3.94 per share on February 16, 2021, on unusually heavy trading volume, thereby damaging investors.

10.  Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that certain of the Company's transactions carried out by the Credit Card Recommendation Business Unit involved undisclosed relationships or lacked business substance; (2) that, as a result, Jianpu's revenue and costs and expenses for fiscal 2018 and 2019 were overstated; (3) that there were material weaknesses in Jianpu's internal controls over financial reporting; (4) that the Company's fiscal 2018 Form 20-F was reasonably likely to be restated; and (5) that, as a result of the foregoing,

3

Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

11.     Defendants also made materially false and/or misleading statements, as well as failed to disclose material adverse facts about, an undisclosed criminal investigation into the Company's data collection practices began in September 2019 but was not disclosed until April 30, 2021.

12.     Defendants also entered into a deceptive scheme to conceal the true ownership of the related parties that were helping it to manipulate its revenue such that the Company would meet revenue and/or earnings forecasts. Defendants' scheme included conduct that enriched the family of the CEO by allowing RDD to charge the Company for additional expenses that lacked business substance.

13.     As a result of Defendants' scheme and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

14.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), SEC Rule 10b-5(b) promulgated thereunder (17 C.F.R. § 240.10b-5), and SEC Rule 10b-5(a) and/or (c).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein,

4

including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

17. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### III. PARTIES

18. Plaintiff, as set forth in his previously filed certification (Dkt. No. 17-2), incorporated by reference herein, purchased Jianpu shares during the Class Period, and suffered damages as a result of the federal securities law violations, including Defendants' scheme and false and/or misleading statements and/or material omissions alleged herein.

19. Defendant Jianpu is incorporated under the laws of the Cayman Islands with its principal executive offices located in Beijing, China. Jianpu's ADSs trade on the New York Stock Exchange ("NYSE") under the symbol "JT."

20. Defendant David Ye ("Ye") was a Co-Founder of the Company and was the Company's Chief Executive Officer ("CEO") and Board Chair at all relevant times. Ye has 20 years of experience in operations and management of internet business and consumer financial institutions in China and the United States. Ye started his career as a risk data analyst at Capital One Financial Corporation's risk strategy and analysis team in 1998, and later worked as a credit risk manager at Global Credit Assurance & Consulting team, where he managed statisticians and data analysts at the acquisition marketing team of Capital One's Under Served Markets group from 2000 to 2004. Ye holds a bachelor's degree in engineering from Hunan University in China and a master's degree in finance from George Washington University.

5

21. Defendant Yilü (Oscar) Chen ("Chen") was the Company's Chief Financial Officer ("CFO") at all relevant times. Chen began his career within the auditing department of KPMG, where he worked for three years. Chen joined the Company's Board of Directors on or around May 28, 2019.

22. Defendants Ye and Chen (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that Defendants made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## IV.  SUBSTANTIVE ALLEGATIONS

### A.  Background and the Company's Business

23. Jianpu purports to be the leading independent open platform for discovery and recommendation of financial products in China. In short, the Company purports to be an online matchmaker between customers looking for various financial products (*e.g.*, a loan or a credit card) and the providers of those products (like banks, credit card issuers, and peer-to-peer investors). The Company touts its proprietary technology that provides search results and recommendations tailored to each user's financial needs and credit profile.

24. Jianpu's most well-known brand is its online platform "Rong360" in China. Rong360 functions as a marketplace, connecting users with financial service providers by: (i) allowing users to access information on loan, credit card, and wealth management products; (ii) recommending loans and credit cards to individual users; and (iii) helping financial service providers target users with specific financial needs or credit profiles.

25. The Company's revenues are primarily generated from fees charged to financial service providers via the Rong360 platform for recommendation services. Jianpu charges financial service providers on a "cost-per-action" basis for loan products (based upon the completion of a loan application) and on a "cost-per-success" basis for credit card products (based upon the issuance of a credit card).

26. One type of financial service provider found on Rong360 is a peer-to-peer ("P2P") lender, which is a common and prevalent feature of the consumer finance market in China. P2P lending, or online lending, is generally considered to be a method of debt financing that directly connects borrowers, whether they are individuals or companies, with lenders – like if someone wanted to loan money to their neighbor.

27. Other types of financial institutions found on Rong360 include traditional banks and credit card issuers.

28. Jianpu reports revenue from its various businesses in three different reporting line items on its income statement: (1) revenue from recommendation services for loans (hereinafter "the Loan Segment"); (2) revenue from recommendation services for credit card services (hereinafter "the Credit Card Segment"); and (3) revenue from advertising, marketing, and other services (hereinafter "the Advertising Segment"). The Advertising Segment includes revenue recognized from the Company's variable interest entity ("VIE") stake in Databook Tech. Ltd.

7

("Databook") and entities affiliated with and/or owned by Databook, including Databook subsidiaries Hangzhou Scorpion Technology Co., Ltd., Hangzhou Magnet Technology Co., Ltd., and Databook (HK) Limited (collectively "Databook"). The Company acquired Databook in June 2018 for RMB 204.5 million.

29.     After Databook was acquired in June 2018, Jianpu recorded RMB 121.3 million of intangible assets and RMB 147.3 million of goodwill on its balance sheet as of the period ending June 30, 2018, for a total asset increase of RMB 268.6 million for an asset that was acquired for RMB 204.5 million. The Company carried these balances on its balance sheet from the time of the Databook transaction through the end of the Class Period.

30.     Databook purports to be engaged in "in optimizing data-driven risk management decisions" by offering "a suite of products and services helping financial service providers to enhance their risk management capabilities."

31.     What Databook really did—until it was shut down due in part to criminal convictions—was unlawfully collect various forms of personal information from its users.

**B.    Unlawful Conduct About the Company's Loan Segment Is Revealed Which Prompts that Segment's Eventual Financial Issues**

32.     On March 15, 2019, Rong360 was featured on "CCTV 315 Night", a program produced by the Chinese state broadcaster China Central Television. CCTV 315 Night is a two-hour show that airs annually on March 15 (hence the "315" in 315 Night). March 15 also happens to be China's Consumer Right's Day, which is why the state-run broadcast exposes improper and/or illegal business practices that target Chinese consumers.

33.     During the 2019 airing of CCTV 315 Night, broadcasters detailed various examples that reflected unlawful conduct stemming from entities found on Rong360.

8

34. Following the CCTV 315 Night—which aired on Friday evening China time but was known during the trading day in New York on March 15, 2019—Jianpu's stock fell $6.48 per share, or 12.86% (using post-reverse split prices) on heavy volume on March 15, 2019.[1]

35. On Sunday March 17, 2019, the Company issued a press release and took responsibility for its conduct that was reported by CCTV, including by voluntarily suspending any further downloads of its mobile apps.

36. The March 17, 2019 press release stated that:

> Although the Company implements stringent standards to screen financial services providers before listing their products on its platform, **we cannot rule out the possibility that the quality of the financial products and the services provided by financial services providers are not in full compliance with applicable laws and regulations at all times**.

> In response to the CCTV Report, Jianpu has promptly organized internal resources to thoroughly review its business practice, **including the voluntarily suspension of further downloads of its mobile apps** on major mobile app stores in order to identify any inappropriate conduct that could adversely affect consumer rights, and to take remediation measures with respect to any inappropriate activity that may be found on the Company's platform.

> The Company hopes to be open and transparent of its findings and remediation measures. Going forward, the Company is committed to continuing to remain as an independent open platform and providing reliable services to users and financial service providers impartially.

37. Following this news, Jianpu's stock continued its decline by $1.60 or 3.64% on the following trading day, which was March 18, 2019.

38. As consumer awareness grew from the resulting publicity associated with CCTV 315 Night, revenue from the Company's Loan Segment peaked and would later implode.

---

[1] Because China is 12 hours ahead of East Coast time, the March 15, 2019, CCTV 315 Night was viewed before trading opened in New York on March 15, 2019 Eastern Standard Time.

39.     For instance, when the Company reported its first quarter 2019 results on May 28, 2019, which were the first financial results following the CCTV report, the Company revealed that the mobile app remained suspended through early May, and that a full launch would not be possible until June 2019. As a result, the Company guided second quarter revenue to RMB 360 – RMB 380 million, which was 42-45% lower than the RMB 654.9 million[2] that the Company reported in the first quarter 2019.

40.     The Company also announced that Board of Directors Member Fan Yuanyuan was stepping down and would be replaced by CFO Chen.[3]

41.     Following all this news, Jianpu's stock fell $2.64 per share, or 6.95% on heavy volume on May 28, 2019.

42.     Given the foreseeable challenge that the Company would have in restoring revenue to the Loan Segment, and with Defendant Chen now part of the Board of Directors, Defendants focused their attention on expanding their existing fraudulent scheme to boost revenue within the Company's Credit Card Segment,[4] which accelerated each quarter following the first quarter of 2019. Indeed, on the May 28, 2019, earnings call, Ye noted that first quarter revenue in the Credit Card segment grew about 17% year-over-year, and that the Company expected that the Credit Card segment growth would be higher during the second half of the year and that "as a team, we know *– we don't have any concern about the credit card business growth for the rest of this year.*"

---

[2] As then reported. The restated Q1 2019 revenue figure was RMB 618.3 million.

[3] Many months later, another Board Member, James Qun Mi, resigned "due to personal reasons" on October 3, 2022.

[4] To be clear, Defendants' scheme to engage in related party transactions designed to inflate its Credit Card revenue began during the first quarter 2018, though *the magnitude accelerated* following the CCTV 315 Night revelations about the Company's Loan Segment.

10

43.     Following the first quarter of 2019, the combination of the exposure from the CCTV 315 Night exposé along with the Company's subsequent admission of the conduct discussed therein, contributed to a swift and sharp blow to the Company's Loan Segment revenue. As shown below, Q1 2019 -- the quarter during which the Company's unlawful loan practices were revealed -- represented the high-water mark for Jianpu's Loan Segment revenue.

**Figure 1**



44.     This sudden implosion within the Company's Loan Segment created an urgent need, and thus a strong motive, for Defendants to boost revenue within the Company's Credit Card Segment.

45.     Indeed, on the Company's May 28, 2019, earnings call discussing Q1 2019 results,[5] Chen observed that even though the Loan Segment would see "some downward trend," he still assured investors that "we are seeing continued growth of our credit card business and also the – our marketing and advertising services and other services [*i.e.*, Databook]." Chen continued

---

[5] Which was the next earnings call following the CCTV 315 Night report.

11

"These 2 lines, we -- I think both year-over-year and quarter-over-quarter we should be able to contribute -- we should able to drive the growth."

46. And on the same earnings call, Ye also assured investors about the Company's "stricter platform policies for financial service providers" and he separately discussed the Company's purported aim to "lead the initiative of introducing and promoting higher industry standards and best practices."

47. Ye also gave the false impression that Jianpu sought to become a compliant industry participant, including by touting a misleading association between Jianpu and its financial regulators:

> As a follow-up to the airing of CCTV 315, we completed our internal review of systems, products and processes. Our mobile app were made available, again, in early May on some application stores and we expect a full launch in June. In the meantime, we continue to drive certain self-imposed improvements to our internal processes such **as adopting more stringent turnaround boarding process, while adhering to a stricter platform policies for financial service providers**. We have engaged a global consulting firm to assist us in the review of our business process, [conduct] industry studies and recommend best practices.
>
>                   \*    \*    \*
>
> And at the same time, our regulatory technology, or reg tech team also ***won a few important mandates*** to help local Chinese financial regulators establishing assistance to monitor financial products and service online. ***Being recognized*** on our platform model and market position ***by the regulators***, we will continue to contribute and **lead the initiative of introducing and promoting higher industry standards and best practices**.

48. As the truth would later show, while the Company assured investors it was promoting higher standards and adopting stricter policies on its platform, it was simultaneously inflating its revenue through nondisclosed related party transactions in its Credit Card Segment – and this scheme actually accelerated beginning in the first quarter of 2019.

12

**C.     The Fraudulent Scheme To Inflate Revenue In The Company's Credit Card Segment**

49.     Around the same time that the Company's Loan Segment revenue began to peak, investors began to attach more importance to Jianpu's Credit Card segment. For instance, roughly two weeks before the CCTV 315 Night report, analysts at J.P. Morgan upgraded their view of Jianpu's shares from Neutral to Overweight in a March 1, 2019 report ("the J.P. Morgan Upgrade"). Part of the reason for the J.P. Morgan Upgrade was because J.P. Morgan's analysts saw Jianpu's revenue mix shifting to "more defensive credit card recommendation business."

50.     Perhaps sensing the importance that investors would attach to the Company's Credit Card Segment revenue, Defendants expanded their ongoing scheme to increase revenue in the Company's Credit Card Segment by entering into sham transactions with related parties, including RDD, which is 40% owned by the CEO Ye's wife.

51.     And as Defendants increased the fictitious revenue booked through the nondisclosed scheme, the Company repeatedly focused investors' attention on its growing Credit Card Segment revenue.

52.     For instance, on August 26, 2019, when the Company discussed quarterly results for the second quarter 2019, the Company held an earnings call wherein Ye again spotlighted the credit card segment, noting "We saw strong credit card revenue growth of 25% year-over year *outpacing peers, even though the credit card market was relatively slower first half of this year compared to the second half of 2018*." Ye further noted that "This growth reaffirms our capabilities to capture the evolving dynamics of the market."

53.     At all relevant times during the Class Period, Defendants' investor relations page included an interactive feature that allowed market participants to receive email alerts when the Company would issue material news. The default feature is to receive "All Alerts", which includes,

13

*inter alia*, "Results Announcements" "Annual Filings" "Quarterly Filings" "News Releases" and more. By equipping its website with such functionality, and through these email alerts, the Company disseminated materially false and misleading statements, including the Company's quarterly and annual results which were ultimately restated.

**D.      The Truth Related to the Company's Credit Card Segment Fraud Begins to Emerge**

54.      On June 15, 2020, the Company filed a Notification of Late Filing on Form 12b-25 with the SEC, in which it stated that it could not timely file its Form 20-F for the fiscal year ended December 31, 2019. In the notification, Jianpu further stated that:

> Jianpu Technology Inc. (the "Company") will not be able to file its Annual Report on Form 20-F for the fiscal year ended December 31, 2019 (the "Form 20-F") by June 15, 2020, as extended from the original due date of April 30, 2020 pursuant to an order issued by the U.S. Securities and Exchange Commission under Section 36 of the Securities Exchange Act of 1934 on March 4, 2020, as amended on March 25, 2020. The independent Audit Committee of the Company's Board of Directors, with the assistance of advisors, is in the process of conducting an internal review of certain matters relating to transactions between the Company and third-party business entities. The Audit Committee is working closely with its advisors to complete the review in a timely manner. The Company will not be in a position to file its Form 20-F until the Audit Committee completes its review and the Company assesses the results of the review.

55.      The above notification was a partial corrective disclosure of the related party transactions that overstated the Company's revenue.

56.      On this news, the Company's share price fell $0.67, or 9.5%, to close at $6.39 per share on June 15, 2020, on unusually heavy trading volume.

57.      On July 2, 2020, Jianpu announced that it had received a notice from NYSE Regulation that the Company was not in compliance with listing requirements due to the failure to timely file its 2019 20-F.

58.      On January 5, 2021, Jianpu announced that the NYSE Regulation agreed "to provide the Company with an additional trading period through July 1, 2021, subject to

14

reassessment on an ongoing basis, to complete and file the Company's Annual Report on Form 20-F for the year ended December 31, 2019."

59.     On February 16, 2021, Jianpu announced the results of its review into "transactions carried out by the Credit Card Recommendation Business Unit" with third-party business entities. The Company concluded that previously reported revenue and associated expenses had been inflated due to "certain transactions [that] involved third-party agents (including both upstream agents and downstream suppliers) with undisclosed relationships and some transactions [that] lacked business substance." Specifically, in a press release stating that the review was "substantially complete," the Company stated, in relevant part:

> ***Summary of Findings***
>
> The following is a summary of the principal findings of the Review as of the date hereof.  Unless otherwise indicated, the Review findings generally cover the fiscal years 2017 through 2019.
>
> The Review found that certain transactions involved third-party agents (including both upstream agents and downstream suppliers) with undisclosed relationships, and some transactions lacked business substance ("questionable transactions").  As a result, certain revenue and associated expenses were inflated or inaccurately recorded in the financial statements.  ***Evidence suggested that certain employees from the Credit Card BU may have known about or been involved in certain of the questionable transactions that resulted in inflated sales commissions to such employees.  In relation to the questionable transactions, the Review found that certain employees improperly altered supporting documents that were provided to the Company's external auditor.***
>
> Other than a business unit head-level employee who has since been terminated, the Review did not find any evidence that other members of senior management who supervised the Credit Card BU knew about or participated in any of the questionable transactions.

60.     In the same press release, Jianpu stated that it would restate its financial statements for fiscal 2018 and that "investors must exercise caution" with respect to the previously reported fiscal 2019 financial information. Jianpu stated that it "anticipates the total amount of overstated revenue for the fiscal years 2018 and 2019 to be approximately, RMB 90 million and RMB 164

15

million, respectively, representing approximately 4.5% and 10.1% of the total revenue previously reported." Specifically, the Company stated:

> ***Follow-up Financial Impact Assessment***
>
> The Company is assessing the overall financial impact of the questionable transactions on its financial statements, including the adjustment of the revenue recognized for the fiscal years 2018 and 2019 to net-based recognition and the reversal of certain revenue and the related costs and expenses. ***The Company anticipates the total amount of overstated revenue for the fiscal years 2018 and 2019 to be approximately, RMB 90 million and RMB 164 million, respectively, representing approximately 4.5% and 10.1% of the total revenue previously reported by the Company for such years,*** and the adjustment to overstated cost and expenses together with the reserve for potential credit loss to be approximately RMB 90 million and RMB 130 million for the fiscal years of 2018 and 2019, respectively, resulting in a minimal net profit impact for the fiscal year 2018 and RMB 34 million of net loss impact for the fiscal year 2019.
>
> ***The Company's consolidated financial statements for fiscal year 2018 will be restated accordingly; the previously issued audited financial statements for the fiscal year 2018 and the auditor's report can no longer be relied upon.*** Moreover, investors must exercise caution when using the Company's previously announced unaudited financial information for the fiscal year 2019.

61. On this news, the Company's share price fell $0.60, or 13%, to close at $3.94 per share on February 16, 2021, on unusually heavy trading volume, thereby damaging investors.

62. On April 30, 2021, the Company issued its Form 20-F for the year ended December 31, 2019. In it, the Company disclosed the following:

i. **The Company's September 30, 2019, impairment of various assets stemmed from a previously undisclosed government investigation into its Databook VIE:**

> In September 2019, the business of Databook was suspended and an investigation was conducted against Databook and certain of its employees by competent authorities in relation to the compliance of information collection or use. The Group therefore recorded a full impairment for goodwill, intangible assets, and an impairment for other assets attributable to the Databook, totaling RMB 254.7 million as of December 31, 2019.

16

ii.    **The Company identified material weaknesses in internal control over three areas:**

[O]ur management concluded that, as of December 31, 2019, we did not maintain effective internal control over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. GAAP.

In the course of auditing our consolidated financial statements for the year ended December 31, 2019, we and our independent registered public accounting firm identified three material weaknesses in our internal control over financial reporting as of December 31, 2019. . .

***One material weakness identified relates to our failure to design and implement effective controls with a sufficient level of precision to prevent and detect misstatements related to our credit card related business***. Specifically, the material weakness is a combination of control deficiencies, including: (i) lack of continuous and effective risk assessment and monitoring procedures on changes in the credit card related business, especially the increased proportion contributed by third-party agents (including both upstream agents and downstream suppliers); (ii) inadequate review over engaging of third-party agents, and lack of effective acceptance procedures such as background information inspection to identify relationships between upstream agents and downstream suppliers and assessment of the qualification of these upstream agents and downstream suppliers; (iii) failure to properly preserve certain original transaction data and effectively perform reconciliation with financial information; (iv) lack of sufficient segregation of duties at certain control activities level; and (v) lack of effective review and analysis of business information to assess the impact on financial reporting. ***This material weakness has resulted in overstated revenue, cost and expenses in our financial statements***.

\*     \*     \*

A second material weakness identified relates to our failure to design and implement controls that have a sufficient level of precision related to pre-approval of and complete and accurate disclosures of related party transactions, ***which has resulted in inaccurate disclosures of certain related party transactions in 2018*** and could have a material effect on our financial statements.

17

* * *

A third material weakness identified relates to the lack of sufficient competent financial reporting and accounting personnel with appropriate understanding of U.S. GAAP to design and implement formal period-end financial reporting policies and procedures, to address complex U.S. GAAP technical accounting issues, and to prepare and review our consolidated financial statements and related disclosures in accordance with U.S. GAAP and financial reporting requirements set forth by the SEC.

63.     While Jianpu never clearly disclosed which related party entity prompted the restatement, the combination of the partial disclosures above creates a strong inference that it was RDD, an entity that is 40% owned by CEO Ye's wife. This inference is supported by the following facts.

**Facts describing the related party transactions that prompted the restatement**

64.     Before the April 30, 2021, restatement, Jianpu's 2019 20-F (issued on April 30, 2021) referred to three related parties: Related Party A; Related Party B; and Related Party C. The Company does not always disclose which entity is which, and, in fact, seeks to deceptively conceal their identities within each discrete filing. But by tracing historical filings and making certain logical deductions, the identity of Related Party A can be deduced.

65.     The February 16, 2021, and April 30, 2021, partial corrective disclosures above both refer to the involvement of "third-party agents." The disclosures also refer to how such third-party agents both contributed to the increased revenue within the Company's financial statements, and also were emboldened by the Company's material weakness over internal controls related to the same.

66.     Moreover, the resulting related party transaction involving "third-party agents" transacting with the Credit Card Segment that prompted the restatement led to a restatement of both

18

revenue *and* expenses. Jianpu's revenue was reduced because it was never really proper revenue to begin with, so it was essentially unwound, as was the associated expense.

67. But the fact that it hit both places is revealing: the Company generated revenue from sham transactions, but it also incurred a corresponding and matching expense – that means the Company also *paid someone else*. And where the corresponding expense hit Jianpu's income statement (which was later adjusted through the restatement) yields additional information about the nature of the related party transactions.

68. The expense appeared in the "advertising, marketing and other services" line within the Company's 2019 Form 20-F. That means the Company paid another entity for services related to "advertising, marketing, or other services." That fact, along with the deductions alleged below, establish that Related Party A was a key beneficiary of the undisclosed related party transactions.

**Related Party A**.

69. Page F-43 of Jianpu's 2019 20-F describes "Related Party A":

> Related party A (minority investee of a company **owned by two founders** of the Company) and its subsidiary *charged the Group advertising and marketing expenses* for *providing advertising and marketing service* to the Group for the years ended December 31, 2018 and 2019. The Group set the pricing terms with this related party by mirroring the corresponding terms entered into *between banks or their agents and the Group*.

*Id.* (emphasis and color coding supplied.)

70. The description of "Related Party A," as Jianpu calls it, shares key attributes with the description of the related party transactions that prompted the restatement as described in Jianpu's internal control weaknesses on April 30, 2021. For example, both the material weakness that "resulted in the inaccurate disclosures of certain related party transactions in 2018" and Related Party A refer to "agents" that transact with the company. Neither Related Party B nor Related Party C have such language (see below).

19

71. More to the point, Related Party A charged Jianpu for "advertising and marketing expenses for providing advertising and marketing service" during 2018 and 2019 (See Jianpu 2019 20-F at F-43)—which is precisely where in Jianpu's financials the restatement hit —and in the same years the revenue and expenses were restated. And post-class period disclosures show that while Related Party A charged Jianpu 51.7 million RMB in 2018 and 21.1 million RMB during 2019, it stopped entirely during 2020 and 2021 (after the scheme became public).[6]

72. Related Party A appears to be RDD because page 67 of Jianpu's 2019 20-F states, "we *conduct our online advertising business through RDD*." Furthermore, according to Jianpu's October 20, 2017 F-1, RDD is, just like Related Party A, also owned by two founders: 40% by Jiayan Lu, and 20% by Caofeng Liu.

73. The remaining 40% of RDD is owned by Ms. Dawei Huang —the wife of CEO Ye.

**Related Parties B & C**.

74. The descriptions of Related Party B and Related Party C -- the only other related parties disclosed in Jianpu's 2019 20-F – are as follows:

> We have entered into a transitional services agreement with RONG360 Inc. with respect to various ongoing relationships between us and RONG360. See "Item 7. Major Shareholders and Related Party Transactions—B. Related Party Transactions—Agreement with RONG360."[7]

75. Logically, Related Party B can be ruled out as the entity that was involved in the related party transactions which prompted the restatement because the restatement impacted *Credit Card* Segment revenue, but Rong 360 is booked in the *Loan Segment* and Related Party B only deals with Rong360.

---

[6] *See* Jianpu's 2020 20-F at F-41.

[7] *See* page F-43 of Jianpu's 2019 20-F.

76. Similarly, Related Party C can also be ruled out as having prompted the restatement. Jianpu's 2019 20-F describes Related Party C as follows:

> The Group invested in and owned 15% of the preference shares of related party C. Related party C facilitated the fee collection for the Group's services delivered.

Jianpu 2019 20-F at F-42.

77. Related Party C can be ruled out as that which caused the restatement because it makes no mention of transacting with the areas on the financial statements that were impacted by the Restatement, nor did Related Party C provide any services *to Jianpu*.

78. In sum, Related Party A, which is owned in large part by CEO Ye's wife, appears to be RDD. And RDD is, by far, the most likely disclosed related party that could have led to a restatement within the Company's advertising and marketing expense line items on Jianpu's income statement. Thus, by logical inference, the related party transactions that prompted the restatement also involved an entity which is 40% owned by CEO' Ye's wife. And because Ye, as husband to a 40% owner of RDD, was thus an indirect beneficiary to the undisclosed transactions, that dynamic made it inevitable that falsehoods on the part of Jianpu would result because of the pertinent disclosure rules under Regulation S-K.

79. Disclosure of related-party transactions is governed by Statement of Financial Accounting Standards No. 57 ("FAS 57") and Item 404 of Regulation S–K ("Item 404"). FAS 57 requires "disclosures of material related-party transactions." Related Party Disclosures, FAS No. 57. "When related-party transactions occur, companies must disclose the nature of the relationship, provide a description of the transactions, report the dollar amounts of the transactions and any amounts due from or to related parties." J. David Spiceland *et al*., I Intermediate Accounting 124 (5th ed. 2009) (citing Related Party Disclosures, FAS 57). Pursuant to FAS 57, related party

transactions include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." Under FAS 57, "affiliates" include any company that is under common control or management with the public company, and "immediate family" is defined as "[f]amily members whom a principal owner or a member of management might control or influence or by whom they might be controlled or influenced because of the family relationship." Item 404 requires disclosures of related-party transactions when "the amount involved exceeds $120,000, and in which any related person had or will have a direct *or indirect* material interest." 17 C.F.R. § 229.404(a) (2013). And here, Jianpu paid Related Party A 51.7 million RMB during 2018, and 21.1 million RMB during 2019. *See* Jianpu 2019 20-F at F-41.

80.     Using average USD/RMB exchange rates during 2018 and 2019, 51.7 million RMB translated into roughly $7.8 million and $3.0 million during 2018 and 2019, respectively.[8] Even 40% of those two figures (adjusting for Ye's wife's proportional ownership), still easily exceed the $120,000 threshold set forth by Regulation S-K.

81.     If Item 404's $120,000 threshold is crossed, the issuer must disclose:

(1)     The name of the related person and the basis on which the person is a related person.

(2)     The related person's interest in the transaction with the registrant, including the related person's position(s) or relationship(s) with, or ownership in, a firm, corporation, or other entity that is a party to, or has an interest in, the transaction.

(3)     The approximate dollar value of the amount involved in the transaction.

---

[8] Based on an average exchange rate of .1514, and .1448 for 2018 and 2019, respectively.

(4)     The approximate dollar value of the amount of the related person's interest in the transaction, which shall be computed without regard to the amount of profit or loss.

(5)     In the case of indebtedness, disclosure of the amount involved in the transaction shall include the largest aggregate amount of principal outstanding during the period for which disclosure is provided, the amount thereof outstanding as of the latest practicable date, the amount of principal paid during the periods for which disclosure is provided, the amount of interest paid during the period for which disclosure is provided, and the rate or amount of interest payable on the indebtedness.

(6)     Any other information regarding the transaction or the related person in the context of the transaction that is material to investors in light of the circumstances of the particular transaction.

17 C.F.R. § 229.404(a).

82.     For purposes of Item 404, a "related person" includes "Any immediate family member of a director or executive officer of the registrant." 17 C.F.R. § 229.404(a)(1)(a)(iii).

83.     On the same day that the Company issued its 2019 20-F, it also issued a Form 6-K that disclosed additional details about the restatement, including quarterly data summarized immediately below.

| | *(In RMB 000s)* | | | | | |
| | **2018** | **Q1 2019** | **Q2 2019** | **Q3 2019** | **Q4 2019** | **2019** |
|---|---|---|---|---|---|---|
| Loan Segment revenue (previously reported) | 1,015,407 | 432,550 | 103,418 | 90,324 | 40,015 | 666,307 |
| As restated | 1,105,407 | 432,550 | 103,418 | 90,324 | 40,015 | 666,307 |
| Credit Card Segment revenue (previously reported) | 750,941 | 149,305 | 196,524 | 195,583 | 208,261 | 749,673 |
| As restated | 689,822 | 125,939 | 162,741 | 151,929 | 145,384 | 585,993 |
| Advertising Segment revenue (previously reported) | 245,494 | 73,004 | 62,341 | 37,595 | 41,389 | 214,329 |
| As restated | 216,647 | 59,794 | 45,551 | 37,595 | 40,487 | 183,427 |
| Total revenue (previously reported) | 2,011,842 | 654,859 | 362,283 | 323,502 | 289,665 | 1,630,309 |
| As restated | 1,921,876 | 618,283 | 311,710 | 279,848 | 225,886 | 1,435,727 |
| **Change in total revenue from previously reported** | **(89,966)** | **(36,576)** | **(50,573)** | **(43,654)** | **(63,779)** | **(194,582)** |

23

**E.     During The Same Quarter That Loan Segment Revenue Peaked, Inflated Revenue In The Credit Card Segment Began To Accelerate Rapidly — Suggesting Purposeful Manipulation**

84.     The Company's restated financials released on April 30, 2021, revealed that Defendants overstated the Company's revenue in the Company's Credit Card segment through related party transactions with increasing intensity each quarter beginning in the first quarter of 2019—when the Company's Loan Segment revenue dropped precipitously in response to the CCTV 315 Night expose as shown by Figure 2 below.

**Figure 2**



85.     To be clear, the red line above is not *total* revenue (or the absolute level of revenue) from the credit card statement, which could increase or decrease based on underlying business fundamentals. Rather, the red line above represents the amount by which the Company later admitted to have **overstated** its revenue in its Credit Card Segment.

86.     In other words, ***the illegitimate, or sham revenue***, began to increase at the same time that the Company's Loan Segment revenue began to fall. *See* Figure 2.

24

87.     The above charts show that the farther Loan Segment revenue fell, the more that *illegitimate* Credit Card Segment revenue grew through undisclosed sham related party transactions designed to boost revenue.

88.     In fact, the Company would not have met its guidance targets for the periods ending June 30, 2019; September 30, 2019; or December 31, 2019 absent the inflated revenue that it recorded after engaging in the related party transactions that prompted the restatement.

| (in RMB millions) | Q1 2019 | Q2 2019 | Q3 2019 | Q4 2019 |
|---|---|---|---|---|
| Previously Reported Revenue | 654.9 | 362.3 | 323.5 | 289.7 |
| Guidance | 600 – 630 | 360 – 380 | 300 – 320 | 240 – 260 |
| Restated Revenue | 618.3 | 311.7 | 279.8 | 225.9 |

89.     According to CW1, a former Rong360 Credit Auditor from April 2017 through October 2019, the Company would normally verify the information provided by the financing company to determine whether the entity actually existed and operated, reducing the likelihood that the related party transactions were unknown to Defendants.

**F.      The Databook Fraud**

90.     During the first and second quarters of 2019, the Company's Advertising Segment revenue grew by 57.5% and 26.2% respectively, from the prior year (before it was restated). While the Company does not itemize its revenue recorded from Databook specifically within its income statement, for the reasons discussed below, it can be reasonably inferred that a material portion of the first half 2019 revenue growth reflected, in part, revenue from Databook. This inference is reasonable because the Company acquired Databook in June 2018 (*i.e.*, the end of Q2 2018), and, as shown below in Figure 3, the periods that follow correspond with a meaningful increase in

revenue compared to prior quarters (until Q3 2019 when the Company appears to have stopped booking revenue from Databook). The Company also disclosed in its 2018 20-F that RMB 46.7 million in revenue from Databook was reflected in its 2018 full year results.

**Figure 3**

Advertising Segment revenue (previously reported)
Advertising Segment revenue (as restated)

91.     It is also evident by looking at Figure 3 that the third quarter 2019 and fourth quarter 2019 revenue from the Advertising Segment both: (a) dropped precipitously; and (b) was not materially restated, which is hard to square with how the Company booked its impairment of its Databook VIE.

92.     Consumer data practices are heavily regulated in China. For instance, in the Company's 2019 20-F, which was not issued until April 30, 2021, the Company disclosed that:

> On November 28, 2019, the Secretary Bureau of the Cyberspace Administration of China, the General Office of the Ministry of Industry and Information Technology, the General Office of the Ministry of Public Security and the General Office of the State Administration for Market Regulation jointly issued the Notice on the Measures for Determining the Illegal Collection and Use of Personal Information through Apps, which aims to provide reference for supervision and administration departments and provide guidance for app operators' self-examination and self-correction and social supervision by netizens, and further elaborates the forms of behavior constituting inappropriate collection activities and use of the personal information through apps including: (i) failing to publish the

26

rules on the collection and use of personal information; (ii) failing to explicitly explain the purposes, methods and scope of the collection and use of personal information; (iii) ***collecting and using personal information without the users' consent*** . . .

93. Item 303 of SEC Regulation S-K provides that the discussion of known trends, uncertainties, and events should appear in the section of an issuer's registration statement reporting "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A").

94. In an 1989 Interpretive Release, the SEC described the purposes of MD&A:

The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.

*Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co. Disclosures*, Release No. 6835 (May 18, 1989) (the "1989 Interpretive Release") available at 1989 WL 1092885.

95. Issuers must disclose both (a) known trends and uncertainties and (b) any material impact of known trends and uncertainties on their own operations even if the trends are a matter of public knowledge. 1989 Interpretive Release, 1989 WL 1092885, at \*6. *See also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 721 (2d Cir. 2011).

96. Item 303 demands disclosure of known trends unless management determines that a material effect on financial condition or results of operations is not likely to appear. The 1989 Interpretive Release provides the following test to determine if disclosure under Item 303(a) is required:

Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

27

> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required. (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.

1989 Interpretive Release,  1989 WL 1092885, at *6

97. Courts have held that the "reasonably likely" prong "requires more than a remote possibility but something less than more-likely-than-not." *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 837–38 (N.D. Ind. 2018).

98. The Instructions to Item 303 requires that discussion "shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

### G. The Databook Fraud Is Revealed

99. Beginning in September 2019, Databook subsidiary, Hangzhou Scorpion, was criminally investigated for the unauthorized storage of 21 million user accounts and passwords. As part of that investigation, Databook had its computers seized.

100. After the September 2019 criminal investigation into Databook was communicated by Chinese investigators, the Company recorded a RMB 250.3 million impairment[9] for the period

---

[9] The third quarter 2019 press release for the period ending September 30, 2019, which was released on December 9, 2019, listed the Databook impairment as RMB 250.3 million on its statement of cash flows. However, in the 2019 20-F the Company reported in footnote 25 that the impairment was for RMB 254.7 million and was taken as of December 31, 2019, not September 30, 2019.

ending September 30, 2019. This impairment was first disclosed on December 9, 2019, when the Company announced its third quarter 2019 earnings (for the period ending September 30, 2019).

101. But during the third quarter 2019 press release, the Company gave only a vague explanation for its impairment, stating only that it "primarily reflects the impairment of the goodwill and intangible assets related to a subsidiary acquired in 2018 due to adverse development of its business and change of the relevant industry background and market conditions."

102. On this news, Jianpu shares fell 5.2% to close at $11.76 per share on December 9, 2019 thereby damaging investors.

103. But even though the Company recorded an impairment that was roughly RMB 45 million more that it paid for Databook just 18 months earlier,[10] the only explanation the Company gave for the impairment was that it "primarily reflects" an "adverse development of its business and change of the relevant industry background and market conditions." In other words, the Company made no mention of the criminal investigation in the 3Q 2019 press release.

104. The Company likewise made no disclosure that Databook was suspended for an investigation during the third quarter 2019 earnings call.

105. Nor did the Company make any disclosure of the Databook investigation during the fourth quarter 2019 press release or earnings call on March 23, 2020.

106. Even so, as shown above, it appears however, that the Company stopped recording revenue for Databook during the third and fourth quarter 2019.

---

[10] As noted above, the Company acquired Databook for RMB 204.5 million but took an impairment for 250.3 million

107. Chinese court filings establish that on September 10, 2020, the Databook investigation escalated, when People's Procuratorate of Xihu District, Hangzhou City filed a criminal case against Hangzhou Scorpion, Zhou Jiangxiang, and Yuan Dong.

108. Roughly four months later, a judgment was entered against Databook subsidiary Hangzhou Scorpion Technology on January 14, 2021, wherein Hangzhou Scorpion was found guilty of committing "an infringement of citizens' personal information" and was sentenced to a fine of RMB 30 million.[11] On top of the fine, the January 14, 2021 order also required Hangzhou Scorpion to return the illegal proceeds of RMB 30 million in unlawful gains (akin to a disgorgement remedy).

109. Zhou Jiangxiang and Yuan Dong, who were also charged in their individual capacities, were found guilty of the same "infringement of citizens' personal information" offense and sentenced to three years in prison. Zhou Jiangxiang and Yuan Dong were also ordered to pay fines of RMB 500,000 and RMB 300,000, respectively.

110. The combination of the facts above strongly suggest that the Company stopped recording revenue from Databook during the third quarter 2019 because: (a) after restating its 2019 financials, the Company made no change to its Advertising Segment revenue during the third quarter 2019, and only made a *de minimus* change to Advertising Segment revenue for fourth quarter 2019; and (b) the Advertising Segment revenue fell by 42% on average in the third and fourth quarter of 2019 from the first and second quarter of 2019, reflecting the absence of any Databook revenue.

---

[11] The RMB 30 million fine leveled against Hangzhou Scorpion Technology matches the RMB 30 million fine that the Company disclosed in its 2019 20-F as being incurred against Databook.

111. In footnote 25 within the 2019 20-F, released on April 30, 2021, the Company stated the following:

> As mentioned in Note 12, in September 2019, the business of Databook was suspended for an investigation conducted against Databook and certain of its employees by competent authorities in relation to the compliance of information collection or use. The Group therefore recorded a full impairment for goodwill, intangible assets, and an impairment for other assets attributable to the Databook, totaling RMB254.7 million as of December 31, 2019. The investigation of Databook initiated in 2019 has concluded in January 2021. Databook was imposed confiscation of gains of RMB30 million and also a fine of RMB30 million, total amount of RMB60 million was paid in January 2021, and certain employees of Databook have been charged with criminal liabilities, neither other entities of the Group nor directors or officers of the Company were involved.
>
> According to ASC 855, it's a first type subsequent event that provides additional evidence about conditions that existed at the date of the balance sheet as of December 31, 2019. ***Thus, the Group reversed RMB30 million in revenues of advertising, marketing and other services, recorded RMB30 million as penalties, and accrued additional current income tax expenses of RMB10.0 million in 2019***. As of December 31, 2019, the net assets of Databook included in the consolidated balance sheet of the Group (which are principally comprised of restricted cash and wealth management products, offset by accounts payable, tax payable, and accrued liabilities) was RMB22.3 million.

112. On the accounting treatment of the impairment, Defendants portray the "reversals" to Databook's revenue not as restatement, but as a proper application of ASC 855, that is – the Company was recording "a first type subsequent event [that purportedly occurred in January 2021] that provides additional evidence about conditions that existed at the date of the balance sheet as of December 31, 2019."[12]

113. But ASC 855 has no application here and Defendants' accounting treatment related to the Databook investigation is improper under Generally Accepted Accounting Practices ("GAAP") because there is no indication that Defendants either: (a) accrued any reserves or

---

[12] *See* April 30, 2021 20-F update and the April 30, 2021 6-K.

31

expenses for any penalties during the third or fourth quarter of 2019; or (b) made appropriate disclosures under ASC 450 – which does apply here.

114.    Under ASC 450:

Accrual of a loss contingency is required when (1) it is probable that a loss has been incurred and (2) the amount can be reasonably estimated.

*       *       *

A loss contingency is recognized only when the likelihood of a future event's occurrence indicates that it is probable that a loss has occurred (assuming the loss contingency is also reasonably estimable). If the likelihood of a future event's occurrence is only reasonably possible, entities should provide appropriate disclosures as required under ASC 450-20-50, although loss accrual is not appropriate.

115.    ASC 450 further requires that additional disclosure "shall be made" on a loss contingency if (a) no liability is accrued, or (b) exposure to loss exists in excess of the amount already accrued. ASC 450-20-50-3.

116.    Here, Defendants had a choice of either: (a) accruing a loss for the Databook investigation beginning in the third quarter of 2019; or (b) providing appropriate disclosure about the "possible" or "probable" loss (*i.e.*, the criminal investigation that led to the September 2019 Databook impairment). Defendants did neither and thus violated ASC 450.

117.    And while Defendants felt the September 2019 investigation was sufficiently serious such that the Company impaired its entire Databook asset in September 2019—suggesting a loss was not just "possible" or "probable," but it was inevitable—Defendants still made insufficient disclosure under ASC 450 regarding the existence of the criminal investigation. Accordingly, Defendants violated GAAP with respect to the Databook investigation and subsequent revenue reversal within the Advertising Segment.

118.    And similar to the nondisclosed related party transactions in the Credit Card Segment, Defendants' improper accounting treatment of the Databook investigation also helped the Company meet its total revenue guidance, as shown below.

| (in RMB millions) | Q1 2019 | Q2 2019 | Q3 2019 | Q4 2019 |
|---|---|---|---|---|
| Previously Reported Revenue | 654.9 | 362.3 | 323.5 | 289.7 |
| Revenue Guidance | 600 – 630 | 360 – 380 | 300 – 320 | 240 – 260 |
| Restated Revenue | 618.3 | 311.7 | 279.8 | 225.9 |
| Databook revenue later "reversed" from criminal conduct | **13.2** | **16.8** | **--** | **.902** |

119.    The Company's election to "reverse" income out of the Databook Segment, rather than restate prior periods is a deliberate action known as a "little r" restatement – and it occurred on top of the Company's prior restatement.

**"little r" restatements**

120.    Many financial market commentators, and the SEC have written about how a company can, as Jianpu did, downplay accounting errors through a series of changes to prior-period accounting entries through creative—though misleading—use of, alternatives to restatements – such as "revisions", "reversals", "reclassifications," or words to similar effect.[13] Such a tactic has come to be known as a "little r" restatement.

121.    The SEC's Acting Chief Accountant, Paul Munter ("Munter") describes the difference between traditional and "little r" restatements:

> Central to the process a registrant must follow when an error is identified in its historical financial statements is determining whether the error

---

[13] *See e.g.*, Paul Munter (Acting Chief Accountant for the SEC), *Assessing Materiality: Focusing on the Reasonable Investor When Evaluating Errors*, March 9, 2020, available at: https://www.sec.gov/news/statement/munter-statement-assessing-materiality-030922

is *material* to those historical financial statements. The Supreme Court has held that a fact is material if there is:

> "a substantial likelihood that the ... fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."

When an error is determined to be material to previously-issued financial statements, the error must be corrected by restating the prior-period financial statements. This type of restatement is sometimes referred to colloquially as a reissuance restatement or a "Big R" restatement.

If the error is not material to previously-issued financial statements, but either correcting the error or leaving the error uncorrected would be material to the current period financial statements, a registrant must still correct the error, but is not precluded from doing so in the current period comparative financial statements by restating the prior period information and disclosing the error. This type of restatement is sometimes referred to colloquially as a revision restatement or a "little r" restatement.

It is important to note that **both of these methods—reissuance and revision, or "Big R" and "little r"—constitute restatements to correct errors in previously-issued financial statements as those terms are defined in U.S. GAAP**. In either case, such errors should be transparently disclosed to investors.

*Id*. (internal citations omitted)[14]

122. According to the SEC, "while the total number of restatements by registrants declined each year from 2013 to 2020, 'little r' restatements as a percentage of total restatements *rose to nearly 76% in 2020*, up from approximately 35% in 2005. *Id*.

123. Munter further noted that "we have observed that some materiality analyses appear to be biased toward supporting an outcome that an error is not material to previously-issued financial statements, resulting in 'little r' revision restatements." *Id*.

---

[14] https://www.sec.gov/news/statement/munter-statement-assessing-materiality-030922

34

124. Munter added that issuers' arguments for electing a "little r" restatement are often self-serving and "unpersuasive":

One variation of this argument is that certain elements of financial statements prepared in accordance with U.S. GAAP or International Financial Reporting Standards ("IFRS") do not provide useful information to investors, so an error in those elements cannot be material. A related argument is that historical financial statements, or specific line items in those financial statements, are irrelevant to investors' current investment decisions. We have not found these types of arguments to be persuasive because ***such views could be used to justify a position that many errors in previously-issued financial statements could never be material regardless of their quantitative significance or other qualitative factors***.

125. Finally, Munter's analysis notes the importance of a company's auditor in making "little r" restatement elections:

A registrant's auditor plays an important role in the assessment of the materiality of accounting errors. In addition to the observations noted above, when auditors evaluate the materiality of uncorrected misstatements, it is important for the audit firm to consider whether its systems of quality control are suitably designed to provide reasonable assurance that its professionals comply with applicable professional standards.

### H.    Post Class Period Events

126. On May 4, 2022, the SEC identified Jianpu as a Commission-Identified Issuer under the Holding Foreign Companies Accountable Act (the "HFCAA").[15]

127. The Company admitted that being identified as such indicates that the SEC determines that the Company used a registered public accounting firm that ***cannot be inspected or investigated*** completely by the Public Company Accounting Oversight Board of the United States (the "PCAOB") to issue the audit opinion for its financial statements for the fiscal year ended December 31, 2021.

---

[15] https://www.sec.gov/hfcaa

128. Jianpu's auditor for the years ended 2019 through 2021 was PricewaterhouseCoopers Zhong Tian LLP, which is the same auditor the Company used during the Class Period.

129. Moreover, on April 12, 2022, the Company announced earnings for the fiscal year 2021 results. In the release, the Company also noted that results included a "reclassification", which is a type of "little r" restatement:

> In the second half year of 2021, in light of business development, the Company added a financial statement line item named cost of promotion and acquisition and **reclassified the previous line item of cost of revenue and sales and marketing expenses**. Cost of promotion and acquisition primarily consists of expenditures relating to user traffic acquisition and rewards to business partners for promotion on social network and social media platform, **which are reclassified from sales and marketing expenses, and marketing costs related to advertising and marketing services including commissions paid to individual insurance brokers, which are reclassified from cost of revenue**. Cost of operation, post the **reclassification**, consists primarily of costs associated with maintenance of the platform including data acquisition costs, bandwidth and server hosting costs, call center outsourcing costs, online payment processing fees, depreciation, payroll and other related costs of operations. Sales and marketing expenses, post the reclassification, consist primarily of marketing expenses relating to marketing activities, payroll costs and related expenses for employees involved in sales and marketing activities, and expenses for the portion of call center operations that the Group outsources. The cost of operation, cost of promotion and acquisition, and sales and marketing expenses **for prior periods of 2021 presented in this press release have also been retrospectively reclassified**. The amount **reclassified** from sales and marketing expenses and cost of revenue to cost of promotion and acquisition are RMB 77.4 million and RMB 14.2 million, respectively, for the first quarter of 2021.

130. On April 29, 2022, the Company issued its Form 20-F for the year ended December 31, 2021. In it, the Company announced that its "little r" restatement was not so little:

> The cost of operation, cost of promotion and acquisition, and sales and marketing expenses **for prior years have also been retrospectively reclassified**. The **amount reclassified** from sales and marketing expenses to cost of promotion and acquisition are **RMB 1,015.5 million, RMB 1,296.4 million, RMB 991.8 million and RMB 353.1 million** for the years ended December 31, 2017, 2018, 2019 and 2020, respectively. The amount **reclassified** from cost of revenue to cost of promotion and acquisition are RMB 64.4 million, RMB106.9 million, RMB 34.2

36

million and RMB 26.3 million for the years ended December 31, 2017, 2018, 2019 and 2020, respectively. Cost of promotion and acquisition ***includes cost from related party of*** nil***, RMB 51.8 million, RMB 21.1 million***, nil and nil for the years ended December 31, 2017, ***2018, 2019***, 2020 and 2021, respectively. [at 19]

***

For comparison purposes, the cost of promotion and acquisition for the years ended December 31, 2019 and 2020 have been **<u>retrospectively re-classified</u>**. The **amount reclassified** from sales and marketing expenses to cost of promotion and acquisition ***are RMB 991.8 million*** and ***RMB 353.1 million*** for the years ended December 31, 2019 and 2020, respectively. The amount **<u>reclassified</u>** from cost of revenue to cost of promotion and acquisition are RMB 34.2 million and RMB 26.3 million for the years ended December 31, 2019 and 2020, respectively. [at 105]

131. On June 17, 2022, the Company issued a Form 6-K announcing that its Chief Operating Officer, Jiayan Lu—who is, or at one point was, a 40% owner of RDD—resigned. Jianpu stated that Lu would be leaving Jianpu to join "a related party of the Company."

132. A few months later, on October 3, 2020, Board of Director member James Qun Mi also resigned "due to personal reasons."

## V. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A. Statements related to the First Quarter 2018

133. The Class Period begins on May 29, 2018. On that day, Jianpu announced its first quarter 2018 financial results in a press release that stated, in relevant part:

**First Quarter 2018 Operational Highlights:**

- Number of loan applications submitted through the Company's platform was approximately 12.1 million in the first quarter of 2018, representing an increase of approximately 21.0% from the prior-year period.

- Credit card volume, which is the measure of the number of credit cards the Company generate revenues from, reached approximately 1.5 million in the first quarter of 2018, representing an increase of approximately 400% from the prior-year period.

37

**First Quarter 2018 Financial Highlights:**

Total revenues for the first quarter of 2018 increased by 145% to RMB335.7 million (US$53.5 million) from RMB137.3 million in the same period of 2017.

Total recommendation services revenues for the first quarter of 2018 increased by 131% to RMB289.3 million (US$46.1 million) from RMB125.2 million in the same period of 2017.

Gross profit increased by 139% to RMB286.4 million (US$45.7 million) in the first quarter of 2018 from RMB119.9 million in the same period of 2017.

Non-GAAP adjusted net loss, which excluded share-based compensation expenses, decreased by 35.9% to RMB19.8 million (US$3.2 million) in the first quarter of 2018, from RMB30.9 million in the same period of 2017.

134. The above statements identified in ¶ 133 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors: (1) that certain material transactions carried out by the Company's Credit Card Segment involved undisclosed related party relationships and/or lacked business substance; (2) that, as a result, Jianpu's revenue and costs and expenses for fiscal 2018 and 2019, including those above, would be overstated; (3) that there were material weaknesses in Jianpu's internal control over financial reporting; (4) that the Company's fiscal 2018 Form 20-F was reasonably likely to be restated; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**B.     Statements related to the Second Quarter 2018**

135. On August 27, 2018, Jianpu announced its second quarter 2018 financial results in a press release that stated, in relevant part:

**Second Quarter 2018 Operational Highlights:**

- Number of loan applications submitted through the Company's platform was approximately 21.2 million in the second quarter of 2018, representing an increase of approximately 11.0% from the same period of 2017 and an increase of approximately 75.2% from the first quarter of 2018.

38

- Credit card volume, which is the measure of the number of credit cards the Company generates revenues from, was approximately 1.6 million in the second quarter of 2018, representing an increase of approximately 167% from the same period of 2017 and an increase of approximately 6.7% from the first quarter of 2018.

**Second Quarter 2018 Financial Highlights:**

- Total revenues for the second quarter of 2018 increased by 91.6% to RMB490.4 million (US$74.1 million) from RMB256.0 million in the same period of 2017.

- Total recommendation services revenues for the second quarter of 2018 increased by 86.2% to RMB441.0 million (US$66.6 million) from RMB236.9 million in the same period of 2017.

- Gross profit increased by 85.3% to RMB431.2 million (US$65.2 million) in the second quarter of 2018 from RMB232.7 million in the same period of 2017. Gross margin was 87.9% in the second quarter of 2018, compared with 85.3% in the first quarter of 2018.

- Net loss was RMB61.1 million (US$9.2 million) in the second quarter of 2018 and was RMB17.4 million in the same period of 2017. Net loss margin was -12.5% in the second quarter of 2018 compared with -6.8% in the same period of 2017. Non-GAAP adjusted net loss was RMB28.5 million (US$4.3 million) in the second quarter of 2018 and was RMB16.9 million in the same period of 2017. Non-GAAP adjusted net margin1 improved to -5.8% from -6.6% in the same period of 2017.

136. The Company also disclosed the following about its acquisition of Databook within

the same press release:

**Acquisition of Subsidiary**

In June 2018, the Company completed the acquisition of 65% of equity interests in a China-based technology company specializing in optimizing data-driven risk management decisions. The acquired company offers a suite of products and services helping financial service providers to enhance their risk management capabilities. The consideration of the transaction consists of cash, ordinary shares of the Company and options to purchase the Company's ordinary shares. The total consideration is approximately RMB204 million, including cash portion of approximately RMB110 million, ordinary shares and options of the Company approximately RMB94 million.

39

137. The above statements identified in ¶¶ 135-36 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors: (1) that certain material transactions carried out by the Company's Credit Card Segment involved undisclosed relationships including with RDD, or lacked business substance; (2) that, as a result, Jianpu's revenue and costs and expenses for fiscal 2018 and 2019 were overstated; (3) that there were material weaknesses in Jianpu's internal control over financial reporting; (4) that the Company's fiscal 2018 Form 20-F and/or fiscal 2019 20-F were reasonably likely to be restated; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

138. The above statements identified in ¶ 136 were also materially false and/or misleading, and/or failed to disclose material adverse facts including that that Databook was engaged in pervasive and unlawful data collection practices that infringed on user's privacy rights and were thus: (a) reasonably likely to cause the Company's investment to be materially impaired once said data collection practices were revealed; and (b) likely to lead to unlawfully earned revenue from the Advertising Segment being disgorged.

### C. Statements related to the Third Quarter 2018

139. On November 19, 2018, Jianpu announced its third quarter 2018 financial results in a press release that stated, in relevant part:

**Third Quarter 2018 Operational and Financial Highlights:**

- Credit card volume was approximately 2.0 million in the third quarter of 2018, representing an increase of approximately 81.8% from the same period of 2017. The average fee per credit card increased by 47.7% to RMB103.59 (US$15.08) in the third quarter of 2018 from RMB70.13 in the third quarter of 2017. As a result, revenues for credit cards in the third quarter of 2018 increased by 175% to RMB204.9 million (US$29.8 million) from RMB74.5 million in the same period of 2017.

\*    \*    \*

40

- Net loss was RMB53.5 million (US$7.8 million) in the third quarter of 2018, improved from net loss of RMB61.1 million in the second quarter of 2018. Net loss margin was -12.1% in the third quarter of 2018 compared with -12.5% in the second quarter of 2018.

\* \* \*

Revenues from recommendation services for credit cards increased by 197% to RMB183.5 million (US$26.7 million) in the third quarter of 2018 from RMB61.8 million in the third quarter of 2017, *due to the increase in both credit card volume and average fee per credit card*. Despite the slowdown of lending activities experienced in the third quarter of 2018, the consumer demand towards credit cards remained strong. Credit card volume for recommendation services in third quarter of 2018 was approximately 1.7 million, representing an increase of approximately 143% from the same period of 2017. The average fee per credit card for recommendation services increased to RMB106.10 (US$15.45) in the third quarter of 2018 from RMB90.40 in the same period of 2017.

140. The above statements identified in ¶ 139 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors: (1) that certain material transactions carried out by the Company's Credit Card Segment involved undisclosed relationships including with RDD or lacked business substance and that undisclosed fact contributed to the increase in credit card revenue which Defendants failed to disclose as a contributing factor; (2) that, as a result, Jianpu's revenue and costs and expenses for fiscal 2018 and 2019 were overstated; (3) that there were material weaknesses in Jianpu's internal control over financial reporting; (4) that the Company's fiscal 2018 and 2019 Form 20-Fs were reasonably likely to be restated; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

141. The above statements identified in ¶ 139 were also materially false and/or misleading because they attributed the growth in the credit card segment to an exclusive set of factors -- an increase in volume and in the average fee per credit card, but failed to disclose that

41

revenue in the Credit Card segment was also increased by nondisclosed related party transactions including with RDD.

**D.      Statements related to the Fourth Quarter 2018**

142.    On February 25, 2019, Jianpu announced its fourth quarter and fiscal year 2018 financial results in a press release that stated, in relevant part:

**Fourth Quarter 2018 Operational and Financial Highlights:**

- Total revenues in the fourth quarter of 2018 increased by 67.3% to RMB742.1 million (US$107.9 million) from RMB443.7 million in the third quarter of 2018, and increased by 26.9% from RMB584.6 million in the same period of 2017.

- Credit card volume, was approximately 2.9 million in the fourth quarter of 2018, representing an increase of approximately 123% from the same period of 2017. The average fee per credit card increased to RMB105.51 (US$15.35) in the fourth quarter of 2018 from RMB102.34 in the fourth quarter of 2017. As a result, revenues for credit cards1 in the fourth quarter of 2018 increased by 136% to RMB310.6 million (US$45.2 million) from RMB131.8 million in the same period of 2017.

                              *        *        *

- Net income was RMB11.9 million (US$1.7 million) in the fourth quarter of 2018, compared with a net loss of RMB136.4 million in the same period of 2017 and a net loss of RMB53.5 million in the third quarter of 2018. Net income margin was 1.6% in the fourth quarter of 2018, compared with net loss margin of 23.3% in the same period of 2017 and net loss margin of 12.1% in the third quarter of 2018.

*Revenues from recommendation services for credit cards* increased by 144% to RMB289.1 million (US$42.1 million) in the fourth quarter of 2018 from RMB118.6 million in the fourth quarter of 2017, *due to the increase in both credit card volume and average fee per credit card*. The consumer demand towards credit cards significantly increased, and Jianpu successfully captured the shift of user demand and achieved remarkable performance in the credit card recommendation services. Credit card volume for recommendation services in the fourth quarter of 2018 was approximately 2.6 million, representing a significant increase of approximately 136% from the same period of 2017. The average fee per credit card for recommendation services increased to RMB112.05 (US$16.30) in the fourth quarter of 2018 from RMB104.49 in the fourth quarter of 2017.

42

143. The above statements identified in ¶ 142 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors: (1) that certain material transactions carried out by the Company's Credit Card Segment involved undisclosed relationships including with RDD or lacked business substance and that undisclosed fact contributed to the increase in credit card revenue which Defendants failed to disclose as a contributing factor; (2) that, as a result, Jianpu's revenue and costs and expenses for fiscal 2018 and 2019 were overstated; (3) that there were material weaknesses in Jianpu's internal control over financial reporting; (4) that the Company's fiscal 2018 Form 20-F was reasonably likely to be restated; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

144. The above statements identified in ¶ 142 were also materially false and/or misleading because they attributed the growth in the credit card segment to an exclusive set of factors -- an increase in volume and in the average fee per credit card -- but failed to disclose that revenue in the Credit Card segment was also increased by nondisclosed related party transactions with RDD that lacked business substance.

145. During the February 25, 2019 earnings call discussing fourth quarter and full year 2018 results, Ye touted the Company's network of financial institutions within the Credit Card Segment:

> As of the end of 2018, **we have built a vibrant network of over 2,500 financial institutions** and have also strengthened our collaboration with all **5 of the largest state-owned national banks and 11 joint stock banks out of the 12 nationwide**.
>
> As mentioned above, our credit card recommendation businesses have achieved very sharp growth momentum, with the total number of credit card issued on our platform standing at more than 10 million. We have the largest

43

network of online credit card issuers **with 25 credit card banks on our platform**. Recently, we introduced our first cobranded credit card, featuring Jianpu RONG360's mascots deepening our collaboration with the bank.

146. The above statements identified in ¶ 145 were materially false and/or misleading because Ye failed to disclose that within the financial institutions that he was tracking and enumerating and discussing with investors included undisclosed relationships including with RDD and transactions that lacked business substance and that, as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

147. Similarly, Chen also touted the strong results in the Credit Card Segment during his prepared remarks during the February 25, 2019 earnings call:

> Led by robust growth in our credit card business and solid recovery of loan recommendation services, our total recommendation services revenues reported a 20% year-over-year increase to RMB 659 million in the fourth quarter, mainly driven by a 144% year-over-year increase in credit card recommendation services, **further illustrating the scalability of our platform model and execution strength**.
>
> Combining the credit card business from both recommendation services and advertising, **we recorded credit card volume of approximately 3 million in the fourth quarter of 2018, representing a year-over-year increase of approximately 123%.**

148. The above statements identified in ¶ 147 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors: (1) that certain material transactions carried out by the Company's Credit Card Segment involved undisclosed relationships including with RDD or lacked business substance and that undisclosed fact contributed to the increase in credit card volume and revenue; (2) that, as a result, Jianpu's revenue for fiscal 2018 and 2019 were overstated; (3) that there were material weaknesses in Jianpu's internal control over financial reporting; (4) that the Company's 2018  20-F and/or 2019

44

20-F were reasonably likely to be restated; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

149. Finally, on the Advertising Segment, Chen stated the following:

Revenues from advertising and marketing services and other services increased by 152% to RMB 246 million in 2018, from RMB 97 million in the prior year, primarily due to an increase in the big data and risk management services, which increased 194% year-over-year as well as an increase in revenues from advertising services provided to credit card issuer and other advertisers.

150. The above statements identified in ¶ 149 were materially false and/or misleading, and/or failed to disclose material adverse facts including that that Databook was engaged in pervasive and unlawful data collection practices that infringed on user's privacy rights and were thus: (a) reasonably likely to cause the Company's investment to be materially impaired once said data collection practices were revealed; and (b) likely to lead to unlawfully earned revenue from the Advertising Segment being disgorged.

151. During the Q&A portion of the February 25, 2019 earnings call, Defendants were asked by a Morgan Stanley analyst if they could provide a revenue breakdown by institution. In response, Chen stated the following:

Okay, thank you, John, for your questions. So first question is regarding the revenue breakdown among the different financial -- different type of financial institutions. So as a practice, we always -- in the previous quarters I think we discussed this breakdown several times. So we will -- I will follow the same practice [to my best knowledge] to discuss the number.

So firstly, in terms of -- so first, **I would give out the number of our total revenue breakdown**. So in the fourth quarter, we have **around 52% of our revenue coming from the banks**. So keep in mind, the majority of this part is contributed by the credit card. **So the total credit card is around 40% of total revenue in the fourth quarter**.

So -- and then we will have the P2P part. I think everyone has a interest to know the number. **So as of the fourth quarter, the P2Ps contribute to around 16% of**

45

**my total revenues. And then the remaining revenues comes from the nonbanking licensed financial institutions, including consumer finance company, microlending company and other license players.**

152. The above statements identified in ¶ 151 were materially false and/or misleading, and/or failed to disclose material adverse facts because Chen provided an enumerated list of institutions that contributed to Q4 2018 revenue but omitted that one source of revenue arose from undisclosed related party transactions including with RDD that lacked business substance within the Company's Credit Card Segment and thus artificially inflated Q4 2018 revenue for the Credit Card segment and thus the Company overall.

153. On April 23, 2019, Jianpu filed its Form 20-F for the period ended December 31, 2018, signed by Ye, affirming the previously reported financial results. As to related party transactions, the Company stated:

> For the year ended December 31, 2018, we generated revenues in the total amount of RMB105.5 million for the recommendation services to RONG360, RMB13.4 million for the advertising, marketing and other services to RONG360, and charged administrative expenses of RMB10.0 million to RONG360, including expenses related to operational, administrative, human resources, legal, accounting and internal control.

> For the year ended December 31, 2018, RONG360 charged us RMB4.6 million for the collection handling fee for the revenue amount billed to third parties through RONG360 by us.

> As of December 31, 2018, the balance arose from the aforementioned related party transactions and various operational payments made by RONG360 was RMB61.0 million. In addition, the accounts receivable billed through RONG360 amounted to RMB135.0 million as of December 31, 2018.

> We obtained contractual control of KTN from a company owned by two founders of our company in October 2018. The related consideration of RMB6.3 million has not been paid as of December 31, 2018.

> Another related party, investee of the company owned by two founders of our company, charged us RMB40.2 million of advertising and of marketing expenses for providing advertising and marketing service to us for the year ended December 31, 2018. The balance arose from the aforementioned transactions with this related party was RMB5.5 million.

154. The 2018 20-F also stated that there was a material weakness in the Company's internal control over financial reporting. It stated:

> The material weakness identified relates to the lack of sufficient competent financial reporting and accounting personnel with appropriate understanding of U.S. GAAP to design and implement formal period-end financial reporting policies and procedures, to address complex U.S. GAAP technical accounting issues, and to prepare and review our consolidated financial statements and related disclosures in accordance with U.S. GAAP and financial reporting requirements set forth by the SEC.

> To remedy our identified material weakness, we have implemented and will continue to enhance and improve our internal control over financial reporting. In 2018, we have formed our U.S. GAAP reporting and internal control teams with additional qualified accounting and reporting personnel who have appropriate knowledge and experience of U.S. GAAP and SEC reporting requirements, established standardized financial closing and reporting procedures, including oversight and clarifying reporting requirements for non-recurring or complex transactions, and implemented training programs for our accounting staffs. We plan to further enhance and improve our financial closing and reporting procedures, and training programs, especially training related to U.S. GAAP and SEC reporting requirements.

155. The above statements identified in ¶¶ 153-54 were materially false and/or misleading, and/or failed to disclose material adverse facts including: (1) that certain material transactions carried out by the Company's Credit Card Segment involved undisclosed relationships including with RDD or lacked business substance; (2) that, as a result, Jianpu's revenue and costs and expenses for fiscal 2018 were overstated; (3) that the Company's fiscal 2018 Form 20-F was reasonably likely to be restated; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. The Company's statements above were also misleading for not disclosing that the related party which charged it 40.2 million RMB was also owned by Ye's wife, and that entity was also engaging in sham transactions with the Company.

47

**E.      Statements related to the First Quarter 2019**

156.      On May 28, 2019, Jianpu announced its first quarter 2019 financial results in a press release that stated, in relevant part:

First Quarter 2019 Operational and Financial Highlights:

- Total revenues in the first quarter of 2019 increased by 95.1% to RMB654.9 million (US$97.6 million) from RMB335.7 million in the same period of 2018. . . .

- Credit card volume, was approximately 1.6 million in the first quarter of 2019, representing an increase of approximately 6.7% from the same period of 2018. The average fee per credit card increased to RMB105.92 (US$15.78) in the first quarter of 2019 from RMB95.20 in the same period of 2018. *As a result, revenues for credit cards in the first quarter of 2019 increased by 18.3% to RMB170.0 million (US$25.3 million) from RMB143.7 million in the same period of 2018*.

* * *

- Net income was RMB18.7 million (US$2.8 million) in the first quarter of 2019, compared with a net loss of RMB57.1 million in the same period of 2018 and a net income of RMB11.9 million in the fourth quarter of 2018. Net income margin was 2.9% in the first quarter of 2019, compared with net loss margin of 17.0% in the same period of 2018 and net income margin of 1.6% in the fourth quarter of 2018.

Revenues from recommendation services for credit cards increased by 15.6% to RMB149.3 million (US$22.2 million) in the first quarter of 2019 from RMB129.2 million in the same period of 2018, *due to the increase in both credit card volume and average fee per credit card*. Credit card volume for recommendation services in the first quarter of 2019 was approximately 1.4 million, representing an increase of approximately 7.7% from the same period of 2018. The average fee per credit card for recommendation services increased to RMB106.45 (US$15.86) in the first quarter of 2019 from RMB97.15 in the same period of 2018.

157.      The above statements identified in ¶ 156 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors: (1) that certain material transactions carried out by the Company's Credit Card Segment involved undisclosed relationships including with RDD or lacked business substance and that undisclosed fact contributed to the increase in credit card revenue which Defendants failed to disclose as a

48

contributing factor in the above press release; (2) that, as a result, Jianpu's revenue and costs and expenses for fiscal 2019 were overstated; (3) that there were material weaknesses in Jianpu's internal control over financial reporting; (4) that the Company's 2019 20-F was reasonably likely to be restated; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

158. The above statements identified in ¶ 156 were also materially false and/or misleading because they attributed growth in the Credit Card Segment to an exclusive set of factors -- an increase in volume and in the average fee per credit card -- but failed to disclose that revenue in the Credit Card Segment was also increased by nondisclosed related party transactions including with RDD that lacked business substance.

159. On May 28, 2019, the Company also hosted an earnings call do discuss its financial results for the first quarter 2019. In his prepared remarks, Ye stated:

> As a follow-up to the airing of CCTV 315, we completed our internal review of systems, products and processes. Our mobile app were made available, again, in early May on some application stores and we expect a full launch in June. In the meantime, we continue to drive certain self-imposed improvements to our internal processes such **as adopting more stringent turnaround boarding process, while adhering to a stricter platform policies for financial service providers**. We have engaged a global consulting firm to assist us in the review of our business process, [conduct] industry studies and recommend best practices.
>
>            \*    \*    \*
>
> And at the same time, our regulatory technology, or reg tech team also won a few important mandates to help local Chinese financial regulators establishing assistance to monitor financial products and service online. Being recognized on our platform model and market position by the regulators, we will continue to contribute and **lead the initiative of introducing and promoting higher industry standards and best practices**.

49

160.     The above statements in ¶ 159 were materially false and/or misleading, and/or failed to disclose material adverse facts because at the same time that Ye assured investors of promoting higher standards and stricter policies, Defendants were simultaneously inflating the Company's revenue through nondisclosed related party transactions including with RDD, an entity that is, or at one point was, 40% owned by his wife. Moreover, by claiming to "being recognized" by the Chinese regulators to monitor financial products, Defendants misleadingly implied that their own practices had somehow been endorsed by the Company's regulator, when in fact there were then existing material weaknesses in Jianpu's internal control over financial reporting.

F.     **Statements related to the Second Quarter 2019**

161.     On August 26, 2019, Jianpu announced its second quarter 2019 financial results in a press release that stated, in relevant part:

**Second Quarter 2019 Operational and Financial Highlights:**

- Credit card volume[] was approximately 1.9 million in the second quarter of 2019, representing an increase of approximately 18.8% from the same period of 2018. The average fee per credit card increased to RMB106.52 (US$15.522) in the second quarter of 2019 from RMB99.43 in the same period of 2018. *As a result, revenues for credit cards in the second quarter of 2019 increased by 24.5% to RMB201.5 million (US$29.4 million) from RMB161.8 million in the same period of 2018*.

\*     \*     \*

**First Six Months 2019 Operational and Financial Highlights:**

- Credit card volume was approximately 3.5 million in the first six months of 2019, representing an increase of approximately 12.9% from the same period of 2018. The average fee per credit card increased to RMB106.24 (US$15.48) in the first six months of 2019 from RMB97.39 in the same period of 2018. *As a result, revenues for credit cards in the first six months of 2019 increased by 21.6% to RMB371.5 million (US$54.1 million) from RMB305.5 million in the same period of 2018.*

\*     \*     \*

50

**Total revenues from recommendation services** decreased by 32.0% to RMB299.9 million (US$43.7 million) in the second quarter of 2019 from RMB441.0 million in the same period of 2018.

> *Revenues from recommendation services for credit cards* increased by 31.8% to RMB196.5 million (US$28.6 million) in the second quarter of 2019 from RMB149.1 million in the same period of 2018, ***due to the increase in both credit card volume and average fee per credit card***. Credit card volume for recommendation services in the second quarter of 2019 was approximately 1.8 million, representing an increase of approximately 20.0% from the same period of 2018. The average fee per credit card for recommendation services increased to RMB108.14 (US$15.75) in the second quarter of 2019 from RMB99.47 in the same period of 2018.

*     *     *

**Net loss** was RMB84.9 million (US$12.4 million) in the second quarter of 2019, compared with a net loss of RMB61.1 million in the same period of 2018. Net loss margin was -23.4% in the second quarter of 2019, compared with a net loss margin of -12.5% in the second quarter of 2018.

162. The above statements identified in ¶ 161 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors: (1) that certain material transactions carried out by the Company's Credit Card Segment involved undisclosed relationships including with RDD or lacked business substance and that undisclosed fact contributed to the increase in credit card revenue that Defendants failed to disclose as a contributing factor in the above press release; (2) that, as a result, Jianpu's revenue and costs and expenses for fiscal 2019 were overstated; (3) that there were material weaknesses in Jianpu's internal control over financial reporting; (4) that the Company's 2019 20-F was reasonably likely to be restated; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

163. The above statements identified in ¶ 161 were also materially false and/or misleading because they attributed the growth in the credit card segment to an exclusive set of

factors -- an increase in volume and in the average fee per credit card -- but failed to disclose that revenue in the Credit Card segment was also increased by nondisclosed related party transactions including with RDD that lacked business substance.

164. Following its second quarter 2019 results, Ye made the following statement on the Company's August 26, 2019 earnings call:

> Before we go into the financials, we just want to continue our update following the [CCTV 315] event and the subsequent mobile application relaunch. As of the end of last week, our mobile apps are available on all App Store now. ***We took the time to conduct a comprehensive internal review and continuously drive certain self-imposed improvement internal processes regarding to FSP onboarding procedures and ongoing monitoring and supervision.*** We have implemented the necessary risk control to better protect the users from participating in products that are out of the scope in terms of industry standard. Being the leading player in this market, we have also been invited by the regulators to participate ***in developing industry standards and promoting industry best practice, including defining guidance for digital financial platform, corporate responsibility and products standard as well as consumer rights protection.***

165. The above statements identified in ¶ 164 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors: (1) that certain of the Company's transactions carried out by the Credit Card Segment involved undisclosed relationships or lacked business substance; (2) that, as a result, Jianpu's revenue and costs for fiscal 2018 and 2019 were overstated; (3) that there were material weaknesses in Jianpu's internal control over financial reporting; (4) that the Company's 2019 20-F was reasonably likely to be restated and the Company would not have achieved its revenue guidance for the periods ending September 30, 2019, or December 31, 2019; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

166. The above statements in ¶ 164 were also materially false and/or misleading, and/or failed to disclose material adverse facts because at the same time that Ye assured investors of

promoting higher standards and stricter policies, Defendants were simultaneously inflating the Company's revenue through nondisclosed related party transactions including with RDD. Moreover, by referring to being "invited" by the Chinese regulators to develop best practices, Defendants misleadingly implied that their conduct adhered to industry best practices, when in fact there were then existing material weaknesses in Jianpu's internal control over financial reporting and the Company was overstating revenue and expenses as a result of nondisclosed related party transactions.

**G.      Statements related to the Third Quarter 2019**

167.    On December 9, 2019, the Company announced its third quarter 2019 financial results in a press release that stated, in relevant part:

**Third Quarter 2019 Operational and Financial Highlights:**

- Credit card volume for recommendation services[] was approximately 1.8 million in the third quarter of 2019, representing an increase of approximately 5.9% from the same period of 2018. The average fee per credit card for recommendation services increased to RMB109.22 (US$215.28) in the third quarter of 2019 from RMB106.10 in the same period of 2018. As a result, revenues from recommendation services for credit cards increased by 6.6% to RMB195.6 million (US$27.4 million) in the third quarter of 2019 from RMB183.5 million in the same period of 2018.

*           *           *

**First Nine Months 2019 Operational and Financial Highlights:**

- Credit card volume for recommendation services was approximately 5.0 million in the first nine months of 2019, representing an increase of approximately 8.7% from the same period of 2018. The average fee per credit card for recommendation services increased to RMB108.05 (US$15.12) in the first nine months of 2019 from RMB101.31 in the same period of 2018. ***As a result, revenues from recommendation services for credit cards in the first nine months of 2019 increased by 17.2% to RMB541.4 million (US$75.7 million) from RMB461.8 million in the same period of 2018.***

53

\* \* \*

**Total revenues from recommendation services** decreased by 24.1% to RMB285.9 million (US$40.0 million) in the third quarter of 2019 from RMB376.9 million in the same period of 2018.

> *Revenues from recommendation services for credit cards* increased by 6.6% to RMB195.6 million (US$27.4 million) in the third quarter of 2019 from RMB183.5 million in the same period of 2018, *due to the increase in both credit card volume and average fee per credit card*. Credit card volume for recommendation services1 in the third quarter of 2019 was approximately 1.8 million, representing an increase of approximately 5.9% from the same period of 2018. The average fee per credit card for recommendation services increased to RMB109.22 (US$15.28) in the third quarter of 2019 from RMB106.10 in the same period of 2018.

\* \* \*

**Net loss** was RMB352.5 million (US$49.3 million) in the third quarter of 2019, compared with a net loss of RMB53.5 million in the same period of 2018. The increase of net loss was primarily due to the impairment loss charged in this quarter.

168. The above statements identified in ¶ 167 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors: (1) that certain of the Company's transactions carried out by the Credit Card Segment involved undisclosed relationships including with RDD or lacked business substance; (2) that, as a result, Jianpu's revenue and costs for fiscal 2019 were overstated; (3) that there were material weaknesses in Jianpu's internal control over financial reporting; (4) that the Company's 2019 20-F was reasonably likely to be restated and the Company would not have achieved its revenue guidance for the period ending December 31, 2019; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

169. The above statements identified in ¶ 167 were also materially false and/or misleading because they attributed the growth in the Credit Card Segment to an exclusive set of

factors -- an increase in volume and in the average fee per credit card -- but failed to disclose that revenue in the Credit Card Segment was also increased by nondisclosed related party transactions.

170. On December 9, 2019, the Company also stated that its impairment "primarily reflects the impairment of the goodwill and intangible assets related to a subsidiary acquired in 2018 *due to adverse development of its business and change of the relevant industry background and market conditions.*"

171. The above statements identified in ¶ 170 were materially false and/or misleading, and/or failed to disclose material adverse facts for the reasons stated above in §IV.F–G.

172. The above statements identified in ¶ 170 were also materially false and/or misleading, and/or failed to disclose material adverse facts because (a) the cause for the impairment was a criminal investigation not "market conditions"; and (b) Databook was engaged in pervasive and unlawful data collection practices that infringed on user's privacy rights and was actively under investigation by criminal authorities and were thus (c) reasonably likely to cause the Company's revenue within its Advertising Segment to be disgorged and/or fined.

**H. Statements related to the Fourth Quarter and Full Year 2019**

173. On March 23, 2020, Jianpu announced its fourth quarter and full year 2019 financial results in a press release that stated, in relevant part:

Fourth Quarter 2019 Operational and Financial Highlights:

- Credit card volume for recommendation services[] was approximately 1.9 million in the fourth quarter of 2019, representing an increase of approximately 5.6% from the third quarter of 2019. The average fee per credit card for recommendation services increased to RMB110.21 (US$15.83) in the fourth quarter of 2019 from RMB109.22 in the third quarter of 2019. *As a result, revenues from recommendation services for credit cards increased by 6.5%* to RMB208.3 million (US$29.9 million) in the fourth quarter of 2019 from RMB195.6 million in the third quarter of 2019.

55

- Net loss was RMB6.6 million (US$0.9 million) in the fourth quarter of 2019, improved from a net loss of RMB352.5 million in the third quarter of 2019.

*    *    *

**Total revenues from recommendation services** decreased by 62.3% to RMB248.3 million (US$35.7 million) in the fourth quarter of 2019 from RMB659.2 million in the same period of 2018.

*Revenues from recommendation services for credit cards* decreased by 27.9% to RMB208.3 million (US$29.9 million) in the fourth quarter of 2019 from RMB289.1 million in the same period of 2018, due to the decrease in both credit card volume and average fee per credit card. Credit card volume for recommendation services in the fourth quarter of 2019 was approximately 1.9 million, representing a decrease of approximately 26.9% from the same period of 2018. The average fee per credit card for recommendation services was RMB110.21 (US$15.83) in the fourth quarter of 2019, compared with RMB112.05 in the same period of 2018.

*    *    *

**Net loss** was RMB6.6 million (US$0.9 million) in the fourth quarter of 2019, compared with a net income of RMB11.9 million in the same period of 2018.

174. The above statements identified in ¶ 173 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors: (1) that certain of the Company's transactions carried out by the Credit Card Segment involved undisclosed relationships or lacked business substance; (2) that, as a result, Jianpu's revenue and costs for fiscal 2019 were overstated; (3) that there were material weaknesses in Jianpu's internal control over financial reporting; (4) that the Company's 2019 20-F was reasonably likely to be restated and the Company would not have achieved its revenue guidance for the period ending December 31, 2019; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

56

175. On April 30, 2020, Jianpu stated that it elected to rely on the SEC Order issued on March 4, 2020, as amended on March 25, 2020, which provides for conditional relief to public companies that are unable to comply with filing requirements due to COVID-19. Specifically, the Company stated:

> The recent outbreak of COVID-19 has posed a significant impact on the Company's ability to file on a timely basis its Annual Report on Form 20-F for the year ended December 31, 2019 (the "Annual Report"), which is originally due to be filed on April 30, 2020 (the "Original Due Date"). Therefore, the Company has elected to rely on the conditional filing relief provided under the SEC Order. In accordance with the SEC Order, the Company plans to file the Annual Report no later than 45 days after the Original Due Date.

> Substantially all of the Company's operations are concentrated in China. In connection with the intensifying efforts to contain the spread of COVID-19, the Chinese government has taken a number of actions, which included extending the Chinese New Year holiday, quarantining individuals infected with or suspected of having COVID-19, restricting residents from travel, encouraging employees of enterprises to work remotely from home and cancelling public activities, among others. To cope with the impact and to protect its employees, the Company has also taken a series of measures, including, among others, the adoption of modified operating hours, temporary closure of certain offices, remote working arrangements for its employees and more stringent workplace sanitation measures. Meanwhile, some of the Company's financial service providers, their agents and the Company's other business partners are experiencing disruptions to business operations and reduction in work efficiency. ***The foregoing factors have reduced the capacity and efficiency of the Company's operations, and resulted in difficulties with respect to information collection related to the preparation of the Annual Report, particularly certain subsequent information to verify the business conducted in 2019.*** As a result, the preparation of the Company's Annual Report has been delayed. The Company needs more time to collect, examine, analyze and compile the information, particularly certain subsequent information recently received from third parties, and to evaluate the impact of such information on the Company's consolidated financial statements and the Annual Report. Therefore, the preparation of the consolidated financial statements and related notes to be included in the Company's annual report on Form 20-F for the year ended December 31, 2019 is still in progress. As such, the Company has decided to rely on the SEC Order.

176. The above statements identified in ¶ 175 were materially false and/or misleading, and/or failed to disclose material adverse facts because: (1) Defendants failure to file its 20-F was unrelated to COVID but was instead related to its pervasive securities fraud including a scheme to

57

boost revenue in its Credit Card Segment which prompted the restatement; (2) that certain of the Company's transactions carried out by the Credit Card Segment involved undisclosed relationships or lacked business substance; (3) that, as a result, Jianpu's revenue and costs and expenses for fiscal 2018 and 2019 were overstated; (4) that there were material weaknesses in Jianpu's internal control over financial reporting; (5) that the Company's fiscal 2018 20-F and 2019 20-F were reasonably likely to be restated; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## VI.    CLASS ACTION ALLEGATIONS

177.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Jianpu shares between May 29, 2018 and February 16, 2021, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

178.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Jianpu's shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Jianpu shares were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by Jianpu or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

58

179. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

180. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

181. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Jianpu; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

182. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VII. UNDISCLOSED ADVERSE FACTS

183. The market for Jianpu's shares was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Jianpu's shares traded at artificially inflated prices during the Class Period. Plaintiff

and other members of the Class purchased or otherwise acquired Jianpu's shares relying upon the integrity of the market price of the Company's shares and market information relating to Jianpu and have been damaged thereby.

184. During the Class Period, Defendants materially misled the investing public thereby inflating the price of Jianpu's shares, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading and through an undisclosed and deceptive scheme to inflate revenue through related party transactions. The statements and omissions were materially false and/or misleading for the reasons set forth herein and because they failed to disclose material adverse information and/or misrepresented the truth about Jianpu's business, operations, and prospects as alleged herein.

185. At all relevant times, the material misrepresentations and omissions and undisclosed scheme particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Jianpu's financial well-being and prospects and engaged in a scheme to do the same. These material misstatements and/or omissions and/or conduct had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's shares to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements and/or conduct during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's shares at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

60

## VIII. LOSS CAUSATION

186. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

187. During the Class Period, Plaintiff and the Class purchased Jianpu's shares at artificially inflated prices and when the truth of Defendants' false statements and unlawful scheme were revealed, Jianpu's shares fell, and investors were damaged thereby. The price of the Company's shares significantly declined when the misrepresentations and unlawful conduct made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects from Defendants' unlawful scheme were revealed, causing investors' losses.

## IX. ADDITIONAL SCIENTER ALLEGATIONS

188. As alleged herein, Defendants acted with scienter because Defendants: knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Jianpu, their control over, and/or receipt and/or modification of Jianpu's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Jianpu, participated in the fraudulent scheme alleged herein.

189. Defendants were aware of the questionable related party transactions because in the 2018 20-F, signed by Defendant Ye, the Company stated that the audit committee, which is chaired by Denny Lee is responsible for "reviewing and approving all proposed related party transactions,

61

as defined in Item 404 of Regulation S-K under the Securities Act." The 2019 20-F, also signed by Ye, stated something substantially similar.

190. Defendants were also aware of the related party transactions because the related party at issue is 40% owned by CEO Ye's wife.

191. Under Item 404 of Regulation S-K, a registrant must "describe any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest." 17 C.F.R. § 229.404(a).

192. Also, according to the 2018 20-F, the audit committee regularly reports to the board of directors. The Company further stated that Mr. Lee, member of the audit committee, qualifies as an "audit committee financial expert."

193. Similarly, the 2019 20-F signed by Defendant Ye, likewise represented that the audit committee is responsible for "reviewing and approving all proposed related party transactions, as defined in Item 404 of Regulation S-K under the Securities Act" and that the audit committee regularly reports to the board of directors. Defendant Chen joined the Board of Directors on May 28, 2019, which coincided with the time that overstated revenue from the Company's Credit Card Segment began to increase markedly on a quarter-over-quarter and a year-over-year basis.

194. The 2019 20-F also identified three material weaknesses within the Company's internal controls, as more fully discussed above in ¶¶ 62 and 154.

195. Additionally, the Company stopped hosting earnings calls after its Q4 2019 earnings were released on Mar 23, 2020. This cessation means that following the Company's partial corrective disclosure on June 15, 2020, investors had no opportunity to question management about

the reasons for the delayed filing, nor even about the nature of the related party transactions that prompted the overstated revenue and the eventual restatement of the Company's financials.

196. Additional scienter is shown by the resignations of Board of Directors Members Fan Yuanyuan and James Qun Mi, as well as by Chief Operating Officer, Jiayan Lu—who is, or at one point was, a 40% owner of RDD.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

197. The market for Jianpu's shares was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Jianpu's shares traded at artificially inflated prices during the Class Period. On March 4, 2019, the Company's share price closed at a Class Period high of $62.72 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's shares relying upon the integrity of the market price of Jianpu's shares and market information relating to Jianpu, and have been damaged thereby.

198. During the Class Period, the artificial inflation of Jianpu's shares was caused by the material misrepresentations and/or omissions and unlawful conduct particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Jianpu's business, prospects, and operations. These material misstatements and/or omissions and deceptive conduct created an unrealistically positive assessment of Jianpu and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements and deceptive conduct during the Class Period resulted in Plaintiff and other members

63

of the Class purchasing the Company's shares at such artificially inflated prices, and each of them has been damaged as a result.

199. At all relevant times, the market for Jianpu's shares was an efficient market for the following reasons, among others:

(a) Jianpu shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Jianpu filed periodic public reports with the SEC and/or the NYSE;

(c) Jianpu regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Jianpu was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

200. As a result of the foregoing, the market for Jianpu's shares promptly digested current information regarding Jianpu from all publicly available sources and reflected such information in Jianpu's share price. Under these circumstances, all purchasers of Jianpu's shares during the Class Period suffered similar injury through their purchase of Jianpu's shares at artificially inflated prices and a presumption of reliance applies.

## XI. NO SAFE HARBOR

201. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

64

The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Jianpu who knew that the statement was false when made.

## XII.   FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5(a) and/or (c) Promulgated Thereunder
### Against All Defendants

202.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

203.   As demonstrated above, Defendants committed deceptive and/or manipulative acts in furtherance of the alleged scheme to defraud.  For purposes of this claim, Defendants' inherently deceptive and/or manipulative acts were distinct from any alleged misstatements.

204.   To advance their unlawful scheme, Defendants: (i) employed devices, and artifices to defraud; (ii) disseminated false and/or misleading statements including but not limited to their interactive email alert feature on their investor relations page (discussed *supra*); and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for Jianpu's shares

in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a)—(c). All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

205. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) engage in nondisclosed related party transactions that lacked economic substance and were instead designed to boost revenue; and (iii) cause Plaintiff and other members of the Class to purchase Jianpu's shares at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

206. Additionally, as alleged herein, Plaintiff and other members of the class relied upon Defendants' deceptive and/or manipulative conduct in connection with their purchases or sales of the Company's securities.

207. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Jianpu's financial well-being and prospects, as specified herein.

208. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Jianpu's value and performance and continued substantial growth, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares during the Class Period.

66

209. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

210. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

211. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Jianpu's shares was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's shares were artificially inflated, Plaintiff and the other members of the Class

67

acquired Jianpu's shares during the Class Period at artificially high prices and were damaged thereby.

212.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were unaware of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Jianpu was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Jianpu shares, or, if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

213.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and/or (c) promulgated thereunder.

214.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's shares during the Class Period.

## XIII.   SECOND CLAIM

### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5(b) Promulgated Thereunder
### <u>Against All Defendants</u>

215.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

216.    During the Class Period, Defendants made false and/or misleading statements and/or omitted material facts designed to cause Plaintiff and other members of the Class to purchase Jianpu's shares at artificially inflated prices.  In furtherance of this unlawful plan, Defendants, and each defendant, took the actions set forth herein.

217. Defendants: (i) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (ii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for Jianpu's shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a)—(c). All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

Defendants also failed to comply with various disclosure requirements, including under Items 303 and 404 of Regulation S-K. *See* 17 C.F.R. §§ 229.303; 229.404(a).

218. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Jianpu's financial well-being and prospects, as specified herein.

219. Defendants, while in possession of material adverse non-public information made an effort to assure investors of Jianpu's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Jianpu and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares during the Class Period.

220. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or

69

directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

221.   Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Jianpu's financial well-being and prospects from the investing public and supporting the artificially inflated price of its shares. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

222.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Jianpu's

shares was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's shares were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the shares trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Jianpu's shares during the Class Period at artificially high prices and were damaged thereby.

223. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were unaware of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Jianpu was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Jianpu shares, or, if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

224. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

225. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's shares during the Class Period.

## XIV. THIRD CLAIM

**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

226. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

227. Individual Defendants acted as controlling persons of Jianpu within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

228. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

229. As set forth above, Jianpu and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## XV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: November 28, 2022          **GLANCY PRONGAY & MURRAY LLP**

By:  *s/ Raymond D. Sulentic*

Robert V. Prongay
Ex Kano S. Sams II (*pro hac vice*)
Raymond D. Sulentic II (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

-and-

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 530
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
glinkh@glancylaw.com

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Attorneys for Plaintiff Enrique Africa*

73
