# EXHIBIT E

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 20-F

**(Mark One)**

o   **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

x   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
    **For the fiscal year ended December 31, 2019.**

OR

o   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
    **For the transition period from            to**

OR

o   **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of event requiring this shell company report

**For the transition period from            to**

Commission file number: 001-38278

# Jianpu Technology Inc.

(Exact Name of Registrant as Specified in Its Charter)

**Not Applicable**

(Translation of Registrant's Name Into English)

**Cayman Islands**

(Jurisdiction of Incorporation or Organization)

**21/F Internet Finance Center**
**Danling Street, Beijing**
**People's Republic of China**
**Telephone: +86-10-8302-3688**
**Email: ir@rong360.com**

(Name, Telephone, E-mail and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol | Name of Each Exchange On Which Registered |
|---|---|---|
| American depositary shares, each representing 20 Class A ordinary shares Class A ordinary shares, par value US$0.0001 per share* | JT | New York Stock Exchange |

*        Not for trading, but only in connection with the listing on the New York Stock Exchange of American depositary shares.

Securities registered or to be registered pursuant to Section 12(g) of the Act:

**None**

(Title of Class)

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:

**None**

(Title of Class)

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

As of December 31, 2019, there were 422,683,735 ordinary shares outstanding, par value US$0.0001 per share, being the sum of 326,211,940 Class A ordinary shares and 96,471,795 Class B ordinary shares.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

o Yes   x No

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.

o Yes   x No

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

o Yes   x No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).

o Yes   x No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer o        Accelerated filer x        Non-accelerated filer o        Emerging growth company x

If an emerging growth company that prepare its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act. x

†The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. § 7262(b)) by the registered public accounting firm that prepared or issued its audit report. o

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP x        International Financial Reporting Standards as issued by the International Accounting Standards Board o        Other o

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.

o Item 17   o Item 18

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

o Yes   x No

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.

**TABLE OF CONTENTS**

| | |
|---|---|
| INTRODUCTION | 1 |
| FORWARD-LOOKING STATEMENTS | 3 |
| PART I | 5 |
| ITEM 1. IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS | 5 |
| ITEM 2. OFFER STATISTICS AND EXPECTED TIMETABLE | 5 |
| ITEM 3. KEY INFORMATION | 5 |
| ITEM 4. INFORMATION ON THE COMPANY | 51 |
| ITEM 4A. UNRESOLVED STAFF COMMENTS | 74 |
| ITEM 5. OPERATING AND FINANCIAL REVIEW AND PROSPECTS | 74 |
| ITEM 6. DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES | 92 |
| ITEM 7. MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS | 102 |
| ITEM 8. FINANCIAL INFORMATION | 104 |
| ITEM 9. THE OFFER AND LISTING | 107 |
| ITEM 10. ADDITIONAL INFORMATION | 107 |
| ITEM 11. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 118 |
| ITEM 12. DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES | 119 |
| PART II | 120 |
| ITEM 13. DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES | 120 |
| ITEM 14. MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS | 120 |
| ITEM 15. CONTROLS AND PROCEDURES | 120 |
| ITEM 16A. AUDIT COMMITTEE FINANCIAL EXPERT | 123 |
| ITEM 16B. CODE OF ETHICS | 123 |
| ITEM 16C. PRINCIPAL ACCOUNTANT FEES AND SERVICES | 123 |
| ITEM 16D. EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES | 123 |
| ITEM 16E. PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS | 123 |
| ITEM 16F. CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT | 124 |
| ITEM 16G. CORPORATE GOVERNANCE | 124 |
| ITEM 16H. MINE SAFETY DISCLOSURE | 124 |
| PART III | 125 |
| ITEM 17. FINANCIAL STATEMENTS | 125 |
| ITEM 18. FINANCIAL STATEMENTS | 125 |
| ITEM 19. EXHIBITS | 125 |
| SIGNATURES | 128 |

i

**EXPLANATORY NOTE**

Our annual consolidated financial statements for the years ended December 31, 2017, 2018 and 2019 have been audited by PricewaterhouseCoopers Zhong Tian LLP in accordance with the standards of the Public Company Accounting Oversight Board (United States). Our consolidated financial statements for the year ended December 31, 2018 included in this annual report have been restated. Our previously issued consolidated financial statements (and the related audit opinion) included in our annual report on Form 20-F for the year ended December 31, 2018 should not be relied upon. The restatement (the "Restatement") of our consolidated financial statements as of and for the year ended December 31, 2018 has resulted in certain changes to our consolidated financial statements previously issued. For more information on the effects of the Restatement of our consolidated financial statements as of and for the year ended December 31, 2018, see note 2 to the consolidated financial statements included in this annual report.

We have not amended, and we do not intend to amend, our previously filed annual report on Form 20-F for the year ended December 31, 2018 or our quarterly financial results for each quarter in 2018 attached as exhibits to our current reports on Form 6-K previously furnished to the United States Securities and Exchange Commission (the "SEC"). The financial information included in reports previously filed or furnished by us in 2018 and 2019 is superseded by the applicable information in this annual report.

**INTRODUCTION**

Except where the context otherwise requires and for purposes of this annual report only:

· "we," "us," "our company" and "our" refer, prior to the Restructuring, to the platform business of RONG360 and, after the Restructuring, to Jianpu Technology Inc., a Cayman Islands exempted company and its subsidiaries and, in the context of describing our operations and consolidated financial information, also include its consolidated variable interest entities;

· "China" or "PRC" refers to the People's Republic of China, excluding, for the purpose of this annual report only, Taiwan, Hong Kong, and Macau;

· "Class A ordinary shares" refers to our Class A ordinary shares, par value US$0.0001 per share;

· "Class B ordinary shares" refers to our Class B ordinary shares, par value US$0.0001 per share;

· "shares" or "ordinary shares" refers to our Class A and Class B ordinary shares, par value US$0.0001 per share;

· "ADSs" refers to our American depositary shares, each of which represents 20 Class A ordinary shares. Except as otherwise indicated, all ADS and per ADS data in this annual report give retroactive effect to the change in the ratio of ADSs to Class A ordinary shares (the "ADS Ratio") from two ADSs to five Class A ordinary shares to one ADS to 20 Class A ordinary shares, which became effective on October 30, 2020;

· "RONG360" means RONG360 Inc., a Cayman Islands exempted company, its subsidiaries and its consolidated variable interest entity, but, prior to the Restructuring, exclude Jianpu Technology Inc., its subsidiaries and its consolidated variable interest entities; and

· the "platform business" refers to the operation of our open platform for the discovery and recommendation of financial products, including recommendation services and advertising, marketing services and other services.

For financial service providers, we generally consider each separate legal entity as one provider. For example, nationwide banks operate with multiple legal entities at provincial and local levels, and each entity has autonomy over product features and credit policies. Accordingly, we treat each legal entity as one financial provider.

We apply the following principles in counting the number of financial products offered through our platform:

· loan products issued by the same financial service provider under the same credit policy within the same geographic area are generally considered one product;

· credit card products issued by the same issuer under the same card policy are generally considered one product;

· wealth management products with the same issuer, expected rate of return, product features and investor tier are generally considered one product; and

· insurance products issued by the same insurance company under the same insurance policy are generally considered one product.

Our reporting currency is the Renminbi because our business is mainly conducted in China and substantially all of our revenues are denominated in Renminbi. This annual report contains translations of Renminbi amounts into U.S. dollars at specific rates solely for the convenience of the reader. The conversion of Renminbi into U.S. dollars in this annual report is based on the exchange rate set forth in the H.10 statistical release of the Board of Governors of the Federal Reserve System. Unless otherwise noted, all translations from Renminbi to U.S. dollars and from U.S. dollars to Renminbi in this annual report were made at a rate of RMB6.9618 to US$1.00, the exchange rate in effect on December 31, 2019 set forth in the H.10 statistical release of the Board of Governors of the Federal Reserve System. We make no representation that any Renminbi or U.S. dollar amounts could have been, or could be, converted into U.S. dollars or Renminbi, as the case may be, at any particular rate, the rates stated below, or at all.

The PRC government imposes control over its foreign currency reserves in part through direct regulation of the conversion of Renminbi into foreign exchange and through restrictions on foreign trade.

**Reliance on SEC Order Granting Conditional Exemptions due to Circumstances Related to COVID-19**

In accordance with an order issued by the Securities and Exchange Commission (the "SEC") on March 25, 2020 under Section 36 of the Securities and Exchange Act of 1934, as amended (the "Exchange Act;" such order, the "Release No. 34-88465"), we filed a current report on Form 6-K on April 30, 2020 stating that we are relying on the Release No. 34-88465 to extend the due date for the filing of this annual report on Form 20-F to no later than 45 days after April 30, 2020. As a result of COVID-19 and its impact, as well as the various measures taken by the PRC government or our company in response to COVID-19, the capacity and efficiency of our operations were reduced, and we faced difficulties with respect to information collection related to the preparation of the annual report, particularly certain subsequent information to verify the business conducted in 2019. Considering we needed more time to collect, examine, analyze and compile the information, particularly certain subsequent information received from third parties, and to evaluate the impact of such information on our consolidated financial statements and the annual report, we decided to rely on the Release No. 34-88465.

**FORWARD-LOOKING STATEMENTS**

This annual report on Form 20-F contains forward-looking statements that involve risks and uncertainties. All statements other than statements of current or historical facts are forward-looking statements. These statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from those expressed or implied by the forward-looking statements.

You can identify these forward-looking statements by words or phrases such as "may," "will," "expect," "anticipate," "aim," "estimate," "intend," "plan," "believe," "likely to" or other similar expressions. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy and financial needs. These forward-looking statements include, but are not limited to, statements about:

·   our goals and strategies;

·   our future business development, financial condition and results of operations;

·   expected changes in our revenues, costs or expenditures;

·   our expectations regarding demand for and market acceptance of our services;

·   our expectation regarding the impact of any communicable diseases, specifically COVID-19, on our business, financial condition and results of operations;

·   prospects for and competition in our industry, and

·   government policies and regulations relating to our industry.

You should read this annual report and the documents that we refer to in this annual report with the understanding that our actual future results may be materially different from and worse than what we expect. Other sections of this annual report include additional factors which could adversely impact our business and financial performance. Moreover, we operate in an evolving environment. New risk factors and uncertainties emerge from time to time and it is not possible for our management to predict all risk factors and uncertainties, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements. We qualify all of our forward-looking statements by these cautionary statements.

You should not rely upon forward-looking statements as predictions of future events. We undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

This annual report on Form 20-F also contains statistical data and estimates that we obtained from industry publications and reports generated by third-party providers of market intelligence, including the size, growth rates and other data relating to the financial services market in China. Although we have not independently verified the data, we believe that the publications and reports are reliable. The market data contained in this annual report involves a number of assumptions, estimates and limitations. The financial services market in China and its components may not grow at the rates projected by market data, or at all. The failure of these markets to grow at the projected rates may have a material adverse effect on our business and the market price of our ADSs. If any one or more of the assumptions underlying the market data turns out to be incorrect, actual results may differ from the projections based on these assumptions. In addition, projections, assumptions and estimates of our future performance and the future performance of the industry in which we operate are necessarily subject to a high degree of uncertainty and risk due to a variety of factors, including those described in "Item 3. Key Information—D. Risk Factors" and elsewhere in this annual report. You should not place undue reliance on these forward-looking statements.

The forward-looking statements made in this annual report relate only to events or information as of the date on which the statements are made in this annual report. Except as required by law, we undertake no obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise, after the date on which the statements are made or to reflect the occurrence of unanticipated events. You should read this annual report and the documents that we refer to in this annual report and have filed as exhibits to the registration statement, of which this annual report is a part, completely and with the understanding that our actual future results may be materially different from what we expect.

4

**PART I**

**ITEM 1.  IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS**

Not applicable.

**ITEM 2.  OFFER STATISTICS AND EXPECTED TIMETABLE**

Not applicable.

**ITEM 3.  KEY INFORMATION**

**A.        Selected Financial Data**

**Our Selected Consolidated Financial Data**

The following selected consolidated statements of comprehensive loss for the years ended December 31, 2017, 2018 and 2019 and selected consolidated balance sheets, as of December 31, 2018 and 2019 have been derived from our audited consolidated financial statements included elsewhere in this annual report. Our selected data from consolidated statements of comprehensive loss for the years ended December 31, 2015 and 2016, and the consolidated balance sheets data as of December 31, 2015, 2016 and 2017 have been derived from our audited consolidated financial statements, which are not included in this annual report. You should read this selected consolidated financial data in conjunction with our consolidated financial statements and the related notes and "Item 5. Operating and Financial Review and Prospects" included elsewhere in this annual report. Our consolidated financial statements are prepared and presented in accordance with accounting principles generally accepted in the United States of America, or U.S. GAAP. Our historical results are not necessarily indicative of results expected for future periods.

5

| | 2015 | 2016 | 2017 | 2018 | 2019 | |
|---|---|---|---|---|---|---|
| | RMB | RMB | RMB | RMB (As Restated)[4] | RMB | US$ |
| | | | (in thousands, except for share, per share and per ADS data) | | | |
| **Selected Consolidated Statements of Comprehensive Loss:** | | | | | | |
| **Revenues:** | | | | | | |
| Recommendation services: | | | | | | |
| Loans[1] | 116,738 | 238,846 | 1,119,456 | 1,015,407 | 666,307 | 95,709 |
| Credit cards | 38,406 | 64,911 | 228,905 | 689,822 | 585,993 | 84,173 |
| Total recommendation services | 155,144 | 303,757 | 1,348,361 | 1,705,229 | 1,252,300 | 179,882 |
| Advertising, marketing and other services[2] | 13,229 | 52,630 | 97,412 | 216,647 | 183,427 | 26,348 |
| **Total revenues** | **168,373** | **356,387** | **1,445,773** | **1,921,876** | **1,435,727** | **206,230** |
| Cost of revenues | (34,423) | (66,683) | (143,828) | (194,492) | (133,968) | (19,243) |
| **Gross profit** | **133,950** | **289,704** | **1,301,945** | **1,727,384** | **1,301,759** | **186,987** |
| **Operating expenses:** | | | | | | |
| Sales and marketing[3] | (262,359) | (382,915) | (1,227,896) | (1,486,399) | (1,199,346) | (172,275) |
| Research and development | (45,358) | (72,832) | (153,905) | (241,270) | (272,343) | (39,120) |
| General and administrative | (22,419) | (16,273) | (93,718) | (178,371) | (100,896) | (14,493) |
| Impairment loss | — | — | — | — | (254,683) | (36,583) |
| Penalties | — | — | — | — | (30,000) | (4,309) |
| **Loss from operations** | **(196,186)** | **(182,316)** | **(173,574)** | **(178,656)** | **(555,509)** | **(79,793)** |
| Net interest income | — | — | — | 5,037 | 5,100 | 733 |
| Others, net | 12 | 191 | (169) | 9,360 | 11,785 | 1,693 |
| **Loss before income tax** | **(196,174)** | **(182,125)** | **(173,743)** | **(164,259)** | **(538,624)** | **(77,367)** |
| Income tax (expenses)/benefits | — | — | (28,382) | 4,473 | 8,005 | 1,150 |
| **Net loss** | **(196,174)** | **(182,125)** | **(202,125)** | **(159,786)** | **(530,619)** | **(76,217)** |
| Less: net income/(loss) attributable to noncontrolling interests | — | — | — | 4,829 | (78,859) | (11,327) |
| **Net loss attributable to Jianpu's shareholders** | **(196,174)** | **(182,125)** | **(202,125)** | **(164,615)** | **(451,760)** | **(64,890)** |
| **Other comprehensive (loss)/income, net** | | | | | | |
| Foreign currency translation adjustments | — | — | (21,170) | 59,658 | 14,685 | 2,109 |
| **Total other comprehensive (loss)/income** | **—** | **—** | **(21,170)** | **59,658** | **14,685** | **2,109** |
| **Total comprehensive loss** | **(196,174)** | **(182,125)** | **(223,295)** | **(100,128)** | **(515,934)** | **(74,108)** |
| | | | | | | |
| Less: total comprehensive income/(loss) attributable to noncontrolling interests | — | — | — | 5,568 | (78,732) | (11,309) |
| **Total comprehensive loss attributable to Jianpu's shareholders** | **(196,174)** | **(182,125)** | **(223,295)** | **(105,696)** | **(437,202)** | **(62,799)** |
| **Net loss per share attributable to Jianpu's Shareholders** | | | | | | |
| Basic and diluted | (0.57) | (0.53) | (0.57) | (0.39) | (1.07) | (0.15) |
| **Net loss per ADS[5] attributable to Jianpu's shareholders** | | | | | | |
| Basic and diluted | (11.35) | (10.54) | (11.44) | (7.89) | (21.48) | (3.09) |
| | | | | | | |
| **Weighted average number of shares[6]** | | | | | | |
| Basic and diluted | 345,541,350 | 345,541,350 | 353,452,309 | 417,315,644 | 420,575,827 | 420,575,827 |

Notes:

(1) Including revenues from related party of nil, RMB19.9 million, RMB103.0 million, RMB105.5 million and RMB32.0 million (US$4.6 million) for the years ended December 31, 2015, 2016, 2017, 2018 and 2019, respectively.

(2) Including revenues from related party of nil, nil, nil, RMB13.4 million and RMB6.9 million (US$1.0 million) for the years ended December 31, 2015, 2016, 2017, 2018 and 2019, respectively.

(3) Including expenses from related party of nil, nil, nil, RMB51.8 million and RMB21.1 million (US$3.0 million) for the years ended December 31, 2015, 2016, 2017, 2018 and 2019, respectively.

(4) For information about the Restatement, see note 2 to the consolidated financial statements included in this annual report.

(5) Each ADS represents 20 Class A ordinary shares. The issuance of ordinary shares to RONG360 Inc. has been retrospectively reflected for all periods presented herein.

(6)   1,500,000,000 shares authorized, US$0.0001 par value. 428,063,797 shares (including 325,592,002 Class A ordinary shares, and 102,471,795 Class B ordinary shares) issued and 415,246,557 shares (including 312,774,762 Class A ordinary shares and 102,471,795 Class B ordinary shares) outstanding as of December 31, 2018, and 430,463,797 shares (including 333,992,002 Class A ordinary shares, and 96,471,795 Class B ordinary shares) issued and 422,683,735 shares (including 326,211,940 Class A ordinary shares and 96,471,795 Class B ordinary shares) outstanding as of December 31, 2019, respectively.

| | As of December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2015 | 2016 | 2017 | 2018 | 2019 | |
| | RMB | RMB | RMB | RMB (As Restated)[2] | RMB | US$ |
| | | | | (in thousands) | | |
| **Selected Consolidated Balance Sheets:** | | | | | | |
| Cash and cash equivalents | — | — | 1,543,811 | 1,270,001 | 694,910 | 99,818 |
| Restricted cash and time deposits | — | — | — | 142,411 | 249,770 | 35,877 |
| Short-term investment | — | — | — | 78,462 | — | — |
| Accounts receivable, net[1] | 41,698 | 57,536 | 182,090 | 444,199 | 345,525 | 49,632 |
| Amount due from related party | — | 21,128 | — | — | 7,082 | 1,017 |
| Prepayments and other current assets | 20,448 | 50,415 | 161,027 | 160,131 | 118,423 | 17,010 |
| Total current assets | 62,146 | 129,079 | 1,886,928 | 2,095,204 | 1,415,710 | 203,354 |
| Restricted cash, time deposit and investment | — | — | — | — | 124,407 | 17,869 |
| Total non-current assets | 7,965 | 5,404 | 26,587 | 349,931 | 246,011 | 35,337 |
| Total assets | 70,111 | 134,483 | 1,913,515 | 2,445,135 | 1,661,721 | 238,691 |
| Short-term borrowings | — | — | — | 130,000 | 60,000 | 8,618 |
| Accounts payable | 47,534 | 32,433 | 177,373 | 201,543 | 184,318 | 26,476 |
| Advances from customers | 13,456 | 18,149 | 71,538 | 115,597 | 44,000 | 6,320 |
| Tax payable | 711 | 1,849 | 17,876 | 39,446 | 22,168 | 3,184 |
| Amount due to related party | — | — | 35,427 | 72,750 | 34,310 | 4,928 |
| Accrued expenses and other current liabilities | 21,976 | 29,445 | 72,839 | 144,478 | 224,018 | 32,178 |
| Total current liabilities | 83,677 | 81,876 | 375,053 | 703,814 | 568,814 | 81,704 |
| Total non-current liabilities | — | — | — | 37,403 | 20,946 | 3,010 |
| Total liabilities | 83,677 | 81,876 | 375,053 | 741,217 | 589,760 | 84,714 |
| Mezzanine equity | — | — | — | — | 5,556 | 798 |
| Total invested (deficit)/equity/shareholders' equity | (13,566) | 52,607 | 1,538,462 | 1,703,918 | 1,066,405 | 153,179 |

Note:

(1)   Including amounts billed through RONG360 of RMB41,698 thousand, RMB57,536 thousand, RMB141,190 thousand, RMB134,966 thousand and RMB3,549 thousand (US$509.8 thousand) as of December 31, 2015, 2016, 2017, 2018 and 2019, respectively.

(2)   For information about the Restatement, see note 2 to the consolidated financial statements included in this annual report.

We completed a corporate restructuring in 2018 ("Restructuring," for more details see "Item 4 Information on the Company"—"A. History and Development of the Company") in order to strengthen our positioning as an independent open platform. As part of the Restructuring, the platform business was transferred from RONG360 to us.

B.      **Capitalization and Indebtedness**

Not applicable.

**C.**      <u>Reasons for the Offer and Use of Proceeds</u>

Not applicable.

**D.**      <u>Risk Factors</u>

**Risks Related to Our Audit Committee Independent Review, Restatement of Our Consolidated Financial Statements, Internal Controls and Related Matters**

*We recently completed an audit committee independent review, which required significant management time and attention, resulted in significant legal and other expenses, and led to the termination of a number of employees.*

As previously announced in June 2020 and February 2021, the audit committee of our board of directors (the "Audit Committee"), with the assistance of advisers, had been conducting an internal review (the "Review") of certain matters relating to transactions carried out by the Credit Card Business Unit of the Company (the "Credit Card BU") with third-party business entities. The Review has been substantially completed and found that certain transactions involved third-party agents (including both upstream agents and downstream suppliers) with undisclosed relationships, and some transactions lacked business substance ("questionable transactions"). As a result, certain revenue and associated costs and expenses were inflated or inaccurately recorded in the consolidated financial statements. Evidence suggests that certain employees from the Credit Card BU may have known about or may have been involved in certain of the questionable transactions that resulted in inflated sales commissions to such employees. In relation to the questionable transactions, the Review found that certain employees improperly altered supporting documents that were provided to our external auditor. The total amount of overstated revenue for the year ended December 31, 2018 as previously reported on Form 20-F was RMB90 million, and for the year ended December 31, 2019 as previously furnished to the SEC on Form 6-K was RMB164 million, representing approximately 4.5% and 10.1% of the total revenue previously reported by us for such years, respectively, and the adjustment to overstated cost and expenses together with the reserve for potential credit loss was approximately RMB90 million and RMB130 million for the years ended December 31, 2018 and 2019, respectively, resulting in a minimal net profit impact for the year ended December 31, 2018 and a RMB34 million increase in net loss for the year ended December 31, 2019. For more details, see "Item 8. Financial Information—A. Consolidated Statements and Other Financial Information—The Independent Review."

We incurred significant costs in connection with the Review, and our management team devoted significant time to the Review. Moreover, we and certain of our officers have been named as defendants in a putative securities class action that was filed in the U.S. District Court for the Southern District of New York in February 2021 (*Guttentag v. Jianpu Technology Inc. et al.* (Case No. 21-cv-01419)). Plaintiffs allege, in sum and substance, that certain of our disclosures since the first quarter of 2018 contained material misstatements and omissions in relation to the issues identified in the Review and in violation of the federal securities laws. See "Item 8. Financial Information—A. Consolidated Statements and Other Financial Information—Legal Proceedings." We and our current and former directors and officers may be subject to other litigation claims and to regulatory inquiries, investigations, or other proceedings arising from or relating to the Review or the Restatement. Regardless of the outcome of the filed lawsuit described above, any additional lawsuits that may be filed, or any regulatory inquiries, investigations, or proceedings that may be commenced, will likely consume a significant amount of our internal resources and result in additional costs.

We have entered into indemnification agreements with our current and former directors and officers, and our articles of association require us, to the fullest extent permitted by Cayman Islands law, to indemnify each of our directors and officers who is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that he or she is or was a director or officer of the Company. Although we maintain insurance coverage in amounts and with deductibles that we believe are appropriate for our operations, our insurance coverage may not cover all claims that may be brought against us or our current and former directors and officers, and insurance coverage may not continue to be available to us at a reasonable cost. As a result, we may be exposed to substantial uninsured liabilities, including pursuant to our indemnification obligations, which could materially and adversely affect our business, prospects, results of operations and financial condition.

*Matters relating to or arising from the Restatement and the Review, including adverse publicity and potential concerns from our customers and partners, have had and could continue to have an adverse effect on our business and financial condition.*

We have been and could continue to be the subject of negative publicity focusing on the Restatement of our financial statements for the year ended December 31, 2018, and adjustments of our unaudited financial statements for the year ended December 31, 2019 as previously furnished to the SEC on Form 6-K, and we may be adversely impacted by negative reactions from our customers, partners or others with whom we do business. Concerns include the perception of the effort required to address our accounting and control environment, and the ability for us to be a long-term provider to our customers. Continued adverse publicity and potential concerns from our customers could harm our business and have an adverse effect on our financial condition.

*We identified three material weaknesses in our internal controls over financial reporting as of December 31, 2019, and if we fail to establish and maintain effective internal controls, our ability to report our financial results accurately or to prevent fraud may be adversely affected, and investor confidence and the market price of the ADSs may be adversely affected.*

We are subject to reporting obligations under the U.S. securities laws. The SEC adopted rules pursuant to Section 404 of the Sarbanes-Oxley Act of 2002 requiring every public company to include a management report on such company's internal control over financial reporting in its annual report, which contains management's assessment of the effectiveness of its internal control over financial reporting.

As we qualify as an "emerging growth company," our independent registered public accounting firm has not conducted an audit of our internal control over financial reporting. However, we and our independent registered public accounting firm, in connection with the preparation and external audit of our consolidated financial statements for the year ended December 31, 2017, 2018 and 2019, identified  one material weakness in our internal control over financial reporting as of December 31, 2017 and three material weaknesses in our internal control over financial reporting as of December 31, 2018 and 2019, in accordance with the standards established by the Public Company Accounting Oversight Board (the "PCAOB") of the United States. As a result of the material weaknesses, management has concluded that our internal control over financial reporting was not effective as of December 31, 2017, 2018 and 2019.

One material weakness identified relates to our failure to design and implement effective controls with a sufficient level of precision to prevent and detect misstatements related to our credit card related business. A second material weakness identified relates to our failure to design and implement controls that have a sufficient level of precision related to pre-approval of and complete and accurate disclosures of related party transactions, which could have a material effect on our financial statements. A third material weakness identified, which was also reported in 2017 and 2018, relates to the lack of sufficient competent financial reporting and accounting personnel with appropriate understanding of U.S. GAAP to design and implement formal period-end financial reporting policies and procedures, to address complex U.S. GAAP technical accounting issues, and to prepare and review our consolidated financial statements and related disclosures in accordance with U.S. GAAP and financial reporting requirements set forth by the SEC. We have implemented and are continuing to implement a number of measures to address the material weaknesses and the deficiencies that have been identified. For details, see "Item 15. Controls and Procedures." However, we cannot assure you that we will be able to continuously implement these measures to effectively remediate our material weaknesses, or that we will not identify additional material weaknesses or significant deficiencies in the future.

Failure to remediate these material weaknesses or failure to discover and address any other control deficiencies could result in inaccuracies in our consolidated financial statements and could also impair our ability to comply with applicable financial reporting requirements and make related regulatory filings on a timely basis. The Restatement of financial statements for the year ended December 31, 2018 and any future material misstatements in our financial statements could cause our investors to lose confidence in our reported financial information. This could in turn limit our access to capital markets, harm our results of operations, and lead to a decline in the trading price of our ADSs. Additionally, ineffective internal controls expose us to increased risk of fraud or misuse of corporate assets and subject us to potential delisting from the stock exchange on which we list or to other regulatory investigations and civil or criminal sanctions.

*The filing of this Form 20-F may not make us "current" in our Exchange Act filing obligations, which means we retain certain potential liability and may not be eligible to use certain forms or rely on certain rules of the SEC.*

We are filing a comprehensive annual report on Form 20-F since we have been delinquent in meeting our periodic reporting requirements with the SEC, following, by analogy, previously issued guidance from the staff of the SEC's Division of Corporation Finance, or the Staff, with respect to U.S. domestic issuers. Our filing of this Form 20-F does not necessarily mean that the Staff will conclude that we have complied with all applicable financial statement requirements or complied with all reporting requirements of the Exchange Act, nor does it foreclose any enforcement action by the SEC with respect to our disclosure, filings or failures to file reports under the Exchange Act.

This Form 20-F for the year ended December 31, 2019 includes our audited consolidated financial statements as of December 31, 2019 and 2018 and for each of the three years in the period ended December 31, 2019. The consolidated financial statements for the year ended December 31, 2018 are restated. We have not amended, and do not intend to amend, our annual report on Form 20-F for the year ended December 31, 2018 previously filed with, or our quarterly financial statements for each quarter in 2018 attached as exhibits to our current reports on Form 6-K previously furnished to, the SEC. Without the unamended reports, investors may not be able to review certain financial and other disclosures that would have been contained in those reports, which would have provided an additional source of information for their evaluation of their investment in us. As a result of our failure to maintain current filings with the SEC in the past, our use of this format of the Form 20-F and any potential enforcement action from the SEC or other regulatory agencies, we may not be eligible to use certain short-form registration statements or rely on certain rules of the SEC. This could increase our transaction costs and adversely impact our ability to raise capital in a timely manner.

**Risks Related to Our Business**

*We have incurred significant losses and we may continue to experience losses in the future.*

We have incurred significant losses in the past. In 2017, 2018 and 2019, we had net loss of RMB202.1 million, RMB159.8 million and RMB530.6 million (US$76.2 million), respectively. We also had loss from operations at similar levels during those periods. In addition, we had cash used in operations of RMB28.1 million, RMB72.8 million and RMB200.8 million (US$28.8 million) in 2017, 2018 and 2019, respectively. Our ability to achieve profitability depends in large part on our ability to manage our sales and marketing expenses (excluding share-based compensation), which accounted for 83.7%, 77.0% and 82.9% of our total revenues in 2017, 2018 and 2019, respectively. We intend to manage and further reduce our sales and marketing expenses as a proportion of our total revenues, but there can be no assurance that we will achieve this goal. Our ability to achieve profitability is also affected by our ability to grow total revenues, which was RMB1,445.8 million, RMB1,921.9 million and RMB1,435.7 million (US$206.2 million) in 2017, 2018 and 2019, respectively. The decrease in total revenues from 2018 to 2019 was primarily due to a decrease in revenues from recommendation services, resulting from the decrease of number of financial products available on our platform given the credit tightening and change of industry dynamics, and a decrease in revenues from advertising, marketing and other services. Our growth may continue to slow down, and revenues may continue to decline for a number of possible reasons, some of which are beyond our control, including decreasing consumer spending, increasing competition, declining growth of our overall market or industry, the emergence of alternative business models, changes in rules, regulations, government policies or general economic conditions. It is difficult to evaluate our prospects, as we may not have sufficient experience in addressing the risks to which companies operating in rapidly evolving markets may be exposed.

*Our limited operating history in the rapidly evolving online and mobile consumer finance market in China makes it difficult to evaluate our future prospects.*

We have a limited operating history, which makes it difficult to evaluate our future prospects and ability to make profit. We launched our online platform with loan products recommendation in 2012, and introduced credit card products in 2013 and big data risk management solutions in 2015. In 2019, we further diversified the types of financial products on our platform with the introduction of insurance products. We operate in China's online and mobile consumer finance market, which is rapidly evolving and may not develop as we anticipate. The business models of the players in this market continue to evolve. The regulatory framework governing the industry is also still evolving and will remain uncertain for the foreseeable future. Other participants in the industry, including users and financial service providers, may have difficulty distinguishing our platform, services and solutions from those of our competitors. As the industry and our business develop, we may modify our business model or change our platform, services and solutions. These changes may not achieve expected results and may have a material and adverse impact on our financial condition and results of operations.

10

You should consider our business and future annual report in light of the risks and challenges we may encounter in this rapidly evolving industry, including, among other things, our ability to:

· expand our user base and increase user activities on our platform;

· provide diversified and distinguishable services and solutions to financial service providers;

· enhance our data analytical and risk management capabilities;

· improve our operational efficiency;

· maintain a reliable, secure, high-performance and scalable technology infrastructure;

· attract, retain and motivate talented employees;

· anticipate and adapt to changing market conditions, including technological developments and changes in the competitive landscape; and

· navigate an evolving and complex regulatory environment.

If we fail to address any or all of these risks and challenges, our business and financial condition may be materially and adversely affected.

***We face challenges with generating and acquiring user traffic to our platform and converting the traffic into our user base.***

The majority of user traffic to our platform is generated from third-party channels, rather than from direct access to our mobile apps or website. Our top five traffic acquisition channels accounted for over 20% of our user traffic in 2017, 2018 and 2019. We also increasingly leverage social network and social media platform as an effective and efficient tool for user acquisition. We introduced a cooperation system called the Social Media and Partner Program in the third quarter of 2018, through which our users may register as our business partners to recommend the financial products on our platform to their social contacts through social network and social media platform, and are rewarded according to our incentive policies. The Social Media and Partner Program has been very effective in user acquisition since its inception, particularly in the recommendation of credit card products on our platform to new users. In 2019, approximately 60% of the credit card volume on our platform were from user acquired through recommendation by our business partners to their social contacts under the Social Media and Partner Program. Despite the initial success of the Social Media and Partner Program, we may not be able to continue to promote awareness of our brand and achieve widespread acceptance of our business model to increase direct access to our platform. We have incurred significant expenses on and devoted considerable resources to branding and marketing activities and user traffic acquisition, and we may continue to do so in the future. Our ability to convert user traffic to user base and retain that user base depends on users' satisfaction with the quantity and quality of financial products offered by financial service providers and trust in the content on our platform. If we fail to meet these challenges, our business, financial performance and prospects will be materially and adversely affected.

***Failure to maintain relationships with financial service providers or develop new ones may materially and adversely affect our business and results of operations.***

Our relationship with financial service providers is crucial to our success. We generate substantially all of our revenues from services and solutions provided to financial service providers. Certain financial service providers have accounted for a significant portion of our revenues in the past. In 2016 and 2017, our largest financial service provider was a third-party technology-enabled online lending platform, and it accounted for 19% and 9% of our total revenues in the respective years. In 2018, our largest financial service provider was a state-owned bank, which accounted for 13% of our total revenues, and in 2019, our largest financial service provider was a joint-stock bank, which accounted for 7% of our total revenues. We work with these financial service providers at arm's-length and negotiate a cooperation agreement with them on an annual basis based on our business needs and market conditions. While we continually seek to diversify our financial service providers, there can be no assurance that the concentration will further decrease. Our ability to attract users to our platform and maintain and grow our user base depends on the quantity and quality of financial products offered by financial service providers on our platform. We also provide big data risk management solutions and integrated solutions to financial service providers, as well as cooperate with them to provide content on our platform and obtain data for our data analytical models. Our arrangements with our financial service providers are typically not exclusive, and they may have similar arrangements with our competitors. If financial service providers are dissatisfied with our services and solutions, they may terminate their relationships with us and switch to our competitors. Moreover, we have seen financial service providers increasingly rely on their own online and technology capabilities to serve online and mobile users in recent years. There can be no assurance that we can maintain relationships with our existing financial service providers on commercially desirable terms. We may also fail to develop new relationships with additional financial service providers. As a result, our business, financial performance and prospects will be materially and adversely affected.

11

*Our match and recommendation of financial products to users may not be effective, which will result in dissatisfaction from both users and financial service providers.*

We may not be able to match users with suitable financial products due to various reasons. Our search and recommendation engine may fail to function properly. The data provided to us by our users, financial service providers and third-party data partners may not be accurate or up to date. If users are recommended financial products but cannot ultimately obtain approval from financial service providers, they may consider our platform to be ineffective at matching. At the same time, financial service providers may be dissatisfied with us for not effectively helping them acquire users. After a user gets a financial product, the user may become dissatisfied with the terms and conditions of the financial product or the services provided by the financial service provider, or the financial service provider may have difficulty collecting repayments from the user. Both the user and financial service provider may associate their dissatisfaction and subsequent difficulties with our platform as the transaction was initiated on our platform. Users may consequently be reluctant to continue to use our platform and financial service providers may be hesitant to continue to partner with us. As a result, our business, reputation, financial performance and prospects will be materially and adversely affected.

*If we are not able to respond to changes in user preferences for financial products and provide a satisfactory user experience on our platform, we will not be able to maintain and expand our user base or effectively convert our users into customers of our financial service providers.*

We believe that our user base is the cornerstone of our business. Our ability to maintain and expand our user base depends on a number of factors, including our ability to match and recommend suitable financial products for our users, the effectiveness of our curation process, and our ability to provide relevant and timely content to meet changing user needs. If we are unable to respond to changes in user preference and deliver satisfactory and distinguishable user experience, users and prospective users may switch to competing platforms or obtain financial products directly from their providers. As a result, user access to and user activity on our platform will decline, our services and solutions will be less attractive to financial service providers and our business, financial performance and prospects will be materially and adversely affected.

*We may not be able to ensure the accuracy of product information and the authenticity of financial products on our platform.*

The acceptance and popularity of our platform is premised on the reliability of the financial products and information on our platform. We rely on our financial service providers for the authenticity of their financial products and the comprehensiveness, accuracy and timeliness of the related financial information. While the products and information from our financial service providers have been generally reliable, there can be no assurance that the reliability can be maintained in the future. If our financial service providers or their agents provide inauthentic financial products or incomplete, misleading, inaccurate or fraudulent information, we may lose the trust of existing and prospective users. In addition, if our users purchase wealth management products that they discover on our platform and they suffer losses, they may blame us and attempt to hold us responsible for their losses. Our reputation could be harmed and we could experience reduced user traffic to our platform, which would adversely affect our business and financial performance.

*We may fail to develop and innovate our platform and products.*

The attractiveness of our online platform to users and our technology-based services and solutions to financial service providers depends on our ability to innovate. To remain competitive, we must continue to develop and expand our product and service offerings and content. We must also continue to enhance and improve our data analytical capabilities, platform interface and technology infrastructure. These efforts may require us to develop internally, or to license, increasingly complex technologies. In addition, new content, services, solutions and technologies developed and introduced by competitors could render our content, services and solutions obsolete if we are unable to update or modify our own technology. Developing and integrating new content, services, solutions and technologies into our existing platform and infrastructure could be expensive and time-consuming. Furthermore, any new features and functions may not achieve market acceptance. We may not succeed in incorporating new technologies, or may incur substantial expenses in order to do so. If we fail to develop, introduce, acquire or incorporate new features, functions or technologies effectively and on a timely basis, our business, financial performance and prospects could be materially and adversely affected.

*We may fail to compete effectively.*

The retail financial market in China is rapidly evolving and highly competitive. New competitors may emerge at any time. We may fail to compete for users and/or financial service providers against any of our existing or potential competitors. We compete as an open platform against other companies that also seek to position themselves as open platforms serving both users and financial service providers. We also compete with online platforms for financial products that are affiliated with major internet companies, including search engine, social media, e-commerce and online payment companies. Some of these internet companies also offer their financial products on our platform, so they both compete and cooperate with us. In addition, we compete with financial service providers to the extent that they offer or list financial products on their own platform, although some of these financial service providers may also offer or list financial products on our platform as well. Such financial service providers may stop utilizing our platform in order to enhance the competitiveness of their own platforms. Existing or potential competitors may have substantially greater brand recognition and possess more financial, marketing and research resources than we do. Our competitors may introduce platforms with more attractive products, content and features, or services and solutions with competitive pricing or enhanced performance that we cannot match. In addition, some of our competitors may have more resources to develop or acquire new technologies and react quicker to changing requirements of users and/or financial service providers. If we fail to compete effectively, our business, financial performance and prospects will be materially and adversely affected.

*We have limited control over the product and service quality of our financial service providers.*

As users access financial products through our platform, they may have the impression that we are at least partially responsible for the quality of these products, especially in the case of loans that are offered through our Gold Cloud system, where the user continues to interact with our platform throughout the discovery, application, approval and loan servicing process. Although we have established standards to screen financial service providers before listing their products on our platform, and to a certain extent, rank the financial products based on past user experience when we make recommendations to users, we have limited control over the quality of the financial products and the services provided by financial service providers. In the event that a user is dissatisfied with a financial product or the service of a financial service provider, we do not have any means to directly make improvements in response to user complaints. Due to the large number of financial products listed on our platform and the extensiveness of our financial service provider network, it is extremely difficult for us to monitor and ensure the product and service quality of financial service providers on our platform at any given time. If users become dissatisfied with the financial products available on our platform or the services of our financial service providers, our business, reputation, financial performance and prospects could be materially and adversely affected. For instance, in March 2019, it was reported by CCTV "315 Night" (CCTV Report), a show concerning consumer rights protection which airs annually on March 15, that certain financial products offered by third-party financial service providers on our platform contained inappropriate conducts, which were suspected of the infringement of consumer rights. In response to the CCTV Report, we promptly instituted a voluntary suspension of further downloads of our mobile apps on major mobile app stores until August 2019, during which period we conducted a comprehensive internal review of our business practice, identified and took remediation measures with respect to any inappropriate conduct on our platform that could adversely affect consumer rights, and implemented certain self-imposed improvement in terms of both our internal process regarding the on-boarding procedures and ongoing monitoring and supervision of financial service providers on our platform and our risk control processes to better protect users from participating in financial products that are out of the scope in terms of industry standard. We have also been working with the relevant regulators and industry associations in developing a set of industry wide standards or best practices to further promote financial education and consumer rights protection, including defining guidance for digital financial platforms, corporate responsibility and financial product standards. We have also strengthened our relationship with media outlets in China such as CCTV, regularly engaging in in-depth discussions with such media outlets to allow for better understanding of our business. In addition, we have also been focusing on providing better consumer rights protection education for our users, equipping them with more comprehensive financial literary and anti-fraud information so that they could better manage their own finances.

13

*Our business may be affected by the condition and competitive landscape of China's credit markets.*

Changes in the condition of China's credit markets generally impact the demand and supply of financial products, which in turn will affect user traffic and user activity on our platform and the demand for our services and solutions by financial service providers. The range, pricing and terms of financial products available in the market partly result from competition among financial service providers. Because the financial products on our platform are provided by third parties, we are not able to ensure they meet users' needs and preferences at any given time. In a rising interest rate environment, our users may seek funding through other means. In a declining interest rate environment, borrowers may choose to refinance their loans with lower-priced financial products, which may not be available on our platform. There can be no assurance that our financial service providers can respond to fluctuations in interest rates in a timely manner by adjusting the financial product listings on our platform.

A credit crisis or prolonged downturn in the credit markets could severely impact our operating environment. A credit crisis or prolonged downturn in the credit markets might cause tightening in credit guidelines, limited liquidity, deterioration in credit performance and increased foreclosure activities. Since we predominantly generate our revenues from fees charged for our sales and marketing services and not on the basis of outstanding loan amounts, a decrease in transaction volumes could cause a material decline in our revenues, even though we do not bear credit risk in the event of borrower default. Moreover, a financial and credit crisis may be coupled with or trigger a downturn in the macroeconomic environment, which could cause a general decrease in lending activity over a longer period of time. If a credit crisis were to occur, particularly in China's credit markets, our business, financial performance and prospects could be materially and adversely affected.

*Regulatory uncertainties relating to online consumer finance in China could harm our business, financial condition and results of operations.*

Our business or the businesses of our financial service providers may be subject to a variety of PRC laws and regulations governing financial services. The application and interpretation of these laws and regulations are ambiguous and may be interpreted and applied inconsistently between different government authorities. In particular, the PRC government's regulatory framework governing the new and rapidly-evolving online consumer finance market, which is the source of the transactions that our platform facilitates, is rapidly evolving and is subject to further change and interpretation. The PRC government may enhance the implementation of existing laws and regulations, and may also adopt a stringent regulatory framework for the online and mobile consumer finance market in the future, and impose specific requirements (including licensing requirements) on market participants. It may be costly for us to comply with applicable PRC laws and regulations. If our practice is deemed to violate any existing or future laws and regulations, we may face injunctions, including orders to cease illegal activities, and may be subject to other penalties as determined by the relevant government authorities. For example, in June 2019, we received a fine of RMB700,000 from the Beijing Administration for Market Regulation for a piece of advertisement placed on our platform by one of our third-party financial service providers due to the advertisement's failure to provide the appropriate risk warning labels associated with predicted financial returns listed in its content. Furthermore, a significant number of financial service providers on our platform operate in the online and mobile consumer finance market, and consequently, new government laws and regulations, stricter enforcement of existing laws and regulations or even speculation regarding such developments on our financial service providers may materially and adversely affect our business, financial condition and prospects. For recent updates of relevant laws and regulations, please also refer to "—If any financial product on our platform or the business practice of us or any of our financial service providers is deemed to violate any new or existing PRC laws or regulations, our business, reputation, financial condition and results of operations could be materially and adversely affected."

14

*Any actual or perceived inappropriate usage or mishandling of personal information and data on our platform could subject us to liabilities, negatively impact our reputation and deter users from using our platform.*

As an open platform, we have access to certain personal and other sensitive data provided by our users and financial service providers. We also make certain personal information provided by users or third-party data providers available to financial service providers using our big data risk management solutions with user consent. There are numerous laws regarding privacy and the storing, sharing, use, disclosure and protection of personally identifiable information and data. Specifically, personally identifiable and other confidential information is increasingly subject to legislation and regulations in numerous domestic and international jurisdictions. PRC government authorities have enacted a series of laws and regulations relating to the protection of privacy and personal information, under which internet service providers and other network operators are required to clearly indicate the purposes, methods and scope of any information collection and usage, to obtain appropriate user consent and to establish user information protection systems with appropriate remedial measures. Furthermore, several PRC governmental authorities have taken a series of strict examinations and inspections against illegal activities of collecting or using data and personal information, and it was reported that numerous mobile applications or website operators were ordered to rectify their illegal activities, or imposed with warnings, fines or other administrative penalties, or even became subjects of criminal investigations. In July 2019, the Ministry of Industry and Information Technology identified us as one of many internet companies that had a few instances of improper collection or use of personal information either without prior user consent or with misleading or unclear user consent, and required us to rectify accordingly. We have taken necessary measures to rectify and improve our personal information and data protection system. We have developed a comprehensive user information protection policy, in which we lay out in detail the types of personal information we collect from users and the purposes, methods and scope of our collection, usage and handling of user personal information. We are continuously updating our policy as the purposes, methods and scope of our collection and handling of user personal information changes. Our user information protection policy and user agreement are displayed permanently in fixed locations on our mobile apps so as to allow users to conveniently access and search such policies and agreements related to the collection and usage of their personal information on our app. We have also added pop-up notifications in our mobile app prompting our users to carefully read and agree to our user information protection policy whenever the user installs, opens up for the first time or registers an account on our mobile app. We are unable to collect any personal information from users unless the user voluntarily agrees to our user agreement and user information protection policy by checking the relevant boxes on our app. For certain functions of our platform where the collection and usage of additional personal information is necessary, we will clearly prompt the users as to the purposes, methods and scope of the collection and usage of the additional personal information. The user is then free to agree to or reject such collection and usage of additional personal information. Rejection of such collection and usage of additional personal information will not impact the use of other unrelated functionalities on our platform.

The regulatory framework for privacy, personal information and data protection issues in China and worldwide is currently evolving and is likely to remain uncertain for the foreseeable future. Operators like us are and may continue to be subject to more comprehensive and stricter supervision by the competent governmental authorities on such issues, especially given our collection and use of personal information by users or third-party data providers with user consent under our big data risk management solutions business. We cannot assure you that our existing personal information and data protection system and technical measures will be considered sufficient under applicable laws and regulations. We could be adversely affected if legislation or regulations in China are expanded to require changes in business practices or privacy policies, or if the PRC governmental authorities interpret or implement their legislation or regulations in ways that negatively affect our business, financial condition and results of operations. In addition to laws, regulations and other applicable rules regarding privacy, personal information and data protection, industry groups or other private parties may propose new and different privacy standards. Because the interpretation and application of privacy, personal information and data protection laws and privacy standards are still uncertain, it is possible that these laws or privacy standards may be interpreted and applied in a manner that is inconsistent with our practices. Any inability to adequately address privacy concerns, even if unfounded, or to comply with applicable privacy, personal information or data protection laws, regulations and privacy standards, could result in additional cost and liability for us, damage our reputation, inhibit the use of our platform and harm our business.

***PRC laws and regulations governing personal credit reporting businesses in China are still at an initial stage and subject to further change and interpretation. If we are deemed to engage in a personal credit reporting business and violate any PRC laws or regulations related to personal credit reporting businesses, our business, financial condition, results of operations and prospects could be materially and adversely affected.***

The PRC government has adopted several regulations governing personal credit reporting businesses. According to the Administrative Regulations on the Credit Reporting Industry, which was promulgated by the State Council and became effective in 2013, "personal credit reporting business" means the activities of collecting, organizing, storing and processing "information related to the credit standing" of individuals as well as providing the information to others, and a "credit reporting agency" refers to a duly established agency whose primary business is credit reporting. These regulations, together with the Administrative Measures for Credit Reporting Agencies, which was promulgated by the People's Bank of China and became effective in 2013, set forth qualification standards for entities conducting a credit reporting business in China, rules and requirements for credit reporting businesses and operating standards for credit reporting agencies. According to these regulations and measures, no entity may engage in personal credit reporting business without approval by the credit reporting industry regulatory department under the State Council. If any entity directly engages in personal credit reporting business without such approval, the entity is subject to penalties including suspension of business, confiscation of revenues related to personal credit reporting business, fines of RMB50,000 (US$7,182) to RMB500,000 (US$71,821) and criminal liabilities. In January 2021, the People's Bank of China published a consultation paper seeking public comments on the Administrative Measures on Credit Reporting Industry (Draft for Comment), or the Draft Credit Reporting Industry Measures, which provides that "information related to credit standing" refers to various information used to determine the credit status of individuals and enterprises to provide services for financial activities, including but not limited to personal and corporate identity, address, transportation, communications, debt, property, payment, consumption, production and operation, fulfillment of legal obligations and other information, as well as the analysis and evaluation of the credit status of individuals and enterprises based on the foregoing information.

We organize, process and analyze information provided by users and data provided by financial service providers and third-party data partners. This information and data contains certain personal information of users, a portion of which we may provide to financial service providers using our big data risk management solutions with user consent. Due to the lack of further interpretations of the current regulations governing personal credit reporting businesses, and the fact that it is uncertain when and whether the Draft Credit Reporting Industry Measures will be officially promulgated and whether the promulgated version would be substantially revised, the exact definition and scope of "information related to credit standing" and "personal credit reporting business" are still unclear. It is therefore uncertain whether we would be deemed to engage in personal credit reporting business because of our big data risk management solutions. As of the date of this annual report, we have not been subject to any material fines or other penalties under any PRC laws or regulations directly related to personal credit reporting business. However, given the evolving regulatory environment of the personal credit reporting industry, and the fact that the People's Bank of China, the credit reporting industry regulatory department under the State Council, granted in February 2018 and December 2020, respectively, personal credit reporting businesses licenses to two entities incorporated under the guidance of the People's Bank of China, we cannot assure you that we will not be required in the future by the relevant governmental authorities to obtain approval or license for personal credit reporting business in order to continue offering our big data risk management solutions. Our business may also become subject to other rules and requirements related to credit reporting business, or new rules and requirements (including approval or license regime) promulgated by the relevant authorities in the future. The existing and future rules and regulations may be costly to comply with, and we may not be able to obtain any required license or other regulatory approvals in a timely manner, or at all. If we are subject to penalties for any of the foregoing reasons, our business, financial condition, results of operations and prospects could be materially and adversely affected.

***We provide recommendation services for financial service providers, which may constitute provision of intermediary service, and our agreements with these financial service providers may be deemed as intermediation contracts under the PRC Civil Law Code.***

Under the PRC Civil Law Code, if an intermediary conceals any material fact intentionally or provides false information in connection with the conclusion of a proposed transaction, which results in harm to a client's interests, the intermediary may not claim for service fees and is liable for any damages caused. We provide recommendation services for financial service providers, which may constitute provision of intermediary service, and our agreements with these financial service providers may be deemed as intermediation contracts under the PRC Civil Law Code, as a consequence, if we intentionally conceal material information or provide false information to financial service providers, or if we fail to identify false information received from users or any third party and in turn provide such information to financial service providers, we could be held liable for damages caused to financial service providers as an intermediary pursuant to the PRC Civil Law Code. On the other hand, we should not assume any liability relating to possible disputes between financial service providers and users with respect to the financial products provided by the financial service providers to the users, solely on the basis of providing recommendations regarding such financial products, as long as we do not intentionally conceal any material fact or provide false information, and are not found at fault. However, due to the lack of detailed regulations and guidance in the area of financial product recommendation services and the possibility that the PRC government authorities may promulgate new laws and regulations regulating financial product recommendation services in the future, there are substantial uncertainties regarding the interpretation and application of current or future PRC laws and regulations for financial product recommendation services, and there can be no assurance that the PRC government authority will share our views.

16

***If any financial product on our platform or the business practice of us or any of our financial service providers is deemed to violate any new or existing PRC laws or regulations, our business, reputation, financial condition and results of operations could be materially and adversely affected.***

Financial products and the businesses of our financial service providers are regulated in China. We may be indirectly subject to PRC financial regulations as a result of the financial products on our platform and our services to and cooperation with financial service providers. On December 1, 2017, the Internet Finance Rectification Office and the Online Lending Rectification Office jointly issued the Notice on Regulating and Rectifying "Cash Loan" Business, or the Circular 141, and on December 8, 2017, the Online Lending Rectification Office issued the Notice on the Rectification and Inspection Acceptance of Risk of Online Lending Intermediaries, or the Circular 57, both of which outlined more specific requirements on financial service providers. In addition, in March 2018, the Internet Finance Rectification Office issued the Notice on Strengthening the Rectification of Asset Management through the Internet and Carrying on the Inspection and Acceptance, or the Circular 29, which outlines more strict and specific requirements on the practices of asset management business (including wealth management plan) through the Internet, such as requirement on obtaining necessary licenses, prohibition of the sale on an agency basis or provision of sale agency service in any disguised form, by any Internet platform of any asset management products provided by any financial asset exchange which is not in full compliance with applicable laws. If any financial product on our platform is deemed to violate any PRC laws or regulations, we may be liable for listing the product or assisting in offering the product on our platform, even if we are not its provider.

In September 2019, the General Office of China Bank and Insurance Regulatory Commission, or the CBIRC, issued the Notice on Addressing Banking and Insurance Institutions' Irregularities against Consumer Rights and Interests, or the CBIRC Notice 194, according to which banks shall explicitly require that their third-party cooperation partners shall stop misleading sales, inappropriate collection activities, or forcible tie-in sales, and shall not double-charge financial institutions and consumers for the same service or illegally access the personal information of customers. Furthermore, in July 2020, the CBIRC promulgated the Interim Measures for Administration of the Internet Loan by Commercial Banks, or the Internet Loan Interim Measures, according to which banks shall meet relevant management requirements related to risk system management, risk data and model management, information technology risk management and loan management in their cooperation with third-party cooperation partners on internet loan business, and if banks recommend Internet loan products to the target customers through third-party cooperation partners, banks are required to sufficiently disclose the lender, actual annual interest rate, annualized comprehensive capital cost, arrangement for repayment of principal and interest and other information in obvious positions to safeguard the rights of customers to be informed and to make choice on their own, and shall not deprive the consumers of their rights to express their wishes by means of check by default, forced bundling or others. Some of the financial service providers on our platform are banks. If our cooperation with any of these banks fails to strictly comply with the CBIRC Notice 194, the Internet Loan Interim Measures, or other applicable laws, the banks may not be allowed to continue their cooperation with us and consequently our business, financial condition and prospects may be materially and adversely affected. If any of our financial service providers is deemed to violate any PRC laws or regulations, we may be jointly liable due to the services or solutions we provide. We may have to remove financial products from our platform or terminate relationship with financial service providers. Although we have implemented internal control procedures reviewing and examining the products on our platform to ensure their compliance with relevant provisions, as we have limited control over the financial products and the services provided by financial service providers, if any financial product on our platform is deemed to violate any laws, rules or regulations, we may face, among others, regulatory warnings, correction orders, condemnation, fines and criminal liability. As a result, our business, reputation, financial performance and prospects could be materially and adversely affected.

17

For instance, in March 2019, it was reported that certain financial products offered by third-party financial service providers on our platform contained inappropriate conducts, which were suspected of the infringement of consumer rights. In response to such report, we have taken immediate measures to rectify and improve our monitoring and supervision of financial service providers and our user protection on our platform. See "—We have limited control over the product and service quality of our financial service providers." Although we implement stringent standards to screen financial service providers before listing their products on our platform, we cannot rule out the possibility that the quality of the financial products and the services provided by financial service providers are not in full compliance with applicable laws and regulations at all times and similar negative reports about the financial products or services offered by third-party financial service providers on our platform may happen again in the future, which could materially and adversely affect our business, reputation, financial condition and results of operations.

*We rely on the accuracy and timeliness of data provided by third parties.*

As an open platform, we have access to data from users, financial service providers and third-party data partners. We synthesize these multiple sources of data with our data modeling and analytics capability, which drives our product recommendation engine. The information on borrower credit risk available in China may be incomplete or unreliable. The People's Bank of China has developed and put into use a national personal and corporate credit information database which remains relatively underdeveloped. The information available to us, financial service providers and third-party data partners is limited. We cannot ensure the accuracy and timeliness of the various sources of data that we use. Low quality and inaccurate data could materially affect the accuracy and validity of our matching capability, services and solutions, which could adversely affect our reputation and financial performance.

*We may not be able to detect or prevent misconduct committed by our employees or third parties.*

Misconduct by our employees, such as unauthorized business transactions, bribery, corruption and breach of our internal policies and procedures, or by consultants or other third parties, such as breach of law, may be difficult to detect or prevent. It could subject us to financial loss and sanctions imposed by governmental authorities while seriously damaging our reputation. This may also impair our ability to effectively attract prospective users, develop customer loyalty, obtain financing on favorable terms and conduct other business activities. Our risk management systems, information technology systems and internal control procedures are designed to monitor our operations and overall compliance. However, there can be no assurance we will be able to identify non-compliance or illegal activities promptly, or at all.

Historically we have identified certain incidents of employee and third-party misconduct, in response to which we have undertaken internal review and remedial measures. See "—Risks Related to Our Audit Committee Independent Review, Restatement of Our Consolidated Financial Statements, Internal Controls and Related Matters—We recently completed an audit committee independent review, which required significant management time and attention, resulted in significant legal and other expenses, and led to the termination of a number of employees." Any misconduct committed by our employees or third parties and our inability to detect and prevent such misconduct may materially and adversely affect our business, brand, financial condition and results of operations.

*Fraudulent activity conducted through our platform or using the brand name of RONG360 could negatively impact our brand and reputation and cause the use of our platform to decrease.*

We are subject to fraudulent activity on our platform or being perpetrated purportedly in the brand name of RONG360, sometimes through sophisticated schemes or collusion. Certain of our own employees may be corrupted and participate in fraudulent or otherwise illegal activities. Our resources, technologies, fraud detection tools and risk management system may be insufficient to accurately detect and timely prevent fraud and misconduct. For instance, it was found recently that certain third parties were using telephone or social network communications to scam our users into wiring deposits or service fees by posing as RONG360 customer service or to trick users into scanning and downloading a counterfeit version of our RONG360 app, both of which may have imposed negative impact on our brand and reputation. Significant increases in fraudulent activity could negatively impact our brand and reputation, result in losses suffered by users and financial service providers, and reduce user access to and user activity on our platform. We may need to adopt additional measures to prevent and reduce fraud, which could increase our costs. We anticipate that we will continue to be subject to claims on the fraudulent activity being perpetrated purportedly in the brand name of RONG360, and may incur extra costs and expenses as a result. High profile fraudulent activity could even lead to regulatory intervention, and may divert our management's attention and cause us to incur additional expenses and costs. If any of the foregoing were to occur, our reputation and financial performance could be materially and adversely affected.

*If we fail to effectively manage our growth, our business and operating results could be harmed.*

As we continue to commit to managing and growing our business, significant demands will continue to be placed on our management, operational and financial resources. We may encounter difficulties as we expand our operations, data and technology, sales and marketing, and general and administrative functions. We expect our expenses to continue to increase in the future as we acquire more users, launch new technology development projects and build additional technology infrastructure. Continued growth could also strain our ability to maintain the quality and reliability of our platform and services, develop and improve our operational, financial, legal and management controls, and enhance our reporting systems and procedures. Our expenses may grow faster than our revenues, and our expenses may be greater than we anticipate. We may expand into new product categories with which we lack familiarity and relevant user data related to these products, making it more difficult for us to anticipate user demand and preferences and manage product and related financial service provider quality. We may also expand into new geographic areas where we do not have experience with local regulations or regulators or where local market conditions are unfavorable for our business model. Managing our growth will require significant expenditures and allocation of valuable management resources. If we fail to achieve the necessary level of efficiency in our organization as it grows, our business, operating results and financial condition could be harmed.

*Our business depends on the continued efforts of our senior management. If one or more of our key executives were unable or unwilling to continue in their present positions, our business may be severely disrupted.*

Our business operations depend on the continued services of our senior management, particularly our co-founders and the executive officers named in this annual report. While we have provided different incentives to our management, we cannot assure you that we can continue to retain their services. If one or more of our key executives were unable or unwilling to continue in their present positions, we may not be able to find suitable replacements, our future growth may be constrained, our business may be severely disrupted and our financial condition and results of operations may be materially and adversely affected. In addition, although we have entered into confidentiality and non-competition agreements with our management, there is no assurance that any member of our management team will not join our competitors or form a competing business. If any dispute arises between our current or former officers and us, we may have to incur substantial costs and expenses in order to enforce such agreements in China or we may not be able to enforce them at all.

*We may not be able to attract and retain the qualified and skilled employees needed to support our business.*

We believe our future success depends on our continued ability to attract, develop, motivate and retain qualified and skilled employees. Competition for highly skilled sales and marketing, technical, risk management and financial personnel is extremely intense in China. We may not be able to hire and retain these personnel at compensation levels consistent with our existing compensation and salary structure. Some of the companies with which we compete for experienced employees have greater resources than we have and may be able to offer more attractive terms of employment. In addition, we invest significant time and resources in training our employees, which increases their value to competitors who may seek to recruit them. If we fail to retain our employees, we could incur significant expenses in hiring and training new employees, and our ability to serve users and financial service providers could diminish, resulting in a material adverse effect to our business.

19

*Any negative publicity with respect to us, our financial service providers or the industry in which we operate may materially and adversely affect our reputation, brand, business and results of operations.*

Our brand and reputation are critical to our business and competitiveness. We operate our platform using the "RONG360" brand and tradename in China. Factors that are vital to our reputation include but are not limited to our ability to:

· effectively match users with financial service providers;

· provide timely and accurate content on our platform;

· provide superior user experience on our platform;

· innovate and improve the services and solutions we provide to financial service providers;

· effectively manage and resolve complaints from users and financial service providers; and

· effectively protect personal information and data.

Any negative publicity about the foregoing or other aspects of our company, including but not limited to our brand, management, business, legal compliance, financial condition or prospects, whether with merit or not, could severely compromise our reputation and harm our business and operating results. In addition, negative publicity with respect to our financial service providers or the industry in which we operate may materially and adversely affect our business and results of operations. For instance, in March 2019, it was reported that certain financial products offered by third-party financial service providers on our platform contained inappropriate conducts, which were suspected of the infringement of consumer rights. See "—We have limited control over the product and service quality of our financial service providers." Although we promptly responded to the negative media exposure to address user concerns and have taken immediate measures to rectify and improve our monitoring and supervision of financial service providers and our user protection on our platform, the media exposure had an immediate adverse impact on our reputation and the "RONG360" brand, which in turn may have adversely affected our business and results of operations. In addition, in June 2019, we received a fine of RMB700,000 from the Beijing Administration for Market Regulation for a piece of advertisement placed on our platform by one of our third-party financial service providers due to the advertisement's failure to provide the appropriate risk warning labels associated with predicted financial returns listed in its content. Furthermore, in July 2019, the Ministry of Industry and Information Technology identified us as one of many internet companies that had instances of improper collection or use of personal information either without prior user consent or with misleading or unclear user consent, and required us to rectify accordingly. We have taken necessary measures to rectify and improve our personal information and data protection system. These incidents attracted negative publicity with respect to our reputation and the "RONG360" brand. Such negative publicity may adversely affect our business and results of operations.

*Our future growth depends on the further acceptance of the internet and particularly the mobile internet as an effective platform for disseminating financial products and content.*

The internet, and particularly the mobile internet, has gained increased popularity in China as a platform for financial products and content in recent years. However, certain lenders, especially traditional financial institutions, and many users have limited experience in handling financial products and content online, and some users may have reservations about using online platforms. For example, users may not find online content to be reliable sources of financial product information. Some financial service providers may not believe online platforms are secure for risk assessment and credit management. Others may not find online platforms effective when promoting and providing their products and services, especially to targeted customers in lower-tier cities or rural areas. If we fail to educate users and financial service providers about the value of our platform and our services and solutions, our growth will be limited and our business, financial performance and prospects may be materially and adversely affected. The further acceptance of the internet and particularly the mobile internet as an effective and efficient platform for financial products and content is also affected by factors beyond our control, including negative publicity around online and mobile consumer finance and restrictive regulatory measures taken by the PRC government. If online and mobile networks do not achieve adequate acceptance in the market, our growth prospects, results of operations and financial condition could be harmed.

20

***Our platform and internal systems rely on software that is highly technical, and if it contains undetected errors, our business could be adversely affected.***

Our platform and internal systems rely on software that is highly technical and complex. In addition, our platform and internal systems depend on the ability of the software to store, retrieve, process and manage immense amounts of data. The software on which we rely has contained, and may now or in the future contain, undetected errors or bugs. Some errors may only be discovered after the code has been released for external or internal use. Errors or other design defects within the software on which we rely may result in a negative experience for users and financial service providers, delay introductions of new features or enhancements, result in errors or compromise our ability to protect data or our intellectual property. Any errors, bugs or defects discovered in the software on which we rely could result in harm to our reputation, loss of users or financial service providers or liability for damages, any of which could adversely affect our business, results of operations and financial conditions.

***Our operations depend on the performance of the internet infrastructure and telecommunications networks in China.***

Almost all access to the internet in China is maintained through state-owned telecommunication operators under the administrative control and regulatory supervision of the Ministry of Industry and Information Technology. We primarily rely on a limited number of telecommunication service providers to provide us with data communications capacity through local telecommunications lines and internet data centers to host our servers. We have limited access to alternative networks or services in the event of disruptions, failures or other problems with China's internet infrastructure or the fixed telecommunications networks provided by telecommunication service providers. With the expansion of our business, we may be required to upgrade our technology and infrastructure to keep up with the increasing traffic on our platform. We cannot assure you that the internet infrastructure and the fixed telecommunications networks in China will be able to support the demands associated with the continued growth in internet usage.

In addition, we have no control over the costs of the services provided by telecommunication service providers. If the prices we pay for telecommunications and internet services rise significantly, our financial performance may be adversely affected. Furthermore, if internet access fees or other charges to internet users increase, our user traffic may decline and our business may be harmed.

***Any significant disruption in service on our platform or in our computer systems, including events beyond our control, could reduce the attractiveness of our platform and solutions and result in a loss of users or financial service providers.***

In the event of a platform outage and physical data loss, the performance of our platform and solutions would be materially and adversely affected. The satisfactory performance, reliability and availability of our platform, solutions and underlying technology infrastructure are critical to our operations and reputation and our ability to retain existing and attract new users and financial service providers. Much of our system hardware is hosted in a leased facility located in Beijing that is operated by our IT staff. We also maintain a real-time backup system in the same facility and a remote backup system at a separate facility also located in Beijing. Our operations depend on our ability to protect our systems against damage or interruption from natural disasters, power or telecommunications failures, air quality issues, environmental conditions, computer viruses or attempts to harm our systems, criminal acts and similar events. If there is a lapse in service or damage to our leased facilities in Beijing, we could experience interruptions and delays in our service and may incur additional expense in arranging new facilities.

Any interruptions or delays in the availability of our platform or solutions, whether as a result of third-party or our error, natural disasters or security breaches, whether accidental or willful, could harm our reputation and our relationships with users and financial service providers. Additionally, in the event of damage or interruption, our insurance policies may not adequately compensate us for any losses that we may incur. Although we conduct regular troubleshooting exercises and disaster recovery drills, our disaster recovery plan has not been tested under actual disaster conditions, and we may not have sufficient capacity to recover all data and services in the event of an outage. These factors could damage our brand and reputation, divert our employees' attention and subject us to liability, any of which could adversely affect our business, financial condition and results of operations.

21

***Any breaches to our security measures, including unauthorized access, computer viruses and hacking, may adversely affect our database, reduce use of our services and damage our reputation and brand names.***

The massive volume of data that we process and store makes us or third-party service providers who host our servers an attractive target and potentially vulnerable to cyber-attacks, computer viruses, physical or electronic break-ins or similar disruptions. While we have taken steps to protect our database, our security measures could be breached. Because techniques used to sabotage or obtain unauthorized access to systems change frequently and generally are not recognized until they are launched against a target, we may be unable to anticipate these techniques or to implement adequate preventative measures. Any accidental or willful security breaches or other unauthorized access to our platform could cause confidential information to be stolen and used for criminal purposes. Security breaches or unauthorized access to confidential information could also expose us to liability related to the loss of the information, time-consuming and expensive litigation and negative publicity. If security measures are breached because of third-party action, employee error, malfeasance or otherwise, or if design flaws in our technology infrastructure are exposed and exploited, our relationships with users and financial service providers could be severely damaged, we could incur significant liability and our business and operations could be adversely affected. The PRC Network Security Law, effective on June 1, 2017, stipulates that a network operator, including internet information services providers among others, must adopt technical measures and other necessary measures in accordance with applicable laws and regulations as well as compulsory national and industrial standards to safeguard the safety and stability of network operations, effectively respond to network security incidents, prevent illegal and criminal activities, and maintain the integrity, confidentiality and availability of network data. While we have adopted comprehensive measures to comply with the applicable laws, regulations and standards, there can be no assurance that such measures will be effective. If we were found by the regulatory authorities to have failed to comply with the PRC Network Security Law, we would be subject to warnings, fines, confiscation of illegal gains, revocation of licenses, cancellation of filings, shutdown of our platform or even criminal liability and our business, financial condition and results of operations would be adversely affected.

***We may not be able to prevent others from making unauthorized use of our intellectual property.***

We regard our software registrations, trademarks, domain names, know-how, proprietary technologies and similar intellectual property as critical to our success, and we rely on a combination of intellectual property laws and contractual arrangements, including confidentiality and non-compete agreements with our employees and others to protect our proprietary rights. See "Item 4. Information on the Company—B. Business Overview—Intellectual Property." Despite these measures, any of our intellectual property rights could be challenged, invalidated, circumvented or misappropriated, or such intellectual property may not be sufficient to provide us with competitive advantages. In addition, there can be no assurance that (i) our application for the registration of trademarks and other intellectual property rights will be approved, (ii) any intellectual property rights will be adequately protected, or (iii) such intellectual property rights will not be challenged by third parties or found by a judicial authority to be invalid or unenforceable. For instance, we are using and will continue to use, or may need to use in the future, certain trademarks including the logo and character of "融 360" for our current and future business operations. The registration applications in the PRC of such trademarks under category 36 (finance related) and category 42 (internet and computer related) were rejected by the Trademark Office of the State Administration for Industry and Commerce, and were further rejected by the Trademark Review Committee (the "Review Committee"). We initiated administrative litigations thereafter against the Review Committee with respect to the aforesaid rejections of our trademark registration applications. We prevailed in one of these administrative litigations, but Beijing Qihoo Technology Co., Ltd. filed an appeal to the decision as a third-party. We lost the other three administrative litigations and have appealed these decisions. Such appeals are still pending and there is no assurance that we will prevail in such appeals and the relevant applications for trademark registration in the PRC will eventually be approved. If these trademarks could not be registered, we may fail to prevent others from using these marks, and our business, financial condition and results of operations may be materially and adversely affected. Furthermore, because of the rapid pace of technological change in our industry, parts of our business rely on technologies developed or licensed by third parties, and we may not be able to obtain or continue to obtain licenses and technologies from these third parties on reasonable terms, or at all.

22

It is often difficult to register, maintain and enforce intellectual property rights in China. Statutory laws and regulations are subject to judicial interpretation and enforcement and may not be applied consistently due to the lack of clear guidance on statutory interpretation. Confidentiality, invention assignment and non-compete agreements may be breached by counterparties, and there may not be adequate remedies available to us for any such breach. Accordingly, we may not be able to effectively protect our intellectual property rights or to enforce our contractual rights in China. Preventing any unauthorized use of our intellectual property is difficult and costly and the steps we take may be inadequate to prevent the misappropriation of our intellectual property. In the event that we resort to litigation to enforce our intellectual property rights, such litigation could result in substantial costs and a diversion of our managerial and financial resources. We can provide no assurance that we will prevail in such litigation. In addition, our trade secrets may be leaked or otherwise become available to, or be independently discovered by, our competitors. To the extent that our employees or consultants use intellectual property owned by others in their work for us, disputes may arise as to the rights in related know-how and inventions. Any failure in protecting or enforcing our intellectual property rights could have a material adverse effect on our business, financial condition and results of operations.

*We may be subject to intellectual property infringement claims, which may be expensive to defend and may disrupt our business and operations.*

We cannot be certain that our operations or any aspects of our business do not or will not infringe upon or otherwise violate trademarks, patents, copyrights, know-how or other intellectual property rights held by third parties. We may be from time to time subject to legal proceedings and claims relating to the intellectual property rights of others. In addition, there may be third-party trademarks, patents, copyrights, know-how or other intellectual property rights that are infringed by our products, services or other aspects of our business without our awareness. Holders of such intellectual property rights may seek to enforce such intellectual property rights against us in China, the United States or other jurisdictions. For instance, in April 2019, Beijing Qihoo Technology Co., Ltd. filed a lawsuit in a court in Beijing against our PRC subsidiary and a related party alleging that our use of RONG360 brand and tradename infringes upon its 360 trademark and constitutes unfair competition, and seeking various remedies from us. We believe this lawsuit has no merits and intend to defend ourselves rigorously. For any third-party infringement claims brought against us, we may be forced to divert management's time and other resources from our business and operations to defend against these claims, regardless of their merits.

Additionally, the application and interpretation of China's intellectual property right laws and the procedures and standards for granting trademarks, patents, copyrights, know-how or other intellectual property rights in China are still evolving and are uncertain, and we cannot assure you that PRC courts or regulatory authorities would agree with our analysis. If we were found to have violated the intellectual property rights of others, we may be subject to liability for our infringement activities or may be prohibited from using such intellectual property, and we may incur licensing fees or be forced to develop alternatives of our own. As a result, our business and financial performance may be materially and adversely affected.

*We face risks associated with the Restructuring and the technology-enabled online lending business operated by RONG360.*

On July 31, 2018, RONG360 completed the share distribution of our ordinary shares held by it to the existing shareholders of RONG360 in proportion to RONG360's shareholding structure, and thus completed the Restructuring to strengthen our positioning as an independent open platform. For more details, see "Item 4. Information on the Company—C. Organizational Structure." If we were unable to enhance the quality of our platform after the Restructuring, our business, financial condition and results of operations would be materially and adversely affected.

RONG360 Inc. and its subsidiaries historically operated both our business and a technology-enabled online lending business. After the platform business was transferred to us as part of the Restructuring, we operate our business under the "Rong360" brand, whereas the technology-enabled online lending business is operated by RONG360 under a separate brand. However, the technology-enabled online lending business may be perceived to be a part of our business, which could subject us to reputational and regulatory risks. Any negative developments with respect to the technology-enabled online lending business and RONG360 may materially and adversely affect our business and brand.

Although the credit decisioning and risk management model of the technology-enabled online lending business is separate and independent from the credit decisioning and risk management solutions of our business, if our users or financial service providers believe otherwise, they may lose confidence in our data analytical capabilities. The technology-enabled online lending online business is expected to be a financial service provider on our platform under an information service cooperation agreement on terms and conditions similar to those we have with third-party financial service providers. In addition, the technology-enabled online lending business will receive operational, administrative, human resources, legal, accounting and internal control support from us through a transitional services agreement for twelve months, and the effective period has already been extended by mutual consent. If our arrangements with the technology-enabled online lending business or RONG360 are perceived by users or other financial service providers to be not on commercially reasonable terms, our reputation as an independent open platform may be damaged and our business and results of operations may be adversely affected. Furthermore, although RONG360 is expected to have its own separate senior management team, certain of our directors and executive officers may continue to provide advisory and other services to RONG360. These relationships could create, or appear to create, conflicts of interest when these persons are faced with decisions with potentially different implications for us and the technology-enabled online lending business. Business opportunities may arise that both we and RONG360 find attractive, and which would complement our respective businesses. The technology-enabled online lending business may wish to take the opportunities itself, which would hinder us from taking advantage of those opportunities. In addition, we may compete with the technology-enabled online lending business in the hiring of new employees, in particular with respect to credit decisioning and risk management related matters. We may not be able to resolve any potential conflicts which may have material adverse effect on our business.

*We may be subject to liability associated with the advertisements on our platform.*

As we generate a small portion of our revenues by providing advertising services to financial service providers, we are required to establish and continually improve a management system for such internet advertising activities. We are required to examine, review, verify and register the names, addresses and other valid contact and identity information of those who choose to place their advertisements on our platform on a regular basis. We must establish archives for the registration and verify and update the archives on a regular basis. Prior to publishing any advertisement, we are required to review its content against the relevant advertising certificate and ensure the content matches the certificate. Furthermore, we must have personnel who are familiar with advertising regulations to review the advertisements. While we have a review procedure prior to publishing, we cannot guarantee that we can entirely eliminate advertisements with content that would be deemed inappropriate or misleading. If we are deemed to be in violation of PRC law or regulations on advertising, we may be subject to penalties, including suspension of publishing, confiscation of the revenues related to these advertisements, levying of fines and suspension or termination of our advertising service, any of which may adversely affect our business. For instance, in June 2019, we received a fine of RMB700,000 from the Beijing Administration for Market Regulation for a piece of advertisement placed on our platform by one of our third-party financial service providers due to the advertisement's failure to provide the appropriate risk warning labels associated with predicted financial returns listed in its content. Advertisements, which are not otherwise misleading, could be perceived as affecting the unbiased search results by our users and financial service providers. As a result, trust in our platform may decline and users may stop using our platform.

*We may be held liable for information or content displayed on, retrieved from or linked to our platform, which may materially and adversely affect our business and operating results.*

The PRC government has adopted regulations governing internet access and distribution of information over the internet. Under these regulations, internet content providers and internet publishers are prohibited from posting or displaying over the internet content that, among other things, violates PRC laws and regulations, impairs the national dignity of China, contains terrorism, extremism, content of force or brutality, or is reactionary, obscene, superstitious, fraudulent or defamatory. Failure to comply with these requirements may result in the revocation of licenses to provide internet content and other licenses, the closure of the concerned websites and criminal liabilities. In the past, failure to comply with these requirements has resulted in the closure of certain websites. The website operator may also be held liable for the censored information displayed on or linked to the website.

In particular, the Ministry of Industry and Information Technology has published regulations that subject website operators to potential liability for content displayed on their websites and the actions of users and others using their systems, including liability for violations of PRC laws and regulations prohibiting the dissemination of content deemed to be socially destabilizing. The Ministry of Public Security has the authority to order any local internet service provider to block any internet website at its sole discretion. From time to time, the Ministry of Public Security has stopped the dissemination over the internet of information which it believes to be socially destabilizing. The State Secrecy Bureau is also authorized to block any website it deems to be leaking state secrets or failing to meet the relevant regulations relating to the protection of state secrets in the dissemination of online information. Furthermore, we are required to report any suspicious content to relevant governmental authorities, and to undergo computer security inspections. If we fail to implement the relevant safeguards against security breaches, our websites may be shut down and our business and ICP licenses may be revoked.

24

According to the Administrative Provisions on Mobile Internet Applications Information Services which was promulgated by the Cyberspace Administration of China and became effective in August 2016, providers of mobile apps may not create, copy, publish or distribute information and content that is prohibited by laws and regulations. We are required to adopt and implement management systems of information security and establish and improve procedures on content examination and administration. We must adopt such measures as warning, restricted release, suspension of updates and close of accounts, keep relevant records, and report unlawful content to competent government authorities. We have implemented internal control procedures screening the information and content on our mobile apps to ensure their compliance with these provisions. However, there can be no assurance that all the information or content displayed on, retrieved from or linked to our mobile apps complies with the requirements of the provisions at all times. If our mobile apps were found to violate the provisions, we may be subject to administrative penalties, including warning, service suspension or removal of our mobile apps from the relevant mobile app store, which may materially and adversely affect our business and operating results.

In addition, the Administrative Measures for Financial Information Services, effective on February 1, 2019, set forth that the financial information service providers shall not produce, copy, publish or spread information that contains any of the following contents: (i) false financial information endangering national financial security or social stability, (ii) distorting national fiscal and monetary policies or financial management policies disrupting the economic orders or damaging national interests; (iii) instigating any other person to commit commercial fraud or economic crime causing any social impact, (iv) fabricating any event or news on the securities, funds, futures, foreign exchange and other financial markets, (v) publicizing financial products and services prohibited by the competent departments, and (vi) any other content prohibited by laws, regulations or rules. Furthermore, financial information service providers are required to formulate internal service standards including the content review standard. Due to the lack of detailed interpretations of such measures, there is still uncertainty as to whether we shall be deemed as financial information service provider regulated by such measures. On December 15, 2019, the Cyberspace Administration of China promulgated the Provisions on Ecological Governance of Network Information Content, or the Network Ecological Governance Provisions, which took effect on March 1, 2020. The Network Ecological Governance Provisions provide the requirements for the content producers of the network information, the service platforms for the network information and the users of the network information. Among others, the Network Ecological Governance Provisions classify the network information into the "encouraged category", the "prohibited category" and the "prevented and resisted category". The content producers of network information are encouraged to produce, copy and publish network information in the encouraged category, prohibited from producing, copying or publishing network information in the prohibited category, and shall take measures to prevent and resist the production, reproduction and publication of undesirable information in the prevented and resisted category. In addition, the service platforms for the network information shall strengthen the management of information content, and upon discovery of any prohibited information or prevented and resisted information, shall immediately take measures in accordance with the laws, keep the relevant records, and report the same to the competent governmental authorities. A service platform for network information shall compile an annual report on the ecological governance of network information, which contains information on the ecological governance of network information, the performance of the person in charge of ecological governance of network information and social evaluation, etc. We have proactively implemented internal control policy screening the information and content on our website and mobile apps to ensure their compliance with the provisions of the Administrative Measures for Financial Information Services and the Network Ecological Governance Provisions. However, there can be no assurance that all the information or content displayed on, retrieved from or linked to our website and mobile apps complies with the requirements of the provisions at all times. If we were deemed as violating the requirements under the Administrative Measures for Financial Information Services, the Network Ecological Governance Provisions or other applicable laws and regulations, we may be subject to inquiries, public condemnation, rectification, or brought into the blacklist for the dishonest, or even subject to administrative penalties or criminal liabilities.

We may also become involved in legal disputes with third parties that disagree with the content on our platform. For example, a financial service provider that received a low rating from our reports filed a lawsuit claiming that we engaged in unfair competition. While this lawsuit was dismissed by the court and subsequently withdrawn by the plaintiff, there can be no assurance that we will successfully defend ourselves against similar lawsuits in the future. In addition, such lawsuits could result in substantial cost and a diversion of our managerial and financial resources.

### *We have limited insurance coverage which could expose us to significant costs and business disruption.*

The insurance industry in China is still in an early stage of development, and insurance companies in China currently offer limited business-related insurance products. We do not maintain business interruption insurance or general third-party liability insurance, nor do we maintain property insurance, product liability insurance. We consider our insurance coverage to be reasonable in light of the nature of our business and the insurance products that are available in China and in line with the practices of other companies in the same industry of similar size in China, but we cannot assure you that our insurance coverage is sufficient to prevent us from any loss or that we will be able to successfully claim our losses under our current insurance policies on a timely basis, or at all. If we incur any loss that is not covered by our insurance policies, or the compensated amount is significantly less than our actual loss, our business, financial condition and results of operations could be materially and adversely affected.

### *Current and future investments in and acquisitions of assets, technologies and businesses may fail and may result in equity and earnings dilution and significant diversion of management attention.*

We have and may further invest in or acquire assets, technologies and businesses that are complementary to our existing business. This may include opportunities to expand our service offerings and strengthen our technology infrastructure and data analytical capabilities. Our investments or acquisitions may not yield the results we expect. In addition, investments and acquisitions could result in the use of substantial amounts of cash, potentially dilutive issuances of equity securities, significant amortization expenses related to intangible assets, significant diversion of management attention and exposure to potential unknown liabilities of the acquired business. Moreover, the cost of identifying and consummating investments and acquisitions, and integrating the acquired businesses into ours, may be significant, and the integration of acquired businesses may be disruptive to our existing business operations. In the event that our investments and acquisitions are not successful, our financial condition and results of operations may be materially and adversely affected. For example, in September 2019, the business of Databook Tech Ltd. and its subsidiaries and VIE, collectively refer to as Databook in this annual report, was suspended and an investigation was conducted against Databook and certain of its employees by competent authorities in relation to the compliance of information collection or use. In relation to the business suspension of Databook, we recorded a full impairment for goodwill, intangible assets and an impairment for other assets attributable to the Databook, totaling RMB254.7 million as of December 31, 2019. The investigation has concluded in January 2021. Databook was imposed confiscation of gains of RMB30 million and a fine of RMB30 million, total amount of RMB60 million was paid in January 2021, and we accrued additional current income tax expenses of RMB10.0 million in 2019. Certain employees of Databook have been charged with criminal liabilities; other than Databook, neither our company nor our directors or officers were involved.

### *We may face challenges in expanding our business and operations internationally and our ability to conduct business in international markets may be adversely affected by legal, regulatory, political and economic risks.*

We face challenges and risks associated with expanding our business and operations globally into new geographic markets. New geographic markets may have competitive conditions, user preferences, and discretionary spending patterns that are more difficult to predict or satisfy than our existing markets. In certain markets, we have relatively little operating experience and may not benefit from any first-to-market advantages or otherwise succeed. We may also face protectionist policies that could, among other things, hinder our ability to execute our business strategies and put us at a competitive disadvantage relative to domestic companies. Local companies may have a substantial competitive advantage because of their greater understanding of, and focus on, the local users, as well as their more established local brand names, requiring us to build brand awareness in that market through greater investments in advertising and promotional activity. International expansion may also require significant capital investment, which could strain our resources and adversely impact current performance, while adding complexity to our current operations. We are subject to PRC law in addition to the laws of the foreign countries in which we operate. If any of our overseas operations, or our associates or agents, violate such laws, we could become subject to sanctions or other penalties, which could negatively affect our reputation, business and operating results.

In addition, we may face operational issues that could have a material adverse effect on our reputation, business and results of operations, if we fail to address certain factors including, but not limited to, the following:

· lack of acceptance of our platform, and challenges of localizing our offerings to appeal to local tastes;

· failure to attract and retain capable talent with international perspectives who can effectively manage and operate local businesses;

· challenges in identifying appropriate local business partners and establishing and maintaining good working relationships with them;

· availability, reliability and security of international payment systems and logistics infrastructure;

· challenges of maintaining efficient and consolidated internal systems, including technology infrastructure, and of achieving customization and integration of these systems with the other parts of our technology platform;

· challenges in replicating or adapting our company policies and procedures to operating environments different from that of China;

· national security policies that restrict our ability to utilize technologies that are deemed by local governmental regulators to pose a threat to their national security;

· the need for increased resources to manage regulatory compliance across our international businesses;

· compliance with privacy laws and data security laws and compliance costs across different legal systems;

· heightened restrictions and barriers on the transfer of data between different jurisdictions;

· differing, complex and potentially adverse customs, import/export laws, tax rules and regulations or other trade barriers or restrictions related compliance obligations and consequences of non-compliance, and any new developments in these areas;

· business licensing or certification requirements of the local markets;

· exchange rate fluctuations; and

· political instability and general economic or political conditions in particular countries or regions, including territorial or trade disputes, war and terrorism.

Failure to manage these risks and challenges could negatively affect our ability to expand our business and operations overseas as well as materially and adversely affect our business, financial condition and results of operations.

***Our expansions into new businesses and new service offerings may expose us to new challenges and more risks and, if such new businesses and new service offerings are not successful, our future results of operations and growth prospects may be materially and adversely affected.***

As part of our growth strategy, we may enter into new businesses or expand the variety of services offered on our platform from time to time by leveraging our large user base and our technology-driven open platform to generate additional revenue streams and through our development of new business or service offerings. Expansions into new businesses or service offerings may present operating, marketing and compliance risks and challenges that differ from those that we currently encounter. For instance, in the fourth quarter of 2019, we introduced insurance products to our platform after completing the acquisition of an insurance brokerage company in China. As the implementation of our business strategies, as well as the development of new businesses and service offerings, require significant time, financial and other resources and involve substantial risks, we may not be able to successfully implement our strategies, launch or develop such new businesses and service offerings in time, or achieve the expected benefits. We may also encounter unexpected technological difficulties in developing and implementing new technologies and, as a result, may incur substantial costs or services disruptions, which could have a material adverse effect on our business, financial condition, results of operations and prospects.

27

We may confront other challenges as we enter new business domains. Our lack of familiarity with the new products and services and lack of relevant user data relating to these products and services may make it more difficult for us to anticipate user demand and preferences. It may also make it more difficult for us to on-board, monitor and supervise new financial service providers and we may experience more customer complaints about them and their financial products and face costly investigations or litigation as a result of offering the financial products on our platform, which would harm our brand and reputation as well as our financial performance. New business domains may also subject us to new complex regulations to comply with, higher compliance costs and serious consequences in cases of non-compliance. Furthermore, we may not have much bargaining power in new categories of financial product services and we may not be able to negotiate favorable terms with financial service providers. We may need to price aggressively to gain market share or remain competitive in new financial product service categories. It may be difficult for us to achieve profitability in the new financial product service categories and our profit margin, if any, may be lower than we anticipate, which would adversely affect our overall profitability and results of operations. We cannot assure you that we will be able to address these new challenges and continue to provide exceptional quality services. If we are not able to solve these issues, we may not be able to compete effectively. We cannot assure you that we will be able to recoup our investments in introducing these new businesses and service offerings.

***We may not be able to obtain additional capital when desired, on favorable terms or at all.***

We believe our current cash and cash equivalents will be sufficient to meet our current and anticipated needs for general corporate purposes for at least the next 12 months. However, we need to make continued investments in facilities, hardware, software, technological systems and to retain talents to remain competitive, by using funds from bank borrowings and operating cash inflows. Due to the unpredictable nature of the capital markets and our industry, there can be no assurance that we will be able to raise additional capital on terms favorable to us, or at all, if and when required, especially if we experience disappointing operating results. If adequate capital is not available to us as required, our ability to fund our operations, take advantage of unanticipated opportunities, develop or enhance our infrastructure or respond to competitive pressures could be significantly limited. If we do raise additional funds through the issuance of equity or convertible debt securities, the ownership interests of our shareholders could be significantly diluted. These newly issued securities may have rights, preferences or privileges senior to those of existing shareholders.

***Privacy concerns relating to our products and services and the use of user information could damage our reputation, deter current and potential users and customers from using our products and services, and negatively impact our business.***

We collect data from our users related to their personal information in order to better understand our users and their needs. Concerns about the collection, use, disclosure or security of personal information or other privacy-related matters, even if unfounded, could damage our reputation, cause us to lose users and customers and adversely affect our operating results. While we strive to comply with applicable data protection laws and regulations, as well as our own posted privacy policies and other obligations we may have with respect to privacy and data protection, the failure or perceived failure to comply may result, and in some cases has resulted, in inquiries and other proceedings or actions against us by government agencies or others, as well as negative publicity and damage to our reputation and brand, each of which could cause us to lose users and customers, which could have an adverse effect on our business.

Any systems failure or compromise of our security that results in the unauthorized access to or release of our users' or customers' data could significantly limit the adoption of our products and services, as well as harm our reputation and brand and, therefore, our business. We strictly limit third-party developers' access to user privacy and user data, and we expend significant resources on technology and product development to protect against leakage of user information and other security breaches. Nonetheless, given its great commercial value, our user data may still be misused by third parties, which could expose us to legal and regulatory risks and seriously harm our business.

The PRC regulatory and enforcement regime with regard to data security and data protection is evolving. On November 7, 2016, the Standing Committee of the National People's Congress issued the Cyber Security Law, which came into effect on June 1, 2017. The Cyber Security Law sets high requirements for the operational security of facilities deemed to be part of the PRC's "critical information infrastructure." In the European Union, or EU, the General Data Protection Regulation, or GDPR, which came into effect on May 25, 2018, present increased challenges and risks in relation to policies and procedures relating to data collection, storage, transfer, disclosure, protection and privacy, and will impose significant penalties for non-compliance, including for example, penalties calculated as a percentage of global revenue under the GDPR. Due to the uncertainties as to the interpretation and applications of the GDPR, the potential risks associated with non-compliance therewith are uniquely difficult to predict. Other jurisdictions may have similar prohibitions.

New laws or regulations concerning data protection, or the interpretation and application of existing consumer and data protection laws or regulations, which is often uncertain and in flux, may be inconsistent with our practices. If so, in addition to the possibility of fines, this could result in an order requiring that we change our practices, which could have an adverse effect on our business and operating results. Complying with new laws and regulations could cause us to incur substantial costs or require us to change our business practices in a manner materially adverse to our business.

*A severe or prolonged downturn in the Chinese or global economy could materially and adversely affect our business and financial condition.*

The global macroeconomic environment is facing challenges, including the end of quantitative easing by the U.S. Federal Reserve, the economic slowdown in the Eurozone since 2014 and uncertainties over the impact of Brexit. The growth of the PRC economy has slowed down since 2010 compared to the previous decade and the trend may continue in the foreseeable future, especially in light of the challenges the global economy is facing due to the COVID-19 global pandemic. See "— We face risks related to natural disasters, health epidemics and other outbreaks, which could significantly disrupt our operations.". There is considerable uncertainty over the long-term effects of the expansionary monetary and fiscal policies adopted by the central banks and financial authorities of some of the world's leading economies, including the United States and China. There have been concerns over unrest and terrorist threats in the Middle East, Europe and Africa. There have also been concerns about the relationship between China and other countries, including surrounding Asian countries, which may potentially lead to foreign investors closing down their business or withdrawing their investment in China. Economic conditions in China are sensitive to global economic conditions, as well as changes in domestic economic and political policies and the expected or perceived overall economic growth rate in China. Any prolonged slowdown in the global or Chinese economy may have a negative impact on our business, results of operations and financial condition. Recent changes in U.S. trade policies, including new tariffs on imports from China generally, and reactions by a number of markets including China in response to these U.S. actions, may have a material adverse effect on global economic conditions and the stability of global financial markets, and they may significantly reduce global trade and, in particular, trade between China and the United States. Our users and customers may reduce or delay their spending or borrowing activities, while we may have difficulty expanding our customer base fast enough, or at all, to offset the impact of decreased spending by our existing customers.

*We and certain of our directors and officers have been named as defendants in a number of putative shareholder class action lawsuits, which could have a material adverse impact on our business, financial condition, results of operation, cash flows and reputation.*

We will have to defend against several putative shareholder class action lawsuits described in "Item 8. Financial Information—A. Consolidated Statements and Other Financial Information—Legal Proceedings," including any appeals of such lawsuits should our initial defense be unsuccessful. We are currently unable to estimate the possible outcome or loss or possible range of loss, if any, associated with the resolution of these lawsuits. In the event that our initial defense of these lawsuits is unsuccessful, there can be no assurance that we will prevail in any appeal. Any adverse outcome of these cases, including any plaintiff's appeal of the judgments in these lawsuits, could have a material adverse effect on our business, financial condition, results of operation, cash flows and reputation. In addition, there can be no assurance that our insurance carriers will cover all or part of the defense costs, or any liabilities that may arise from these matters. The litigation process may utilize a significant portion of our resources and divert management's attention from the day-to-day operations of our company, all of which could harm our business. We also may be subject to claims for indemnification related to these matters, and we cannot predict the impact that indemnification claims may have on our business or financial results.

***We face risks related to natural disasters, health epidemics and other outbreaks, which could significantly disrupt our operations.***

Our business could be materially and adversely affected by natural disasters, health epidemics or other public safety concerns affecting the PRC, and particularly Beijing. Natural disasters may give rise to server interruptions, breakdowns, system failures, technology platform failures or internet failures, which could cause the loss or corruption of data or malfunctions of software or hardware as well as adversely affect our ability to operate our platform and provide services and solutions. Our business could also be adversely affected if our employees are affected by health epidemics. Our business operations could be disrupted if any of our employees is suspected of having any transmissible health epidemic, since this may cause our employees to be quarantined and/or our offices to be temperately shut down. In addition, our results of operations could be adversely affected to the extent that any health epidemic harms the Chinese economy in general. Our headquarters are located in Beijing, where most of our management and employees currently reside. Most of our system hardware and back-up systems are hosted in facilities located in Beijing. Consequently, if any natural disasters, health epidemics or other public safety concerns were to affect Beijing, our operation may experience material disruptions, which may materially and adversely affect our business, financial condition and results of operations.

For example, beginning in January 2020, the outbreak of COVID-19 has severely impacted China and the rest of the world, and our business and results of operations have been adversely affected as a result. In early 2020, the COVID-19 pandemic resulted in the temporary closure of many corporate offices across China. Given the strict implementation of quarantine measures during this period, we and certain of our business partners implemented temporary adjustment of work schemes allowing employees to work from home and adopted remote collaboration. We made operational adjustments to maintain the same high quality service we had always provided our users, customers and partners as we simultaneously worked to minimize the impact of COVID-19 and push forward our business initiatives. However, as our cooperation with financial service partners rely heavily on face-to-face communications, our cooperation with them has been negatively impacted by the quarantine measures in China and in Beijing, in particular, for several months in 2020. Additionally, the global COVID-19 pandemic and the associated inability to travel globally has negatively affected the progress of the originally planned further expansion of our service offerings overseas since early 2020 and such negative impact may continue in 2021.

Many of the quarantine measures within China have since been relaxed, and we, together with our business partners, have gradually resumed normal operations since mid-July 2020. The COVID-19 global pandemic has resulted in, and may intensify, global economic distress, and the duration and extent of the impact of COVID-19 outbreak is highly uncertain at this time. The extent to which it may affect our results of operations, financial condition and cash flows will depend on the future development of the outbreak, which is also highly uncertain and difficult to predict and will depend on a number of factors, including the duration and severity of COVID-19, the extent and severity of new waves of outbreak in China and other countries, the development and progress of distribution of COVID-19 vaccine and other medical treatment and the effectiveness of such vaccine and other medical treatment, and the actions taken by government authorities to contain the outbreak, all of which are beyond our control. If the situation materially deteriorates in China or globally, our business, results of operations and financial condition could be materially and adversely affected.

## Risks Related to Our Corporate Structure

***If the PRC government deems that our contractual arrangements with our variable interest entities do not comply with PRC regulatory restrictions on foreign investment in the relevant industries, or if these regulations or the interpretation of existing regulations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations.***

Foreign ownership of internet-based businesses, such as distribution of online information, is subject to restrictions under current PRC laws and regulations. For example, foreign investors are not allowed to own more than 50% of the equity interests in a value-added telecommunication service provider which is engaged in internet information provision business like us and any such foreign investor must have experience in providing value-added telecommunications services overseas and maintain a good track record in accordance with the Special Entry Management Measures (Negative List) for the Access of Foreign Investment (2020 version), which was promulgated on June 23, 2020 and took effect on July 23, 2020, and other applicable laws and regulations.

We are a Cayman Islands exempted company and our PRC subsidiaries are considered foreign-invested enterprises. To comply with PRC laws and regulations, we conduct operations in China through Beijing Rongdiandian Information Technology Co., Ltd., or RDD, and other affiliated PRC entities. We refer to these affiliated PRC entities as our variable interest entities, or the VIEs, and we have entered into a series of contractual arrangements with the VIEs and their shareholders, which enable us to (i) exercise effective control over the VIEs, (ii) receive majority of the economic benefits and bear the obligation to absorb substantially all of the losses of the VIEs, and (iii) have an exclusive option to purchase all or part of the equity interests in the VIEs when and to the extent permitted by PRC laws. Because of these contractual arrangements, we are deemed the primary beneficiary of the VIEs and hence consolidate their financial results under U.S. GAAP. For a detailed description of these contractual arrangements, see "Item 4. Information on the Company —C. Organizational Structure."

In the opinion of Fangda Partners, our PRC legal counsel, (i) the ownership structure of our wholly foreign owned subsidiaries and the VIEs in China does not result in any violation of PRC laws and regulations currently in effect; and (ii) the contractual arrangements between our wholly foreign owned subsidiaries, the VIEs and the shareholders of the VIEs that are governed by PRC law are valid, binding and enforceable, and do not result in any violation of PRC laws or regulations currently in effect. However, we have been advised by our PRC legal counsel that there are substantial uncertainties regarding the interpretation and application of current and future PRC laws, regulations and rules, and there can be no assurance that the PRC regulatory authorities will take a view that is consistent with the opinion of our PRC legal counsel.

On March 15, 2019, the National People's Congress approved the Foreign Investment Law, and on December 26, 2019, the State Council promulgated the Implementing Rules of the Foreign Investment Law of the People's Republic of China, or the Implementing Rules, to further clarify and elaborate the relevant provisions of the Foreign Investment Law. The Foreign Investment Law and the Implementing Rules both took effect on January 1, 2020. The Foreign Investment Law and the Implementing Rules do not explicitly classify whether variable interest entities that are controlled through contractual arrangements would be deemed as foreign invested enterprises if they are ultimately "controlled" by foreign investors. Since the Foreign Investment Law and the Implementing Rules are relatively new, uncertainties still exist in relation to their interpretation and implementation, and it is still unclear how the Foreign Investment Law and the Implementing Rules would affect our variable interest entity structure and business operation. See "— Risks Related to Doing Business in China—Uncertainties exist with respect to the interpretation and implementation of the newly enacted Foreign Investment Law and its implementing rules and how they may impact our business, financial condition and results of operations."

If the ownership structure, contractual arrangements and businesses of our PRC subsidiaries or the VIEs are found to be in violation of any existing or future PRC laws or regulations, or our PRC subsidiaries or the VIEs fail to obtain or maintain any of the required permits or approvals, the relevant PRC regulatory authorities would have broad discretion to take action in dealing with such violations or failures, including:

· revoking the business licenses and/or operating licenses of such entities;

· shutting down our servers or blocking our website, or discontinuing or placing restrictions or onerous conditions on our operation through any transactions between our PRC subsidiaries and the VIEs;

· imposing fines, confiscating the income from our PRC subsidiaries or the VIEs, or imposing other requirements with which we or our variable interest entities may not be able to comply;

· requiring us to restructure our ownership structure or operations, including terminating the contractual arrangements with the VIEs and deregistering the equity pledge of the VIEs, which in turn would affect our ability to consolidate, derive economic interests from, or exert effective control over the VIEs; or

31

· restricting or prohibiting our use of the proceeds of our IPO to finance our business and operations in China, and taking other regulatory or enforcement actions that could be harmful to our business.

Any of these actions could cause significant disruption to our business operations and severely damage our reputation, which would in turn materially and adversely affect our business, financial condition and results of operations. If any of these occurrences results in our inability to direct the activities of the VIEs that most significantly impact their economic performance, and/or our failure to receive the economic benefits from the VIEs, we may not be able to consolidate the entities in our consolidated financial statements in accordance with U.S. GAAP.

*We rely on contractual arrangements with the VIEs and their shareholders to exercise control over a significant part of our business, which may not be as effective as direct ownership in providing operational control.*

We have relied and expect to continue to rely on the contractual arrangements with our variable interest entities to conduct a significant part of our operations in China. We rely on contractual arrangements with the VIEs and their shareholders to conduct a significant part of our operations in China. For a description of these contractual arrangements, see "Item 4. Information on the Company—C. Organizational Structure." The shareholders of the VIEs may not act in the best interests of our company or may not perform their obligations under these contracts. If we had direct ownership of the VIEs, we would be able to exercise our rights as a shareholder to effect changes in the board of directors of the VIEs, which in turn could implement changes, subject to any applicable fiduciary obligations, at the management and operational level. However, under the contractual arrangements, we would rely on legal remedies under PRC law for breach of contract in the event that the VIEs and their shareholders did not perform their obligations under the contracts. These legal remedies may not be as effective as direct ownership in providing us with control over the VIEs.

If the VIEs or their shareholders fail to perform their obligations under the contractual arrangements, we may have to incur substantial costs and expend additional resources to enforce such arrangements. All the agreements under our contractual arrangements are governed by PRC law and provide for the resolution of disputes through arbitration in China. Accordingly, these contracts would be interpreted in accordance with PRC law and any disputes would be resolved in accordance with PRC legal procedures. The legal system in the PRC is not as developed as in some other jurisdictions, such as the United States. As a result, uncertainties in the PRC legal system could limit our ability to enforce these contractual arrangements. Meanwhile, there are very few precedents and little formal guidance as to how contractual arrangements in the context of a variable interest entity should be interpreted or enforced under PRC law. There remain significant uncertainties regarding the ultimate outcome of such arbitration should legal action become necessary. In addition, under PRC law, rulings by arbitrators are final, parties cannot appeal the arbitration results in courts, and if the losing parties fail to carry out the arbitration awards within a prescribed time limit, the prevailing parties may only enforce the arbitration awards in PRC courts through arbitration award recognition proceedings, which would require additional expenses and delay. In the event we are unable to enforce these contractual arrangements, or if we suffer significant delay or other obstacles in the process of enforcing these contractual arrangements, we may not be able to exert effective control over our variable interest entities, and our ability to conduct our business may be negatively affected. See "—Risks Related to Doing Business in China—Uncertainties in the interpretation and enforcement of Chinese laws and regulations could limit the legal protections available to you and us."

*The shareholders of the VIEs may have potential conflicts of interest with us, which may materially and adversely affect our business and financial condition.*

RDD is 40% owned by the appointed family member of our chief executive officer, Mr. Daqing (David) Ye, 40% owned by Mr. Jiayan Lu, who is our chief operating officer, and 20% owned by Mr. Caofeng Liu, who is our chief technology officer. Owners of the other VIEs include Jianpu's employees and one affiliate to Jianpu's founder. They may have potential conflicts of interest with us. These shareholders may breach, or cause the VIEs to breach, or refuse to renew, the existing contractual arrangements we have with them and the VIEs, which would have a material and adverse effect on our ability to effectively control our variable interest entities and receive economic benefits from it. For example, the shareholders may be able to cause our agreements with the VIEs to be performed in a manner adverse to us by, among other things, failing to remit payments due under the contractual arrangements to us on a timely basis. We cannot assure you that when conflicts of interest arise, any or all of these shareholders will act in the best interests of our company or such conflicts will be resolved in our favor.

32

Currently, we do not have any arrangements to address potential conflicts of interest between these shareholders and our company. For certain management members, we rely on them to abide by the laws of the Cayman Islands and China, which provide that directors owe a fiduciary duty to the company that requires them to act in good faith and in what they believe to be the best interests of the company and not to use their position for personal gains. There is currently no specific and clear guidance under PRC laws that address any conflict between PRC laws and laws of Cayman Islands in respect of any conflict relating to corporate governance. If we cannot resolve any conflict of interest or dispute between us and the shareholders of the VIEs, we would have to rely on legal proceedings, which could result in disruption of our business and subject us to substantial uncertainty as to the outcome of any such legal proceedings.

***Our contractual arrangements with the VIEs may be subject to scrutiny by the PRC tax authorities and they may determine that we or our variable interest entities owe additional taxes, which could negatively affect our financial condition and the value of your investment.***

Under applicable PRC laws and regulations, arrangements and transactions among related parties may be subject to audit or challenge by the PRC tax authorities within ten years after the taxable year when the transactions are conducted. The PRC enterprise income tax law requires every enterprise in China to submit its annual enterprise income tax return together with a report on transactions with its related parties to the relevant tax authorities. The tax authorities may impose reasonable adjustments on taxation if they have identified any related party transactions that are inconsistent with arm's length principles. We may face material and adverse tax consequences if the PRC tax authorities determine that the contractual arrangements between our wholly foreign owned subsidiaries, our variable interest entities, and shareholders of the VIEs were not entered into on an arm's length basis in such a way as to result in an impermissible reduction in taxes under applicable PRC laws, rules and regulations, and adjust the income of the VIEs in the form of a transfer pricing adjustment.

A transfer pricing adjustment could, among other things, result in a reduction of expense deductions recorded by the VIEs for PRC tax purposes, which could in turn increase their tax liabilities without reducing the tax expenses of relevant PRC subsidiaries. In addition, if our PRC subsidiaries request the shareholders of the relevant VIEs to transfer their equity interest in such VIEs at nominal or no value pursuant to the contractual agreements, such transfer could be viewed as a gift and subject the relevant PRC subsidiaries to PRC income tax. Furthermore, the PRC tax authorities may impose late payment fees and other penalties on the VIEs for the adjusted but unpaid taxes according to the applicable regulations. Our financial position could be materially and adversely affected if our variable interest entities' tax liabilities increase or if it is required to pay late payment fees and other penalties.

***We may lose the ability to use and benefit from assets held by the VIEs that are material to the operation of our business if the entity goes bankrupt or becomes subject to a dissolution or liquidation proceeding.***

As part of our contractual arrangements with the VIEs, these entities hold certain assets that are material to the operation of our business. If any of the VIEs go bankrupt and all or part of their assets become subject to liens or rights of third-party creditors, we may be unable to continue some or all of our business activities, which could materially and adversely affect our business, financial condition and results of operations. Under the contractual arrangements, the VIEs may not, in any manner, sell, transfer, mortgage or dispose of its assets or legal or beneficial interests in the business without our prior consent. If the VIEs undergo a voluntary or involuntary liquidation proceeding, unrelated third-party creditors may claim rights to some or all of these assets, thereby hindering our ability to operate our business, which could materially and adversely affect our business, financial condition and results of operations.

**Risks Related to Doing Business in China**

***Changes in China's economic, political or social conditions or government policies could have a material and adverse effect on our business and results of operations.***

Substantially all of our assets and operations are located in China. Accordingly, our business, financial condition, results of operations and prospects may be influenced to a significant degree by political, economic and social conditions in China generally and by continued economic growth in China as a whole. The PRC economy differs from the economies of most developed countries in many respects, including the level of government involvement, level of development, growth rate, control of foreign exchange and allocation of resources. Although the PRC government has implemented measures emphasizing the utilization of market forces for economic reform, the reduction of state ownership of productive assets, and the establishment of improved corporate governance in business enterprises, a substantial portion of productive assets in China is still owned by the government. In addition, the PRC government continues to play a significant role in regulating industry development by imposing industrial policies.

The PRC government also exercises significant control over China's economic growth through allocating resources, controlling payment of foreign currency-denominated obligations, setting monetary policy, and providing preferential treatment to particular industries or companies.

While the Chinese economy has experienced significant growth over the past decades, growth has been uneven, both geographically and among various sectors of the economy. The Chinese government has implemented various measures to encourage economic growth and guide the allocation of resources. Some of these measures may benefit the overall Chinese economy, but may have a negative effect on us. For example, our financial condition and results of operations may be adversely affected by government control over capital investments or changes in tax regulations.

*Uncertainties with respect to the PRC legal system could adversely affect us.*

The PRC legal system is a civil law system based on written statutes. Unlike the common law system, prior court decisions may be cited for reference but have limited precedential value.

In 1979, the PRC government began to promulgate a comprehensive system of laws and regulations governing economic matters in general. The overall effect of legislation over the past decades has significantly enhanced the protections afforded to various forms of foreign investments in China. However, China has not developed a fully integrated legal system, and recently enacted laws and regulations may not sufficiently cover all aspects of economic activities in China. In particular, the interpretation and enforcement of these laws and regulations involve uncertainties. Since PRC administrative and court authorities have significant discretion in interpreting and implementing statutory and contractual terms, it may be difficult to evaluate the outcome of administrative and court proceedings and the level of legal protection available to you and us.

Furthermore, the PRC legal system is based in part on government policies and internal rules, some of which are not published on a timely basis or at all, and which may have a retroactive effect. As a result, we may not be aware of our violation of any of these policies and rules until sometime after the violation. Such uncertainties, including uncertainty over the scope and effect of our contractual, property (including intellectual property) and procedural rights, and any failure to respond to changes in the regulatory environment in China could materially and adversely affect our business and impede our ability to continue our operations.

*Uncertainties exist with respect to the interpretation and implementation of the newly enacted Foreign Investment Law and its implementing rules and how they may impact our business, financial condition and results of operations.*

The variable interest entity structure has been adopted by many PRC-based companies, including us, to obtain necessary licenses and permits in the industries that are currently subject to foreign investment restrictions in China. The Ministry of Commerce published a discussion draft of the proposed Foreign Investment Law in January 2015, or the 2015 Draft FIL, according to which, variable interest entities that are controlled via contractual arrangements would also be deemed as foreign-invested entities, if they are ultimately "controlled" by foreign investors. In March 2019, the PRC National People's Congress promulgated the Foreign Investment Law, and in December 2019, the State Council promulgated the Implementing Rules to further clarify and elaborate the relevant provisions of the Foreign Investment Law. The Foreign Investment Law and the Implementing Rules both became effective from January 1, 2020 and replaced the major previous laws and regulations governing foreign investments in the PRC. Pursuant to the Foreign Investment Law ,"foreign investments" refer to investment activities conducted by foreign investors (including foreign natural persons, foreign enterprises or other foreign organizations) directly or indirectly in the PRC, which include any of the following circumstances: (i) foreign investors setting up foreign-invested enterprises in the PRC solely or jointly with other investors, (ii) foreign investors obtaining shares, equity interests, property portions or other similar rights and interests of enterprises within the PRC, (iii) foreign investors investing in new projects in the PRC solely or jointly with other investors, and (iv) investment in other methods as specified in laws, administrative regulations, or as stipulated by the State Council. The Foreign Investment Law and the Implementing Rules do not introduce the concept of "control" in determining whether a company would be considered as a foreign-invested enterprise, nor do they explicitly provide whether the variable interest entity structure would be deemed as a method of foreign investment. However, the Foreign Investment Law has a catch-all provision that includes into the definition of "foreign investments" made by foreign investors in China in other methods as specified in laws, administrative regulations, or as stipulated by the State Council, and as the Foreign Investment Law and the Implementing Rules are newly adopted and relevant government authorities may promulgate more laws, regulations or rules on the interpretation and implementation of the Foreign Investment Law, the possibility cannot be ruled out that the concept of "control" as stated in the 2015 Draft FIL may be embodied in, or the variable interest entity structure adopted by us may be deemed as a method of foreign investment by, any of such future laws, regulations and rules. If our consolidated VIEs were deemed as foreign-invested enterprises under any of such future laws, regulations and rules, and any of the businesses that we operate would be in the "negative list" for foreign investment and therefore be subject to foreign investment restrictions or prohibitions, further actions required to be taken by us under such laws, regulations and rules may materially and adversely affect our business, financial condition and results of operations. Furthermore, if future laws, administrative regulations or rules mandate further actions to be taken by companies with respect to existing contractual arrangements, we may face substantial uncertainties as to whether we can complete such actions in a timely manner, or at all. Failure to take timely and appropriate measures to cope with any of these or similar regulatory compliance challenges could materially and adversely affect our current corporate structure, business, financial condition and results of operations.

***We may be adversely affected by the complexity, uncertainties and changes in PRC regulation of internet-related businesses and companies and other businesses we are or will be engaged in.***

The PRC government extensively regulates the internet industry, including foreign ownership and the licensing and permit requirements for companies in the internet industry. See "Item 4. Information on the Company—B. Business Overview—Regulation—Regulation Related to Foreign Investment Restrictions" and "Item 4. Information on the Company—B. Business Overview—Regulation—Regulations Related to Value-Added Telecommunications Services." These laws and regulations are relatively new and evolving, and their interpretation and enforcement involve significant uncertainties. As a result, in certain circumstances it may be difficult to determine what actions or omissions may be deemed to be in violation of applicable laws and regulations.

Due to the restriction of foreign investment in businesses providing value-added telecommunications services in China, including internet information provision services, we rely on the contractual arrangements with RDD, one of our variable interest entities, to provide such services. RDD has obtained an ICP license. Any challenge to the validity of these arrangements may significantly disrupt our business, subject us to sanctions, compromise enforceability of our contractual arrangements, or have other harmful effects on us. It is uncertain if our variable interest entities will be required to obtain a separate operating license in addition to the valued-added telecommunications business operating licenses for internet content provision services.

Although we believe that we are not explicitly required to obtain a separate license for our mobile applications, there can be no assurance that we will not be required to apply for such license in the future.

The interpretation and application of existing PRC laws, regulations and policies and possible new laws, regulations or policies relating to the internet industry have created substantial uncertainties regarding the legality of existing and future foreign investments in, and the businesses and activities of, internet businesses in China, including our business. For instance, on August 1, 2019, the General Office of the State Council promulgated the Guiding Opinions on Promoting the Well-regulated and Sound Development of the Platform Economy, or the Guiding Opinions on Platform Economy, which provide that the market access management and the operational and post-operational supervision of the financial business of internet platforms involving financial services shall be subject to laws, regulations and the relevant provisions. Establishment of financial institutions, operation of financial activities, provision of financial information intermediary and transaction matching services shall be subject to entry administration according to the laws. Due to the lack of further interpretations of the Guiding Opinions on Platform Economy, it is uncertain whether we will be deemed as providing "financial information intermediary and transaction matching services" as prescribed under the Guiding Opinions on Platform Economy and be subject to entry administration. Therefore, we cannot assure you that we have obtained all the permits or licenses required for conducting our business in China or will be able to maintain our existing licenses or obtain new ones, and we cannot assure you that we will not be required in the future by the relevant governmental authorities to obtain other approvals or licenses. If we were required to obtain any new approval or license, we may not be able to obtain such license or approval in a timely manner, or at all. As a platform, we have been continuously improving and innovating products, services and solutions to better empower our users and enable financial service providers. For instance, we launched our Social Media and Partner Program in the third quarter of 2018, within which we introduced a cooperation system with our users who may register as our business partners in carrying out the financial product recommendation services on our platform (see "Item 4. Information on the Company—B. Business Overview—Marketing and Brand Promotion"). Given the complexity, uncertainties and changes in PRC regulations, and that we have limited control over our users and financial service providers on our platform and may not be able to effectively monitor their activities, so we cannot assure you that our practices or the activities of our users and financial service providers will not be deemed to violate any existing or future laws, regulations or policies. If any of our practices or the activities of our users and financial service providers is deemed to violate any existing or future laws, regulations or policies, we may be ordered to cease such activities, and may be subject to other penalties as determined by the relevant government authorities, and our business, financial condition, results of operations and prospects could be materially and adversely affected.

In addition, we started to operate insurance brokerage business through Shanghai Anguo Insurance Brokerage Co., Ltd. since the fourth quarter of 2019. The insurance brokerage business is a highly regulated industry in China, and the regulatory regime continues to evolve. The China Banking and Insurance Regulatory Commission, or the CBIRC, has extensive authority to supervise and regulate the insurance industry in China and has been enhancing its supervision over this industry in recent years, and new laws, regulations and regulatory requirements have been promulgated and implemented from time to time. We face challenges brought by these new laws, regulations and regulatory requirements, as well as significant uncertainties in the interpretation and application thereof. We might be required to spend significant time and resources in order to comply with any material changes in the regulatory environment, which could trigger significant changes to the competitive landscape of our insurance brokerage business and we may lose some or all of our competitive advantages during this process. Moreover, the CBIRC and its local branches may conduct various examinations and inspections on our insurance brokerage business operations from time to time, which could cover a broad range of aspects, including financial reporting, tax reporting, internal control and compliance with applicable laws, rules and regulations. If any non-compliance incidents in our insurance brokerage business operation are identified, we may be required to take certain rectification measures in accordance with applicable laws and regulations, or we may be subject to other administrative penalties.

***We may rely on dividends and other distributions on equity paid by our PRC subsidiaries to fund any cash and financing requirements we may have, and any limitation on the ability of our PRC subsidiaries to make payments to us could have a material and adverse effect on our ability to conduct our business.***

We are a holding company, and we may rely on dividends and other distributions on equity paid by our PRC subsidiaries for our cash and financing requirements, including the funds necessary to pay dividends and other cash distributions to our shareholders and service any debt we may incur. For a detailed discussion of applicable PRC regulations governing distribution of dividends, see "Item 5. Operating and Financial Review and Prospectus—B. Liquidity and Capital Resources—Holding Company Structure." Additionally, if our PRC subsidiaries incur debt on their own behalf in the future, the instruments governing their debt may restrict their ability to pay dividends or make other distributions to us. Furthermore, the PRC tax authorities may require our subsidiaries to adjust their taxable income under the contractual arrangements they currently have in place with our variable interest entities in a manner that would materially and adversely affect their ability to pay dividends and other distributions to us. See "—Risks Related to Our Corporate Structure—Our contractual arrangements with the VIEs may be subject to scrutiny by the PRC tax authorities and they may determine that we or our variable interest entities owe additional taxes, which could negatively affect our financial condition and the value of your investment."

Any limitation on the ability of our PRC subsidiaries to pay dividends or make other distributions to us could materially and adversely limit our ability to grow, make investments or acquisitions that could be beneficial to our business, pay dividends, or otherwise fund and conduct our business. See also "—If we are classified as a PRC resident enterprise for PRC income tax purposes, such classification could result in unfavorable tax consequences to us and our non-PRC shareholders or ADS holders."

36

*Fluctuations in exchange rates could have a material and adverse effect on our results of operations and the value of your investment.*

The conversion of Renminbi into foreign currencies, including U.S. dollars, is based on rates set by the People's Bank of China. The Renminbi has fluctuated against the U.S. dollar, at times significantly and unpredictably. The value of Renminbi against the U.S. dollar and other currencies is affected by changes in China's political and economic conditions and by China's foreign exchange policies, among other things. We cannot assure you that Renminbi will not appreciate or depreciate significantly in value against the U.S. dollar in the future. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between Renminbi and the U.S. dollar in the future.

Any significant appreciation or depreciation of Renminbi may materially and adversely affect our revenues, earnings and financial position, and the value of, and any dividends payable on, our ADSs in U.S. dollars. For example, to the extent that we need to convert U.S. dollars we receive into Renminbi to pay our operating expenses, appreciation of Renminbi against the U.S. dollar would have an adverse effect on the RMB amount we would receive from the conversion. Conversely, a significant depreciation of Renminbi against the U.S. dollar may significantly reduce the U.S. dollar equivalent of our earnings, which in turn could adversely affect the price of our ADSs.

Very limited hedging options are available in China to reduce our exposure to exchange rate fluctuations. To date, we have not entered into any hedging transactions in an effort to reduce our exposure to foreign currency exchange risk. While we may decide to enter into hedging transactions in the future, the availability and effectiveness of these hedges may be limited and we may not be able to adequately hedge our exposure or at all. In addition, our currency exchange losses may be magnified by PRC exchange control regulations that restrict our ability to convert Renminbi into foreign currency. As a result, fluctuations in exchange rates may have a material adverse effect on your investment.

*PRC regulation of loans to and direct investment in PRC entities by offshore holding companies and governmental control of currency conversion may delay or prevent us from using the proceeds of our offshore offerings to make loans to or make additional capital contributions to our PRC subsidiaries, which could materially and adversely affect our liquidity and our ability to fund and expand our business.*

Under PRC laws and regulations, we are permitted to utilize the proceeds from our IPO and the concurrent private placements to fund our PRC subsidiaries by making loans to or additional capital contributions to our PRC subsidiaries, subject to applicable government registration and approval requirements. For more details, see "Item 4. Information on the Company—B. Business Overview—Regulation—Regulations Related to Foreign Exchange—Regulation on Foreign Currency Exchange." These PRC laws and regulations may significantly limit our ability to use Renminbi converted from the net proceeds of our IPO and the concurrent private placements to fund the establishment of new entities in China by our PRC subsidiaries, to invest in or acquire any other PRC companies through our PRC subsidiaries, or to establish new variable interest entities in China. Moreover, we cannot assure you that we will be able to complete the necessary registrations or obtain the necessary government approvals on a timely basis, if at all, with respect to future loans to our PRC subsidiaries or future capital contributions by us to our PRC subsidiaries. If we fail to complete such registrations or obtain such approvals, our ability to use the proceeds we received or expect to receive from our offshore offerings and to capitalize or otherwise fund our PRC operations may be negatively affected, which could materially and adversely affect our liquidity and our ability to fund and expand our business.

*Governmental control of currency conversion may limit our ability to utilize our revenues effectively and affect the value of your investment.*

The PRC government imposes controls on the convertibility of Renminbi into foreign currencies and, in certain cases, the remittance of currency out of China. Under existing PRC foreign exchange regulations, payments of current account items, such as profit distributions and trade and service-related foreign exchange transactions, can be made in foreign currencies without prior approval from the State Administration of Foreign Exchange, or SAFE, by complying with certain procedural requirements. However, approval from or registration with appropriate governmental authorities is required where Renminbi is to be converted into foreign currency and remitted out of China to pay capital expenses such as the repayment of loans denominated in foreign currencies. See "Item 4. Information on the Company—B. Business Overview—Regulation—Regulations Related to Foreign Exchange—Regulation on Foreign Currency Exchange."

37

Since 2016, the PRC government has tightened its foreign exchange policies again and stepped up scrutiny of major outbound capital movement. More restrictions and a substantial vetting process have been put in place by SAFE to regulate cross-border transactions falling under the capital account. The PRC government may also restrict access in the future to foreign currencies for current account transactions, at its discretion. We receive substantially all of our revenues in RMB. If the foreign exchange control system prevents us from obtaining sufficient foreign currencies to satisfy our foreign currency demands, we may not be able to pay dividends in foreign currencies to our shareholders, including holders of our ADSs.

***PRC regulations relating to offshore investment activities by PRC residents may limit our PRC subsidiaries' ability to increase their registered capital or distribute profits to us or otherwise expose us or our PRC resident beneficial owners to liability and penalties under PRC law.***

SAFE requires PRC residents or entities to register with SAFE or its local branch in connection with their establishment or control of an offshore entity established for the purpose of overseas investment or financing. In addition, such PRC residents or entities must update their SAFE registrations when the offshore special purpose vehicle undergoes certain material events. See "Item 4. Information on the Company—B. Business Overview—Regulation—Regulations Related to Foreign Exchange—Regulations on Foreign Exchange Registration of Overseas Investment by PRC Residents."

If our shareholders who are PRC residents or entities do not complete their registration with the local SAFE branches, our PRC subsidiaries may be prohibited from distributing their profits and any proceeds from any reduction in capital, share transfer or liquidation to us, and we may be restricted in our ability to contribute additional capital to our PRC subsidiaries. Moreover, failure to comply with SAFE registration requirements could result in liability under PRC laws for evasion of applicable foreign exchange restrictions. All of the shareholders who directly or indirectly hold shares in our Cayman Islands holding company and who are known to us as being PRC residents have completed the initial foreign exchange registrations.

However, we may not be informed of the identities of all the PRC residents or entities holding direct or indirect interests in our company, nor can we compel our beneficial owners to comply with SAFE registration requirements. As a result, we cannot assure you that all of our shareholders or beneficial owners who are PRC residents or entities have complied with, and will in the future make or obtain any applicable registrations or approvals required by, SAFE regulations. Failure by such shareholders or beneficial owners to comply with SAFE regulations, or failure by us to amend the foreign exchange registrations of our PRC subsidiaries, could subject us to fines or legal sanctions, restrict our overseas or cross-border investment activities, limit our PRC subsidiaries' ability to make distributions or pay dividends to us or affect our ownership structure, which could adversely affect our business and prospects.

***The M&A Rules and certain other PRC regulations establish complex procedures for some acquisitions of PRC companies by foreign investors, which could make it more difficult for us to pursue growth through acquisitions in China.***

A number of PRC laws and regulations have established procedures and requirements that could make merger and acquisition activities in China by foreign investors more time consuming and complex. In addition to the Anti-monopoly Law itself, these include the Regulations on Mergers and Acquisitions of Domestic Enterprises by Foreign Investors, or the M&A Rules, adopted by six PRC regulatory agencies in 2006, and the Rules of the Ministry of Commerce on Implementation of Security Review System of Mergers and Acquisitions of Domestic Enterprises by Foreign Investors, or the Security Review Rules, promulgated in 2011. These laws and regulations impose requirements in some instances that the Ministry of Commerce be notified in advance of any change-of-control transaction in which a foreign investor takes control of a PRC domestic enterprise. In addition, the Anti-Monopoly Law requires that the anti-monopoly enforcement agency be notified in advance of any concentration of undertaking if certain thresholds are triggered. Moreover, the Security Review Rules specify that mergers and acquisitions by foreign investors that raise "national defense and security" concerns and mergers and acquisitions through which foreign investors may acquire de facto control over domestic enterprises that raise "national security" concerns are subject to strict review by the Ministry of Commerce, and prohibit any attempt to bypass a security review, including by structuring the transaction through a proxy or contractual control arrangement. In the future, we may grow our business by acquiring complementary businesses. Complying with the requirements of the relevant regulations to complete such transactions could be time consuming, and any required approval processes, including approvals from the anti-monopoly enforcement agency or the Ministry of Commerce, may delay or inhibit our ability to complete such transactions, which could affect our ability to expand our business or maintain our market share.

*Any failure to comply with PRC regulations regarding the registration requirements for employee stock incentive plans may subject the PRC plan participants or us to fines and other legal or administrative sanctions.*

Under SAFE regulations, PRC residents who participate in a stock incentive plan in an overseas publicly listed company are required to register with SAFE or its local branches and complete certain other procedures. See "Item 4. Information on the Company—B. Business Overview—Regulation—Regulations Related to Stock Incentive Plans." We and our PRC resident directors, employees and consultants who participate in our share incentive plans are subject to these regulations. If we or any of these PRC resident directors, employees and consultants fail to comply with these regulations, we or such directors, employees and consultants may be subject to fines and other legal or administrative sanctions. We also face regulatory uncertainties that could restrict our ability to adopt additional incentive plans for our directors, executive officers and employees under PRC law.

*If we are classified as a PRC resident enterprise for PRC income tax purposes, such classification could result in unfavorable tax consequences to us and our non-PRC shareholders or ADS holders.*

Under the PRC Enterprise Income Tax Law and its implementation rules, an enterprise established outside of the PRC with a "de facto management body" within the PRC is considered a PRC resident enterprise. The implementation rules define the term "de facto management body" as the body that exercises full and substantial control over and overall management of the business, productions, personnel, accounts and properties of an enterprise. In 2009, the State Administration of Taxation issued a circular, known as Circular 82, which provides certain specific criteria for determining whether the "de facto management body" of a PRC-controlled enterprise that is incorporated offshore is located in China. Although Circular 82 only applies to offshore enterprises controlled by PRC enterprises or PRC enterprise groups, the criteria set forth in the circular may reflect the State Administration of Taxation's general position on how the "de facto management body" test should be applied in determining the tax resident status of all offshore enterprises. According to Circular 82, an offshore incorporated enterprise controlled by a PRC enterprise or a PRC enterprise group will be regarded as a PRC tax resident by virtue of having its "de facto management body" in China and will be subject to PRC enterprise income tax on its global income only if all of the following conditions are met: (i) the primary location of the senior management team in charge of day-to-day operation is in the PRC; (ii) decisions relating to the enterprise's financial and human resource matters are made or are subject to approval by organizations or personnel in the PRC; (iii) the enterprise's primary assets, accounting books and records, company seals, and board and shareholder resolutions, are located or maintained in the PRC; and (iv) at least 50% of voting board members or senior executives habitually reside in the PRC.

We believe that none of our entities outside of China is a PRC resident enterprise for PRC tax purposes. However, the tax resident status of an enterprise is subject to determination by the PRC tax authorities and uncertainties remain with respect to the interpretation of the term "de facto management body." If the PRC tax authorities determine that we are a PRC resident enterprise for enterprise income tax purposes, we will be subject to the enterprise income tax on our global income at the rate of 25% and we will be required to comply with PRC enterprise income tax reporting obligations. In addition, gains realized on the sale or other disposition of our ADSs or Class A ordinary shares may be subject to PRC tax, at a rate of 10% in the case of non-PRC enterprises or 20% in the case of non-PRC individuals (in each case, subject to the provisions of any applicable tax treaty), if such gains are deemed to be from PRC sources. It is unclear whether non-PRC shareholders of our company would be able to claim the benefits of any tax treaties between their country of tax residence and the PRC in the event that we are treated as a PRC resident enterprise. Any such tax may reduce the returns on your investment in the ADSs.

*We may not be able to obtain certain benefits under the relevant tax arrangement for dividends paid by our PRC subsidiaries to us through our Hong Kong subsidiaries.*

We are a holding company incorporated under the laws of the Cayman Islands and as such rely on dividends and other distributions on equity from our PRC subsidiaries to satisfy part of our liquidity requirements. Pursuant to the PRC Enterprise Income Tax Law, a withholding tax rate of 10% currently applies to dividends paid by a PRC "resident enterprise" to a foreign enterprise investor, unless any such foreign investor's jurisdiction of incorporation has a tax treaty with China that provides for preferential tax treatment. Pursuant to the Arrangement between the Mainland China and the Hong Kong Special Administrative Region for the Avoidance of Double Taxation and Tax Evasion on Income, such withholding tax rate may be lowered to 5% if a Hong Kong resident enterprise is the beneficial owner of the dividends and owns no less than 25% of a PRC enterprise. The State Administration of Taxation promulgated SAT Circular 9 in February 2018, which became effective from April 2018 and stipulates that in determining whether a non-resident enterprise has the status as a beneficial owner, comprehensive analysis shall be conducted based on the factors listed therein and the actual circumstances of the specific case shall be taken into consideration. Specifically, it expressly excludes an agent or a designated payee from being considered as a "beneficial owner". Furthermore, the Administrative Measures for Non-Resident Enterprises to Enjoy Treatments under Tax Treaties, which became effective in August 2015, require non-resident enterprises to determine whether they are qualified to enjoy the preferential tax treatment under the tax treaties and file relevant report and materials with the tax authorities. There are also other conditions for enjoying the reduced withholding tax rate according to other relevant tax rules and regulations. See "Item 5. Operating and Financial Review and Prospectus—A. Operating Results—Taxation—China." As of December 31, 2017 no withholding tax was recorded on the retained earnings of our or RONG360 Inc.'s PRC subsidiaries (as applicable) as they did not have any retained earnings for any of the periods. We do not have any present plan to have our subsidiaries to distribute their earnings overseas, and we intend to retain most, if not all, of our available funds and any future earnings in China to operate and expand our business within the PRC. Accordingly, we did not record any withholding tax on the retained earnings of our subsidiaries in the PRC as of December 31, 2018 and 2019. We cannot assure you that our determination regarding our qualification to enjoy the preferential tax treatment will not be challenged by the relevant tax authority or we will be able to complete the necessary filings with the relevant tax authority and enjoy the preferential withholding tax rate of 5% under the arrangement with respect to any dividends to be paid by our PRC subsidiaries to our Hong Kong subsidiaries.

***We and our shareholders face uncertainty with respect to indirect transfers of equity interests in PRC resident enterprises, assets attributed to a PRC establishment of a non-PRC company or immovable properties located in China owned by non-PRC companies.***

In February 2015, the State Administration of Taxation issued the Bulletin on Issues of Enterprise Income Tax on Indirect Transfers of Assets by Non-PRC Resident Enterprises, or SAT Bulletin 7. In October, 2017, SAT issued the Bulletin of SAT on Issues Concerning the Withholding of Non-resident Enterprise Income Tax at Source, or the SAT Bulletin 37, which became effective on December 1, 2017 and repealed certain rules stipulated SAT Bulletin 7. The Bulletin 37 further details and clarifies the tax withholding methods in respect of income of non-resident enterprises. Pursuant to the applicable laws and regulations, an "indirect transfer" of assets, including equity interests in a PRC resident enterprise, by non-PRC resident enterprises may be re-characterized and treated as a direct transfer of PRC taxable assets, if the arrangement does not have a reasonable commercial purpose and was established for the purpose of avoiding payment of PRC enterprise income tax. As a result, gains derived from the indirect transfer may be subject to PRC enterprise income tax. According to SAT Bulletin 7, "PRC taxable assets" include assets attributed to an establishment in China, immovable properties located in China, and equity investments in PRC resident enterprises. Gains derived from the transfer of PRC taxable assets by a direct holder that is a non-PRC resident enterprise is subject to PRC enterprise income taxes. When determining whether an arrangement has a "reasonable commercial purpose", the following factors are considered: whether the value of the equity interest of the relevant offshore enterprise is mainly derived from PRC taxable assets; whether the assets of the relevant offshore enterprise mainly consist of direct or indirect investment in China; whether the income of the relevant offshore enterprise is mainly generated from China; whether the offshore enterprise and its subsidiaries directly or indirectly holding PRC taxable assets have real commercial nature as evidenced by actual function and risk exposure; for how long the existing business model and organizational structure of the relevant offshore enterprise has existed; the replicability of the arrangement by direct transfer of PRC taxable assets; and the tax situation of such indirect transfer and applicable tax treaties or similar arrangements. Gains derived from an indirect offshore transfer of assets of a PRC establishment or place of business are to be included in the enterprise income tax filing of the PRC establishment or place of business, and are subject to a PRC enterprise income tax rate of 25%. In case of a transfer of immovable properties located in China or of equity investments in a PRC resident enterprise, which is not related to a PRC establishment or place of business of a non-resident enterprise, a PRC enterprise income tax rate of 10% applies, subject to available preferential tax treatment under applicable tax treaties or similar arrangements. The party who is obligated to pay for the transfer has the withholding obligation with respect to the transfer. Where the payor fails to withhold sufficient tax, the transferor is required to declare and pay such tax to the tax authority by itself. Where a transferor fails to declare and pay such tax, the tax authority may require it to pay during a specified period, and the transferor shall declare and pay such tax during the period determined by the tax authority; and where the transferor declares and pays tax on its own initiative before the specified period expires, it shall be deemed to have paid such tax as scheduled. SAT Bulletin 7 does not apply to sales of shares by investors through a public stock exchange if the shares were acquired by the investors through a public stock exchange.

40

We face uncertainties as to the application of SAT Bulletin 37 and SAT Bulletin 7, including reporting and other obligations with respect to certain past and future transactions where PRC taxable assets are involved, such as offshore restructuring, sale of the shares in our offshore subsidiaries or investments. We may be subject to filing obligations or taxed as the transferor, or subject to withholding obligations as the transferee, in the transactions. For transfer of our shares by investors that are non-PRC resident enterprises, our PRC subsidiaries may be requested to assist in filings under SAT Bulletin 7. We may be required to allocate valuable resources to comply with SAT Bulletin 37 and SAT Bulletin 7, to request relevant transferors from whom we purchase taxable assets to comply with these rules, or to establish that we should not be taxed under these rules, which may have a material adverse effect on our financial condition and results of operations.

***Our ADSs may be delisted under the Holding Foreign Companies Accountable Act if the PCAOB is unable to inspect auditors who are located in China. The delisting of our ADSs, or the threat of their being delisted, may materially and adversely affect the value of your investment. Additionally, the inability of the PCAOB to conduct inspections deprives our investors with the benefits of such inspections.***

The Holding Foreign Companies Accountable Act, or the HFCA Act, was enacted on December 18, 2020. The HFCA Act states if the SEC determines that we have filed audit reports issued by a registered public accounting firm that has not been subject to inspection by the PCAOB for three consecutive years beginning in 2021, the SEC shall prohibit our shares or ADSs from being traded on a national securities exchange or in the "over-the-counter" trading market in the U.S.

Our auditor, the independent registered public accounting firm that issues the audit report included elsewhere in this annual report, as an auditor of companies that are traded publicly in the United States and a firm registered with the PCAOB, is subject to laws in the United States pursuant to which the PCAOB conducts regular inspections to assess its compliance with the applicable professional standards. Since our auditor is located in China, a jurisdiction where the PCAOB has been unable to conduct inspections without the approval of the Chinese authorities, our auditor is currently not inspected by the PCAOB.

On March 24, 2021, the SEC adopted interim final rules relating to the implementation of certain disclosure and documentation requirements of the HFCA Act. We will be required to comply with these rules if the SEC identifies us as having a "non-inspection" year under a process to be subsequently established by the SEC. The SEC is assessing how to implement other requirements of the HFCA Act, including the listing and trading prohibition requirements described above.

The SEC may propose additional rules or guidance that could impact us if our auditor is not subject to PCAOB inspection. For example, on August 6, 2020, the President's Working Group on Financial Markets, or the PWG, issued the Report on Protecting United States Investors from Significant Risks from Chinese Companies to the then President of the United States. This report recommended the SEC implement five recommendations to address companies from jurisdictions that do not provide the PCAOB with sufficient access to fulfil its statutory mandate. Some of the concepts of these recommendations were implemented with the enactment of the HFCA Act. However, some of the recommendations were more stringent than the HFCA Act. For example, if a company was not subject to PCAOB inspection, the report recommended that the transition period before a company would be delisted would end on January 1, 2022.

The SEC has announced that the SEC staff is preparing a consolidated proposal for the rules regarding the implementation of the HFCA Act and to address the recommendations in the PWG report. It is unclear when the SEC will complete its rulemaking and when such rules will become effective and what, if any, of the PWG recommendations will be adopted. The implications of this possible regulation in addition the requirements of the HFCA Act are uncertain. Such uncertainty could cause the market price of our ADSs to be materially and adversely affected, and our securities could be delisted or prohibited from being traded "over-the-counter" earlier than would be required by the HFCA Act. If our securities are unable to be listed on another securities exchange by then, such a delisting would substantially impair your ability to sell or purchase our ADSs when you wish to do so, and the risk and uncertainty associated with a potential delisting would have a negative impact on the price of our ADSs.

41

The PCAOB's inability to conduct inspections in China prevents it from fully evaluating the audits and quality control procedures of our independent registered public accounting firm. As a result, we and investors in our ordinary shares are deprived of the benefits of such PCAOB inspections. The inability of the PCAOB to conduct inspections of auditors in China makes it more difficult to evaluate the effectiveness of our independent registered public accounting firm's audit procedures or quality control procedures as compared to auditors outside of China that are subject to the PCAOB inspections, which could cause investors and potential investors in our stock to lose confidence in our audit procedures and reported financial information and the quality of our financial statements.

In May 2013, the PCAOB announced that it had entered into a Memorandum of Understanding on Enforcement Cooperation with the CSRC and the PRC Ministry of Finance, which establishes a cooperative framework between the parties for the production and exchange of audit documents relevant to investigations undertaken by the PCAOB in the PRC or by the CSRC or the PRC Ministry of Finance in the United States. The PCAOB continues to be in discussions with the CSRC and the PRC Ministry of Finance to permit joint inspections in the PRC of audit firms that are registered with the PCAOB and audit Chinese companies that trade on U.S. exchanges.

***Proceedings instituted by the SEC against certain PRC-based accounting firms, including our independent registered public accounting firm, could result in financial statements being determined to not be in compliance with the requirements of the Exchange Act.***

Starting in 2011 the Big Four PRC-based accounting firms in China, including our independent registered public accounting firm, were affected by a conflict between U.S. and Chinese law. Specifically, for certain U.S.-listed companies operating and audited in mainland China, the SEC and the PCAOB sought to obtain from the Chinese firms access to their audit work papers and related documents. The firms were, however, advised and directed that under Chinese law, they could not respond directly to the U.S. regulators on those requests, and that requests by foreign regulators for access to such papers in China had to be channeled through the CSRC.

In late 2012, this impasse led the SEC to commence administrative proceedings under Rule 102(e) of its Rules of Practice and also under the Sarbanes-Oxley Act of 2002 against the Chinese accounting firms, including our independent registered public accounting firm. A first instance trial of the proceedings in July 2013 in the SEC's internal administrative court resulted in an adverse judgment against the firms. The administrative law judge proposed penalties on the firms including a temporary suspension of their right to practice before the SEC, although that proposed penalty did not take effect pending review by the Commissioners of the SEC. On February 6, 2015, before a review by the Commissioner had taken place, the firms reached a settlement with the SEC. Under the settlement, the SEC accepted that future requests by the SEC for the production of documents will normally be made to the CSRC. The firms failed to meet specified criteria, the SEC retained authority to impose a variety of additional remedial measures on the firms depending on the nature of the failure.

Under the terms of the settlement, the underlying proceeding against the four PRC-based accounting firms was deemed dismissed with prejudice four years after entry of the settlement. The four-year mark occurred on February 6, 2019. While we cannot predict if the SEC will further challenge the four PRC-based accounting firms' compliance with U.S. law in connection with U.S. regulatory requests for audit work papers or if the results of such a challenge would result in the SEC imposing penalties such as suspensions. If additional remedial measures are imposed on the four PRC-based accounting firms, including our independent registered public accounting firm, we could be unable to timely file future financial statements in compliance with the requirements of the Exchange Act.

In the event the four PRC-based accounting firms become subject to additional legal challenges by the SEC or PCAOB, depending upon the final outcome, listed companies in the United States with major PRC operations may find it difficult or impossible to retain auditors in respect of their operations in the PRC, which could result in financial statements being determined to not be in compliance with the requirements of the Exchange Act, including possible delisting. Moreover, any negative news about any such future proceedings against these audit firms may cause investor uncertainty regarding China-based, U.S.-listed companies and the market price of our common stock may be adversely affected.

42

If our independent registered public accounting firm was denied, even temporarily, the ability to practice before the SEC and we were unable to timely find another registered public accounting firm to audit and issue an opinion on our financial statements, our financial statements could be determined not to be in compliance with the requirements of the Exchange Act. Such a determination could ultimately lead to the delisting of the ADSs from the New York Stock Exchange or deregistration from the SEC, or both, which would substantially reduce or effectively terminate the trading of the ADSs in the United States.

*It may be difficult for overseas regulators to conduct investigations or collect evidence within China.*

Shareholder claims or regulatory investigations that are common in jurisdictions outside China are difficult to pursue as a matter of law or practicality in China. For example, in China, there are significant legal and other obstacles to providing information needed for regulatory investigations or litigation initiated outside China. Although the authorities in China may establish a regulatory cooperation mechanism with the securities regulatory authorities of another country or region to implement cross-border supervision and administration, such cooperation with the securities regulatory authorities in the United States or other jurisdictions may not be efficient in the absence of a mutual and practical cooperation mechanism. Furthermore, according to Article 177 of the PRC Securities Law, or Article 177, which became effective in March 2020, no overseas securities regulator is allowed to directly conduct investigation or evidence collection activities within the territory of the PRC, and without the consent by the Chinese securities regulatory authorities and the other competent governmental agencies, no entity or individual may provide documents or materials related to securities business to any foreign party. While detailed interpretation of or implementation rules under Article 177 have yet to be promulgated, the inability of an overseas securities regulator to directly conduct investigation or evidence collection activities within China and the potential obstacles for information provision may further increase difficulties you face in protecting your interests. See also "—Risks Related to Our ADSs— You may face difficulties in protecting your interests, and your ability to protect your rights through U.S. courts may be limited, because we are incorporated under Cayman Islands law."

*The custodians or authorized users of our controlling non-tangible assets, including chops and seals, may fail to fulfill their responsibilities, or misappropriate or misuse these assets.*

Under the PRC law, legal documents for corporate transactions, including agreements and contracts are executed using the chop or seal of the signing entity or with the signature of a legal representative whose designation is registered and filed with relevant PRC market regulation administrative authorities.

In order to secure the use of our chops and seals, we have established internal control procedures and rules for using these chops and seals. In any event that the chops and seals are intended to be used, the responsible personnel will submit the application through our office automation system and the application will be verified and approved by authorized employees in accordance with our internal control procedures and rules. In addition, in order to maintain the physical security of our chops, we generally have them stored in secured locations accessible only to authorized employees. Although we monitor such authorized employees, the procedures may not be sufficient to prevent all instances of abuse or negligence. There is a risk that our employees could abuse their authority, for example, by entering into a contract not approved by us or seeking to gain control of one of our subsidiaries or our VIEs or their subsidiaries. If any employee obtains, misuses or misappropriates our chops and seals or other controlling non-tangible assets for whatever reason, we could experience disruption to our normal business operations. We may have to take corporate or legal action, which could involve significant time and resources to resolve and divert management from our operations.

*Recent litigation and negative publicity surrounding China-based companies listed in the U.S. may result in increased regulatory scrutiny of us and negatively impact the trading price of our ADSs.*

We believe that litigation and negative publicity surrounding companies with operations in China that are listed in the U.S. have negatively impacted stock prices for such companies. Various equity-based research organizations have published reports on China-based companies after examining, among other things, their corporate governance practices, related party transactions, sales practices and financial statements that have led to special investigations and stock suspensions on national exchanges. Any similar scrutiny of us, regardless of its lack of merit, could result in a diversion of management resources and energy, potential costs to defend ourselves against rumors, decreases and volatility in the ADS trading price, and increased directors and officers insurance premiums, and could have a material adverse effect upon our business, results of operations and financial condition.

43

**Risks Related to Our ADSs**

***If the market price for our ADSs falls below US$1.00 for an extended period of time, or falls to US$0.16 at any time, our ADSs may be delisted from the NYSE.***

Pursuant to NYSE Rule 802.01C, a company will be considered to be below compliance standards if the average closing price of a security as reported on the consolidated tape is less than US$1.00 over a consecutive 30 trading-day period. Once notified, the company must bring its share price and average share price back above US$1.00 within the applicable cure period following receipt of the notification. The company can regain compliance at any time during the cure period if on the last trading day of any calendar month during the cure period the company has a closing share price of at least US$1.00 and an average closing share price of at least US$1.00 over the 30 trading-day period ending on the last trading day of that month. In the event that at the expiration of the cure period, both a US$1.00 closing share price on the last trading day of the cure period and a US$1.00 average closing share price over the 30 trading-day period ending on the last trading day of the cure period are not attained, the NYSE will commence suspension and delisting procedures. In addition, we understand that the NYSE has a policy to suspend trading immediately and commence delisting procedures if the market price of securities falls to US$0.16 or less. We received a letter from the NYSE dated April 13, 2020 and further e-mail communication on April 23, 2020, notifying us that (i) we are below compliance standards due to the trading price of our ADSs and (ii) the applicable cure period for us to regain compliance expires on December 22, 2020. In response to the letter and email communication from the NYSE, we changed the ratio of ADSs to our Class A ordinary shares from the previous ADS Ratio of two ADSs to five Class A ordinary shares to a new ADS Ratio of one ADS to 20 Class A ordinary shares, effective October 30, 2020. However, we cannot assure you that our ADSs will remain in compliance with the NYSE listing rules going forward. If our ADSs are delisted from the NYSE, the liquidity and value of an investment in our ADSs will be materially and adversely affected.

***The trading price of our ADSs is likely to be volatile, which could result in substantial losses to investors.***

Since our ADSs became listed on NYSE on November 16, 2017, the trading price of our ADSs has ranged from US$2.02 to US$75.92 per ADS, taking into account retrospective adjustments for the change in the number of Class A ordinary shares represented by each ADS that occurred on October 30, 2020. The trading price of our ADSs is likely to be volatile and could fluctuate widely due to factors beyond our control. This may happen because of broad market and industry factors, like the performance and fluctuation of the market prices of other companies with business operations located mainly in China that have listed their securities in the United States. A number of Chinese companies have listed or are in the process of listing their securities on U.S. stock markets. The securities of some of these companies have experienced significant volatility, including price declines in connection with their IPOs. The trading performances of these Chinese companies' securities after their offerings may affect the attitudes of investors toward Chinese companies listed in the United States in general and consequently may impact the trading performance of our ADSs, regardless of our actual operating performance.

In addition to market and industry factors, the price and trading volume for our ADSs may be highly volatile for factors specific to our own operations, including the following:

· variations in our revenues, earnings and cash flow;

· announcements of new investments, acquisitions, strategic partnerships or joint ventures by us or our competitors;

· announcements of new services and expansions by us or our competitors;

· announcements of new policies, rules or regulations relating to the internet or the financial services industry in China;

44

· changes in financial estimates by securities analysts;

· detrimental adverse publicity about us, our services, our competitors or our industry;

· additions or departures of key personnel;

· our share repurchase programs;

· litigation, government investigation or other legal or regulatory proceedings;

· fluctuations of exchange rates between the RMB and the U.S. dollar;

· release of lock-up or other transfer restrictions on our outstanding equity securities or sales of additional equity securities; and

· general economic or political conditions in China or elsewhere in the world.

Any of these factors may result in large and sudden changes in the volume and price at which our ADSs will trade.

We are named as a defendant in two putative shareholder class action lawsuits in the United States and we may be involved in more class action lawsuits in the future. See "Item 8. Financial Information—A. Consolidated Statements and Other Financial Information—Legal Proceedings." Such lawsuits could divert a significant amount of our management's attention and other resources from our business and operations and require us to incur significant expenses to defend the suits, which could harm our results of operations and our reputation, and could restrict our ability to raise capital in the future. In addition, if any of these claims is successfully made against us, we may be required to pay significant damages, which could have a material adverse effect on our financial condition and results of operations.

*Techniques employed by short sellers may drive down the market price of our ADSs.*

Short selling is the practice of selling securities that the seller does not own but rather has borrowed from a third party with the intention of buying identical securities back at a later date to return to the lender. The short seller hopes to profit from a decline in the value of the securities between the sale of the borrowed securities and the purchase of the replacement shares, as the short seller expects to pay less in that purchase than it received in the sale. As it is in the short seller's interest for the price of the security to decline, many short sellers publish, or arrange for the publication of, negative opinions regarding the relevant issuer and its business prospects in order to create negative market momentum and generate profits for themselves after selling a security short. These short attacks have, in the past, led to selling of shares in the market.

Public companies listed in the United States that have a substantial majority of their operations in China have been the subject of short selling. Much of the scrutiny and negative publicity has centered on allegations of a lack of effective internal control over financial reporting resulting in financial and accounting irregularities and mistakes, inadequate corporate governance policies or a lack of adherence thereto and, in many cases, allegations of fraud. As a result, many of these companies are now conducting internal and external investigations into the allegations and, in the interim, are subject to shareholder lawsuits and/or SEC enforcement actions.

We may be the subject of unfavorable allegations made by short sellers in the future. Any such allegations may be followed by periods of instability in the market price of our common shares and ADSs and negative publicity. If and when we become the subject of any unfavorable allegations, whether such allegations are proven to be true or untrue, we could have to expend a significant amount of resources to investigate such allegations and/or defend ourselves. While we would strongly defend against any such short seller attacks, we may be constrained in the manner in which we can proceed against the relevant short seller by principles of freedom of speech, applicable federal or state law or issues of commercial confidentiality. Such a situation could be costly and time-consuming and could distract our management from growing our business. Even if such allegations are ultimately proven to be groundless, allegations against us could severely impact our business operations and shareholders' equity, and the value of any investment in our ADSs could be greatly reduced or rendered worthless.

***Our dual-class share structure with different voting rights will limit your ability to influence corporate matters and could discourage others from pursuing any change of control transactions that holders of our Class A ordinary shares and ADSs may view as beneficial.***

Immediately prior to the completion of our IPO, we adopted a dual-class share structure such that our ordinary shares consist of Class A ordinary shares and Class B ordinary shares. In respect of matters requiring the votes of shareholders, holders of Class A ordinary shares are entitled to one vote per share, while holders of Class B ordinary shares are entitled to ten votes per share based on our dual-class share structure. We sold Class A ordinary shares represented by our ADSs in our IPO. Each Class B ordinary share is convertible into one Class A ordinary share at any time by the holder thereof, while Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Upon any sale, transfer, assignment or disposition of any Class B ordinary share by a founder to any person who is not a founder affiliate of such founder, or upon a change of ultimate beneficial ownership of any Class B ordinary share from a founder to any person who is not a founder affiliate of such founder, such Class B ordinary share shall be automatically and immediately converted into one Class A ordinary share. In addition, if shares beneficially owned by the founders collectively account for less than five percent (5%) of the issued shares in the capital of the Company, then each Class B ordinary share shall automatically be re-designated into one Class A ordinary share and no Class B ordinary shares shall be issued by the Company thereafter. When a founder ceases to be a director or an executive officer of the Company, each Class B ordinary share beneficially owned by such founder shall automatically be re-designated into one Class A ordinary share.

On July 31, 2018, RONG360 completed the share distribution of our ordinary shares held by it to the existing shareholders of RONG360 in proportion to RONG360's shareholding structure, and thus completed the Restructuring to strengthen our positioning as an independent open platform. As of December 31, 2020, Mr. Daqing (David) Ye, Mr. Jiayan Lu, Mr. Caofeng Liu and Mr. Chenchao Zhuang hold Class B ordinary shares and beneficially own approximately 76.6% of the aggregate voting power of our company. As a result of the dual-class share structure and the concentration of ownership, holders of our Class B ordinary shares will have considerable influence over matters such as decisions regarding mergers, consolidations and the sale of all or substantially all of our assets, election of directors and other significant corporate actions. They may take actions that are not in the best interest of us or our other shareholders. We may incur share-based compensation expenses as a result of adopting this dual-class share structure. This concentration of ownership may discourage, delay or prevent a change in control of our company, which could have the effect of depriving our other shareholders of the opportunity to receive a premium for their shares as part of a sale of our company and may reduce the price of our ADSs. This concentrated control will limit your ability to influence corporate matters and could discourage others from pursuing any potential merger, takeover or other change of control transactions that holders of Class A ordinary shares and ADSs may view as beneficial. In addition, we may incur share-based compensation expenses as a result of adopting this dual-class share structure.

***We cannot guarantee that any share repurchase program will be fully consummated or that any share repurchase program will enhance long-term shareholder value, and share repurchases could increase the volatility of the price of our ADSs and could diminish our cash reserves.***

On August 24, 2018, our board of directors authorized a share repurchase program, under which we may repurchase up to US$20 million of our ADSs over the following twelve months through August 24, 2019. On February 22, 2019, our board of directors authorized a new share repurchase program, under which we may repurchase up to US$10 million of our ADSs during the following twelve months through February 22, 2020. The share repurchase programs, authorized by our board of directors, do not obligate us to repurchase any specific dollar amount or to acquire any specific number of ADSs. The share repurchase programs could affect the price of our ADSs and increase volatility and may be suspended or terminated at any time, which may result in a decrease in the trading price of our ADSs. We had accumulatively repurchased approximately US$30 million of ADSs and closed the two share repurchase programs in the third quarter of 2019.

***If securities or industry analysts do not publish research or reports about our business, or if they adversely change their recommendations regarding our ADSs, the market price for our ADSs and trading volume could decline.***

The trading market for our ADSs will be influenced by research or reports that industry or securities analysts publish about our business. If one or more analysts who cover us downgrade our ADSs, the market price for our ADSs would likely decline. If one or more of these analysts cease to cover us or fail to regularly publish reports on us, we could lose visibility in the financial markets, which in turn could cause the market price or trading volume for our ADSs to decline.

***Because we do not expect to pay dividends in the foreseeable future, you must rely on price appreciation of our ADSs for return on your investment.***

We currently intend to retain most, if not all, of our available funds and any future earnings to fund the development and growth of our business. As a result, we do not expect to pay any cash dividends in the foreseeable future. Therefore, you should not rely on an investment in our ADSs as a source for any future dividend income.

Our board of directors has complete discretion as to whether to distribute dividends. Even if our board of directors decides to declare and pay dividends, the timing, amount and form of future dividends, if any, will depend on, among other things, our future results of operations and cash flow, our capital requirements and surplus, the amount of distributions, if any, received by us from our subsidiaries, our financial condition, contractual restrictions and other factors deemed relevant by our board of directors. Accordingly, the return on your investment in our ADSs will likely depend entirely upon any future price appreciation of our ADSs. There is no guarantee that our ADSs will appreciate in value or even maintain the price at which you purchased the ADSs. You may not realize a return on your investment in our ADSs and you may even lose your entire investment in our ADSs.

***There can be no assurance that we will not be classified as a passive foreign investment company, or PFIC, for U.S. federal income tax purposes for any taxable year, which could result in adverse U.S. federal income tax consequences to U.S. holders of our ADSs or Class A ordinary shares.***

A non-U.S. corporation will be classified as a passive foreign investment company, or PFIC, for any taxable year if either (1) at least 75% of its gross income for such year consists of certain types of "passive" income or (2) at least 50% of the value of its assets (based on an average of the quarterly values of the assets) during such year is attributable to assets that produce passive income or are held for the production of passive income. Based on our current and expected income and assets, we do not believe we were a PFIC for the taxable year ended December 31, 2019. However, no assurance can be given in this regard because the determination of whether we were, are or will become a PFIC is a fact-intensive inquiry made on an annual basis that depends, in part, upon the composition of our income and assets. Recent fluctuations in the market price of our ADSs have increased our risk of becoming a PFIC, and continued fluctuations in the market price of our ADSs may cause us to become a PFIC for the current or subsequent taxable years because the value of our assets for the purpose of the second part of the test described above may be determined by reference to the market price of our ADSs. The composition of our income and assets may also be affected by how, and how quickly, we use our liquid assets.

If we were to be or become a PFIC for any taxable year during which a U.S. Holder (as defined in "Item 10. Additional Information—E. Taxation—United States Federal Income Tax Considerations") holds our ADSs or Class A ordinary shares, certain adverse U.S. federal income tax consequences could apply to such U.S. Holder. See "Item 10. Additional Information—E. Taxation—Passive Foreign Investment Company Rules."

***Our memorandum and articles of association contain anti-takeover provisions that could have a material adverse effect on the rights of holders of our ordinary shares and ADSs.***

Our memorandum and articles of association contain provisions to limit the ability of others to acquire control of our company or cause us to engage in change-of-control transactions. These provisions could have the effect of depriving our shareholders of an opportunity to sell their shares at a premium over prevailing market prices by discouraging third parties from seeking to obtain control of our company in a tender offer or similar transaction. Our proposed dual-class voting structure gives disproportionate voting power to the Class B ordinary shares. In addition, our board of directors will have the authority, without further action by our shareholders, to issue preferred shares in one or more series and to fix their designations, powers, preferences, privileges, and relative participating, optional or special rights and the qualifications, limitations or restrictions, including dividend rights, conversion rights, voting rights, terms of redemption and liquidation preferences, any or all of which may be greater than the rights associated with our ordinary shares, in the form of ADS or otherwise. Preferred shares could be issued quickly with terms calculated to delay or prevent a change in control of our company or make removal of management more difficult. If our board of directors decides to issue preferred shares, the price of our ADSs may fall and the voting and other rights of the holders of our ordinary shares and ADSs may be materially and adversely affected.

47

***You may face difficulties in protecting your interests, and your ability to protect your rights through U.S. courts may be limited, because we are incorporated under Cayman Islands law.***

We are an exempted company incorporated under the laws of the Cayman Islands. Our corporate affairs are governed by our memorandum and articles of association, the Companies Act of the Cayman Islands, as amended, and the common law of the Cayman Islands. The rights of shareholders to take action against the directors, actions by minority shareholders and the fiduciary responsibilities of our directors to us under Cayman Islands law are to a large extent governed by the common law of the Cayman Islands. The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from the common law of England, the decisions of whose courts are of persuasive authority, but are not binding, on a court in the Cayman Islands. The rights of our shareholders and the fiduciary responsibilities of our directors under Cayman Islands law are not as clearly established as they would be under statutes or judicial precedent in some jurisdictions in the United States. In particular, the Cayman Islands has a less developed body of securities laws than the United States. Some U.S. states, such as Delaware, have more fully developed and judicially interpreted bodies of corporate law than the Cayman Islands. In addition, Cayman Islands companies may not have standing to initiate a shareholder derivative action in a federal court of the United States.

Shareholders of Cayman Islands exempted companies like us have no general rights under Cayman Islands law to inspect corporate records (other than the memorandum and articles of associations) or to obtain copies of lists of shareholders of these companies. Our directors have discretion under our articles of association to determine whether or not, and under what conditions, our corporate records may be inspected by our shareholders, but are not obliged to make them available to our shareholders. This may make it more difficult for you to obtain the information needed to establish any facts necessary for a shareholder motion or to solicit proxies from other shareholders in connection with a proxy contest.

Certain corporate governance practices in the Cayman Islands, which is our home country, differ significantly from requirements for companies incorporated in other jurisdictions such as the United States. If we choose to follow home country practice, our shareholders may be afforded less protection than they otherwise would under rules and regulations applicable to U.S. domestic issuers.

As a result of all of the above, our public shareholders may have more difficulty in protecting their interests in the face of actions taken by management, members of the board of directors or controlling shareholders than they would as public shareholders of a company incorporated in the United States.

***Certain judgments obtained against us by our shareholders may not be enforceable.***

We are a Cayman Islands exempted company and all of our assets are located outside of the United States. Substantially all of our current operations are conducted in China. In addition, most of our current directors and officers are nationals and residents of countries other than the United States. All or a substantial portion of the assets of these persons are located outside the United States. As a result, it may be difficult or impossible for you to bring an action against us or against these individuals in the United States in the event that you believe that your rights have been infringed under the U.S. federal securities laws or otherwise. Even if you are successful in bringing an action of this kind, the laws of the Cayman Islands and of China may render you unable to enforce a judgment against us, our assets, our directors and officers or their assets.

***We have incurred increased costs as a result of being a public company, and the costs may continue to increase in the future.***

As a public company, we have incurred significant legal, accounting and other expenses that we did not incur as a private company. The Sarbanes-Oxley Act of 2002, as well as rules subsequently implemented by the SEC and the NYSE, impose various requirements on the corporate governance practices of public companies. These rules and regulations increase our legal and financial compliance costs and some corporate activities more time-consuming and costly. For example, in comparison with a private company, we need an increased number of independent directors and have to adopt policies regarding internal controls and disclosure controls and procedures. In addition, we incur additional costs associated with our public company reporting requirements. We expect to continue to incur significant expenses and devote substantial management effort toward ensuring compliance with the requirements of Section 404 of the Sarbanes-Oxley Act of 2002 and the other rules and regulations of the SEC and the NYSE.

We are named as a defendant in two putative shareholder class action lawsuits in the United States, and we may be involved in more class action lawsuits in the future. See "Item 8. Financial Information—A. Consolidated Statements and Other Financial Information—Legal Proceedings." Such lawsuits could divert a significant amount of our management's attention and other resources from our business and operations, which could harm our results of operations and require us to incur significant expenses to defend the lawsuits. Any such class action suit, whether or not successful, could harm our reputation and restrict our ability to raise capital in the future. In addition, if a claim is successfully made against us, we may be required to pay significant damages, which could have a material adverse effect on our financial condition and results of operations.

***We are a foreign private issuer within the meaning of the rules under the Exchange Act, and as such we are exempt from certain provisions applicable to United States domestic public companies.***

Because we are a foreign private issuer under the Exchange Act, we are exempt from certain provisions of the securities rules and regulations in the United States that are applicable to U.S. domestic issuers, including:

· the rules under the Exchange Act requiring the filing of quarterly reports on Form 10-Q or current reports on Form 8-K with the SEC;

· the sections of the Exchange Act regulating the solicitation of proxies, consents, or authorizations in respect of a security registered under the Exchange Act;

· the sections of the Exchange Act requiring insiders to file public reports of their stock ownership and trading activities and liability for insiders who profit from trades made in a short period of time; and

· the selective disclosure rules by issuers of material nonpublic information under Regulation FD.

We are required to file an annual report on Form 20-F within four months of the end of each fiscal year. In addition, we intend to publish our results on a quarterly basis through press releases, distributed pursuant to the rules and regulations of the NYSE. Press releases relating to financial results and material events will also be furnished to the SEC on Form 6-K. However, the information we are required to file with or furnish to the SEC will be less extensive and less timely than that required to be filed with the SEC by U.S. domestic issuers. As a result, you may not be afforded the same protections or information that would be made available to you were you investing in a U.S. domestic issuer.

***The voting rights of holders of ADSs are limited by the terms of the deposit agreement, and you may not be able to exercise your right to vote your Class A ordinary shares.***

As a holder of our ADSs, you will only be able to exercise the voting rights with respect to the underlying Class A ordinary shares in accordance with the provisions of the deposit agreement. Under the deposit agreement, you must vote by giving voting instructions to the depositary. Upon receipt of your voting instructions, the depositary will vote the underlying Class A ordinary shares in accordance with these instructions. You will not be able to directly exercise your right to vote with respect to the underlying shares unless you withdraw the shares. Under our amended and restated memorandum and articles of association, the minimum notice period required for convening a general meeting is 14 days. When a general meeting is convened, you may not receive sufficient advance notice to withdraw the shares underlying your ADSs to allow you to vote with respect to any specific matter. If we ask for your instructions, the depositary will notify you of the upcoming vote and will arrange to deliver our voting materials to you. We cannot assure you that you will receive the voting materials in time to ensure that you can instruct the depositary to vote your shares. In addition, the depositary and its agents are not responsible for failing to carry out voting instructions or for their manner of carrying out your voting instructions. This means that you may not be able to exercise your right to vote and you may have no legal remedy if the shares underlying your ADSs are not voted as you requested.

***The depositary for our ADSs will give us a discretionary proxy to vote our Class A ordinary shares underlying your ADSs if you do not vote at shareholders' meetings, except in limited circumstances, which could adversely affect your interests.***

Under the deposit agreement for the ADSs, if you do not vote, the depositary will give us a discretionary proxy to vote our Class A ordinary shares underlying your ADSs at shareholders' meetings unless:

· we have failed to timely provide the depositary with notice of meeting and related voting materials;

· we have instructed the depositary that we do not wish a discretionary proxy to be given;

· we have informed the depositary that there is substantial opposition as to a matter to be voted on at the meeting;

· a matter to be voted on at the meeting would have a material adverse impact on shareholders; or

· the voting at the meeting is to be made on a show of hands.

The effect of this discretionary proxy is that if you do not vote at shareholders' meetings, you cannot prevent our Class A ordinary shares underlying your ADSs from being voted, except under the circumstances described above. This may make it more difficult for shareholders to influence the management of our company. Holders of our ordinary shares are not subject to this discretionary proxy.

***You may not receive dividends or other distributions on our ordinary shares and you may not receive any value for them, if it is illegal or impractical to make them available to you.***

The depositary of our ADSs has agreed to pay you the cash dividends or other distributions it or the custodian receives on ordinary shares or other deposited securities underlying our ADSs, after deducting its fees and expenses. You will receive these distributions in proportion to the number of Class A ordinary shares your ADSs represent. However, the depositary is not responsible if it decides that it is unlawful or impractical to make a distribution available to any holders of ADSs. For example, it would be unlawful to make a distribution to a holder of ADSs if it consists of securities that require registration under the Securities Act but that are not properly registered or distributed under an applicable exemption from registration. The depositary may also determine that it is not feasible to distribute certain property through the mail. Additionally, the value of certain distributions may be less than the cost of mailing them. In these cases, the depositary may determine not to distribute such property. We have no obligation to register under U.S. securities laws any ADSs, ordinary shares, rights or other securities received through such distributions. We also have no obligation to take any other action to permit the distribution of ADSs, ordinary shares, rights or anything else to holders of ADSs. This means that you may not receive distributions we make on our ordinary shares or any value for them if it is illegal or impractical for us to make them available to you. These restrictions may cause a material decline in the value of our ADSs.

***You may experience dilution of your holdings due to inability to participate in rights offerings.***

We may, from time to time, distribute rights to our shareholders, including rights to acquire securities. Under the deposit agreement, the depositary will not distribute rights to holders of ADSs unless the distribution and sale of rights and the securities to which these rights relate are either exempt from registration under the Securities Act with respect to all holders of ADSs or are registered under the provisions of the Securities Act. The depositary may, but is not required to, attempt to sell these undistributed rights to third parties, and may allow the rights to lapse. We may be unable to establish an exemption from registration under the Securities Act, and we are under no obligation to file a registration statement with respect to these rights or underlying securities or to endeavor to have a registration statement declared effective. Accordingly, holders of ADSs may be unable to participate in our rights offerings and may experience dilution of their holdings as a result.

***You may be subject to limitations on transfer of your ADSs.***

Your ADSs are transferable on the books of the depositary. However, the depositary may close its books at any time or from time to time when it deems expedient in connection with the performance of its duties. The depositary may close its books from time to time for a number of reasons, including in connection with corporate events such as a rights offering, during which time the depositary needs to maintain an exact number of ADS holders on its books for a specified period. The depositary may also close its books in emergencies, and on weekends and public holidays. The depositary may refuse to deliver, transfer or register transfers of our ADSs generally when our share register or the books of the depositary are closed, or at any time if we or the depositary thinks it is advisable to do so because of any requirement of law or of any government or governmental body, or under any provision of the deposit agreement, or for any other reason.

**ITEM 4.  INFORMATION ON THE COMPANY**

**A.**  <u>History and Development of the Company</u>

We commenced our operations in 2011, when Beijing Rongshiji Information Technology Co., Ltd. was established in preparation for the launch of our platform. Mr. Daqing (David) Ye, the chairman of our board of directors and our chief executive officer, Mr. Jiayan Lu, our chief operating officer, Mr. Caofeng Liu, our chief technology officer, and Mr. Chenchao Zhuang, are our co-founders.

RONG360 Inc. was established in 2012 as the offshore holding company for this business. RONG360 Inc. established RONG360 (Hong Kong) Limited in 2012 as its intermediary holding company. RONG360 (Hong Kong) Limited subsequently established two wholly owned subsidiaries in China in 2012, Beijing Ronglian Shiji Information Technology Co., Ltd. and Tianjin Rongshiji Information Technology Co., Ltd.

RONG360 Inc. obtained control and became the primary beneficiary of Beijing Rongshiji Information Technology Co., Ltd. in 2012 by entering into a series of contractual arrangements with it and its shareholders through Beijing Ronglian Shiji Information Technology Co., Ltd. Due to the PRC legal restrictions on foreign ownership of internet-based businesses, RONG360 has relied on these contractual arrangements to conduct a significant part of its operations in China.

We began operating our platform by introducing loan recommendation services in the first quarter of 2012. We subsequently introduced credit card recommendation services in the third quarter of 2013 and wealth management information services in the second quarter of 2014. We introduced our big data risk management solutions in the second quarter of 2015 and our Gold Cloud system in the first quarter of 2016.

In addition to our platform business, RONG360 started operating a technology-enabled online lending business in 2015, which offers its own consumer credit products to borrowers by performing credit assessment and credit decisioning of these borrowers and facilitating funding from third-party financial service providers.

On June 1, 2017, RONG360 Inc. established a wholly owned subsidiary, Jianpu Technology Inc., in the Cayman Islands. On June 19, 2017, Jianpu Technology Inc. established a wholly owned subsidiary, Jianpu (Hong Kong) Limited, in Hong Kong. RDD was established on March 3, 2017 as a wholly owned PRC subsidiary of Beijing Rongshiji Information Technology Co., Ltd. and Beijing Ronglian Shiji Information Technology Co., Ltd., and RONG360 (Hong Kong) Limited established Beijing Rongqiniu Information Technology Co., Ltd., or RQN, on August 21, 2017, as a sino-foreign joint venture under PRC law. Immediately after RQN was established, RQN entered into a series of variable interest entity arrangements with RDD and its then sole shareholder, Beijing Rongshiji Information Technology Co., Ltd.

Pursuant to a series of agreements entered into in connection with the Restructuring, all the operating assets and liabilities relating to the operation of the platform business were transferred to the new group. Specifically, Beijing Ronglian Shiji Information Technology Co., Ltd. entered into agreements to transfer its related assets and liabilities to RQN, and Beijing Rongshiji Information Technology Co., Ltd. entered into agreements to transfer its related assets and liabilities to RDD. RONG360 Inc. has provided RMB150 million of initial working capital to us in the form of a capital contribution.

All equity interests in RQN held by Beijing Ronglian Shiji Information Technology Co., Ltd. and RONG360 (Hong Kong) Limited were transferred to Jianpu (Hong Kong) Limited. As a result, RQN is wholly owned by Jianpu (Hong Kong) Limited. Beijing Rongshiji Information Technology Co., Ltd. transferred its equity interests in RDD to three individual shareholders.

After the foregoing, Jianpu Technology Inc. is our holding company in the Cayman Islands. A wholly owned subsidiary of Jianpu Technology Inc., Jianpu (Hong Kong) Limited, is our intermediary holding company in Hong Kong. Jianpu (Hong Kong) Limited has one wholly owned subsidiary in China, RQN.

On November 16, 2017, our ADSs commenced trading on the NYSE under the symbol "JT." We raised approximately US$204.9 million (approximately equivalent to RMB1,358.0 million) in net proceeds from the issuance of new shares from the IPO and concurrent private placements after deducting underwriting commissions and the offering expenses payable by us. On October 30, 2020, we changed the ratio of ADSs to Class A ordinary shares (the "ADS Ratio") from two ADSs to five Class A ordinary shares to one ADS to 20 Class A ordinary shares. Except as otherwise indicated, all ADS and per ADS data in this annual report give retroactive effect to the ADS Ratio of one ADS to 20 Class A ordinary shares.

On July 31, 2018, RONG360 completed the share distribution of our ordinary shares held by it to the existing shareholders of RONG360 in proportion to RONG360's shareholding structure, and thus completed the Restructuring to strengthen our positioning as an independent open platform.

From 2018 to 2020, we set up and acquired several subsidiaries and variable interest entities to support our business growth in China and overseas. For more details, see "Item 4. Information on the Company—C. Organizational Structure."

Our principal executive offices are located at 21/F Internet Finance Center, Danling Street, Beijing, People's Republic of China. Our telephone number at this address is +86-10-8302-3688. Our registered office in the Cayman Islands is located at the offices of Sertus Incorporations (Cayman) Limited, Sertus Chambers, Governors Square, Suite #5-204, 23 Lime Tree Bay Avenue, P.O. Box 2547, Grand Cayman, KY1-1104, Cayman Islands. Our agent for service of process in the United States is Law Debenture Corporate Services Inc., located at 801 2nd Avenue, Suite 403, New York, NY 10017. We maintain our web site at *ir.jianpu.ai*.

The SEC maintains a web site at *www.sec.gov* that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC using its EDGAR system.

See "Item 5. Operating and Financial Review and Prospects—B. Liquidity and Capital Resources—Capital Expenditures" for a discussion of our capital expenditures.

**B      Business Overview**

We are a leading independent open platform for discovery and recommendation of financial products in China. By leveraging our deep data insights and proprietary technology, we provide users with personalized search results and recommendations that are tailored to each user's particular financial needs and credit profile. We also enable financial service providers with sales and marketing solutions to reach and serve their target customers more effectively through online and mobile channels and enhance their competitiveness by providing them with tailored data, risk management and end-to-end solutions. We are committed to maintaining an independent open platform, which allows us to serve the needs of users and financial service providers impartially.

As an open platform, we have access to data from users, financial service providers and of third-party data partners that are obtained with their respective consent. Our data analytics and proprietary technology enable us to conduct extensive analysis and offer valuable services to both users and financial service providers. These capabilities drive product recommendations and credit analysis for users and support credit underwriting, fraud detection and fraud prevention for financial service providers. In particular, we offer big data risk management solutions to financial service providers, which help them improve their customer acquisition, application approval, fraud detection and prevention and other credit underwriting processes. Our proprietary technology enables us to match users with the appropriate financial products and to help financial service providers better target and serve users. We have been continually improving our advanced matching capability by leveraging big data, artificial intelligence and other technologies.

Our users have convenient access to a wide variety of financial products on our platform, including consumer and other loans, credit cards and wealth management products. The variety of financial products on our platform was further diversified to include insurance products in the fourth quarter of 2019. We are able to identify and recommend the most suitable products for each user's specific financial circumstances from a wide selection of products with different credit policies and geographic coverage offered by financial service providers. Users can easily compare the terms and conditions of products from different financial service providers on our platform. With Gold Cloud, our integrated solution, we offer a seamless user experience throughout the entire discovery, application approval and loan servicing process, and a significant and increasing number of applications are completed without leaving our platform. Because consumers in China lack understanding of the increasingly complicated financial products that are available on the market, we enable them to access a wide range of information and content on our platform, including short videos, audio, online articles and offline booklets and handouts. Our content educates and provides valuable information to users to make more informed financial decisions, serves as a reference point for financial service providers and is widely reported by the media and other institutions.

A large and diverse group of financial service providers offer a wide variety of financial products nationwide across a broad credit spectrum on our platform. We have invested nine years in building our stable and strong network from the ground up as most traditional financial institutions in China only operate within specific geographic areas or conduct their business on a city-by-city basis, with localized business strategies and credit policies. Additional financial service providers are proactively reaching out to us to join our network. We provide sales and marketing solutions to financial service providers to help them acquire customers through online and mobile channels, and enable them with data, risk management and end-to-end solutions. Traditional financial institutions that face challenges understanding and interacting with mobile savvy customers often adopt our sales and marketing solutions when they first join our platform, and over time more and more of them have been adopting our big data risk management solutions as well.

We primarily generate our revenue from fees that we charge financial service providers or their agents for recommendation services for loan products on a cost-per-action basis, where the action is generally determined by a user's completion of a loan application, and for credit card products on a cost-per-success basis, where the success is most often defined as the issuance of a credit card and in other cases by the completion of an application or the first usage of a credit card, depending on the credit card issuer's policy. To a lesser extent, we provide display and performance-based advertising and marketing services primarily to financial service providers of credit cards and wealth management products. We also offer financial service providers big data risk management solutions, which we introduced in the second quarter of 2015.

We have experienced substantial growth since the commencement of our operations, and our management team has a strong track record of executing our strategies. We introduced loan recommendation services in the first quarter of 2012, credit card recommendation services in the third quarter of 2013 and wealth management information services in the second quarter of 2014. We introduced our big data risk management solutions in the second quarter of 2015 and our Gold Cloud system in the first quarter of 2016. In the fourth quarter of 2019, we further diversified the types of financial products on our platform with the introduction of insurance products.

**Our Open Platform**

*Overview of our platform*

We operate an independent open platform for the discovery and recommendation of financial products in China. Financial service providers offer a wide variety of financial products on our platform, including consumer and other loans, credit cards, wealth management products and insurance products. In addition to matching users to financial products, we provide a wide range of services and solutions to financial service providers on our platform, including sales and marketing solutions, big data risk management solutions and integrated solutions through Gold Cloud. Moreover, we provide extensive professional content on financial products, the financial industry and personal finances in many forms, including short videos, audio, online articles and offline booklets and handouts. Users generally access our platform through our mobile channel, which accounts for approximately 91% of the traffic to our platform in 2019.

*Financial products on our platform*

*Overview*

Our platform had over 179,700 financial products in 2019, including over 50,700 loan products, 3,000 credit card products, 125,600 wealth management products and 400 insurance products. All of the financial products on our platform are offered and sold by financial service providers. Depending on our arrangement with the financial service provider, applications for financial products may be hosted on our platform or referred to the financial service provider's platform.

*Loan products*

We launched our platform with consumer loan recommendation services in the first quarter of 2012. We added recommendation services for SME and auto loans in the second quarter of 2012 and mortgage loans in the third quarter of 2012. Users submitted a total of approximately 37.7 million loan applications through our platform in 2019. As of December 31, 2019, out of all the loan products offered on our platform, around 80% were consumer loan products. Our revenue for loan recommendation services is generally determined on a cost-per-action basis, where the action is generally determined by a user's completion of a loan application.

·    Consumer loan products provide for a wide variety of personal needs such as home decorations, weddings, travel, major appliances and other personal expenses. China's population has been increasing its consumption, which has driven the demand for consumer loans. As a result, a broad range of financial service providers offer consumer loan products through our platform, addressing a wide range of financial needs across the credit spectrum. Consumer loan products can vary greatly by terms, targeted borrowers and approval conditions. Substantially all of the consumer loan products offered on our platform are unsecured. As of December 31, 2019, consumer loan products on our platform generally had terms ranging from one month to three years and principal amounts of between RMB1,000 (US$143.6) and RMB1 million (US$143.6 thousand).

·    SME loan products target small businesses that need capital to start up or expand their operations, purchase inventory or meet day-to-day expenses. SME loans have been supported by the significant growth in SMEs and an increase in financial service providers who are extending credit to this market segment. As of December 31, 2019, SME loan products on our platform generally had terms ranging from one month to ten years and principal amounts of between RMB20,000 (US$2.9 thousand) and RMB10 million (US$1.4 million).

·    Mortgage loan products include both loans to help users make an initial purchase of property and, more commonly, loans secured by property that the user already owns. Our geographic coverage gives us unique insights into the mortgage lending market in China, and we provide up-to-date mortgage market information on our platform including real-time mortgage rates for 50 cities in China. As of December 31, 2019, mortgage loan products on our platform generally had terms ranging from 10 months to 30 years and principal amounts of between RMB100,000 (US$14.4 thousand) and RMB1.6 million (US$0.2 million).

·    Auto loan products include loans for the purchase of new and used automobiles as well as loans secured by an automobile that the user already owns. The market for auto loans has grown tremendously in China in recent years. Auto loans are especially popular among young urban professionals who have good salaries but limited savings. As of December 31, 2019, auto loan products on our platform generally had terms ranging from 12 months to 3 years and principal amounts of between RMB40,000 (US$5.7 thousand) and RMB0.3 million (US$43.1 thousand).

Users can efficiently browse the different loan products offered by local financial service providers on our platform based on their specific needs utilizing our recommendation engine. Depending on the country and on our arrangement with the financial service provider, applications for loan products may be hosted on our platform or referred to the financial service provider's platform or app. Starting at the end of 2019, we added loan recommendation services to users overseas in Southeast Asia on our platform.

54

### Credit card products

We introduced credit card recommendation services on our platform in the third quarter of 2013, and we are the largest independent online credit card application platform in China. We have cooperated with 30 credit card issuers that accept applications online in China, including 5 state-owned banks and 11 of the 12 joint-stock banks. Since 2018, we have also broadened and diversified our credit card partners network to include more of the banks' local branches and authorized partners. Our revenue for credit card recommendation services is generally determined on a cost-per-success basis, where the success is most often defined as the issuance of a credit card and in other cases by the completion of an application or the first usage of a credit card, depending on the issuer's policy. Our credit card volume, which is our measure of the number of credit cards we generate revenues from, in 2019 was approximately 5.9 million as of December 31, 2019. Starting in the third quarter of 2019, we also started credit card recommendation services to users in Hong Kong after completing the acquisition of 55% of equity interests in a Hong Kong-based independent digital media platform specializing in the field of financial services primarily in Hong Kong.

Credit card products vary greatly, including by issuer, payment network, credit tier, card alliance, loyalty program and specialty purpose. Due to the mass customization, it can be difficult for consumers to navigate the large selection of credit card products and identify the ones suitable for their needs. We believe that our recommendation engine empowers user to discover suitable credit card products in an efficient way. Our platform features credit card offers from major issuers and popular credit cards targeting different user groups and lifestyles, such as for hotel and business travel, shopping and airline mileage.

### Wealth management products

We introduced wealth management information services to our platform in the second quarter of 2014. Unlike with loans and credit cards, our users are investors rather than borrowers in relation to wealth management products, so we provide them with information about the terms and conditions of the products and the relative credit risk of the different financial service providers that offer the products. While users can obtain information on wealth management products on our platform, we have made a deliberate choice not to host purchases of these products on our platform, due in part to regulatory uncertainty, potential investment risk for our users and the potential impact on our brand. Users must either click through to the financial service provider's platform or contact the financial service provider offline to place an order. We currently focus on less risky products, including certificates of deposit, money market funds, etc.

### Insurance products

We introduced insurance product information services to our platform after completing the acquisition of an insurance brokerage company in China with the necessary insurance broker license in the fourth quarter of 2019. We cooperate with approximately 40 insurance companies and their agents selling insurance products in China. The types of insurance products currently available on our platform include life insurance, auto and home insurance, savings insurance, medical insurance, etc.

### Our users

Our users are predominately individual consumers, though they also include many sole proprietors and SMEs. We have a geographically diverse user base, as the top three cities in terms of number of users accounted for only 3.4%, 2.5% and 2.4% of our total users in 2019.

### The discovery and recommendation process for loans and credit cards

The first time users launch our app or access our website, our platform is able to detect their IP address and other information as to their location, and asks them to confirm the city where they reside. "City" in this context refers to administrative subdivisions that contain both urban and rural areas and in the aggregate include most of the population of China. Although more and more financial service providers have been able to leverage mobile technology to offer the same financial products nationally, most of the traditional financial institutions still operate on a city-by-city basis and have localized credit policies, local "know your client" and credit approval processes, and local client servicing, so while we operate a national site for all of China, most products are only available after the user confirms their city. The first time that users try to view the details of any particular financial product, they will be asked to register on our platform by inputting certain basic information about themselves including their mobile phone numbers.

Users can search for loan and credit card products by filtering for type of product and various terms specific to that type of product. For example, they can filter loans by principal amount, term, and their own employment status, and they can filter credit cards by a range of parameters including issuer, specialty purpose, and type of loyalty program such as points or discounts. For each user, our platform will generate a set of impartial recommendations based on the user's profile and financial needs and the financial service provider's product criteria, focusing on certainty, speed, convenience and terms. Our recommendation engine ranks the products using a complex algorithm that takes into account a number of factors, including the likelihood of application approval, how competitive the interest rate is and whether other users were satisfied with the financial service provider in the past. Our recommendation engine also takes into account bidding between loan sales representatives within the same financial service provider for the same financial product. Users have the flexibility to browse through as many products as they wish, but with the number of financial products available, our recommendation engine plays a critical role in matching users with the most suitable financial products.

Users can also obtain information on wealth management products on our platform, but we do not offer matching and recommendation services for these products for users. As our users would be purchasers of wealth management products, we focus on product safety and reliability, and only provide information on relatively conservative wealth management products on our platform.

### *The application and approval process*

The application process depends on the type of financial product and the financial service provider selected by the user. Depending on the financial product that the user wishes to apply for, the user may be asked to provide more detailed information. There are several different types of information that may be requested, with the exact questions varying depending on the policies of the financial service provider and the terms of the specific financial product. Users will be able to skip part or all of this step if they already provided this information previously, so our platform becomes even more convenient with repeated use.

Application approval time varies with the type of financial service provider and the terms of the product. Micro-loans may be approved within a few minutes, whereas loans from traditional financial institutions may take one to two weeks for approval. Credit card applications often can be approved within a day, not including the time required to deliver the physical card to the successful applicant or any additional time required for activation of the card.

Our platform has three different models for the approval process of financial products.

· *Online approval*. For most credit card applications and some loan applications, we generate click-throughs for financial service providers. We refer the user directly to their website. The application, decisioning and approval process are completed on the financial service provider's online platform.

· *Offline approval.* For loan products offered by traditional financial service providers, the user's application typically is referred to a loan sales representative at the financial service provider, who normally contacts the user offline to explain what other steps need to be taken to complete the application. The user then relies on the loan sales representative for assistance with the rest of the application and approval process.

· *End-to-end approval*. If the financial service provider has adopted our Gold Cloud solution, we support the application, approval and loan servicing process for its financial products. Users are supported by our platform throughout the lifetime of a financial product, including submitting the application and related documents, receiving notification of approval and making payments.

*Content*

Our platform provides rich and professional content to our users as a way of driving user engagement and cultivating user loyalty. We have a wealth of data about a wide range of financial products on our platform and we empower users to compare and contrast different products within and across product categories. We also provide a variety of third-party information on the subjects of personal finances, wealth management and financial planning, including wealth management columns and articles and an online wealth management forum. In addition, we have a dedicated team that creates additional content for our platform that is used by academic institutions, industry experts and government bodies. For example, we have issued a series of reports and analyses related to mortgages, consumer loans, consumer finance asset-backed securities, the consumer finance industry, etc. We also issue monthly mortgage reports covering 66 mortgage lenders in 36 cities in China. Our content includes research reports, investment reports, mortgage reports, industry reports and rating reports for online investment platforms. Content is available in a number of forms including short videos, Vlogs, cartoons, audio, online articles and offline booklets and handouts, and we distribute our content through a third-party syndicated content network that includes CCTV, Xinhua Finance, ChinaNews, People's Daily Online, Yahoo Finance, etc., as well as Tencent's Wechat social media platform, Kwai's video platform and Toutiao's news and information mobile app. We believe that our content library attracts both existing and potential users to our platform and complements our other channels for attracting user traffic.

*User service center*

Our user service center provides live assistance to our users with a combination of automated programs and service representatives. Users can contact our user service center by telephone or through social media platforms such as Wechat and QQ. Our user service representatives help users understand financial products, follow up on financial product application status and collect user feedback on their experience with financial service providers. If a user appears interested in a product but leaves our platform without completing an application, our user service center may contact the user to collect feedback and encourage the user to submit an application and even help the user to complete the application form. We recruit user service representatives with substantial experience in supporting users on their financial product queries. Each representative is required to complete mandatory training conducted by experienced managers on financial products knowledge and communication skills. While we have outsourced some of our user services, we have provided training through our own employees to ensure quality service.

*Financial service providers*

We have attracted a large and diversified group of financial service providers to our platform, including 5 state-owned banks and 11 of the 12 joint-stock banks in China. In both 2019 and 2020, over 2,000 financial service providers offered products on our platform, including banks, credit card issuers, consumer finance companies, micro-loan companies, insurance companies and other licensed financial institutions, and a variety of local financial service providers.

China's retail financial services market is highly fragmented. Many of the financial institutions only operate within specific geographic areas or conduct their business on a city-by-city basis, with localized business strategies and credit policies. The nine years that we have invested building our network of financial service providers from the ground up have enabled us to offer a variety of financial products across a broad credit spectrum with extensive geographic reach in over 350 cities across China.

*Sales and marketing solutions and advertising services*

Our platform provides efficient and effective sales and marketing solutions to financial service providers. We perform an initial screening of users based on information provided by the user or otherwise obtained with the user's permission. We check for patterns of suspicious activity or information that is not consistent or appears to be fabricated. We synthesize information from our users with data from financial service providers and third-party data partners to build up a user profile for each user. This allows us to match users with financial products and allocate users to financial service providers.

57

In addition, we have offered advertising services to financial service providers, mostly for providers of credit cards and wealth management products. From time to time, we purchase advertising resources from third-party search engine, social networking and other platforms for the purpose of providing advertising services. To maintain our position as an independent open platform, we strictly separate our advertising services and our content on credit research and rankings to ensure that our recommendations and research reports remain impartial and independent.

### Big data risk management solutions

We introduced our big data risk management solutions in 2015. We leverage our big data technology to provide one-stop, cost-effective and diversified risk management services and solutions to financial service providers. Through collaborations with users, financial service provides and third-party data partners, we have authorized access to a wide variety of information.

Our big data risk management solutions range from simple to highly integrated:

· *Data solutions*. We provide data products to financial service providers to enhance their data and risk-management capabilities by leveraging information that we have access to.

· *Modeling solutions*. At the next level, we provide tailored modeling solutions that the financial service provider can use to analyze the data. The modeling solutions can be used in credit assessment and credit decisioning.

· *Total solutions*. Our big data risk management solutions can be fully integrated into the financial service provider's own system and used as end-to-end solutions. Our goal is to provide financial service providers with an integrated solution encompassing product design, user acquisition, marketing, risk management and user services. We are also dedicated to helping our banking partners to build and boost digital capabilities so that they could better serve more consumers with financial needs.

In 2019, we started to offer our big data risk management solutions to financial service providers overseas in Southeast Asia, providing end-to-end integrated solutions to empower inclusive financing businesses.

### SaaS-based end-to-end solution

Gold Cloud, our SaaS-based end-to-end solution, allows financial service providers to migrate their entire customer acquisition, loan application and loan servicing process onto our platform. Rather than referring the user to the financial service provider's platform at an early stage in the application process, we support the entire process. We apply our analytical credit model in the application process but the financial service provider has the final decision as to whether it will extend credit. Gold Cloud can also assist users with loan account management and servicing throughout the process.

Gold Cloud appeals to a variety of financial service providers which do not have their own risk management departments or which are unable to keep up with best practices in this area. Gold Cloud enables us to remain engaged with the user for longer and build up our relationship and brand. It also gives us additional insights from our data, allowing us to improve our recommendation engine for matching users to financial products.

### Screening of financial service providers and financial products

We screen the financial products that are offered on our platform based on the financial service provider's licensing status, the suitability of the product for our users, the creditworthiness of the financial service provider, the quality of the customer service provided by the financial service provider, the terms and conditions of the financial products and other factors. One major step in the screening of financial products is examining and verifying the qualifications of the financial service providers that offer them. We examine their business licenses, the qualification certificates for their products and their reputation in the industry and make inquiries about the market acceptance of their financial products. As a part of our internal control process, we conduct our own due diligence on financial service providers and maintain a whitelist of financial service providers based on our verification results. We typically enter into framework agreements of fixed terms with financial service providers and renew them periodically if the relationship continues to be satisfactory. Starting in 2019, we regularly conduct random checks and screenings of our existing financial service provider partners during the term of our cooperation with them to ensure the continual suitability of their financial products for our users, including re-examining their business licenses, the qualification certificates for their products and their current business operation status. We also constantly monitor user feedback of each financial product and financial service provider as well as other related public social indicators to ensure that we can promptly identify and deal with risky financial products and financial service providers.

**Data and Technology**

We have built our technology infrastructure relying primarily on proprietary software and systems and to a lesser extent on third-party software that we have modified and incorporated. Our advanced technology is vital in supporting our discovery and recommendation-based open platform for financial products.

As an open platform, we have access to data from users, financial service providers and third-party data partners that are obtained with their respective consent. Our data modeling and analytical capabilities drive product recommendations and credit analyses for users and support credit underwriting and fraud detection and prevention for financial service providers.

### Big data

*Data sources.* Users provide us information with consent when they register on our platform and when they apply for financial products through our platform. We have authorized data on applications, approvals and credit performance from financial service providers. We also collaborate with third-party data partners with respect to data obtained with users' permission.

*Infrastructure and modeling and algorithm support.* The real-time decisioning and fast iteration of our big data model is well supported by our big data infrastructure and algorithms. Our data platform can extract multi-dimensional features from multi-source data in a highly efficient and secure way to support modeling. We use a base big data cluster for the mining of massive volume of data. We use a graphic database to support the calculation of billions of items of data on social network relationships. We adopt a framework of streaming computing to support real-time updates to our data and model. As a result, our big data model can complete decisioning within milliseconds after a user uploads or updates his application materials.

### Search and recommendation technology

*Advanced search engine.* We developed our sophisticated search engine based on our deep understanding of the characteristics of financial products and the needs of our users. Our search engine is able to identify users' search intent through user profiling and data mining technology and generate personalized search results within milliseconds through real-time indexing technology. Based on real-time reinforcement learning on users' search behavior, the search engine can intelligently adjust the ranking of search results and support secondary searches within the existing search results. We believe that our advanced search engine meets the advanced and complex search needs of our users.

*Personalized smart recommendation system.* Our personalized smart recommendation system is designed to help users increase the success rate of financial product application, help financial service providers increase their approval rates for financial products and reduce the overall service costs of distributing financial products. Synthesizing a wide variety of data from financial service providers, including encrypted data on user profiles, user application histories and feedback on user approvals, we have built our recommendation model through machine learning. The model can predict the success rate of a user's application for each financial product and estimate the credit limit that the user can obtain. This allows us to make accurate and personalized recommendations of financial products to our users.

59

*Big data risk management solutions*

We provide risk management solutions based on big data analytics and modeling. We believe big data analytics provide more accurate risk forecasts and support more comprehensive risk management decisioning than the traditional scorecard model. Our data platform can extract features from multi-source encrypted data to construct user profiles. We have built a deep transfer learning model to understand the features of and the relationships between different types of data. This understanding helps to increase the generalization ability and forecast performance of our big data model. The entire process of data input, encryption, feature generation, modeling optimization and forecast decisioning is free from manual intervention, which accelerates model iteration and protects data security.

*Data security*

We are committed to protecting user data in our business and operations. We use encrypted storage of sensitive data, including data loss prevention solutions. Our network is configured with multiple layers of protection to protect our databases from unauthorized access, and we use sophisticated security protocols for communications between applications. To prevent unauthorized access to our system, we utilize software systems to automatically detect and protect against attacks. Internally, we limit and minimize authorized access to protected information provided by users through a variety of techniques, including network access authentication and division of network security domains. We continually improve and enhance our data and system security through routine checks and timely upgrades.

**Sales and Business Development**

We have built a sales and business development team with extensive experience in both the financial service and internet industries. This team is dedicated to establishing long-term relationships with financial service providers, understanding and anticipating their needs and identifying opportunities for them to adopt our services and solutions. As we strengthen our relationship with a financial service provider and understand more about its strategies and policies, we have the opportunity to upsell and cross-sell additional services and solutions and offer our integrated solutions. Our sales and business development team works closely with financial service providers and continually gains insights into the competitive dynamics of the industry and new market opportunities. These insights help our other departments develop new solutions and technologies and offer new content and features on our platform.

We have sales and business development personnel based at our headquarters in Beijing, at our regional offices in Shanghai and Shenzhen and a dozen of tier 2 cities in China. This allows our sales and business development team to be in close contact with the research and development team and operations team at our headquarters to maintain an aligned sales and business development strategy. The sales and business development personnel at our regional offices focus on catering and understanding local market requirements, which helps the other teams at our headquarters remain abreast of developments with financial service providers in different regions of China.

**Marketing and Brand Promotion**

The "RONG360" brand is well recognized as an intelligent mobile platform for financial products in China. We plan to continue to use the "RONG360" brand for our platform in China.

We employ a variety of marketing methods to promote our image as a reliable, smart and accessible platform. Our mascot Rong Bulls in eight colors represent the diversity of our offerings to both users and financial service providers. Our marketing team works closely with our sales and business development team and utilizes our proprietary data analytical capabilities to conduct cost-efficient marketing. We acquire user traffic from third-party channels, including search engines, news feeds, social networking platforms, app stores and specific apps, and incur traffic acquisition expenses. We also have organic traffic on our platform which is not redirected from third-party channels and for which we do not incur traffic acquisition expenses.

We leverage social network and social media platform as an effective and efficient tool for user acquisition and engagement. We introduced a cooperation system called the Social Media and Partner Program in the third quarter of 2018, through which our users may register as our business partners to recommend the financial products on our platform to their social contacts through social network and social media platform, and are rewarded according to our incentive policies. The Social Media and Partner Program has been very effective in user acquisition and engagement since its inception, particularly in the recommendation of credit card products on our platform to new users. In 2019, approximately 60% of the credit card volume on our platform were from user traffic acquired through recommendation by our business partners to their social contacts under the Social Media and Partner Program.

60

In addition, we primarily conduct marketing on online, mobile and social media platforms. We use mostly self-produced articles and videos as marketing materials. Since July 2015, we have produced a weekly series of videos on financial literacy including fraud avoidance. Since September 2019, we have also produced a series of short video programming focused on uncovering financial scams. Both series have been highly popular and won numerous awards from organizations like Fuzhou Municipal Administration for Market Regulation and Payment & Clearing Association of China. We distribute our content through a third-party syndicated content network that includes Weibo, Tencent's video platform, Kwai's video platform and Toutiao's news and information mobile app, etc. to generate additional user traffic to our platform. We do not pay a fee for this content distribution, except when the content distribution is one element of a marketing campaign and we are paying a fee for the marketing campaign as a whole. We were also invited to prominent industry events and conferences to promote our brand and our platform, for instance, the 2019 Boao Forum for Asia, the sixth World Internet Conference in 2019 and the 19th China Entrepreneur Future Star Conference in 2019. In addition, we have organized and participated in a variety of charitable activities mostly related to helping to spread financial literacy in China, including providing left behind children with our "RONG360 Financial Fraud Prevention Manual" and sporting equipment, hosting seminars about financial literary and fraud prevention in poverty areas in China, etc.

We are a standing member of the National Internet Finance Association of China, the Beijing Internet Finance Association and the Zhongguancun Internet Finance Association and the Zhongguancun Modern Information Consumer Application Industry Technology Alliance. We are also a member of the Internet Society of China, the Shenzhen Internet Finance Association, the Beijing Communication Industry Association, the Beijing Zhongguancun High-Tech Enterprises Association and the Shanghai Foreign Investment Association.

## Competition

We are an open and independent platform, and our competitors are primarily other companies that also seek to position themselves as open platforms connecting both financial service providers and users primarily in the loan and credit card recommendation businesses. We also compete with platforms that are affiliated with major internet companies, including search engine, social media, e-commerce and online payment companies. Some of these internet companies also offer their financial products on our platform and provide us with user traffic, so they both compete and cooperate with us. In addition, we compete with financial service providers to the extent that they offer or list financial products on their own platform, although some of these financial service providers may also offer or list financial products on our platform as well. We believe that network effects will benefit whichever platform gains a significant first mover advantage in this field, and that it will be difficult for latecomers to establish relationships with financial service providers or, more importantly, to generate sufficient user traffic.

## Seasonality

Our revenue and operating results have fluctuated in the past from quarter to quarter due in part to seasonal variations in demand for financial products. Typically, our revenue is lowest in the first quarter of the year, in part due to the reduced level of borrowing activities during the Chinese New Year holiday, and highest in the fourth quarter of the year. In 2019, our revenue was highest in the first quarter with decreases in revenue in each subsequent quarter, which was primarily due to the continuous decreases in revenues from recommendation services for loan products, resulting from the continuous decreases in the number of financial products available on our platform given the credit tightening and change of industry dynamics in 2019. However, due to our limited operating history, the seasonal trends that we have experienced in the past may not apply to, or be indicative of, our future operating results.

**Intellectual Property**

We seek to protect our technology, including our proprietary technology infrastructure and core software system, through a combination of copyrights, trade secrets, trademarks and confidentiality agreements. As of December 31, 2020, we hold or otherwise have legal right to use 161 registered copyrights for software or work of art, 192 registered domain names, including *rong360.com*, and 72 registered trademarks, including "Rong360."

We intend to protect our technology and proprietary rights vigorously, but there can be no assurance that our efforts will be successful. Even if our efforts are successful, we may incur significant costs in defending our rights. From time to time, third parties may initiate litigation against us alleging infringement of their proprietary rights or declaring their non-infringement of our intellectual property rights. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business—We may not be able to prevent others from making unauthorized use of our intellectual property" and "—We may be subject to intellectual property infringement claims, which may be expensive to defend and may disrupt our business and operations."

**Insurance**

We do not maintain business interruption insurance or general third-party liability insurance, nor do we maintain property insurance, product liability insurance or key-man insurance. We consider our insurance coverage to be reasonable in light of the nature of our business and the insurance products that are available in China and in line with the practices of other companies in the same industry of similar size in China.

**Regulation**

This section sets forth a summary of the most significant rules and regulations that affect our business activities in China or the rights of our shareholders to receive dividends and other distributions from us.

*Regulations Related to Internet Information Security and Privacy Protection*

The PRC government has enacted laws and regulations with respect to internet information security and protection of personal information from any inappropriate collection activities abuse or unauthorized disclosure. Internet information in China is regulated and restricted from a national security standpoint. PRC laws impose criminal penalties for any effort to: (i) gain improper entry into a computer or system of strategic importance; (ii) disseminate politically disruptive information; (iii) leak state secrets; (iv) spread false commercial information; or (v) infringe intellectual property rights. In addition, the Ministry of Public Security has promulgated measures prohibiting use of the internet in ways which result in a leak of state secrets or a spread of socially destabilizing content, among other things. If an internet information service provider violates any of these measures, competent authorities may revoke its operating license and shut down its websites.

Under the Several Provisions on Regulating the Market Order of Internet Information Services, issued by the Ministry of Industry and Information Technology in 2011, an internet information service provider may not collect any personal information on a user or provide any such information to third parties without the user's consent. It must expressly inform the user of the method, content and purpose of the collection and processing of such user's personal information and may only collect information to the extent necessary to provide its services. An internet information service provider is also required to properly maintain users' personal information, and in case of any leak or likely leak of such information, it must take immediate remedial measures and, in the event of a serious leak, report to the telecommunications regulatory authority immediately.

Pursuant to the Decision on Strengthening the Protection of Online Information, issued by the Standing Committee of the National People's Congress in 2012, and the Order for the Protection of Telecommunication and Internet User Personal Information, issued by the Ministry of Industry and Information Technology in 2013, any collection and use of a user's personal information must be subject to the consent of the user, be legal, rational and necessary and be limited to specified purposes, methods and scopes. An internet information service provider must also keep such information strictly confidential, and is further prohibited from divulging, tampering or destroying any such information, or selling or providing such information to other parties. An internet information service provider is required to take technical and other measures to prevent the collected personal information from any unauthorized disclosure, damage or loss. Any violation of these laws and regulations may subject the internet information service provider to warnings, fines, confiscation of illegal gains, revocation of licenses, cancelation of filings, closedown of websites or even criminal liabilities.

Pursuant to the Notice of the Supreme People's Court, the Supreme People's Procuratorate and the Ministry of Public Security on Legally Punishing Criminal Activities Infringing upon the Personal Information of Citizens, issued in 2013, and the Interpretation of the Supreme People's Court and the Supreme People's Procuratorate on Several Issues regarding Legal Application in Criminal Cases Infringing upon the Personal Information of Citizens, which was issued on May 8, 2017 and took effect on June 1, 2017, the following activities may constitute the crime of infringing upon a citizen's personal information: (i) providing a citizen's personal information to specified persons or releasing a citizen's personal information online or through other methods in violation of relevant national provisions; (ii) providing legitimately collected information relating to a citizen to others without such citizen's consent (unless the information is processed, not traceable to a specific person and not recoverable); (iii) collecting a citizen's personal information in violation of applicable rules and regulations when performing a duty or providing services; or (iv) collecting a citizen's personal information by purchasing, accepting or exchanging such information in violation of applicable rules and regulations. In addition, according to the Interpretations of the Supreme People's Court and the Supreme People's Procuratorate on Several Issues concerning the Application of the Law in Handling Criminal Cases Involving Crimes of Illegally Using the Information Network or Providing Aid for Criminal Activities regarding Information Network issued on October 21, 2019 and taking effect on November 1, 2019, a violator refusing to perform the obligation of safety management for the information network, causing the disclosure of user information, and falling under one of the following circumstances shall be deemed "causing serious consequences" as prescribed under the PRC Criminal Law: (i) causing the disclosure of not less than 500 pieces of location information, communication content, credit information, and property information; (ii) causing the disclosure of not less than 5,000 pieces of accommodation information, communication records, health and physiological information, transaction information and other user information that may affect personal or property safety; (iii) causing the disclosure of not less than 50,000 pieces of user information other than the information set forth in items (i) and (ii); (iv) causing the disclosure of user information which quantity does not meet the standards set forth in items (i), (ii) and (iii), but meets the relevant quantity standards after conversion at the corresponding proportion in aggregate; (v) causing deaths, serious injuries, mental disorders or kidnapping of others, or other serious consequences; (vi) causing material economic losses; (vii) seriously disturbing the social order; or (viii) causing other serious consequences.

The PRC Network Security Law, which was promulgated in November 2016 and took effect on June 1, 2017, requires a network operator, including internet information services providers among others, to adopt technical measures and other necessary measures in accordance with applicable laws and regulations as well as compulsory national and industrial standards to safeguard the safety and stability of network operations, effectively respond to network security incidents, prevent illegal and criminal activities, and maintain the integrity, confidentiality and availability of network data. The Network Security Law emphasizes that any individuals and organizations that use networks must not endanger network security or use networks to engage in unlawful activities such as those endangering national security, economic order and the social order or infringing the reputation, privacy, intellectual property rights and other lawful rights and interests of others. The Network Security Law has also reaffirmed certain basic principles and requirements on personal information protection previously specified in other existing laws and regulations, including those described above. Any violation of the provisions and requirements under the Network Security Law may subject an internet service provider to warnings, fines, confiscation of illegal gains, revocation of licenses, cancellation of filings, closedown of websites or even criminal liabilities.

On November 28, 2019, the Secretary Bureau of the Cyberspace Administration of China, the General Office of the Ministry of Industry and Information Technology, the General Office of the Ministry of Public Security and the General Office of the State Administration for Market Regulation jointly issued the Notice on the Measures for Determining the Illegal Collection and Use of Personal Information through Apps, which aims to provide reference for supervision and administration departments and provide guidance for app operators' self-examination and self-correction and social supervision by netizens, and further elaborates the forms of behavior constituting inappropriate collection activities and use of the personal information through apps including: (i) failing to publish the rules on the collection and use of personal information; (ii) failing to explicitly explain the purposes, methods and scope of the collection and use of personal information; (iii) collecting and using personal information without the users' consent; (iv) collecting personal information unrelated to the services it provides and beyond necessary principle; (v) providing personal information to others without the users' consent; (vi) failing to provide the function of deleting or correcting the personal information according to the laws or failing to publish information such as ways of filing complaints and reports.

Users give us certain personal information and we also synthesize, analyze and share the information with financial service providers. We have taken necessary measures in order to obtain consent from users to keep and use their personal information, and have also established information security systems to protect the user information and to abide by other network security requirements under applicable laws and regulations.

*Regulation Related to Foreign Investment*

*Foreign Investment law*

On March 15, 2019, the National People's Congress approved the Foreign Investment Law, and on December 26, 2019, the State Council promulgated the Implementing Rules of the PRC Foreign Investment Law, or the Implementing Rules, to further clarify and elaborate the relevant provisions of the Foreign Investment Law. The Foreign Investment Law and the Implementing Rules both took effect on January 1, 2020 and replaced three major previous laws on foreign investments in China, namely, the Sino-foreign Equity Joint Venture Law, the Sino-foreign Cooperative Joint Venture Law and the Wholly Foreign-owned Enterprise Law, together with their respective implementing rules. Pursuant to the Foreign Investment Law, "foreign investments" refer to investment activities conducted by foreign investors (including foreign natural persons, foreign enterprises or other foreign organizations) directly or indirectly in the PRC, which include any of the following circumstances: (i) foreign investors setting up foreign-invested enterprises in the PRC solely or jointly with other investors, (ii) foreign investors obtaining shares, equity interests, property portions or other similar rights and interests of enterprises within the PRC, (iii) foreign investors investing in new projects in the PRC solely or jointly with other investors, and (iv) investment in other methods as specified in laws, administrative regulations, or as stipulated by the State Council. The Implementing Rules introduce a see-through principle and further provide that foreign-invested enterprises that invest in the PRC shall also be governed by the Foreign Investment Law and the Implementing Rules.

The Foreign Investment Law and the Implementing Rules provide that a system of pre-entry national treatment and negative list shall be applied for the administration of foreign investment, where "pre-entry national treatment" means that the treatment given to foreign investors and their investments at market access stage is no less favorable than that given to domestic investors and their investments, and "negative list" means the special administrative measures for foreign investment's access to specific fields or industries, which will be proposed by the competent investment department of the State Council in conjunction with the competent commerce department of the State Council and other relevant departments, and be reported to the State Council for promulgation, or be promulgated by the competent investment department or competent commerce department of the State Council after being reported to the State Council for approval. Foreign investments beyond the negative list will be granted national treatment. Foreign investors shall not invest in the prohibited fields as specified in the negative list, and foreign investors who invest in the restricted fields shall comply with the special requirements on the shareholding, senior management personnel, etc. In the meantime, relevant competent government departments will formulate a catalogue of industries for which foreign investments are encouraged according to the needs for national economic and social development, to list the specific industries, fields and regions in which foreign investors are encouraged and guided to invest. The current industry entry clearance requirements governing investment activities in the PRC by foreign investors are set out in two categories, namely the Special Entry Management Measures (Negative List) for the Access of Foreign Investment (2020 version), or the 2020 Negative List, as promulgated by the National Development and Reform Commission, or the NDRC, and the Ministry of Commerce and taking effect on July 23, 2020, and the Encouraged Industry Catalogue for Foreign Investment (2020 version), as promulgated by the NDRC and the Ministry of Commerce and taking effect on January 27, 2021. Industries not listed in these two catalogues are generally deemed "permitted" for foreign investment unless specifically restricted by other PRC laws.

According to the Implementing Rules, the registration of foreign-invested enterprises shall be handled by the State Administration for Market Regulation, or the SAMR or its authorized local counterparts. Where a foreign investor invests in an industry or field subject to licensing in accordance with laws, the relevant competent government department responsible for granting such license shall review the license application of the foreign investor in accordance with the same conditions and procedures applicable to PRC domestic investors unless it is stipulated otherwise by the laws and administrative regulations, and the competent government department shall not impose discriminatory requirements on the foreign investor in terms of licensing conditions, application materials, reviewing steps and deadlines, etc.

Pursuant to the Foreign Investment Law and the Implementing Rules, and the Information Reporting Measures for Foreign Investment jointly promulgated by the MOFCOM and the SAMR, which took effect on January 1, 2020, a foreign investment information reporting system shall be established and foreign investors or foreign-invested enterprises shall report investment information to competent commerce departments of the government through the enterprise registration system and the enterprise credit information publicity system, and the administration for market regulation shall forward the above investment information to the competent commerce departments in a timely manner.

*Foreign Investment Restriction on Value-Added Telecommunications Services*

According to the 2020 Negative List and other applicable laws and regulations, the industries of value-added telecommunications services (other than the services of electronic commerce, multiparty conferencing within the PRC, information storage and forwarding, and call center) are generally restricted to foreign investment with very limited exceptions in certain pilot demonstration zones.

According to the Administrative Regulations on Foreign-Invested Telecommunications Enterprises, as most recently amended in February 2016, foreign-invested value-added telecommunications enterprises must be in the form of a Sino-foreign equity joint venture. The regulations limit the ultimate capital contribution percentage by foreign investor(s) in a foreign-invested value-added telecommunications enterprise to 50% or less and require the primary foreign investor in a foreign invested value-added telecommunications enterprise to have a good track record and operational experience in the industry.

In 2006, the predecessor to the Ministry of Industry and Information Technology issued the Circular of the Ministry of Information Industry on Strengthening the Administration of Foreign Investment in Value-added Telecommunications Business, according to which a foreign investor in the telecommunications service industry of China must establish a foreign invested enterprise and apply for a telecommunications businesses operation license. This circular further requires that: (i) PRC domestic telecommunications business enterprises must not lease, transfer or sell a telecommunications businesses operation license to a foreign investor through any form of transaction or provide resources, offices and working places, facilities or other assistance to support the illegal telecommunications services operations of a foreign investor; (ii) value-added telecommunications enterprises or their shareholders must directly own the domain names and trademarks used by such enterprises in their daily operations; (iii) each value-added telecommunications enterprise must have the necessary facilities for its approved business operations and maintain such facilities in the regions covered by its license; and (iv) all providers of value-added telecommunications services are required to maintain network and internet security in accordance with the standards set forth in relevant PRC regulations. If a license holder fails to comply with the requirements in the circular and cure such non-compliance, the Ministry of Industry and Information Technology or its local counterparts have the discretion to take measures against such license holder, including revoking its license for value-added telecommunications business.

In light of the above restrictions and requirements, we conduct our value-added telecommunications businesses through our VIEs.

*Regulations Related to Value-added Telecommunications Services*

The PRC Telecommunications Regulations, as most recently amended in February 2016, are the primary regulations governing telecommunications services. Under the Telecommunications Regulations, a telecommunications service provider is required to procure operating licenses prior to the commencement of its operations. The Telecommunications Regulations distinguish "basic telecommunications services" from "value-added telecommunications services." Value-added telecommunications services are defined as telecommunications and information services provided through public networks. A catalogue was issued as an attachment to the Telecommunications Regulations to categorize telecommunications services as either basic or value-added, and the value-added telecommunications services are further divided into Class I value-added telecommunications services and Class II value-added telecommunications services. The current catalogue, as most recently updated in June 2019, categorizes online information services as Class II value-added telecommunications services.

The Administrative Measures on Telecommunications Business Operating Licenses, promulgated by the Ministry of Industry and Information Technology in 2009 and most recently amended in July 2017, set forth more specific provisions regarding the types of licenses required to operate value-added telecommunications services, the qualifications and procedures for obtaining such licenses and the administration and supervision of such licenses. Under these measures, a commercial operator of value-added telecommunications services must first obtain a license from the Ministry of Industry and Information Technology or its provincial level counterpart, or else such operator might be subject to sanctions including corrective orders and warnings from the competent administration authority, fines and confiscation of illegal gains. In case of serious violations, the operator's websites may be ordered to be closed.

Pursuant to the Administrative Measures on Internet Information Services, "internet information services" refers to the provision of information through the internet to online users, and they are categorized into "commercial internet information services" and "non-commercial internet information services". Commercial internet information service is a type of Class II value-added telecommunications service in the current catalogue attached to the Telecommunications Regulations, as most recently updated in June 2019. A commercial internet information services operator must obtain a value-added telecommunications services license for internet information services, which is known as an ICP License, from the relevant government authorities before engaging in any commercial internet information services operations in China. No ICP License is required if the operator will only provide internet information on a non-commercial basis. According to the Administrative Measures on Telecommunications Business Operating Licenses, an ICP License has a term of five years and can be renewed within 90 days before expiration.

RDD, one of our variable interest entities, has obtained an ICP License for the provision of commercial internet information services issued by the Beijing Telecommunication Administration in July 2017.

In addition to the Telecommunications Regulations and the other regulations discussed above, the provision of commercial internet information services on mobile internet applications is regulated by the Administrative Provisions on Information Services of Mobile Internet Applications, which was promulgated by the State Internet Information Office in June 2016. The information service providers of mobile internet applications are subject to requirements under these provisions, including acquiring the qualifications required by laws and regulations and being responsible for information security.

*Regulations Related to Internet Advertisements and Online Advertising*

The PRC government regulates advertising, including online advertising, principally through the State Administration for Market Regulation, formerly known as the State Administration for Industry and Commerce. The PRC Advertising Law, as recently amended in April 2015, outlines the regulatory framework for the advertising industry and allows foreign investors to own up to all equity interests in PRC advertising companies.

Advertisers, advertising service providers and advertising publishers are required by PRC advertising laws and regulations to ensure that the contents of the advertisements they prepare or distribute are true and in full compliance with applicable laws and regulations. For example, advertisements must not contain terms such as "the state-level," "the highest grade," "the best" or other similar words. In addition, if a special government review is required for certain categories of advertisements before publishing, the advertisers, advertising operators and advertising distributors are obligated to verify that such a review has been performed and the relevant approval has been obtained. Pursuant to the PRC Advertising Law, the use of the internet to distribute advertisements must not affect the normal use of the internet by users. Where internet information service providers know or should know that illegal advertisements are being distributed using their services, they must prevent such distribution.

In addition to the regulations described above, the Interim Measures for Administration of Internet Advertising, adopted by the State Administration for Industry and Commerce and effective on September 1, 2016, set forth certain compliance requirements for online advertising businesses. Advertising operators and distributors of internet advertisement must examine, verify and record identity information for advertisers such as name, address and contact information, and maintain a verification record that is updated on a regular basis. Moreover, advertising operators and advertising distributors must examine supporting documentation provided by advertisers and verify the contents of the advertisements against supporting documents before publishing them. If the contents of advertisements are inconsistent with the supporting documents, or the supporting documents are incomplete, advertising operators and distributors must refrain from providing design, production, agency or publishing services. These measures also prohibit the following activities: (i) providing or using applications and hardware to block, filter, skip over, tamper with, or cover up lawful advertisements; (ii) using network access, network equipment and applications to disrupt the normal transmission of lawful advertisements or adding or uploading advertisements without authorization; and (iii) harming the interests of a third party by using fake statistics or traffic data.

Violation of the foregoing laws and regulations may result in penalties, including fines, confiscation of advertising income, orders to cease dissemination of the advertisements and orders to publish an advertisement correcting the misleading information. In case of serious violations, the State Administration for Market Regulation or its local branches may force the violator to terminate its advertising operation or may even revoke its business license. Furthermore, advertisers, advertising operators or advertising distributors may be subject to civil liability if they infringe on the legal rights and interests of third parties.

We conduct our online advertising business through RDD.

*Regulation Related to Insurance Brokerage Business*

According to the Administrative Measures for Insurance Licenses promulgated by China Insurance Regulatory Commission, currently known as the China Banking and Insurance Regulatory Commission, or the CBIRC, in June 2007 and the PRC Insurance Law promulgated by the SCNPC, in June 1995 and most recently amended in April 2015, an insurance brokerage company is an entity that, in the interest of the applicant, provides intermediary services between the applicant and the insurer for the conclusion of an insurance contract and receives a commission in accordance with relevant laws. An insurance brokerage company shall obtain an Insurance Brokerage Business Operation License before it engages in insurance brokerage business.

The Regulatory Provisions on Insurance Brokerages, or the Insurance Brokerages Provisions, which was promulgated by the CBIRC on February 1, 2018 and took effect on May 1, 2018, are also important regulations in the regulatory and legal framework for the PRC insurance brokerage industry. According to the Insurance Brokerages Provisions, to operate insurance brokerage business, an insurance brokerage company shall satisfy the relevant statutory requirements with respect to its shareholders, registered capital, business scope, articles of associations, company name, senior management personnel, governance structure, internal control system, feasible business mode, business premise, etc. An insurance brokerage company may not exceed the business scope and business area of the insurers, and may operate all or part of the following businesses: (i) drafting insurance plans for policyholders, selecting insurance companies and processing insurance application formalities; (ii) assisting insured parties or beneficiaries in making claims; (iii) carrying out reinsurance brokerage businesses; (iv) providing disaster prevention or loss prevention, risk evaluation and risk management advisory services to entrusting parties; and/or (v) any other insurance brokerage-related business stipulated by the CBIRC. In addition, the examination and approval of the qualification of insurance brokerage practitioners have been canceled by the PRC Insurance Law amended in 2015. Pursuant to the Insurance Brokerages Provisions, before an insurance intermediary practitioner begins to practice, his/her company shall handle the practicing registration in the insurance intermediary regulatory information system of the CBIRC for him/her. The practicing registration for each insurance brokerage practitioner shall only be conducted through one insurance brokerage company. Violations of the Insurance Brokerages Provisions by the insurance brokerage companies may subject them to penalties including without limitation warning, fines, confiscation of illegal gains, rectification, revocation of licenses, and the insurance brokerage companies may be prevented from applying for administrative approval again within a specified time.

On April 2, 2019, the CBIRC promulgated the Circular on Issuing the 2019 Plan for the Rectification of Chaos in the Insurance Intermediary Market, or the Rectification Plan, aiming to further curb the chaos of violations of laws and regulations in the insurance intermediary market. The Rectification Plan mainly provides three key tasks: (i) to ascertain insurance companies' responsibility for management and control of various intermediary channels; (ii) to carefully investigate business compliance of insurance intermediaries; and (iii) to strengthen the rectification of insurance business of the third-party online platforms in cooperation with insurance institutions. An insurance intermediary shall strengthen the internal control management, prevent business risks, and focus on the rectification based on the following factors: (i) whether the professional insurance intermediary assists an insurance company in maliciously obtaining insurance proceeds by fabricating agency business, etc.; (ii) whether the professional insurance intermediary sells unapproved non-insurance financial products; (iii) whether the professional insurance intermediary grants benefits other than those stipulated in relevant insurance contracts to policyholders, the issued and beneficiaries; and (iv) whether the professional insurance intermediary has filed registration for sales personnel for practice in accordance with relevant regulations, etc.

67

On December 17, 2020, the CBIRC promulgated the Regulatory Measures for Online Insurance Business, or the Online Insurance Measures, which took effect on February 1, 2021. The Online Insurance Measures set forth the fundamental business rules applicable to the business operation of all insurance institutions (including insurance companies and insurance intermediaries) and their self-operated online platforms, as well as the specific business rules applicable to various types of insurance institutions and their business operation. In particular, the Online Insurance Measures provide that insurance institutions shall sell the Internet insurance products or provide insurance brokerage and insurance adjustment services through their self-operated online platforms or the self-operated online platforms of other insurance institutions, and the insurance application page must belong to the self-operated online platforms of insurance institutions. If an insurance intermediary conducts the Internet insurance business, its insurance type shall not exceed the insurance coverage and business area of the underwriting insurance company, and its business scope shall not exceed the scope agreed upon in the cooperation or entrustment agreement. An insurance institution operating the Internet insurance business shall submit information related to its self-operated online platforms, Internet insurance products, cooperative sales channels, and related changes to the relevant information system of the relevant regulatory authority. An insurance institution shall submit a report on the operation of the Internet insurance business over the previous year to the relevant information system before April 30 each year. In addition, insurance institutions are required to conduct rectification in accordance with the Online Insurance Measures, complete the rectification of system construction, marketing, sales management, information disclosure and other issues within three months following the implementation of the Online Insurance Measures, and complete the rectification of other business operation issues within six months thereafter, and complete the network security level protection certification of the self-operated network platform within 12 months thereafter. Any insurance institutions in violation of the Online Insurance Measures may be ordered to make rectification or subject to other regulatory measures.

*Regulation Related to Anti-money Laundering*

Pursuant to the PRC Anti-money Laundering Law, which was promulgated by the SCNPC on October 31, 2006 and took effect on January 1, 2007, a financial institution established in the PRC or a special non-financial institution that shall perform the obligation of anti-money laundering shall adopt relevant prevention and supervision measures according to the laws, establish and improve its clients' identification system, preservation system of clients' identity materials and transactional records, reporting system of large sum transactions and doubtful transactions, and perform its anti-money laundering obligations.

Pursuant to the Notice of Strengthening Anti-money Laundering in Insurance Industry promulgated by the CBIRC on August 10, 2010 and Administrative Measures for Anti-money Laundering Agenda in Insurance Industry promulgated on September 13, 2011 by the CBIRC and became effective on October 1, 2011, the CBIRC shall organize, coordinate and direct anti-money laundering efforts in insurance industry.

Pursuant to the Notice of Strengthening Anti-money Laundering in Insurance Industry, equity investments in insurance intermediaries and equity structure changes therein should be in line with relevant requirements on fund sources in anti-money laundering laws and regulations of the PRC. According to the provisions of the Administrative Measures for Anti-money Laundering Agenda in Insurance Industry, insurance brokerage companies shall, in the light of the real-name system for policies and according to the work principles that client materials are complete, transaction records are available for inspection and circumstance of funds is regulated, effectively enhance the internal control level of anti-money laundering. Insurance brokerage companies shall establish an internal control system for anti-money laundering and prohibit funds which have an illegal source from investing into them. The senior management officers of insurance brokerage companies shall understand laws and regulations on anti-money laundering. Newly established insurance intermediaries and branch institutions and those restructured or reformed should meet anti-money laundering criteria specified by the CBIRC, including (i) establishment of system for client identity recognition, client identity and transaction record keeping, training and education, auditing, confidentiality, internal control system and operation protocols including those facilitating monitoring and inspection and administrative investigation; (ii) dedicated anti-money laundering posts and job descriptions, manning and training for such posts; and (iii) other requirements according to regulatory provisions.

68

***Regulation Related to Intellectual Property Rights***

The PRC government has promulgated various laws and regulations relating to the protection of intellectual property. Software owners, licensees and transferees may register their rights in software with the National Copyright Administration or its local branches and obtain software copyright registration certificates. Although such registration is not mandatory under PRC law, software owners, licensees and transferees are encouraged to go through the registration process to enjoy the better protections afforded to registered software rights. The State Intellectual Property Office, formerly the Trademark Office of the State Administration for Industry and Commerce, handles trademark registrations and grants a protection term of ten years to registered trademarks. The Ministry of Industry and Information Technology is in charge of the overall administration of domain names in China. The registration of domain names in PRC is on a "first-apply-first-registration" basis. A domain name applicant will become the domain name holder upon the completion of the application procedure.

***Regulations Related to Employment***

The Labor Contract Law, which became effective in 2008, requires employers to enter into written contracts with their employees, restricts the use of temporary workers and aims to give employees long-term job security.

Employers are required to contribute to social insurance for their employees in the PRC, including basic pension insurance, basic medical insurance, unemployment insurance, maternity insurance and injury insurance. Employers are also required to make contributions to a housing provident fund for their employees.

***Regulations Related to Foreign Exchange***

***Regulation on Foreign Currency Exchange***

The principal regulations governing foreign currency exchange in China are the Foreign Exchange Administration Regulations, most recently amended in 2008. Under PRC foreign exchange regulations, payments of current account items, such as profit distributions, interest payments and trade and service-related foreign exchange transactions, can be made in foreign currencies without prior approval from the State Administration of Foreign Exchange, or SAFE, by complying with certain procedural requirements. By contrast, approval from or registration with appropriate government authorities is required where RMB is to be converted into foreign currency and remitted out of China to pay capital account items, such as direct investments, repayment of foreign currency-denominated loans, repatriation of investments and investments in securities outside of China.

In 2012, SAFE promulgated the Circular of Further Improving and Adjusting Foreign Exchange Administration Policies on Foreign Direct Investment, or Circular 59, which substantially amends and simplifies the current foreign exchange procedure. Pursuant to Circular 59, the opening of various special purpose foreign exchange accounts, such as pre-establishment expenses accounts, foreign exchange capital accounts and guarantee accounts, the reinvestment of RMB proceeds derived by foreign investors in the PRC, and remittance of foreign exchange profits and dividends by a foreign-invested enterprise to its foreign shareholders no longer require the approval or verification of SAFE, and multiple capital accounts for the same entity may be opened in different provinces, which was not possible previously. In 2013, SAFE specified that the administration by SAFE or its local branches over direct investment by foreign investors in the PRC must be conducted by way of registration and banks must process foreign exchange business relating to the direct investment in the PRC based on the registration information provided by SAFE and its branches. In February 2015, SAFE promulgated the Notice on Further Simplifying and Improving the Administration of the Foreign Exchange Concerning Direct Investment, or SAFE Notice 13. Instead of applying for approvals regarding foreign exchange registrations of foreign direct investment and overseas direct investment from SAFE, entities and individuals may apply for such foreign exchange registrations from qualified banks. The qualified banks, under the supervision of SAFE, may directly review the applications and conduct the registration.

69

In March 2015, SAFE promulgated the Circular of the SAFE on Reforming the Management Approach regarding the Settlement of Foreign Capital of Foreign-invested Enterprise, or Circular 19, which expands a pilot reform of the administration of the settlement of the foreign exchange capitals of foreign-invested enterprises nationwide. Circular 19 replaced both the Circular of the SAFE on Issues Relating to the Improvement of Business Operations with Respect to the Administration of Foreign Exchange Capital Payment and Settlement of Foreign-invested Enterprises, or Circular 142, and the Circular of the SAFE on Issues concerning the Pilot Reform of the Administrative Approach Regarding the Settlement of the Foreign Exchange Capitals of Foreign-invested Enterprises in Certain Areas, or Circular 36. Circular 19 allows all foreign-invested enterprises established in the PRC to settle their foreign exchange capital on a discretionary basis according to the actual needs of their business operation, provides the procedures for foreign invested companies to use Renminbi converted from foreign currency-denominated capital for equity investments and removes certain other restrictions that had been provided in Circular 142. However, Circular 19 continues to prohibit foreign-invested enterprises from, among other things, using RMB funds converted from their foreign exchange capital for expenditure beyond their business scope and providing entrusted loans or repaying loans between non-financial enterprises. SAFE promulgated the Notice of the State Administration of Foreign Exchange on Reforming and Standardizing the Foreign Exchange Settlement Management Policy of Capital Account, or Circular 16, effective June 2016, which reiterates some of the rules set forth in Circular 19. Circular 16 provides that discretionary foreign exchange settlement applies to foreign exchange capital, foreign debt offering proceeds and remitted foreign listing proceeds, and the corresponding RMB capital converted from foreign exchange may be used to extend loans to related parties or repay inter-company loans (including advances by third parties). However, there are substantial uncertainties with respect to Circular 16's interpretation and implementation in practice. Circular 19 or Circular 16 may delay or limit us from using the proceeds of offshore offerings to make additional capital contributions to our PRC subsidiaries and any violations of these circulars could result in severe monetary or other penalties.

In January 2017, SAFE promulgated the Circular on Further Improving Reform of Foreign Exchange Administration and Optimizing Genuineness and Compliance Verification, or Circular 3, which stipulates several capital control measures with respect to the outbound remittance of profits from domestic entities to offshore entities, including (i) banks must check whether the transaction is genuine by reviewing board resolutions regarding profit distribution, original copies of tax filing records and audited financial statements, and (ii) domestic entities must retain income to account for previous years' losses before remitting any profits. Moreover, pursuant to Circular 3, domestic entities must explain in detail the sources of capital and how the capital will be used, and provide board resolutions, contracts and other proof as a part of the registration procedure for outbound investment.

On October 23, 2019, SAFE issued Circular of the State Administration of Foreign Exchange on Further Promoting the Facilitation of Cross-border Trade and Investment, or the Circular 28, which took effect on the same day. Circular 28 allows non-investment foreign-invested enterprises to use their capital funds to make equity investments in China, provided that such investments do not violate the effective special entry management measures for foreign investment (negative list) and the target investment projects are genuine and in compliance with laws. Since Circular 28 was only issued recently, its interpretation and implementation in practice are still subject to substantial uncertainties.

***Regulations on Foreign Exchange Registration of Overseas Investment by PRC Residents***

In 2014, SAFE issued the SAFE Circular on Relevant Issues Relating to Domestic Resident's Investment and Financing and Roundtrip Investment through Special Purpose Vehicles, or SAFE Circular 37. SAFE Circular 37 regulates foreign exchange matters in relation to the use of special purpose vehicles by PRC residents or entities to seek offshore investment and financing or conduct round trip investment in China. Under SAFE Circular 37, a "special purpose vehicle" refers to an offshore entity established or controlled, directly or indirectly, by PRC residents or entities for the purpose of seeking offshore financing or making offshore investment, using legitimate onshore or offshore assets or interests, while "round trip investment" refers to direct investment in China by PRC residents or entities through special purpose vehicles, namely, establishing foreign-invested enterprises to obtain ownership, control rights and management rights. SAFE Circular 37 provides that, before making a contribution into a special purpose vehicle, PRC residents or entities are required to complete foreign exchange registration with SAFE or its local branch.

70

In 2015, SAFE promulgated the Notice on Further Simplifying and Improving the Administration of the Foreign Exchange Concerning Direct Investment. This notice has amended SAFE Circular 37 by requiring PRC residents or entities to register with qualified banks rather than SAFE or its local branch in connection with their establishment or control of an offshore entity established for the purpose of overseas investment or financing. PRC residents or entities who had contributed legitimate onshore or offshore interests or assets to special purpose vehicles but had not registered as required before the implementation of the SAFE Circular 37 must register their ownership interests or control in the special purpose vehicles with qualified banks. An amendment to the registration is required if there is a material change with respect to the special purpose vehicle registered, such as any change of basic information (including change of the PRC residents, name and operation term), increases or decreases in investment amount, transfers or exchanges of shares, and mergers or divisions. Failure to comply with the registration procedures set forth in SAFE Circular 37 and the subsequent notice, or making misrepresentations or failing to disclose the control of the foreign-invested enterprise that is established through round-trip investment, may result in restrictions being imposed on the foreign exchange activities of the relevant foreign-invested enterprise, including payment of dividends and other distributions, such as proceeds from any reduction in capital, share transfer or liquidation, to its offshore parent or affiliate, and the capital inflow from the offshore parent, and may also subject relevant PRC residents or entities to penalties under PRC foreign exchange administration regulations.

### Regulations Related to Stock Incentive Plans

SAFE promulgated the Circular of the SAFE on Issues concerning the Administration of Foreign Exchange Used for Domestic Individuals' Participation in Equity Incentive Plans of Companies Listed Overseas, or the Stock Option Rules, in February 2012, replacing the previous rules issued by SAFE in March 2007. Under the Stock Option Rules and other relevant rules and regulations, PRC residents who participate in a stock incentive plan in an overseas publicly listed company are required to register with SAFE or its local branches and complete certain other procedures. Participants in a stock incentive plan who are PRC residents must retain a qualified PRC agent, which could be a PRC subsidiary of the overseas publicly listed company or another qualified institution selected by the PRC subsidiary, to conduct the SAFE registration and other procedures with respect to the stock incentive plan on behalf of the participants. In addition, the PRC agent is required to amend the SAFE registration with respect to the stock incentive plan if there is any material change to the stock incentive plan or the PRC agent or any other material changes. The PRC agent must apply to SAFE or its local branches on behalf of the PRC residents who have the right to exercise the employee share options for an annual quota for the payment of foreign currencies in connection with the PRC residents' exercise of the employee share options. The foreign exchange proceeds received by the PRC residents from the sale of shares under the stock incentive plans granted and dividends distributed by the overseas listed companies must be remitted into the bank accounts in the PRC opened by the PRC agents before distribution to such PRC residents.

See "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China—Any failure to comply with PRC regulations regarding the registration requirements for employee stock incentive plans may subject the PRC plan participants or us to fines and other legal or administrative sanctions."

### Regulations Related to Dividend Distribution

See "Item 5. Operating and Financial Review and Prospectus—B. Liquidity and Capital Resources—Holding Company Structure."

### Regulations Related to Taxation

See "Item 5. Operating and Financial Review and Prospectus—A. Operating Results—Taxation—China" and "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China—If we are classified as a PRC resident enterprise for PRC income tax purposes, such classification could result in unfavorable tax consequences to us and our non-PRC shareholders or ADS holders" and "—We may not be able to obtain certain benefits under the relevant tax arrangement for dividends paid by our PRC subsidiaries to us through our Hong Kong subsidiaries."

### Regulations Related to M&A and Overseas Listings

In 2006, six PRC regulatory agencies, including the Ministry of Commerce, the State-owned Assets Supervision and Administration Commission, the State Administration for Taxation, the State Administration for Industry and Commerce, the CSRC, and SAFE, jointly issued the Regulations on Mergers and Acquisitions of Domestic Enterprises by Foreign Investors, or the M&A Rules.

71

C.      **Organizational Structure**

The following diagram illustrates the principal entities in our corporate structure as of the date of this annual report:



1. VIEs and VIEs' subsidiaries include Beijing Rongdiandian Information Technology Co., Ltd. ("RDD") and its subsidiary Shanghai Anguo Insurance Brokerage Co., Ltd., Beijing Kartner Information Technology Co., Ltd. ("KTN") and Beijing Guangkezhixun Information Technology Co., Ltd. ("GKZX").

We conduct most of our business operations through our directly owned subsidiaries. However, due to the PRC legal restrictions on foreign ownership of value-added telecommunications businesses, we conduct a significant part of such operations in China through our VIEs. Our VIEs will also employ part of our research and development team. In addition, RDD has obtained a value-added telecommunications services license for internet information services, which is known as an ICP License.

**Contractual Arrangements with the VIEs**

We have entered into a series of contractual arrangements, including exclusive call option agreements, equity pledge agreements and exclusive business cooperation agreements, with the VIEs and their shareholders. These contractual arrangements allow us to exercise effective control over the VIEs, receive substantially all of the economic benefits of the VIEs, and have an exclusive option to purchase all or part of the equity interests in the VIEs when and to the extent permitted by PRC law. As a result of these contractual arrangements, we are regarded as the primary beneficiary of the VIEs, and we treat them as our variable interest entities under U.S. GAAP. We consolidate the financial results of the VIEs and their subsidiaries in our consolidated financial statements in accordance with U.S. GAAP. On April 3, 2019, one of the previous shareholders of RDD transferred her equity holdings in RDD to another individual. Concurrent with the completion of such equity transfer in RDD, the previous contractual arrangements we entered into with RDD's previous shareholders that provided us effective control over RDD were terminated and a new set of contractual arrangements with the same terms were entered into with RDD's new shareholders.

The following is a summary of the contractual arrangements entered into by and among RQN or Beijing Rongsanliuling Information Technology Co., Ltd., or R360, as applicable, the applicable VIE and the shareholders of the applicable VIE.

72

*Agreements that provide us effective control over the VIEs*

*Exclusive Purchase Option Agreements.*    Pursuant to each exclusive purchase option agreement by and among RQN or R360, as applicable, the applicable VIE, and the shareholders of the applicable VIE, each of the shareholders of the applicable VIE irrevocably grants RQN or R360, as applicable, an exclusive option to purchase, or have its designated person to purchase, at its discretion, to the extent permitted under PRC law, all or part of the shareholders' equity interests in the VIE at the lowest price permitted by applicable PRC law. In addition, the applicable VIE grants RQN or R360, as applicable, an exclusive option to purchase, or have its designated person to purchase, at its discretion, to the extent permitted under PRC law, all or part of the assets of the VIE at the price of the net book value of such assets, or the lowest price permitted by applicable PRC law, whichever is higher. Without the prior written consent of RQN or R360, as applicable, the applicable VIE may not increase or decrease the registered capital, dispose of its assets, enter into any material contract with a value exceeding a specific amount except for those executed in the ordinary course of business, appoint or remove any directors, distribute dividends to the shareholders, guarantee its continuance, amend its articles of association and provide loans to any third parties. The shareholders of the applicable VIE agree that, without the prior written consent of RQN or R360, as applicable, they will not transfer or otherwise dispose of their equity interests in the VIE or create or allow any encumbrance on the equity interests. Each exclusive purchase option agreement will remain effective until all equity interests in each applicable VIE held by its shareholders and all assets owned by each applicable VIE are transferred or assigned to RQN or R360, as applicable, or its designated representatives.

*Equity Pledge Agreements.*    Pursuant to each equity pledge agreement by and among RQN or R360, as applicable, the applicable VIE, and the shareholders of the applicable VIE, each of the shareholders of the applicable VIE pledges all of their equity interests in the VIE to guarantee their and the VIE's performance of their obligations under the contractual arrangements including, but not limited to, the applicable exclusive business cooperation agreement, the applicable exclusive purchase option agreement and the applicable shareholders' power of attorney. If the applicable VIE or its shareholders breach their contractual obligations under these agreements, RQN or R360, as applicable, as pledgee, will have the right to dispose of the pledged equity interests. The shareholders of the applicable VIE agree that, during the term of the equity pledge agreements, they will not dispose of the pledged equity interests or create or allow any encumbrance on the pledged equity interests, and they also agree that the rights of RQN or R360, as applicable, relating to the equity pledges shall not be prejudiced by the legal actions of the shareholders, their successors or their designates. During the term of each equity pledge agreement, RQN or R360, as applicable, has the right to receive all of the dividends and profits distributed on the pledged equity interests. The equity pledges will remain effective until the applicable VIE and its shareholders discharge all their obligations under the contractual arrangements. We have registered the equity pledges in each VIE with the relevant office of the administration for market regulation in accordance with the PRC Property Rights Law.

*Power of Attorney.*    Each shareholder of each VIE has signed an irrevocable power of attorney. Pursuant to the power of attorney, each of the shareholders of the VIEs will appoint RQN or R360, as applicable, as their attorney-in-fact, to exercise all shareholder rights, including, but not limited to, attending the shareholders' meeting, voting on all matters of the applicable VIE requiring shareholder approval, appointing or removing directors and executive officers, and disposing of all or part of the shareholder's equity interests in the applicable VIE pursuant to the applicable exclusive purchase option agreement and the applicable equity pledge agreement. The power of attorney of shareholders of each VIE will remain in force for an unlimited term, unless RQN or R360, as applicable, issues a contrary instruction in writing otherwise.

*Agreement that allows us to receive economic benefits from the VIEs*

*Exclusive Business Cooperation Agreements.*    Under the exclusive business cooperation agreements by and between RQN or R360, as applicable, and the applicable VIE, RQN or R360, as applicable, has the exclusive right to provide the applicable VIE with technical, consulting and other services needed for the business of the VIE. In return, RQN or R360, as applicable, is entitled to receive a service fee from the applicable VIE. RQN or R360, as applicable, is entitled to receive the service fee on a monthly basis and at an amount equivalent to all of the net income of the applicable VIE as confirmed by RQN or R360, as applicable, which is adjustable at the sole discretion of RQN or R360, as applicable. RQN or R360, as applicable, owns the exclusive intellectual property rights created as a result of the performance of the applicable exclusive business cooperation agreement. Except with RQN's or R360's prior written consent, as applicable, the applicable VIE may not accept any consultation or services provided by any third party and may not cooperate with any third party regarding the matters contemplated by the applicable exclusive business cooperation agreement, unless RQN or R360, as applicable, appoints other parties to provide the applicable VIE with consultation or services. Each of the exclusive business cooperation agreements between RQN or R360, as applicable and the applicable VIE will remain effective unless terminated unilaterally by RQN or R360, as applicable.

73

In the opinion of Fangda Partners, our PRC legal counsel:

· the ownership structure of our variable interest entities and wholly foreign owned subsidiaries in China does not violate any applicable PRC laws or regulations currently in effect; and

· the contractual arrangements among our wholly foreign owned subsidiaries, our variable interest entities and the shareholders of our variable interest entities governed by PRC law are valid, binding and enforceable in accordance with their terms and applicable PRC laws or regulations currently in effect and do not violate any applicable PRC laws or regulations currently in effect.

However, there are substantial uncertainties regarding the interpretation and application of current and future PRC laws, regulations and rules. Accordingly, the PRC regulatory authorities may in the future take a view that is contrary to or otherwise different from the above opinion of our PRC legal counsel. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure—If the PRC government deems that our contractual arrangements with our variable interest entities do not comply with PRC regulatory restrictions on foreign investment in the relevant industries, or if these regulations or the interpretation of existing regulations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations" and "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China—Uncertainties exist with respect to the interpretation and implementation of the newly enacted Foreign Investment Law and its implementing rules and how they may impact our business, financial condition and results of operations."

### D.   Property, Plant and Equipment

Our headquarters are located at the Zhongguancun technology hub in Beijing. Our research and development facilities and our management and operations facilities are located at our headquarters and two other locations in Beijing. We have sales and business development personnel at our headquarters in Beijing and at our regional offices in Shanghai and Shenzhen. We currently lease approximately 3,368 square meters of office space in Beijing, approximately 832 square meters of office space in Shanghai, approximately 461 square meters of office space in Shenzhen and approximately 5,125 square meters of office space in other cities in China.

### ITEM 4A.  UNRESOLVED STAFF COMMENTS

None.

### ITEM 5.  OPERATING AND FINANCIAL REVIEW AND PROSPECTS

You should read the following discussion and analysis of our financial condition and results of operations in conjunction with our consolidated financial statements and the related notes included elsewhere in this annual report on Form 20-F. This discussion contains forward-looking statements that involve risks and uncertainties. Our actual results and the timing of selected events could differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth under "Item 3. Key Information—D. Risk Factors" and elsewhere in this annual report on Form 20-F.

### A.   Operating Results

**Overview**

We are the leading independent open platform for discovery and recommendation of financial products in China. Our users have access to an extensive range of financial products on our platform, including consumer and other loans, credit cards, wealth management products and insurance products. We synthesize a massive volume of data and leverage our proprietary technology to identify and recommend the most suitable products for each user's specific financial circumstances. Gold Cloud, our SaaS-based end-to-end solution which we introduced in the first quarter of 2016, supports the application, approval and loan servicing process for a large and growing percentage of our loan products, allowing financial service providers to offer a seamless user experience.

We generate our revenue primarily from fees that we charge financial service providers or their agents for our recommendation services for loan products on a cost-per-action basis, where the action is generally determined by a user's completion of a loan application, and for credit card products on a cost-per-success basis, where the success is most often defined as the issuance of a credit card. To a lesser extent, we provide display and performance-based advertising and marketing services primarily to financial service providers of credit cards and wealth management products. We also offer financial service providers big data risk management solutions, which we introduced in the second quarter of 2015.

**Our Relationship with RONG360**

Before the completion of transfer of the platform business from RONG360 to us, our business was historically operated by RONG360 Inc. through its subsidiaries and variable interest entity. Our consolidated financial statements included elsewhere in this annual report include the assets, liabilities, revenues, expenses and cash flows that were directly attributable to us throughout the periods presented. See "Item 5. Operating and Financial Review and Prospectus—A. Operating Results—Critical Accounting Policies, Judgments and Estimates—Basis of Presentation and Principles of Consolidation."

Historically, RONG360 operated our business with its financial, administrative, sales and marketing, legal and information technology resources, as well as the services of its executive officers and other employees, the costs of which were allocated to us based on the proportion of revenues, infrastructure usage, labor usage and other factors attributable to our business, and were included in our consolidated financial statements for the periods presented. In October 2017, we completed the transfer of the platform business from RONG360 to us, and since then, our business has been operated by our own subsidiaries and variable interest entities. In addition, as a part of the Restructuring, RONG360 transferred all operating assets and liabilities relating to our business to our company, as well as all related personnel and business contracts. As a result, we have our own financial, administrative, sales and marketing, legal and information technology functions to operate our business. We have entered into a transitional services agreement with RONG360 Inc. with respect to various ongoing relationships between us and RONG360. See "Item 7. Major Shareholders and Related Party Transactions—B. Related Party Transactions—Agreement with RONG360."

On July 31, 2018, RONG360 completed the share distribution of our ordinary shares held by it to the existing shareholders of RONG360 in proportion to RONG360's shareholding structure, and thus completed the Restructuring to strengthen our positioning as an independent open platform. For more details, see "Item 4. Information on the Company—C. Organizational Structure." Following the completion of the share distribution, RONG360 is no longer our parent company.

**Key Factors Affecting Our Results of Operations**

*Economic and industry trends in China*

The growth in consumer lending in China in recent years has been supported by generally rising consumer demand and increased willingness to assume credit. Consumer demand has increased as China's emerging middle class has enjoyed more disposable income, and Chinese consumers have been more willing to take on debt in an environment of relative economic stability and good employment prospects. With the rapid growth in China's internet population, financial service providers have been seeking online channels to access those segments of the population that previously have been underserved, including the younger generation of potential customers that increasingly prefer mobile access to the internet. In addition, new technology-enabled financial service providers have emerged to compete with traditional financial institutions and take advantage of this market opportunity, which in turn gives traditional financial institutions an incentive to utilize online channels. Lending to SMEs has also grown rapidly in China as SMEs have grown significantly and more financial service providers have been focusing on SME lending. The growth of our business will depend in part on the continuation of these trends.

*Effectiveness of matching and recommendation*

The revenue and growth of our recommendation services for financial service providers primarily depend on the effectiveness of our matching and recommendation capabilities. We rely on our data insights and proprietary technologies to efficiently match users with the financial products most suitable to their needs and increase the success rate of their applications to attract users to our platform. In turn, our user base enables us to serve financial service providers in reaching and serving their target customers more effectively through online and mobile channels. As we generate the majority of our revenues from recommendation services for financial service providers, we must continually enhance our data insights and strengthen our proprietary technologies to improve our matching and recommendation capabilities.

*Integration with financial service providers*

We launched our online platform in 2012 with sales and marketing solutions, and introduced big data risk management solutions in 2015 and Gold Cloud in 2016. Through cooperation with financial service providers, we have further improved and developed the services and solutions that we can offer to them. These services and solutions often require some degree of integration between our systems and the financial service provider's, which increases their efficiency and also give financial service providers an additional incentive to remain on our platform. Increased integration also gives us access to more and better data, enabling better curation of financial products and improving monetization. We offer a range of solutions requiring different degrees of integration, and over time, financial service providers have been increasingly adopting solutions that require greater levels of integration. For this trend to continue, we must continue to enhance our data insights and develop proprietary technology to make our new and existing solutions more attractive to financial service providers. Developing new solutions will also give us more opportunities to cross sell.

*Expansion of our user base and user activity*

Although we generate our revenue primarily from fees that we charge financial service providers, their demand for our services and solutions largely depends on our ability to help them reach and serve their target customers. Therefore, the size and characteristics of our user base on our platform significantly affect our revenue and results of operations. We must maintain a large and active user base that is geographically and demographically diverse. We have incurred significant expenses and devoted considerable resources to marketing activities and user traffic acquisition as we have grown our business, and we expect to continue to incur significant expenses as we grow. To achieve profitability, we must be able to retain and expand our user base and user activity in a cost effective manner.

*Operating leverage of our platform*

We have incurred significant expenses in building our platform and developing capabilities in data analytics and technology. Our business model is highly scalable and our platform is built to support our continued growth. While we expect our expenses to increase in absolute terms as our business expands, we also expect them to decrease as a proportion of our total revenues as we leverage our platform and achieve more economies of scale. Personnel costs have been the largest component of our total costs and expenses after marketing expenses, so to maintain and improve the operating leverage of our platform we must be able to grow our business without adding disproportionately to our personnel costs.

*Ability to compete effectively*

Our business and results of operations depend on our ability to compete effectively in the markets in which we operate. We compete primarily with other companies that also seek to position themselves as open platforms serving both users and financial service providers. We also compete with platforms that are affiliated with major internet companies, including search engine, social media, e-commerce and online payment companies. Some of these internet companies also offer their financial products on our platform, so they both compete and cooperate with us. In addition, we compete with financial service providers to the extent that they offer or list financial products on their own platform, and some of these financial service providers may also offer financial products on our platform as well. The internet finance industry is continually evolving, and new competitors may emerge at any time. We must continue to innovate our services and solutions in a way that financial service providers will find attractive. Our ability to compete effectively depends in large part on our ability to anticipate the needs of both financial service providers and users.

76

*Regulatory environment in China*

The PRC government's regulatory framework governing the online consumer finance market is rapidly evolving and is subject to further change and interpretation, and the application and interpretation of these laws and regulations are ambiguous and may be interpreted and applied inconsistently between different governing authorities. If the PRC government adopts stringent regulations on financial service providers in the online consumer finance market, the growth of that market may slow, which may limit our growth. If they impose specific requirements (including licensing requirements) on us, the requirements may be difficult or costly for us to comply with. Regulations may be adopted in a way that favor competing business models or that disadvantage the internet finance industry as a whole in comparison to traditional financial institutions.

**Impact of COVID-19 On Our Operations**

Beginning in January 2020, the outbreak of COVID-19 has severely impacted China and the rest of the world, and our business and results of operations have been adversely affected as a result. In early 2020, the COVID-19 pandemic resulted in the temporary closure of many corporate offices across China. Given the strict implementation of quarantine measures during this period, we and certain of our business partners implemented temporary adjustment of work schemes allowing employees to work from home and adopted remote collaboration. We made operational adjustments to maintain the same high-quality service we had always provided our users, customers and partners as we simultaneously worked to minimize the impact of COVID-19 and push forward our business initiatives. However, as our cooperation with financial service partners rely heavily on face-to-face communications, our cooperation with them has been negatively impacted by the quarantine measures in China and in Beijing, in particular, for several months in 2020. Additionally, the global COVID-19 pandemic and the associated inability to travel globally has negatively affected the progress of the originally planned further expansion of our service offerings overseas since early 2020 and such negative impact may continue in 2021.

Many of the quarantine measures within China have since been relaxed, and we, together with our business partners, have gradually resumed normal operations since mid-July 2020. The COVID-19 global pandemic has resulted in, and may intensify, global economic distress, and the duration and extent of the impact of COVID-19 outbreak is highly uncertain at this time. The extent to which it may affect our results of operations, financial condition and cash flows will depend on the future development of the outbreak, which is also highly uncertain and difficult to predict and will depend on a number of factors, including the duration and severity of COVID-19, the extent and severity of new waves of outbreak in China and other countries, the development and progress of distribution of COVID-19 vaccine and other medical treatment and the effectiveness of such vaccine and other medical treatment, and the actions taken by government authorities to contain the outbreak, all of which are beyond our control. If the situation materially deteriorates in China or globally, our business, results of operations and financial condition could be materially and adversely affected.

See "Item 3. Key Information—D. Risk Factors —We face risks related to natural disasters, health epidemics and other outbreaks, which could significantly disrupt our operations."

**Key Components of Results of Operations**

*Revenues*

Our revenues are derived from recommendation services for loans and credit cards and advertising, marketing and other services offered to financial service providers.

The following table sets forth the breakdown of our total revenues, both in absolute amount and as a percentage of our total revenues, for the periods presented:

| | For the Year Ended December 31, | | | | | | |
| | 2017 | | 2018 | | 2019 | | |
| | RMB | % | RMB (As Restated) | % | RMB | US$ | % |
| | | | (in thousands, except percentages) | | | | |
| Revenues: | | | | | | | |
| Recommendation services: | | | | | | | |
| Loans | 1,119,456 | 77.4 | 1,015,407 | 52.8 | 666,307 | 95,709 | 46.4 |
| Credit cards | 228,905 | 15.9 | 689,822 | 35.9 | 585,993 | 84,173 | 40.8 |
| Total recommendation services | 1,348,361 | 93.3 | 1,705,229 | 88.7 | 1,252,300 | 179,882 | 87.2 |
| Advertising, marketing and other services | 97,412 | 6.7 | 216,647 | 11.3 | 183,427 | 26,348 | 12.8 |
| Total revenues | 1,445,773 | 100.0 | 1,921,876 | 100.0 | 1,435,727 | 206,230 | 100.0 |

*Recommendation services.*   We record fees charged for our recommendation services for loan products on a cost-per-action basis, where the action is generally determined by a user's completion of a loan application. Due to macro slowdown and online lending market adjustments pertaining to the evolving regulatory framework, the loan applications on the Company's platform has experienced fluctuation in volume and the average fee per loan application. The number of loan applications on the Company's platform was approximately 37.7 million in the fiscal year 2019, representing a decrease of approximately 47.1% from the prior year. The average fee per loan application increased by 14.3% from RMB12.46 in 2017 to RMB14.24 in 2018 and increased by 24.2% to RMB17.68 (US$2.54) in 2019.

We record fees charged for our recommendation services for credit card products on a cost-per-success basis, where the success is most often defined as the issuance of a credit card and in other cases by the completion of an application or the first usage of a credit card, depending on the credit card issuer's policy. Credit card volume for recommendation services in the fiscal year 2019 was approximately 5.5 million, representing a decrease of approximately 19.1% from fiscal year 2018. Our average fee per credit card, based on the portion of our credit card volume relating to our recommendation services revenues, increased from RMB92.78 in 2017 to RMB101.94 in 2018 and further to RMB106.45 (US$15.29) in 2019.

*Advertising, marketing and other services.*   We provide performance-based and to a lesser extent time-based advertising and marketing services primarily to financial service providers of credit cards and wealth management products, both on our own platform and on third-party search engine, social networking or other platforms where we purchase advertising resources. Other services primarily consist of big data risk management services we provide to financial service providers, which integrates data and provides customizable automatic credit information inquiry services to the financial service providers to facilitate their credit assessment primarily for loan products applicants.

## Cost of revenues

The following table sets forth our cost of revenues, both in absolute amount and as a percentage of total revenues, for the periods indicated:

| | For the Year Ended December 31, | | | | | | |
| | 2017 | | 2018 | | 2019 | | |
| | RMB | % | RMB (As Restated) | % | RMB | US$ | % |
| | | | (in thousands, except percentages) | | | | |
| Cost of revenues | (143,828) | 9.9 | (194,492) | 10.1 | (133,968) | (19,243) | 9.3 |

Cost of revenues consists primarily of direct costs relating to advertising and marketing services revenue, data acquisition costs and short message service (SMS) fees, bandwidth and server hosting cost, online payment processing fees, depreciation, payroll and other related costs of operations. Our total cost of revenues increased by 35.2% from RMB143.8 million in the year ended December 31, 2017 to RMB194.5 million in the year ended December 31, 2018 and decreased by 31.1% to RMB134.0 million (US$19.2 million) in the year ended December 31, 2019, which was in line with the revenue increase and decrease during the respective periods. The percentage of our cost to total revenues remained stable for the periods of year ended December 31, 2017, 2018 and 2019.

*Operating Expenses*

Our operating expenses consist of sales and marketing expenses, research and development expenses, general and administrative expenses, impairment loss and penalties.

The following table sets forth our operating expenses, both in absolute amount and as a percentage of total revenues, for the periods indicated:

|  | For the Year Ended December 31, | | | | | | |
|  | 2017 | | 2018 | | 2019 | | |
|  | RMB | % | RMB (As Restated) | % | RMB | US$ | % |
|---|---|---|---|---|---|---|---|
|  | (in thousands, except percentages) | | | | | | |
| **Operating expenses:** | | | | | | | |
| Sales and marketing | (1,227,896) | 84.9 | (1,486,399) | 77.3 | (1,199,346) | (172,275) | 83.5 |
| Research and development | (153,905) | 10.7 | (241,270) | 12.6 | (272,343) | (39,120) | 19.0 |
| General and administrative | (93,718) | 6.5 | (178,371) | 9.3 | (100,896) | (14,493) | 7.0 |
| Impairment loss | — | — | — | — | (254,683) | (36,583) | 17.7 |
| Penalties | — | — | — | — | (30,000) | (4,309) | 2.1 |
| Total operating expenses | (1,475,519) | 102.1 | (1,906,040) | 99.2 | (1,857,268) | (266,780) | 129.3 |

*Sales and marketing expenses*

Our sales and marketing expenses consist primarily of marketing expenses relating to traffic acquisition, rewards to business partners for promotion in social network and social media platform, payroll costs and related expenses for employees involved in sales and marketing activities, and expenses for the portion of our call center operations that we outsource. We expense all sales and marketing costs as incurred. We expect our sales and marketing expenses in 2020 to decrease in absolute terms and account for a smaller percentage of revenue, in line with our business trend and our efforts to improve operating efficiency.

*Research and development expenses*

Our research and development expenses consist primarily of payroll costs and related expenses for employees involved in developing and improving our platform and our services and solutions. We expense all research and development costs as incurred. We expect our research and development expenses in 2020 to decrease in absolute terms as we continue to engage in cost optimization measures.

*General and administrative expenses*

Our general and administrative expenses consist primarily of payroll costs and related expenses for employees involved in general corporate functions, including finance, legal and human resources, and professional fees relating to these functions. We expect our general and administrative expenses in 2020 to increase in absolute terms as the reversal of share-based compensation expenses in 2019 was a one-off event and there were increased general and administrative expenses associated with our expansion into new business in 2020, including the introduction of insurance products onto our platform starting in the fourth quarter of 2019.

*Impairment loss and penalties*

Our impairment loss in the year ended December 31, 2019 primarily reflects the impairment of the goodwill and intangible assets of an acquired subsidiary. The business of the subsidiary has been suspended and an investigation related to compliance of information collection or use was initiated by competent authorities in 2019. The investigation has concluded in 2021 and the subsidiary was imposed a fine, in relation to which, we recorded RMB30 million penalties in 2019. We did not incur any impairment loss or penalties for the years ended December 31, 2017 and 2018, respectively.

**Taxation**

*Cayman Islands*

We are not subject to income or capital gains tax under the current laws of the Cayman Islands. There are no other taxes likely to be material to us levied by the government of the Cayman Islands.

*Hong Kong*

Jianpu (Hong Kong) Limited, our subsidiary incorporated in Hong Kong, is subject to Hong Kong profits tax at a rate of 16.5% for taxable income earned in Hong Kong before April 1, 2018. Starting from the financial year commencing on April 1, 2018, the two-tiered profits tax regime took effect, under which the tax rate is 8.25% for assessable profits on the first HK$2 million and 16.5% for any assessable profits in excess of HK$2 million. Hong Kong does not impose a withholding tax on dividends.

*China*

Our PRC subsidiaries and our variable interest entities which are considered PRC resident enterprises under PRC tax law, are subject to enterprise income tax on their worldwide taxable income as determined under PRC tax laws and accounting standards at a rate of 25% except for 15% for the entity qualified as High and New Technology Enterprises. In addition, our PRC subsidiaries and our variable interest entities are subject to value added taxes, or VAT, at a rate of 6% on the services we provide to financial service providers, less any deductible VAT we have already paid or borne. They are also subject to surcharges on VAT payments in accordance with PRC law.

Dividends paid by our wholly foreign-owned subsidiaries in China to our intermediary holding company in Hong Kong will be subject to a withholding tax rate of 10%, unless they qualify for a special exemption. If Jianpu (Hong Kong) Limited satisfies all the requirements under the Arrangement between the Mainland China and the Hong Kong Special Administrative Region for the Avoidance of Double Taxation and Tax Evasion on Income and receives approval from the relevant tax authority, then dividends paid by our wholly foreign-owned subsidiaries in China will be subject to a withholding tax rate of 5% instead. See "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China—We may not be able to obtain certain benefits under the relevant tax arrangement for dividends paid by our PRC subsidiaries to us through our Hong Kong subsidiaries."

If our holding company in the Cayman Islands or any of our subsidiaries outside of China were deemed to be a "resident enterprise" under the PRC Enterprise Income Tax Law, it would be subject to enterprise income tax on its worldwide income at a rate of 25%. See "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China—If we are classified as a PRC resident enterprise for PRC income tax purposes, such classification could result in unfavorable tax consequences to us and our non-PRC shareholders or ADS holders."

**Critical Accounting Policies, Judgments and Estimates**

An accounting policy is considered critical if it requires an accounting estimate to be made based on assumptions about matters that are highly uncertain at the time such estimate is made, and if different accounting estimates that reasonably could have been used, or changes in the accounting estimates that are reasonably likely to occur periodically, could materially impact the consolidated financial statements.

We prepare our financial statements in conformity with U.S. GAAP, which requires us to make judgments, estimates and assumptions. We continually evaluate these estimates and assumptions based on the most recently available information, our own historical experiences and various other assumptions that we believe to be reasonable under the circumstances. Since the use of estimates is an integral component of the financial reporting process, actual results could differ from our expectations as a result of changes in our estimates. Some of our accounting policies require a higher degree of judgment than others in their application and require us to make significant accounting estimates.

The following descriptions of critical accounting policies, judgments and estimates should be read in conjunction with our consolidated financial statements and accompanying notes and other disclosures included in this annual report. When reviewing our financial statements, you should consider (i) our selection of critical accounting policies, (ii) the judgments and other uncertainties affecting the application of such policies and (iii) the sensitivity of reported results to changes in conditions and assumptions.

*Basis of presentation and principles of consolidation*

Prior to the completion of transfer of the platform business to us, our business was carried out by various subsidiaries and a variable interest entity of RONG360 Inc. that were under common control with us by RONG360. The accompanying consolidated financial statements include the assets, liabilities, revenue, expenses and cash flows that were directly attributable to our business for all periods presented. The historical funding provided by RONG360 for our business was deemed and presented as a contribution to us from RONG360 in the consolidated financial statements. However, such presentation may not necessarily reflect the results of operations, financial position and cash flows if we had actually existed on a stand-alone basis during the periods presented.

The assets and liabilities had been stated at historical carrying amounts. Only those assets and liabilities that were specifically identifiable to our business were included in our consolidated balance sheets. Income tax liability was calculated based on a separate return basis as if we had filed a separate tax return. Our statement of comprehensive loss consisted all the related revenues, costs and expenses of our business, including allocation to the cost of revenues, sales and marketing expenses, research and development expenses, and general and administrative expenses, which were incurred by RONG360 but related to our business prior to the transfer of the platform business. These allocated costs and expenses were primarily related to workplace resources, information technology supports and certain corporate functions, including senior management, finance, legal and human resources, as well as share-based compensation. These allocations were based on proportional cost allocation by considering proportion of headcount and transaction volume, among other things, attributable to us and were made on a basis considered reasonable by our management.

The following table sets forth the cost of revenues, sales and marketing expenses, research and development expenses, and general and administrative expenses allocated from RONG360 for the year ended December 31, 2017 prior to the transfer of platform business to us:

| | For the Year Ended December 31, 2017 RMB (in thousands) |
| --- | --- |
| Cost of revenues | 8,081 |
| Sales and marketing expenses | 25,049 |
| Research and development expenses | 29,940 |
| General and administrative expenses | 11,882 |
| Total | 74,952 |

Our business was operated within RONG360 Inc.'s corporate cash management program prior to the transfer of platform business from RONG360 to us by the end of October 2017. For purposes of presentation in our consolidated statements of cash flows, the cash flow from RONG360 to support our business was presented as funding from RONG360, which was included in cash flows from financing activities. Funding from RONG360 as disclosed under cash flows from financing activities also reflected the changes in contribution from RONG360 as presented in the consolidated statements of changes in invested/shareholders' (deficit)/equity.

Our consolidated financial statements related to periods after the completion of the transfer of the platform business from RONG360 to us include the financial statements of Jianpu Technology Inc., its subsidiaries and the variable interest entities for which Jianpu Technology Inc. is the ultimate primary beneficiary. Subsidiaries are those entities in which Jianpu Technology Inc., directly or indirectly, controls more than one half of the voting power, or has the power to govern the financial and operating policies, to appoint or remove the majority of the members of the board of directors, or to cast a majority of votes at the meeting of directors.

A variable interest entity is an entity in which Jianpu Technology Inc., or its subsidiary, through contractual arrangements, exercises effective control over the activities that most impact the economic performance, bears the risks of, and enjoys the rewards normally associated with ownership of the entity, and therefore Jianpu Technology Inc. or its subsidiary is the primary beneficiary of the entity.

All significant intercompany transactions and balances between Jianpu Technology Inc. and its wholly-owned subsidiaries and the variable interest entities are eliminated upon consolidation.

*Revenue recognition*

We operate a platform for discovery and recommendation of financial products, including consumer and other loans, credit cards, and wealth management products offered by a variety of financial service providers. Our platform includes our website, mobile website and mobile apps, which enable users to browse and search product information and initiate an online application. We generate revenues from recommendation services for loans and credit cards and from advertising, marketing and other services. On January 1, 2018, we adopted ASC Topic 606, Revenue from Contracts with Customers ("ASC 606"), using the modified retrospective method. Revenues for reporting periods beginning after January 1, 2018 are presented under ASC606, while revenues for prior periods are not adjusted and continue to be presented under ASC Topic 605. The accumulated effect of adopting ASC 606 to the opening balance of accumulated losses as of January 1, 2018 is not material, therefore it was not adjusted.

Consistent with the criteria of ASC 606, we recognize revenues when performance obligations under the terms of a contract with a customer are satisfied and promised services have transferred to the customer, in an amount of consideration to which an entity expects to be entitled to in exchange for those goods or services and net of value-added tax.

For service arrangements that involve multiple performance obligations, the transaction price is allocated to each performance obligation based on relative standalone selling prices of services being provided to customers. For the periods presented, we primarily use the price to be charged for the service when the service is sold separately in similar circumstances to similar customers to determine the relative standalone selling price.

We account for discounts and return allowances as variable consideration. We consider the constraint on variable consideration and only recognize revenue to the extent that it is probable that a significant reversal will not occur when the uncertainty associated with the variable consideration is subsequently resolved. Customers for recommendation services are entitled to apply for returns for invalid recommendations within a specified period after the recommendation is delivered under a limited circumstance, i.e., the applicant's phone number cannot be connected, or the applicant is in the blacklist maintained by the financial service providers, etc. Return allowances are estimated based on historical experiences of returns granted to customers.

Timing of revenue recognition may differ from the timing of payment from customers. We do not have material contract assets as we generally have the unconditional right to payment as revenue is recognized or the timing difference is immaterial. Accounts receivable represents amounts that we have satisfied the performance obligation and have the unconditional right to payment. Unearned revenue consists of payments received related to unsatisfied performance obligations at the end of the period, included in "Advance from customers" in our consolidated balance sheets. Due to the generally short-term duration of our contracts, the majority of the performance obligations are satisfied in one year. The amount of revenue recognized that was included in the receipts in advance from customers balance at the beginning of the year was RMB70.1 million and RMB80.5 million for the years ended December 31, 2018 and 2019.

**Recommendation services:**

(i)    Loans

We provide recommendation services in respect of loan products offered by the financial service providers on our platform, and assist the financial service providers or their loan sales representatives to identify qualified individual users or borrowers. We consider the financial service providers, including banks, consumer finance companies, micro-loan companies and other licensed financial institutions, or their loan sales representatives to be our customers, and receives service fees from the customers primarily based on number of applications of qualified users. After the users or borrowers submit applications for the recommended products to the customers, we do not retain any further obligations. The price for each recommendation charged to the financial service providers is a fixed price as pre-agreed in the service contract, or pre-set in the bidding systems by the customers. The price is not determined by the size or duration of the loan underlying of each recommendation. Revenue is recognized when all of the revenue recognition criteria are met, which is generally when the user application is delivered to customers.

(ii)        Credit card

We provide recommendation services in respect of credit card products offered by credit card issuers or their agents on our platform. The individual users can select and apply for the credit cards, and submit applications to credit card issuers or their agents. We are not involved in the credit card approval or issuance process. Service fee is charged to the customers, i.e., the credit card issuers or their agents, upon completion of an application, issuance or first usage of a credit card by the users (collectively referred to as "cost-per-success"). Revenue is recognized when all of the revenue recognition criteria are met, which is generally when the customers confirm the number of card application, issuance or first usage with us.

(iii)        Advertising and marketing services

We also provide advertising, marketing and other services primarily to financial service providers of credit cards and wealth management products. Our advertising and marketing services allow customers to place advertisements in particular areas of our platform and third-party advertising network, at performance-based or time-based fixed prices, in particular formats and over particular periods of time. Performance-based revenues are recognized based on effective clicks, or effective activations, depending on the relevant performance measures. The effective clicks refer to that users click on the advertisements. The effective activations primarily include providing contact information or completing a registration form by users on the advertisers' websites redirected from the advertisements, and user's application are successfully approved by the credit card issuers in the case of advertising and marketing services related to credit card products. Time-based revenues are recognized ratably over the contractual term.

For service arrangements involved with third-party platforms, we consider whether we should report revenues on a gross or net basis by assessing all indicators set forth in ASC 606, and determine if we are acting as principal or agent. For arrangements where we control the service before it is transferred to the customer as a principal, as we are the primary obligor, subject to inventory risk, and having discretion in establishing prices, revenue is recorded on a gross basis on the amount of fees we billed to our customers, and the related marketing costs charged by third-party platforms that are directly attributable to the customers are recorded as costs of revenues. Otherwise, the revenue is record on a net basis.

**Other services**

Other services primarily consist of big data risk management services provided by us, which integrates data and provides customizable automatic credit information inquiry services to customers, i.e., the financial service providers, to facilitate their credit assessment primarily for loan products applicants. Revenue is recognized when all of the revenue recognition criteria are met, which is generally when the result of query is provided to customers with a pre-agreed fixed price.

***Share-based Compensation Expense and Valuation of Underlying Equity***

All share-based awards granted to employees or non-employees, including restricted ordinary shares and share options, are measured at fair value on grant date. Share-based compensation expense is recognized using the straight-line vesting method for awards that contain only service conditions, and using graded vesting method for other awards, net of estimated forfeitures, over the requisite service period, which is the vesting period.

We use the binomial option pricing model to estimate fair value of the share options. The determination of estimated fair value of share-based awards on the grant date using an option pricing model is affected by the fair value of underlying ordinary shares as well as assumptions regarding a number of complex and subjective variables. These variables include the expected value volatility of underlying ordinary shares over the expected term of the awards, actual and projected share option exercise behaviors, a risk free interest rate and any expected dividends. The underlying ordinary shares which do not have quoted market prices, were valued based on the income approach. Determination of estimated fair value of the underlying ordinary shares requires complex and subjective judgments due to their limited financial and operating history, unique business risks and limited public information on companies in China similar to them.

Forfeitures are estimated at the time of grant and revised in subsequent periods if actual forfeitures differ from those estimates. We use historical data to estimate forfeitures of the pre-vesting options and record share-based compensation expenses only for those awards that are expected to vest.

For share options granted with performance condition, the share-based compensation expenses are recorded when the performance condition is considered probable. Where the occurrence of an IPO is a performance condition, cumulative share-based compensation expenses for the options that have satisfied the service condition are recorded upon the completion of the IPO. We reassess the probability of vesting at each reporting period for awards with performance conditions and adjust compensation expense based on our probability assessment. We recognize a cumulative catch up adjustment for changes in our probability assessment in the reporting periods of the changes.

A modification is defined as a change in the terms or conditions of a share-based award ("modified award"). The compensation expenses associated with the modified awards are recognized if either the original vesting condition or the new vesting condition is achieved. Total recognized compensation cost for the awards is at least equal to the fair value of the awards at the grant date unless at the date of the modification the performance or service conditions of the original awards are not expected to be satisfied. The incremental compensation expenses are equal to the excess of the fair value of the modified award immediately after the modification over the fair value of the original award immediately before the modification. For stock options already vested as of the modification date, we immediately recognized the incremental value as compensation expenses. For stock options still unvested as of the modification date, the incremental compensation expenses are recognized over the requisite service period of these stock options.

Our share based awards granted to employees of the non-platform business should be recognized as a deemed dividend from us to our shareholders at the fair value determined as of the grant date.

The detailed information of the share-based compensation expenses recognized for the year ended December 31, 2017, 2018 and 2019 is included in note 18 to our consolidated financial statements in this annual report.

### *Goodwill*

Goodwill represents the excess of the purchase price over the fair value of the identifiable assets and liabilities acquired as a result of the acquisitions of interests in our subsidiaries and consolidated VIEs. We perform quantitative goodwill impairment test annually or more frequently when an event occurs or circumstances change that indicate the carrying value may not be recoverable. A goodwill impairment loss is recognized for the amount that the carrying amount of a reporting unit, including goodwill, exceeds its fair value, limited to the total amount of goodwill allocated to that reporting unit. Nil, nil and RMB147.3 million of impairment loss of goodwill were recognized for the years ended December 31, 2017, 2018 and 2019, respectively.

### *Impairment of long-lived assets*

We evaluate our long-lived assets with finite lives for impairment whenever events or changes in circumstances (such as a significant adverse change to market conditions that will impact the future use of the assets) indicate that the carrying amount of an asset may not be fully recoverable. When these events occur, we evaluate the impairment by comparing carrying amount of the assets to an estimate of future undiscounted cash flows expected to be generated from the use of the assets and their eventual disposition. If the sum of the expected future undiscounted cash flows is less than the carrying amount of the assets, we recognize an impairment loss based on the excess of the carrying amount of the long-lived assets over their fair value. Nil, nil and RMB101.1 million of impairment loss of long-lived assets were recognized for the years ended December 31, 2017, 2018 and 2019, respectively.

84

**Business combinations**

We account for our business combinations using the purchase method of accounting in accordance with ASC topic 805, Business Combinations. The purchase method of accounting requires that the consideration transferred to be allocated to the assets, including separately identifiable assets and liabilities we acquired, based on their estimated fair values. The consideration transferred in an acquisition is measured as the aggregate of the fair values at the date of exchange of the assets given, liabilities incurred, and equity instruments issued as well as the contingent considerations and all contractual contingencies as of the acquisition date. The costs directly attributable to the acquisition are expensed as incurred. Identifiable assets, liabilities and contingent liabilities acquired or assumed are measured separately at their fair value as of the acquisition date, irrespective of the extent of any noncontrolling interests. The excess of (i) the total of cost of acquisition, fair value of the noncontrolling interests and acquisition date fair value of any previously held equity interest in the acquiree over (ii) the fair value of the identifiable net assets of the acquiree, is recorded as goodwill. If the cost of acquisition is less than the fair value of the net assets of the subsidiary acquired, the difference is recognized directly in earnings.

The determination and allocation of fair values to the identifiable assets acquired, liabilities assumed and noncontrolling interests is based on various assumptions and valuation methodologies requiring considerable judgment from management. The most significant variables in these valuations are discount rates, terminal values, the number of years on which to base the cash flow projections, as well as the assumptions and estimates used to determine the cash inflows and outflows. We determine discount rates to be used based on the risk inherent in the related activity's current business model and industry comparisons. Terminal values are based on the expected life of assets, forecasted life cycle and forecasted cash flows over that period.

**Results of Operations**

The following table sets forth a summary of our consolidated results of operations for the periods indicated, both in absolute amounts and as percentages of our total revenues. This information should be read together with our consolidated financial statements and related notes included elsewhere in this annual report. The operating results in any period are not necessarily indicative of the results that may be expected for any future period.

| | For the Year Ended December 31, | | | | | | |
| | 2017 | | 2018 | | 2019 | | |
| | RMB | % | RMB (As Restated) | % | RMB | US$ | % |
| | (in thousands, except percentages) | | | | | | |
| **Revenues:** | | | | | | | |
| Recommendation services: | | | | | | | |
| Loans (including revenues from related party of RMB102,997, RMB105,492 and RMB31,980 for the years ended December 31, 2017, 2018 and 2019, respectively.) | 1,119,456 | 77.4 | 1,015,407 | 52.8 | 666,307 | 95,709 | 46.4 |
| Credit cards | 228,905 | 15.9 | 689,822 | 35.9 | 585,993 | 84,173 | 40.8 |
| Total recommendation services | 1,348,361 | 93.3 | 1,705,229 | 88.7 | 1,252,300 | 179,882 | 87.2 |
| Advertising, marketing and other services (including revenues from related party of nil, RMB13,405 and RMB6,858 for the years ended December 31, 2017, 2018 and 2019, respectively) | 97,412 | 6.7 | 216,647 | 11.3 | 183,427 | 26,348 | 12.8 |
| **Total revenues** | **1,445,773** | **100.0** | **1,921,876** | **100.0** | **1,435,727** | **206,230** | **100.0** |
| Cost of revenues | (143,828) | (9.9) | (194,492) | (10.1) | (133,968) | (19,243) | (9.3) |
| **Gross profit** | **1,301,945** | **90.1** | **1,727,384** | **89.9** | **1,301,759** | **186,987** | **90.7** |
| **Operating expenses:** | | | | | | | |
| Sales and marketing (including expenses from related party of nil, RMB51,753 and RMB21,099 for the years ended December 31, 2017, 2018 and 2019, respectively) | (1,227,896) | (84.9) | (1,486,399) | (77.3) | (1,199,346) | (172,275) | (83.6) |
| Research and development | (153,905) | (10.7) | (241,270) | (12.6) | (272,343) | (39,120) | (19.0) |
| General and administrative | (93,718) | (6.5) | (178,371) | (9.3) | (100,896) | (14,493) | (7.0) |
| Impairment loss | — | — | — | — | (254,683) | (36,583) | (17.7) |
| Penalties | — | — | — | — | (30,000) | (4,309) | (2.1) |
| **Loss from operations** | **(173,574)** | **(12.0)** | **(178,656)** | **(9.3)** | **(555,509)** | **(79,793)** | **(38.7)** |
| Net interest income | — | — | 5,037 | 0.3 | 5,100 | 733 | 0.4 |
| Others, net | (169) | (0.0) | 9,360 | 0.5 | 11,785 | 1,693 | 0.8 |
| **Loss before income tax** | **(173,743)** | **(12.0)** | **(164,259)** | **(8.5)** | **(538,624)** | **(77,367)** | **(37.5)** |
| Income tax (expenses)/benefits | (28,382) | (2.0) | 4,473 | 0.2 | 8,005 | 1,150 | 0.5 |
| **Net loss** | **(202,125)** | **(14.0)** | **(159,786)** | **(8.3)** | **(530,619)** | **(76,217)** | **(37.0)** |
| Less: net income/(loss) attributable to noncontrolling interests | — | — | 4,829 | 0.3 | (78,859) | (11,327) | (5.5) |
| **Net loss attributable to Jianpu's shareholders** | **(202,125)** | **(14.0)** | **(164,615)** | **(8.6)** | **(451,760)** | **(64,890)** | **(31.5)** |

**Year Ended December 31, 2019 Compared to Year Ended December 31, 2018**

*Total revenues.*   Our total revenues decreased by 25.3% from RMB1,921.9 million in 2018 to RMB1,435.7 million (US$206.2 million) in 2019, primarily due to decreases in revenues both from recommendation services for loan and credit card products and advertising and marketing services and other services.

· *Revenues from recommendation services* decreased by 26.6% to RMB1,252.3 million (US$179.9 million) in 2019 from RMB1,705.2 million in 2018, primarily due to a decrease in revenues from recommendation services for loan products.

· *Revenues from recommendation services for credit cards* decreased by 15.0% to RMB586.0 million (US$84.2 million) in 2019 from RMB689.8 million in 2018. Credit card volume for recommendation services in 2019 was approximately 5.5 million, representing a decrease of approximately 19.1% from that in 2018. The average fee per credit card for recommendation services increased to RMB106.45 (US$15.29) in 2019 from RMB101.94 in 2018.

· *Revenues from recommendation services for loans* decreased by 34.4% to RMB666.3 million (US$95.7 million) in 2019 from RMB1,015.4 million in 2018, mainly due to the decrease in number of loan applications on our platform. The number of loan applications on our platform was approximately 37.7 million in 2019, representing a decrease of approximately 47.1% from that in 2018. The decrease was mainly attributable to the decrease of number of financial products available on our platform given the credit tightening and change of industry dynamics. The average fee per loan application increased to RMB17.68 (US$2.54) in 2019 from RMB14.24 in 2018.

· *Revenues from advertising, marketing and other services* decreased by 15.3% to RMB183.4 million (US$26.3 million) in 2019 from RMB216.6 million in 2018, primarily due to a decrease in revenues from advertising and marketing services, partially offset by an increase in revenues from big data and risk management services.

*Cost of revenues.* Our cost of revenues decreased by 31.1% to RMB134.0 million (US$19.2 million) in 2019 from RMB194.5 million in 2018. The decrease was primarily attributable to the decrease from RMB106.9 million in 2018 to RMB34.2 million (US$4.9 million) in 2019 in direct costs relating to advertising and marketing services revenue, partially offset by the increase from RMB22.8 million in 2018 to RMB32.0 million (US$4.6 million) in 2019 in data acquisition costs and the increase from RMB9.5 million in 2018 to RMB15.5 million (US$2.2 million) in 2019 in depreciation costs.

*Gross profit and gross margin*. Our gross profit decreased by 24.6% to RMB1,301.8 million (US$187.0 million) in 2019 from RMB1,727.4 million in 2018. The decrease was primarily attributable to the decrease of our total revenues. Gross margin was 90.7% in 2019, compared with 89.9% in 2018.

*Sales and marketing expenses*. Our sales and marketing expenses decreased by 19.3% to RMB1,199.3 million (US$172.3 million) in 2019 from RMB1,486.4 million in 2018. The decrease was mainly due to the decrease from RMB1,216.1 million in 2018 to RMB437.6 million (US$62.9 million) in 2019 in traffic acquisition cost, and the decrease from RMB33.3 million in 2018 to RMB14.8 million (US$2.1 million) in 2019 in call center outsourcing cost, partially offset by the growth from RMB85.4 million in 2018 to RMB590.2 million (US$84.8 million) in 2019 in rewards to business partners for promotion through the Social Media and Partner Program.

*Research and development expenses*. Our research and development expenses increased by 12.8% to RMB272.3 million (US$39.1 million) in 2019 from RMB241.3 million in 2018, primarily due to the increase from RMB190.6 million in 2018 to RMB209.6 million (US$30.1 million) in 2019 in payroll costs mainly related to the hiring of new R&D staff in the first half of 2019.

*General and administrative expenses.* Our general and administrative expenses decreased by 43.4% to RMB100.9 million (US$14.5 million) in 2019 from RMB178.4 million in 2018. The decrease was primarily due to a net impact of negative RMB79.6 million arising from the reversal of share-based compensation expenses related to the options granted in 2017 with a performance condition and the recognition of share-based compensation expenses for the modification of performance condition for the same awards in the fourth quarter of 2019. Such reversal and recognition were recorded, because the achievement of original performance condition became improbable and a modification was made consequently. Apart from the impact of share-based compensation, our general and administrative expenses increased by 78.7% in 2019 compared with that in 2018, which was mainly due to the increase in professional fees from RMB20.3 million in 2018 to RMB43.0 million (US$6.2 million) in 2019, and the increase in allowance for doubtful accounts from RMB1.0 million in 2018 to RMB28.3 million (US$4.1 million) in 2019.

*Impairment loss and penalties*. Our impairment loss and penalties in 2019 were RMB254.7 million (US$36.6 million) and RMB30 million (US$4.3 million), respectively, compared with nil and nil, respectively, in 2018, primarily due to the impairment of the goodwill and intangible assets of an acquired subsidiary. The business of the subsidiary has been suspended and an investigation related to compliance of information collection or use was initiated by competent authorities in 2019. The investigation has concluded in 2021 and the subsidiary was imposed a fine, in relation to which, we recorded RMB30 million penalties in 2019.

*Net loss.* As a result of the foregoing, we had a net loss of RMB530.6 million (US$76.2 million) in 2019, compared with a net loss of RMB159.8 million in 2018.

**Year Ended December 31, 2018 Compared to Year Ended December 31, 2017**

*Total revenues.*   Our total revenues increased by 32.9% from RMB1,445.8 million in 2017 to RMB1,921.9 million in 2018, primarily due to increases in revenues both from recommendation services for credit cards and advertising and marketing services and other services.

·   *Revenues from recommendation services* increased by 26.5% from RMB1,348.4 million in 2017 to RMB1,705.2 million in 2018. Revenues from recommendation services for loan products decreased by 9.3% from RMB1,119.5 million in 2017 to RMB1,015.4 million in 2018, primarily due to the decrease in the number of loan applications on our platform, partially offset by increase in the average fee per loan application. Revenues from recommendation services for credit card products significantly increased by 201% from RMB228.9 million in 2017 to RMB689.8 million in 2018, as consumer demand towards credit cards significantly increased in 2018 and we successfully captured the shift of user demand.

·   *Revenues from advertising, marketing and other services* increased by 122% from RMB97.4 million in 2017 to RMB216.6 million in 2018, primarily due to an increase in revenues from big data and risk management services including that generated by a subsidiary acquired in June 2018 and, to a lesser extent, the increase in revenues from advertising service.

*Cost of revenues.* Cost of revenues increased by 35.2% from RMB143.8 million in 2017 to RMB194.5 million in 2018, primarily attributable to the increase from RMB64.7 million in 2017 to RMB106.9 million in 2018 in direct costs relating to revenues from advertising and marketing services, an increase in bandwidth and server hosting costs from RMB2.6 million in 2017 to RMB12.3 million in 2018, and an increase in depreciation from RMB2.9 million in 2017 to RMB9.5 million in 2018.

*Gross profit and gross margin.*   Our gross profit increased by 32.7% from RMB1,301.9 million in 2017 to RMB1,727.4 million in 2018, while our gross margin slightly decreased from 90.0% in 2017 to 89.9% in 2018.

*Sales and marketing expenses.*   Our sales and marketing expenses increased by 21.1% from RMB1,227.9 million in 2017 to RMB1,486.4 million in 2018, primarily due to a 12.1% increase in marketing and advertising expenses from RMB1,085.3 million in 2017 to RMB1,216.1 million in 2018, a 40.6% increase in payroll costs relating to marketing activities from RMB80.0 million in 2017 to RMB112.5 million in 2018. Our marketing and advertising expenses grew as we devoted more resources to attracting users and financial service providers to our platform. Our payroll costs grew due to increases in both the number and average pay of sales and marketing employees.

*Research and development expenses*.   Our research and development expenses increased by 56.8% from RMB153.9 million in 2017 to RMB241.3 million in 2018, primarily due to the increase in payroll costs mainly related to the hiring of new R&D staff to further enhance our technology capabilities in terms of big data and AI, as well as the increase of the amortization of the intangible assets in connection with acquisition.

*General and administrative expenses*.   Our general and administrative expenses increased by 90.4% from RMB93.7 million in 2017 to RMB178.4 million in 2018, primarily due to the share-based compensation, including the impact of the options granted after the IPO, as well as increase in payroll costs in 2018. Share-based compensation included in general and administrative expenses as percentage of revenue increased from nil in 2016 to 3.7% in 2017, and further increased to 5.5% in 2018.

*Net loss.*   As a result of the foregoing, we had a net loss of RMB202.1 million in 2017 as compared to a net loss of RMB159.8 million in 2018.

**Recent Accounting Pronouncements**

A list of recent accounting pronouncements that are relevant to us is included in note 4 to our consolidated financial statements included elsewhere in this prospectus.

**B.     Liquidity and Capital Resources**

The following table sets forth a summary of our cash flows for the periods presented:

| | For the Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2019 | |
| | RMB | RMB (As Restated) | RMB | US$ |
| | | (in thousands) | | |
| **Summary Consolidated Cash Flow Data:** | | | | |
| Net cash used in operating activities | (28,099) | (72,827) | (200,837) | (28,849) |
| Net cash used in investing activities | (18,823) | (323,438) | (47,457) | (6,816) |
| Net cash provided by/(used in) financing activities | 1,611,903 | 60,399 | (198,034) | (28,444) |
| Effect of exchange rate changes on cash and cash equivalents and restricted cash | (21,170) | 62,056 | 9,709 | 1,395 |
| Net increase/(decrease) in cash and cash equivalents and restricted cash | 1,543,811 | (273,810) | (436,619) | (62,714) |
| Cash and cash equivalents and restricted cash at beginning of the year | — | 1,543,811 | 1,270,001 | 182,424 |
| Including: | | | | |
| Cash and cash equivalents at beginning of the year | — | 1,543,811 | 1,270,001 | 182,424 |
| Restricted cash at beginning of the year | — | — | — | — |
| Cash and cash equivalents and restricted cash at end of the year | 1,543,811 | 1,270,001 | 833,382 | 119,710 |
| Including: | | | | |
| Cash and cash equivalents at end of the year | 1,543,811 | 1,270,001 | 694,910 | 99,818 |
| Restricted cash at end of the year | — | — | 138,472 | 19,892 |

Our business operated within RONG360 Inc.'s corporate cash management program prior to the transfer of the platform business from RONG360 to us. Historically, RONG360 Inc. completed four rounds of equity financing between 2012 and 2015, before the launch of its technology-enabled online lending business, when our platform business constituted its only business. For purposes of presentation in our consolidated statements of cash flows, the cash flow from RONG360 to support our business was presented as funding from RONG360, which was included in cash flows from financing activities. Funding from RONG360 as disclosed under cash flows from financing activities also reflected the changes in contribution from RONG360 as presented in the consolidated statements of changes in invested/shareholders' equity.

RONG360 Inc. has provided RMB150.0 million of initial working capital to us in the form of a capital contribution in 2017.

We believe our current cash and cash equivalents will be sufficient to meet our current and anticipated needs for general corporate purposes for at least the next 12 months. After our IPO, we decide to enhance our liquidity position or increase our cash reserve for future investments through additional capital and finance funding. The issuance and sale of additional equity would result in further dilution to our shareholders. The incurrence of indebtedness would result in increased fixed obligations and could result in operating covenants that would restrict our operations. We cannot assure you that financing will be available in amounts or on terms acceptable to us, if at all.

In utilizing the proceeds we received from our IPO, we may make additional capital contributions to our PRC subsidiaries, establish new PRC subsidiaries and make capital contributions to these new PRC subsidiaries, make loans to our PRC subsidiaries, or acquire offshore entities with business operations in China in offshore transactions. However, most of these uses are subject to PRC regulations and approvals. For example:

· capital contributions to our PRC subsidiaries conducting our value-added telecommunications businesses must be approved by the Ministry of Commerce or its local counterparts; and

· loans by us to our PRC subsidiaries to finance their activities cannot exceed statutory limits and must be registered with SAFE or its local branches.

See "Item 4. Information on the Company—B. Business Overview—Regulation—Regulations Related to Foreign Exchange."

A majority of our future revenues are likely to be in RMB. Under existing PRC foreign exchange regulations, payments of current account items, including profit distributions, interest payments and trade and service-related foreign exchange transactions, can be made in foreign currencies without prior SAFE approval as long as certain routine procedural requirements are fulfilled. Therefore, our PRC subsidiaries are allowed to pay dividends in foreign currencies to us without prior SAFE approval by following certain routine procedural requirements. However, approval from or registration with competent government authorities is required where the RMB is to be converted into foreign currency and remitted out of China to pay capital expenses such as the repayment of loans denominated in foreign currencies. The PRC government may at its discretion restrict access to foreign currencies for current account transactions in the future.

*Operating Activities*

Net cash used in operating activities for the year ended December 31, 2019 was RMB200.8 million (US$28.8 million), as compared to net loss of RMB530.6 million (US$76.2 million) for the same period. The principal non-cash items affecting the difference between our net loss and our net cash used in operating activities in 2019 were RMB254.7 million (US$36.6 million) of impairment loss, RMB36.5 million (US$5.2 million) of depreciation and amortization expenses, RMB28.3 million (US$4.1 million) of allowance for doubtful accounts and partially offset by deferred income tax benefits of RMB16.8 million (US$2.4 million). The principal changes in operating assets and liabilities were a decrease of RMB71.7 million (US$10.3 million) in advance from customers, a decrease of RMB38.4 million (US$5.5 million) in amount due to related party, a decrease of RMB17.3 million (US$2.5 million) in tax payable, partially offset by a decrease of RMB73.3 million (US$10.5 million) in accounts receivable, an increase of RMB48.4 million (US$7.0 million) in accrued expenses and other current liabilities and a decrease of RMB46.4 million (US$6.7 million) in prepayments and other current assets. The decrease in advance from customers was attributable to the slowdown of loan business under the influence of industry volatility. The decrease in accounts receivable and prepayments were attributable to the optimization of collection and payment cycles.

Net cash used in operating activities for the year ended December 31, 2018 was RMB72.8 million, as compared to net loss of RMB159.8 million for the same period. The principal changes in operating assets and liabilities were an increase of RMB261.4 million in accounts receivable, which was mainly due to the expansion of credit card business, partially offset by the following changes: an increase of RMB66.4 million in accrued expenses and other current liabilities, mainly due to the increase of  accrued payroll, an increase of RMB31.2 million in advance from customers, an increase of RMB30.6 million in amount due to related party and an increase of RMB21.2 million of tax payable. The principal non-cash items affecting the difference between our net loss and our net cash used in operating activities in 2018 were RMB130.7 million of share-based compensation expenses and RMB25.3 million of depreciation and amortization expenses. The increases in accounts receivable, accrued expenses and other current liabilities, and advance from customers were attributable to the growth of our business.

Net cash used in operating activities for the year ended December 31, 2017 was RMB28.1 million, as compared to net loss of RMB202.1 million for the same period. The principal changes in operating assets and liabilities were an increase of RMB124.6 million in accounts receivable and an increase of RMB110.6 million in prepayments and other current assets, partially offset by an increase of RMB136.2 million in accounts payable, an increase of RMB56.6 million in amount due to related party, an increase of RMB53.4 million in advance from customers and an increase of RMB40.3 million of accrued expenses and other current liabilities. The principal non-cash items affecting the difference between our net loss and our net cash provided by operating activities in 2017 were RMB107.8 million of share-based compensation expenses and RMB5.8 million of depreciation and amortization expenses. The increases in accounts receivable, accounts payable and prepayments and other current assets were attributable to the growth of our business.

*Investing Activities*

Net cash used in investing activities for the year ended December 31, 2019 was RMB47.5 million (US$6.8 million), including a net inflow of RMB42.8 million (US$6.1 million) of short-term investments and restricted investment activities, a net outflow of RMB45.4 million (US$6.5 million) of restricted time deposits, RMB24.6 million (US$3.5 million) of payment for business combination and RMB16.4 million (US$2.4 million) of payment for property and equipment.

Net cash used in investing activities for the year ended December 31, 2018 was RMB323.4 million including RMB142.4 million transferred to restricted time deposits, RMB109.6 million of payment for business combination, RMB41.8 million of payment for property and equipment, and RMB27.9 million of payment for long-term investments.

Net cash used in investing activities for the year ended December 31, 2017 was RMB18.8 million for purchases of property and equipment.

*Financing Activities*

Net cash used in financing activities for the year ended December 31, 2019 was RMB198.0 million (US$28.4 million), including a net cash outflow of RMB70.0 million (US$10.1 million) of short-term borrowing activities and RMB134.6 million (US$19.3 million) of payment for share repurchase, partially offset by RMB10.0 million (US$1.4 million) of proceeds from employees exercising stock options.

Net cash provided by financing activities for the year ended December 31, 2018 was RMB60.4 million including RMB130 million of proceeds from short-term borrowings, RMB70.1 million of payment for share repurchase and RMB0.5 million of proceeds from employees exercising stock options.

Net cash provided by financing activities for the year ended December 31, 2017 was RMB1,611.9 million including the receipt of IPO proceeds, net of cost RMB1,368.5 million, RMB150.0 million of initial working capital provided by RONG360 to us in the form of a capital contribution and RMB93.4 million working capital support provided by RONG360 prior to the transfer of platform business to us.

*Capital Expenditures*

Our capital expenditures are primarily incurred for purchases of property and equipment. Our capital expenditures were RMB18.8 million in 2017, RMB41.8 million in 2018 and RMB16.4 million (US$2.4 million) in 2019. We intend to fund our future capital expenditures with bank loans and operational cash inflows. We will continue to make capital expenditures to meet the needs of the expected growth of our business.

**Holding Company Structure**

Jianpu Technology Inc. is a holding company with no material operations of its own. We conduct our operations primarily through our PRC subsidiaries and our variable interest entities in China. As a result, Jianpu Technology Inc.'s ability to pay dividends depends upon dividends paid by our PRC subsidiaries. If our existing PRC subsidiaries or any newly formed ones incur debt on their own behalf in the future, the instruments governing their debt may restrict their ability to pay dividends to us. In addition, our wholly foreign-owned subsidiaries in China are permitted to pay dividends to us only out of their retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. Under PRC law, each of our subsidiaries and our variable interest entities in China is required to set aside at least 10% of its after-tax profits each year, if any, to fund certain statutory reserve funds until such reserve funds reach 50% of its registered capital. In addition, any of our wholly foreign-owned subsidiaries in China may allocate a portion of its after-tax profits based on PRC accounting standards to enterprise expansion funds and staff bonus and welfare funds at its discretion, and our variable interest entities may allocate a portion of its after-tax profits based on PRC accounting standards to a discretionary surplus fund at its discretion. The statutory reserve funds and the discretionary funds are not distributable as cash dividends. For the years ended December 31, 2017, 2018 and 2019, profit appropriation to statutory surplus fund for our entities incorporated in the PRC was approximately nil, nil and RMB1.9 million (US$0.3 million) respectively. No appropriation to other reserve funds was made for any of the periods presented. Remittance of dividends by a wholly foreign-owned company out of China is subject to examination by the banks designated by SAFE. Our PRC subsidiaries have not paid dividends and will not be able to pay dividends until they generate accumulated profits and meet the requirements for statutory reserve funds.

**C.      Research and Development**

See "Item 4. Information On the Company—B. Business Overview—Data and Technology." and "Item 4. Information On the Company—B. Business Overview—Intellectual Property."

**D.      Trend Information**

Other than as disclosed elsewhere in this annual report, we are not aware of any trends, uncertainties, demands, commitments or events for the year ended December 31, 2019 that are reasonably likely to have a material and adverse effect on our net revenues, income, profitability, liquidity or capital resources, or that would cause the disclosed financial information to be not necessarily indicative of future results of operations or financial conditions.

**E.      Off-balance Sheet Arrangements**

We have not entered into any financial guarantees or other commitments to guarantee the payment obligations of any unconsolidated third parties. In addition, we have not entered into any derivative contracts that are indexed to our shares and classified as shareholders' equity or that are not reflected in our consolidated financial statements. Furthermore, we do not have any retained or contingent interest in assets transferred to an unconsolidated entity that serves as credit, liquidity or market risk support to such entity. Moreover, we do not have any variable interest in any unconsolidated entity that provides financing, liquidity, market risk or credit support to us or engages in leasing, hedging or product development services with us.

F.      **Tabular Disclosure of Contractual Obligations**

The following table sets forth our contractual obligations as of December 31, 2019:

| | Total | | Less than 1 year | | 1-3 years | | 3-5 Years | | More than 5 years | |
|---|---|---|---|---|---|---|---|---|---|---|
| | RMB | US$ | RMB | US$ | RMB | US$ | RMB | US$ | RMB | US$ |
| | | | | | (in thousands) | | | | | |
| Operating lease agreements | 15,292 | 2,197 | 14,619 | 2,100 | 673 | 97 | — | — | — | — |
| Total | 15,292 | 2,197 | 14,619 | 2,100 | 673 | 97 | — | — | — | — |

Operating lease agreements represent leases for our office premises.

Other than as shown above, we did not have any significant capital and other commitments, long-term obligations, or guarantees as of December 31, 2019.

G.      **Safe Harbor**

See "Forward-Looking Statements" on page 3 of this annual report.

**ITEM 6.   DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES**

A.      **Directors and Senior Management**

The following table sets forth information regarding our directors and executive officers as of the date of this annual report.

| Directors and Executive Officers | Age | Position/Title |
|---|---|---|
| Daqing (David) Ye | 48 | Co-Founder, Chairman and Chief Executive Officer |
| Jiayan Lu | 45 | Co-Founder, Director and Chief Operating Officer |
| Caofeng Liu | 38 | Co-Founder, Director and Chief Technology Officer |
| Chenchao Zhuang | 45 | Co-Founder, Director |
| Yilü (Oscar) Chen | 46 | Director and Chief Financial Officer |
| James Qun Mi | 53 | Director |
| Denny Lee | 53 | Independent Director |
| Xiaoyan Zhang | 44 | Independent Director |
| Kuang-Yu (Jeff) Liao | 61 | Independent Director |

*Mr. Daqing (David) Ye* has served as the chairman of our board of directors and our chief executive officer since October 2017. He is a co-founder of RONG360, and has served as its chairman since its inception. Mr. Ye has 20 years of experience in operations and management of internet business and consumer financial institutions in China and the United States. Before founding our company, he served as head of marketing for PayPal, China from 2009 to 2011, director of digital marketing capabilities of American Express Company's, Risk, Information & Banking Group in New York from 2007 to 2009, and senior manager of marketing analysis at AOL Inc. from 2004 to 2007. Mr. Ye started his career as a risk data analyst at Capital One Financial Corporation's risk strategy and analysis team in 1998, and later worked as a credit risk manager at Global Credit Assurance & Consulting team, and managed statisticians and data analysts at the acquisition marketing team of Capital One's Under Served Markets group from 2000 to 2004. Mr. Ye received a bachelor's degree in engineering from Hunan University in China and a master's degree in finance from the George Washington University in the United States. He is an EMBA candidate at the PBC School of Finance, Tsinghua University.

*Mr. Jiayan Lu* has served as our director and chief operating officer since October 2017. He is a co-founder of RONG360, and has served as its director since August 2015. Mr. Lu served as deputy director of Pudong branch, deputy general manager of Shanghai branch and deputy general manager of operations of the Bank of Ningbo from 2007 to 2011. Mr. Lu worked as the manager of the customer service center of Royal & Sun Alliance Insurance plc in greater China from 2004 to 2007 and director of the customer service center of Standard Chartered Bank from 2002 to 2004. Mr. Lu received a bachelor's degree in international finance from Shanghai Jiaotong University in 1997 and an MBA degree from Shanghai Jiaotong University in 2002.

92

*Mr. Caofeng Liu* has served as our director and chief technology officer since October 2017. He is a co-founder of RONG360. Prior to founding our company, Mr. Liu served as research and development manager at Baidu, Inc. from 2008 to 2011, senior research and development manager at kuxun.com from 2006 to 2008 and architect at tq.com from 2004 to 2006. Mr. Liu received a bachelor's degree in electronic engineering from Nanchang Hangkong University in 2004. He is an EMBA candidate at the PBC School of Finance, Tsinghua University.

*Mr. Chenchao Zhuang* has served as our director since October 2017. He is a co-founder of RONG360. Mr. Zhuang is a co-founder and managing director of Zebra Global Capital, a technology private-equity firm in China. Prior to that, Mr. Zhuang was a co-founder and chief executive officer of Qunar Cayman Islands Limited from June 2011 to January 2016, where he and his team grew Qunar from a small technology startup to become a leading online travel company. Prior to co-founding Qunar, Mr. Zhuang worked for the World Bank as a system architect based in Washington, D.C. from 2001 to 2005. Prior to moving to Washington, D.C., Mr. Zhuang was the chief technology officer of Shawei.com, a leading sports portal website in China. Mr. Zhuang received a bachelor's of science degree in electrical engineering from Peking University in 1998.

*Mr. Yilü (Oscar) Chen* has served as our director since May 2019 and as our chief financial officer since October 2017, and before that RONG360 Inc.'s chief financial officer. Mr. Chen served as the chief financial officer of Jia.com from July 2015 to November 2016. Prior to that, Mr. Chen served as executive director at Fosun Kinzon Capital from July 2014 to July 2015, executive director at Goldman Sachs Gao Hua Securities from 2006 to 2014, vice president at Changjiang BNP Paribas Peregrine from 2005 to 2006, assistant general manager of the investment banking division at China Southern Securities Co., Ltd. from 2000 to 2005 and assistant audit manager at KPMG from 1997 to 2000. Mr. Chen received a bachelor's degree in international business management from Shanghai University of International Business and Economics in 1997.

*Mr. James Qun Mi* has served as our director since October 2017. He has served as a managing director of Lightspeed China Partners, a China-focused early-stage venture capital firm with investments in internet, mobile and information technology, since co-founding it in 2011. Mr. Mi served as a managing director of Lightspeed Venture Partners from 2008 to 2011. From 2003 to 2008, Mr. Mi worked for Google, first as its head of Asia Products and the chief representative of its representative office in China, and later as a director of corporate development for strategic investments and mergers and acquisitions in the greater China area and the pan-Asian region. Mr. Mi holds 14 U.S. patents in flash memory, communications, internet security and commerce. Mr. Mi is also a director of 49 privately held companies. Mr. Mi received a bachelor's degree in physics from Fudan University in 1989 and a master's degree in electrical engineering from Princeton University in 1991.

*Mr. Denny Lee* has served as our independent director since November 2017. Mr. Lee has served as a director of NetEase, Inc., a leading internet and online game service provider in China listed on the Nasdaq Global Select Market, since 2002. He was the chief financial officer of NetEase, Inc. from 2002 to 2007. Prior to joining NetEase, Inc., Mr. Lee worked in the Hong Kong office of KPMG for more than ten years. Mr. Lee currently serves as an independent non-executive director and the chairman of the audit committees of the following four companies: (1) New Oriental Education & Technology Group Inc., a provider of private education services in China listed on the New York Stock Exchange, (2) Concord Medical Services Holdings Limited, a leading specialty hospital management solution provider and operator in China listed on the New York Stock Exchange, and (3) China Metal Resources Utilization Ltd., a company principally engaged in the manufacturing and sales of copper and related products in China listed on the main board of Hong Kong Stock Exchange, and (4) NIO Inc., a pioneer in China's premium electric vehicle market listed on the New York Stock Exchange. Mr. Lee graduated from the Hong Kong Polytechnic University majoring in accounting and is a member of The Hong Kong Institute of Certified Public Accountants and The Chartered Association of Certified Accountants.

*Dr. Xiaoyan Zhang* has served as our independent director since February 2018. Dr. Zhang is currently Associate Dean and Xinyuan Chair Professor of Finance at the PBC School of Finance, Tsinghua University. Dr. Zhang's research focuses on financial technology, international finance, empirical asset pricing and applied econometrics. Before she joined Tsinghua University in 2018, Dr. Zhang was the Duke Realty Chair Professor of Finance with tenure at the Krannert School of Management, Purdue University.  Prior to joining Krannert faculty in 2010, Dr. Zhang was an assistant professor of finance at the Johnson School of Management at Cornell University from 2002 to 2010. In 2014, Dr. Zhang was named one of the "Top 40 under 40" Business School professors in the world. Dr. Zhang served as a member of the Issuance Examination Committee of China Securities Regulatory Commission. She also serves as an independent director at Sinoma International Engineering Co., and ANZ Bank China. Dr. Zhang received her Bachelor Degree in international economics from Peking University in 1997, and her Doctoral Degree of Philosophy in Finance from Columbia Business School in 2002.

*Mr. Kuang-Yu (Jeff) Liao* has served as our independent director since November 2018. Mr. Liao has 30 years of experience in operations and senior management across online payments, e-Commerce, and consumer finance in Greater China. He served as the head of Apple Pay Asia from November 2014 to March 2018. In the ten years before he joined Apple Pay Asia, Mr. Liao held several senior executive positions at global technology companies, including head of Visa China, CEO of eBay Greater China, head of PayPal China and general manager at Standard Chartered Consumer Bank China. Prior to that, he also held key posts at GE Capital, Citicorp and American Express in Hong Kong and Taiwan. Currently, Mr. Liao serves as an independent director of Zizaike.com, a privately held company that operates an online marketplace for hospitality service. Mr. Liao received a bachelor's degree in chemical engineering from Tsing Hua University (Taiwan) in 1982 and graduate study in material science from San Jose State University in 1987.

**Employment Agreements and Indemnification Agreements**

We have entered into employment agreements with our senior executive officers. Pursuant to these agreements, we are entitled to terminate a senior executive officer's employment for cause at any time without remuneration for certain acts of the officer, such as being convicted of any criminal conduct, any act of gross or willful misconduct or any serious, willful, grossly negligent or persistent breach of any employment agreement provision, or engaging in any conduct which may make the continued employment of such officer detrimental to our company. In connection with the employment agreement, each senior executive officer will enter into an intellectual property ownership and confidentiality agreement and agree to hold all information, know-how and records in any way connected with the products of our company, including, without limitation, all software and computer formulas, designs, specifications, drawings, data, manuals and instructions and all customer and supplier lists, sales and financial information, business plans and forecasts, all technical solutions and the trade secrets of our company, in strict confidence perpetually. Each officer will also agree that we shall own all the intellectual property developed by such officer during his or her employment.

We have also entered into indemnification agreements with our directors and senior executive officers. Under these agreements, we agree to indemnify them against certain liabilities and expenses that they incur in connection with claims made by reason of their being a director or officer of our company.

**B.    Compensation**

For the year ended December 31, 2019, we paid an aggregate of approximately RMB5.4 million (US$0.78 million) in cash and benefits to our executive officers. We do not pay our non-executive directors. For share incentive grants to our officers and directors, see "—Share Incentive Plans." We have not set aside or accrued any amount to provide pension, retirement or other similar benefits to our executive officers and directors. Our PRC subsidiaries are required by law to make contributions equal to certain percentages of each employee's salary for his or her pension insurance, medical insurance, unemployment insurance and other statutory benefits and a housing provident fund.

**Share Incentive Plans**

RONG360 Inc. adopted its 2012 Share Plan, or the RONG360 2012 Plan, in November 2012. We adopted a share incentive plan, Global Share Plan effective on our IPO, to link the personal interests of our employees, directors and consultants to the success of our business. Our Global Share Plan is substantially identical to the RONG360 2012 Plan, pursuant to the Global Share Plan, not more than 26,905,189 shares of us may be issued.

94

In October 2017, our board of directors approved the 2017 Share Incentive Plan to attract and retain the best available personnel, provide additional incentives to employees, directors and consultants and promote the success of our business. Under the 2017 Share Incentive Plan, or the 2017 Plan, the maximum number of shares available for issuance shall be 2% of the total number of shares issued and outstanding as of the closing of our IPO, plus an annual increase on the first day of each of the first five fiscal years of the Company during the term of the 2017 Plan commencing with the fiscal year beginning January 1, 2018, by an amount equal to 2% of the total number of shares issued and outstanding on the last day of the immediately preceding fiscal year (excluding issued shares reserved for future option exercise and restricted share unit vesting), and an annual increase on the first day of each of the next five fiscal years of the Company during the term of the 2017 Plan commencing with the fiscal year beginning January 1, 2023, by an amount equal to 1.5% of the total number of shares issued and outstanding on the last day of the immediately preceding fiscal year (excluding issued shares reserved for future option exercise and restricted share unit vesting)

We assumed all outstanding share incentive awards issued under the RONG360 2012 Plan and administered the assumed awards pursuant to the Global Share Plan. As of December 31, 2020, a total of 23,474,169 awards (7,794,964 of which are exercisable), including the share awards succeeding from the RONG360 2012 Share Plan, has been granted under the Global Share Plan to our directors, employees and other eligible persons, and a total of 28,684,772 awards (10,276,839 of which are exercisable) has been granted under the 2017 Share Incentive Plan to our directors, management executives and employees.

The following paragraphs summarize the terms of our Global Share Plan.

*Types of Awards.*  Our Global Share Plan permits awards of share purchase rights and options.

*Plan Administration*.  Our Global Share Plan is administered by our board of directors or by a committee of one or more members designated by our board of directors. The committee or the full board of directors, as applicable, has full authority and discretion to take any actions it deems necessary or advisable for the administration of the plan.

*Award Agreement.*  Awards granted under our Global Share Plan are evidenced by a share purchase agreement or share option agreement that sets forth terms, conditions and limitations for each award.

*Exercise Price.*  The plan administrator determines the purchase price or exercise price for each award, subject to the conditions set forth in our Global Share Plan.

*Eligibility.*  We may grant awards to our employees, non-employee directors and consultants. However, we may grant incentive share options only to our employees, parent and subsidiaries.

*Term of the Awards*.  The term of each option granted under our Global Share Plan may not exceed ten years from date of the grant. The term of share purchase rights granted under our Global Share Plan is set forth in the relevant share purchase agreement.

*Vesting Schedule.*  In general, the plan administrator determines the vesting schedule, which is set forth in the share purchase agreement or the share option agreement.

*Transfer Restrictions.*  Options may not be transferred in any manner by the recipient other than by will, by the laws of descent and distribution or by beneficiary designation, except as otherwise provided by the plan administrator. The plan administrator determines the transfer restrictions on shares awarded pursuant to share purchase rights, which are set forth in the share purchase agreement.

*Termination.*  Our Global Share Plan will terminate ten years after the later of (1) the date when our board adopted our Global Share Plan or (2) the date when our board approved the most recent increase in the award pool under our Global Share Plan that was also approved by our shareholders, provided that our board may terminate the plan at any time and for any reason, subject to shareholder approval in certain cases.

The following paragraphs describe the principal terms of the 2017 Plan.

95

*Types of Awards.*  The 2017 Plan permits the awards of options, restricted shares or any other type of awards that the committee decides.

*Plan Administration.*  Our board of directors or a committee of one or more members of the board of directors will administer the 2017 Plan. The committee or the full board of directors, as applicable, will determine the participants to receive awards, the type and number of awards to be granted to each participant, and the terms and conditions of each award grant.

*Award Agreement.*  Awards granted under the 2017 Plan are evidenced by an award agreement that sets forth terms, conditions and limitations for each award, which may include the term of the award, the provisions applicable in the event of the grantee's employment or service terminates, and our authority to unilaterally or bilaterally amend, modify, suspend, cancel or rescind the award.

*Eligibility.*  We may grant awards to our employees, directors and consultants of our company. However, we may grant incentive share options only to our employees, parent and subsidiaries.

*Vesting Schedule.*  In general, the plan administrator determines the vesting schedule, which is specified in the relevant award agreement.

*Exercise of Options.*  The plan administrator determines the exercise price for each award, which is stated in the award agreement. The vested portion of option will expire if not exercised prior to the time as the plan administrator determines at the time of its grant. However, the maximum exercisable term is ten years from the date of a grant.

*Transfer Restrictions.*  Awards may not be transferred in any manner by the recipient other than by will or the laws of descent and distribution, except as otherwise provided by the plan administrator.

*Termination and amendment of the 2017 Plan.*  Unless terminated earlier, the 2017 Plan has a term of ten years. Our board of directors has the authority to amend or terminate the plan. However, no such action may adversely affect in any material way any awards previously granted unless agreed by the recipient.

The following table summarizes, as of December 31, 2020, the outstanding options that were granted to our directors, executive officers and other grantees in the aggregate under the Global Share Plan and the 2017 Plan:

| Name | Ordinary Shares Underlying Outstanding Options | Exercise Price (US$/Share) | Grant Date | Expiration Date |
|---|---|---|---|---|
| Daqing (David) Ye | * | 0.01 | December 2017 and December 2019 | December 2027 and December 2029 |
| Jiayan Lu | * | 0.01 | December 2017 and December 2019 | December 2027 and December 2029 |
| Caofeng Liu | * | 0.01 | December 2017 and December 2019 | December 2027 and December 2029 |
| Yilü (Oscar) Chen | * | 0.01-0.21 | April and December 2017 and December 2019 | April and December 2027 and December 2029 |
| Denny Lee | * | 0.01 | November 2017 and December 2019 | November 2027 and December 2029 |
| Xiaoyan Zhang | * | 0.01 | February 2018 and December 2019 | February 2028 and December 2029 |
| Kuang-Yu (Jeff) Liao | * | 0.01 | November 2018 and December 2019 | November 2028 and December 2029 |
| Other grantees | 18,767,438 | 0.00035-0.80 | February 2013 to December 2019 | October 2021 to December 2029 |
| **Total** | 28,475,356 | | | |

---

*    Less than one percent of our total outstanding shares.

96

**C.**　　　**Board Practices**

**Board of Directors**

Our board of directors currently consists of nine members. A director is not required to hold any shares in our company to qualify to serve as a director. A director may vote with respect to any contract, proposed contract, or arrangement in which he or she is materially interested. A director may exercise all the powers of the company to borrow money, mortgage its business, property and uncalled capital and issue debentures or other securities whenever money is borrowed or as security for any obligation of the company or of any third party.

**Committees of the Board of Directors**

As a Cayman Islands company listed on the NYSE, we are subject to the NYSE corporate governance listing standards. However, NYSE rules permit a foreign private issuer like us to follow the corporate governance practices of its home country. Certain corporate governance practices in the Cayman Islands, which is our home country, may differ significantly from the NYSE corporate governance listing standards. For example, neither the Companies Act of the Cayman Islands nor our memorandum and articles of association requires a majority of our directors to be independent, we could include non-independent directors as members of our compensation committee and nominating committee, and our independent directors would not necessarily hold regularly scheduled meetings at which only independent directors are present. However, we currently intend to comply with the rules of the NYSE in lieu of following home country practice.

We have established an audit committee, a compensation committee and a nominating committee under the board of directors. We have adopted a charter for each of the three committees. Each committee's members and functions are described below.

*Audit Committee.* Our audit committee consists of Denny Lee, Xiaoyan Zhang and Kuang-Yu (Jeff) Liao, and is chaired by Mr. Lee. Mr. Lee, Ms. Zhang and Mr. Liao satisfy the "independence" requirements of Section 303A of the Corporate Governance Rules of the NYSE and meet the independence standards under Rule 10A-3 under the Exchange Act. We have determined that Mr. Lee qualifies as an "audit committee financial expert" as set forth under the applicable rules of the SEC. The audit committee oversees our accounting and financial reporting processes and the audits of the financial statements of our company. The audit committee is responsible for, among other things:

· selecting the independent registered public accounting firm and pre-approving all auditing and non-auditing services permitted to be performed by the independent registered public accounting firm;

· reviewing with the independent registered public accounting firm any audit problems or difficulties and management's response;

· reviewing and approving all proposed related party transactions, as defined in Item 404 of Regulation S-K under the Securities Act;

· discussing the annual audited financial statements with management and the independent registered public accounting firm;

· reviewing major issues as to the adequacy of our internal control and any special audit steps adopted in light of material control deficiencies;

· annually reviewing and reassessing the adequacy of our audit committee charter;

· meeting separately and periodically with management and the independent registered public accounting firm; and

· reporting regularly to the board.

***Compensation Committee.*** Our compensation committee consists of Xiaoyan Zhang, Denny Lee and Kuang-Yu (Jeff) Liao, and is chaired by Ms. Zhang. Ms. Zhang and Mr. Lee and Mr. Liao satisfy the "independence" requirements of Section 303A of the Corporate Governance Rules of the NYSE. The compensation committee assists the board in reviewing and approving the compensation structure, including all forms of compensation, relating to our directors and executive officers. Our chief executive officer may not be present at any committee meeting during which his compensation is deliberated upon. The compensation committee is responsible for, among other things:

· reviewing the total compensation package for our executive officers and making recommendations to the board with respect to it;

· reviewing the compensation of our non-employee directors and making recommendations to the board with respect to it; and

· periodically reviewing and approving any long-term incentive compensation or equity plans, programs or similar arrangements, annual bonuses, and employee pension and welfare benefit plans.

***Nominating Committee.*** Our nominating committee consists of Kuang-Yu (Jeff) Liao, Denny Lee and Xiaoyan Zhang, and is chaired by Mr. Liao. Mr. Liao, Ms. Zhang and Mr. Lee satisfy the "independence" requirements of Section 303A of the Corporate Governance Rules of the NYSE. The nominating committee assists the board in selecting individuals qualified to become our directors and in determining the composition of the board and its committees. The nominating committee is responsible for, among other things:

· recommending nominees to the board for election or re-election to the board, or for appointment to fill any vacancy on the board;

· reviewing annually with the board the current composition of the board with regards to characteristics such as independence, age, skills, experience and availability of service to us;

· selecting and recommending to the board the names of directors to serve as members of the audit committee and the compensation committee, as well as of the nominating committee itself; and

· monitoring compliance with our code of business conduct and ethics, including reviewing the adequacy and effectiveness of our procedures to ensure proper compliance.

## Duties of Directors

Under Cayman Islands law, our directors have fiduciary duties, including duties of loyalty and a duty to act honestly in good faith with a view to our best interests. Our directors also have a duty to exercise the skill they actually possess and such care and diligence that a reasonably prudent person would exercise in comparable circumstances. In fulfilling their duty of care to us, our directors must ensure compliance with our memorandum and articles of association. We have the right to seek damages if a duty owed by our directors is breached. In limited exceptional circumstances, a shareholder may have the right to seek damages in our name if a duty owed by our directors is breached.

## Terms of Directors and Officers

Our officers are elected by and serve at the discretion of the board of directors. Under Cayman Islands law, we are not required to hold an annual election of directors, and our directors are not subject to a term of office and hold office until such time as they are removed from office by ordinary resolution of the shareholders or by the board. A director will be removed from office automatically if, among other things, the director (i) becomes bankrupt or makes any arrangement or composition with his creditors; or (ii) is found by our company to be or becomes of unsound mind.

**D.      Employees**

We had 784, 1,109 and 839 employees as of December 31, 2017, 2018 and 2019, respectively. The following table sets forth the numbers of our employees categorized by function as of December 31, 2017, 2018 and 2019:

| Function: | As of December 31, | | |
| | 2017 | 2018 | 2019 |
|---|---|---|---|
| Sales and marketing | 314 | 366 | 252 |
| Research and development | 283 | 532 | 415 |
| Operations | 126 | 115 | 103 |
| General administration | 61 | 96 | 69 |
| Total | 784 | 1,109 | 839 |

As of December 31, 2019, we had 778 employees in Beijing, 23 employees in Shanghai, 9 employees in Shenzhen, and another 29 employees in various other places in China.

As required by laws and regulations in China, we participate in various employee social security plans that are organized by municipal and provincial governments, including housing, pension, medical insurance and unemployment insurance. We are required under Chinese law to make contributions to employee benefit plans at specified percentages of the salaries, bonuses and certain allowances of our employees, up to a maximum amount specified by the local government from time to time.

We enter into standard confidentiality and employment agreements with our employees. The contracts with our key personnel typically include a standard non-compete covenant that prohibits the employee from competing with us, directly or indirectly, during his or her employment and for one year after the termination of his or her employment, provided that we pay compensation equal to RMB5,000 per month during the restriction period.

We believe that we maintain a good working relationship with our employees, and we have not experienced any labor disputes. None of our employees are represented by labor unions.

**E.      Share Ownership**

The following table sets forth information concerning the beneficial ownership of our ordinary shares on an as-converted basis as of December 31, 2020 for:

·      each of our directors and executive officers; and

·      each person known to us to beneficially own 5% or more of our ordinary shares.

The calculations in the table below are based on 423,627,480 ordinary shares outstanding as of December 31, 2020, including (i) 327,155,685 Class A ordinary shares; and (ii) 96,471,795 Class B ordinary shares.

Beneficial ownership is determined in accordance with the rules and regulations of the SEC. In computing the number of shares beneficially owned by a person and the percentage ownership of that person, we have included shares that the person has the right to acquire within 60 days, including through the exercise of any option, warrant or other right or the conversion of any other security. These shares, however, are not included in the computation of the percentage ownership of any other person.

99

| | **Ordinary Shares Beneficially Owned** | | | | |
| | **Class A ordinary shares** | **Class B ordinary shares** | **Total ordinary shares on an as converted basis** | **% of total ordinary shares** | **% of aggregate voting power** |
|---|---|---|---|---|---|
| **Directors and Executive Officers: \*\*** | | | | | |
| Daqing (David) Ye[1] | 6,196,457 | 29,254,625 | 35,451,082 | 8.3 | 23.1 |
| Jiayan Lu [2] | 2,196,457 | 28,738,439 | 30,934,896 | 7.3 | 22.4 |
| Caofeng Liu [3] | 2,031,337 | 11,377,901 | 13,409,238 | 3.2 | 9.0 |
| Chenchao Zhuang [4] | 13,875,000 | 27,100,830 | 40,975,830 | 9.7 | 22.1 |
| Yilü (Oscar) Chen [5] | 5,008,956 | — | 5,008,956 | 1.2 | 0.4 |
| James Qun Mi [6] | 46,220,160 | — | 46,220,160 | 10.9 | 3.6 |
| Denny Lee [7] | * | — | * | * | * |
| Xiaoyan Zhang | * | — | * | * | * |
| Kuang-Yu (Jeff) Liao[8] | * | — | * | * | * |
| All directors and executive officers as a group | 75,821,180 | 96,471,795 | 172,292,975 | 39.9 | 80.1 |
| **Principal Shareholders:** | | | | | |
| JYLu Holdings Ltd.[2] | — | 28,738,439 | 28,738,439 | 6.8 | 22.2 |
| Sun Flower Information Technology Ltd. [4] | 2,125,000 | 27,100,830 | 29,225,830 | 6.9 | 21.1 |
| Investment funds affiliated with Sequoia [9] | 62,337,346 | — | 62,337,346 | 14.7 | 4.8 |
| Lightspeed China Partners I, L.P. and Lightspeed China Partners I-A, L.P. [6] | 46,220,160 | — | 46,220,160 | 10.9 | 3.6 |
| Sailing Capital Overseas Investments Fund, LP [10] | 32,711,304 | — | 32,711,304 | 7.7 | 2.5 |
| Morgan Stanley[11] | 27,334,580 | — | 27,334,580 | 6.5 | 2.1 |
| Article Light Limited [12] | 26,536,229 | — | 26,536,229 | 6.3 | 2.1 |

---

†   For each person and group included in this column, percentage of voting power is calculated by dividing the voting power beneficially owned by such person or group by the voting power of all of our Class A and Class B ordinary shares as a single class. Each holder of Class A ordinary shares is entitled to one vote per share and each holder of our Class B ordinary shares is entitled to ten votes per share on all matters submitted to them for a vote. Our Class A ordinary shares and Class B ordinary shares vote together as a single class on all matters submitted to a vote of our shareholders, except as may otherwise be required by law. Our Class B ordinary shares are convertible at any time by the holder thereof into Class A ordinary shares on a one-for-one basis.

*   Less than 1% of our total outstanding shares.

\*\*   Except as indicated otherwise below, the business address of our directors and executive officers is 21/F Internet Finance Center, Danling Street, Beijing, People's Republic of China.

(1)   Represents (i) 1,035,720 Class A ordinary shares in the form of ADSs and (ii) 17,663,915 Class B ordinary shares held by LEFT BK Holdings Ltd., (iii) 4,000,000 Class A ordinary shares and (iv) 11,590,710 Class B ordinary shares held by Mount Bonnell Limited, and (v) 1,160,737 Class A ordinary shares issuable upon exercise of options and vesting of restricted shares within 60 days after the date of December 31, 2020. LEFT BK Holdings Ltd. is a British Virgin Islands company wholly owned by Mr. Daqing Ye. Mount Bonnell Limited is a British Virgin Islands company wholly owned by Ms. Dawei Huang, who is Mr. Ye's wife. The registered office of each of these entities is at Geneva Place, Waterfront Drive, P.O. Box 3469, Road Town, Tortola, British Virgin Islands.

(2)   Represents (i) 1,035,720 Class A ordinary shares in the form of ADSs and (ii) 28,738,439 Class B ordinary shares held by JYLu Holding Ltd. and (iii) 1,160,737 Class A ordinary shares issuable upon exercise of options and vesting of restricted shares within 60 days after the date of December 31, 2020. JYLu Holding Ltd. is a British Virgin Islands company wholly owned by Mr. Jiayan Lu with its registered office at Geneva Place, Waterfront Drive, P.O. Box 3469, Road Town, Tortola, British Virgin Islands.

(3)   Represents (i) 870,600 Class A ordinary shares in the form of ADSs, (ii) 11,377,901 Class B ordinary shares held by CFLIU Holdings Ltd. and (iii) 1,160,737 Class A ordinary shares issuable upon exercise of options and vesting of restricted shares within 60 days after the date of December 31, 2020. CFLIU Holdings Ltd. is a British Virgin Islands company wholly owned by Mr. Caofeng Liu with its registered office at Geneva Place, Waterfront Drive, P.O. Box 3469, Road Town, Tortola, British Virgin Islands.

(4)   Represents (i) 27,100,830 Class B ordinary shares and (ii) 2,125,000 Class A ordinary shares held by Sun Flower Information Technology Ltd., a British Virgin Islands company wholly owned by the family of Mr. Chenchao Zhuang, and (iii) 11,750,000 Class A ordinary shares held by Lucky Fish Information Technology Limited, a British Virgin Islands company wholly owned by the family of Mr. Chenchao Zhuang. The registered office of each of these entities is at Geneva Place, Waterfront Drive, P.O. Box 3469, Road Town, Tortola, British Virgin Islands. The Business address of Mr. Zhuang is A-901, PingAn International Financial Centre, Chaoyang District, Beijing 100027

(5)   Represents (i) 1,035,720 Class A ordinary shares in the form of ADSs held by Maple Evergreen Limited and (ii) 3,973,236 Class A ordinary shares issuable upon exercise of options and vesting of restricted shares within 60 days after the date of December 31, 2020. Maple Evergreen Limited is a British Virgin Islands company wholly owned by Mr. Yilü (Oscar) Chen with its registered office at Sea Meadow House, P.O. Box 116, Road Town, Tortola, British Virgin Islands.

(6)   Represents (i) 40,659,873 Class A Ordinary Shares held by Lightspeed China Partners I, L.P. and (ii) 5,560,287 Class A Ordinary Shares held by Lightspeed China Partners I-A, L.P. The voting and dispositive power over the ordinary shares held by Lightspeed China Partners I, L.P. and Lightspeed China Partners I-A, L.P. is controlled by their general partner, Lightspeed China Partners I GP, LLC. Mr. James Qun Mi and Mr. Ronald Cao are the managing directors of Lightspeed China Partners I GP, LLC and together hold all shareholder voting rights in Lightspeed China Partners I GP, LLC. Mr. Mi disclaims beneficial ownership of the shares held by Lightspeed China Partners I, L.P. and Lightspeed China Partners I-A, L.P., except to the extent of his pecuniary interests therein. The business address of Mr. Mi is Suite 2105, Platinum Building, 233 Tai Cang Road, Huangpu District, Shanghai 200020.

(7)   The business address of Mr. Denny Lee is No. 4 Dianthus Road, Yau Yatchuen, Kowloon, Hong Kong.

(8)   The business address of Mr. Kuang-Yu (Jeff) Liao is 9/F, No. 8, Neihu Road, Sec 2, Lane 103, Taipei, Taiwan.

(9)   Represents (i) 55,952,470 Class A ordinary shares held by Sequoia Capital CV IV Holdco, Ltd., and (ii) 6,384,876 Class A ordinary shares held by Sequoia Capital China GF Holdco III-A, Ltd. Sequoia Capital CV IV Holdco, Ltd. is an exempted company with limited liability incorporated under the laws of the Cayman Islands that is wholly owned by Sequoia Capital CV IV Senior Holdco, Ltd., which is wholly owned by Sequoia Capital China Venture Fund IV, L.P., whose general partner is SC China Venture IV Management, L.P. Sequoia Capital China GF Holdco III-A, Ltd. is an exempted company with limited liability incorporated under the laws of the Cayman Islands that is wholly owned by Sequoia Capital China Growth Fund III, L.P., whose general partner is SC China Growth III Management, L.P. SC China Holding Limited acts as the general partner of each of SC China Venture IV Management, L.P. and SC China Growth III Management, L.P. SC China Holding Limited is wholly owned by SNP China Enterprises Limited, whose sole owner and sole director is Nan Peng Shen. The business address of each of Sequoia Capital CV IV Holdco, Ltd. and Sequoia Capital China GF Holdco III-A, Ltd. is c/o Conyers Trust Company (Cayman) Limited, Cricket Square, Hutchins Drive, P.O. Box 268, Grand Cayman, KY1-1111, Cayman Islands.

(10) Represents (i) 29,661,224 Class A ordinary shares held by Torch International Investment Ltd., (ii) 2,737,580 Class A ordinary shares held by Rosy Parade Limited, and (iii) 312,500 Class A ordinary shares held by MJM International Limited. Torch International Ltd. is a direct and controlled subsidiary of Sailing Capital Overseas Investments Fund, LP, a Cayman Islands limited partnership. MJM International Limited and Rosy Parade Limited are affiliates of Torch International Ltd. Because of Sailing Capital Overseas Investments Fund, LP's relationship with Torch International Investment Ltd., Rosy Parade Limited and MJM International Limited, Sailing Capital Overseas Investments Fund, LP may be deemed to have beneficial ownership of the Class A ordinary shares directly held by Torch International Investment Ltd., Rosy Parade Limited and MJM International Limited. None of Torch International Investment Ltd., Rosy Parade Limited or MJM International Limited has the power to direct Sailing Capital Overseas Investments Fund, LP to vote or dispose of the Class A ordinary shares. James Xiao Dong Liu functions as the general partner of Sailing Capital Overseas Investments Fund, LP. The business address of Sailing Capital Overseas Investments Fund, LP is Unit 2006-08, Harbour Centre, 25 Harbour Road, Wan Chai, Hong Kong.

101

(11) Based on a Schedule 13G/A filed by the relevant reporting persons on February 11, 2021. Represents 27,334,580 Class A ordinary shares owned, or may be deemed to be beneficially owned, by Morgan Stanley Capital Services LLC, a wholly-owned subsidiary of Morgan Stanley. The business address of each of Morgan Stanley and Morgan Stanley Capital Services LLC is 1585 Broadway New York, NY 10036, USA.

(12) Represents 26,536,229 Class A ordinary shares held by Article Light Limited, a British Virgin Islands limited company with registered address at Ritter House Wickhams Cay II, Road Town, Tortola, VG 1110, British Virgin Islands. Article Light Limited is controlled by Yunfeng Fund II, L.P., the controlling person of which is Mr. Yu Feng. The business address of Mr. Yu Feng is Suite 3206, One Exchange Square, 8 Connaught Place, Central, Hong Kong.

To our knowledge, as of December 31, 2020, 195,576,610 of our ordinary shares were held by one record holder in the United States, which was Deutsche Bank Trust Company Americas, the depositary of our ADS program. The number of beneficial owners of our ADSs in the United States is likely to be much larger than the number of record holders of our ordinary shares in the United States.

Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares are entitled to one vote per share, while holders of Class B ordinary shares are entitled to ten votes per share.

We are not aware of any arrangement that may, at a subsequent date, result in a change of control of our company.

## ITEM 7.  MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS

**A.**     **Major Shareholders**

Please refer to "Item 6. Directors, Senior Management and Employees—E. Share Ownership."

**B.**     **Related Party Transactions**

**Contractual Arrangements with Our Variable Interest Entities and Their Shareholders**

See "Item 4. Information of the Company—C. Organizational Structure—Contractual Arrangements with the VIEs."

**Agreement with Our Shareholders**

On July 31, 2018, RONG360 completed the share distribution of our ordinary shares held by it to the existing shareholders of RONG360 in proportion to RONG360's shareholding structure, and thus completed the Restructuring to strengthen our positioning as an independent open platform. Following the completion of the share distribution, RONG360 is no longer our parent company. We expect to enter into a registration rights agreement with these shareholders, pursuant to which holders of our registrable shares will be entitled to registration rights, including demand registration rights and piggyback registration rights.

**Employment Agreements and Indemnification Agreements**

See "Item 6. Directors, Senior Management and Employees—A. Directors and Senior Management—Employment Agreements and Indemnification Agreements."

**Share Incentives**

See "Item 6. Directors, Senior Management and Employees—B. Compensation—Share Incentive Plans."

**Agreement with RONG360**

We have entered into a transitional services agreement with RONG360 with respect to various ongoing relationships between us and RONG360. Pursuant to the transitional services agreement, we will, during the transitional period which was initially 12 months after the effective date of the agreement and was already extended by mutual consent, provide RONG360 with various corporate support services, including operational, administrative, human resources, legal, accounting and internal control support. The price to be paid for the operational services provided under the transitional services agreement will be based on the actual costs of providing such services. The price to be paid for the other services is a fixed amount specified in the transitional services agreement.

RONG360 provided us with support for the employees, business contracts and other business resources relating to the platform business during the transitional period. Furthermore, before the registration procedure of the title transfer of all intellectual property rights relating to our business from RONG360 to us is completed, RONG360 grants us a license to use these rights. Our consolidated financial statements include costs and expenses allocated from RONG360 prior to the transfer of platform business to us, amounting to RMB75.0 million for the year ended December 31, 2017. In addition, RONG360 provided cash funding support to us to satisfy platform business' working capital requirements. RONG360 Inc. provided RMB150.0 million of initial working capital to us in the form of a capital contribution. We received the related cash in November 2017.

**Related Party Transactions**

For the year ended December 31, 2019, we generated revenues in the total amount of RMB32.0 million for the recommendation services to RONG360, RMB6.9 million for the advertising, marketing and other services to RONG360, and charged administrative expenses of RMB4.0 million to RONG360, including expenses related to operational, administrative, human resources, legal, accounting and internal control.

For the year ended December 31, 2019, RONG360 charged us RMB2.2 million for research and development expense including expenses related to system development.

As of December 31, 2019, the balance arose from the aforementioned related party transactions and various operational payments made by RONG360 was RMB24.3 million. In addition, the accounts receivable billed through RONG360 amounting to RMB3.5 million as of December 31, 2019.

We obtained contractual control of KTN from a company owned by two founders of our company in October 2018. The related consideration of RMB6.3 million has not been paid as of the date of this annual report.

Another related party, minority investee of a company owned by two founders of our company, and its subsidiary, charged us RMB21.1 million of advertising and marketing expenses for providing advertising and marketing service to us for the year ended December 31, 2019. The balance arose from the aforementioned transactions with this related party was RMB3.7 million as of December 31, 2019. We set the pricing terms with this related party by mirroring the corresponding terms entered into between banks or their agents and us.

We invested in and owned 15% of the preference shares of another related party, which facilitated the fee collection for our services delivered. The transactions and balance arose from the aforementioned transactions with this related party was RMB7.1 million as of December 31, 2019.

**C.**   **Interests of Experts and Counsel**

Not applicable.

**ITEM 8.  FINANCIAL INFORMATION**

**A.**   **Consolidated Statements and Other Financial Information**

We have appended consolidated financial statements filed as part of this annual report.

**Legal Proceedings**

We are subject to legal proceedings and claims in our ordinary course of business from time to time. On October 25, 2018, a putative securities class action was filed against us, certain of our directors and officers, and others in the U.S. District Court for the Southern District of New York: *Panther Partners Inc., v. Jianpu Technology Inc. et al.* (Case No. 18-cv-09848). The plaintiffs in the case allege, in sum and substance, that certain disclosures and statements made by our company in connection with our initial public offering contained material misstatements and omissions in violation of the Securities Act of 1933. On January 10, 2019, the court entered an order appointing lead plaintiffs of this case, and on March 28, 2019, a consolidated amended complaint was filed. On September 27, 2020, the Court denied the defendants' motion to dismiss. The case remains in a preliminary stage, with discovery still to be completed.

On February 17, 2021, another putative securities class action was filed against us and certain of our officers in the U.S. District Court for the Southern District of New York: *Guttentag v. Jianpu Technology Inc. et al.* (Case No. 21-cv-01419). The plaintiffs in the case allege, in sum and substance, that certain of our company's disclosures since the first quarter of 2018 contained material misstatements and omissions in violation of the Securities Exchange Act of 1934. Lead plaintiff for this class action has yet to be appointed, and the consolidated amended complaint has yet to be filed.

Both cases remain in their preliminary stages, and we cannot predict the timing, outcome or consequences of these class actions. We intend to defend the actions vigorously.

Litigation or any other legal or administrative proceeding, regardless of the outcome, is likely to result in substantial cost and diversion of our resources, including our management's time and attention. For risks and uncertainties relating to the pending case against us, please see "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business—We and certain of our directors and officers have been named as defendants in a putative shareholder class action lawsuit, which could have a material adverse impact on our business, financial condition, results of operation, cash flows and reputation."

**Independent Review**

As we previously disclosed in February 2021, the Audit Committee retained Paul Hastings LLP as independent legal counsel to assist in conducting a review of certain matters relating to transactions carried out by the Credit Card BU with third-party business entities. The Audit Committee was also assisted by forensic accounting experts from a Big-Four accounting firm that is not our external auditor which worked under Paul Hasting's direction.

The Review has been substantially completed. The Review entailed procedures that the Audit Committee and the above-mentioned professional advisers, in their professional judgment, considered necessary and sufficient to investigate the issues, including, but not limited to, review of documents and data from multiple company employees (such as review of emails and other electronic files and communications); interviews of company employees and relevant third parties; and analysis and testing of our relevant transactions, and books and records. We cooperated with the Review.

*Summary of Findings*

The following is a summary of the principal findings of the Review as of the date hereof. Unless otherwise indicated, the Review findings generally cover the fiscal years 2017 through 2019.

The Review found that certain transactions involved third-party agents (including both upstream agents and downstream suppliers) with undisclosed relationships and some questionable transactions. As a result, certain revenue and associated costs and expenses were inflated or inaccurately recorded in the consolidated financial statements. Evidence suggests that certain employees from the Credit Card BU may have known about or may have been involved in certain of the questionable transactions that resulted in inflated sales commissions to such employees. In relation to the questionable transactions, the Review found that certain employees improperly altered supporting documents that were provided to our external auditor.

Other than a business unit head-level employee who has since been terminated, the Review did not find any evidence that other members of senior management who supervised the Credit Card BU knew about or participated in any of the questionable transactions.

### *Financial Impact Assessment*

The total amount of overstated revenue for the year ended December 31, 2018 as previously reported on Form 20-F was RMB90 million, and for the year ended December 31, 2019 as previously furnished to the SEC on Form 6-K was RMB164 million, representing approximately 4.5% and 10.1% of the total revenue previously reported by us for such years, respectively, and the adjustment to overstated cost and expenses together with the reserve for potential credit loss was approximately RMB90 million and RMB130 million for the fiscal years of 2018 and 2019, respectively, resulting in a minimal net profit impact for the fiscal year 2018 and a RMB34 million increase in net loss for the fiscal year 2019.

Our consolidated financial statements for fiscal year 2018 has been restated accordingly; the previously issued audited financial statements for the fiscal year 2018 and the auditor's report on Form 20-F filed on April 23, 2019 can no longer be relied upon. The restated consolidated financial statement is included elsewhere in this annual report.

### *Update of 2019 Financials*

The previously announced unaudited financial statements for the fiscal year 2019 attached as an exhibit to our current report on Form 6-K previously furnished to the SEC was updated to reflect the financial impact of the results of the Review as well as other adjustments. Such other adjustments primarily arose from new information relating to Databook as disclosed in note 25 "Subsequent events" to our consolidated financial statements included elsewhere in this annual report. These other adjustments included a reversal of RMB30 million in revenues of advertising, marketing and other services, an accrual of penalties of RMB30 million, an increase in current income tax expenses of RMB10.0 million, and an increase in net loss attributable to noncontrolling interests of RMB17.8 million. The following table reconciles the unaudited financial results for fiscal year 2019 we previously announced with the final, as-reported financial results for the year ended December 31, 2019 included elsewhere in this annual report.

| | For the Year Ended December 31, 2019 | | |
| --- | --- | --- | --- |
| | As Previously Announced RMB | Adjustments RMB | As Reported RMB |
| | (in thousands, except for share, per share and per ADS data) | | |
| **Revenues:** | | | |
| Recommendation services: | | | |
| Credit cards | 749,673 | (163,680) | 585,993 |
| Total recommendation services | 1,415,980 | (163,680) | 1,252,300 |
| Advertising, marketing and other services | 214,329 | (30,902) | 183,427 |
| **Total revenues** | **1,630,309** | **(194,582)** | **1,435,727** |
| **Gross profit** | **1,496,341** | **(194,582)** | **1,301,759** |
| **Operating expenses:** | | | |
| Sales and marketing | (1,352,296) | 152,950 | (1,199,346) |
| General and administrative | (77,110) | (23,786) | (100,896) |
| Penalties | — | (30,000) | (30,000) |
| **Loss from operations** | **(460,091)** | **(95,418)** | **(555,509)** |
| **Loss before income tax** | **(443,206)** | **(95,418)** | **(538,624)** |
| Income tax benefits | 17,957 | (9,952) | 8,005 |
| **Net loss** | **(425,249)** | **(105,370)** | **(530,619)** |
| Less: net loss attributable to noncontrolling interests | (61,098) | (17,761) | (78,859) |
| **Net loss attributable to Jianpu's shareholders** | **(364,151)** | **(87,609)** | **(451,760)** |
| **Total comprehensive loss** | **(410,564)** | **(105,370)** | **(515,934)** |
| Less: total comprehensive loss attributable to noncontrolling interests | (60,971) | (17,761) | (78,732) |
| **Total comprehensive loss attributable to Jianpu's shareholders** | **(349,593)** | **(87,609)** | **(437,202)** |
| **Net loss per share attributable to Jianpu's shareholders** | | | |
| Basic and diluted | (0.87) | (0.20) | (1.07) |
| **Net loss per ADS attributable to Jianpu's shareholders** | | | |
| Basic and diluted | (17.32) | (4.16) | (21.48) |

105

| | As of December 31, 2019 | | |
| | As Previously Announced | Adjustments | As Reported |
| | RMB | RMB | RMB |
| | | (in thousands) | |
|---|---:|---:|---:|
| Accounts receivable, net | 370,266 | (24,741) | 345,525 |
| Prepayments and other current assets | 118,100 | 323 | 118,423 |
| Other non-current assets | 50,458 | (5,298) | 45,160 |
| Accounts payable | 185,681 | (1,363) | 184,318 |
| Tax payable | 12,272 | 9,896 | 22,168 |
| Accrued expenses and other current liabilities | 156,897 | 67,121 | 224,018 |
| Accumulated losses | (706,497) | (86,488) | (792,985) |
| Statutory reserves | 3,021 | (1,121) | 1,900 |
| Noncontrolling interests | 22,774 | (17,761) | 5,013 |

*Remedial Measures in Response to Review*

We, with input from the Audit Committee and the above-described professional advisers, have prepared a remediation plan in response to the Review, including but not limited to (i) disciplinary actions, including termination of employment, against employees found to have engaged in misconduct, (ii) termination of cooperation with high-risk third-party agencies, (iii) adjustment of our internal structure and reporting lines where appropriate, (iv) enhancement of our internal policies and controls (including the identification and remediation of potential material weaknesses and control deficiencies), as well as financial reporting function, and (v) conducting follow-on reviews of additional business units that may share similar internal controls vulnerabilities as those identified in the Credit Card BU and taking further remedial actions as necessary and appropriate; (vi) conducting additional training for our employees regarding the issues implicated in the Review findings. We are in the process of implementing the remediation plan.

**Dividend Policy**

We have not previously declared or paid cash dividends and we have no plan to declare or pay any dividends in the near future on our shares or ADSs. We currently intend to retain most, if not all, of our available funds and any future earnings to operate and expand our business.

We are a holding company incorporated in the Cayman Islands. We rely principally on dividends from our PRC subsidiaries for our cash requirements, including any payment of dividends to our shareholders. PRC regulations may restrict the ability of our PRC subsidiaries to pay dividends to us. See "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China—We may rely on dividends and other distributions on equity paid by our PRC subsidiaries to fund any cash and financing requirements we may have, and any limitation on the ability of our PRC subsidiaries to make payments to us could have a material and adverse effect on our ability to conduct our business."

Our board of directors has discretion as to whether to distribute dividends, subject to applicable laws. Even if our board of directors decides to pay dividends, the form, frequency and amount will depend upon our future operations and earnings, capital requirements and surplus, general financial condition, contractual restrictions and other factors that the board of directors may deem relevant. If we pay any dividends, we will pay our ADS holders to the same extent as holders of our ordinary shares, subject to the terms of the deposit agreement, including the fees and expenses payable thereunder. Cash dividends on our ordinary shares, if any, will be paid in U.S. dollars.

**B.**      **Significant Changes**

Except as disclosed elsewhere in this annual report, we have not experienced any significant changes since the date of our audited consolidated financial statements included in this annual report.

**ITEM 9.  THE OFFER AND LISTING**

**A.**      **Offering and Listing Details**

See "C. Markets" for our host market and trading symbol. We have a dual-class structure in which Class B ordinary shares have different voting rights from Class A ordinary shares. Class B ordinary shares are each entitled to ten votes, whereas Class A ordinary shares are each entitled to one vote. See " Item 3. Key Information—D. Risk Factors—Risks Related to Our ADSs—Our dual-class share structure with different voting rights will limit your ability to influence corporate matters and could discourage others from pursuing any change of control transactions that holders of our Class A ordinary shares and ADSs may view as beneficial."

**B.**      **Plan of Distribution**

Not applicable.

**C.**      **Markets**

Our ADSs have been listed on the NYSE since November 16, 2017. On October 30, 2020, we changed the ratio of ADSs to Class A ordinary shares (the "ADS Ratio") from two ADSs to five Class A ordinary shares to one ADS to 20 Class A ordinary shares. Except as otherwise indicated, all ADS and per ADS data in this annual report give retroactive effect to the ADS Ratio of one ADS to 20 Class A ordinary shares. Our ADSs trade under the symbol "JT."

**D.**      **Selling Shareholders**

Not applicable.

**E.**      **Dilution**

Not applicable.

**F.**      **Expenses of the Issue**

Not applicable.

**ITEM 10.  ADDITIONAL INFORMATION**

**A.**      **Share Capital**

Not applicable.

107

**B.**    <u>**Memorandum and Articles of Association**</u>

The following are summaries of material provisions of our second amended and restated memorandum and articles of association and the Companies Act as they relate to the material terms of our shares.

The following discussion primarily concerns the ordinary shares and the rights of holders of the ordinary shares. The holders of ADSs will not be treated as our shareholders and will be required to surrender their ADSs for cancellation and withdrawal from the depositary facility in which the shares are held in accordance with the provisions of the deposit agreement in order to exercise directly shareholders' rights in respect of the shares. The depositary will agree, so far as it is practical, to vote or cause to be voted the amount of the shares represented by ADSs in accordance with the non-discretionary written instructions of the holders of such ADSs.

**Exempted Company**

We are an exempted company incorporated with limited liability under the Companies Act. The Companies Act distinguishes between ordinary resident companies and exempted companies. Any company that is registered in the Cayman Islands but conducts business mainly outside of the Cayman Islands may apply to be registered as an exempted company. The requirements for an exempted company are essentially the same as for an ordinary resident company except for the exemptions and privileges listed below:

·    an exempted company does not have to file an annual return of its shareholders with the Registrar of Companies;

·    an exempted company is not required to open its register of members for inspection;

·    an exempted company does not have to hold an annual general meeting;

·    an exempted company may issue no par value, negotiable or bearer shares;

·    an exempted company may obtain an undertaking against the imposition of any future taxation (such undertakings are usually given for 20 years in the first instance);

·    an exempted company may register by way of continuation in another jurisdiction and be deregistered in the Cayman Islands;

·    an exempted company may register as an exempted limited duration company; and

·    an exempted company may register as a segregated portfolio company.

**Ordinary Shares**

*General*

All of our outstanding ordinary shares are fully paid and non-assessable. Our shareholders who are non-residents of the Cayman Islands may freely hold and vote their ordinary shares.

*Dividends*

The holders of our ordinary shares are entitled to receive such dividends as may be declared by our board of directors subject to our memorandum and articles of association and the Companies Act. In addition, our shareholders may by ordinary resolution declare a dividend, but no dividend may exceed the amount recommended by our directors. Under Cayman Islands law, dividends may be paid only out of profits and out of share premium. No dividend may be declared and paid unless our directors determine that, immediately after the payment, we will be able to satisfy our liabilities as they become due in the ordinary course of business and we have funds lawfully available for such purpose.

*Register of Members*

Under Cayman Islands law, we must keep a register of members and there must be entered therein:

· the names and addresses of the members, a statement of the shares held by each member, and of the amount paid or agreed to be considered as paid, on the shares of each member;

· the date on which the name of any person was entered on the register as a member; and

· the date on which any person ceased to be a member.

Under Cayman Islands law, the register of members of our company is prima facie evidence of the matters set out therein (i.e., the register of members will raise a presumption of fact on the matters referred to above unless rebutted). The shareholders recorded in the register of members are deemed to have legal title to the shares set against their names.

If the name of any person is, without sufficient cause, entered in or omitted from the register of members, or if default is made or unnecessary delay takes place in entering on the register the fact of any person having ceased to be a member, the person or member aggrieved or any member or the company itself may apply to the Cayman Islands Grand Court for an order that the register be rectified, and the Court may either refuse such application or it may, if satisfied of the justice of the case, make an order for the rectification of the register.

*Class of Ordinary Shares*

Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of our Class A ordinary shares and Class B ordinary shares will have the same rights except for voting and conversion rights. Each Class A Ordinary Share shall entitle the holder thereof to one (1) vote on all matters subject to vote at our general meetings, and each Class B ordinary share shall entitle the holder thereof to ten (10) votes on all matters subject to vote at our general meetings. Our ordinary shares are issued in registered form and are issued when registered in our register of members.

*Conversion*

Each Class B ordinary share is convertible into one Class A ordinary share at any time by the holder thereof. Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Upon any sale, transfer, assignment or disposition of any Class B ordinary share by a founder to any person who is not a founder affiliate of such founder, or upon a change of ultimate beneficial ownership of any Class B ordinary share from a founder to any person who is not a founder affiliate of such founder, such Class B ordinary share shall be automatically and immediately converted into one Class A ordinary share. In addition, if shares beneficially owned by the founders collectively account for less than five percent (5%) of the issued shares in the capital of the Company, then each Class B ordinary share shall automatically be re-designated into one Class A ordinary share, and no Class B ordinary shares shall be issued by the Company thereafter. When a founder ceases to be a director or an executive officer of the Company, each Class B ordinary share beneficially owned by such founder shall automatically be re-designated into one Class A ordinary share.

*Voting Rights*

Holders of our ordinary shares have the right to receive notice of, attend, speak and vote at general meetings of our company. Each holder of Class A ordinary shares is entitled to one vote per share and each holder of our Class B ordinary shares is entitled to ten votes per share on all matters submitted to them for a vote. Our Class A ordinary shares and Class B ordinary shares vote together as a single class on all matters submitted to a vote of our shareholders, except as may otherwise be required by law. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by the chairman. An ordinary resolution to be passed by the shareholders requires the affirmative vote of a simple majority of the votes attaching to the ordinary shares cast in a general meeting, which can be an annual general meeting or a special meeting of shareholders. A special resolution requires the affirmative vote of no less than two-thirds of the votes attaching to the ordinary shares cast in a general meeting. Both ordinary resolutions and special resolutions may also be passed by a unanimous written resolution signed by all the shareholders of our company, as permitted by the Companies Act and our second memorandum and articles of association. A special resolution will be required for important matters such as a change of name or making changes to our memorandum and articles of association.

109

*General Meetings and Shareholder Proposals*

As a Cayman Islands exempted company, we are not obliged by the Companies Act to call shareholders' annual general meetings. Our second memorandum and articles of association provide that we may (but are not obliged to) in each year hold a general meeting as our annual general meeting in which case we will specify the meeting as such in the notices calling it, and the annual general meeting will be held at such time and place as may be determined by our directors. We, however, will hold an annual shareholders' meeting during each fiscal year, as required by rules of the NYSE. Neither Cayman Islands law nor the exchange-mandated meeting require annual election of directors.

Cayman Islands law provides shareholders with only limited rights to requisition a general meeting, and does not provide shareholders with any right to put any proposal before a general meeting. However, these rights may be provided in a company's articles of association. Our second memorandum and articles of association allow our shareholders holding not less than one-third of all notes attaching to all issued and outstanding shares to requisition a special meeting of the shareholders, in which case the directors are obliged to call such meeting and to put the resolutions so requisitioned to a vote at such meeting; however, our second memorandum and articles of association do not provide our shareholders with any right to put any proposals before annual general meetings or extraordinary general meetings not called by such shareholders.

A quorum required for a meeting of shareholders consists of one or more shareholders holding not less than one-third of all paid up voting share capital of our company present in person or by proxy or, if a corporation or other non-natural person, by its duly authorized representative. Advance notice of at least ten days is required for the convening of our annual general meeting and other shareholders' meetings.

*Transfer of Ordinary Shares*

Subject to the restrictions in our amended and restated memorandum and articles of association as set out below, any of our shareholders may transfer all or any of his or her ordinary shares by an instrument of transfer in the usual or common form or any other form approved by our board.

Our board of directors may, in its absolute discretion, decline to register any transfer of any ordinary share which is not fully paid-up or on which we have a lien. Our directors may also decline to register any transfer of any ordinary share unless:

· the instrument of transfer is lodged with us, accompanied by the certificate for the ordinary shares to which it relates and such other evidence as our board of directors may reasonably require to show the right of the transferor to make the transfer;

· the instrument of transfer is in respect of only one class of shares;

· the instrument of transfer is properly stamped, if required;

· in the case of a transfer to joint holders, the number of joint holders to whom the ordinary share is to be transferred does not exceed four;

· the ordinary shares transferred are fully paid or free of any lien in favor of us; or

· such lesser sum as the directors may from time to time require, is paid to the company thereof.

The registration of transfers of shares or of any class of shares may, after compliance with any notice requirement of the designated stock exchange, be suspended at such times and for such periods (not exceeding in the whole thirty (30) days in any year) as the Board may determine.

110

*Liquidation*

On a return of capital on winding-up or otherwise (other than on conversion, redemption or purchase of ordinary shares), assets available for distribution among the holders of ordinary shares will be distributed among the holders of the ordinary shares on a pro rata basis. If our assets available for distribution are insufficient to repay all of the paid-up capital, the assets will be distributed so that the losses are borne by our shareholders proportionately. We are an exempted company with limited liability registered under the Companies Act, and under the Companies Act, the liability of our members is limited to the amount, if any, unpaid on the shares respectively held by them. Our memorandum of association contains a declaration that the liability of our members is so limited.

*Calls on Ordinary Shares and Forfeiture of Ordinary Shares*

Our board of directors may from time to time make calls upon shareholders for any amounts unpaid on their ordinary shares in a notice served to such shareholders at least 14 calendar days prior to the specified time and place of payment. The ordinary shares that have been called upon and remain unpaid on the specified time are subject to forfeiture.

*Redemption, Repurchase and Surrender of Ordinary Shares*

We may issue shares on terms that such shares are subject to redemption, at our option or at the option of the holders thereof, on such terms and in such manner as may be determined, before the issue of such shares, by our board of directors or by a special resolution of our shareholders. Our company may also repurchase any of our shares provided that the manner and terms of such purchase have been approved by our board of directors and agree with the shareholder, or are otherwise authorized by our memorandum and articles of association. Under the Companies Act, the redemption or repurchase of any share may be paid out of our company's profits or one of the share premium account, or out of the proceeds of a fresh issue of shares made for the purpose of such redemption or repurchase, or, if so authorized by its articles of association, out of capital if the company can, immediately following such payment, pay its debts as they fall due in the ordinary course of business. In addition, under the Companies Act no such share may be redeemed or repurchased (a) unless it is fully paid-up, (b) if such redemption or repurchase would result in there being no shares outstanding, or (c) if the company has commenced liquidation. In addition, our company may accept the surrender of any fully paid share for no consideration.

*Variations of Rights of Shares*

If at any time the share capital is divided into different classes of shares, the rights attached to any class of shares may, unless otherwise provided by the terms of issue of the shares of that class, be varied with the consent in writing of the holders of the shares of that class or with the sanction of a resolution passed at a separate meeting of the holders of the shares of that class by holding of two-thirds of the issued shares of that class.

*Inspection of Books and Records*

Holders of our ordinary shares will have no general right under Cayman Islands law to inspect or obtain copies of our list of shareholders or our corporate records. However, we will provide our shareholders with annual audited financial statements.

*Changes in Capital*

Our shareholders may from time to time by ordinary resolutions:

·  increase the share capital by such sum, to be divided into shares of such classes and amount, as the resolution prescribes;

·  consolidate and divide all or any of our share capital into shares of a larger amount than our existing shares;

·  convert all or any of our paid-up shares into stock and reconvert that stock into paid-up shares of any denomination;

·  sub-divide our existing shares, or any of them into shares of a smaller amount than that fixed by our memorandum of association; provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced share will be the same as it was in case of the share from which the reduced share is derived; or

·  cancel any shares which, at the date of the passing of the resolution, have not been taken or agreed to be taken by any person and diminish the amount of our share capital by the amount of the shares so cancelled.

111

Subject to the Companies Act, our shareholders may by special resolution reduce our share capital and any capital redemption reserve in any manner authorized by law.

**C.**     **Material Contracts**

We have not entered into any material contracts other than in the ordinary course of business and other than those described in "Item 4. Information on the Company," "Item 7. Major Shareholders and Related Party Transactions," or elsewhere in this annual report on Form 20-F.

**D.**     **Exchange Controls**

See "Item 4. Information on the Company—B. Business Overview—Regulation—Regulation on Foreign Currency Exchange."

**E.**     **Taxation**

The following summary of material Cayman Islands, PRC and U.S. federal income tax consequences of an investment in our ADSs or Class A ordinary shares is based upon laws and relevant interpretations thereof in effect as of the date of this annual report, all of which are subject to change. This summary does not deal with all possible tax consequences relating to an investment in our ADSs or Class A ordinary shares, such as the tax consequences under state, local and other tax laws.

**Cayman Islands Taxation**

The Cayman Islands currently levies no taxes on individuals or corporations based upon profits, income, gains or appreciation and there is no taxation in the nature of inheritance tax or estate duty. There are no other taxes likely to be material to investors levied by the government of the Cayman Islands. The Cayman Islands is not party to any double tax treaties which are applicable to any payments made by our company.

**People's Republic of China Taxation**

Although we are incorporated in the Cayman Islands, we may be treated as a PRC resident enterprise for PRC tax purposes under the Enterprise Income Tax Law. The Enterprise Income Tax Law provides that an enterprise established under the laws of a foreign country or region but whose "de facto management body" is located in the PRC is treated as a PRC resident enterprise for PRC tax purposes. The implementing rules of the Enterprise Income Tax Law merely define the location of the "de facto management body" as the "body that exercises full and substantial control over and overall management of the business, productions, personnel, accounts and properties of an enterprise." Based on a review of the facts and circumstances, we do not believe that Jianpu Technology Inc. or Jianpu (Hong Kong) Limited should be considered a PRC resident enterprise for PRC tax purposes. However, there is limited guidance and implementation history of the Enterprise Income Tax Law. If Jianpu Technology Inc. were to be considered a PRC resident enterprise, any gain realized on the sale or other disposition of our ADSs or Class A ordinary shares by investors that are non-PRC enterprises and any interest or dividends payable by us to such investors is subject to PRC income tax at a rate of 10%. In case of investors that are non-PRC individuals, the applicable PRC income tax rate is 20%. See "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China—If we are classified as a PRC resident enterprise for PRC income tax purposes, such classification could result in unfavorable tax consequences to us and our non-PRC shareholders or ADS holders."

112

**United States Federal Income Tax Considerations**

The following discussion is a summary of U.S. federal income tax considerations generally applicable to the ownership and disposition of our ADSs or Class A ordinary shares by a U.S. Holder (as defined below) that holds our ADSs or Class A ordinary shares as "capital assets" (generally, property held for investment) under the U.S. Internal Revenue Code of 1986, as amended, or the Code. This discussion is based upon existing U.S. federal tax law, which is subject to differing interpretations or change, possibly with retroactive effect. No ruling has been sought from the Internal Revenue Service, or the IRS, with respect to any U.S. federal income tax consequences described below, and there can be no assurance that the IRS or a court will not take a contrary position. This discussion, moreover, does not address the U.S. federal estate, gift and alternative minimum tax considerations, the 3.8% Medicare tax on certain net investment income, or any state, local and non-U.S. tax considerations, relating to the ownership or disposition of our ADSs or Class A ordinary shares. The following summary does not address all aspects of U.S. federal income taxation that may be important to particular investors in light of their individual circumstances or to persons in special tax situations such as:

· banks and other financial institutions;

· insurance companies;

· pension plans;

· cooperatives;

· regulated investment companies;

· real estate investment trusts;

· broker-dealers;

· traders that elect to use a mark-to-market method of accounting;

· certain former U.S. citizens or long-term residents;

· tax-exempt entities (including private foundations);

· persons liable for alternative minimum tax;

· holders who acquire their ADSs or Class A ordinary shares pursuant to any employee share option or otherwise as compensation;

· investors that will hold their ADSs or Class A ordinary shares as part of a straddle, hedge, conversion, constructive sale or other integrated transaction for U.S. federal income tax purposes;

· investors that have a functional currency other than the U.S. dollar;

· persons that actually or constructively own 10% or more of our stock (by vote or value); or

· partnerships or other entities taxable as partnerships for U.S. federal income tax purposes, or persons holding ADSs or Class A ordinary shares through such entities, all of whom may be subject to tax rules that differ significantly from those discussed below.

Each U.S. Holder is urged to consult its tax advisor regarding the application of U.S. federal taxation to its particular circumstances, and the state, local, non-U.S. and other tax considerations of the ownership and disposition of our ADSs or Class A ordinary shares.

113

**General**

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of our ADSs or Class A ordinary shares that is, for U.S. federal income tax purposes:

· an individual who is a citizen or resident of the United States;

· a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created in, or organized under the law of, the United States or any state thereof or the District of Columbia;

· an estate the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source; or

· a trust (A) the administration of which is subject to the primary supervision of a U.S. court and which has one or more U.S. persons who have the authority to control all substantial decisions of the trust or (B) that has otherwise validly elected to be treated as a U.S. person under the Code.

If a partnership (or other entity treated as a partnership for U.S. federal income tax purposes) is a beneficial owner of our ADSs or Class A ordinary shares, the tax treatment of a partner in the partnership will generally depend upon the status of the partner and the activities of the partnership. Partnerships holding our ADSs or Class A ordinary shares and their partners are urged to consult their tax advisors regarding an investment in our ADSs or Class A ordinary shares.

For U.S. federal income tax purposes, it is generally expected that a U.S. Holder of ADSs will be treated as the beneficial owner of the underlying shares represented by the ADSs. The remainder of this discussion assumes that a U.S. Holder of our ADSs will be treated in this manner. Accordingly, deposits or withdrawals of Class A ordinary shares for ADSs will generally not be subject to U.S. federal income tax.

**Passive Foreign Investment Company Considerations**

A non-U.S. corporation, such as our company, will be classified as a PFIC, for U.S. federal income tax purposes for any taxable year, if either (i) 75% or more of its gross income for such year consists of certain types of "passive" income or (ii) 50% or more of the value of its assets (based on an average of the quarterly values of the assets) during such year is attributable to assets that produce or are held for the production of passive income. For this purpose, cash and assets readily convertible into cash are categorized as passive assets, and the company's goodwill and other unbooked intangibles are taken into account. Passive income generally includes, among other things, dividends, interest, rents, royalties, and gains from the disposition of passive assets. We will be treated as owning a proportionate share of the assets and earning a proportionate share of the income of any other corporation in which we own, directly or indirectly, more than 25% (by value) of the stock.

Although the law in this regard is not entirely clear, we treat our consolidated variable interest entities as being owned by us for U.S. federal income tax purposes because we control their management decisions and are entitled to substantially all of the economic benefits associated with these entities. As a result, we consolidate their results of operations in our consolidated U.S. GAAP financial statements. If it were determined, however, that we are not the owner of such consolidated variable interest entities for U.S. federal income tax purposes, we may be treated as a PFIC for the taxable year ended December 31, 2019 and any subsequent taxable year.

Assuming that we are the owner of our consolidated variable interest entities for U.S. federal income tax purposes, based upon our current and projected income and assets, we do not believe we were a PFIC for the taxable year ended December 31, 2019. However, no assurance can be given in this regard because the determination of whether we will be or become a PFIC is a factual determination made annually that will depend, in part, upon the composition of our income and assets. Recent fluctuations in the market price of our ADSs have increased our risk of becoming a PFIC, and continued fluctuations in the market price of our ADSs may cause us to be classified as a PFIC for the current or future taxable years because the value of our assets for the purpose of the second part of the test described above, including the value of our goodwill and unbooked intangibles, may be determined by reference to the market price of our ADSs from time to time (which may be volatile). If our market capitalization subsequently declines, we may be or become classified as a PFIC for the current taxable year or future taxable years. Furthermore, the composition of our income and assets may also be affected by how, and how quickly, we use our liquid assets. Under circumstances where our revenue from activities that produce passive income significantly increases relative to our revenue from activities that produce non-passive income, or where we determine not to deploy significant amounts of cash for active purposes, our risk of becoming classified as a PFIC may substantially increase.

114

If we are classified as a PFIC for any year during which a U.S. Holder holds our ADSs or Class A ordinary shares, the PFIC rules discussed below under "Passive Foreign Investment Company Rules" generally will apply to such U.S. Holder for such taxable year, and unless the U.S. Holder makes certain elections, will apply in future years even if we cease to be a PFIC.

The discussion below under "Dividends" and "Sale or Other Disposition" is written on the basis that we will not be or become classified as a PFIC for U.S. federal income tax purposes. The U.S. federal income tax rules that apply generally if we are treated as a PFIC are discussed below under "Passive Foreign Investment Company Rules."

**Dividends**

Subject to the discussion below under "Passive Foreign Investment Company Rules," any cash distributions (including the amount of any PRC tax withheld) paid on our ADSs or Class A ordinary shares out of our current or accumulated earnings and profits, as determined under U.S. federal income tax principles, will generally be includible in the gross income of a U.S. Holder as dividend income on the day actually or constructively received by the U.S. Holder, in the case of Class A ordinary shares, or by the depositary, in the case of ADSs. Because we do not intend to determine our earnings and profits on the basis of U.S. federal income tax principles, any distribution we pay will generally be treated as a "dividend" for U.S. federal income tax purposes. Dividends received on our ADSs or Class A ordinary shares will not be eligible for the dividends received deduction allowed to corporations in respect of dividends received from U.S. corporations.

Individuals and other non-corporate U.S. Holders will be subject to tax at the lower capital gains tax rate applicable to "qualified dividend income," provided that certain conditions are satisfied, including that (1) the ADSs or Class A ordinary shares on which the dividends are paid are readily tradable on an established securities market in the United States, or, in the event that we are deemed to be a PRC resident enterprise under the PRC tax law, we are eligible for the benefit of the United States-PRC income tax treaty, (2) we are neither a PFIC nor treated as such with respect to a U.S. Holder (as discussed below) for the taxable year in which the dividend is paid or the preceding taxable year, (3) certain holding period requirements are met, and (4) such non-corporate U.S. Holders are not under an obligation to make related payments with respect to positions in substantially similar or related property. For this purpose, ADSs listed on the NYSE will generally be considered to be readily tradable on an established securities market in the United States. Although the law in this regard is not entirely clear, since we do not expect our Class A ordinary shares will be listed on any securities market, we do not believe that Class A ordinary shares that are not represented by ADSs will generally be considered to be readily tradable on an established securities market in the United States. You should consult your tax advisor regarding the availability of the lower rate for dividends paid with respect to our ADSs or Class A ordinary shares.

In the event that we are deemed to be a PRC resident enterprise under the PRC Enterprise Income Tax Law (see "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China—If we are classified as a PRC resident enterprise for PRC income tax purposes, such classification could result in unfavorable tax consequences to us and our non-PRC shareholders or ADS holders."), we may be eligible for the benefits of the United States-PRC income tax treaty. If we are eligible for such benefits, dividends we pay on our Class A ordinary shares, regardless of whether such shares are represented by the ADSs, and regardless of whether our ADSs are readily tradable on an established securities market in the United States, would be eligible for the reduced rates of taxation applicable to qualified dividend income, as described in the preceding paragraph.

For U.S. foreign tax credit purposes, dividends paid on our ADSs or Class A ordinary shares generally will be treated as income from foreign sources and generally will constitute passive category income. If PRC withholding taxes apply to dividends paid to you with respect to our ADSs or Class A ordinary shares, you may be able to obtain a reduced rate of PRC withholding taxes under the United States-PRC income tax treaty if certain requirements are met. In addition, subject to certain conditions and limitations, PRC withholding taxes on dividends that are non-refundable under the income tax treaty between the United States and the PRC may be treated as foreign taxes eligible for credit against your U.S. federal income tax liability. If you do not elect to claim a foreign tax credit, you may instead claim a deduction for U.S. federal income tax purposes in respect of such withholding, but only for a year in which you elect to do so for all creditable foreign income taxes. You should consult your tax advisor regarding the creditability of any PRC tax.

115

**Sale or Other Disposition**

Subject to the discussion below under "Passive Foreign Investment Company Rules," a U.S. Holder will generally recognize gain or loss upon the sale or other disposition of our ADSs or Class A ordinary shares in an amount equal to the difference between the amount realized upon the disposition and the holder's adjusted tax basis in such ADSs or Class A ordinary shares. The gain or loss will generally be capital gain or loss. Individuals and other non-corporate U.S. Holders who have held the ADS or Class A ordinary shares for more than one year will generally be eligible for reduced tax rates. The deductibility of a capital loss may be subject to limitations. Any such gain or loss that the U.S. Holder recognizes will generally be treated as U.S. source income or loss for foreign tax credit limitation purposes, which will generally limit the availability of foreign tax credits. However, in the event we are deemed to be a PRC resident enterprise under the PRC Enterprise Income Tax Law, we may be eligible for the benefits of the United States-PRC income tax treaty. In such event, if PRC tax were to be imposed on any gain from the disposition of the ADSs or Class A ordinary shares, a U.S. Holder that is eligible for the benefits of the United States-PRC income tax treaty may elect to treat such gain as PRC source income. If a U.S. Holder is not eligible for the benefits of the United States-PRC income tax treaty or fails to make the election to treat any gain as foreign-source, then such U.S. Holder may not be able to use the foreign tax credit arising from any PRC tax imposed on the disposition of the ADSs or ordinary shares unless such credit can be applied (subject to applicable limitations) against U.S. federal income tax due on other income derived from foreign sources in the same income category (generally, the passive category). U.S. Holders should consult their tax advisors regarding the creditability of any PRC tax.

**Passive Foreign Investment Company Rules**

If we are classified as a PFIC for any taxable year during which a U.S. Holder holds our ADSs or Class A ordinary shares, and unless the U.S. Holder makes a mark-to-market election (as described below), the U.S. Holder will generally be subject to special tax rules on (i) any excess distribution that we make to the U.S. Holder (which generally means any distribution paid during a taxable year to a U.S. Holder that is greater than 125 percent of the average annual distributions paid in the three preceding taxable years or, if shorter, the U.S. Holder's holding period for the ADSs or Class A ordinary shares), and (ii) any gain realized on the sale or other disposition, including, under certain circumstances, a pledge, of ADSs or Class A ordinary shares. Under the PFIC rules:

·   the excess distribution or gain will be allocated ratably over the U.S. Holder's holding period for the ADSs or Class A ordinary shares;

·   the amount allocated to the current taxable year and any taxable years in the U.S. Holder's holding period prior to the first taxable year in which we are classified as a PFIC (each, a "pre-PFIC year"), will be taxable as ordinary income;

·   the amount allocated to each prior taxable year, other than a pre-PFIC year, will be subject to tax at the highest tax rate in effect for individuals or corporations, as appropriate, for that year; and

·   the interest charge generally applicable to underpayments of tax will be imposed on the tax attributable to each prior taxable year, other than a pre-PFIC year.

If we are a PFIC for any taxable year during which a U.S. Holder holds our ADSs or Class A ordinary shares and any of our subsidiaries, our variable interest entities or any of the subsidiaries of our variable interest entities is also a PFIC, such U.S. Holder would be treated as owning a proportionate amount (by value) of the shares of the lower-tier PFIC for purposes of the application of these rules. U.S. Holders are urged to consult their tax advisors regarding the application of the PFIC rules to any of our subsidiaries, our variable interest entities or any of the subsidiaries of our variable interest entities.

116

As an alternative to the foregoing rules, a U.S. Holder of "marketable stock" (as defined below) in a PFIC may make a mark-to-market election with respect to such stock. If a U.S. Holder makes this election with respect to our ADSs, the holder will generally (i) include as ordinary income for each taxable year that we are a PFIC the excess, if any, of the fair market value of the ADSs held at the end of the taxable year over the adjusted tax basis of such ADSs and (ii) deduct as an ordinary loss in each such taxable year the excess, if any, of the adjusted tax basis of the ADSs over the fair market value of such ADSs held at the end of the taxable year, but such deduction will only be allowed to the extent of the amount previously included in income as a result of the mark-to-market election. The U.S. Holder's adjusted tax basis in the ADSs would be adjusted to reflect any income or loss resulting from the mark-to-market election. If a U.S. Holder makes a mark-to-market election in respect of our ADSs and we cease to be classified as a PFIC, the holder will not be required to take into account the gain or loss described above during any period that we are not classified as a PFIC. If a U.S. Holder makes a mark-to-market election, any gain such U.S. Holder recognizes upon the sale or other disposition of our ADSs in a year when we are a PFIC will be treated as ordinary income and any loss will be treated as ordinary loss to the extent of the net amount previously included in income as a result of the mark-to-market election.

The mark-to-market election is available only for "marketable stock," which is stock that is traded (in other than de minimis quantities) on at least 15 days during each calendar quarter ("regularly traded") on a qualified exchange or other market, as defined in applicable United States Treasury regulations. We believe that our ADSs, but not our Class A ordinary shares, should be treated as traded on a qualified exchange or other market upon their listing on the NYSE and that our ADSs should qualify as being regularly traded, but no assurances may be given in this regard.

Because, as a technical matter, a mark-to-market election cannot be made for any lower-tier PFICs that we may own, a U.S. Holder may continue to be subject to the PFIC rules with respect to such U.S. Holder's indirect interest in any investments held by us that are treated as an equity interest in a PFIC for U.S. federal income tax purposes.

We do not intend to provide information necessary for U.S. Holders to make qualified electing fund elections, which, if available, would result in tax treatment different from (and generally less adverse than) the general tax treatment for PFICs described above.

If a U.S. Holder owns our ADSs or Class A ordinary shares during any taxable year that we are a PFIC, the holder must generally file an annual IRS Form 8621. You should consult your tax advisor regarding the U.S. federal income tax consequences of owning and disposing of our ADSs or Class A ordinary shares if we are or become a PFIC.

**F.      Dividends and Paying Agents**

Not applicable.

**G.      Statement by Experts**

Not applicable.

**H.      Documents on Display**

We are subject to the periodic reporting and other informational requirements of the Exchange Act. Under the Exchange Act, we are required to file reports and other information with the SEC. Specifically, we are required to file annually a Form 20-F no later than four months after the close of each fiscal year. The SEC maintains a web site at *www.sec.gov* that contains reports, proxy and information statements, and other information regarding registrants that make electronic filings with the SEC using its EDGAR system. As a foreign private issuer, we are exempt from the rules under the Exchange Act prescribing the furnishing and content of quarterly reports and proxy statements, and officers, directors and principal shareholders are exempt from the reporting and short-swing profit recovery provisions contained in Section 16 of the Exchange Act.

We will furnish Deutsche Bank Trust Company Americas, the depositary of our ADSs, with our annual reports, which will include a review of operations and annual audited consolidated financial statements prepared in conformity with U.S. GAAP, and all notices of shareholders' meetings and other reports and communications that are made generally available to our shareholders. The depositary will make such notices, reports and communications available to holders of ADSs and, upon our request, will mail to all record holders of ADSs the information contained in any notice of a shareholders' meeting received by the depositary from us.

I.      **Subsidiary Information**

Not applicable.

**ITEM 11.  QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

**Inflation**

To date, inflation in China has not materially impacted our results of operations. According to the National Bureau of Statistics of China, the year-over-year percent changes in the consumer price index for December 2017, 2018 and 2019 were increases of 1.8%, 1.9% and 4.5%, respectively. Although we have not been materially affected by inflation in the past, we can provide no assurance that we will not be affected by higher rates of inflation in China in the future.

*Foreign Exchange Risk*

Substantially all of our revenues and expenses are denominated in RMB. We do not believe that we currently have any significant direct foreign exchange risk and have not used any derivative financial instruments to hedge exposure to such risk. Although our exposure to foreign exchange risks should be limited in general, the value of your investment in our ADSs will be affected by the exchange rate between U.S. dollar and Renminbi because the value of our business is effectively denominated in RMB, while our ADSs will be traded in U.S. dollars.

The conversion of Renminbi into foreign currencies, including U.S. dollars, is based on rates set by the People's Bank of China. The Renminbi has fluctuated against the U.S. dollar, at times significantly and unpredictably. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between Renminbi and the U.S. dollar in the future.

To the extent that we need to convert U.S. dollars into Renminbi for our operations, appreciation of the Renminbi against the U.S. dollar would have an adverse effect on the RMB amount we receive from the conversion. Conversely, if we decide to convert Renminbi into U.S. dollars for the purpose of making payments for dividends on our ordinary shares or ADSs or for other business purposes, appreciation of the U.S. dollar against the Renminbi would have a negative effect on the U.S. dollar amounts available to us.

*Interest Rate Risk*

We have not been exposed to material risks due to changes in market interest rates, and we have not used any derivative financial instruments to manage our interest risk exposure.

We do not expect rising or falling interest rates to have a material impact on our financial condition unless uncertainty about the direction and timing of interest rate changes materially affects the level of borrowing and lending activity in the economy. Our business is dependent upon the healthy functioning of the credit markets in China, and we cannot provide assurance that we will not be exposed to material risks in the event of a credit crisis or prolonged period of uncertainty in the credit markets. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business—Our business may be affected by the condition and competitive landscape of China's credit markets."

After completion of our IPO, we invest the net proceeds we receive from the offering and the concurrent private placements. Fixed rate securities may have their fair market value adversely impacted due to a rise in interest rates, while floating rate securities may produce less income than expected if interest rates fall.

118

**ITEM 12.  DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES**

A.        **Debt Securities**

Not applicable.

B.        **Warrants and Rights**

Not applicable.

C.        **Other Securities**

Not applicable.

D.        **American Depositary Shares**

**Fees and Charges Our ADS Holders May Have to Pay**

As an ADS holder, you will be required to pay the following service fees to the depositary bank and certain taxes and governmental charges (in addition to any applicable fees, expenses, taxes and other governmental charges payable on the deposited securities represented by any of your ADSs):

| Service | Fees |
| --- | --- |
| · To any person to which ADSs are issued or to any person to which a distribution is made in respect of ADS distributions pursuant to stock dividends or other free distributions of stock, bonus distributions, stock splits or other distributions (except where converted to cash) | Up to US$0.05 per ADS issued |
| · Cancellation of ADSs, including the case of termination of the deposit agreement | Up to US$0.05 per ADS cancelled |
| · Distribution of cash dividends | Up to US$0.05 per ADS held |
| · Distribution of cash entitlements (other than cash dividends) and/or cash proceeds from the sale of rights, securities and other entitlements | Up to US$0.05 per ADS held |
| · Distribution of ADSs pursuant to exercise of rights. | Up to US$0.05 per ADS held |
| · Distribution of securities other than ADSs or rights to purchase additional ADSs | Up to US$0.05 per ADS held |
| · Depositary services | Up to US$0.05 per ADS held on the applicable record date(s) established by the depositary bank |

As an ADS holder, you will also be responsible to pay certain fees and expenses incurred by the depositary bank and certain taxes and governmental charges (in addition to any applicable fees, expenses, taxes and other governmental charges payable on the deposited securities represented by any of your ADSs) such as:

· Fees for the transfer and registration of Class A ordinary shares charged by the registrar and transfer agent for the Class A ordinary shares in the Cayman Islands (i.e., upon deposit and withdrawal of Class A ordinary shares).

· Expenses incurred for converting foreign currency into U.S. dollars.

· Expenses for cable, telex and fax transmissions and for delivery of securities.

· Taxes and duties upon the transfer of securities, including any applicable stamp duties, any stock transfer charges or withholding taxes (i.e., when Class A ordinary shares are deposited or withdrawn from deposit).

· Fees and expenses incurred in connection with the delivery or servicing of Class A ordinary shares on deposit.

· Fees and expenses incurred in connection with complying with exchange control regulations and other regulatory requirements applicable to Class A ordinary shares, deposited securities, ADSs and ADRs.

· Any applicable fees and penalties thereon.

The depositary fees payable upon the issuance and cancellation of ADSs are typically paid to the depositary bank by the brokers (on behalf of their clients) receiving the newly issued ADSs from the depositary bank and by the brokers (on behalf of their clients) delivering the ADSs to the depositary bank for cancellation. The brokers in turn charge these fees to their clients. Depositary fees payable in connection with distributions of cash or securities to ADS holders and the depositary services fee are charged by the depositary bank to the holders of record of ADSs as of the applicable ADS record date.

The depositary fees payable for cash distributions are generally deducted from the cash being distributed or by selling a portion of distributable property to pay the fees. In the case of distributions other than cash (i.e., share dividends, rights), the depositary bank charges the applicable fee to the ADS record date holders concurrent with the distribution. In the case of ADSs registered in the name of the investor (whether certificated or uncertificated in direct registration), the depositary bank sends invoices to the applicable record date ADS holders. In the case of ADSs held in brokerage and custodian accounts (via DTC), the depositary bank generally collects its fees through the systems provided by DTC (whose nominee is the registered holder of the ADSs held in DTC) from the brokers and custodians holding ADSs in their DTC accounts. The brokers and custodians who hold their clients' ADSs in DTC accounts in turn charge their clients' accounts the amount of the fees paid to the depositary banks.

In the event of refusal to pay the depositary fees, the depositary bank may, under the terms of the deposit agreement, refuse the requested service until payment is received or may set off the amount of the depositary fees from any distribution to be made to the ADS holder.

**Fees and Other Payments Made by the Depositary to Us**

The depositary has agreed to reimburse us for certain expenses we incur that are related to establishment and maintenance of the ADR program upon such terms and conditions as we and the depositary may agree from time to time. We have received approximately US$4.7 million of such reimbursement from the depositary as of December 31, 2020.

## PART II

### ITEM 13.  DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES

None.

### ITEM 14.  MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS

None.

### ITEM 15.  CONTROLS AND PROCEDURES

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our management, including our chief executive officer and our chief financial officer, we carried out an evaluation of the effectiveness of our disclosure controls and procedures, which is defined in Rules 13a-15(e) of the Exchange Act as of the end of the period covered by this annual report. Based upon that evaluation, our management, with the participation of our chief executive officer and chief financial officer, has concluded that we did not maintain effective disclosure controls and procedures as of December 31, 2019, because of the material weaknesses in our internal control over financial reporting described below under "Management's Annual Report on Internal Control over Financial Reporting". Our disclosure controls and procedures were not effective to satisfy the objectives for which they are intended.

Notwithstanding management's assessment that we did not maintain effective internal control over financial reporting as of December 31, 2019 due to the material weaknesses described below, we believe that the consolidated financial statements included in this annual report on Form 20-F correctly present our financial position, results of operations and cash flows for the fiscal years covered thereby in all material respects.

**Management's Annual Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined under Rule 13(a)-15(f) and 15(d)-15(f) of the Exchange Act. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Our internal control over financial reporting includes those policies and procedures that: (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective may not prevent or detect misstatements and can provide only reasonable assurance with respect to financial statement preparation and presentation. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

As required by Section 404 of the Sarbanes-Oxley Act of 2002 and related rules as promulgated by the Securities and Exchange Commission, our management, under the supervision and with the participation of our chief executive officer and chief financial officer, conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2019 using the criteria set forth in the report "Internal Control-Integrated Framework (2013)" issued by the Committee on Sponsoring Organizations of the Treadway Commission. Based on our evaluation under the framework in Internal Control-Integrated Framework (2013), due to the material weaknesses described below, our management concluded that, as of December 31, 2019, we did not maintain effective internal control over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. GAAP.

In the course of auditing our consolidated financial statements for the year ended December 31, 2019, we and our independent registered public accounting firm identified three material weaknesses in our internal control over financial reporting as of December 31, 2019. As defined in the standards established by the U.S. PCAOB, a "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our company's annual or interim consolidated financial statements will not be prevented or detected on a timely basis.

One material weakness identified relates to our failure to design and implement effective controls with a sufficient level of precision to prevent and detect misstatements related to our credit card related business. Specifically, the material weakness is a combination of control deficiencies, including: (i) lack of continuous and effective risk assessment and monitoring procedures on changes in the credit card related business, especially the increased proportion contributed by third-party agents (including both upstream agents and downstream suppliers); (ii) inadequate review over engaging of third-party agents, and lack of effective acceptance procedures such as background information inspection to identify relationships between upstream agents and downstream suppliers and assessment of the qualification of these upstream agents and downstream suppliers; (iii) failure to properly preserve certain original transaction data and effectively perform reconciliation with financial information; (iv) lack of sufficient segregation of duties at certain control activities level; and (v) lack of effective review and analysis of business information to assess the impact on financial reporting. This material weakness has resulted in overstated revenue, cost and expenses in our financial statements.

121

We are implementing a number of remedial measures to address this material weakness, including: (i) strengthening risk assessment and monitoring changes in the business model, such as improvements in the frequency and dimension of the analysis of the revenue contribution of different customer types, on a sufficient level of precision by appropriate reviewers; (ii) performing a comprehensive risk assessment when engaging third-party business partners, such as enhancing our review steps in acceptance procedures, including analyzing the background of third-party business partners and the substance and reasonableness of cooperation arrangements; (iii) improving ethics and compliance policies, and developing enforcement measures for violations, including strengthening ethics and compliance training to educate all relevant personnel; (iv) implementing effective communication and cooperation mechanisms between business units and the finance team to facilitate updates of any changes in business to the finance team in a timely manner; (v) improving the information system related to our credit card business and standardizing data and file preservation policies and procedures; (vi) strengthening the risk assessment of different business models when setting up staff positions and formulationg job responsibilities, and ensure appropriate design and implementation of segregation of duties; and (vii) strengthening relevant training for financial reporting staff and improving financial reporting review procedures to ensure an effective assessment of the impact of business information on financial reporting.

A second material weakness identified relates to our failure to design and implement controls that have a sufficient level of precision related to pre-approval of and complete and accurate disclosures of related party transactions, which has resulted in inaccurate disclosures of certain related party transactions in 2018 and could have a material effect on our financial statements.

To address this material weakness, we will improve our identification and disclosure procedures for related party transactions to a sufficient level of precision, including assigning more competent personnel to perform related control activities, obtaining pre-approval for significant related party transactions, and strengthening the review of related party list and related party transactions before disclosure.

A third material weakness identified relates to the lack of sufficient competent financial reporting and accounting personnel with appropriate understanding of U.S. GAAP to design and implement formal period-end financial reporting policies and procedures, to address complex U.S. GAAP technical accounting issues, and to prepare and review our consolidated financial statements and related disclosures in accordance with U.S. GAAP and financial reporting requirements set forth by the SEC.

This material weakness described above was also reported in 2017 and 2018. We have implemented since and will continue to implement a number of measures to address this material weakness, including: (i) we are expanding our U.S. GAAP reporting and internal control teams with additional qualified accounting and reporting personnel who have appropriate knowledge and experience of U.S. GAAP and SEC reporting requirements; (ii) we have improved and will continue to enhance standardized financial closing and reporting procedures, including oversight and clarifying reporting requirements for non-recurring or complex transactions; (iii) we are in the process of establishing clear roles and responsibilities for accounting and financial reporting staff to address accounting and financial reporting issues; (iv) we are in the process of implementing an ongoing training program to provide sufficient and appropriate training for our financial reporting and accounting staff, especially training related to U.S. GAAP and SEC reporting requirements.

We cannot assure you that we will be able to continuously implement these measures to effectively remediate our material weaknesses, or that we will not identify any additional material weaknesses or significant deficiencies in the future. For risks and uncertainties related to our internal control, see "Item 3. Key Information—D. Risk Factors—Risks Related to Our Audit Committee Independent Review, Restatement of Our Consolidated Financial Statements, Internal Controls and Related Matters—We identified three material weaknesses in our internal controls over financial reporting as of December 31, 2019, and if we fail to establish and maintain effective internal controls, our ability to report our financial results accurately or to prevent fraud may be adversely affected, and investor confidence and the market price of the ADSs may be adversely affected."

As a company with less than US$1.07 billion in revenue for our last fiscal year, we qualify as an "emerging growth company" pursuant to the JOBS Act. An emerging growth company may take advantage of specified reduced reporting and other requirements that are otherwise applicable generally to public companies. These provisions include exemption from the auditor attestation requirement under Section 404 of the Sarbanes-Oxley Act of 2002, in the assessment of the emerging growth company's internal control over financial reporting.

**Report of the Registered Public Accounting Firm**

This annual report on Form 20-F does not include an attestation report of our independent registered public accounting firm because we qualified as an "emerging growth company" as defined under the JOBS Act as of December 31, 2019.

**Changes in Internal Control over Financial Reporting**

Other than as described above, there were no changes in our internal controls over financial reporting that occurred during the period covered by this annual report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**ITEM 16A.  AUDIT COMMITTEE FINANCIAL EXPERT**

See "Item 6.C. Directors, Senior Management and Employees—Board Practices."

**ITEM 16B.  CODE OF ETHICS**

Our board of directors adopted a code of business conduct and ethics that applies to our directors, officers, employees and advisors in October 2017. We have posted a copy of our code of business conduct and ethics on our website at *www.jianpu.ai.*

**ITEM 16C.  PRINCIPAL ACCOUNTANT FEES AND SERVICES**

The following table sets forth the aggregate fees billed by PricewaterhouseCoopers Zhong Tian LLP and its affiliates, our principal auditor or accountant for 2018 and 2019. We did not pay any other fees to our principal auditor during the periods indicated below.

| | Year Ended December 31, | |
| | 2018 | 2019 |
| | (in US$ thousands) | |
| Audit fees[1] | 1,204 | 2,336 |

Notes:

(1)  "Audit fees" means the aggregate fees billed in each of the fiscal years listed for professional services rendered by our principal auditors for the audit of our annual financial statements.

The policy of our audit committee is to pre-approve all audit and non-audit services provided by PricewaterhouseCoopers Zhong Tian LLP and its affiliates, including audit services, audit-related services, tax services and other services as described above, other than those for *de minimis* services which are approved by the audit committee prior to the completion of the audit.

**ITEM 16D.  EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES**

Not applicable.

**ITEM 16E.  PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS**

On August 24, 2018, our board of directors authorized a share repurchase program, under which we may repurchase up to US$20 million of our ADSs over the following twelve-month period from August 25, 2018 through August 24, 2019. The share repurchase program was publicly announced on August 27, 2018. As of August 24, 2019, the expiration date of the share repurchase program, we had repurchased 4,181,816 of our outstanding ADSs for an aggregate purchase price of approximately US$20 million pursuant to the program.

On February 22, 2019, our board of directors authorized a new share repurchase program, under which we may repurchase up to US$10 million of our ADSs during the following twelve-month period from February 23, 2019 through February 22, 2020. The new share repurchase program was publicly announced on February 25, 2019. As of August 30, 2019, we had repurchased 2,143,154 of our outstanding ADSs for an aggregate purchase price of approximately US$10 million under the program.

123

The table below is a summary of the shares repurchased by us in 2019. All shares were repurchased in the open market pursuant to the share repurchase programs announced on August 27, 2018 and February 25, 2019, respectively, and both share repurchase programs closed in August 2019.

| Period | Total Number of ADSs Purchased[1] | Average Price Paid per ADSs (US$)[1] | Total Number of ADSs Purchased as Part of Share Repurchase Programs[1] | Approximate Dollar Value of ADSs that May Yet Be Purchased Under Share Repurchase Programs (US$, in millions) |
|---|---|---|---|---|
| January 2019 | 923,272 | 4.90 | 923,272 | 15.3 |
| February 2019 | 66,345 | 5.97 | 66,345 | 14.9 |
| March 2019 | 1,040,238 | 5.23 | 1,040,238 | 9.5 |
| April 2019 | 710,967 | 5.06 | 710,967 | 5.9 |
| May 2019 | 669,461 | 4.85 | 669,461 | 2.6 |
| June 2019 | 447,899 | 4.19 | 447,899 | 0.8 |
| July 2019 | 74,841 | 3.78 | 74,841 | 0.5 |
| August 2019 | 142,116 | 3.42 | 142,116 | — |
| **Total** | 4,075,139 | 4.87 | 4,075,139 | — |

Notes:

(1)  Total number of ADSs purchased, average price paid per ADSs and total number of ADSs purchased as part of share repurchase programs do not give retroactive effect to the change in the ratio of ADSs to Class A ordinary shares from two ADSs to five Class A ordinary shares to one ADS to 20 Class A ordinary shares, which became effective on October 30, 2020.

## ITEM 16F.  CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT

Not applicable.

## ITEM 16G.  CORPORATE GOVERNANCE

As a Cayman Islands company listed on the NYSE, we are subject to the NYSE corporate governance listing standards. However, NYSE rules permit a foreign private issuer like us to follow the corporate governance practices of its home country. Certain corporate governance practices in the Cayman Islands, which is our home country, may differ significantly from the NYSE corporate governance listing standards. Section 303A.01 of the NYSE Listed Company Manual requires a listed company to have a majority of independent directors. Section 303A.12(a) of the NYSE Listed Company Manual requires each listed company's chief executive officer to certify to the NYSE each year that he or she is not aware of any violation by the company of NYSE corporate governance listing standards. We currently follow our home country practice in lieu of these requirements. We may also continue to rely on these and other exemptions available to foreign private issuers in the future. As a result, our shareholders may be afforded less protection than they otherwise would under the NYSE corporate governance listing standards applicable to U.S. domestic issuers. See "Item 3. Key Information—D. Risk Factors— Risks Related to Our American Depositary Shares— We are a foreign private issuer within the meaning of the rules under the Exchange Act, and as such we are exempt from certain provisions applicable to United States domestic public companies."

## ITEM 16H.  MINE SAFETY DISCLOSURE

Not applicable.

**PART III**

**ITEM 17.  FINANCIAL STATEMENTS**

We have elected to provide financial statements pursuant to Item 18.

**ITEM 18.  FINANCIAL STATEMENTS**

The consolidated financial statements of Jianpu Technology Inc., its subsidiaries and its consolidated affiliated entities are included at the end of this annual report.

**ITEM 19.  EXHIBITS**

| Exhibit Number | Description of Document |
|---|---|
| 1.1 | Second Amended and Restated Memorandum and Articles of Association of the Registrant, effective October 19, 2017 (incorporated herein by reference to Exhibit 3.2 to the registration statement on Form F-1 filed on October 20, 2017 (File No. 333-221056)) |
| 2.1 | Registrant's Specimen American Depositary Receipt (included in Exhibit 2.3) (incorporated herein by reference to Exhibit 4.1 to the registration statement on Form F-1 filed on November 13, 2017 (File No. 333-221056)) |
| 2.2 | Registrant's Specimen Certificate for Class A ordinary shares (incorporated herein by reference to Exhibit 4.2 to the registration statement on Form F-1 filed on November 3, 2017 (File No. 333-221056)) |
| 2.3 | Form of Deposit Agreement among the Registrant, the depositary and holder of the American Depositary Receipts (incorporated herein by reference to Exhibit 4.3 to the registration statement on Form F-1 filed on November 13, 2017 (File No. 333-221056)) |
| 2.4* | Description of Securities |
| 4.1 | Form of Global Share Plan (incorporated herein by reference to Exhibit 10.1 to the registration statement on Form F-1 filed on October 20, 2017 (File No. 333-221056)) |
| 4.2 | Form of 2017 Incentive Plan (incorporated herein by reference to Exhibit 10.2 to the registration statement on Form F-1 filed on October 20, 2017 (File No. 333-221056)) |
| 4.3 | Form of Indemnification Agreement with the Registrant's directors (incorporated herein by reference to Exhibit 10.3 to the registration statement on Form F-1 filed on October 20, 2017 (File No. 333-221056)) |
| 4.4 | Form of Employment Agreement between the Registrant and an executive officer of the Registrant (incorporated herein by reference to Exhibit 10.4 to the registration statement on Form F-1 filed on October 20, 2017 (File No. 333-221056)) |
| 4.5 | English translation of Transitional Services Agreement between the Registrant and RONG360 (incorporated herein by reference to Exhibit 10.5 to the registration statement on Form F-1 filed on October 20, 2017 (File No. 333-221056)) |

| Exhibit Number | Description of Document |
|---|---|
| 4.6 | English translation of Information Service Cooperation Agreement between the Registrant and RONG360 (incorporated herein by reference to Exhibit 10.6 to the registration statement on Form F-1 filed on November 3, 2017 (File No. 333-221056)) |
| 4.7* | English translation of executed form of Exclusive Purchase Option Agreement, by and among a VIE of the Registrant, its shareholders and a WFOE of the Registrant, as currently in effect, and a schedule of all executed Exclusive Purchase Option Agreements adopting the same form in respect of each of the VIEs of the Registrant |
| 4.8* | English translation of executed form of Equity Pledge Agreement by and among a VIE of the Registrant, each of its shareholders and a WFOE of the Registrant, as currently in effect, and a schedule of all executed Equity Pledge Agreements adopting the same form in respect of each of the VIEs of the Registrant |
| 4.9* | English translation of executed form of Power of Attorney from the shareholders of a VIE of the Registrant to a WFOE of the Registrant, as currently in effect, and a schedule of all executed Power of Attorneys adopting the same form in respect of each of the VIEs of the Registrant |
| 4.10* | English translation of executed form of Exclusive Business Cooperation Agreement by and between a VIE of the Registrant and a WFOE of the Registrant, as currently in effect, and a schedule of all executed Exclusive Business Cooperation Agreements adopting the same form in respect of each of the VIEs of the Registrant |
| 4.11 | English translation of Baidu KA Online Promotion Service Framework Contract dated January 1, 2017 between Beijing Ronglian Shiji Information Technology Co., Ltd. and Beijing Wushuang Technology Co., Ltd. (incorporated herein by reference to Exhibit 10.11 to the registration statement on Form F-1 filed on November 3, 2017 (File No. 333-221056)) |
| 4.12 | English translation of the Agreement on Change of Contracting Parties dated October 18, 2017 by and between Beijing Ronglian Shiji Information Technology Co., Ltd., Beijing Wushuang Technology Co., Ltd. and Beijing Rongqiniu Information Technology Co., Ltd. (incorporated herein by reference to Exhibit 10.12 to the registration statement on Form F-1 filed on November 3, 2017 (File No. 333-221056)) |
| 4.13 | Share Purchase Agreement, dated November 3, 2017, between the Registrant and Torch International Investment Ltd. (incorporated herein by reference to Exhibit 10.13 to the registration statement on Form F-1 filed on November 3, 2017 (File No. 333-221056)) |
| 4.14 | Share Purchase Agreement, dated November 3, 2017, between the Registrant and Rosy Parade Limited (incorporated herein by reference to Exhibit 10.14 to the registration statement on Form F-1 filed on November 3, 2017 (File No. 333-221056)) |

Table of Contents

| Exhibit Number | Description of Document |
| --- | --- |
| 4.15 | Share Purchase Agreement, dated November 3, 2017, between the Registrant and MJM International Limited (incorporated herein by reference to Exhibit 10.15 to the registration statement on Form F-1 filed on November 3, 2017 (File No. 333-221056)) |
| 4.16 | Share Purchase Agreement, dated November 3, 2017, between the Registrant and Article Light Limited (incorporated herein by reference to Exhibit 10.16 to the registration statement on Form F-1 filed on November 3, 2017 (File No. 333-221056)) |
| 8.1* | Principal subsidiaries of the Registrant |
| 11.1 | Code of Business Conduct and Ethics of the Registrant (incorporated herein by reference to Exhibit 99.1 to the registration statement on Form F-1 filed on October 20, 2017 (File No. 333-221056)) |
| 12.1* | CEO Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 12.2* | CFO Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 13.1** | CEO Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 13.2** | CFO Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 15.1* | Consent of Fangda Partners |
| 15.2* | Consent of Pricewaterhousecoopers Zhong Tian LLP |
| 101.INS* | XBRL Instance Document |
| 101.SCH* | XBRL Taxonomy Extension Schema Document |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | XBRL Taxonomy Extension Presentation Linkbase Document |

\*    Filed with this annual report on Form 20-F
\*\*   Furnished with this annual report on Form 20-F

Table of Contents

**SIGNATURES**

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and that it has duly caused and authorized the undersigned to sign this annual report on its behalf.

**Jianpu Technology Inc.**

By:     /s/ Daqing (David) Ye
Name:   Daqing (David) Ye
Title:  Chief Executive Officer

Date: April 30, 2021

128

**JIANPU TECHNOLOGY INC.**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets as of December 31, 2018 and 2019 | F-3 |
| Consolidated Statements of Comprehensive Loss for the Years Ended December 31, 2017, 2018 and 2019 | F-4 |
| Consolidated Statements of Changes in Invested/Shareholders' Equity for the Years Ended December 31, 2017, 2018 and 2019 | F-5 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2017, 2018 and 2019 | F-6 |
| Notes to Consolidated Financial Statements | F-7 |

F-1

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Shareholders of Jianpu Technology Inc.

*Opinion on the Financial Statements*

We have audited the accompanying consolidated balance sheets of Jianpu Technology Inc. and its subsidiaries (the "Company") as of December 31, 2019 and 2018, and the related consolidated statements of comprehensive loss, of changes in invested/shareholders' equity and of cash flows for each of the three years in the period ended December 31, 2019, including the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2019 in conformity with accounting principles generally accepted in the United States of America.

*Restatement of Previously Issued Financial Statements*

As discussed in Note 2 to the consolidated financial statements, the Company has restated its 2018 consolidated financial statements to correct misstatements.

*Basis for Opinion*

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits of these consolidated financial statements in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ PricewaterhouseCoopers Zhong Tian LLP
Beijing, the People's Republic of China
April 30, 2021

We have served as the Company's or its predecessor's auditor since 2016.

F-2

**JIANPU TECHNOLOGY INC.**
**CONSOLIDATED BALANCE SHEETS**
**(All amounts in thousands, except for share and per share data)**

| | As of December 31, | | |
|---|---|---|---|
| | 2018 | 2019 | 2019 |
| | RMB (As Restated) | RMB | US$ Note 3(f) |
| **ASSETS** | | | |
| **Current assets:** | | | |
| Cash and cash equivalents | 1,270,001 | 694,910 | 99,818 |
| Restricted cash and time deposits | 142,411 | 249,770 | 35,877 |
| Short-term investment | 78,462 | — | — |
| Accounts receivable, net (including amounts billed through RONG360 Inc. ("RONG360") of RMB134,966 and RMB3,549 as of December 31, 2018 and 2019, respectively) | 444,199 | 345,525 | 49,632 |
| Amount due from related party | — | 7,082 | 1,017 |
| Prepayments and other current assets | 160,131 | 118,423 | 17,010 |
| **Total current assets** | **2,095,204** | **1,415,710** | **203,354** |
| **Non-current assets:** | | | |
| Property and equipment, net | 52,322 | 36,686 | 5,270 |
| Intangible assets, net | 115,037 | 27,061 | 3,887 |
| Goodwill | 147,296 | 12,697 | 1,824 |
| Restricted cash, time deposit and investment | — | 124,407 | 17,869 |
| Other non-current assets | 35,276 | 45,160 | 6,487 |
| **Total non-current assets** | **349,931** | **246,011** | **35,337** |
| **Total assets** | **2,445,135** | **1,661,721** | **238,691** |
| **LIABILITIES, MEZZANINE EQUITY AND SHAREHOLDERS' EQUITY** | | | |
| **Current liabilities:** | | | |
| Short-term borrowings | 130,000 | 60,000 | 8,618 |
| Accounts payable (including amounts of the consolidated variable interest entities ("VIEs") of RMB4,256 and RMB16,720 as of December 31, 2018 and 2019, respectively. Note 1(e)) | 201,543 | 184,318 | 26,476 |
| Advances from customers (including amounts of the consolidated VIEs of RMB21,717 and RMB164 as of December 31, 2018 and 2019, respectively. Note 1(e)) | 115,597 | 44,000 | 6,320 |
| Tax payable (including amounts of the consolidated VIEs of RMB15,116 and RMB19,205 as of December 31, 2018 and 2019, respectively. Note 1(e)) | 39,446 | 22,168 | 3,184 |
| Amount due to related party | 72,750 | 34,310 | 4,928 |
| Accrued expenses and other current liabilities (including amounts of the consolidated VIEs of RMB17,963 and RMB135,883 as of December 31, 2018 and 2019, respectively. Note 1(e)) | 144,478 | 224,018 | 32,178 |
| **Total current liabilities** | **703,814** | **568,814** | **81,704** |
| **Non-current liabilities:** | | | |
| Deferred tax liabilities | 16,865 | 5,801 | 833 |
| Other non-current liabilities (including amounts of the consolidated VIEs of nil and RMB408 as of December 31, 2018 and 2019, respectively. Note 1(e)) | 20,538 | 15,145 | 2,177 |
| **Total non-current liabilities** | **37,403** | **20,946** | **3,010** |
| **Total liabilities** | **741,217** | **589,760** | **84,714** |
| **Commitments and contingencies (Note 24)** | | | |
| **Mezzanine equity:** | | | |
| Redeemable noncontrolling interest | — | 5,556 | 798 |
| **Shareholders' equity:** | | | |
| Ordinary shares: US$0.0001 par value, 428,063,797 shares (including 325,592,002 Class A ordinary shares, and 102,471,795 Class B ordinary shares) issued and 415,246,557 shares (including 312,774,762 Class A ordinary shares and 102,471,795 Class B ordinary shares) outstanding as of December 31, 2018, and 430,463,797 shares (including 333,992,002 Class A ordinary shares, and 96,471,795 Class B ordinary shares) issued and 422,683,735 shares (including 326,211,940 Class A ordinary shares, and 96,471,795 Class B ordinary shares) outstanding as of December 31, 2019, respectively. | 284 | 286 | 41 |
| Treasury stock, at cost (12,817,240 and 7,780,062 shares held as of December 31, 2018 and December 31, 2019, respectively) | (70,113) | (102,222) | (14,683) |
| Additional paid-in capital | 1,959,655 | 1,902,105 | 273,220 |
| Accumulated losses | (339,325) | (792,985) | (113,905) |
| Statutory reserves | — | 1,900 | 273 |
| Accumulated other comprehensive income | 37,750 | 52,308 | 7,513 |
| **Total Jianpu's shareholders' equity** | **1,588,251** | **1,061,392** | **152,459** |
| Noncontrolling interests | 115,667 | 5,013 | 720 |
| **Total shareholders' equity** | **1,703,918** | **1,066,405** | **153,179** |
| **Total liabilities, mezzanine equity and shareholders' equity** | **2,445,135** | **1,661,721** | **238,691** |

The accompanying notes are an integral part of these consolidated financial statements.

**JIANPU TECHNOLOGY INC.**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS**
**(All amounts in thousands, except for share and per share data)**

| | For the Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2019 |
| | RMB | RMB (As Restated) | RMB | US$ Note 3(f) |
| **Revenues:** | | | | |
| Recommendation services: | | | | |
| Loans (including revenues from related party of RMB102,997, RMB105,492 and RMB31,980 for the years ended December 31, 2017, 2018 and 2019, respectively) | 1,119,456 | 1,015,407 | 666,307 | 95,709 |
| Credit cards | 228,905 | 689,822 | 585,993 | 84,173 |
| Total recommendation services | 1,348,361 | 1,705,229 | 1,252,300 | 179,882 |
| Advertising, marketing and other services (including revenues from related party of nil, RMB13,405 and RMB6,858 for the years ended December 31, 2017, 2018 and 2019, respectively) | 97,412 | 216,647 | 183,427 | 26,348 |
| **Total revenues** | **1,445,773** | **1,921,876** | **1,435,727** | **206,230** |
| Cost of revenues | (143,828) | (194,492) | (133,968) | (19,243) |
| **Gross profit** | **1,301,945** | **1,727,384** | **1,301,759** | **186,987** |
| **Operating expenses:** | | | | |
| Sales and marketing (including expenses from related party of nil, RMB51,753 and RMB21,099 for the years ended December 31, 2017, 2018 and 2019, respectively) | (1,227,896) | (1,486,399) | (1,199,346) | (172,275) |
| Research and development | (153,905) | (241,270) | (272,343) | (39,120) |
| General and administrative | (93,718) | (178,371) | (100,896) | (14,493) |
| Impairment loss | — | — | (254,683) | (36,583) |
| Penalties | — | — | (30,000) | (4,309) |
| **Loss from operations** | **(173,574)** | **(178,656)** | **(555,509)** | **(79,793)** |
| Net interest income | — | 5,037 | 5,100 | 733 |
| Others, net | (169) | 9,360 | 11,785 | 1,693 |
| **Loss before income tax** | **(173,743)** | **(164,259)** | **(538,624)** | **(77,367)** |
| Income tax (expenses)/benefits | (28,382) | 4,473 | 8,005 | 1,150 |
| **Net loss** | **(202,125)** | **(159,786)** | **(530,619)** | **(76,217)** |
| Less: net income/(loss) attributable to noncontrolling interests | — | 4,829 | (78,859) | (11,327) |
| **Net loss attributable to Jianpu's shareholders** | **(202,125)** | **(164,615)** | **(451,760)** | **(64,890)** |
| **Other comprehensive (loss)/income, net** | | | | |
| Foreign currency translation adjustments | (21,170) | 59,658 | 14,685 | 2,109 |
| **Total other comprehensive (loss)/income** | **(21,170)** | **59,658** | **14,685** | **2,109** |
| **Total comprehensive loss** | **(223,295)** | **(100,128)** | **(515,934)** | **(74,108)** |
| Less: total comprehensive income/(loss) attributable to noncontrolling interests | — | 5,568 | (78,732) | (11,309) |
| **Total comprehensive loss attributable to Jianpu's shareholders** | **(223,295)** | **(105,696)** | **(437,202)** | **(62,799)** |
| **Net loss per share attributable to Jianpu's shareholders** | | | | |
| Basic and diluted | (0.57) | (0.39) | (1.07) | (0.15) |
| **Net loss per ADS attributable to Jianpu's shareholders[1]** | | | | |
| Basic and diluted | (11.44) | (7.89) | (21.48) | (3.09) |
| **Weighted average number of shares** | | | | |
| Basic and diluted | 353,452,309 | 417,315,644 | 420,575,827 | 420,575,827 |

Notes:

(1) Net loss per ADS attributable to Jianpu's shareholders has been retrospectively adjusted for the ADS ratio change that were effective on October 30, 2020 as detailed in Note 25(c).

The accompanying notes are an integral part of these consolidated financial statements.

F-4

**JIANPU TECHNOLOGY INC.**
**CONSOLIDATED STATEMENTS OF CHANGES IN INVESTED/SHAREHOLDERS' EQUITY**
**(All amounts in thousands, except for share and per share data)**

| | Ordinary shares | | Treasury stock | | Additional paid in capital | Statutory reserves | Accumulated other comprehensive (loss)/income | Accumulated losses | RONG360's investment | Noncontrolling interests | Total invested/ shareholders' equity |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount RMB | Shares | Amount RMB | RMB | RMB | RMB | RMB | RMB | RMB | RMB |
| **Balance at December 31, 2016** | — | — | — | — | — | — | — | — | 52,607 | — | 52,607 |
| RONG360's contribution | — | — | — | — | — | — | — | — | 93,431 | — | 93,431 |
| Share-based compensation(Note 18) | — | — | — | — | 106,039 | — | — | — | 1,727 | — | 107,766 |
| Net loss | — | — | — | — | — | — | — | (174,710) | (27,415) | — | (202,125) |
| Completion of reorganization(Note 1(b)) | 345,541,350 | 229 | — | — | 120,121 | — | — | — | (120,350) | — | — |
| Initial working capital contributed by RONG360 | — | — | — | — | 150,000 | — | — | — | — | — | 150,000 |
| Issuance of ordinary shares for the IPO and the concurrent private placements | 68,750,000 | 46 | — | — | 1,357,907 | — | — | — | — | — | 1,357,953 |
| Share-based awards to employees of non-platform business (Note 18) | — | — | — | — | 8,851 | — | — | — | — | — | 8,851 |
| Deemed dividends to RONG360 in connection with the share-based awards to employees of non-platform business (Note 18) | — | — | — | — | (8,851) | — | — | — | — | — | (8,851) |
| Currency translation adjustment | — | — | — | — | — | — | (21,170) | — | — | — | (21,170) |
| **Balance at December 31, 2017** | **414,291,350** | **275** | — | — | **1,734,067** | — | **(21,170)** | **(174,710)** | — | — | **1,538,462** |
| Share-based compensation(Note 18) | — | — | — | — | 130,659 | — | — | — | — | — | 130,659 |
| Net loss | — | — | — | — | — | — | — | (164,615) | — | 4,829 | (159,786) |
| Issuance of ordinary shares for business combination (Note 9) | 5,772,447 | 4 | — | — | 88,177 | — | — | — | — | — | 88,181 |
| Issuance of options for business combination (Note 9) | — | — | — | — | 6,052 | — | — | — | — | — | 6,052 |
| Issuance of ordinary shares reserved for future exercise of share-based awards | 8,000,000 | 5 | (8,000,000) | (5) | — | — | — | — | — | — | — |
| Share repurchase(Note 20) | — | — | (5,624,578) | (70,109) | — | — | — | — | — | — | (70,109) |
| Exercise of share-based awards(Note 18) | — | — | 807,338 | 1 | 700 | — | — | — | — | — | 701 |
| Share-based awards to employees of non-platform business (Note 18) | — | — | — | — | 17,314 | — | — | — | — | — | 17,314 |
| Deemed dividends to shareholders in connection with the share-based awards to employees of non-platform business (Note 18) | — | — | — | — | (17,314) | — | — | — | — | — | (17,314) |
| Currency translation adjustment | — | — | — | — | — | — | 58,920 | — | — | 738 | 59,658 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Noncontrolling interests arising from business combinations (Note 9) | | | | | | | | | | 110,100 | 110,100 |
| **Balance at December 31, 2018 (As Restated)** | **428,063,797** | **284** | **(12,817,240)** | **(70,113)** | **1,959,655** | **—** | **37,750** | **(339,325)** | **—** | **115,667** | **1,703,918** |
| Share-based compensation(Note 18) | — | — | — | — | 6,390 | — | — | — | — | — | 6,390 |
| Net loss | — | — | — | — | — | — | — | (451,760) | — | (78,631) | (530,391) |
| Transactions with noncontrolling shareholders(Note 9) | 2,400,000 | 2 | — | — | 28,722 | — | — | — | — | (32,159) | (3,435) |
| Share repurchase(Note 20) | — | — | (10,187,848) | (134,616) | — | — | — | — | — | — | (134,616) |
| Exercise of share-based awards(Note 18) | — | — | 15,225,026 | 102,507 | (92,662) | — | — | — | — | — | 9,845 |
| Share-based awards to employees of non-platform business (Note 18) | — | — | — | — | 1,929 | — | — | — | — | — | 1,929 |
| Deemed dividends to shareholders in connection with the share-based awards to employees of non-platform business (Note 18) | — | — | — | — | (1,929) | — | — | — | — | — | (1,929) |
| Statutory reserves | — | — | — | — | — | 1,900 | — | (1,900) | — | — | — |
| Currency translation adjustment | — | — | — | — | — | — | 14,558 | — | — | 136 | 14,694 |
| **Balance at December 31, 2019** | **430,463,797** | **286** | **(7,780,062)** | **(102,222)** | **1,902,105** | **1,900** | **52,308** | **(792,985)** | **—** | **5,013** | **1,066,405** |

The accompanying notes are an integral part of these consolidated financial statements.

F-5

**JIANPU TECHNOLOGY INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(All amounts in thousands, except for share and per share data)**

| | For the Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2019 | 2019 |
| | RMB | RMB (As Restated) | RMB | US$ Note 3(f) |
| **Cash flows from operating activities:** | | | | |
| Net loss | (202,125) | (159,786) | (530,619) | (76,217) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | |
| Depreciation and amortization expenses | 5,769 | 25,291 | 36,478 | 5,240 |
| Share-based compensation expenses | 107,766 | 130,659 | 6,390 | 918 |
| Allowance for doubtful accounts | — | 1,709 | 28,316 | 4,067 |
| Investment income | — | (576) | (2,248) | (323) |
| Impairment loss | — | — | 254,683 | 36,583 |
| Foreign exchange gain and loss | — | (2,869) | (65) | (9) |
| Deferred income tax | — | 1,417 | (16,793) | (2,412) |
| Loss on disposal of property and equipment | — | — | 1,111 | 160 |
| Changes in operating assets and liabilities: | | | | |
| Accounts receivable | (124,554) | (261,386) | 73,291 | 10,526 |
| Amount due from related party | 21,128 | — | (7,082) | (1,017) |
| Prepayments and other current assets | (110,612) | 7,792 | 46,380 | 6,662 |
| Other non-current assets | (6,808) | (1,279) | 5,816 | 835 |
| Accounts payable | 136,217 | 16,191 | (11,184) | (1,606) |
| Advance from customers | 53,389 | 31,190 | (71,734) | (10,304) |
| Amount due to related party | 35,427 | 30,595 | (38,391) | (5,515) |
| Tax payable | 16,027 | 21,240 | (17,294) | (2,485) |
| Accrued expenses and other current liabilities | 40,277 | 66,447 | 48,392 | 6,951 |
| Other non-current liabilities | — | 20,538 | (6,284) | (903) |
| **Net cash used in operating activities** | **(28,099)** | **(72,827)** | **(200,837)** | **(28,849)** |
| **Cash flows from investing activities:** | | | | |
| Proceeds from maturity of short-term investments and restricted investment | — | 86,649 | 374,292 | 53,764 |
| Purchases of short-term investments and restricted investment | — | (88,350) | (331,490) | (47,616) |
| Purchases of property and equipment | (18,823) | (41,835) | (16,366) | (2,351) |
| Proceeds from sale of property and equipment | — | — | 11 | 2 |
| Cash paid for long-term investments | — | (27,921) | (3,872) | (556) |
| Cash paid for business combination, net of cash acquired (Note 9) | — | (109,570) | (24,584) | (3,531) |
| Transfer to restricted time deposits | — | (142,411) | (90,775) | (13,039) |
| Maturity of restricted time deposits | — | — | 45,327 | 6,511 |
| **Net cash used in investing activities** | **(18,823)** | **(323,438)** | **(47,457)** | **(6,816)** |
| **Cash flows from financing activities:** | | | | |
| Proceeds from issuance of ordinary shares, net | 1,368,472 | — | — | — |
| Initial working capital contributed by RONG360 | 150,000 | — | — | — |
| Funding from RONG360 | 93,431 | — | — | — |
| Proceeds from short-term borrowings | — | 130,000 | 137,082 | 19,691 |
| Repayment of short-term borrowings | — | — | (207,082) | (29,745) |
| Proceeds from employees exercising stock options | — | 508 | 10,017 | 1,439 |
| Share repurchase | — | (70,109) | (134,616) | (19,336) |
| Purchase of noncontrolling interests | — | — | (3,435) | (493) |
| **Net cash provided by/(used in) financing activities** | **1,611,903** | **60,399** | **(198,034)** | **(28,444)** |
| Effect of exchange rate changes on cash and cash equivalents and restricted cash | (21,170) | 62,056 | 9,709 | 1,395 |
| **Net increase/(decrease) in cash and cash equivalents and restricted cash** | **1,543,811** | **(273,810)** | **(436,619)** | **(62,714)** |
| **Cash and cash equivalents and restricted cash at beginning of the year** | **—** | **1,543,811** | **1,270,001** | **182,424** |
| Including: | | | | |
| Cash and cash equivalents at beginning of the year | — | 1,543,811 | 1,270,001 | 182,424 |
| Restricted cash at beginning of the year | — | — | — | — |
| **Cash and cash equivalents and restricted cash at end of the year** | **1,543,811** | **1,270,001** | **833,382** | **119,710** |
| Including: | | | | |
| Cash and cash equivalents at end of the year | 1,543,811 | 1,270,001 | 694,910 | 99,818 |
| Restricted cash at end of the year | — | — | 138,472 | 19,892 |
| **Supplemental schedule of non-cash investing and financing activities :** | | | | |
| Deemed dividends to RONG360 in connection with the share-based awards granted to employees of non-platform business (Note 18) | 8,851 | 17,314 | 1,929 | 277 |

| | | | | |
|---|---|---|---|---|
| Consideration paid in ordinary shares and options in business combinations (Note 9) | — | 94,233 | — | — |
| Liability assumed as consideration of acquisition (Note 9) | — | — | 34,081 | 4,895 |

The accompanying notes are an integral part of these consolidated financial statements.

**JIANPU TECHNOLOGY INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(All amounts in thousands, except for share and per share data)**

## 1. Nature of operations and reorganization

### (a)        Nature of operations

Jianpu Technology Inc. ("Jianpu" or the "Company") is a holding company and conducts its business mainly through its subsidiaries and variable interest entities ("VIEs"). Jianpu, its subsidiaries, and VIEs together are referred to as the "Group". The Group is primarily engaged in the operation of its platform for providing online discovery and recommendation services of financial products. The individual users can have access to financial products through the platform, including consumer and other loans, credit cards, and wealth management products. The Group recommends loans and credit cards to individual users and assists the financial service providers in targeting users with specific characteristics based on the users' financial needs and credit profile, as well as the products offerings and risk appetite of the financial service providers ("Recommendation Services"). The Group also provides advertising, marketing and other services primarily to financial service providers. All these services together refer to as "Platform Business". The Group's principal operations and geographic markets are in the People's Republic of China ("PRC").

### (b)        Reorganization

Jianpu is an exempted company with limited liability incorporated in the Cayman Islands on June 1, 2017 in connection with a group reorganization (the "Reorganization") of RONG360. The Platform Business was carried out by various subsidiaries and a VIE of RONG360 (the "Predecessor Operations") prior to the Reorganization. In connection with the Reorganization, the Platform Business was transferred to the Group by the end of October 2017. The technology-enabled online lending business (the "non-platform business") was continued to be carried by RONG360 through its relevant subsidiaries and VIEs after the Reorganization. The Reorganization was approved by the Board of Directors and a restructuring framework agreement was entered into by the Group, RONG360, and the shareholders of RONG360 on August 11, 2017.

As of December 31, 2016, the corporate structure of RONG360 prior to the initiation of the Reorganization was as follows:

*Corporate structure of RONG360 as of December 31, 2016*

| | Date of incorporation | Place of incorporation | Percentage of direct or indirect economic interest | Principal activities |
|---|---|---|---|---|
| **Parent:** | | | | |
| RONG360 Inc. | February 21, 2012 | The Cayman Islands | | Investment holding |
| **Wholly owned subsidiaries of RONG360:** | | | | |
| RONG360 (Hong Kong) Limited ("RONG360 HK") | February 29, 2012 | Hong Kong | 100% | Investment holding |
| Beijing Ronglian Shiji Information Technology Co. Limited ("RLSJ") | June 25, 2012 | PRC | 100% | Platform Business and technology-enabled online lending business |
| Tianjin Rongshiji Information Technology Co. Limited | September 25, 2012 | PRC | 100% | Platform Business and technology-enabled online lending business |
| **VIE of RONG360:** | | | | |
| Beijing Rongshiji Information Technology Co. Limited ("RSJ") | November 10, 2011 | PRC | 100% | Platform Business and technology-enabled online lending business |

The Group has completed the steps of Reorganization as described below:

F-7

*Establishment of Jianpu, its subsidiaries and VIE in the Reorganization*

The ownership structure of the subsidiaries and VIE of the Group has been established during the Reorganization as below. The Group was a wholly owned subgroup of RONG360 upon completion of the Reorganization in October 2017 and as of December 31, 2017.

| | Date of incorporation | Place of incorporation | Percentage of direct or indirect economic interest | Principal activities |
|---|---|---|---|---|
| **The Company:** | | | | |
| Jianpu | June 1, 2017 | The Cayman Islands | | Investment holding |
| **Wholly owned subsidiaries of the Company:** | | | | |
| Jianpu (Hong Kong) Limited ("Jianpu HK") | June 19, 2017 | Hong Kong | 100% | Investment holding |
| Beijing Rongqiniu Information Technology Co., Ltd. ("RQN") | August 21, 2017 | PRC | 100% | Platform Business |
| **VIE of the Company:** | | | | |
| Beijing Rongdiandian Information Technology Co., Ltd. ("RDD") | March 3, 2017 | PRC | 100% | Platform Business |

The major reorganization steps are described below:

(1)  Jianpu as the holding company for the Group was set up by RONG360 as a wholly owned subsidiary in June 2017.

(2)  Jianpu established a wholly owned subsidiary, Jianpu HK, in June 2017.

(3)  RDD was established in March 2017. RQN was established by RLSJ and RONG360 HK in August 2017. All equity interests in RQN held by RLSJ and RONG360 HK were transferred to Jianpu HK subsequently.

(4)  RQN entered into a series of contractual arrangements with RDD and its then shareholders, i.e., certain founders and family member of a founder of RONG 360, through which Jianpu has become the ultimate primary beneficiary of RDD. Refer to Note 1(c) for more detailed information.

*Transfer of assets and liabilities relating to Platform Business to the Group*

Pursuant to a series of agreements entered into by the Group's entities and RONG360 group entities in August and September 2017 in connection with the Reorganization, all operating assets and liabilities relating to the operation of the Platform Business were transferred from the Predecessor Operations to the Group as capital contribution, along with the establishment of Group's entities as described above.

The historical funding provided by RONG360 for the Platform Business is deemed and presented as a contribution to the Group from RONG360 in the consolidated financial statements.

F-8

*Transitional services arrangement*

In September 2017, a transitional services agreement between the Group entities and Predecessor Operations entities was entered into with respect to various ongoing relationships between the Group and the Predecessor Operations entities. Pursuant to the transitional services agreement, the Group entities, during the transitional period which is initially 12 months after the effective date of the agreement and have been extended by mutual agreement, provide the Predecessor Operations entities with various corporate support services, including operational, administrative, human resources, legal, accounting and internal control support. The Predecessor Operations entities provide the Group entities with various support for these employees, business contracts and other business resources relating to the Platform Business during the transitional period. Furthermore, before the registration procedure of the title transfer of all intellectual property rights relating to the Platform Business from the Predecessor Operations entities to the Group entities is completed, Predecessor Operations entities grant the Group entities a license to use these rights.

Subsequent to the transfer of all operating assets and liabilities relating to the operation of the Platform Business to the Group, the key employees, business contracts and operations relating to the Platform Business were transferred to the Group. The Reorganization was completed by the end of October 2017.

*Basis of Presentation for the Reorganization*

Immediately before and after the Reorganization, all the legal entities involved in the Reorganization are ultimately controlled by RONG360. Since the Group and the Predecessor Operations were under common control, the accompanying consolidated financial statements include the assets, liabilities, revenue, expenses and cash flows that were directly attributable to the Predecessor Operations for all periods presented prior to the Reorganization. However, such presentation may not necessarily reflect the results of operations, financial position and cash flows if the Group had actually existed on a stand-alone basis during the periods presented prior to the Reorganization.

The assets and liabilities had been stated at historical carrying amounts. Only those assets and liabilities that were specifically identifiable to the Platform Business were included in the Group's consolidated balance sheets. Income tax liability was calculated on a separate return basis as if the Group had filed a separate tax return. The Group's statements of comprehensive loss consisted all the revenues, costs and expenses of the Platform Business, including allocations to the cost of revenues, sales and marketing expenses, research and development expenses, and general and administrative expenses, which were incurred by RONG360 but related to the Platform Business prior to the Reorganization. These allocated costs and expenses were primarily related to workplace resources, information technology supports and certain corporate functions, including senior management, finance, legal and human resources, as well as share-based compensation expenses. These allocations were based on proportional cost allocation by considering proportion of headcount, transaction volume, among other things, attributable to the Group and were made on a basis considered reasonable by management.

The following table sets forth the cost of revenues, sales and marketing expenses, research and development expenses, and general and administrative expenses allocated from RONG360 for all periods presented prior to the Reorganization:

|  | 2017 |
|---|---|
|  | RMB |
| Cost of revenues | 8,081 |
| Sales and marketing expenses | 25,049 |
| Research and development expenses | 29,940 |
| General and administrative expenses | 11,882 |
| Total | 74,952 |

The Platform Business was operated within RONG360's corporate cash management program for all periods presented prior to the Reorganization. For purposes of presentation in the consolidated statements of cash flows, the cash flow from RONG360 to support the Platform Business is presented as funding from RONG360, which is included in cash flows from financing activities. Funding from RONG360 as disclosed under cash flows from financing activities also reflected the changes in contribution from RONG360 as presented in the consolidated statements of changes in invested/shareholders' equity.

F-9

(c)        **Major subsidiaries, VIEs and subsidiary of VIEs**

As of December 31, 2019, the Company's major subsidiaries, consolidated VIEs and subsidiary of VIEs are as follows:

| | Date of incorporation | Place of incorporation | Percentage of direct or indirect economic interest | Principal activities |
|---|---|---|---|---|
| **The Company:** | | | | |
| Jianpu | June 1, 2017 | The Cayman Islands | | Investment holding |
| **Major subsidiaries of the Company:** | | | | |
| Jianpu (Hong Kong) Limited | June 19, 2017 | Hong Kong | 100% | Investment holding |
| Beijing Rongqiniu Information Technology Co., Ltd. | August 21, 2017 | PRC | 100% | Platform Business |
| Databook Tech Ltd.(Databook Tech Ltd. and its subsidiaries and VIE collectively refer to "Databook") | Acquired in June 2018 (Note 9) | The Cayman Islands | 74.61% | Platform Business |
| Databook (HK) Limited. | Acquired in June 2018 (Note 9) | Hong Kong | 74.61% | Platform Business |
| Hangzhou Magnet Technology Co., Ltd. | Acquired in June 2018 (Note 9) | PRC | 74.61% | Platform Business |
| Beijing Rongsanliuling Information Technology Co., Ltd. | November 5, 2018 | PRC | 100% | Platform Business |
| CC Information Limited | Acquired in August 2019 | Hong Kong | 55% | Platform Business |
| **Major VIEs of the Company:** | | | | |
| Beijing Rongdiandian Information Technology Co., Ltd. | March 3, 2017 | PRC | 100% | Platform Business |
| Hangzhou Scorpion Technology Co., Ltd. | Acquired in June 2018 (Note 9) | PRC | 74.61% | Platform Business |
| Beijing Kartner Information Technology Co., Ltd. ("KTN") | Acquired in October 2018 (Note 9) | PRC | 100% | Platform Business |
| Beijing Guangkezhixun Information Technology Co., Ltd. | July 31, 2019 | PRC | 100% | Platform Business |
| **Subsidiary of VIE:** | | | | |
| Shanghai Anguo Insurance Brokerage Co., Ltd. ("Anguo") | Acquired in December 2019 (Note 9) | PRC | 100% | Platform Business |

(d)        **Variable interest entities**

In order to comply with the PRC laws and regulations which prohibit or restrict foreign control of companies involved in provision of internet content, the Group operates its websites and carries out other restricted businesses in the PRC through certain PRC domestic companies, whose equity interests are held by certain management members or family members of founders as nominee shareholders. The Group obtained control over these PRC domestic companies through certain PRC subsidiaries, by entering into a series of contractual arrangements with these PRC domestic companies and their nominee shareholders. To comply with PRC laws and regulations which prohibit or restrict foreign ownership of internet content, the nominee shareholders are legal owners of an entity. However, the rights of those nominee shareholders have been transferred to the Group's relevant PRC subsidiaries through such contractual arrangements. These contractual arrangements include exclusive purchase option agreements, exclusive business cooperation agreement, equity pledge agreement and power of attorney. Management concluded that the Group's relevant PRC subsidiaries, through the contractual arrangements, have the power to direct the activities that most significantly impact economic performance of these PRC domestic companies, bear the risks of and enjoy the rewards normally associated with ownership of these PRC domestic companies. Therefore, these PRC domestic companies are VIEs of the Group's relevant PRC subsidiaries, of which the Company is the ultimate primary beneficiary. As such, the Group consolidated the financial statements of these PRC domestic companies.

The following is a summary of the contractual arrangements that the Company's subsidiaries entered into with VIEs and their nominee shareholders:

·    *Exclusive Purchase Option Agreement*

The nominee shareholders of the VIEs have granted the Company's relevant PRC subsidiaries the exclusive and irrevocable option to purchase from the nominee shareholders, to the extent permitted under PRC laws and regulations, part or all of their equity interests in these entities at the lowest price permitted by the laws of the PRC applicable at the time of exercise. The nominee shareholders of the VIEs have agreed the Company's relevant PRC subsidiaries to grant the exclusive and irrevocable option to purchase, to the extent permitted under PRC laws and regulations, part or all of VIEs' assets at the price equal to the higher one of net book value of the purchased assets and the lowest price permitted by the applicable laws of the PRC. The Company's relevant PRC subsidiaries may exercise such options at any time. In addition, the VIEs and their nominee shareholders have agreed that without prior written consent of the Company's relevant PRC subsidiaries, they shall not sell, transfer, mortgage or dispose of any assets or equity interests of the VIEs or declare any dividend.

·    *Exclusive Business Cooperation Agreement*

The Company's relevant PRC subsidiaries and the VIEs entered into exclusive business cooperation agreement under which the VIEs engage the Company's relevant PRC subsidiaries as their exclusive provider of technical services and business consulting services. The VIEs shall pay to the Company's relevant PRC subsidiaries service fees, which is determined by the Company's relevant PRC subsidiaries at their sole discretion. The Company's relevant PRC subsidiaries shall have exclusive and proprietary rights and interests in all rights, ownership, interests and intellectual properties arising from the performance of the agreement. During the term of the agreement, the VIEs shall not accept any consultations and/or services provided by any third party and shall not cooperate with any third party for the provision of identical or similar services without prior consent of the Company's relevant PRC subsidiaries.

·    *Equity Pledge Agreement*

Pursuant to the relevant equity pledge agreement, the nominee shareholders of the VIEs have pledged all of their equity interests in the VIEs to the Company's relevant PRC subsidiaries as collateral for all of the VIEs' payments due to the Company's relevant PRC subsidiaries and to secure the VIEs' obligations under the exclusive business cooperation agreement, exclusive purchase option agreement and power of attorney. The nominee shareholders shall not transfer or assign the equity interests, the rights and obligations in the equity pledge agreement or create or permit to create any pledges which may have an adverse effect on the rights or benefits of the Company's relevant PRC subsidiaries without their written consent. The Company's relevant PRC subsidiaries are entitled to transfer or assign in full or in part the equity interests pledged. In the event of default, the Company's relevant PRC subsidiaries as the pledgee, will be entitled to request immediate payment of the unpaid service fee and other amounts due to the Company's relevant PRC subsidiaries, and/or to dispose of the pledged equity.

·    *Power of Attorney*

Pursuant to the irrevocable power of attorney, the Company's relevant PRC subsidiaries are authorized by each of the nominee shareholders as their attorney in- fact to exercise all shareholder rights under PRC law and the relevant articles of association, including but not limited to, the sale or transfer or pledge or disposition of all or part of the nominee shareholders' equity interests, and designate and appoint directors, chief executive officers and general manager, and other senior management members of the VIEs. Each power of attorney will remain in force during the period when the nominee shareholder continues to be shareholder of the VIEs, unless the Company's relevant PRC subsidiaries issue adverse instructions in writing. Each nominee shareholder has waived all the rights which have been authorized to the Company's relevant PRC subsidiaries under each power of attorney.

Prior to the Reorganization, similar contractual arrangements have been entered into among the RONG360's wholly owned subsidiary, and RONG360's VIE and their nominee shareholders. Consequently, the financial results of this VIE directly attributable to the Predecessor Operations were included in the Group's consolidated financial statements in accordance with the basis of presentation for the Reorganization as stated in Note 1(b).

F-11

**(e)**        **Risks in relation to the VIE structure**

In the opinion of management, the contractual arrangements with the VIEs and the nominee shareholders are in compliance with PRC laws and regulations and are legally binding and enforceable. The nominee shareholders are also management members or family members of founders of the Group or employees of the Group and therefore have no current interest in seeking to act contrary to the contractual arrangements. However, there are substantial uncertainties regarding the interpretation and application of PRC laws and regulations including those that govern the contractual arrangements, which could limit the Group's ability to enforce these contractual arrangements and if the nominee shareholders of the VIEs were to reduce their interests in the Group, their interest may diverge from that of the Group and that may potentially increase the risk that they would seek to act contrary to the contractual arrangements. On March 15, 2019, the National People's Congress approved the Foreign Investment Law, and on December 26, 2019, the State Council promulgated the Implementing Rules of the Foreign Investment Law of the People's Republic of China, or the Implementing Rules, to further clarify and elaborate the relevant provisions of the Foreign Investment Law. The Foreign Investment Law and the Implementing Rules both took effect on January 1, 2020. The Foreign Investment Law and the Implementing Rules do not explicitly classify whether variable interest entities that are controlled through contractual arrangements would be deemed as foreign invested enterprises if they are ultimately "controlled" by foreign investors. Since the Foreign Investment Law and the Implementing Rules are relatively new, uncertainties still exist in relation to their interpretation and implementation, and it is still unclear how the Foreign Investment Law and the Implementing Rules would affect the Group's variable interest entity structure and business operation. The Group's ability to control the VIEs also depend on the power of attorney that the subsidiaries of the Group has to vote on all matters requiring shareholder approval in the VIEs. As noted above, the Group believes these power of attorney are legally enforceable but may not be as effective as direct equity ownership. In addition, if the Group's corporate structure and the contractual arrangements with the VIEs through which the Group conducts its business in the PRC were found to be in violation of any existing or future PRC laws and regulations, the Group's relevant PRC regulatory authorities could:

·        revoke or refuse to grant or renew the Group's business and operating licenses;

·        restrict or prohibit related party transactions between the subsidiaries of the Group and the VIEs;

·        impose fines, confiscate income or other requirements which the Group may find difficult or impossible to comply with;

·        require the Group to alter, discontinue or restrict its operations;

·        restrict or prohibit the Group's ability to finance its operations, and;

·        take other regulatory or enforcement actions against the Group that could be harmful to the Group's business.

The imposition of any of these restrictions or actions could result in a material adverse effect on the Group's ability to conduct its business. In such case, the Group may not be able to operate or control the VIEs, which may result in deconsolidation of the VIEs in the Group's consolidated financial statements. In the opinion of management, the likelihood for the Group to lose such ability is remote based on current facts and circumstances. The Group's operations depend on the VIEs to honor their contractual arrangements with the Group. These contractual arrangements are governed by PRC law and disputes arising out of these agreements are expected to be decided by arbitration in the PRC. The management believes that each of the contractual arrangements constitutes valid and legally binding obligations of each party to such contractual arrangements under PRC laws. However, the interpretation and implementation of the laws and regulations in the PRC and their application to an effect on the legality, binding effect and enforceability of contracts are subject to the discretion of competent PRC authorities, and therefore there is no assurance that relevant PRC authorities will take the same position as the Group herein in respect of the legality, binding effect and enforceability of each of the contractual arrangements. Meanwhile, since the PRC legal system continues to rapidly evolve, the interpretations of many laws, regulations and rules are not always uniform and enforcement of these laws, regulations and rules involve uncertainties, which may limit legal protections available to the Group to enforce the contractual arrangements should the VIEs or the nominee shareholders of the VIEs fail to perform their obligations under those arrangements.

The following financial information of the Group's VIEs or RONG360's VIE directly attributable to the Predecessor Operations as of December 31, 2018 and 2019 and for the years ended December 31, 2017, 2018 and 2019 were included in the Group's consolidated financial statements.

F-12

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2018 | 2019 | 2019 |
| | RMB | RMB | US$ |
| Cash and cash equivalents | 14,665 | 6,673 | 959 |
| Restricted time deposit-current | — | 1,000 | 144 |
| Short-term investment | 78,462 | — | — |
| Accounts receivable, net (including amounts billed through RONG360 of nil and nil as of December 31, 2018 and 2019, respectively) | 17,269 | 11,232 | 1,613 |
| Amount due from the subsidiaries of the Group* | 95,876 | 173,024 | 24,853 |
| Amount due from related party other than the subsidiaries of the Group | — | 34,456 | 4,949 |
| Prepayments and other current assets | 5,807 | 17,173 | 2,467 |
| Property and equipment, net | 17,589 | 12,925 | 1,857 |
| Intangible assets, net | 1,111 | 21,398 | 3,074 |
| Goodwill | — | 7,313 | 1,050 |
| Restricted cash, time deposit and investment—non-current | — | 28,038 | 4,027 |
| Other non-current assets | 1,068 | 1,107 | 159 |
| **Total assets** | **231,847** | **314,339** | **45,152** |
| Accounts payable | 4,256 | 16,720 | 2,402 |
| Advances from customers | 21,717 | 164 | 24 |
| Tax payable | 15,116 | 19,205 | 2,759 |
| Accrued expenses and other current liabilities | 17,963 | 135,883 | 19,518 |
| Non-current liabilities | — | 5,658 | 813 |
| **Total liabilities** | **59,052** | **177,630** | **25,516** |

\* The balances are eliminated through the consolidation in the preparation of the Group's consolidated financial statements.

| | For the Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2019 | 2019 |
| | RMB | RMB | RMB | US$ |
| Total revenues* | 408,445 | 183,003 | 666,683 | 95,763 |
| Net income/(loss) | 231,781 | 18,506 | (69,972) | (10,051) |

\* The transactions are eliminated through the consolidation in the preparation of the Group's consolidated financial statements were nil, RMB93,976, RMB597,022 for the years ended December 31, 2017, 2018 and 2019, respectively.

| | For the Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2019 | 2019 |
| | RMB | RMB | RMB | US$ |
| Net cash provided by/(used in) operating activities | 35,002 | 28,292 | (68,513) | (9,842) |
| Net cash (used in)/provided by investing activities | (7,076) | (14,453) | 31,359 | 4,504 |
| Net cash (used in)/provided by financing activities | (27,100) | — | 30,000 | 4,309 |
| Net increase/(decrease) in cash and cash equivalents and restricted cash | 826 | 13,839 | (7,154) | (1,029) |
| Cash and cash equivalents and restricted cash at beginning of the year | — | 826 | 14,665 | 2,106 |
| Cash and cash equivalents and restricted cash at end of the year | 826 | 14,665 | 7,511 | 1,077 |

## 2. Restatement

During 2020 the Company's independent audit committee of its board of directors (the "Audit Committee"), with the assistance of advisers, conducted an internal review (the "Review") of certain matters relating to transactions carried out with third-party business entities by the Credit Card Business Unit of the Company (the "Credit Card BU"). The Review found that certain transactions by the Credit Card BU in the year ended December 31, 2018 involved third-party agents (including both upstream agents and downstream suppliers) with undisclosed related-party relationships, and some transactions lacked business substance (collectively, the "questionable transactions").

F-13

As a result of the questionable transactions, certain revenues were inflated with costs and expenses of the same amount or erroneously presented on a gross basis for the year ended December 31, 2018, therefore should be restated to be reversed for transactions that lacked business substance, or be restated to be presented on a net basis. Management of the Company has determined that previously reported revenues for the year ended December 31, 2018 were overstated by RMB89,966, with corresponding overstatement of costs and expenses of the same amount. The misstatement has no impact on previously reported loss from operations, net loss, or per-share amounts. In response, the Company has restated its previously issued financial statements for the year ended December 31, 2018 to correct for the misstatements resulting from the questionable transactions. The restatement has no impact on the Group's consolidated balance sheets and consolidated statements of cash flows as of and for the year ended December 31, 2018.

The effects of the restatement for the misstatements on the consolidated statements of comprehensive loss are as follows:

| | | For the Year Ended December 31, 2018 | | |
| | Item | As Previously Reported RMB | Restatement RMB | As Restated RMB |
|---|---|---|---|---|
| **Revenues:** | | | | |
| Recommendation services: | | | | |
| Loans (including revenues from related party of RMB105,492 for the year ended December 31, 2018) | | 1,015,407 | — | 1,015,407 |
| Credit cards | (a) | 750,941 | (61,119) | 689,822 |
| Total recommendation services | | 1,766,348 | (61,119) | 1,705,229 |
| Advertising, marketing and other services (including revenues from related party of RMB13,405 for the year ended December 31, 2018) | (a) | 245,494 | (28,847) | 216,647 |
| **Total revenues** | | **2,011,842** | **(89,966)** | **1,921,876** |
| Cost of revenues | (a) | (223,339) | 28,847 | (194,492) |
| **Gross profit** | | **1,788,503** | **(61,119)** | **1,727,384** |
| **Operating expenses:** | | | | |
| Sales and marketing (including expenses from related party of RMB51,753 (see Note (b)) for the year ended December 31, 2018) | (a) | (1,547,518) | 61,119 | (1,486,399) |
| Research and development | | (241,270) | — | (241,270) |
| General and administrative | | (178,371) | — | (178,371) |
| **Loss from operations** | | **(178,656)** | **—** | **(178,656)** |
| Net interest income | | 5,037 | — | 5,037 |
| Others, net | | 9,360 | — | 9,360 |
| **Loss before income tax** | | **(164,259)** | **—** | **(164,259)** |
| Income tax benefits | | 4,473 | — | 4,473 |
| **Net loss** | | **(159,786)** | **—** | **(159,786)** |
| Less: net income attributable to noncontrolling interests | | 4,829 | — | 4,829 |
| **Net loss attributable to Jianpu's shareholders** | | **(164,615)** | **—** | **(164,615)** |
| **Other comprehensive income, net** | | | | |
| Foreign currency translation adjustments | | 59,658 | — | 59,658 |
| **Total other comprehensive income** | | **59,658** | **—** | **59,658** |
| **Total comprehensive loss** | | **(100,128)** | **—** | **(100,128)** |
| Less: total comprehensive income attributable to noncontrolling interests | | 5,568 | — | 5,568 |
| **Total comprehensive loss attributable to Jianpu's shareholders** | | **(105,696)** | **—** | **(105,696)** |
| **Net loss per share attributable to Jianpu's shareholders** | | | | |
| Basic and diluted | | (0.39) | — | (0.39) |
| **Net loss per ADS attributable to Jianpu's shareholders** | | | | |
| Basic and diluted | | (7.89) | — | (7.89) |
| **Weighted average number of shares** | | | | |
| Basic and diluted | | 417,315,644 | — | 417,315,644 |

Notes:

(a)        Restatement for inflated or erroneously presented revenue and associated costs and expenses

As a result of the Review, management restated revenues, corresponding costs and expenses for year ended December 31, 2018 due to the questionable transactions with certain third-party agents.

(b)        Previously undisclosed information for related party transactions

In connection with the assessment of the financial impact of the Review, management found that previously disclosed amounts for related party transactions were understated by RMB11,586 for the year ended December 31, 2018. The Company has therefore restated the disclosures for related party transactions on the face of the consolidated statements of comprehensive loss. Amounts disclosed in Note 22 "Related party transactions" have also been restated accordingly.

## 3. Summary of significant accounting policies

**(a)        Basis of presentation**

The consolidated financial statements of the Group have been prepared in accordance with U.S. GAAP. Significant accounting policies followed by the Group in the preparation of the accompanying consolidated financial statements are summarized below.

**(b)        Principles of consolidation**

The consolidated financial statements include the financial statements of the Company, its subsidiaries and the VIEs for which the Company is the ultimate primary beneficiary.

Subsidiaries are those entities in which the Company, directly or indirectly, controls more than one half of the voting power; or has the power to govern the financial and operating policies, to appoint or remove the majority of the members of the board of directors, or to cast a majority of votes at the meeting of directors.

A VIE is an entity in which the Company, or its subsidiary, through contractual arrangements, exercises effective control over the activities that most impact the entity's economic performance, bears the risks of, and enjoys the rewards normally associated with ownership of the entity, and therefore the Company or its subsidiary is the primary beneficiary of the entity.

All significant intercompany transactions and balances between the Company and its subsidiaries and the VIEs have been eliminated upon consolidation.

**(c)        Noncontrolling interests**

For the Company's consolidated subsidiaries and VIEs, noncontrolling interests are recognized to reflect the portion of their equity that is not attributable, directly or indirectly, to the Company as the controlling shareholder. Noncontrolling interests are classified as a separate line item in the equity section of the Group's consolidated balance sheets and have been separately disclosed in the Group's consolidated statements of comprehensive loss to distinguish the interests from that of the Group.

Changes in the Company's ownership interest while the Company retains its controlling interest in its subsidiary or VIE shall be accounted for as equity transactions. Therefore, no gain or loss will be recognized in consolidated net income/(loss) or comprehensive income/(loss). The carrying amount of the noncontrolling interest will be adjusted to reflect the change in its ownership interest in the subsidiary or VIE. Any difference between the fair value of the consideration received or paid and the amount by which the noncontrolling interest is adjusted will be recognized in equity attributable to the Company.

F-15

**(d)**       **Use of estimates**

The preparation of the consolidated financial statements in conformity with U.S. GAAP requires the Group to make estimates and assumptions that affect the reported amounts of assets and liabilities, related disclosures of contingent assets and liabilities at the balance sheet date, and the reported revenues and expenses during the reporting period in the consolidated financial statements and accompanying notes. Significant accounting estimates reflected in the Group's financial statements include, but are not limited to, valuation and recognition of share-based compensation expenses, fair value of assets and liabilities acquired in business combinations, assessment of impairment of long-lived assets and goodwill, allowance for doubtful accounts and valuation allowances for deferred tax assets. Actual results could differ from those estimates.

**(e)**       **Foreign currency translation**

The Group's reporting currency is Renminbi ("RMB"). The functional currency of the Company and the Group's subsidiaries incorporated in Hong Kong ("HK") and Singapore is United States dollars ("US$"). The Group's PRC subsidiaries and VIEs determined their functional currency to be RMB. The determination of the respective functional currency is based on the criteria set out by Accounting Standards Codification ("ASC") 830, Foreign Currency Matters.

Transactions denominated in foreign currencies other than functional currency are translated into the functional currency at the exchange rates prevailing on the transaction dates. Assets and liabilities denominated in foreign currencies other than functional currency are remeasured into the functional currency at the exchange rates prevailing at the balance sheet date. Exchange gains or losses arising from foreign currency transactions are recorded in the consolidated statements of comprehensive loss.

The financial statements of the Group's non-PRC entities are translated from their respective functional currency into RMB. Assets and liabilities denominated in foreign currencies are translated into RMB using the applicable exchange rates at the balance sheet date. Equity accounts other than earnings generated in the current period are translated into RMB using the appropriate historical rates. Revenues, expenses, gains and losses are translated into RMB using the average exchange rates for the relevant period. The resulting foreign currency translation adjustments are recorded in other comprehensive (loss)/income in the consolidated statements of comprehensive loss, and the accumulated foreign currency translation adjustments are presented as a component of accumulated other comprehensive (loss)/income in the consolidated statements of changes in invested/shareholders' equity. Total foreign currency translation adjustments included in the Group's other comprehensive (loss)/income were loss of RMB21,170, income of RMB59,658 and income of RMB14,685 for the years ended December 31, 2017, 2018 and 2019, respectively.

**(f)**       **Convenience translation**

Translations of the consolidated balance sheets, consolidated statements of comprehensive loss and consolidated statements of cash flows from RMB into US$ as of and for the year ended December 31, 2019 are solely for the convenience of the readers and were calculated at the rate of US$1.00=RMB6.9618, representing the noon buying rate set forth in the H.10 statistical release of the U.S. Federal Reserve Board on December 31, 2019. No representation is made that the RMB amounts could have been, or could be, converted, realized or settled into US$ at that rate on December 31, 2019, or at any other rate.

**(g)**       **Cash and cash equivalents**

Cash and cash equivalents represent cash on hand, time deposits and highly-liquid investments placed with banks or other financial institutions, which are unrestricted to withdrawal or use, and which have original maturities of three months or less.

**(h)**       **Restricted cash, time deposit and investments**

Cash and time deposits that are restricted as to withdrawal or use for current operations are classified as restricted cash and restricted term deposits, respectively.

Restricted investment presents certain short term investments of wealth management products issued by bank, which is restricted as to withdrawal (Note 6).

In the event that the restriction is expected to be removed within the next twelve months, the relevant assets are classified as current assets. Otherwise, they are classified as non-current assets.

F-16

**(i)**        **Short-term investments**

Short-term investments include wealth management products, which are certain deposits with variable interest rates or principal not-guaranteed with certain financial institutions. In accordance with ASC 825, Financial Instruments, for financial products with variable interest rates referenced to performance of underlying assets, the Group elected the fair value method at the date of initial recognition and carries these investments at fair value. Changes in the fair value of these investments are reflected in the consolidated statements of comprehensive loss as investment income and included in "others, net". Fair value is estimated based on quoted prices of similar products provided by financial institutions at the end of each reporting period. The Group classifies these inputs as Level 2 fair value measurement.

**(j)**        **Accounts receivable, net**

Accounts receivable are stated at the historical carrying amount net of write-offs and allowance for doubtful accounts. The Group reviews the accounts receivable on a periodic basis and makes allowances when there is doubt as to the collectability of individual balances. In evaluating the collectability of individual accounts receivable balances, the Group considers several factors, including the age of the balance, the customer's payment history, and current credit-worthiness, and current economic trends. Accounts receivable balances are written off after all collection efforts have been exhausted.

**(k)**        **Long-term investments**

The Group measures long-term equity investments other than equity method investments at fair value through earnings along with the adoption of Accounting Standards Update ("ASU") 2016-01 in 2018. For the investments without readily determinable fair values, the Group elected to record these investments at cost, less impairment, and plus or minus subsequent adjustments for observable price changes ("measurement alternative"). Under this measurement alternative, changes in the carrying value of the equity investment will be required to be made whenever there are observable price changes in orderly transactions for the identical or similar investment of the same issuer. The Group makes reasonable efforts to identify price changes that are known or that can reasonably be known.

The Group assesses these investments for impairment by considering factors including, but not limited to, current economic and market conditions, operating performance of the companies, and other company-specific information. The Group uses a combination of valuation methodologies in determination of the fair value, including market and income approaches based on the Group's best estimate, which is determined by using information including but not limited to the pricing of recent rounds of financing, future cash flow forecasts, liquidity factors and selection of the comparable companies. The fair value determination, particularly for investments in privately-held companies whose revenue model is still unclear, requires significant judgment to determine appropriate estimates and assumptions. Changes in these estimates and assumptions could affect the calculation of the fair value of the investments. If this assessment indicates that an impairment exists, the Group will estimate the fair value of the investment and, if the fair value is less than carrying value, the Group will write down the asset to its fair value and take the corresponding charge to the consolidated statements of comprehensive loss.

**(l)**        **Property and equipment, net**

Property and equipment are stated at cost less accumulated depreciation and impairment, if any. Depreciation is calculated using the straight-line method over estimated useful lives of the assets as follows:

|  | Estimated useful life |
| --- | --- |
| Office furniture and equipment | 3 years |
| Computer equipment | 3 years |
| Servers and network equipment | 3 years |
| Vehicles | 4 years |
| Building | 20 years |
| Leasehold improvements | Lesser of the term of the lease or the estimated useful lives of the leasehold improvement |

Repair and maintenance costs are charged to expenses as incurred, whereas the cost of renewals and betterment that extend the useful lives of property and equipment is capitalized as additions to the related assets. Retirements, sales and disposals of assets are recorded by removing the cost and accumulated depreciation from the assets and accumulated depreciation accounts with any resulting gain or loss reflected in the consolidated statements of comprehensive loss.

**(m)          Intangible assets, net**

Intangible assets acquired through business combinations are recognized as assets separated from goodwill if they satisfy either the "contractual-legal" or "separability" criterion. Intangible assets purchased are recognized and measured at fair value upon acquisition.

Intangible assets with finite lives are carried at cost less accumulated amortization and impairment, if any. All intangible assets with finite lives are amortized using the straight-line method over the estimated economic lives.

Amortization is calculated using the straight-line method over estimated useful lives of the assets as follows:

|  | Estimated useful life |
| --- | --- |
| Technology | 8.5 years |
| Customer relationship | 3~5.5 years |
| Non-compete agreement | 5.5 years |
| Software | 3 years |
| Brand | 8 years |
| License | 15 years |

**(n)          Business combinations**

The Group accounts for its business combinations using the purchase method of accounting in accordance with ASC topic 805, Business Combinations. The purchase method of accounting requires that the consideration transferred to be allocated to the assets, including separately identifiable assets and liabilities the Group acquired, based on their estimated fair values. The consideration transferred in an acquisition is measured as the aggregate of the fair values at the date of exchange of the assets given, liabilities incurred, and equity instruments issued as well as the contingent considerations and all contractual contingencies as of the acquisition date. The costs directly attributable to the acquisition are expensed as incurred. Identifiable assets, liabilities and contingent liabilities acquired or assumed are measured separately at their fair value as of the acquisition date, irrespective of the extent of any noncontrolling interests. The excess of (i) the total of cost of acquisition, fair value of the noncontrolling interests and acquisition date fair value of any previously held equity interest in the acquiree over (ii) the fair value of the identifiable net assets of the acquiree, is recorded as goodwill. If the cost of acquisition is less than the fair value of the net assets of the subsidiary acquired, the difference is recognized directly in earnings.

The determination and allocation of fair values to the identifiable assets acquired, liabilities assumed and noncontrolling interests is based on various assumptions and valuation methodologies requiring considerable judgment from management. The most significant variables in these valuations are discount rates, terminal values, the number of years on which to base the cash flow projections, as well as the assumptions and estimates used to determine the cash inflows and outflows. The Group determines discount rates to be used based on the risk inherent in the related activity's current business model and industry comparisons. Terminal values are based on the expected life of assets, forecasted life cycle and forecasted cash flows over that period.

**(o)          Goodwill**

Goodwill represents the excess of the purchase price over the fair value of the identifiable assets and liabilities acquired as a result of the acquisitions of interests in the Group's subsidiaries and consolidated VIEs. The Group performs quantitative goodwill impairment test annually or more frequently when an event occurs or circumstances change that indicate the carrying value may not be recoverable. A goodwill impairment loss is recognized for the amount that the carrying amount of a reporting unit, including goodwill, exceeds its fair value, limited to the total amount of goodwill allocated to that reporting unit. Nil, nil and RMB147,296 of impairment loss of goodwill were recognized for the years ended December 31, 2017, 2018 and 2019, respectively (Note 12).

**(p)          Impairment of long-lived assets**

The Group evaluates its long-lived assets with finite lives for impairment whenever events or changes in circumstances (such as a significant adverse change to market conditions that will impact the future use of the assets) indicate that the carrying amount of an asset may not be fully recoverable. When these events occur, the Group evaluates the impairment by comparing carrying amount of the assets to an estimate of future undiscounted cash flows expected to be generated from the use of the assets and their eventual disposition. If the sum of the expected future undiscounted cash flows is less than the carrying amount of the assets, the Group recognizes an impairment loss based on the excess of the carrying amount of the long-lived assets over their fair value. Nil, nil and RMB101,136 of impairment loss of long-lived assets were recognized for the years ended December 31, 2017, 2018 and 2019, respectively.

**(q)**          **Fair value measurement**

Accounting guidance defines fair value as the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities required or permitted to be recorded at fair value, the Group considers the principal or most advantageous market in which it would transact and it considers assumptions that market participants would use when pricing the asset or liability.

Accounting guidance establishes a fair value hierarchy that requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value. A financial instrument's categorization within the fair value hierarchy is based upon the lowest level of input that is significant to the fair value measurement. Accounting guidance establishes three levels of inputs that may be used to measure fair value:

Level 1—Quoted prices (unadjusted) in active markets for identical assets or liabilities.

Level 2—Observable, market-based inputs, other than quoted prices, in active markets for identical assets or liabilities.

Level 3—Unobservable inputs to the valuation methodology that are significant to the measurement of the fair value of assets or liabilities.

Accounting guidance describes three main approaches to measuring the fair value of assets and liabilities: (1) market approach; (2) income approach and (3) cost approach. The market approach uses prices and other relevant information generated from market transactions involving identical or comparable assets or liabilities. The income approach uses valuation techniques to convert future amounts to a single present value amount. The measurement is based on the value indicated by current market expectations about those future amounts. The cost approach is based on the amount that would currently be required to replace an asset.

Transfers into or out of fair value hierarchy classifications are made if the significant inputs used in the financial models measuring the fair value of the assets and liabilities became unobservable or observable in the current marketplace. These transfers are considered to be effective as of the beginning of the period in which they occur. The Group did not transfer any assets or liabilities in or out of Level 2 and Level 3 during the years ended December 31, 2018 and 2019.

*Fair value measurements on a recurring basis*

As of December 31, 2018, the financial instruments measured at fair value on a recurring basis are as follows:

| | | Fair value measurement at reporting date using | | |
| | Fair value as of December 31, 2018 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| **Description** | RMB | RMB | RMB | RMB |
| Short-term investments (Note 3(i)): | | | | |
| Wealth management products | 78,462 | — | 78,462 | — |

As of December 31, 2019, the financial instruments measured at fair value on a recurring basis are as follows:

| | | Fair value measurement at reporting date using | | |
| | Fair value as of December 31, 2019 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| **Description** | RMB | RMB | RMB | RMB |
| Restricted cash, time deposit and investment (Note 6) | | | | |
| Long-term wealth management products | 38,200 | — | 38,200 | — |

The Group's financial instruments including amount due to or due from related party, receivables, short-term borrowing, payables and other current liabilities are not measured at fair value but for which the fair value is estimated for disclosure purposes, the carrying amount of which approximates the fair value due to their short-term nature.

F-19

*Fair value measurements on a non-recurring basis*

The Group's long-term equity investments are measured at fair value on a nonrecurring basis under measurement alternative, if an impairment loss is charged or fair value adjustment is made for an observable price in an orderly transaction for identical or similar investments of the same issuer. The related inputs used are classified as Level 3 fair value measurement. Please refer to Note 3(k) for more details of valuation techniques.

The Group's non-financial assets, such as goodwill, intangible assets, and property and equipment, would be measured at fair value on a non-recurring basis, only if they were determined to be impaired. The inputs used to measure the estimated fair value of goodwill are classified as Level 3 fair value measurement due to the significance of unobservable inputs used such as historical financial information and assumptions about future growth rates and discount rates, which require significant judgment and company-specific information.

**(r)        Revenue recognition**

The Group generates revenues from Recommendation Services, advertising, marketing and other services.

On January 1, 2018, the Group adopted ASC Topic 606, Revenue from Contracts with Customers ("ASC 606"), using the modified retrospective method. Revenues for reporting periods beginning after January 1, 2018 are presented under ASC606, while revenues for prior periods are not adjusted and continue to be presented under ASC Topic 605. The accumulated effect of adopting ASC 606 to the opening balance of accumulated losses as of January 1, 2018 is not material, therefore it was not adjusted.

Consistent with the criteria of ASC 606, the Group recognizes revenues when performance obligations under the terms of a contract with a customer are satisfied and promised services have transferred to the customer, in an amount of consideration to which an entity expects to be entitled to in exchange for those goods or services and net of value-added tax.

For service arrangements that involve multiple performance obligations, the transaction price is allocated to each performance obligation based on relative standalone selling prices of services being provided to customers. For the periods presented, the Group primarily uses the price to be charged for the service when the service is sold separately in similar circumstances to similar customers to determine the relative standalone selling price.

The Group accounts for discounts and return allowances as variable consideration. The Company considers the constraint on variable consideration and only recognize revenue to the extent that it is probable that a significant reversal will not occur when the uncertainty associated with the variable consideration is subsequently resolved. Customers for recommendation services are entitled to apply for returns for invalid recommendations within a specified period after the recommendation is delivered under a limited circumstances, i.e., the applicant's phone number cannot be connected, or the applicant is in the blacklist maintained by the financial service providers, etc. Return allowances are estimated based on historical experiences of returns granted to customers.

Timing of revenue recognition may differ from the timing of payment from customers. The Group does not have material contract assets as it generally has the unconditional right to payment as revenue is recognized or the timing difference is immaterial. Accounts receivable represents amounts that the Group has satisfied the performance obligation and have the unconditional right to payment. Unearned revenue consists of payments received related to unsatisfied performance obligations at the end of the period, included in "Advance from customers" in the Group's consolidated balance sheets. Due to the generally short-term duration of the Group's contracts, the majority of the performance obligations are satisfied in one year. The amount of revenue recognized that was included in the receipts in advance from customers balance at the beginning of the year was RMB70.1 million and RMB80.5 million for the years ended December 31, 2018 and 2019.

*Recommendation services:*

*(i)        Loans:*

The Group provides Recommendation Services in respect of loan products offered by the financial service providers on its platform, and assist the financial service providers or their loan sales representatives to identify qualified individual users or borrowers. The Group considers the financial service providers, including banks, micro-loan companies and other licensed financial institutions, consumer finance companies and emerging technology-enabled financial service providers, or their loan sales representatives to be its customers, and receives service fees from the customers primarily based on number of applications of qualified users. After the users or borrowers submit applications for the recommended products to the customers, the Group does not retain any further obligations. The price for each recommendation charged to the financial service providers is a fixed price as pre-agreed in the service contract, or pre-set in the bidding systems by the customers. The price is not determined by the size or duration of the loan underlying of each recommendation. Revenue is recognized when all of the revenue recognition criteria are met, which is generally when the user application is delivered to customers.

F-20

*(ii)*        *Credit card:*

The Group provides Recommendation Services in respect of credit card products offered by credit card issuers or their agents on its platform. The individual users can select and apply for the credit cards, and submit applications to credit card issuers or their agents. The Group is not involved in the credit card approval or issuance process. Service fee is charged to the customers, i.e., the credit card issuers or their agents, upon completion of an application, issuance or first usage of a credit card by the users (collectively referred to as "cost-per-success"). Revenue is recognized when all of the revenue recognition criteria are met, which is generally when the customers confirm the number of card application, issuance or first usage with the Group.

*Advertising and marketing services*

The Group also provides advertising, marketing and other services primarily to financial service providers of credit cards and wealth management products. The Group's advertising and marketing services allow customers to place advertisements in particular areas of the Group's platform and third-party advertising network, at performance-based or time-based fixed prices, in particular formats and over particular periods of time. Performance-based revenues are recognized based on effective clicks, or effective activations, depending on the relevant performance measures. The effective clicks refer to that users click on the advertisements. The effective activations primarily include providing contact information or completing a registration form by users on the advertisers' websites redirected from the advertisements, and user's application are successfully approved by the credit card issuers in the case of advertising and marketing services related to credit card products. Time-based revenues are recognized ratably over the contractual term.

For service arrangements involved with third-party platform, the Group considers whether it should report revenues on a gross or net basis by assessing all indicators set forth in ASC 606, and determine if the Group is acting as principal or agent. For arrangements where the Group controls the service before it is transferred to the customer as a principal, as the Group is the primary obligor, subject to inventory risk, and having discretion in establishing prices, revenue is recorded on a gross basis on the amount of fees it billed to its customers, and the related marketing costs charged by third party platform that are directly attributable to the customers are recorded as costs of revenues. Otherwise, the revenue is recorded on a net basis.

*Other services*

Other services primarily consist of big data risk management services provided by the Group, which integrates data and provides customizable automatic credit information inquiry services to customers, i.e., the financial service providers, to facilitate their credit assessment primarily for loan products applicants. Revenue is recognized when all of the revenue recognition criteria are met, which is generally when the result of query is provided to customers with a pre-agreed fixed price.

**(s)        Cost of revenues**

Cost of revenues consists primarily of costs associated with maintenance of the platform including bandwidth and server hosting costs, call center outsourcing costs, online payment processing fees, credit acquisition costs, direct marketing costs, depreciation, payroll and other related costs of operations.

**(t)        Sales and marketing expenses**

Sales and marketing expenses consist primarily of marketing expenses relating to traffic acquisition, rewards to business partners for promotion in social network and social media platform, payroll costs and related expenses for employees involved in sales and marketing activities, and expenses for the portion of call center operations that the Group outsources.

Advertising costs are expensed as incurred. Total amount of advertising expenditures and rewards to business partners for promotion recognized in sales and marketing expenses were RMB1,085,314, RMB1,301,521 (As Restated) and RMB1,027,820 for the years ended December 31, 2017, 2018 and 2019, respectively.

F-21

**(u)        Research and development expenses**

Research and development expenses consist primarily of payroll costs and related expenses for employees involved in developing and improving platform and services and solutions. All research and development costs was expensed as incurred. Since inception, the amount of costs qualifying for capitalization has been immaterial and, as a result, all development costs have been expensed as incurred.

**(v)        General and administrative expenses**

General and administrative expenses consist primarily of payroll costs and related expenses for employees involved in general corporate functions, including finance, legal and human resources, and professional fees relating to these functions.

**(w)        Share-based compensation**

All share-based awards granted to employees or non-employees, including restricted ordinary shares and share options, are measured at fair value on grant date. Share-based compensation expense is recognized using the straight-line vesting method for awards that contain only service conditions, and using graded vesting method for other awards, net of estimated forfeitures, over the requisite service period, which is the vesting period.

The Group uses the binomial option pricing model to estimate fair value of the share options. The determination of estimated fair value of share-based awards on the grant date using an option pricing model is affected by the fair value of underlying ordinary shares as well as assumptions regarding a number of complex and subjective variables. These variables include the expected value volatility of underlying ordinary shares over the expected term of the awards, actual and projected share option exercise behaviors, a risk-free interest rate and any expected dividends. The underlying ordinary shares which do not have quoted market prices, were valued based on the income approach. Determination of estimated fair value of the underlying ordinary shares requires complex and subjective judgments due to their limited financial and operating history, unique business risks and limited public information on companies in China similar to them.

Forfeitures are estimated at the time of grant and revised in subsequent periods if actual forfeitures differ from those estimates. The Group uses historical data to estimate forfeitures of the pre-vesting options and records share-based compensation expenses only for those awards that are expected to vest.

For share options granted with performance condition, the share-based compensation expenses is recorded when the performance condition is considered probable. Where the occurrence of an initial public offering ("IPO") is a performance condition, cumulative share-based compensation expenses for the options that have satisfied the service condition are recorded upon the completion of the IPO. The Group reassesses the probability of vesting at each reporting period for awards with performance conditions and adjusts compensation expense based on its probability assessment. The Group recognizes a cumulative catch up adjustment for changes in its probability assessment in the reporting periods of the changes.

A modification is defined as a change in the terms or conditions of a share-based award ("modified award"). The compensation expenses associated with the modified awards are recognized if either the original vesting condition or the new vesting condition is achieved. Total recognized compensation cost for the awards is at least equal to the fair value of the awards at the grant date unless at the date of the modification the performance or service conditions of the original awards are not expected to be satisfied. The incremental compensation expenses are equal to the excess of the fair value of the modified award immediately after the modification over the fair value of the original award immediately before the modification. For stock options already vested as of the modification date, the Group immediately recognized the incremental value as compensation expenses. For stock options still unvested as of the modification date, the incremental compensation expenses are recognized over the requisite service period of these stock options.

The Company's share-based awards granted to employees of the non-platform business should be recognized as a deemed dividend from the Group to its shareholders at the fair value determined as of the grant date.

**(x)        Income taxes**

Current income taxes are provided in accordance with the regulations of the relevant tax jurisdictions. The Group follows the liability method of accounting for income taxes. Under this method, deferred tax assets and liabilities are determined based on the temporary differences between the financial statements carrying amounts and tax basis of existing assets and liabilities by applying enacted statutory tax rates that will be in effect in the period in which the temporary differences are expected to reverse. The Group records a valuation allowance to reduce the amount of deferred tax assets if based on the weight of available evidence, it is more likely than not that some portion, or all, of the deferred tax assets will not be realized. The effect on deferred taxes of a change in tax rates is recognized in the consolidated statements of comprehensive loss in the period of change. Income tax liability is calculated based on a separate return basis as if the Group had filed separate tax returns before the Reorganization.

F-22

To assess uncertain tax positions, the Group applies a more likely than not threshold and a two-step approach for the tax position measurement and financial statement recognition. Under the two-step approach, the first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates that it is more likely than not that the position will be sustained, including resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount that is more than 50% likely of being realized upon settlement. As of December 31, 2018 and 2019, the Group did not have any significant unrecognized uncertain tax positions.

**(y)      Leases**

Prior to adoption of ASU No. 2016-02, Leases ("ASU 2016-02"), each lease is classified at the inception date as either a capital lease or an operating lease. For the lessee, a lease is a capital lease if any of the following conditions exists: a) ownership of the leased property is transferred to the lessee by the end of the lease term, b) there is a bargain purchase option, c) the lease term is at least 75% of the leased property's estimated remaining economic life or d) the present value of the minimum lease payments at the beginning of the lease term is 90% or more of the fair value of the leased property to the leaser at the inception date. A capital lease is accounted for as if there was an acquisition of an asset and an incurrence of an obligation at the inception of the lease. All other leases are accounted for as operating leases. Payments made under operating lease are charged to the consolidated statements of comprehensive loss on a straight-line basis over the term of underlying lease. The Group has no capital lease for any of the periods presented.

The Group adopted ASU 2016-02, on January 1, 2019 using modified retrospective method and did not restate comparable periods. The Group elected the package of practical expedients permitted under the transition guidance, which allowed the Group to carry forward the historical lease classification, the assessment whether a contract is or contains a lease and initial direct costs for any leases that exist prior to adoption of the new standard. As a result of the adoption, the Group recognized approximately RMB39.0 million of right-of-use assets recorded in other non-current assets, and corresponding short-term leasing liabilities recorded in accrued expenses and other current liabilities and long-term leasing liabilities recorded in other non-current liabilities respectively on the Group's consolidated balance sheet as of January 1, 2019. The adoption had no material impact on the Group's consolidated statements of comprehensive loss for the year ended December 31, 2019 or the opening balances of accumulated losses as of January 1, 2019.

According to ASU 2016-02, the Group determines if an arrangement is or contains a lease at inception. The determination of whether an arrangement is a lease or contains a lease is made at inception by evaluating whether the arrangement conveys the right to use an identified asset and whether the Group obtains substantially all of the economic benefits from and has the ability to direct the use of the asset. The Group has operating leases primarily for office space. The Group elects to apply the short-term lease measurement and recognition exemption for contracts with lease terms of 12 months or less therefore the short-term leases are not recorded on the Group's consolidated balance sheet. Right-of-use assets and liabilities are recognized at lease commencement date based on the present value of remaining lease payments over the lease terms. The Group considers only payments that are fixed and determinable at the time of lease commencement.

The Group uses the implicit rate when readily determinable, or its incremental borrowing rate based on the information available, at the commencement date in determining the present value of lease payments. Certain leases include renewal options and/or termination options. Renewal options are included in the lease term if the Group is reasonably certain to exercise those options while options to terminate the lease are only included in the lease term if the Group is reasonably certain not to exercise those options. Lease expense is recorded on a straight-line basis over the lease term.

**(z)      Comprehensive loss**

Comprehensive loss is defined as the changes in equity of the Group during a period from transactions and other events and circumstances excluding transactions resulting from investments from shareholders and distributions to shareholders. Comprehensive loss for the periods presented includes net loss and foreign currency translation adjustments.

F-23

**(aa)**        **Segment reporting**

The Group's chief operating decision maker has been identified as its Chief Executive Officer, who reviews the consolidated results when making decisions about allocating resources and assessing performance of the Group as a whole and hence, the Group has only one reportable segment. The Group does not distinguish between markets or segments for the purpose of internal reporting. The Group's long-lived assets are substantially all located in the PRC and substantially all of the Group's revenues are derived from the PRC. Therefore, no geographical segments are presented.

**(ab)**        **Statutory reserves**

The Group's subsidiaries and VIEs established in the PRC are required to make appropriations to certain non-distributable reserve funds.

In accordance with the laws applicable to the Foreign Investment Enterprises established in the PRC, the Group's subsidiaries registered as wholly-owned foreign enterprise have to make appropriations from their annual after-tax profits (as determined under generally accepted accounting principles in the PRC ("PRC GAAP") to reserve funds including general reserve fund, enterprise expansion fund and staff bonus and welfare fund. The appropriation to the general reserve fund must be at least 10% of the annual after-tax profits calculated in accordance with PRC GAAP. Appropriation is not required if the general reserve fund has reached 50% of the registered capital of the company. Appropriations to the enterprise expansion fund and staff bonus and welfare fund are made at the respective company's discretion.

In addition, in accordance with the PRC Company Laws, the Group's VIEs registered as Chinese domestic company must make appropriations from its annual after-tax profits as determined under the PRC GAAP to non-distributable reserve funds including statutory surplus fund and discretionary surplus fund. The appropriation to the statutory surplus fund must be 10% of the annual after-tax profits as determined under PRC GAAP. Appropriation is not required if the statutory surplus fund has reached 50% of the registered capital of the company. Appropriation to the discretionary surplus fund is made at the discretion of the company.

The use of the general reserve fund, enterprise expansion fund, statutory surplus fund and discretionary surplus fund are restricted to offsetting of losses or increasing of the registered capital of the respective company. The staff bonus and welfare fund is a liability in nature and is restricted to fund payments of special bonus to employees and for the collective welfare of all employees. None of these reserves are allowed to be transferred to the company in terms of cash dividends, loans or advances, nor can they be distributed except under liquidation.

For the years ended December 31, 2017, 2018 and 2019, profit appropriation to statutory surplus fund for the Group's entities incorporated in the PRC were nil, nil and RMB1,900 respectively. No appropriation to other reserve funds was made for any of the periods presented.

**4. Recent accounting pronouncements**

In June 2016, the Financial Accounting Standards Board ("FASB") issued ASU 2016-13, "Financial Instruments—Credit Losses (Topic 326), Measurement of Credit Losses on Financial Instruments", which replaces the existing incurred loss impairment model with an expected loss methodology on the measurement of credit losses for financial assets measured at amortized cost, which includes accounts receivable and available-for-sale debt securities. For financial assets measured at amortized cost, this new guidance requires an entity to: (1) estimate its lifetime expected credit losses upon recognition of the financial assets and establish an allowance to present the net amount expected to be collected; (2) recognize this allowance and changes in the allowance during subsequent periods through net income; and (3) consider relevant information about past events, current conditions and reasonable and supportable forecasts in assessing the lifetime expected credit losses. This guidance will be effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2019. The Group does not expect a material impact from the adoption of this guidance. Currently, the Group expects an increase of approximately RMB2.8 million in the allowance for credit losses upon the initial adoption of this guidance effective on January 1, 2020.

In August 2018, the FASB issued ASU No. 2018-13, "Fair Value Measurement (Topic 820), Disclosure Framework—Changes to the Disclosure Requirements for Fair Value Measurement", which eliminates, adds and modifies certain disclosure requirements for fair value measurements. Under the guidance, public companies will be required to disclose the range and weighted average used to develop significant unobservable inputs for Level 3 fair value measurements. The guidance is effective for all entities for fiscal years beginning after December 15, 2019 and for interim periods within those fiscal years, but entities are permitted to early adopt either the entire standard or only the provisions that eliminate or modify the requirements. The Group does not expect the adoption to have a material impact on its consolidated financial statements.

F-24

In December 2019, the FASB issued ASU 2019-12, "Simplifying the Accounting for Income Taxes", which removes specific exceptions to the general principles in Topic 740 and to simplifies accounting for income taxes. The guidance is effective for all entities for fiscal years beginning after December 15, 2020 and for interim periods within those fiscal years. The Group does not expect the adoption to have a material impact on its consolidated financial statements.

In January 2020, the FASB issued ASU 2020-01, "Investments-Equity Securities (Topic 321), Investments-Equity Method and Joint Ventures (Topic 323), and Derivatives and Hedging (Topic 815): Clarifying the Interactions between Topic 321, Topic 323, and Topic 815", which clarifies the interaction of the accounting for equity investments under Topic 321 and investments accounted for under the equity method of accounting in Topic 323 and the accounting for certain forward contracts and purchased options accounted for under Topic 815. The guidance is effective for all entities for fiscal years beginning after December 15, 2020 and for interim periods within those fiscal years. The Group does not expect the adoption to have a material impact on its consolidated financial statements.

## 5. Concentration and risks

### (a)        Concentration of customers and suppliers

There was nil, one and nil customer accounted for more than 10% of the Company's total revenues for the years ended December 31, 2017, 2018 and 2019 respectively. There were four customers which individually accounted for more than 10% of the Company's net accounts receivable as of December 31, 2018 and three customers with relationship with each other in aggregate accounted for 31% of the Company's net accounts receivable as of December 31, 2019.

| Revenues | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2018 | 2019 |
| Customer A | * | 13% | * |

| Accounts receivable, net | As of December 31, | |
| --- | --- | --- |
| | 2018 | 2019 |
| Customer A | 29% | * |
| Customer B | 12% | * |
| Customer C | 11% | * |
| Customer D | 10% | * |
| In aggregate of Customer E,F,G | * | 31% |

There were two, nil and nil suppliers, e.g. advertising agencies, which individually accounted for more than 10% of the Company's total costs and expenses for the years ended December 31, 2017, 2018 and 2019 respectively. One and two suppliers individually accounted for more than 10% of the Company's accounts payable as of December 31, 2018 and 2019 respectively as follows:

| Costs and expenses | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2018 | 2019 |
| Supplier I | 13%* | * | |
| Supplier II | 14%* | * | |

| Accounts payable | As of December 31, | |
| --- | --- | --- |
| | 2018 | 2019 |
| Supplier III | 14% | * |
| Supplier IV | * | 36% |
| Supplier V | * | 17% |

---

*    The percentage was below 10% for the period.

**(b)**        **Credit risks**

The Group's credit risk primarily arises from receivables due from its customers, related parties and other parties. The maximum exposure of such assets to credit risk is the assets' carrying amounts as of the balance sheet dates. The Group believes that there is no significant credit risk associated with amount due from related parties. Receivables due from customers are typically unsecured in the PRC and the credit risk with respect to which is mitigated by credit evaluations the Group performs on its customers and its ongoing monitoring process of outstanding balances.

**(c)**        **Foreign currency risk**

The Group's operating transactions are mainly denominated in RMB. RMB is not freely convertible into foreign currencies. The value of the RMB is subject to changes by the central government policies and to international economic and political developments. In the PRC, certain foreign exchange transactions are required by law to be transacted only by authorized financial institutions at exchange rates set by the People's Bank of China (the "PBOC"). Remittances in currencies other than RMB by the Group in China must be processed through PBOC or other China foreign exchange regulatory bodies which require certain supporting documentation in order to effect the remittance.

## 6. Restricted cash, time deposit and investment

| | As of December 31, | |
| --- | --- | --- |
| | 2018 RMB | 2019 RMB |
| **Current:** | | |
| Restricted cash | — | 56,265 |
| Restricted time deposit | 142,411 | 193,505 |
| Total | 142,411 | 249,770 |
| | | |
| **Non-current:** | | |
| Restricted cash | — | 82,207 |
| Restricted time deposit | — | 4,000 |
| Restricted wealth management products | — | 38,200 |
| Total | — | 124,407 |

Line of credits for short-term bank borrowings was secured by cash and short-term time deposits in banks, amounting to RMB142.4 million and RMB216.9 million as of December 31, 2018 and 2019, respectively.

The cash of RMB114.1 million and wealth management products of RMB38.2 million of Databook became temporary restricted as to withdrawal or usage by the Group and was consequently reclassified to restricted cash, and restricted wealth management products, respectively, as of December 31, 2019. These cash and wealth management products became unrestricted to withdraw or use in January 2021 when the case was closed. See Note 12 and Note 25(b) for more detailed information.

Besides that, there are three-year time deposits of RMB5.0 million in custodian accounts for insurance brokerage business of the Group as of December 31, 2019, out of which RMB1.0 million will mature within one year from December 31, 2019 therefore is presented in current assets.

## 7. Accounts receivable, net

Accounts receivable, net consists of the following:

| | As of December 31, | |
| --- | --- | --- |
| | 2018 RMB | 2019 RMB |
| Accounts receivable | 444,270 | 369,310 |
| Less: allowance for doubtful accounts | (71) | (23,785) |
| Accounts receivable, net | 444,199 | 345,525 |

F-26

Accounts receivable are non-interest bearing and are generally on terms between 1 to 30 days. In some cases, these terms are extended for certain qualifying long-term customers to less than a year who have met specific credit requirements.

The movements in the allowance for doubtful accounts are as follows:

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2018 | 2019 |
| | RMB | RMB | RMB |
| Balance at beginning of the year | (785) | — | (71) |
| Additions | — | (1,709) | (29,383) |
| Write offs | 785 | 1,638 | 5,669 |
| Balance at end of the year | — | (71) | (23,785) |

## 8. Prepayments and other current assets

Prepayments and other current assets consist of the following:

| | As of December 31, | |
| --- | --- | --- |
| | 2018 | 2019 |
| | RMB | RMB |
| Prepaid advertising expenses, rentals and others | 126,648 | 84,330 |
| Deposits | 30,083 | 28,366 |
| Staff advances | 1,323 | 1,244 |
| Deductible VAT input | 231 | 1,565 |
| Interest receivable | 1,846 | 2,918 |
| Total | 160,131 | 118,423 |

## 9. Business combinations

(a) Databook

In June 2018, the Group completed the acquisition of 65% of equity interests in Databook Tech Ltd., a Cayman registered company engaged in optimizing data-driven risk management decisions through its subsidiaries and VIE in the PRC and operated independently from the other businesses of the Group. The acquired company offers a suite of products and services helping financial service providers to enhance their risk management capabilities. The total consideration of the transaction was RMB204.5 million, consists of cash of RMB110.2 million, Class A ordinary shares of the Company of 5,772,447 shares and options to purchase the Company's Class A ordinary shares of 397,820 shares. The purchase price allocation is as follows:

| | Amount |
| --- | --- |
| | RMB |
| Fair value of issued the Company's Class A ordinary shares | 88,181 |
| Fair value of issued the options to purchase the Company's Class A ordinary shares | 6,052 |
| Cash consideration | 110,240 |
| Total consideration | 204,473 |
| Noncontrolling interests | 110,100 |
| Total | 314,573 |

| | Amount | Amortization years |
| --- | --- | --- |
| | RMB | Years |
| Cash and cash equivalents | 474 | |
| Other working capital | (15,850) | |
| Short-term investment | 75,706 | |
| Other assets | 2,567 | |
| Identifiable intangible assets acquired | | |
| Technology | 71,000 | 8.5 |
| Customer relationship | 22,900 | 5.5 |
| Non-compete agreement | 28,900 | 5.5 |
| Goodwill | 147,296 | |
| Deferred tax liabilities | (18,420) | |
| Total | 314,573 | |

Goodwill primarily represents the expected synergies from the combined business, which increase the competitiveness and competence in providing relevant services, and the assembled workforce and their knowledge and experiences in the industry.

The total revenue and net income from Databook that are included in the Group's consolidated statement of comprehensive loss for the year ended December 31, 2018 were RMB46,675 and RMB13,795, respectively.

The following unaudited pro forma consolidated financial information reflects the combined results of operations of the Group and Databook for the years ended December 31, 2017 and 2018, as if the acquisition of Databook had occurred on January 1, 2017, and after giving effect to purchase accounting adjustments. These pro forma results have been prepared for comparative purposes only and do not purport to be indicative of what operating results would have been had the acquisition actually taken place as of the beginning of the periods presented and may not be indicative of future operating results.

| | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2017 | 2018 |
| | RMB | RMB |
| Net revenues | 1,477,555 | 2,029,055 |
| Net loss | (212,988) | (163,490) |

The pro forma net loss for the periods presented includes RMB25.5 million for the amortization of identifiable intangible assets net of tax for each year. The relevant tax impact was determined using the actual effective income tax rate of Databook for each presented period.

In the second quarter of 2019, Databook repurchased 504,527 shares or 2.36% equity interests in Databook Tech Ltd. from one noncontrolling shareholder with nominal price, which was accounted as a contribution from noncontrolling shareholder. In the same quarter, the Company purchased 1,009,053 ordinary shares or 7.25% equity interest in Databook from another noncontrolling shareholder, with cash consideration of US$500 and 2,400,000 Class A ordinary shares of the Company at fair value of US$3,590. The difference between the fair value of the consideration paid and the amount by which the noncontrolling interest was adjusted for each of these transactions has been recognized in equity attributable to the Company, totaling RMB4,039. The Company held 74.61% of equity interest in Databook immediately after these transactions.

In September 2019, the goodwill of RMB147,296 carried from the business combination of Databook was fully impaired and recorded in impairment loss in the consolidated statements of comprehensive loss. See Note 12 for more detailed information.

(b) KTN

In October 2018, the Group completed the acquisition of 100% equity interest in KTN from a related party ("related party B", please refer to Note 22). Upon completion of the acquisition, KTN became a VIE of the Company through contractual arrangements entered into by the Company's wholly owned subsidiary, nominee shareholders of KTN and KTN. KTN was a startup and engaged in financial product recommendation service by leveraging the social media and partner program. Total consideration was RMB6.3 million in cash. The purchase price allocation is as follows:

| | Amount |
| --- | --- |
| | RMB |
| Cash consideration | 6,250 |
| Total consideration | 6,250 |

| | Amount |
| --- | --- |
| | RMB |
| Cash and cash equivalents | 196 |
| Other working capital | 6,054 |
| Total | 6,250 |

F-28

No goodwill was recognized based on the purchase price allocation as of the acquisition date.

(c) Anguo

In December 2019, the Group completed the acquisition of 100% equity interests in Anguo, a Shanghai registered company engaged in insurance brokerage business. The total consideration of the transaction was RMB67.5 million, consists of cash of RMB33.4 million and liabilities to be assumed by the Group of RMB34.1 million. The purchase price allocation is as follows:

| | Amount RMB |
|---|---|
| Fair value of liabilities to be assumed | 34,081 |
| Cash consideration | 33,459 |
| Total consideration | 67,540 |

| | Amount RMB | Amortization years Years |
|---|---|---|
| Cash and cash equivalents | 412 | |
| Restricted time deposits | 5,000 | |
| Other working capital | 39,065 | |
| License | 21,000 | 15 |
| Goodwill | 7,313 | |
| Deferred tax liability | (5,250) | |
| Total | 67,540 | |

Goodwill primarily represents the expected synergies from the combined business provided by the platform, which increases the competitiveness and competence in providing relevant services.

As the business combination was completed in late December 2019, the total revenue and net loss from Anguo that are included in the Group's consolidated statements of comprehensive loss for the year ended December 31, 2019 were both immaterial.

The acquired business is not considered material to the Group thus the presentation of the pro-forma financial information with regard to a summary of the results of operations of the Group for the business combinations is not presented.

(d) Other acquisition

The Group also completed a small size business acquisition in the third quarter of 2019, the Group paid RMB5,426 as the cash consideration to acquire 55% equity interest of the acquiree. By this acquisition, the Group acquired net assets of RMB5,794, which included cash and cash equivalents amounting to RMB1,383, and the goodwill amounting to RMB5,430 was recognized.

## 10. Intangible assets, net

Intangible assets consists of the following:

| | Weighted-average amortization period Year | As of December 31, 2019 | | | |
|---|---|---|---|---|---|
| | | Gross carrying amount RMB | Accumulated amortization RMB | Impairment amount RMB | Net carrying amount RMB |
| Technology | 8.5 | 71,000 | (11,137) | (59,863) | — |
| Customer relationship | 3-5.5 | 24,244 | (5,701) | (17,348) | 1,195 |
| Non-compete agreement | 5.5 | 28,900 | (7,006) | (21,894) | — |
| Software | 3 | 4,442 | (2,232) | (834) | 1,376 |
| Brand | 8 | 2,239 | (93) | — | 2,146 |
| License | 15 | 22,344 | — | — | 22,344 |
| Total | | 153,169 | (26,169) | (99,939) | 27,061 |

F-29

| | Weighted-average amortization period | As of December 31, 2018 | | | |
| --- | --- | --- | --- | --- | --- |
| | Year | Gross carrying amount RMB | Accumulated amortization RMB | Impairment amount RMB | Net carrying amount RMB |
| Technology | 8.5 | 71,000 | (4,873) | — | 66,127 |
| Customer relationship | 5.5 | 22,900 | (2,429) | — | 20,471 |
| Non-compete agreement | 5.5 | 28,900 | (3,065) | — | 25,835 |
| Software | 3 | 3,482 | (878) | — | 2,604 |
| Total | | 126,282 | (11,245) | — | 115,037 |

Amortization expenses were nil, RMB11,245 and RMB14,826 for the years ended December 31, 2017, 2018 and 2019, respectively.

The impairment loss of intangible assets were nil, nil and RMB99,939 for the years ended December 31, 2017, 2018 and 2019, respectively (Note 12).

As of December 31, 2019, expected amortization expense relating to the existing intangible assets for each of the next five years and thereafter is as follows:

| | Amount RMB |
| --- | --- |
| 2020 | 3,594 |
| 2021 | 2,217 |
| 2022 | 2,068 |
| 2023 | 1,770 |
| 2024 | 1,770 |
| Thereafter | 15,642 |
| | 27,061 |

## 11. Property and equipment, net

Property and equipment, net consists of the following:

| | As of December 31, | |
| --- | --- | --- |
| | 2018 RMB | 2019 RMB |
| Office furniture and equipment | 2,007 | 1,774 |
| Computer equipment | 7,517 | 8,812 |
| Servers and network equipment | 45,601 | 51,810 |
| Leasehold improvements | 12,539 | 11,427 |
| Vehicles | 575 | 727 |
| Building | 12,512 | 12,512 |
| Total | 80,751 | 87,062 |
| Accumulated depreciation | (28,429) | (49,179) |
| Impairment | — | (1,197) |
| Property and equipment, net | 52,322 | 36,686 |

The impairment loss of property and equipment were nil, nil and RMB1,197 for the years ended December 31, 2017, 2018 and 2019, respectively (Note 12).

F-30

Depreciation expenses were RMB5,769, RMB14,046 and RMB21,652 for the years ended December 31, 2017, 2018 and 2019, respectively.

## 12. Goodwill

The changes in the carrying amount of goodwill were as follows:

| | Amount RMB |
|---|---|
| Balance as of December 31, 2017 | — |
| Additions (Note 9) | 147,296 |
| Balance as of December 31, 2018 | 147,296 |
| Additions (Note 9) | 12,743 |
| Impairment | (147,296) |
| Translation adjustments | (46) |
| Balance as of December 31, 2019 | 12,697 |

In September 2019, the business of Databook was suspended and an investigation was conducted against Databook and certain of its employees by competent authorities in relation to the compliance of information collection or use. The Group therefore recorded a full impairment for goodwill, intangible assets, and an impairment for other assets attributable to the Databook, totaling RMB254.7 million as of December 31, 2019. See Note 25(b) for more detailed information.

## 13. Long-term investment

| | As of December 31, | |
|---|---|---|
| | 2018 RMB | 2019 RMB |
| Equity investments | 29,348 | 29,733 |

The long-term investments were included in "Other non-current assets" as presented on the Group's consolidated balance sheets.

As of December 31, 2018 and 2019, the Group's long-term investments primarily included two equity investments in privately-held companies. In 2018, the Group invested in preferred shares of Firestorm Holdings Limited ("Firestorm") with a consideration of cash in US$2,137 (RMB14,908). Firestorm operates an open platform in Indonesia for discovery and recommendation of financial products. The Group invested in preferred shares of Conflux Global ("Conflux") with a consideration of cash in US$2,000 (RMB13,952). Conflux is a decentralized applications blockchain solution provider. These preferred shares invested are not considered in-substance ordinary shares and do not have readily determinable fair value, which are accounted for using the measurement alternative method. No adjustments for the fair value were made as no orderly transactions for the identical or similar investment of the same issuer were identified during the years ended December 31, 2018 and 2019. A full impairment of RMB1,663 was made in the year of 2019 for long-term investments held by Databook. See Note 12 for more detailed information.

## 14. Leases

The Group has operating leases for office buildings, with lease terms from within one year to around three years. There is no finance lease for the Group. A summary related to operating leases as of December 31, 2019 is as follows:

| | Amount RMB |
|---|---|
| Operating lease right-of-use assets, net | 15,363 |
| Operating lease liabilities - current | 11,481 |
| Operating lease liabilities - non-current | 800 |
| Total operating lease liabilities | 12,281 |
| Weighted average remaining lease term | 1.04 |
| Weighted average discount rate | 4.75% |

F-31

| | Amount<br>RMB |
|---|---|
| Operating lease expenses | 21,959 |
| Short-term lease expenses | 759 |
| Total lease expenses* | 22,718 |
| Cash paid for amounts included in the measurement of lease liabilities | 20,146 |
| Supplemental noncash information on lease liabilities arising from obtaining right-of- use assets | 2,467 |

*The lease expenses were RMB11,004, RMB24,518 and RMB22,718 for the years ended December 31, 2017, 2018 and 2019, respectively.

A summary of maturity of operating lease liabilities under the Group's non-cancelable operating leases as of December 31, 2019 is as follows:

| | Amount<br>RMB |
|---|---|
| 2020 | 11,921 |
| 2021 | 651 |
| 2022 | 22 |
| Total future minimum payments | 12,954 |
| Less: interest | (313) |
| Present value of operating lease liabilities | 12,281 |

As of December 31, 2018, future minimum lease payment obligations under non-cancelable operating leases before the adoption of ASU 2016-02 were disclosed as follows:

| | Amount<br>RMB |
|---|---|
| 2019 | 17,954 |
| 2020 | 17,882 |
| Total future minimum payments | 35,836 |

## 15. Accrued expenses and other current liabilities

Accrued expenses and other current liabilities consist of the following:

| | As of<br>December 31, | |
|---|---|---|
| | 2018<br>RMB | 2019<br>RMB |
| Accrued liabilities for legal proceeding (Note 25(b)) | — | 60,000 |
| Accrued payroll | 114,201 | 57,275 |
| Customer advance payments relating to Databook | — | 47,703 |
| Consideration payable of business combination | — | 12,506 |
| Operating lease liabilities | — | 11,481 |
| Accrued expenses | 12,054 | 9,896 |
| Payable to employees for proceeds from shares as sold | 8,598 | 2,906 |
| Others | 9,625 | 22,251 |
| Total | 144,478 | 224,018 |

## 16. Short-term borrowings

In 2018, RQN obtained a loan facility of credit line of RMB130 million with a fixed annual interest rate of 4.95%, issued by East West Bank (China) Limited and secured by short-term time deposits denominated in US$ of Jianpu HK. In 2019, RQN obtained another loan facility of credit line of RMB250 million with a fixed annual interest rate, issued by Xiamen International Bank and secured by cash and short-term time deposits denominated in US$ of Jianpu HK. These cash and short-term time deposits were accounted for as restricted cash and time deposits (see Note 6).

As of December 31, 2018 and 2019, the Group utilized part of the credit lines, and the balance of short-term borrowings was RMB130 million and RMB60 million, respectively. All of these borrowings were denominated in RMB and repayable within one year.

**17. Income tax**

Cayman Islands

Under the current laws of the Cayman Islands, the Company is not subject to tax on income or capital gain. Additionally, the Cayman Islands does not impose a withholding tax on payments of dividends to shareholders.

Hong Kong

Under the current Hong Kong Inland Revenue Ordinance, the subsidiaries incorporated in Hong Kong were subject to Hong Kong profits tax at a rate of 16.5% for taxable income earned in Hong Kong before April 1, 2018. Starting from the financial year commencing on April 1, 2018, the two-tiered profits tax regime took effect, under which the tax rate is 8.25% for assessable profits on the first HK$2 million and 16.5% for any assessable profits in excess of HK$2 million. The payments of dividends to their shareholders are not subject to withholding tax in Hong Kong.

PRC

In accordance with the Enterprise Income Tax Law ("EIT Law"), Foreign Investment Enterprises ("FIEs") and domestic companies are subject to Enterprise Income Tax ("EIT") at a uniform rate of 25%. Preferential tax treatments are granted to certain entities qualified as High and New Technology Enterprises (''HNTEs''). Certain PRC subsidiary of the Group or the Predecessor Operations obtained certificates of HNTEs and therefore are eligible to enjoy a preferential tax rate of 15% for three years, provided that they are qualified as HNTEs during such periods. The management expects that all the criteria to utilize this preferential tax treatment can be satisfied for the relevant annual tax filing during such periods. Accordingly, a preferential tax rate of 15% were applied for these entities, and other subsidiaries and VIEs of the Group and Predecessor Operations in the PRC are subject to a uniform income tax rate of 25% for all periods presented.

The EIT Law also provides that an enterprise established under the laws of a foreign country or region but whose "de facto management body" is located in the PRC be treated as a resident enterprise for PRC tax purposes and consequently be subject to the PRC income tax at the rate of 25% for its global income. The Implementing Rules of the EIT Law merely define the location of the "de facto management body" as "the place where the exercising, in substance, of the overall management and control of the production and business operation, personnel, accounting, properties, etc., of a non-PRC company is located." Based on a review of surrounding facts and circumstances, the Group does not believe that it is likely that its operations outside of the PRC be considered a resident enterprise for PRC tax purposes. However, due to limited guidance and implementation history of the EIT Law, should the Company be treated as a resident enterprise for PRC tax purposes, the Company will be subject to PRC income tax on worldwide income at a uniform tax rate of 25%.

*Composition of income tax expenses/(benefits):*

|  | For the Year Ended December 31, | | |
|  | 2017 RMB | 2018 RMB | 2019 RMB |
| --- | --- | --- | --- |
| Current income tax | 31,467 | (5,890) | 8,788 |
| Deferred income tax | (3,085) | 1,417 | (16,793) |
| Total | 28,382 | (4,473) | (8,005) |

Reconciliation of the differences between statutory income tax rate and the effective income tax rate for the years ended December 31, 2017, 2018 and 2019 are as below:

F-33

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2018 | 2019 |
| Statutory EIT rate | 25.00% | 25.00% | 25.00% |
| Tax effect of preferential tax treatment | (3.76)% | (11.04)% | (8.81)% |
| Tax effect of permanent differences | (1.72)% | 0.88% | (1.73)% |
| Changes in valuation allowance | (35.86)% | (12.12)% | (12.97)% |
| Effective income tax rate | (16.34)% | 2.72% | 1.49% |

The following table sets forth the effect of preferential tax:

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2018 | 2019 |
| | RMB | RMB | RMB |
| Tax effect of preferential tax treatment | 6,535 | 18,137 | 47,453 |
| Basic and diluted loss per share effect | 0.02 | 0.04 | 0.11 |

*Composition of deferred tax assets and liabilities:*

Deferred taxes assets and liabilities arising from PRC subsidiaries and VIEs were measured using the enacted tax rates for the periods in which they are expected to be reversed. The Group's deferred tax assets and liabilities consist of the following components:

| | As of December 31, | |
| --- | --- | --- |
| | 2018 | 2019 |
| | RMB | RMB |
| **Deferred tax assets** | | |
| Advances from customers | 1,904 | 6,015 |
| Accrued payroll and expenses | 6,216 | 3,377 |
| Allowances of doubtful accounts | 203 | 5,035 |
| Allowances of impaired assets | — | 1,804 |
| Net operating loss carry-forwards | 22,751 | 84,925 |
| Advertising expenses in excess of deduction limit | 13,781 | 12,250 |
| Amortization of intangible assets | 876 | 1,737 |
| **Total deferred tax assets** | 45,731 | 115,143 |
| Less: Valuation allowance | (45,618) | (115,143) |
| **Total deferred tax assets, net** | 113 | — |

| | As of December 31, | |
| --- | --- | --- |
| | 2018 | 2019 |
| | RMB | RMB |
| **Deferred tax liabilities** | | |
| Intangible assets acquired from business combinations | 16,865 | 5,801 |
| **Total deferred tax liabilities** | 16,865 | 5,801 |

A valuation allowance is provided against deferred tax assets when the Group determines that it is more likely than not that the deferred tax assets will not be utilized in the future. In making such determination, the Group evaluates a variety of factors including the Group's operating history, accumulated losses, existence of taxable temporary differences and reversal periods.

The Group believes that it is more likely than not that the advertising expenses in excess of deduction limit will not be utilized in the future given the Group expects its advertising expenses will continue to exceed the deduction limit in the foreseeable future. Full valuation allowance for the deferred tax assets arising from such advertising expenses were provided. In addition, the Group believed that it is more likely than not that the accumulated operating losses and other deferred tax assets for certain entities will not be utilized in the future given these entities had incurred net accumulated operating losses for income tax purposes since its inception. Therefore, the valuation allowances for these deferred tax assets were provided. The total valuation allowance provided were RMB45,618 and RMB115,143 as of December 31, 2018 and 2019 respectively. The net deferred tax assets as recognized was included in the "Other non-current assets" in the consolidated balance sheets.

F-34

Movement of valuation allowance:

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2018 | 2019 |
| | RMB | RMB | RMB |
| Balance at beginning of the year | 123,938 | 33,980 | 45,618 |
| Derecognized* | (110,153) | — | — |
| Additions | 78,542 | 20,678 | 80,468 |
| Reversals** | (58,347) | (9,040) | (10,943) |
| Balance at end of the year | 33,980 | 45,618 | 115,143 |

* Immediately upon the completion of the Reorganization, deferred tax assets from the accumulated net operating loss carry-forwards with full valuation allowances on that completion date were derecognized, as which are not allowed to be transferred to the Group's VIEs and subsidiaries under the tax laws and regulations.

** The reversal of valuation allowance for the year ended December 31, 2017 was primarily attributed to changes of the enacted income tax rate due to aforementioned preferential tax treatment of certain PRC entities in 2017 when certificates of HNTEs were obtained.

## 18. Share-based compensation expenses

The following table sets forth the share-based compensation expenses included in each of the relevant accounts:

| | For the Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2019 | 2019 |
| | RMB | RMB | RMB | US$ |
| Cost of revenues | 4,246 | (724) | 935 | 134 |
| Sales and marketing expenses | 17,817 | 6,772 | 8,549 | 1,228 |
| Research and development expenses | 32,104 | 13,435 | 16,063 | 2,307 |
| General and administrative expenses | 53,599 | 111,176 | (19,157) | (2,751) |
| Total | 107,766 | 130,659 | 6,390 | 918 |

### (a)    2012 Share plan of RONG360

Prior to the Reorganization, all of the options and restricted ordinary shares were granted by RONG360 under its 2012 Share Plan with its own underlying shares. The 2012 Share Plan of RONG360 provides for the grant of share options and other equity-based awards to eligible employees of RONG360 and its subsidiaries and VIE. Starting from 2013, RONG360 granted multiple tranches of share options with tiered vesting commencement dates to employees. Options granted under the 2012 Share Plan were subject to a service condition of four or seven years and a performance condition of occurrence of an IPO. The service condition requires one-fourth of the awards to vest on the first anniversary date of the specified vesting commencement date, and the remaining of the awards to vest in equal installments on a quarterly basis in the remaining vesting period. The grantees are entitled the rights to receive underlying shares that options are exercised only if the performance target of an IPO is achieved, provided the service condition is also met. Options granted typically expire in ten years from the respective vesting commencement date as stated in the grant letters.

The Group did not recognize any share-based compensation expenses for the options granted under the 2012 Share Plan until the IPO as the vesting of the awards was contingent upon an IPO, which was not considered probable until it happened.

The activities of share options granted under RONG360's 2012 Share Plan for the period from December 31, 2016 to the IPO date which is in November 2017, are summarized as below ( * ) :

F-35

| | Number of shares | Weighted average exercise prices US$/Share | Aggregate intrinsic Value US$ | Weighted average remaining contractual years |
|---|---|---|---|---|
| Outstanding as of December 31, 2016 | 15,857,198 | 0.24 | 36,826 | 7.50 |
| Granted during the year | 5,370,319 | 0.52 | | |
| Forfeited during the year | (747,031) | 0.41 | | |
| Outstanding immediately prior to the IPO | 20,480,486 | 0.31 | 103,295 | 7.35 |

_____

(*)     Option activities include all activities of share options of RONG360. The share-based compensation expenses discussed below only include the expenses attributable to the Platform Business.

The total share-based compensation expenses recognized by the Group for the year ended December 31, 2017 for which the service condition had been met and the performance target of IPO was achieved were RMB32,149. The outstanding options under this plan immediately prior to the IPO were converted to options under the Global Share Plan upon the completion of the Company's IPO (Note 18 (b)), and no more expenses were recognized under this plan thereafter.

F-36

The fair values of the options granted under RONG360's 2012 Share Plan in relation to the share-based compensation expenses attributable to the Platform Business for the years ended December 31, 2017 are as follows:

| | For the Year Ended December 31, 2017 |
| --- | --- |
| | US$ |
| Weighted average grant date fair value of option per share | 3.03 |
| Aggregate grant date fair value of options granted | 9,013 |

The estimated fair value of each option granted under RONG360's 2012 Share Plan is estimated on the date of grant using the binomial option-pricing model with the following assumptions:

| | For the Year Ended December 31, 2017 |
| --- | --- |
| Risk-free interest rate per annum | 2.31% ~ 2.40% |
| Expected term (in years) | 10 |
| Expected volatility | 55% ~ 57% |
| Expected dividends yield | — |

The Group estimated the risk-free interest rate based on the yield to maturity of U.S. treasury bonds denominated in US$ at the option valuation date. Expected term is the contract life of the option. The expected volatility at the grant date and each option valuation date was estimated based on the annualized standard deviation of the daily return embedded in historical share prices of comparable peer companies with a time horizon close to the expected expiry of the term of the options. RONG360 has never declared or paid any cash dividends on its capital stock, and the Group does not anticipate any dividend payments in the foreseeable future.

**(b)      Global share plan**

The Company adopted a Global Share Plan, of which the terms are substantially identical to the 2012 Share Plan of RONG360, effective upon the completion of the Company's IPO. Pursuant to the Global Share Plan, the Company assumed all outstanding 20,480,486 share options issued under the 2012 Share Plan of RONG360. Each one of the outstanding share options under the 2012 Share Plan with underlying shares of RONG360 were converted to one share option of the Company (i.e. the Platform Business) and one share option of RONG360's other subsidiaries (i.e. the non-platform business) in a way that employees kept an equitable position immediately before and after the conversion. There was no significant incremental share-based compensation expense recorded as a result of the conversion.

In addition to the options converted from the Global Share Plan as aforementioned, the Group granted new options to eligible employees or nonemployees under this plan in 2018 and 2019. Options granted were subject to a service condition, which requires the awards to vest in installments during the vesting periods ranged from one to seven years. Options granted typically expire in ten years from the respective vesting commencement date as stated in the grant letters.

The activities of share options granted under Jianpu's Global Share Plan in relation to the share-based compensation expenses of the Group for the years ended December 31, 2017, 2018 and 2019 are summarized as below:

| | Number of shares | Weighted average exercise prices US$/Share | Aggregate intrinsic Value US$ | Weighted average remaining contractual years |
| --- | --- | --- | --- | --- |
| Outstanding immediately after the IPO | 18,640,845 | 0.21 | 44,454 | 7.14 |
| Granted during the year | — | — | | |
| Outstanding as of December 31, 2017 | 18,640,845 | 0.21 | 44,454 | 7.14 |
| Granted during the year | 1,940,654 | 0.24 | | |
| Forfeited during the year | (1,122,550) | 0.53 | | |
| Exercised during the year | (759,518) | 0.10 | | |
| Outstanding as of December 31, 2018 | 18,699,431 | 0.20 | 38,480 | 6.42 |
| Granted during the year | 19,340 | 0.56 | | |
| Forfeited during the year | (427,014) | 0.52 | | |
| Exercised during the year | (10,011,528) | 0.13 | | |
| Outstanding as of December 31, 2019 | 8,280,229 | 0.25 | 2,829 | 6.54 |

F-37

The fair value of the options granted under Jianpu's Global Share Plan in relation to the share-based compensation expenses for the years ended December 31, 2018 and 2019 are as follows:

| | For the Year Ended December 31, | |
|---|---|---|
| | **2018** | **2019** |
| | **US$** | **US$** |
| Weighted average grant date fair value of option per share | 2.46 | 0.86 |
| Aggregate grant date fair value of options granted | 4,776 | 17 |

The estimated fair value of each option granted under Jianpu's Global Share Plan is estimated on the date of grant using the binomial option-pricing model with the following assumptions:

| | For the Year Ended December 31, | |
|---|---|---|
| | **2018** | **2019** |
| Risk-free interest rate per annum | 2.40% ~ 3.05% | 1.78% ~ 2.60% |
| Expected term (in years) | 10 | 10 |
| Expected volatility | 53% ~ 54% | 51% ~ 58% |
| Expected dividends yield | — | — |

The Group estimated the risk-free interest rate based on the yield to maturity of U.S. treasury bonds denominated in US$ at the option valuation date. Expected term is the contract life of the option. The expected volatility at the grant date and each option valuation date was estimated based on the annualized standard deviation of the daily return embedded in historical share prices of comparable peer companies with a time horizon close to the expected expiry of the term of the options. The Group has never declared or paid any cash dividends on its capital stock, and the Group does not anticipate any dividend payments in the foreseeable future.

As of December 31, 2019, 8,280,229 share options of the Company were held by the Group's employees and non-employees under Global Share Plan with the weighted average exercise price of US$0.25 per option and weighted average remaining contractual years of 6.54 years, out of which 6,049,815 options were exercisable with the weighted average exercise price of US$0.23 per option and weighted average remaining contractual years of 6.37 years. 8,013,226 share options were expected to be vested with the weighted average exercise price of US$0.25 per option and weighted average remaining contractual years of 6.53 years. The aggregate intrinsic value of the outstanding options, exercisable options and share options expected to be vested as of December 31, 2019 are US$2,829, US$2,197 and US$2,805 respectively. There were RMB6,210 of unrecognized share-based compensation expenses, which are expected to be recognized over a weighted-average period of 1.65 years.

As of December 31, 2019, 1,281,957 share options of the Company were held by the employees of the Group's related parties for non-platform business under the Global Share Plan with the weighted average exercise price of US$0.44 per option and weighted average remaining contractual years of 7.62 years, out of which 774,563 options were exercisable with the weighted average exercise price of US$0.37 per option and weighted average remaining contractual years of 6.99 years. 1,145,604 share options were expected to be vested with the weighted average exercise price of US$0.43 per option and weighted average remaining contractual years of 7.53 years. The aggregate intrinsic value of the outstanding options, exercisable options and share options expected to be vested as of December 31, 2019 are US$199, US$177 and US$193 respectively. The share options granted to employees of the Group's related parties for non-platform business were accounted for as deemed dividend from the Company to its shareholders, as these employees do not provide services to the Company. The share awards were measured based on the fair value as of the grant date. The amount recognized as deemed dividend were RMB8,851, RMB9,402 and RMB14 for the years ended December 31, 2017, 2018 and 2019, respectively.

F-38

As of December 31, 2019, 17,566,274 share options with underlying shares of non-platform business were held by the Group's employees under the Global Share Plan. The vesting of such awards is conditional upon the fulfillment of requisite service conditions to the Company and listing of non-platform business. The cost relating to such share-based awards succeeded from 2012 Share Plan of RONG360 are recognized by the Company as a shareholder contribution as the award will ultimately be settled by RONG360. The award is accounted for as a financial derivative and initially measured at its fair value in accordance with ASC 815-10-55-46 through 55-48, and the related expense will be recognized over the requisite service period in the consolidated income statements with a corresponding credit to additional paid-in capital. Subsequent changes in the fair value of the award are recorded in the consolidated income statement through the date on which the underlying award are settled. The share-based compensation expenses recognized for the year ended December 31, 2019 in relation to share options with underlying share of non-platform business granted to the Group employees under the Global Share Plan were RMB1,336.

**(c)        2017 Share incentive plan**

In October 2017, the board of directors approved and adopted the 2017 Share Incentive Plan (the "2017 Plan"). The 2017 Plan permits the awards of options, restricted shares or any other type of share-based awards. The maximum number of shares available for issuance shall be 2% of the total number of shares issued and outstanding as of the closing of the Company's IPO, plus an annual increase from the fiscal year beginning January 1, 2018 in according with the approved increasing scheme.

The Group granted multiple tranches of share options with tiered vesting commencement dates to eligible employees and non-employees under the 2017 Share Incentive Plan. Options granted to employees were subject to a service condition and a performance condition. The service condition requires one-fourth of the awards to vest on the first anniversary date of the specified vesting commencement date, and the remaining of the awards to vest in equal installments on a quarterly basis in the remaining vesting period, or one-fourth to vest immediately on vesting commencement date and the remaining to vest in equal installments on a quarterly basis in the remaining vesting period. An evaluation is made each quarter as to the likelihood of performance condition being met.

In the fourth quarter of 2019, the Group evaluated each of the underlying performance conditions related to the outstanding options with performance conditions, and determined that it was not probable that the performance condition relating to year 2020 would be met for the 6,214,370 share options granted in 2017. Consequently, the Group reversed all previously recognized share-based compensation expenses related to these awards of RMB96,831, and the performance condition for these share options was modified to link to financial performance of year 2021, which is assessed as probable to achieve. In accordance with ASC 718, such modification is a Type III modification because the original condition is not expected to be satisfied as of the modification date. The fair value of the 6,214,370 shares options of the modified performance conditions was re-measured and the aggregate grant date fair value is RMB25,838. The Group recognized the incremental value as share-based compensation expenses for vested awards amounting to RMB17,225 in the fourth quarter of 2019.

Option granted to non-employees were subject to a service condition with a vesting period ranged from one to four years. One-third, one-fourth or nil of the options vested immediately on vesting commencement date and the remaining of the awards to vest in equal installments on a quarterly or yearly basis in the remaining vesting period. Options granted typically expire in ten years from the respective vesting commencement date as stated in the grant letters.

The activities of share options granted under Jianpu's 2017 Share Incentive Plan in relation to the share-based compensation expenses of the Group for the years ended December 31, 2018 and 2019 are summarized as below:

| | Number of shares | Weighted average exercise prices US$/Share | Aggregate intrinsic Value US$ | Weighted average remaining contractual years |
|---|---|---|---|---|
| Outstanding as of December 31, 2017 | 8,285,827 | 0.01 | 21,394 | 10.00 |
| Granted during the year | 8,014,091 | 0.01 | | |
| Forfeited during the year | (411,325) | 0.01 | | |
| Outstanding as of December 31, 2018 | 15,888,593 | 0.01 | 35,644 | 9.27 |
| Granted during the year | 7,183,239 | 0.01 | | |
| Forfeited during the year | (1,337,432) | 0.01 | | |
| Exercised during the year | (4,344,515) | 0.01 | | |
| Outstanding as of December 31, 2019 | 17,389,885 | 0.01 | 10,190 | 8.92 |

F-39

The estimated fair value of each option grant is based on the market price of the underlying ordinary share of the Company on the same date.

As of December 31, 2019, 17,389,885 share options of the Company were granted under 2017 Share Incentive Plan with the weighted average exercise price of US$0.01 per option and weighted average remaining contractual years of 8.92 years, out of which 4,745,457 options were exercisable with the weighted average exercise price of US$0.01 per option and weighted average remaining contractual years of 8.33 years. 16,727,541 share options were expected to be vested with the weighted average exercise price of US$0.01 per option and weighted average remaining contractual years of 8.92 years. The aggregate intrinsic value of the outstanding options, exercisable options and share options expected to be vested as of December 31, 2019 are US$10,190, US$2,781 and US$9,802 respectively. For the years ended December 31, 2018 and 2019, share-based compensation expenses recognized associated with the share options granted by the Company were RMB96,321 and negative RMB15,632. There were RMB64,495 of unrecognized share-based compensation expenses, which are expected to be recognized over a weighted-average period of 2.69 years.

As of December 31, 2019, 731,161 share options of the Company were held by the employees of the Group's related parties for non-platform business under the 2017 Share Incentive Plan with the weighted average exercise price of US$0.01 per option and weighted average remaining contractual years of 8.84 years, out of which 168,361 options were exercisable with the weighted average exercise price of US$0.01 per option and weighted average remaining contractual years of 8.31 years. 587,647 share options were expected to be vested with the weighted average exercise price of US$0.01 per option and weighted average remaining contractual years of 8.84 years. The aggregate intrinsic value of the outstanding options, exercisable options and share options expected to be vested as of December 31, 2019 are US$428, US$99 and US$334 respectively. The share options granted to employees of non-platform business were accounted for as deemed dividend from the Company to its shareholders, as these employees do not provide services to the Company. The share awards were measured based on the fair value as of the grant date. The amount recognized as deemed dividend were RMB7,912 and RMB1,915 for the years ended December 31, 2018 and 2019.

**(d)    Restricted shares granted to executive officers and director**

On July 16, 2014, RONG360 approved and granted of an aggregate of 14,000,000 restricted ordinary shares to three executive officers and a director, who are also founders of RONG360 ("Restricted Shares"). The Restricted Shares vest over seven years provided the grantees remain employment relationship with RONG360. One-fourth of the awards vest on the fourth anniversary date of the specified service commencement date, which is earlier than the grant date, and one forty-eighth of the awards vest on a monthly basis in the remaining vesting period, subject to acceleration under certain circumstances including a successful IPO.

The activities of the Restricted Shares for the years ended December 31, 2017, are summarized as below (*):

| | Number of shares | Weighted-Average Grant-Date Fair Value (in US$) |
|---|---|---|
| Unvested at January 1, 2016 | 10,266,667 | 0.45 |
| Vested | (4,083,333) | 0.45 |
| Unvested at December 31, 2016 | 6,183,334 | 0.45 |
| Vested | (6,183,334) | 0.45 |
| Unvested at December 31, 2017 | — | |

(*)    Activities of Restricted Shares include all activities of the Restricted Shares of RONG360. The share-based compensation expenses discussed below only include the expenses attributable to the Platform Business.

Total fair value or intrinsic value of the Restricted Shares vested on the respective vesting dates attributable to the Platform Business during the years ended December 31, 2017, were US$15,223.

For the years ended December 31, 2017, share-based compensation expenses recognized associated with the Restricted Shares attributable to the Platform Business were RMB2,388. As of December 31, 2018 and 2019, there were no unrecognized share-based compensation expenses related to the Restricted Shares attributable to the Platform Business.

There were no Restricted Shares granted during the years ended December 31, 2017, 2018 and 2019.

F-40

**19. Ordinary shares**

Upon incorporation, the Company had 1,000,000,000 shares authorized, 1 ordinary share issued and outstanding with a par value of US$0.0001 per share, which was held by RONG360. Pursuant to a written resolution of the Company dated on September 25, 2017, 345,541,350 ordinary shares of par value US$0.0001 each were issued to RONG360 on the same day.

In November 2017, the Company completed an IPO and private placements to certain investors concurrently with the IPO with new issuance of totaling 68,750,000 Class A ordinary shares. Immediately prior to the completion of the IPO, all the ordinary shares as issued and held by RONG360 were redesignated into an equal number of the Class B ordinary shares. Each Class A ordinary share is entitled to one vote per share and each Class B ordinary share is entitled to ten votes per share. Each Class B ordinary share can be converted into one Class A ordinary share at any time, while Class A ordinary shares cannot be converted into Class B ordinary shares. Upon transfer of Class B ordinary shares by RONG360 Inc. to other persons, (i) all shares transferred to Mr. Daqing (David) Ye, Mr. Caofeng Liu, and Mr. Jiayan Lu or their respective affiliates, will remain Class B ordinary shares; (ii) 27,100,830 shares transferred to Mr. Chenchao Zhuang or his affiliates will remain Class B ordinary shares; and (iii) all shares to any party other than those shares mentioned in the foregoing (i) and (ii) will automatically convert into an equal number of Class A ordinary shares. Upon further transfer of Class B ordinary shares by any of Mr. Daqing (David) Ye, Mr. Caofeng Liu, Mr. Jiayan Lu and Chenchao Zhuang (individually referred to as a "Founder" and collectively referred to as the "Founders") to anyone other than his affiliates, such Class B Ordinary Shares will automatically be converted into an equal number of Class A ordinary shares. When a Founder, ceases to be a director or an officer of the Company, his Class B ordinary shares will automatically be converted into an equal number of Class A ordinary share, and that when the Founders collectively beneficially own less than 5% of the Company's total issued and outstanding shares on an as-converted basis, all Class B ordinary shares will automatically be converted into an equal number of Class A ordinary shares. The Group concluded that the adoption of dual-class share structure did not have a material impact on its consolidated financial statements. As of December 31, 2017, all the Class B ordinary shares of 345,541,350 shares were solely held by RONG360.

On July 31, 2018, all the Company's ordinary shares held by RONG360 were distributed to the existing shareholders of RONG360 in proportion to RONG360's shareholding structure ("Share Distribution"). 102,471,795 Class B ordinary shares, which were distributed to Founders, remained as the Class B ordinary shares, and 243,069,555 Class B ordinary share as distributed were automatically converted to Class A ordinary shares as aforementioned. Upon completion of the Share Distribution, the existing shareholders of RONG360 on July 31, 2018 became the Company's shareholders. Since then, RONG360 is not the Group's parent company any longer.

In June 2018, the Company issued 5,772,447 Class A ordinary shares for the business combination of Databook. Please refer to Note 9 Business combinations for details.

In August 2018, the Company issued 8,000,000 Class A ordinary shares and then designated to treasury stocks for options to be exercised in the future.

In June 2019, 6,000,000 Class B ordinary shares were redesignated to Class A ordinary shares.

In June 2019, the Company issued 2,400,000 Class A ordinary shares for the transactions with noncontrolling shareholders of Databook in June 2019. Please refer to Note 9 Business combinations for details.

**20. Share repurchase program**

On August 24, 2018, the board of directors of the Company had approved a share repurchase program, under which the Company may repurchase its Class A ordinary shares in the form of American depositary shares ("ADSs") with an aggregate value of up to US$20 million during the next twelve-month period. On February 22, 2019, the board of directors of the Company has approved a new share repurchase program, under which the Company may repurchase up to US$10 million of ADSs during the next twelve-month period. The share repurchases may be made in accordance with applicable laws and regulations through open market transactions, privately negotiated transactions or other legally permissible means as determined by the management.

During the year ended December 31, 2018, the Company had repurchased 2,249,831 ADSs for US$10,151 under these programs on the open market, at a weighted average price of US$4.51 per ADS. During the year ended December 31, 2019, the Company had repurchased 4,075,139 ADSs for US$19,849 under these programs on the open market, at a weighted average price of US$4.87 per ADS. The Company accounts for repurchased ordinary shares under the cost method and includes such treasury stock as a component of the shareholders' equity. The number of ADSs repurchased, total amount and weighted average price paid for ADSs repurchase do not give retroactive effect to the change in the ratio of ADSs to Class A ordinary shares from two ADSs to five Class A ordinary shares to one ADS to twenty Class A ordinary shares, which became effective on October 30, 2020.

The Company had accumulatively repurchased US$30 million of ADSs and closed these two programs in the third quarter of 2019.

## 21. Loss per share

Basic net loss per share is computed using the weighted average number of ordinary shares outstanding during the period. Diluted net loss per share is computed using the weighted average number of ordinary shares and dilutive potential ordinary shares outstanding during the period. Because the Class A ordinary shares and Class B ordinary shares have the same dividend and other rights, except for voting and conversion rights for Class B ordinary shares to be converted into Class A ordinary shares on one-to-one basis, the two classes of ordinary shares have been presented on a combined basis in the consolidated statements of comprehensive loss and in the computation of net loss per share.

The Company issued ordinary shares to RONG360 in connection with the Reorganization in September 2017 (See Note 1 and Note 19). 345,541,350 ordinary shares were issued and outstanding upon the completion of the Reorganization (See Note 1 and Note 19) in October 2017, which are held by RONG360. Basic and diluted net loss per ordinary share reflecting the effect of the issuance of ordinary shares to RONG360 are presented as follows, as if they had been existed since January 1, 2016.

Basic and diluted net loss per ordinary share for each of the years are presented as follows:

| | For the Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2019 | 2019 |
| | RMB (In thousands, except for share and per share data) | RMB (In thousands, except for share and per share data) | RMB (In thousands, except for share and per share data) | US$ (In thousands, except for share and per share data) |
| **Numerator** : | | | | |
| Net loss | (202,125) | (164,615) | (451,760) | (64,890) |
| Numerator for basic and diluted net loss per share | (202,125) | (164,615) | (451,760) | (64,890) |
| **Denominator:** | | | | |
| Weighted average number of ordinary shares | 353,452,309 | 417,315,644 | 420,575,827 | 420,575,827 |
| Denominator for basic and diluted net loss per share | 353,452,309 | 417,315,644 | 420,575,827 | 420,575,827 |
| **Net loss per ordinary share:** | | | | |
| Basic and diluted | (0.57) | (0.39) | (1.07) | (0.15) |

Diluted net loss per share is computed using the weighted average number of ordinary shares and dilutive potential ordinary shares outstanding during the respective year. The potential ordinary shares of restricted shares and share options were excluded from the diluted loss net per share calculations because to do so would be antidilutive for all the periods presented. The numbers of share options excluded from the calculation of diluted net loss per share of the Company were 28,766,313, 38,073,598 and 28,081,052 as of December 31, 2017, 2018 and 2019 respectively.

## 22. Related party transactions

The Group's consolidated financial statements include costs and expenses allocated from RONG360 prior to the Reorganization, amounting to RMB74,952 for the year ended December 31, 2017. In addition, RONG360 provided cash funding support to the Group to satisfy Platform Business' working capital requirements. See Note 1(b) for more detailed information.

F-42

The following sets forth significant related party transactions of the Group during the years presented:

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2017 RMB | 2018 RMB (As Restated) | 2019 RMB |
| Revenues from recommendation services for loans generated from RONG360 (a) | 102,997 | 105,492 | 31,980 |
| Revenues from advertising, marketing and other services generated from RONG360 (a) | — | 13,405 | 6,858 |
| Sales and marketing expense charged by related party A (b) | — | (51,753) | (21,099) |
| Administrative expenses charged to RONG360 (c) | 2,691 | 10,000 | 4,000 |
| Research and development expenses charged by RONG360 (d) | — | — | (2,162) |
| Collection handling services provided by RONG360 (e) | (1,564) | (4,644) | — |
| Initial working capital contributed by RONG360 immediately before the IPO (f) | 150,000 | — | — |
| Business combination transaction with related party B (h) | — | (6,250) | — |

The following sets forth related party outstanding balance:

| | As of December 31, | |
|---|---|---|
| | 2018 | 2019 |
| Amount due to RONG360 (g) | (61,048) | (24,345) |
| Amount due to related party A (b) | (5,452) | (3,715) |
| Amount due to related party B (h) | (6,250) | (6,250) |
| Amount due from related party C (i) | — | 7,082 |

(a)     RONG360's business comprised the Platform Business segment and non-platform Business segment prior to the Reorganization, thus transactions between the Group's Predecessor Operation, i.e. the Platform Business, and non-Platform business segment of RONG360 are accounted for as related party transactions. After the Share Distribution, RONG360 is still considered as a related party of the Group due to the existence of some same major shareholders of RONG360 and the Company. The Group provided loan recommendation services and advertising, marketing and other services to the non-platform Business segment of RONG360 and the related service fees were charged at a standard fee rate same as that charged to third party customers.

(b)     Related party A (minority investee of a company owned by two founders of the Company) and its subsidiary charged the Group advertising and marketing expenses for providing advertising and marketing service to the Group for the years ended December 31, 2018 and 2019. The Group set the pricing terms with this related party by mirroring the corresponding terms entered into between banks or their agents and the Group.

(c)     Following the Reorganization, the administrative expenses allocated to RONG360 consist of various expenses attributable to the non-platform business segment of RONG360, including expenses related to operational, administrative, human resources, legal, accounting and internal control support pursuant to the transitional services arrangement (see Note 1(b)).

(d)     RONG360 charged the Group research and development expenses for providing research and development services to the Group for the year ended December 31, 2019.

(e)     Following the Reorganization, RONG360 charged the Group collection handling fees for the revenue amount billed to third parties through RONG360 by the Group. As of December 31, 2019, the accounts receivable billed through RONG360 amounting to RMB3,549.

(f)     RONG360 provided RMB150 million of initial working capital to the Company in the form of a capital contribution. The Company received the related cash in November 2017.

(g)     The balance arose from the aforementioned related party transactions and various operational payments made by RONG360 on behalf of the Group, such as payroll costs, miscellaneous expenses, etc..

(h)     The Group obtained control of KTN from related party B (a company owned by two founders of the Company) in October 2018. The balance represented the unpaid consideration. Please refer to Note 9- Business combinations for more details.

(i)     The Group invested in and owned 15% of the preference shares of related party C. Related party C facilitated the fee collection for the Group's services delivered.

**23. Employee benefits**

Full time employees of the Group in the PRC participate in a government mandated defined contribution plan, pursuant to which certain pension benefits, medical care, employee housing fund and other welfare benefits are provided to the employees. Chinese labor regulations require that the PRC subsidiaries and VIEs of the Group make contributions to the government for these benefits based on certain percentages of the employees' salaries, up to a maximum amount specified by the local government. The Group has no legal obligation for the benefits beyond the contributions made. Total amounts of such employee benefit expenses, which were expensed as incurred, were approximately RMB38,726, RMB65,727 and RMB81,278 for the years ended December 31, 2017, 2018 and 2019, respectively.

**24. Commitments and contingencies**

*Short-term lease commitments*

The Group has leased office premises under non-cancellable short-term operating lease agreements. Future aggregate minimum lease payments under non-cancellable short-term operating leases agreements are as follows:

|  | As of December 31, 2019 |
| --- | --- |
|  | RMB |
| Within one year | 2,698 |
| Total | 2,698 |

*Capital and other commitments*

The Group did not have significant capital and other commitments as of December 31, 2018 and 2019.

*Contingencies*

The Company and certain of its officers and directors have been named as defendants in a putative securities class action filed on October 25, 2018 in the United States District Court for the Southern District of New York. The pending action was purportedly brought on behalf of a class of persons who allegedly suffered damages as a result of their purchase of the Company's ADSs pursuant to the Company's IPO. The plaintiffs alleged that the Company made misstatements and omissions in connection with its IPO in violation of the Securities Act of 1933. On January 10, 2019, the court entered an order appointing lead plaintiffs of this case, and on March 28, 2019, a consolidated amended complaint was filed. On September 27, 2020, the court denied the defendants' motion to dismiss. The action otherwise remains in its preliminary stage and the Group is currently unable to estimate the possible loss or a possible range of loss.

The Company and certain of its officers have been named as defendants in another putative securities class action filed on February 17, 2021 in the United States District Court for the Southern District of New York. The plaintiffs alleged that certain of the Company's disclosures since the first quarter of 2018 contained material misstatements and omissions in violation of the Securities Exchange Act of 1934. Lead plaintiff for this class action has yet to be appointed, and the consolidated amended complaint has yet to be filed. The Group is currently unable to estimate the possible loss or a possible range of loss.

In addition, from time to time, the Group is subject to legal proceedings, investigations and claims incidental to the conduct of its business. For these legal proceedings, the Group is currently unable to estimate the possible loss or a possible range of loss, if any, but the Group believes that the likelihood for such legal proceedings individually and in the aggregate, when finally resolved, to cause a material impact on the Group's financial position, result of operations and cash flows to be remote.

**25. Subsequent events**

(a)      **Impact of COVID-19**

Beginning in January 2020, the outbreak of COVID-19 has severely impacted China and the rest of the world, and the Group's business and results of operations have been adversely affected as a result. In early 2020, the COVID-19 pandemic resulted in the temporary closure of many corporate offices across China. Given the strict implementation of quarantine measures during this period, the Group and certain of its business partners implemented temporary adjustment of work schemes allowing employees to work from home and adopted remote collaboration. The Group made operational adjustments to maintain the same high quality service it had always provided its users, customers and partners as the Group simultaneously worked to minimize the impact of COVID-19 and push forward its business initiatives. However, as the Group's cooperation with financial service partners rely heavily on face-to-face communications, the Group's cooperation with them has been negatively impacted by the quarantine measures in China and in Beijing, in particular, for several months in 2020 when the strict quarantine measures were implemented. Although the quarantine measures have been largely relaxed compared to early 2020, the global COVID-19 pandemic and the associated inability to travel globally has negatively affected the progress of the originally planned further expansion of the Group's service offerings overseas since early 2020 and such negative impact may continue in 2021.

**(b)**          **Databook**

As mentioned in Note 12, in September 2019, the business of Databook was suspended for an investigation conducted against Databook and certain of its employees by competent authorities in relation to the compliance of information collection or use. The Group therefore recorded a full impairment for goodwill, intangible assets, and an impairment for other assets attributable to the Databook, totaling RMB254.7 million as of December 31, 2019. The investigation of Databook initiated in 2019 has concluded in January 2021. Databook was imposed confiscation of gains of RMB30 million and also a fine of RMB30 million, total amount of RMB60 million was paid in January 2021, and certain employees of Databook have been charged with criminal liabilities, neither other entities of the Group nor directors or officers of the Company were involved. According to ASC 855, it's a first type subsequent event that provides additional evidence about conditions that existed at the date of the balance sheet as of December 31, 2019. Thus, the Group reversed RMB30 million in revenues of advertising, marketing and other services, recorded RMB30 million as penalties, and accrued additional current income tax expenses of RMB10.0 million in 2019. As of December 31, 2019, the net assets of Databook included in the consolidated balance sheet of the Group (which are principally comprised of restricted cash and wealth management products, offset by accounts payable, tax payable, and accrued liabilities) was RMB22.3 million.

**(c)**          **ADS Ratio Change**

On October 21, 2020, the Company announced that it plans to change the ratio of its ADS to its Class A ordinary shares (the "ADS Ratio"), par value US$0.0001 per share, from the current ADS Ratio of two (2) ADSs to five (5) Class A ordinary shares to a new ADS Ratio of one (1) ADS to twenty (20) Class A ordinary shares. The Company filed a post-effective amendment to the ADS Registration Statement on Form F-6 with the U.S. Securities and Exchange Commission ("SEC") to reflect the change in the ADS Ratio. The change in the ADS Ratio took effective on October 30, 2020, as the SEC having declared the post-effective amendment to the ADS Registration Statement on Form F-6 on that date. The change in the ADS Ratio had no impact on the Company's underlying Class A ordinary shares, and no Class A ordinary shares was issued or cancelled in connection with the change in the ADS Ratio. Except as otherwise indicated, all ADS and per ADS data in these consolidated financial statements are prepared on a basis after taking into account the effect of the ADS Ratio Change and have been retrospectively adjusted accordingly.

**26. Restricted net assets**

The Group's ability to pay dividends is primarily dependent on the Group receiving distributions of funds from its subsidiaries. Relevant PRC statutory laws and regulations permit payments of dividends by the Group's subsidiaries and VIEs incorporated in the PRC only out of their retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. The results of operations reflected in the financial statements prepared in accordance with U.S. GAAP differ from those reflected in the statutory financial statements of the Group's subsidiaries and VIEs.

In accordance with the PRC laws and regulations, statutory reserve funds shall be made and can only be used for specific purposes and are not distributable as cash dividends. See Note 3(ab) for more detailed information. As a result of these PRC laws and regulations that require annual appropriation of 10% of net after-tax profits determined in accordance with PRC accounting standards and regulations to be set aside prior to payment of dividends as general reserve fund or statutory surplus fund, the Group's PRC subsidiaries and VIEs are restricted in their ability to transfer a portion of their net assets to the Company.

The Group performed a test on the restricted net assets of its consolidated subsidiaries and VIEs (the "restricted net assets") in accordance with Securities and Exchange Commission Regulation S-X Rule 4-08 (e) (3), "General Notes to Financial Statements". Such restricted net assets amounting to approximately RMB197.6 million, or 18.62% of the Group's total consolidated net assets, as of December 31, 2019.

F-45

**Description of Rights of Each Class of Securities Registered under Section 12 of the Securities Exchange Act of 1934 (the "Exchange Act")**

American Depositary Shares ("ADSs"), each representing 20 Class A ordinary shares of Jianpu Technology Inc. ("Jianpu," "we," "our," "our company," or "us") are listed and traded on the New York Stock Exchange ("NYSE") and, in connection therewith, the Class A ordinary shares are registered under Section 12(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). This exhibit contains a description of the rights of (i) the holders of Class A ordinary shares and (ii) the holders of ADSs. Class A ordinary shares underlying the ADSs are held by Deutsche Bank Trust Company Americas, as depositary, and holders of ADSs will not be treated as holders of Class A ordinary shares.

**Description of Class A Ordinary Shares**

The following is a summary of material provisions of our currently effective second amended and restated memorandum and articles of association (the "Memorandum and Articles of Association"), as well as the Companies Act (as amended) of the Cayman Islands (the "Companies Act") insofar as they relate to the material terms of the Class A ordinary shares. Notwithstanding this, because it is a summary, it may not contain all the information that you may otherwise deem important. For more complete information, you should read the entire Memorandum and Articles of Association, which has been filed with the Securities And Exchange Commission (the "SEC") as an exhibit to our Registration Statement on Form F-1 (File No. 333-221056), initially filed with the SEC on October 20, 2017.

***Type and Class of Securities (Item 9.A.5 of Form 20-F)***

Each Class A ordinary share has par value of US$0.0001. The number of Class A ordinary shares that have been issued as of the last day of the fiscal year ended December 31, 2019 is provided on the cover of the annual report on Form 20-F filed on April 30, 2021 (the "2019 Form 20-F"). Our Class A ordinary shares may be held in either certified or uncertified form.

***Preemptive Rights (Item 9.A.3 of Form 20-F)***

The shareholders of Jianpu do not have preemptive right.

***Limitations or Qualifications (Item 9.A.6 of Form 20-F)***

We have a dual-class voting structure such that our ordinary shares consist of Class A ordinary shares and Class B ordinary shares. Each Class A ordinary share shall entitle the holder thereof to one vote on all matters subject to vote at our general meetings, and each Class B ordinary share shall entitle the holder thereof to ten votes on all matters subject to vote at our general meetings. Due to the super voting power of Class B ordinary share holder, the voting power of the Class A ordinary shares may be materially limited.

***Rights of Other Types of Securities (Item 9.A.7 of Form 20-F)***

Not applicable.

***Rights of Class A Ordinary Shares (Item 10.B.3 of Form 20-F)***

***Class of Ordinary Shares***

Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of our Class A ordinary shares and Class B ordinary shares will have the same rights except for voting and conversion rights. Each Class A Ordinary Share shall entitle the holder thereof to one (1) vote on all matters subject to vote at our general meetings, and each Class B ordinary share shall entitle the holder thereof to ten (10) votes on all matters subject to vote at our general meetings. Our ordinary shares are issued in registered form and are issued when registered in our register of members.

Each Class B ordinary share is convertible into one Class A ordinary share at any time by the holder thereof. Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Upon any sale, transfer, assignment or disposition of any Class B ordinary share by a founder to any person who is not a founder affiliate of such founder, or upon a change of ultimate beneficial ownership of any Class B ordinary share from a founder to any person who is not a founder affiliate of such founder, such Class B ordinary share shall be automatically and immediately converted into one Class A ordinary share. In addition, if shares beneficially owned by the founders collectively account for less than five percent (5%) of the issued shares in the capital of the Company, then each Class B ordinary share shall automatically be re-designated into one Class A ordinary share, and no Class B ordinary shares shall be issued by the Company thereafter. When a founder ceases to be a director or an executive officer of the Company, each Class B ordinary share beneficially owned by such founder shall automatically be re-designated into one Class A ordinary share.

### *Dividends*

The holders of our ordinary shares are entitled to receive such dividends as may be declared by our board of directors subject to the Memorandum and Articles of Association and the Companies Act. In addition, our shareholders may by ordinary resolution declare a dividend, but no dividend may exceed the amount recommended by our directors. Under Cayman Islands law, dividends may be paid only out of profits and out of share premium. No dividend may be declared and paid unless our directors determine that, immediately after the payment, we will be able to satisfy our liabilities as they become due in the ordinary course of business and we have funds lawfully available for such purpose.

### *Voting Rights*

Holders of our ordinary shares have the right to receive notice of, attend, speak and vote at general meetings of our company. Each holder of Class A ordinary shares is entitled to one vote per share and each holder of our Class B ordinary shares is entitled to ten votes per share on all matters submitted to them for a vote. Our Class A ordinary shares and Class B ordinary shares vote together as a single class on all matters submitted to a vote of our shareholders, except as may otherwise be required by law. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by the chairman. An ordinary resolution to be passed by the shareholders requires the affirmative vote of a simple majority of the votes attaching to the ordinary shares cast in a general meeting, which can be an annual general meeting or a special meeting of shareholders. A special resolution requires the affirmative vote of no less than two-thirds of the votes attaching to the ordinary shares cast in a general meeting. Both ordinary resolutions and special resolutions may also be passed by a unanimous written resolution signed by all the shareholders of our company, as permitted by the Companies Act and the Memorandum and Articles of Association. A special resolution will be required for important matters such as a change of name or making changes to the Memorandum and Articles of Association.

### *Transfer of Ordinary Shares*

Subject to the restrictions in the Memorandum and Articles of Association as set out below, any of our shareholders may transfer all or any of his or her ordinary shares by an instrument of transfer in the usual or common form or any other form approved by our board.

Our board of directors may, in its absolute discretion, decline to register any transfer of any ordinary share which is not fully paid-up or on which we have a lien. Our directors may also decline to register any transfer of any ordinary share unless:

· the instrument of transfer is lodged with us, accompanied by the certificate for the ordinary shares to which it relates and such other evidence as our board of directors may reasonably require to show the right of the transferor to make the transfer;

2

· the instrument of transfer is in respect of only one class of shares;

· the instrument of transfer is properly stamped, if required;

· in the case of a transfer to joint holders, the number of joint holders to whom the ordinary share is to be transferred does not exceed four;

· the ordinary shares transferred are fully paid or free of any lien in favor of us; or

· such lesser sum as the directors may from time to time require, is paid to the company thereof.

The registration of transfers of shares or of any class of shares may, after compliance with any notice requirement of the designated stock exchange, be suspended at such times and for such periods (not exceeding in the whole thirty (30) days in any year) as the Board may determine.

### *Liquidation*

On a return of capital on winding-up or otherwise (other than on conversion, redemption or purchase of ordinary shares), assets available for distribution among the holders of ordinary shares will be distributed among the holders of the ordinary shares on a pro rata basis. If our assets available for distribution are insufficient to repay all of the paid-up capital, the assets will be distributed so that the losses are borne by our shareholders proportionately. We are an exempted company with "limited liability" registered under the Companies Act, and under the Companies Act, the liability of our members is limited to the amount, if any, unpaid on the shares respectively held by them. Our memorandum of association contains a declaration that the liability of our members is so limited.

### *Calls on Ordinary Shares and Forfeiture of Ordinary Shares*

Our board of directors may from time to time make calls upon shareholders for any amounts unpaid on their ordinary shares in a notice served to such shareholders at least 14 calendar days prior to the specified time and place of payment. The ordinary shares that have been called upon and remain unpaid on the specified time are subject to forfeiture.

### *Redemption, Repurchase and Surrender of Ordinary Shares*

We may issue shares on terms that such shares are subject to redemption, at our option or at the option of the holders thereof, on such terms and in such manner as may be determined, before the issue of such shares, by our board of directors or by a special resolution of our shareholders. Our company may also repurchase any of our shares provided that the manner and terms of such purchase have been approved by our board of directors and agree with the shareholder, or are otherwise authorized by the Memorandum and Articles of Association. Under the Companies Act, the redemption or repurchase of any share may be paid out of our company's profits or one of the share premium account, or out of the proceeds of a fresh issue of shares made for the purpose of such redemption or repurchase, or, if so authorized by its articles of association, out of capital if the company can, immediately following such payment, pay its debts as they fall due in the ordinary course of business. In addition, under the Companies Act no such share may be redeemed or repurchased (a) unless it is fully paid-up, (b) if such redemption or repurchase would result in there being no shares outstanding, or (c) if the company has commenced liquidation. In addition, our company may accept the surrender of any fully paid share for no consideration.

## *Requirements to Change the Rights of Holders of Class A Ordinary Shares (Item 10.B.4 of Form 20-F)*

### *Variations of Rights of Shares*

If at any time the share capital is divided into different classes of shares, the rights attached to any class of shares may, unless otherwise provided by the terms of issue of the shares of that class, be varied with the consent in writing of the holders of the shares of that class or with the sanction of a resolution passed at a separate meeting of the holders of the shares of that class by holding of two-thirds of the issued shares of that class.

3

*Limitations on the Rights to Own Class A Ordinary Shares (Item 10.B.6 of Form 20-F)*

There are no limitations under the laws of the Cayman Islands or under the Memorandum and Articles of Association that limit the right of non-resident or foreign owners to hold or vote Class A ordinary shares, other than anti-takeover provisions contained in the Memorandum and Articles of Association to limit the ability of others to acquire control of our company or cause our company to engage in change-of-control transactions.

*Provisions Affecting Any Change of Control (Item 10.B.7 of Form 20-F)*

*Anti-Takeover Provisions in the Memorandum and Articles of Association*

Some provisions of the Memorandum and Articles of Association may discourage, delay or prevent a change in control of our company or management that shareholders may consider favorable, including provisions that authorize our board of directors to issue preferred shares in one or more series and to designate the price, rights, preferences, privileges and restrictions of such preferred shares without any further vote or action by our shareholders.

However, under Cayman Islands law, our directors may only exercise the rights and powers granted to them under the Memorandum and Articles of Association for a proper purpose and for what they believe in good faith to be in the best interests of our company.

*Ownership Threshold (Item 10.B.8 of Form 20-F)*

There are no provisions under the laws of the Cayman Islands or under the Memorandum and Articles of Association that govern the ownership threshold above which shareholder ownership must be disclosed.

*Differences Between the Law of Different Jurisdictions (Item 10.B.9 of Form 20-F)*

The Companies Act is modeled after that of the English companies legislation but does not follow recent English law statutory enactments, and accordingly there are significant differences between the Companies Act and the current Companies Act of England. In addition, the Companies Act differs from laws applicable to Delaware corporations and their shareholders. Set forth below is a summary of the significant differences between the provisions of the Companies Act applicable to us and the laws applicable to Delaware corporations and their shareholders.

*Mergers and Similar Arrangements*

The Companies Act permits mergers and consolidations between Cayman Islands companies and between Cayman Islands companies and non-Cayman Islands companies. For these purposes, (a) "merger" means the merging of two or more constituent companies and the vesting of their undertakings, property and liabilities in one of such companies as the surviving company and (b) a "consolidation" means the combination of two or more constituent companies into a consolidated company and the vesting of the undertakings, property and liabilities of such companies to the consolidated company. In order to effect such a merger or consolidation, the directors of each constituent company must approve a written plan of merger or consolidation, which must then be authorized by (a) a special resolution of the shareholders of each constituent company, and (b) such other authorization, if any, as may be specified in such constituent company's articles of association. The written plan of merger or consolidation must be filed with the Registrar of Companies together with a declaration as to the solvency of the consolidated or surviving company, a declaration as to the assets and liabilities of each constituent company and an undertaking that a copy of the certificate of merger or consolidation will be given to the members and creditors of each constituent company and that notification of the merger or consolidation will be published in the Cayman Islands Gazette. Dissenting shareholders have the right to be paid the fair value of their shares (which, if not agreed between the parties, will be determined by the Cayman Islands court) if they follow the required procedures, subject to certain exceptions. Court approval is not required for a merger or consolidation which is effected in compliance with these statutory procedures.

4

In addition, there are statutory provisions that facilitate the reconstruction and amalgamation of companies, provided that the arrangement is approved by a majority in number of each class of shareholders and creditors with whom the arrangement is to be made, and who must in addition represent three-fourths in value of each such class of shareholders or creditors, as the case may be, that are present and voting either in person or by proxy at a meeting, or meetings, convened for that purpose. The convening of the meetings and subsequently the arrangement must be sanctioned by the Grand Court of the Cayman Islands. While a dissenting shareholder has the right to express to the court the view that the transaction ought not to be approved, the court can be expected to approve the arrangement if it determines that:

· the statutory provisions as to the due majority vote have been met;

· the shareholders have been fairly represented at the meeting in question and the statutory majority are acting bona fide without coercion of the minority to promote interests adverse to those of the class;

· the arrangement is such that may be reasonably approved by an intelligent and honest man of that class acting in respect of his interest; and

· the arrangement is not one that would more properly be sanctioned under some other provision of the Companies Act.

When a takeover offer is made and accepted by holders of 90% of the shares affected (within four months), the offeror may, within a two-month period commencing on the expiration of such four-month period, require the holders of the remaining shares to transfer such shares on the terms of the offer. An objection can be made to the Grand Court of the Cayman Islands, but this is unlikely to succeed in the case of an offer which has been so approved unless there is evidence of fraud, bad faith or collusion.

If the arrangement and reconstruction is thus approved, the dissenting shareholder would have no rights comparable to appraisal rights, which would otherwise ordinarily be available to dissenting shareholders of United States corporations, providing rights to receive payment in cash for the judicially determined value of the shares.

***Shareholders' Suits***

In principle, we will normally be the proper plaintiff and as a general rule a derivative action may not be brought by a minority shareholder. However, based on English authorities, which would in all likelihood be of persuasive authority in the Cayman Islands, there are exceptions to the foregoing principle, including when:

· a company acts or proposes to act illegally or ultra vires;

· the act complained of, although not ultra vires, could only be effected duly if authorized by more than a simple majority vote that has not been obtained; and

5

***Indemnification of Directors and Executive Officers and Limitation of Liability***

The ability of Cayman Islands companies to provide in their articles of association for indemnification of officers and directors is limited, insofar as it is not permissible for the directors to contract out of the core fiduciary duties they owe to the company, nor would any indemnity be effective if it were held by the Cayman Islands courts to be contrary to public policy, which would include any attempt to provide indemnification against civil fraud or the consequences of committing a crime. The Memorandum and Articles of Association provide that our directors, secretary, assistant secretary, officers and the personal representatives of the same shall be indemnified against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by such persons, other than by reason of such persons' own dishonesty, willful default or fraud, in or about the conduct of our company's business or affairs (including as a result of any mistake of judgment) or in the execution or discharge of his duties, powers, authorities or discretions, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by such director or officer in defending (whether successfully or otherwise) any civil proceedings concerning our company or its affairs in any court whether in the Cayman Islands or elsewhere. This standard of conduct is generally the same as permitted under the Delaware General Corporation Law for a Delaware corporation. In addition, we have entered into indemnification agreements with each of our directors and executive officers that will provide such persons with additional indemnification beyond that provided in the Memorandum and Articles of Association.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to our directors, officers or persons controlling us under the foregoing provisions, we have been informed that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

***Directors' Fiduciary Duties***

Under Delaware corporate law, a director of a Delaware corporation has a fiduciary duty to the corporation and its shareholders. This duty has two components, the duty of care and the duty of loyalty. The duty of care requires that a director act in good faith, with the care that an ordinarily prudent person would exercise under similar circumstances. Under this duty, a director must inform himself of, and disclose to shareholders, all material information reasonably available regarding a significant transaction. The duty of loyalty requires that a director must act in a manner he or she reasonably believes to be in the best interests of the corporation. A director must not use his or her corporate position for personal gain or advantage. This duty prohibits self-dealing by a director and mandates that the best interests of the corporation and its shareholders take precedence over any interest possessed by a director, officer or controlling shareholder not shared by the shareholders generally. In general, actions of a director are presumed to have been made on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the corporation. However, this presumption may be rebutted by evidence of a breach of one of the fiduciary duties. Should such evidence be presented concerning a transaction by a director, the director must prove the procedural fairness of the transaction and that the transaction was of fair value to the corporation.

As a matter of Cayman Islands law, a director of a Cayman Islands company is in the position of a fiduciary with respect to the company, and therefore it is considered that he or she owes the following duties to the company including a duty to act bona fide in the best interests of the company, a duty not to make a personal profit out of his or her position as director (unless the company permits him or her to do so), a duty not to put himself or herself in a position where the interests of the company conflict with his or her personal interests or his or her duty to a third party and a duty to exercise powers for the purpose for which such powers were intended. A director of a Cayman Islands company owes to the company a duty to act with skill and care. It was previously considered that a director need not exhibit in the performance of his or her duties a greater degree of skill than may reasonably be expected from a person of his or her knowledge and experience. However, there are indications that the English and commonwealth courts are moving towards an objective standard with regard to the required skill and care and these authorities are likely to be followed in the Cayman Islands.

Under the Memorandum and Articles of Association, directors who are in any way, whether directly or indirectly, interested in a contract or proposed contract with our company must declare the nature of their interest at a meeting of the board of directors. Following such declaration, a director may vote in respect of any contract or proposed contract notwithstanding his interest.

### Shareholder Proposals

Under the Delaware General Corporation Law, a shareholder has the right to put any proposal before the annual meeting of shareholders, provided that it complies with the notice provisions in the governing documents. A special meeting may be called by the board of directors or any other person authorized to do so in the governing documents, but shareholders may be precluded from calling special meetings.

The Companies Act provides shareholders with only limited rights to requisition a general meeting, and does not provide shareholders with any right to put any proposal before a general meeting. However, these rights may be provided in a company's articles of association. The Memorandum and Articles of Association allow any one or more of our shareholders who together hold shares which carry in aggregate not less than one-third of the total number of votes attaching to all issued and outstanding shares of our company entitled to vote at general meetings to requisition an extraordinary general meeting of our shareholders, in which case our board of directors is obliged to convene an extraordinary general meeting and to put the proposals so requisitioned to a vote at such meeting. Other than this right to requisition a shareholders' meeting, the Memorandum and Articles of Association do not provide our shareholders with any other right to put proposals before annual general meetings or extraordinary general meetings not called by such shareholders. As an exempted Cayman Islands company, we are not obliged by law to call shareholders' annual general meetings.

### Cumulative Voting

Under the Delaware General Corporation Law, cumulative voting for elections of directors is not permitted unless the corporation's certificate of incorporation specifically provides for it. Cumulative voting potentially facilitates the representation of minority shareholders on a board of directors since it permits the minority shareholder to cast all the votes to which the shareholder is entitled for a single director, which increases the shareholder's voting power with respect to electing such director. There are no prohibitions in relation to cumulative voting under the laws of the Cayman Islands but the Memorandum and Articles of Association do not provide for cumulative voting.

### Removal of Directors

Under the Delaware General Corporation Law, a director of a corporation may be removed with the approval of a majority of the outstanding shares entitled to vote, unless the certificate of incorporation provides otherwise. Under the Memorandum and Articles of Association, directors may be removed with or without cause, by an ordinary resolution of our shareholders.

7

The Delaware General Corporation Law contains a business combination statute applicable to Delaware public corporations whereby, unless the corporation has specifically elected not to be governed by such statute by amendment to its certificate of incorporation, it is prohibited from engaging in certain business combinations with an "interested shareholder" for three years following the date on which such person becomes an interested shareholder. An interested shareholder generally is one which owns or owned 15% or more of the target's outstanding voting shares within the past three years. This has the effect of limiting the ability of a potential acquiror to make a two-tiered bid for the target in which all shareholders would not be treated equally. The statute does not apply if, among other things, prior to the date on which such shareholder becomes an interested shareholder, the board of directors approves either the business combination or the transaction that resulted in the person becoming an interested shareholder. This encourages any potential acquiror of a Delaware public corporation to negotiate the terms of any acquisition transaction with the target's board of directors.

Cayman Islands law has no comparable statute. As a result, we cannot avail ourselves of the types of protections afforded by the Delaware business combination statute. However, although Cayman Islands law does not regulate transactions between a company and its significant shareholders, it does provide that such transactions entered into must be bona fide in the best interests of the company, for a proper corporate purpose and not with the effect of perpetrating a fraud on the minority shareholders.

### *Dissolution; Winding Up*

Under the Delaware General Corporation Law, unless the board of directors approves the proposal to dissolve, dissolution must be approved by shareholders holding 100% of the total voting power of the corporation. Only if the dissolution is initiated by the board of directors may it be approved by a simple majority of the corporation's outstanding shares. The Delaware General Corporation Law allows a Delaware corporation to include in its certificate of incorporation a supermajority voting requirement in connection with dissolutions initiated by the board of directors. Under the Companies Act, our company may be dissolved, liquidated or wound up by a special resolution, or by an ordinary resolution on the basis that our company is unable to pay its debts as they fall due.

### *Variation of Rights of Shares*

If at any time, our share capital is divided into different classes of shares, under the Delaware General Corporation Law, a corporation may vary the rights of a class of shares with the approval of a majority of the outstanding shares of such class, unless the certificate of incorporation provides otherwise. Under the Memorandum and Articles of Association and as permitted by the Companies Act, if our share capital is divided into more than one class of shares, we may vary the rights attached to any class with the sanction of a special resolution of the holders of the shares of that class.

### *Amendment of Governing Documents*

Under the Delaware General Corporation Law, a corporation's governing documents may be amended with the approval of a majority of the outstanding shares entitled to vote, unless the certificate of incorporation provides otherwise. Under the Companies Act, the Memorandum and Articles of Association may only be amended by a special resolution of our shareholders.

8

Some provisions of the Memorandum and Articles of Association may discourage, delay or prevent a change of control of our company or management that shareholders may consider favorable, including a provision that authorizes our board of directors to issue preferred shares in one or more series and to designate the price, rights, preferences, privileges and restrictions of such preferred shares without any further vote or action by our shareholders.

However, under Cayman Islands law, our directors may only exercise the rights and powers granted to them under the Memorandum and Articles of Association for a proper purpose and for what they believe in good faith to be in the best interests of our company.

### Rights of Non-Resident or Foreign Shareholders

There are no limitations imposed by foreign law or by the Memorandum and Articles of Association on the rights of non-resident or foreign shareholders to hold or exercise voting rights on our ordinary shares. In addition, there are no provisions in the Memorandum and Articles of Association governing the ownership threshold above which shareholder ownership must be disclosed.

### Directors' Power to Issue Shares

Under the Memorandum and Articles of Association, our board of directors is empowered to issue or allot shares or grant options and warrants with or without preferred, deferred, qualified or other special rights or restrictions.

### Exempted Company.

The Companies Act in the Cayman Islands distinguishes between ordinary resident companies and exempted companies. Any company that is registered in the Cayman Islands but conducts business mainly outside of the Cayman Islands may apply to be registered as an exempted company. The requirements for an exempted company are essentially the same as for an ordinary company except for the exemptions and privileges listed below:

· an exempted company does not have to file an annual return of its shareholders with the Registrar of Companies;

· an exempted company's register of members is not required to be open to inspection;

· an exempted company does not have to hold an annual general meeting;

· an exempted company may issue no par value shares;

· an exempted company may obtain an undertaking against the imposition of any future taxation (such undertakings are usually given for 30 years in the first instance);

· an exempted company may register by way of continuation in another jurisdiction and be deregistered in the Cayman Islands;

· an exempted company may register as a limited duration company; and

· an exempted company may register as a segregated portfolio company.

9

"Limited liability" means that the liability of each shareholder is limited to the amount unpaid by the shareholder on that shareholder's shares of the company (except in exceptional circumstances, such as involving fraud, the establishment of an agency relationship or an illegal or improper purpose or other circumstances in which a court may be prepared to pierce or lift the corporate veil).

### Changes in Capital (Item 10.B.10 of Form 20-F)

Our shareholders may from time to time by ordinary resolutions:

· increase the share capital by such sum, to be divided into shares of such classes and amount, as the resolution prescribes;

· consolidate and divide all or any of our share capital into shares of a larger amount than our existing shares;

· convert all or any of our paid-up shares into stock and reconvert that stock into paid-up shares of any denomination;

· sub-divide our existing shares, or any of them into shares of a smaller amount than that fixed by our memorandum of association; provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced share will be the same as it was in case of the share from which the reduced share is derived; or

· cancel any shares which, at the date of the passing of the resolution, have not been taken or agreed to be taken by any person and diminish the amount of our share capital by the amount of the shares so cancelled.

Subject to the Companies Act, our shareholders may by special resolution reduce our share capital and any capital redemption reserve in any manner authorized by law.

### Debt Securities (Item 12.A of Form 20-F)

Not applicable.

### Warrants and Rights (Item 12.B of Form 20-F)

Not applicable.

### Other Securities (Item 12.C of Form 20-F)

Not applicable.

### American Depositary Shares (Items 12.D.1 and 12.D.2 of Form 20-F)

Deutsche Bank Trust Company Americas, as depositary, registers and delivers the ADSs. Each ADS represents ownership of 20 Class A ordinary shares, deposited with Deutsche Bank AG, Hong Kong Branch, as custodian for the depositary. Each ADS also represents ownership of any other securities, cash or other property which may be held by the depositary. The depositary's corporate trust office at which the ADSs are administered is located at 60 Wall Street, New York, NY 10005, USA. The principal executive office of the depositary is located at 60 Wall Street, New York, NY 10005, USA.

The Direct Registration System, or DRS, is a system administered by The Depository Trust Company, or DTC, pursuant to which the depositary may register the ownership of uncertificated ADSs, which ownership shall be evidenced by periodic statements issued by the depositary to the ADS holders entitled thereto.

We do not treat ADS holders as our shareholders and accordingly, you, as an ADS holder, do not have shareholder rights. Cayman Islands law governs shareholder rights. The depositary is the holder of the Class A ordinary shares underlying your ADSs. As a holder of ADSs, you have ADS holder rights. A deposit agreement among us, the depositary and you, as an ADS holder, and the beneficial owners of ADSs sets out ADS holder rights as well as the rights and obligations of the depositary. The laws of the State of New York govern the deposit agreement and the ADSs.

10

The following is a summary of the material provisions of the deposit agreement. For more complete information, you should read the entire deposit agreement and the form of ADR which contains the terms of your ADSs. The deposit agreement has been filed with the SEC as an exhibit to a Registration Statement on Form F-6 (File No. 333-221356) for our company. The form of ADR is on file with the SEC as an exhibit to our Registration Statement on Form F-1/A (File No. 333-221056), filed with the SEC on November 13, 2017.

### Holding the ADSs

*How will you hold your ADSs?*

You may hold ADSs either (1) directly (a) by having an American Depositary Receipt, or ADR, which is a certificate evidencing a specific number of ADSs, registered in your name, or (b) by holding ADSs in DRS, or (2) indirectly through your broker or other financial institution. If you hold ADSs directly, you are an ADS holder. This description assumes you hold your ADSs directly. ADSs will be issued through DRS, unless you specifically request certificated ADRs. If you hold the ADSs indirectly, you must rely on the procedures of your broker or other financial institution to assert the rights of ADS holders described in this section. You should consult with your broker or financial institution to find out what those procedures are.

### Dividends and Other Distributions

*How will you receive dividends and other distributions on the shares?*

The depositary has agreed to pay to you the cash dividends or other distributions it or the custodian receives on Class A ordinary shares or other deposited securities, after deducting its fees and expenses. You will receive these distributions in proportion to the number of Class A ordinary shares your ADSs represent as of the record date (which will be as close as practicable to the record date for our Class A ordinary shares) set by the depositary with respect to the ADSs.

· **Cash**.  The depositary will convert or cause to be converted any cash dividend or other cash distribution we pay on the Class A ordinary shares or any net proceeds from the sale of any Class A ordinary shares, rights, securities or other entitlements under the terms of the deposit agreement into U.S. dollars if it can do so on a practicable basis, and can transfer the U.S. dollars to the United States and will distribute promptly the amount thus received. If the depositary shall determine in its judgment that such conversions or transfers are not practical or lawful or if any government approval or license is needed and cannot be obtained at a reasonable cost within a reasonable period or otherwise sought, the deposit agreement allows the depositary to distribute the foreign currency only to those ADS holders to whom it is possible to do so. It will hold or cause the custodian to hold the foreign currency it cannot convert for the account of the ADS holders who have not been paid and such funds will be held for the respective accounts of the ADS holders. It will not invest the foreign currency and it will not be liable for any interest for the respective accounts of the ADS holders.

11

·   Before making a distribution, any taxes or other governmental charges, together with fees and expenses of the depositary, that must be paid, will be deducted. See "Item 10 Additional Information — E. Taxation." of the 2019 Form 20-F. It will distribute only whole U.S. dollars and cents and will round down fractional cents to the nearest whole cent. If the exchange rates fluctuate during a time when the depositary cannot convert the foreign currency, you may lose some or all of the value of the distribution.

·   *Shares*.  For any Class A ordinary shares we distribute as a dividend or free distribution, either (1) the depositary will distribute additional ADSs representing such Class A ordinary shares or (2) existing ADSs as of the applicable record date will represent rights and interests in the additional Class A ordinary shares distributed, to the extent reasonably practicable and permissible under law, in either case, net of applicable fees, charges and expenses incurred by the depositary and taxes and/or other governmental charges. The depositary will only distribute whole ADSs. It will try to sell Class A ordinary shares which would require it to deliver a fractional ADS and distribute the net proceeds in the same way as it does with cash. The depositary may sell a portion of the distributed Class A ordinary shares sufficient to pay its fees and expenses, and any taxes and governmental charges, in connection with that distribution.

·   *Elective Distributions in Cash or Shares*.  If we offer holders of our Class A ordinary shares the option to receive dividends in either cash or shares, the depositary, after consultation with us and having received timely notice as described in the deposit agreement of such elective distribution by us, has discretion to determine to what extent such elective distribution will be made available to you as a holder of the ADSs. We must timely first instruct the depositary to make such elective distribution available to you and furnish it with satisfactory evidence that it is legal to do so. The depositary could decide it is not legal or reasonably practicable to make such elective distribution available to you. In such case, the depositary shall, on the basis of the same determination as is made in respect of the Class A ordinary shares for which no election is made, distribute either cash in the same way as it does in a cash distribution, or additional ADSs representing Class A ordinary shares in the same way as it does in a share distribution. The depositary is not obligated to make available to you a method to receive the elective dividend in shares rather than in ADSs. There can be no assurance that you will be given the opportunity to receive elective distributions on the same terms and conditions as the holders of Class A ordinary shares.

·   *Rights to Purchase Additional Shares*.  If we offer holders of our Class A ordinary shares any rights to subscribe for additional shares, the depositary shall having received timely notice as described in the deposit agreement of such distribution by us, consult with us, and we must determine whether it is lawful and reasonably practicable to make these rights available to you. We must first instruct the depositary to make such rights available to you and furnish the depositary with satisfactory evidence that it is legal to do so. If the depositary decides it is not legal or reasonably practicable to make the rights available but that it is lawful and reasonably practicable to sell the rights, the depositary will endeavor to sell the rights and in a riskless principal capacity or otherwise, at such place and upon such terms (including public or private sale) as it may deem proper distribute the net proceeds in the same way as it does with cash. The depositary will allow rights that are not distributed or sold to lapse. In that case, you will receive no value for them.

12

If the depositary makes rights available to you, it will establish procedures to distribute such rights and enable you to exercise the rights upon your payment of applicable fees, charges and expenses incurred by the depositary and taxes and/or other governmental charges. The Depositary shall not be obliged to make available to you a method to exercise such rights to subscribe for Class A ordinary shares (rather than ADSs).

U.S. securities laws may restrict transfers and cancellation of the ADSs represented by shares purchased upon exercise of rights. For example, you may not be able to trade these ADSs freely in the United States. In this case, the depositary may deliver restricted depositary shares that have the same terms as the ADSs described in this section except for changes needed to put the necessary restrictions in place.

There can be no assurance that you will be given the opportunity to exercise rights on the same terms and conditions as the holders of Class A ordinary shares or be able to exercise such rights.

· ***Other Distributions***.  Subject to receipt of timely notice, as described in the deposit agreement, from us with the request to make any such distribution available to you, and provided the depositary has determined such distribution is lawful and reasonably practicable and feasible and in accordance with the terms of the deposit agreement, the depositary will distribute to you anything else we distribute on deposited securities by any means it may deem practicable, upon your payment of applicable fees, charges and expenses incurred by the depositary and taxes and/or other governmental charges. If any of the conditions above are not met, the depositary will endeavor to sell, or cause to be sold, what we distributed and distribute the net proceeds in the same way as it does with cash; or, if it is unable to sell such property, the depositary may dispose of such property in any way it deems reasonably practicable under the circumstances for nominal or no consideration, such that you may have no rights to or arising from such property.

The depositary is not responsible if it decides that it is unlawful or impractical to make a distribution available to any ADS holders. We have no obligation to register ADSs, shares, rights or other securities under the Securities Act. We also have no obligation to take any other action to permit the distribution of ADSs, shares, rights or anything else to ADS holders. This means that you may not receive the distributions we make on our shares or any value for them if we and/or the depositary determines that it is illegal or not practicable for us or the depositary to make them available to you.

***Deposit, Withdrawal and Cancellation***

*How are ADSs issued?*

The depositary will deliver ADSs if you or your broker deposit Class A ordinary shares or evidence of rights to receive Class A ordinary shares with the custodian. Upon payment of its fees and expenses and of any taxes or charges, such as stamp taxes or stock transfer taxes or fees, the depositary will register the appropriate number of ADSs in the names you request and will deliver the ADSs to or upon the order of the person or persons entitled thereto.

Except for Class A ordinary shares deposited by us in connection with this offering, no shares will be accepted for deposit during a period of 180 days after the date of this prospectus.

13

You may turn in your ADSs at the depositary's corporate trust office or by providing appropriate instructions to your broker. Upon payment of its fees and expenses and of any taxes or charges, such as stamp taxes or stock transfer taxes or fees, the depositary will deliver the Class A ordinary shares and any other deposited securities underlying the ADSs to you or a person you designate at the office of the custodian. Or, at your request, risk and expense, the depositary will deliver the deposited securities at its corporate trust office, to the extent permitted by law.

*How do ADS holders interchange between Certificated ADSs and Uncertificated ADSs?*

You may surrender your ADR to the depositary for the purpose of exchanging your ADR for uncertificated ADSs. The depositary will cancel that ADR and will send you a statement confirming that you are the owner of uncertificated ADSs. Alternatively, upon receipt by the depositary of a proper instruction from a holder of uncertificated ADSs requesting the exchange of uncertificated ADSs for certificated ADSs, the depositary will execute and deliver to you an ADR evidencing those ADSs.

***Voting Rights***

*How do you vote?*

You may instruct the depositary to vote the Class A ordinary shares or other deposited securities underlying your ADSs at any meeting at which you are entitled to vote pursuant to any applicable law, the provisions of the Memorandum and Articles of Association, and the provisions of or governing the deposited securities. Otherwise, you could exercise your right to vote directly if you withdraw the Class A ordinary shares. However, you may not know about the meeting sufficiently enough in advance to withdraw the Class A ordinary shares.

If we ask for your instructions and upon timely notice from us by regular, ordinary mail delivery, or by electronic transmission, as described in the deposit agreement, the depositary will notify you of the upcoming meeting at which you are entitled to vote pursuant to any applicable law, the provisions of the Memorandum and Articles of Association, and the provisions of or governing the deposited securities, and arrange to deliver our voting materials to you. The materials will include or reproduce (a) such notice of meeting or solicitation of consents or proxies; (b) a statement that the ADS holders at the close of business on the ADS record date will be entitled, subject to any applicable law, the provisions of the Memorandum and Articles of Association, and the provisions of or governing the deposited securities, to instruct the depositary as to the exercise of the voting rights, if any, pertaining to the Class A ordinary shares or other deposited securities represented by such holder's ADSs; and (c) a brief statement as to the manner in which such instructions may be given or deemed given in accordance with the second to last sentence of this paragraph if no instruction is received, to the depositary to give a discretionary proxy to a person designated by us. Voting instructions may be given only in respect of a number of ADSs representing an integral number of Class A ordinary shares or other deposited securities. For instructions to be valid, the depositary must receive them in writing on or before the date specified. The depositary will try, as far as practical, subject to applicable law and the provisions of the Memorandum and Articles of Association, to vote or to have its agents vote the Class A ordinary shares or other deposited securities (in person or by proxy) as you instruct. The depositary will only vote or attempt to vote as you instruct. If we timely requested the depositary to solicit your instructions but no instructions are received by the depositary from an owner with respect to any of the deposited securities represented by the ADSs of that owner on or before the date established by the depositary for such purpose, the depositary shall deem that owner to have instructed the depositary to give a discretionary proxy to a person designated by us with respect to such deposited securities, and the depositary shall give a discretionary proxy to a person designated by us to vote such deposited securities. However, no such instruction shall be deemed given and no such discretionary proxy shall be given with respect to any matter if we inform the depositary we do not wish such proxy given, substantial opposition exists or the matter materially and adversely affects the rights of holders of the Class A ordinary shares.

14

We cannot assure you that you will receive the voting materials in time to ensure that you can instruct the depositary to vote the Class A ordinary shares underlying your ADSs. In addition, there can be no assurance that ADS holders and beneficial owners generally, or any holder or beneficial owner in particular, will be given the opportunity to vote or cause the custodian to vote on the same terms and conditions as the holders of our Class A ordinary shares.

The depositary and its agents are not responsible for failing to carry out voting instructions or for the manner of carrying out voting instructions. This means that you may not be able to exercise your right to vote and you may have no recourse if the Class A ordinary shares underlying your ADSs are not voted as you requested.

In order to give you a reasonable opportunity to instruct the depositary as to the exercise of voting rights relating to deposited securities, if we request the depositary to act, we will give the depositary notice of any such meeting and details concerning the matters to be voted at least 30 business days in advance of the meeting date.

***Compliance with Regulations***

*Information Requests*

Each ADS holder and beneficial owner shall (a) provide such information as we or the depositary may request pursuant to law, including, without limitation, relevant Cayman Islands law, any applicable law of the United States of America, the Memorandum and Articles of Association, any resolutions of our Board of Directors adopted pursuant to such memorandum and articles of association, the requirements of any markets or exchanges upon which the Class A ordinary shares, ADSs or ADRs are listed or traded, or to any requirements of any electronic book-entry system by which the ADSs or ADRs may be transferred, regarding the capacity in which they own or owned ADRs, the identity of any other persons then or previously interested in such ADRs and the nature of such interest, and any other applicable matters, and (b) be bound by and subject to applicable provisions of the laws of the Cayman Islands, the Memorandum and Articles of Association, and the requirements of any markets or exchanges upon which the ADSs, ADRs or Class A ordinary shares are listed or traded, or pursuant to any requirements of any electronic book-entry system by which the ADSs, ADRs or Class A ordinary shares may be transferred, to the same extent as if such ADS holder or beneficial owner held Class A ordinary shares directly, in each case irrespective of whether or not they are ADS holders or beneficial owners at the time such request is made.

*Disclosure of Interests*

Each ADS holder and beneficial owner shall comply with our requests pursuant to Cayman Islands law, the rules and requirements of the New York Stock Exchange and any other stock exchange on which the Class A ordinary shares are, or will be, registered, traded or listed or the Memorandum and Articles of Association, which requests are made to provide information, inter alia, as to the capacity in which such ADS holder or beneficial owner owns ADS and regarding the identity of any other person interested in such ADS and the nature of such interest and various other matters, whether or not they are ADS holders or beneficial owners at the time of such requests.

15

| **If we:** | **Then:** |
|---|---|
| Change the nominal or par value of our Class A ordinary shares | The cash, shares or other securities received by the depositary will become deposited securities. |
| Reclassify, split up or consolidate any of the deposited securities | Each ADS will automatically represent its equal share of the new deposited securities. |
| Distribute securities on the Class A ordinary shares that are not distributed to you, or Recapitalize, reorganize, merge, liquidate, sell all or substantially all of our assets, or take any similar action | The depositary may distribute some or all of the cash, shares or other securities it received. It may also deliver new ADSs or ask you to surrender your outstanding ADRs in exchange for new ADRs identifying the new deposited securities. |

### *Amendment and Termination*

*How may the deposit agreement be amended?*

We may agree with the depositary to amend the deposit agreement and the form of ADR without your consent for any reason. If an amendment adds or increases fees or charges, except for taxes and other governmental charges or expenses of the depositary for registration fees, facsimile costs, delivery charges or similar items, including expenses incurred in connection with foreign exchange control regulations and other charges specifically payable by ADS holders under the deposit agreement, or materially prejudices a substantial existing right of ADS holders, it will not become effective for outstanding ADSs until 30 days after the depositary notifies ADS holders of the amendment. At the time an amendment becomes effective, you are considered, by continuing to hold your ADSs, to agree to the amendment and to be bound by the ADRs and the deposit agreement as amended. If any new laws are adopted which would require the deposit agreement to be amended in order to comply therewith, we and the depositary may amend the deposit agreement in accordance with such laws and such amendment may become effective before notice thereof is given to ADS holders.

*How may the deposit agreement be terminated?*

The depositary will terminate the deposit agreement if we ask it to do so, in which case the depositary will give notice to you at least 90 days prior to termination. The depositary may also terminate the deposit agreement if the depositary has told us that it would like to resign, or if we have removed the depositary, and in either case we have not appointed a new depositary within 90 days. In either such case, the depositary must notify you at least 30 days before termination.

 After termination, the depositary and its agents will do the following under the deposit agreement but nothing else: collect distributions on the deposited securities, sell rights and other property and deliver Class A ordinary shares and other deposited securities upon cancellation of ADSs after payment of any fees, charges, taxes or other governmental charges. Six months or more after the date of termination, the depositary may sell any remaining deposited securities by public or private sale. After that, the depositary will hold the money it received on the sale, as well as any other cash it is holding under the deposit agreement, for the pro rata benefit of the ADS holders that have not surrendered their ADSs. It will not invest the money and has no liability for interest. After such sale, the depositary's only obligations will be to account for the money and other cash. After termination, we shall be discharged from all obligations under the deposit agreement except for our obligations to the depositary thereunder.

The depositary will maintain ADS holder records at its depositary office. You may inspect such records at such office during regular business hours but solely for the purpose of communicating with other holders in the interest of business matters relating to the Company, the ADRs and the deposit agreement.

The depositary will maintain facilities in the Borough of Manhattan, The City of New York to record and process the issuance, cancellation, combination, split-up and transfer of ADRs.

These facilities may be closed at any time or from time to time when such action is deemed necessary or advisable by the depositary in connection with the performance of its duties under the deposit agreement or at our reasonable written request.

### *Limitations on Obligations and Liability*

*Limits on our Obligations and the Obligations of the Depositary and the Custodian; Limits on Liability to Holders of ADSs*

The deposit agreement expressly limits our obligations and the obligations of the depositary and the custodian. It also limits our liability and the liability of the depositary. The depositary and the custodian:

· are only obligated to take the actions specifically set forth in the deposit agreement without gross negligence or willful misconduct;

· are not liable if any of us or our respective controlling persons or agents are prevented or forbidden from, or subjected to any civil or criminal penalty or restraint on account of, or delayed in, doing or performing any act or thing required by the terms of the deposit agreement and any ADR, by reason of any provision of any present or future law or regulation of the United States or any state thereof, the Cayman Islands or any other country, or of any other governmental authority or regulatory authority or stock exchange, or on account of the possible criminal or civil penalties or restraint, or by reason of any provision, present or future, of the Memorandum and Articles of Association or any provision of or governing any deposited securities, or by reason of any act of God or war or other circumstances beyond its control (including, without limitation, nationalization, expropriation, currency restrictions, work stoppage, strikes, civil unrest, revolutions, rebellions, explosions and computer failure);

· are not liable by reason of any exercise of, or failure to exercise, any discretion provided for in the deposit agreement or in the Memorandum and Articles of Association or provisions of or governing deposited securities;

· are not liable for any action or inaction of the depositary, the custodian or us or their or our respective controlling persons or agents in reliance upon the advice of or information from legal counsel, any person presenting Class A ordinary shares for deposit or any other person believed by it in good faith to be competent to give such advice or information;

· are not liable for the inability of any holder of ADSs to benefit from any distribution on deposited securities that is not made available to holders of ADSs under the terms of the deposit agreement;

17

- are not liable for any special, consequential, indirect or punitive damages for any breach of the terms of the deposit agreement, or otherwise;

- may rely upon any documents we believe in good faith to be genuine and to have been signed or presented by the proper party;

- disclaim any liability for any action or inaction or inaction of any of us or our respective controlling persons or agents in reliance upon the advice of or information from legal counsel, accountants, any person presenting Class A ordinary shares for deposit, holders and beneficial owners (or authorized representatives) of ADSs, or any person believed in good faith to be competent to give such advice or information; and

- disclaim any liability for inability of any holder to benefit from any distribution, offering, right or other benefit made available to holders of deposited securities but not made available to holders of ADS.

The depositary and any of its agents also disclaim any liability (i) for any failure to carry out any instructions to vote, the manner in which any vote is cast or the effect of any vote or failure to determine that any distribution or action may be lawful or reasonably practicable or for allowing any rights to lapse in accordance with the provisions of the deposit agreement, (ii) the failure or timeliness of any notice from us, the content of any information submitted to it by us for distribution to you or for any inaccuracy of any translation thereof, (iii) any investment risk associated with the acquisition of an interest in the deposited securities, the validity or worth of the deposited securities, the credit-worthiness of any third party, (iv) for any tax consequences that may result from ownership of ADSs, Class A ordinary shares or deposited securities, or (v) for any acts or omissions made by a successor depositary whether in connection with a previous act or omission of the depositary or in connection with any matter arising wholly after the removal or resignation of the depositary, provided that in connection with the issue out of which such potential liability arises the depositary performed its obligations without gross negligence or willful misconduct while it acted as depositary.

In addition, the deposit agreement provides that each party to the deposit agreement (including each holder, beneficial owner and holder of interests in the ADRs) irrevocably waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any lawsuit or proceeding against the depositary or our company related to our shares, the ADSs or the deposit agreement.

In the deposit agreement, we agree to indemnify the depositary under certain circumstances.

### *Jurisdiction and Arbitration*

The laws of the State of New York govern the deposit agreement and the ADSs and we have agreed with the depositary that the federal or state courts in the City of New York shall have exclusive jurisdiction to hear and determine any dispute arising from or in connection with the deposit agreement and that the depositary will have the right to refer any claim or dispute arising from the relationship created by the deposit agreement to arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The arbitration provisions of the deposit agreement do not preclude you from pursuing claims arising under the U.S. federal securities laws in federal courts.  The arbitration provision of the deposit agreement is not intended to be deemed a waiver by any holder or beneficial owner of ADSs of the Company's or the depositary's compliance with the U.S. federal securities laws or the rules and regulations promulgated thereunder.

The deposit agreement provides that each party to the deposit agreement (including each holder, beneficial owner and holder of interests in the ADRs) irrevocably waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any lawsuit or proceeding against us or the depositary arising out of or relating to our shares, the ADSs or the deposit agreement, including any claim under the U.S. federal securities laws. If we or the depositary opposed a jury trial demand based on the waiver, the court would determine whether the waiver was enforceable based on the facts and circumstances of that case in accordance with the applicable law. No condition, stipulation or provision of the deposit agreement or ADSs serves as a waiver by any holder or beneficial owner of ADSs or by us or the depositary of compliance with the U.S. federal securities laws and the rules and regulations promulgated thereunder.

### Requirements for Depositary Actions

Before the depositary will issue, deliver or register a transfer of an ADS, split-up, subdivide or combine ADSs, make a distribution on an ADS, or permit withdrawal of Class A ordinary shares, the depositary may require:

· payment of stock transfer or other taxes or other governmental charges and transfer or registration fees charged by third parties for the transfer of any Class A ordinary shares or other deposited securities and payment of the applicable fees, expenses and charges of the depositary;

· satisfactory proof of the identity and genuineness of any signature or any other matters contemplated in the deposit agreement; and

· compliance with (A) any laws or governmental regulations relating to the execution and delivery of ADRs or ADSs or to the withdrawal or delivery of deposited securities and (B) such reasonable regulations and procedures as the depositary may establish, from time to time, consistent with the deposit agreement and applicable laws, including presentation of transfer documents.

The depositary may refuse to issue and deliver ADSs or register transfers of ADSs generally when the register of the depositary or our transfer books are closed or at any time if the depositary or we determine that it is necessary or advisable to do so.

### Your Right to Receive the Shares Underlying Your ADSs

You have the right to cancel your ADSs and withdraw the underlying Class A ordinary shares at any time except:

· when temporary delays arise because: (1) the depositary has closed its transfer books or we have closed our transfer books; (2) the transfer of Class A ordinary shares is blocked to permit voting at a shareholders' meeting; or (3) we are paying a dividend on our Class A ordinary shares;

· when you owe money to pay fees, taxes and similar charges;

· when it is necessary to prohibit withdrawals in order to comply with any laws or governmental regulations that apply to ADSs or to the withdrawal of Class A ordinary shares or other deposited securities, or

19

- other circumstances specifically contemplated by Section I.A.(1) of the General Instructions to Form F-6 (as such General Instructions may be amended from time to time); or

- for any other reason if the depositary or we determine, in good faith, that it is necessary or advisable to prohibit withdrawals.

The depositary shall not knowingly accept for deposit under the deposit agreement any Class A ordinary shares or other deposited securities required to be registered under the provisions of the Securities Act, unless a registration statement is in effect as to such Class A ordinary shares.

This right of withdrawal may not be limited by any other provision of the deposit agreement.

### *Direct Registration System*

In the deposit agreement, all parties to the deposit agreement acknowledge that the DRS and Profile Modification System, or Profile, will apply to uncertificated ADSs upon acceptance thereof to DRS by DTC. DRS is the system administered by DTC pursuant to which the depositary may register the ownership of uncertificated ADSs, which ownership shall be evidenced by periodic statements issued by the depositary to the ADS holders entitled thereto. Profile is a required feature of DRS which allows a DTC participant, claiming to act on behalf of an ADS holder, to direct the depositary to register a transfer of those ADSs to DTC or its nominee and to deliver those ADSs to the DTC account of that DTC participant without receipt by the depositary of prior authorization from the ADS holder to register such transfer.

In connection with and in accordance with the arrangements and procedures relating to DRS/Profile, the parties to the deposit agreement understand that the depositary will not verify, determine or otherwise ascertain that the DTC participant claiming to be acting on behalf of an ADS holder in requesting registration of transfer and delivery described in the paragraph above has the actual authority to act on behalf of the ADS holder (notwithstanding any requirements under the Uniform Commercial Code).

20

**Form of Exclusive Purchase Option Agreement**

This Exclusive Purchase Option Agreement (this "<u>Agreement</u>") is entered into in Beijing, the People's Republic of China (the "<u>PRC</u>" or "<u>China</u>") on [Execution Date] by and among:

**Party A:**          **[Name of WFOE]**
                     [Address of WFOE]

**Party B:**          **[Name of VIE Shareholders]**
                     ID No. *****************

**Party C:**          **[Name of VIE]**
                     [Address of VIE]

In this Agreement, Party A, Party B and Party C may be hereinafter referred to individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>."

 (1)   The Persons of Party B are all the currently registered shareholders of Party C and hold 100% equity interest in Party C in the aggregate;

 (2)   Subject to the laws of the PRC, Party B intends to transfer to Party A and/or any other entity or individual designated by it, and Party A intends to accept such transfer of, all the equity interest in Party C held by Party B;

 (3)   Subject to the laws of the PRC, Party C intends to transfer to Party A and/or any other entity or individual designated by it, and Party A intends to accept such transfer of, the assets owned by Party C;

 (4)   In order to consummate the aforesaid equity or asset transfer, Party B and Party C agree to grant, on an exclusive basis, respectively to Party A irrevocable Equity Purchase Option (as defined below) and Asset Purchase Option (as defined below), Party C agrees that Party B grants the Equity Purchase Option to Party A in accordance with this Agreement, and Party B agrees that Party C grants the Asset Purchase Option to Party A in accordance with this Agreement.

NOW, THEREFORE, through mutual consultation, the Parties agree as follows:

1.      **Equity Purchase Option and Asset Purchase Option**

1.1     Grant of Options

        Party B hereby irrevocably grants to Party A an irrevocable and exclusive option to purchase, or cause one or more designated Persons (each, a "<u>Designee</u>") to purchase, all or any part of equity interest in Party C held by any Person of Party B now or hereafter from such Person at any time, one or more times, at the price set forth in Article 1.3 hereof according to the steps for exercise as determined by Party A in its sole discretion (the "<u>Equity Purchase Option</u>"). No third Person other than Party A and the Designees shall have the right to purchase equity interest in Party C held by Party B or other rights related to equity interest in Party C held by Party B. Party C hereby agrees that Party B grants the Equity Purchase Option to Party A in accordance with this Agreement. "<u>Person</u>" referred to in this article and this Agreement means individual, company, joint venture, partnership, enterprise, trust or unincorporated organization.

Party C hereby irrevocably grants to Party A an irrevocable and exclusive option to purchase, or cause the Designee(s) to purchase, all or any part of assets owned by Party C now or hereafter from Party C at any time, one or more times, at the price set forth in Article 1.3 hereof according to the steps for exercise as determined by Party A in its sole discretion (the "<u>Asset Purchase Option</u>"). No third Person other than Party A and the Designees shall have the right to purchase assets of Party C or other rights related to assets of Party C. Party B hereby agrees that Party C grants the Asset Purchase Option to Party A in accordance with this Agreement.

Party A agrees to accept the aforesaid Equity Purchase Option and the Asset Purchase Option. For the avoidance of doubt, Party A may exercise any rights hereunder, including the Equity Purchase Option and/or the Asset Purchase Option, at any time after the execution and effectiveness of this Agreement. To the fullest extent permitted by the laws of the PRC, Party A shall have the right to exercise the rights hereunder, including the Equity Purchase Option and/or the Asset Purchase Option, against Party B or its successor or successor entity and Party C and its successor entity in accordance with the terms of this Agreement.

1.2     Steps for Exercise

1.2.1     Subject to the terms and conditions of this Agreement, to the extent permitted by the laws of the PRC, Party A shall determine the timing, method and times of its exercise of the Equity Purchase Option and the Asset Purchase Option in its absolute and sole discretion and shall have the right to request at any time Party B to transfer all or any part of its equity interest in Party C, or Party C to transfer all or any part of its assets, to it or the Designee(s).

1.2.2     With respect to the Equity Purchase Option, Party A shall have the right to determine in its sole discretion the amount of equity interest to be transferred by each Person of Party B to Party A and/or the Designee(s) in each exercise, and Party B shall transfer such amount of the Purchased Equity (as defined below) as requested by Party A to Party A and/or the Designee(s). Party A and/or the Designee(s) shall pay the transfer price to the transferring Person of Party B for the Purchased Equity acquired in each exercise.

1.2.3     With respect to the Asset Purchase Option, Party A shall have the right to determine the specific assets of Party C to be transferred by Party C to Party A and/or the Designee(s) in each exercise, and Party C shall transfer the Purchased Assets (as defined below) as requested by Party A to Party A and/or the Designee(s). Party A and/or the Designee(s) shall pay the transfer price to Party C for the Purchased Assets acquired in each exercise.

1.2.4     When Party A exercises the Equity Purchase Option or the Asset Purchase Option, it shall give a written notice (the "<u>Equity Purchase Notice</u>" or the "<u>Asset Purchase Notice</u>") to Party B, specifying (a) decision made by Party A or the Designee(s) on exercise of the Equity Purchase Option/the Asset Purchase Option; (b) the percentage of equity interest proposed to be purchased by Party A or the Designee(s) from Party B (the "<u>Purchased Equity</u>"), or the specific assets proposed to be purchased from Party C (the "<u>Purchased Assets</u>"); and (c) the purchase date/transfer date of the purchased equity or assets. After the receipt of such notice, Party B or Party C shall, pursuant to such notice, promptly transfer the Purchased Equity or the Purchased Assets to Party A and/or the Designee(s) in such way as described in this Agreement.

1.3    Transfer Price

    1.3.1    With respect to the Equity Purchase Option hereunder, the transfer price corresponding to the Purchased Equity in each exercise by Party A shall be the lowest price permitted by the laws of the PRC applicable at the time of exercise; with respect to the Asset Purchase Option hereunder, the transfer price corresponding to the Purchased Assets in each exercise by Party A shall be the net book value of the Purchased Assets; if the lowest price permitted by the then applicable laws of the PRC is higher than the net book value of the Purchased Assets, the transfer price shall be the lowest price permitted by the laws of the PRC.

    1.3.2    The Parties hereby agree that, after Party A exercises the Equity Purchase Option and/or the Asset Purchase Option, Party B and/or Party C shall pay all the transfer price collected thereby to Party A or another party designated by it without compensation.

1.4    Transfer of the Purchased Equity/the Purchased Assets

When Party A exercises the Equity Purchase Option and/or the Asset Purchase Option each time:

    1.4.1    Party C shall, and Party B shall cause Party C to, promptly hold a shareholders' meeting, at which a resolution shall be adopted on the approval of the transfer of the Purchased Equity by Party B, or the transfer of the Purchased Assets by Party C, to Party A and/or the Designee(s);

    1.4.2    with respect to the transfer of the Purchased Equity to Party A and/or the Designee(s), Party B shall obtain a written statement from the other shareholders of Party C, in which they approve such transfer and waive the right of first refusal; meantime, when Party A exercises the Equity Purchase Option to purchase equity interest in Party C held by several Persons of Party B, the other Persons of Party B shall issue a written statement, in which they approve such transfer and waive the right of first refusal;

    1.4.3    Party B shall enter into an equity transfer agreement for each equity transfer with Party A and/or the Designee(s) (as applicable) in accordance with this Agreement and the Equity Purchase Notice, in the form and substance satisfactory to Party A; Party C shall enter into an asset transfer agreement for each asset transfer with Party A and/or the Designee(s) (as applicable) in accordance with this Agreement and the Asset Purchase Notice, in the form and substance satisfactory to Party A;

1.4.4    the relevant Parties shall execute all other necessary contracts, agreements or documents (including, without limitation, amendment to the articles of association), obtain all necessary governmental licenses and permits (including, without limitation, business license) and take all necessary actions to transfer the valid title of the Purchased Equity and/or the Purchased Assets to Party A and/or the Designee(s), free and clear of any Security Interest, and cause Party A and/or the Designee(s) to become the registered owner(s) of the Purchased Equity and/or the Purchased Assets, if applicable. For the purpose of this article and this Agreement, "Security Interest" includes security, mortgage, third party rights or interests, any call option, right to acquire, right of first refusal, right of set-off, ownership detainment or other security arrangements, for the sake of clarity, excluding any Security Interest created under this Agreement, the Equity Pledge Agreement of Party B and the Power of Attorney of Party B. The "Equity Pledge Agreement of Party B" referred to in this article and this Agreement means the Equity Pledge Agreement entered into by Party A, Party B and Party C on the date hereof, as amended, modified or restated; the "Power of Attorney of Party B" referred to in this article and this Agreement means the Power of Attorney executed by Party B to authorize Party A on the date hereof, as amended, modified or restated.

2.    **Covenants**

2.1    Covenants Concerning Party C

Party B (as the shareholders of Party C) and Party C hereby covenant that:

2.1.1    without the prior written consent of Party A, they shall not supplement, modify or amend the articles of association or bylaws of Party C in any form, increase or decrease its registered capital or otherwise change its registered capital structure;

2.1.2    they shall maintain the corporate existence of Party C according to good financial and business standards and practices, conduct its business and transact its affairs prudently and effectively and cause Party C to perform its obligations under the Exclusive Business Cooperation Agreement executed by it on the date hereof;

2.1.3    without the prior written consent of Party A, they shall not sell, transfer, mortgage or otherwise dispose of lawful or beneficial interest in any assets, business or income of Party C or permit the encumbrance thereon of any Security Interest at any time from the date hereof (including without limitation transfer of any of Party C's intellectual properties, or any encumbrance on the ownership or right to use of such assets);

2.1.4    after the statutory liquidation described in Article 3.2.6, Party B will fully pay Party A any remaining residual value collected on the basis of non-bidirectional payment or procure such payment; if such payment is prohibited by the laws of the PRC, Party B will pay such income to Party A or the party designated by Party A to the extent permitted by the laws of the PRC;

2.1.5   without the prior written consent of Party A, they shall not incur, inherit, guarantee or permit the existence of any debts, except for (i) debts incurred in the ordinary course of business other than through loans; and (ii) debts disclosed to and approved by Party A in writing;

2.1.6   they shall always conduct all the business of Party C in the ordinary course of business to maintain the asset value of Party C and refrain from any act/omission that may affect the operation status and asset value of Party C;

2.1.7   without the prior written consent of Party A, they shall not cause Party C to enter into any material contract, except for the contracts entered into in the ordinary course of business (for the purpose of this paragraph, a contract shall be deemed as a material contract if its value exceeds RMB100,000);

2.1.8   without the prior written consent of Party A, they shall not cause Party C to provide any Person with loan or credit or any form of security;

2.1.9   upon request by Party A, they shall provide Party A with all information regarding the operation and financial status of Party C, including but without limitation, the balance sheet, profit statement and cash flow statement;

2.1.10   if requested by Party A, they shall procure and maintain insurance on assets and business of Party C, the amounts and types of which shall be consistent with those of the companies operating similar business, with an insurer acceptable to Party A;

2.1.11   without the prior written consent of Party A, they shall not cause or allow Party C to merge or consolidate with any Person or acquire or invest in any Person, or cause or allow Party C to sell its assets with value of more than RMB100,000;

2.1.12   they shall promptly notify Party A of any litigation, arbitration or administrative proceeding initiated or threatened in relation to the assets, business or income of Party C;

2.1.13   to retain Party C's title to all of its assets, they shall execute all necessary or appropriate documents, take all necessary or appropriate actions and file all necessary or appropriate complaints or make necessary and appropriate defenses against all claims;

2.1.14   without the prior written consent of Party A, they shall ensure that Party C shall not distribute dividends to its shareholders in any form; provided, however, that Party C shall promptly distribute all distributable profits to its shareholders upon written request by Party A;

2.1.15    upon request by Party A, they shall appoint any Person designated by Party A as the director of Party C and/or remove the incumbent director of Party C; and

2.1.16    without the written consent of Party A, Party C shall not be dissolved or liquidated, unless mandatorily required by the laws of the PRC.

2.2    Acknowledgements and Covenants of Party B

Party B hereby acknowledges that:

2.2.1    to the fullest extent permitted by the laws of the PRC, any equity interest in Party C held by Party B now or hereafter shall not belong to community property of Party B (in the event that Party B is a natural Person) or hereditament and shall not be divided or inherited, nor shall Party B use its equity interest in Party C to assume debt repayment liability or security liability. If, due to any reason, such equity interest is divided, transferred or inherited, successor(s) or transferee(s) shall execute all documents requested by Party A (including, without limitation, this Agreement, the Equity Pledge Agreement of Party B and the Power of Attorney of Party B).

Party B hereby covenants that:

2.2.2    without the prior written consent of Party A, it shall not sell, transfer, mortgage or otherwise dispose of any lawful or beneficial interest in its equity interest in Party C or permit the encumbrance thereon of any Security Interest, other than the pledge created on such equity interest in accordance with the Equity Pledge Agreement of Party B;

2.2.3    it shall not request Party C to distribute dividends or make other forms of profit distribution in connection with its equity interest in Party C, propose a resolution thereon to the shareholders' meeting or vote in favor of such resolution at the shareholders' meeting. In any event, if Party B receives any proceeds, profit distribution or dividends from Party C, to the extent permitted by the laws of the PRC, Party B shall promptly pay or transfer such proceeds, profit distribution or dividends to Party A or the party designated by Party A for the benefit of Party C as the service fee payable by Party C to Party A under the Exclusive Business Cooperation Agreement;

2.2.4    it shall cause the shareholders' meeting and/or the board of directors of Party C not to approve the sale, transfer, mortgage or other disposal of any lawful or beneficial interest in its equity interest in Party C or permit the encumbrance thereon of any Security Interest without the prior written consent of Party A, other than the pledge created on such equity interest in accordance with the Equity Pledge Agreement of Party B;

2.2.5    it shall cause the shareholders' meeting or the board of directors of Party C not to approve merger or consolidation with any Person or acquisition of or investment in any Person without the prior written consent of Party A;

2.2.6    it shall promptly notify Party A of any litigation, arbitration or administrative proceeding initiated or threatened in relation to its equity interest in Party C;

2.2.7    it shall cause the shareholders' meeting or the board of directors of Party C to approve the transfer of the Purchased Equity hereunder and take any and all other actions that Party A may request;

2.2.8    to retain its ownership of its equity interest in Party C, it shall execute all necessary or appropriate documents, take all necessary or appropriate actions and file all necessary or appropriate complaints or make necessary and appropriate defenses against all claims;

2.2.9    upon request by Party A, it shall appoint any Person designated by Party A as the director of Party C;

2.2.10    upon request by Party A at any time, it shall promptly and unconditionally transfer its equity interest in Party C to the Designee(s) of Party A based on the Equity Purchase Option hereunder, and Party B hereby waives the right of first refusal, if any, with respect to the equity transfer by another existing shareholder of Party C; and

2.2.11    it shall strictly comply with this Agreement and other contracts entered into by Party B, Party C and Party A jointly or severally, perform its obligations hereunder and thereunder and refrain from any act/omission that may affect the validity and enforceability hereof and thereof. If Party B has any remaining rights with respect to the equity interest under this Agreement or the Equity Pledge Agreement among the Parties hereto or the Power of Attorney granted in favor of Party A, Party B shall not exercise such rights, unless according to the written instructions given by Party A.

2.3    Covenants of Party C

Party C hereby covenants that:

2.3.1    if the execution and performance of this Agreement and the grant of the Equity Purchase Option or the Asset Purchase Option hereunder require consent, permit, waiver or authorization of any third party or approval, permit or exemption of any governmental authority or completion of registration or filing procedures with any governmental authority (if required in accordance with law), Party C will use its best efforts to assist the satisfaction of such conditions.

2.3.2    without the prior written consent of Party A, Party C will not assist or permit Party B to transfer or otherwise dispose of, or create any Security Interest or other third party rights on, any equity interest in Party C held by Party B.

2.3.3    without the prior written consent of Party A, Party C will not transfer or otherwise dispose of any material assets of Party C, or create any Security Interest or other third party rights on any assets of Party C.

2.3.4    Party C will not do or permit to be done any act or action likely to have adverse effect on the interests of Party A hereunder; and

2.3.5    Party C covenants that upon issuance of the Asset Purchase Notice by Party A for the exercise of the Asset Purchase Option: Party C shall immediately cause Party B to hold a shareholders' meeting and adopt a resolution of the shareholders' meeting and take all other necessary actions to approve the transfer by Party C of the Purchased Assets to Party A and/or the Designee(s) at the transfer price set forth herein; it shall immediately execute an asset transfer agreement with Party A and/or the Designee(s) to transfer all the Purchased Assets to Party A and/or the Designee(s) at the transfer price set forth herein, and shall cause all shareholders of Party C to provide necessary supports to Party A in accordance with requirements of Party A, laws and regulations (including provision and execution of all relevant legal documents, completion of all governmental approval and registration formalities and assumption of all relevant obligations), such that Party A and/or the Designee(s) shall obtain the ownership of the Purchased Assets, free and clear of any legal defects and any Security Interest, third party rights or any other restrictions.

3.    **Representations and Warranties**

3.1    Each Person of Party B hereby severally but not jointly represents and warrants that, as of the date hereof and each transfer date of the Purchased Equity:

3.1.1    with respect to a natural Person, he is a PRC citizen with full capacity to act, has full and independent legal status and capacity to execute, deliver and perform this Agreement and may sue or be sued as an independent party. With respect to a Person other than a natural Person, it is a legal entity validly established and lawfully existing under the laws of the PRC, has full and independent legal status and capacity to execute, deliver and perform this Agreement and may sue or be sued as an independent party.

3.1.2    he or it has full power and authority to execute, deliver and perform this Agreement and all other documents to be executed by him or it in connection with the transactions contemplated hereby, and has full power and authority to consummate the transactions contemplated hereby.

3.1.3    this Agreement has been lawfully and duly executed and delivered by him or it. This Agreement constitutes his or its legal and binding obligations enforceable against him or it in accordance with the terms hereof.

3.1.4    he or it is the registered shareholder of the Purchased Equity; other than the pledge right created under the Equity Pledge Agreement of Party B and the proxy rights created under the Power of Attorney of Party B, the Purchased Equity held by him or it is free and clear of any lien, pledge right, claim right and other Security Interest and third party rights. In accordance with this Agreement, Party A and/or the Designee(s) may, upon exercise of option, obtain good title to the Purchased Equity, free and clear of any lien, pledge right, claim right and other Security Interest or third party rights.

3.2      Party C hereby represents and warrants as follows:

     3.2.1      It is a limited liability company duly registered and lawfully existing under the laws of the PRC with independent legal person status. It has full and independent legal status and capacity to execute, deliver and perform this Agreement and may sue or be sued as an independent party.

     3.2.2      It has full internal power and authority to execute, deliver and perform this Agreement and all other documents to be executed by it in connection with the transactions contemplated hereby, and has full power and authority to consummate the transactions contemplated hereby.

     3.2.3      This Agreement has been lawfully and duly executed and delivered by it. This Agreement constitutes its legal and binding obligations.

     3.2.4      The assets of Party C are free and clear of any lien, mortgage right, claim right and other Security Interest and third party rights. In accordance with this Agreement, Party A and/or the Designee(s) may, upon exercise of option, obtain good title to the assets of Party C, free and clear of any lien, mortgage right, claim right and other Security Interest or third party rights.

     3.2.5      Party C does not have any outstanding debts, except for (i) debt incurred in the ordinary course of business; and (ii) debts disclosed to Party A for which Party A's written consent has been obtained.

     3.2.6      If the laws of PRC requires it to be dissolved or liquidated, Party C shall sell all of its assets to the extent permitted by the laws of PRC to Party A or its Designee(s), at the lowest selling price permitted by applicable the laws of PRC. Any obligation for Party A to pay Party C as a result of such transaction shall be forgiven by Party C or any proceeds from such transaction shall be paid to Party A or its Designee(s) in partial satisfaction of the service fees under the Exclusive Business Corporation Agreement, as applicable under then-current the laws of PRC.

4.      **Effective Date**

4.1      This Agreement shall become effective from the date on which it is duly executed by the Parties. This Agreement shall be terminated after all assets of Party C and all equity interest in Party C held by Party B have been lawfully transferred to Party A and/or another Person designated by it in accordance with the provisions hereof.

4.2      Notwithstanding the foregoing, Party A shall have the right to terminate this Agreement by giving written notice to Party B at any time 30 days in advance and Party A shall not be liable for any breach of contract in respect of its unilateral termination of this Agreement.

5. **Governing Law and Resolution of Disputes**

5.1     Governing law

The execution, effectiveness, construction, performance, amendment and termination of this Agreement and the resolution of disputes hereunder shall be governed by the formally published and publicly available laws of China. Matters not covered by formally published and publicly available laws of China shall be governed by international legal principles and practices.

5.2     Methods of Resolution of Disputes

30 In the event of any dispute with respect to the construction and performance of this Agreement, the Parties shall first resolve the dispute through friendly negotiations. In the event the Parties fail to reach an agreement on the dispute within 30 days after either Party's request to the other Parties for resolution of the dispute through negotiations, either Party may submit the relevant dispute to the China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration, in accordance with its then effective arbitration rules. The arbitration shall be conducted in Beijing, and the language used in arbitration shall be Chinese. The arbitration award shall be final and binding on all Parties.

6. **Taxes and Expenses**

Each Party shall pay any and all transfer and registration tax, expenses and fees incurred thereby or levied thereon in accordance with the laws of China in connection with the preparation and execution of this Agreement and the Transfer Agreements, as well as the consummation of the transactions contemplated under this Agreement and the Transfer Agreements.

7. **Notices**

7.1     All notices and other communications required or permitted to be given pursuant to this Agreement shall be delivered personally or sent by registered mail, postage prepaid, by a commercial courier service or by facsimile transmission to the address of such Party set forth below. A confirmation copy of each notice shall also be sent by email. The dates on which notices shall be deemed to have been effectively given shall be determined as follows:

7.1.1     Notices given by personal delivery, by courier service or by registered mail, postage prepaid, shall be deemed effectively given on the date of delivery or refusal at the address specified for notices.

7.1.2     Notices given by facsimile transmission shall be deemed effectively given on the date of successful transmission (as evidenced by an automatically generated confirmation of transmission).

7.2     For the purpose of notices, the addresses of the Parties are as follows:

Party A:            [Name of WFOE]
Address:
Attn:
Phone:

Party B:            [Name of VIE Shareholders]
Address:
Attn:
Phone:

Party C:            [Name of VIE]
Address:
Attn:
Phone:

7.3 Any Party may at any time change its address for notices by a notice delivered to the other Parties in accordance with the terms hereof.

8. **<u>Confidentiality</u>**

The Parties acknowledge that any oral or written information exchanged among them with respect to this Agreement is confidential information. Each Party shall maintain the confidentiality of all such information, and without obtaining the written consent of other Parties, it shall not disclose any relevant information to any third parties, except in the following circumstances: (a) such information is or will be in the public domain (provided that this is not the result of a public disclosure by the receiving Party); (b) information disclosed as required by applicable laws or rules or regulations of any stock exchange; or (c) information required to be disclosed by any Party to its legal counsel or financial advisor regarding the transaction contemplated hereunder, and such legal counsel or financial advisor are also bound by confidentiality duties similar to the duties in this Section. Disclosure of any confidential information by the staff members or agency hired by any Party shall be deemed disclosure of such confidential information by such Party, which Party shall be held liable for breach of this Agreement. This Section shall survive the termination of this Agreement for any reason.

9. **<u>Further Warranties</u>**

The Parties agree to promptly execute documents that are reasonably required for or are conducive to the implementation of the provisions and purposes of this Agreement and take further actions that are reasonably required for or are conducive to the implementation of the provisions and purposes of this Agreement.

10. **<u>Liabilities for Breach of Contract</u>**

10.1 If Party B or Party C materially violates any provision of this Agreement, Party A shall have the right to terminate this Agreement and/or claim damages against Party B or Party C; this Article 10 shall not prejudice any other rights of Party A hereunder.

10.2 Unless otherwise provided by laws, in no event shall Party B or Party C have the right to terminate or rescind this Agreement.

11. **Miscellaneous**

11.1    Amendment, change and supplement

Any amendment, change and supplement to this Agreement shall require the execution of a written agreement by all of the Parties.

11.2    Entire agreement

Except for the amendments, supplements or changes in writing executed after the execution of this Agreement, this Agreement shall constitute the entire agreement reached by and among the Parties hereto with respect to the subject matter hereof, and shall supersede all prior oral and written consultations, representations and contracts reached with respect to the subject matter of this Agreement.

11.3    Headings

The headings of this Agreement are for convenience only, and shall not be used to interpret, explain or otherwise affect the meanings of the provisions of this Agreement.

11.4    Language

This Agreement is written in both Chinese and English language in five (5) copies, Party A, each Person of Party B and Party C having one (1) copy with equal legal validity; in case there is any conflict between the Chinese version and the English version, the Chinese version shall prevail.

11.5    Severability

In the event that one or several of the provisions of this Agreement are found to be invalid, illegal or unenforceable in any aspect in accordance with any laws or regulations, the validity, legality or enforceability of the remaining provisions of this Agreement shall not be affected or compromised in any respect. The Parties shall strive in good faith to replace such invalid, illegal or unenforceable provisions with effective provisions that accomplish to the greatest extent permitted by law and the intentions of the Parties, and the economic effect of such effective provisions shall be as close as possible to the economic effect of those invalid, illegal or unenforceable provisions.

11.6    Successors

This Agreement shall be binding on and shall inure to the interest of the respective successors of the Parties and the permitted assigns of such Parties.

11.7    Survival

11.7.1    Any obligations that occur or that are due as a result of this Agreement upon the expiration or early termination of this Agreement shall survive the expiration or early termination thereof.

11.7.2    The provisions of Sections 5, 7, 8 and this Section 11.8 shall survive the termination of this Agreement.

11.8    Waivers

Any Party may waive the terms and conditions of this Agreement, provided that such a waiver must be provided in writing and shall require the signatures of the Parties. No waiver by any Party in certain circumstances with respect to a breach by other Parties shall operate as a waiver by such a Party with respect to any similar breach in other circumstances.

11.9    Spousal Consent

With the execution of this Agreement on the date hereof, each of Party B shall cause his/her spouse to execute and deliver to Party A a spousal consent letter in substantially the form attached hereto as Annex I.

[The space below is intentionally left blank.]

**Annex 1**

**Form of Spousal Consent Letter**

I, being the spouse of [Name of VIE Shareholder] (the "<u>Shareholder</u>"), who has signed the foregoing Exclusive Option Agreement (the "<u>Agreement</u>"), hereby acknowledge that I have read and is familiar with the provisions of said Agreement and agree to be bound thereby and join therein to the extent that my agreement and joinder may be necessary: I hereby further acknowledge and agree that the shares registered in the Shareholder's name shall be or may be pledged, sold or otherwise disposed of under the terms of said Agreement without my further consent: I further acknowledge and agree that the Shareholder may join in any future amendment or modification of said Agreement without any further signature, acknowledgement, agreement or consent on my part: and I hereafter acquire in the shares of the Shareholder in [Name of VIE] shall be subject to the provisions of said Agreement.

I acknowledge that I had the opportunity to employ separate counsel in connection with the preparation of said Agreement, but I consent and specifically declined to do so.

Name: _____

Date: _____

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Exclusive Purchase Option Agreement as of the date first written above.

**Party A: [Name of WFOE]**

By: _____

Name:

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Exclusive Purchase Option Agreement as of the date first written above.

**Party B: [Name of VIE Shareholder]**

By: _____

Name:

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Exclusive Purchase Option Agreement as of the date first written above.

**Party C: [Name of VIE]**

By: _____

Name:

---

Schedule of Material Differences

The VIE Shareholders and the VIEs as set out below entered into exclusive option agreements with Beijing Rongqiniu Information Technology Co., Ltd. or Beijing Rongsanliuling Information Technology Co., Ltd., as applicable, the WFOE, using this form. Pursuant to Instruction ii to Item 601 of Regulation S-K, the Registrant may only file this form as an exhibit with a schedule setting forth the material details in which the executed agreements differ from this form:

| No. | Name of WFOE | Name of VIE Shareholder | Name of Variable Interest Entity (the "VIE") | Execution Date |
|---|---|---|---|---|
| 1 | Beijing Rongqiniu Information Technology Co., Ltd. | Ye Huijing, Lu Jiayan, Liu Caofeng | Beijing Rongdiandian Information Technology Co., Ltd. ("RDD") | April 3, 2019[1] |
| 2 | Beijing Rongqiniu Information Technology Co., Ltd. | Li Hui; Liu Yang | Beijing Kartner Information Technology Co., Ltd.[2] | October 1, 2018 |
| 3 | Beijing Rongsanliuling Information Technology Co., Ltd. | Zhu Xiang; Huang Dan | Beijing Guangkezhixun Information Technology Co., Ltd. | October 1, 2019 |

Notes:

(1) On April 3, 2019, one of the previous shareholders of RDD transferred her equity holdings in RDD to Ye Huijing. Concurrent with the completion of such equity transfer in RDD, the previous exclusive purchase option agreement of the same form entered into by and between Beijing Rongqiniu Information Technology Co., Ltd., RDD and RDD's previous shareholders on September 29, 2017 was terminated and this new exclusive purchase option agreement was entered into with RDD's new shareholders.

(2) Beijing Kartner Information Technology Co., Ltd. was formerly known as Beijing Xiaokayingjia Technology Co. Ltd.

**Form of Equity Pledge Agreement**

This Equity Pledge Agreement (this "**Agreement**") has been executed by and among the following Parties on [Execution Date] in Beijing:

**Party A:**          **[Name of WFOE]** (hereinafter "**Pledgee**")

Address:

Legal Representative:

**Party B:**          **[Name of VIE Shareholder(s)]** (hereinafter "**Pledgor**")

ID Number:

**Party C:**          **[Name of VIE]**

Address:

Legal Representative

In this Agreement, each of Pledgee, Pledgor and Party C shall be referred to as a "**Party**" respectively, and they shall be collectively referred to as the "**Parties**".

Whereas,

1.  Pledgor is the citizen of the People's Republic of China ("China"), and holds [  ]% of the equity interest in Party C. Party C is a limited liability company registered in Beijing, China. Party C acknowledges the respective rights and obligations of Pledgor and Pledgee under this Agreement, and agrees to provide any necessary assistance in registering the Pledge;

2.  Pledgee is a Wholly Foreign Owned Enterprise registered in Beijing, China. Pledgee and Party C have executed an Exclusive Business Cooperation Agreement on [Execution Date of the Exclusive Business Cooperation Agreement] (the "Exclusive Business Cooperation Agreement"); Pledgee, Pledgor and Party C entered into the Exclusive Purchase Option Agreement on [Execution Date of the Exclusive Purchase Option Agreement] (the "Exclusive Purchase Option Agreement"), and Pledgor executed the Power of Attorney to authorize Pledgee on [Execution Date of the Power of Attorney] (the "Power of Attorney"; together with the Exclusive Business Cooperation Agreement, the Exclusive Purchase Option Agreement and this Agreement, the "Control Agreements").

3.  To ensure that Pledgee collects all payments due by Party C, including without limitation the consulting and service fees regularly from Party C, and guarantee the performance by Party C and Pledgor of other obligations under the Control Agreements, Pledgor hereby pledge all of the equity interest he/she holds in Party C as security for the obligations under the Control Agreements.

NOW, THEREFORE, through mutual consultation, the Parties agree as follows:

1. **Definitions**

Unless otherwise provided herein, the terms below shall have the following meanings:

1.1    "**Pledge**" shall refer to the security interest granted by Pledgor to Pledgee pursuant to Article 2 of this Agreement, i.e., the right of Pledgee to be compensated on a preferential basis with the conversion, auction or sales price of the Equity Interest.

1.2    "**Equity Interest**" shall refer to all of the equity interest lawfully now held and hereafter acquired by Pledgor in Party C.

1.3    "**Term of Pledge**" shall refer to the term set forth in Section 3 of this Agreement.

1.4    "**Contractual Obligations**" shall mean all obligations of the Pledgor and Party C under the Exclusive Business Cooperation Agreement, the Exclusive Purchase Option Agreement, the Power of Attorney and this Agreement (including, without limitation, the obligation to pay consulting and service fees to the Pledgee when they fall due and payable (whether on the specified due date, by early repayment or otherwise) in accordance with the Exclusive Business Cooperation Agreement).

1.5    "**Secured Indebtedness**" shall mean all direct, indirect and consequential losses and loss of foreseeable profits suffered by the Pledgee due to any Event of Default of the Pledgor and/or Party C. The basis for the amounts of such losses includes, but is not limited to, reasonable business plans and profit forecasts of the Pledgee, and all costs incurred by the Pledgee in connection with its enforcement of the Contractual Obligations against the Pledgor and/or Party C.

1.6    "**Event of Default**" shall refer to any of the circumstances set forth in Article 7 of this Agreement.

1.7    "**Notice of Default**" shall refer to the notice issued by Pledgee in accordance with this Agreement declaring an Event of Default.

2. **The Pledge**

2.1    As collateral security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of any or all the payments due by Party C, including without limitation the consulting and services fees payable to the Pledgee under the Exclusive Business Cooperation Agreement (collectively, the "**Secured Obligations**"), Pledgor hereby pledges to Pledgee a first security interest in the [  ]% Equity Interest of Party C owned by the Pledgor (including the [  ]% registered capital (amount of capital contribution) currently owned by the Pledgor and all relevant equity interest, as well as other registered capital (amount of capital contribution) and all relevant equity interest, which may be obtained by the Pledgor in the future).

2

**2.2**    The Parties understand and agree that the monetary valuation arising from, relating to or in connection with the Secured Obligations shall be a variable and floating valuation until the Settlement Date (as defined below).

**2.3**    Upon the occurrence of any of the events below (each an "**Event of Settlement**"), the Secured Obligations shall be fixed at a value of the sum of all Secured Obligations that are due, outstanding and payable to the Pledgee on or immediately prior to the date of such occurrence (the "**Fixed Obligations**"):

(a)    any other Control Agreement expires or is terminated pursuant to the stipulations thereunder;

(b)    the occurrence of an Event of Default pursuant to Section 7 that is not resolved, which results in the Pledgee serving a Notice of Default to the Pledgor pursuant to Section 7.3;

(c)    the Pledgee reasonably determines (having made due enquiries) that the Pledgor and/or Party C is insolvent or could potentially be made insolvent; or

(d)    any other event that requires the settlement of the Secured Obligations in accordance with relevant laws of the PRC.

**2.4**    For the avoidance of doubt, the day of the occurrence of an Event of Settlement shall be the settlement date (the "**Settlement Date**"). On or after the Settlement Date, the Pledgee shall be entitled, at the election of the Pledgee, to enforce the Pledge in accordance with Section 8.

**2.5**    The Pledgee is entitled to collect dividends or other distributions, if any, arising from the Equity Interest during the Term of the Pledge (as defined below).

**2.6**    The Pledgor may increase the capital of Party C only with the prior written consent of the Pledgee. Any increase in the capital contributed by the Pledgor to the registered capital of Party C as a result of any capital increase shall also be deemed as the Equity Interest pledged hereunder.

**2.7**    If Party C is required to be dissolved or liquidated in accordance with the mandatory provisions of the laws of the PRC, after Party C completes dissolution or liquidation procedures in accordance with law, any interests distributed to the Pledgor by Party C in accordance with law shall be, as requested by the Pledgee, (1) deposited into an account designated by the Pledgee, placed under the custody of the Pledgee, used to provide security for the Contractual Obligations and first applied towards the satisfaction of the Secured Indebtedness; or (2) unconditionally donated to the Pledgee or the person designated by the Pledgee subject to the laws of the PRC.

3

**3.**    **Term of Pledge**

3.1    The Pledge shall become effective as of the date when the pledge of the Equity Interest is registered with the local administration of industry and commerce (the "**Registration Authority**"). The Term of the Pledge (the "**Term of Pledge Authority**") shall end when the Contractual Obligations and the Secured Indebtedness secured by the Pledge are paid or fully fulfilled. The Parties agree that, promptly after the execution of this Agreement (but in no event later than 20 days from the execution date of this Agreement), Pledgor and Party A shall submit their application for pledge registration to the Registration Authority in accordance with the Measures on Equity Pledge Registration with the Administration of Industry and Commerce. The Parties also agree that within fifteen (15) days as of the Registration Authority officially commences the acceptance of equity pledge application, Pledgor and Party C shall complete the pledge registration procedure, obtain the pledge registration notice and completely and accurately register the Pledge of Equity Interest on the Pledge Registration Book of the Registration Authority. The Parties jointly acknowledge that, for the purpose of completing equity pledge registration formalities, the Parties shall submit this Agreement or an equity pledge contract which is executed in the form requested by the administrative authority for industry and commerce in the locality of Party C and truly reflects the information regarding the Pledge hereunder (the "**Pledge Contract for Industrial and Commercial Registration**") to the administrative authority for industry and commerce. This Agreement shall apply to the matters not mentioned in the Pledge Contract for Industrial and Commercial Registration.

3.2    During the Term of Pledge, in the event Party C fails to perform the Contractual Obligations or repay the Secured Indebtedness, Pledgee shall have the right, but not the obligation, to dispose of the Pledge in accordance with the provisions of this Agreement.

**4.**    **Custody of Records for Equity Interest subject to Pledge**

4.1    During the Term of Pledge set forth in this Agreement, Pledgor shall deliver to Pledgee's custody the capital contribution certificate for the Equity Interest and the shareholders' register containing the Pledge (and other documents reasonably requested by the Pledgee, including without limitation the notice of registration of the Pledge issued by relevant administration of industry and commerce) within one week from the date the Pledge is registered. Pledgee shall have custody of such items during the entire Term of Pledge set forth in this Agreement.

**5.**    **Representations and Warranties of Pledgor and Party C**

**The Pledgor Represent and Warrant to the Pledgee that:**

5.1    Pledgor is the sole legal and beneficial owners of the Equity Interest. Except for being subject to other agreements entered into by the Pledgor and the Pledgee, the Pledgor enjoys legal and complete ownership of the Equity Interest.

5.2    Pledgee shall have the right to dispose of and transfer the Equity Interest in accordance with the provisions set forth in this Agreement.

4

**5.3**    Except for the Pledge, Pledgor has not placed any security interest or other encumbrance on the Equity Interest. There are no controversies over the ownership of the Equity Interest. The Equity Interest is not seized or subject to any other legal proceedings or similar threats, and is good for transfer and pledging according to applicable laws.

**5.4**    The Pledgor's execution of this Agreement and exercise of its rights under this Agreement (or fulfillment of its obligations under this Agreement) will not breach any laws, regulations, and agreements or contracts to which the Pledgor is a party, or any promise the Pledgor has made to any third parties.

**5.5**    All documents, materials, statements and certificates provided by the Pledgor to the Pledgee are accurate, true, complete and valid.

**Party C Represent and Warrant to the Pledgee that:**

**5.6**    Party C is a limited liability company registered under the laws of China and legally exists. Party C has the qualification of an independent legal person, enjoys complete and independent legal status and the legal capacity to sign, deliver and fulfill this Agreement.

**5.7**    Upon due execution of Party C, this Agreement constitute legal, effective and binding obligation on Party C.

**5.8**    Party C has the complete internal right and authorization to sign and deliver this Agreement and all other documents relating to the transactions contemplated under this Agreement. Party C has the complete right and authorization to complete the transactions contemplated under this Agreement.

**5.9**    Regarding the assets owned by Party C, there are not any guarantee interests or any other encumbrance on property rights that are substantial and may impact the Pledgee's right and interests in the Equity Interest (including without limitation transfer of any of Party C's intellectual properties or any assets with an a value equaling or over RMB 100,000, or any encumbrance on the ownership or right to use of such assets).

**5.10**   Without the prior written consent of Party A, they shall not incur, inherit, guarantee or suffer the existence of any debt, except for (i) debts incurred in the ordinary course of business other than through loans; and (ii) debts disclosed to Party A for which Party A's written consent has been obtained;

**5.11**   They shall always operate all of Party C's businesses during the ordinary course of business to maintain the asset value of Party C and refrain from any action/omission that may affect Party C's operating status and asset value;

**5.12**   In any court or arbitration tribunal, there are no pending (or, as far as Party knows, threatening) litigation, arbitration or other legal proceedings against the Equity Interest, Party C or its assets, and in any governmental agencies or departments, there are no pending (or, as far as Party knows, threatening) administrative proceedings or penalties against the Equity Interest, Party C or its assets, which may substantially and adversely impact Party C's economic condition or the Pledgor's ability to fulfill their obligations and guarantee liabilities under this Agreement.

5

5.13    Party C hereby agrees that it is jointly and severally liable to the Pledgee for all representations and warranties made by any and all of the Pledgor under this Agreement.

5.14    Party C hereby warrants to the Pledgee that, at any time and under any circumstances prior to complete fulfillment of the obligations under this Agreement or the secured debts being fully repaid, the aforementioned representations and warranties are true and accurate and will be fully complied with.

**6.**    **Covenants and Further Agreements of Pledgor**

**The covenants and further agreements of the Pledgor are set forth below.**

6.1    Pledgor hereby covenants to the Pledgee, that during the term of this Agreement, Pledgor shall:

6.1.1    not transfer (or agree to others' transfer of) all or any part of the Equity Interest, place or permit the existence of any security interest or other encumbrance that may affect the Pledgee's rights and interests in the Equity Interest, without the prior written consent of Pledgee, except for the performance of the Exclusive Purchase Option Agreement executed by Pledgor, Pledgee and Party C on [Execution Date of the Exclusive Purchase Option Agreement];

6.1.2    comply with the provisions of all laws and regulations applicable to the pledge of rights, and within 5 days of receipt of any notice, order or recommendation issued or prepared by relevant competent authorities (or any other relevant parties) regarding the Pledge, shall present the aforementioned notice, order or recommendation to Pledgee, and shall comply with the aforementioned notice, order or recommendation or submit objections and representations with respect to the aforementioned matters upon Pledgee's reasonable request or upon consent of Pledgee;

6.1.3    promptly notify Pledgee of any event or notice received by Pledgor that may have an impact on Pledgee's rights to the Equity Interest or any portion thereof, as well as any event or notice received by Pledgor that may have an impact on any guarantees and other obligations of Pledgor arising out of this Agreement.

6.2    Pledgor agrees that the rights acquired by Pledgee in accordance with this Agreement with respect to the Pledge shall not be interrupted or harmed by Pledgor or any heirs or representatives of Pledgor or any other persons through any legal proceedings.

6.3    To protect or perfect the security interest granted by this Agreement, Pledgor hereby undertakes to execute in good faith and to cause other parties who have an interest in the Pledge to execute all certificates, agreements, deeds and/or covenants required by Pledgee. Pledgor also undertakes to perform and to cause other parties who have an interest in the Pledge to perform actions required by Pledgee, to facilitate the exercise by Pledgee of its rights and authority granted thereto by this Agreement, and to enter into all relevant documents regarding ownership of Equity Interest with Pledgee or designee(s) of Pledgee (natural/legal persons). Pledgor undertakes to provide Pledgee within a reasonable time with all notices, orders and decisions regarding the Pledge that are required by Pledgee.

6.4     Pledgor hereby undertakes to comply with and perform all guarantees, promises, agreements, representations and conditions under this Agreement. In the event of failure or partial performance of its guarantees, promises, agreements, representations and conditions, Pledgor shall indemnify Pledgee for all losses resulting therefrom.

6.5     If the Equity Interest pledged under this Agreement is, for any reason, subject to mandatory measures imposed by the court of law or other governmental departments, the Pledgor shall try their best to release such mandatory measures imposed by the court of law or other governmental departments, including without limitation providing to the court of law other kinds of security or other measures.

6.6     If there is a possibility that the value of the Equity Interest will be decreased and such decrease is sufficient to harm the rights and interests of the Pledgee, the Pledgee may request the Pledgor to provide additional collateral or security. If the Pledgor refuses to provide such security, the Pledgee may, at any time, sell the Equity Interest or put it up for auction, and use the monies obtained from such sale or auction to settle the secured obligations in advance or put such monies under custody; all expenses therefore occurred shall be borne by the Pledgor.

6.7     Without the prior written consent from the Pledgee, the Pledgor and/or Party C shall not (by themselves or assisting others to) increase, decrease or transfer the registered capital of Party C (or their capital contribution to Party C) or impose any encumbrances on it, including the Equity Interest. Subject to the forgoing provision, any Equity Interest which is registered and obtained by the Pledgor subsequent to the date of this Agreement shall be called "Additional Equity Interest". The Pledgor and Party C shall, immediately after the Pledgor obtains the Additional Equity Interest, enter with the Pledgee supplemental equity pledge agreement for the Additional Equity Interest, make the board of directors and shareholders meeting of Party C approve the supplemental equity pledge agreement, and deliver to the Pledgee all documents necessary for the supplemental equity pledge agreement, including without limitation (a) the original certificate issued by Party C about shareholders' capital contribution relating to the Additional Equity Interest; and (b) the verified photocopy of the capital contribution verification report (issued by certified public accountant in China) regarding the Additional Equity Interest. The Pledgor and Party C shall, according to Article 3.1 of this Agreement, handle the pledge registration procedures relating to the Additional Equity Interest.

7

**6.8** Unless otherwise instructed by the Pledgee in writing, the Pledgor and/or Party C agree that, if part of or all of the Equity Interest is transferred between the Pledgor and any third parties in violation of this Agreement ("Transferee of the Equity Interest"), then the Pledgor and/or Party C shall ensure that the Transferee or the Equity Interest will unconditionally recognize the Pledge and follow necessary procedures for modification of the registration of the Pledge (including without limitation signing relevant documents) so as to ensure the continued existence of the Pledge.

**6.9** If the Pledgee provides to Party C loan of monies, the Pledgor and/or the Party C agree to pledge the Equity Interest to the Pledgee for security of such additional loan of monies, and to follow procedures as soon as possible according to relevant laws, regulations or local practice (if any), including without limitation executing relevant documents and completing registration procedures for setting up (or modification) of a pledge.

**The covenants and further agreements of Party C are set forth below.**

**6.10** If, for the execution of this Agreement and Pledge under this Agreement, it is necessary to obtain any third party consent, approval, waiver or authorization, any governmental approval, license or waiver, or complete registration procedures in any governmental departments (as required by the law), then Party C will try its best to assist in obtaining the same and cause it to remain in effect during the term of this Agreement.

**6.11** Without prior written consent of the Pledgee, Party C will not provide any person with any loan or credit or guarantee in any form; assist or allow the Pledgor to set up any new pledges or grant other security over the Equity Interest, nor will Party C assist or allow the Pledgor to transfer the Equity Interest.

**6.12** Party C agrees to, jointly with the Pledgor, strictly comply with Article 6.7, Article 6.8 and Article 6.9 of this Agreement.

**6.13** Without prior written consent of the Pledgee, Party C shall not transfer its assets or set up (or allow the existence of) any security or encumbrances on property rights that may affect the Pledgee's rights and interests in the Equity Interest (including without limitation transfer of any of Party C's intellectual properties or any assets with an a value equaling or over RMB 100,000, or any encumbrance on the ownership or right to use of such assets).

**6.14** Where there are any litigations, arbitrations or any other claims, which may adversely impact party C, the Equity Interest, or the Pledgee's interests under the Control Agreements, Party C shall, as soon as possible, send timely notice to the Pledgee and according to reasonable requests of the Pledgee take all necessary measures to protect the Pledgee's interests in the Equity Interest.

**6.15** Party C shall not conduct or allow any acts or actions that may adversely impact the Equity Interest or Pledgee's interest under the Control Agreements.

8

**6.16** Party C shall, during the first month of each quarter, provide to the Pledgee its financial statements for the preceding quarter, including without limitation its balance sheets, profit statements and cash flow statements.

**6.17** Party C shall, pursuant to the Pledgee's reasonable requests, take all necessary measures and sign all necessary documents so as to ensure and protect the Pledgee's rights over the Equity Interest and realization of them.

**6.18** If the exercise of the Pledge under this Agreement results to any transfer of the Equity Interest, Party C agrees and warrants that it will take all measures to effect such transfer.

**6.19** Party B shall ensure and cause the other shareholders of Party C to ensure that Party C will complete the operation term extension registration formalities within three (3) months prior to the expiration of its operation term so that the validity of this Agreement shall be maintained.

**7.**   **Event of Default**

**7.1** The following circumstances shall be deemed Event of Default:

7.1.1   Party C fails to pay in full any of the consulting and service fees payable under the Exclusive Business Cooperation Agreement, or fail to repay its loan or breaches any other obligations of Party C under the Control Agreements;

7.1.2   Any representation or warranty by Pledgor in Article 5 of this Agreement contains material misrepresentations or errors, and/or Pledgor violates any of the warranties in Article 5 of this Agreement;

7.1.3   Pledgor and Party C fail to complete the registration of the Pledge with Registration Authority;

7.1.4   Pledgor and Party C breach any provisions of this Agreement;

7.1.5   Except as expressly stipulated in Section 6.1.1, Pledgor transfers or purports to transfer or abandons the Equity Interest pledged or assigns the Equity Interest pledged without the written consent of Pledgee;

7.1.6   Any of Pledgor's own loans, guarantees, indemnifications, promises or other debt liabilities to any third party or parties (1) become subject to a demand of early repayment or performance due to default on the part of Pledgor; or (2) become due but are not capable of being repaid or performed in a timely manner;

7.1.7   Any approval, license, permit or authorization of government agencies that makes this Agreement enforceable, legal and effective is withdrawn, terminated, invalidated or substantively changed;

9

7.1.8 The promulgation of applicable laws renders this Agreement illegal or renders it impossible for Pledgor to continue to perform its obligations under this Agreement;

7.1.9 Adverse changes in properties owned by Pledgor, which lead Pledgee to believe that that Pledgor's ability to perform its obligations under this Agreement has been affected;

7.1.10 The successor or custodian of Party C is capable of only partially performing or refuses to perform the payment obligations under the Exclusive Business Cooperation Agreement; and

7.1.11 Any other circumstances occur where Pledgee is or may become unable to exercise its right with respect to the Pledge.

**7.2** Upon notice or discovery of the occurrence of any circumstances or event that may lead to the aforementioned circumstances described in Section 7.1, Pledgor shall immediately notify Pledgee in writing accordingly.

**7.3** Unless an Event of Default set forth in this Section 7.1 has been successfully resolved to Pledgee's satisfaction within thirty (30) days of the Pledgee's notice, Pledgee may issue a Notice of Default to Pledgor in writing upon the occurrence of the Event of Default or at any time thereafter and demand that Pledgor immediately pays all outstanding payments due under the Control Agreements, and/or repays loans and all other payments due to Pledgee, and/or disposes of the Pledge in accordance with the provisions of Article 8 of this Agreement.

**8.** <u>**Exercise of Pledge**</u>

**8.1** Pledgor shall not assign the Pledge or the Equity Interest in Party C without the Pledgee's written consent.

**8.2** Pledgee may issue a Notice of Default to Pledgor when exercising the Pledge.

**8.3** Subject to the provisions of Section 7.3, Pledgee may exercise the right to enforce the Pledge concurrently with the issuance of the Notice of Default in accordance with Section 7.2 or at any time after the issuance of the Notice of Default. Once Pledgee elects to enforce the Pledge, Pledgor shall cease to be entitled to any rights or interests associated with the Equity Interest.

**8.4** In the event of default, to the extent permitted, Pledgee is entitled to take possession of the Equity Interest pledged hereunder and to dispose of the Equity Interest pledged and exercise all of its remedies and rights for breach of contract in accordance with law; if, after satisfying all obligations secured, there is any balance in the monies collected by the Pledgee by enforcing the Pledge, then such balance shall be, without calculation of interests, paid to the Pledgor or other parties entitled to receive such balance. The Pledgee shall not be liable for any loss caused by its reasonable exercise of its remedies and rights for breach of contract. The Pledgee shall have the right, at its option, to exercise any of its remedies for breach of contract simultaneously or successively. The Pledgee shall not be required to exercise other remedies for breach of contract before its exercise of the right to be repaid in priority out of the proceeds from the conversion, auction or sale of the Equity Interest pledged hereunder.

**8.5**    When Pledgee disposes of the Pledge in accordance with this Agreement, Pledgor and Party C shall provide necessary assistance to enable Pledgee to enforce the Pledge in accordance with this Agreement.

**8.6**    Unless otherwise provided by the law, all expenses, tax, charges and all legal fees relating to the establishment of the Pledge and enforcement of it shall be borne by the Pledgor.

**9.**    <u>**Assignment**</u>

**9.1**    Without Pledgee's prior written consent, Pledgor shall not have the right to assign or delegate its rights and obligations under this Agreement.

**9.2**    This Agreement shall be binding on Pledgor and its successors and permitted assigns, and shall be valid with respect to Pledgee and each of its successors and assigns.

**9.3**    At any time, Pledgee may assign any and all of its rights and obligations under the Exclusive Business Cooperation Agreement to its designee(s) (natural/legal persons), in which case the assigns shall have the rights and obligations of Pledgee under this Agreement, as if it were the original party to this Agreement. When the Pledgee assigns the rights and obligations under the Exclusive Business Cooperation Agreement, upon Pledgee's request, Pledgor shall execute relevant agreements or other documents relating to such assignment.

**9.4**    In the event of a change in Pledgee due to an assignment, Pledgor shall, at the request of Pledgee, execute a new pledge agreement with the new pledgee on the same terms and conditions as this Agreement.

**9.5**    Pledgor shall strictly abide by the provisions of this Agreement and other contracts jointly or separately executed by the Parties hereto or any of them, including the Exclusive Purchase Option Agreement and the Power of Attorney granted to Pledgee, perform the obligations hereunder and thereunder, and refrain from any action/omission that may affect the effectiveness and enforceability thereof. Any remaining rights of Pledgor with respect to the Equity Interest pledged hereunder shall not be exercised by Pledgor except in accordance with the written instructions of Pledgee.

11

10.     **Termination**

Upon the full performance and payment of the consulting and service fees under the Exclusive Business Cooperation Agreement and upon termination of Party C's obligations under the Control Agreements, this Agreement shall be terminated, and Pledgee shall then cancel or terminate this Agreement as soon as reasonably practicable.

Unless otherwise provided by laws, in no event shall the Pledgor or Party C have the right to terminate or rescind this Agreement.

11.     **Handling Fees and Other Expenses**

All fees and out of pocket expenses relating to this Agreement, including but not limited to legal costs, costs of production, stamp tax and any other taxes and fees, shall be borne by Party C. If Applicable Laws requires that Pledgee should bear some related taxes and fees, Pledgor shall cause Party C to fully repay Pledgee the paid taxes and fees.

12.     **Confidentiality**

The Parties acknowledge that any oral or written information exchanged among them with respect to this Agreement is confidential information. Each Party shall maintain the confidentiality of all such information, and without obtaining the written consent of other Parties, it shall not disclose any relevant information to any third parties, except in the following circumstances: (a) such information is or will be in the public domain (provided that this is not the result of a public disclosure by the receiving party); (b) information disclosed as required by applicable laws or rules or regulations of any stock exchange; or (c) information required to be disclosed by any Party to its legal counsel or financial advisor regarding the transaction contemplated hereunder, and such legal counsel or financial advisor are also bound by confidentiality duties similar to the duties in this section. Disclosure of any confidential information by the staff members or agency hired by any Party shall be deemed disclosure of such confidential information by such Party, which Party shall be held liable for breach of this Agreement. This section shall survive the termination of this Agreement for any reason.

13.     **Governing Law and Resolution of Disputes**

13.1    The execution, effectiveness, construction, performance, and the resolution of disputes hereunder shall be governed by the formally published and publicly available laws of China. Matters not covered by formally published and publicly available laws of China shall be governed by international legal principles and practices.

13.2    In the event of any dispute with respect to the construction and performance of the provisions of this Agreement, the Parties shall negotiate in good faith to resolve the dispute. In the event the Parties fail to reach an agreement on the resolution of such a dispute within 30 days after any Party's request for resolution of the dispute through negotiations, any Party may submit the relevant dispute to the China International Economic and Trade Arbitration Commission ("**CIETAC**") for arbitration, in accordance with its then effective arbitration rules. The arbitration shall be conducted in Beijing, and the language used during arbitration shall be Chinese. The arbitration ruling shall be final and binding on all Parties.

12

**13.3**  Upon the occurrence of any disputes arising from the construction and performance of this Agreement or during the pending arbitration of any dispute, except for the matters under dispute, the Parties to this Agreement shall continue to exercise their respective rights under this Agreement and perform their respective obligations under this Agreement.

**14.**  **Notices**

**14.1**  All notices and other communications required or permitted to be given pursuant to this Agreement shall be delivered personally or sent by registered mail, postage prepaid, by a commercial courier service or by facsimile transmission to the address of such party set forth below. A confirmation copy of each notice shall also be sent by email. The dates on which notices shall be deemed to have been effectively given shall be determined as follows:

14.1.1  Notices given by personal delivery, by courier service or by registered mail, postage prepaid, shall be deemed effectively given on the date of delivery or refusal at the address specified for notices.

14.1.2  Notices given by facsimile transmission shall be deemed effectively given on the date of successful transmission (as evidenced by an automatically generated confirmation of transmission).

**14.2**  For the purpose of notices, the addresses of the Parties are as follows:

**Party A:**            **[Name of WFOE]**
Address:
Attn:
Phone:

**Party B:**            **[Name of VIE Shareholder(s)]**
Phone:

**Party C:**            **[Name of VIE]**
Address:
Attn:
Phone:

**14.3**  Any Party may at any time change its address for notices by a notice delivered to the other Parties in accordance with the terms hereof.

13

15. **Severability**

In the event that one or several of the provisions of this Agreement are found to be invalid, illegal or unenforceable in any aspect in accordance with any laws or regulations, the validity, legality or enforceability of the remaining provisions of this Agreement shall not be affected or compromised in any respect. The Parties shall strive in good faith to replace such invalid, illegal or unenforceable provisions with effective provisions that accomplish to the greatest extent permitted by law and the intentions of the Parties, and the economic effect of such effective provisions shall be as close as possible to the economic effect of those invalid, illegal or unenforceable provisions.

16. **Attachments**

The attachments set forth herein shall be an integral part of this Agreement.

17. **Effectiveness**

17.1    Any amendments, changes and supplements to this Agreement shall be in writing and shall become effective upon completion of the governmental registration procedures (if applicable) after the affixation of the signatures or seals of the Parties.

17.2    This Agreement is written in Chinese and English in four (4) copies. Each of the Pledgor, Pledgee and Party C shall hold one (1) copy, respectively; and one (1) copy shall be submitted to the Registration Authority. Each copy of this Agreement shall have equal validity. In case there is any conflict between the Chinese version and the English version, the Chinese version shall prevail.

17.3    With the execution of this Agreement on the date hereof, the Pledgor shall cause his/her spouse to execute and deliver to the Pledgee a spousal consent letter in substantially the form attached hereto as Attachment 1.

14

Annex 1

**Spousal Consent Letter**

I, being the spouse of [Name of the VIE Shareholder](the "Shareholder"), who has signed the foregoing Equity Pledge Agreement (the "Agreement"), hereby acknowledge that I have read and is familiar with the provisions of said Agreement and agree to be bound thereby and join therein to the extent that my agreement and joinder may be necessary; I hereby further acknowledge and agree that the shares registered in the Shareholder's name shall be or may be pledged, sold or otherwise disposed of under the terms of said Agreement without my further consent; I further acknowledge and agree that the Shareholder may join in any future amendment or modification of said Agreement without any further signature, acknowledgement, agreement or consent on my part; and I hereafter acquire in the shares of the Shareholder in [Name of VIE] shall be subject to the provisions of said Agreement.

I acknowledge that I had the opportunity to employ separate counsel in connection with the preparation of said Agreement, but I consent and specifically declined to do so.

Name: _____

Date: _____

15

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Exclusive Equity Pledge Agreement as of the date first written above.

**Party A: [Name of WFOE]**

By:

Name:

16

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Exclusive Equity Pledge Agreement as of the date first written above.

**Party B: [Name of VIE Shareholder(s)]**

By:

Name:

17

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Exclusive Equity Pledge Agreement as of the date first written above.

**Party C: [Name of VIE]**

By:

Name:

18

## Schedule of Material Differences

The VIE Shareholders and the VIEs as set out below entered into equity pledge agreements with Beijing Rongqiniu Information Technology Co., Ltd. or Beijing Rongsanliuling Information Technology Co., Ltd.,as applicable, the WFOE, using this form. Pursuant to Instruction ii to Item 601 of Regulation S-K, the Registrant may only file this form as an exhibit with a schedule setting forth the material details in which the executed agreements differ from this form:

| No. | Name of WFOE | Name of VIE Shareholder(s) | Name of Variable Interest Entity (the "VIE") | % of VIE Shareholder's Equity Interest in the VIE | Execution Date |
|---|---|---|---|---|---|
| 1 | Beijing Rongqiniu Information Technology Co., Ltd. | Ye Huijing, Lu Jiayan, Liu Caofeng | Beijing Rongdiandian Information Technology Co., Ltd. ("RDD") | 100% | April 3, 2019[1] |
| 2 | Beijing Rongqiniu Information Technology Co., Ltd. | Li Hui | Beijing Kartner Information Technology Co., Ltd.[2] | 60% | October 1, 2018 |
| 3 | Beijing Rongqiniu Information Technology Co., Ltd. | Liu Yang | Beijing Kartner Information Technology Co., Ltd.[2] | 40% | October 1, 2018 |
| 4 | Beijing Rongsanliuling Information Technology Co., Ltd. | Zhu Xiang | Beijing Guangkezhixun Information Technology Co., Ltd. | 60% | October 1, 2019 |
| 5 | Beijing Rongsanliuling Information Technology Co., Ltd. | Huang Dan | Beijing Guangkezhixun Information Technology Co., Ltd. | 40% | October 1, 2019 |

Notes:

(1) On April 3, 2019, one of the previous shareholders of RDD transferred her equity holdings in RDD to Ye Huijing. Concurrent with the completion of such equity transfer in RDD, the previous equity pledge agreement of the same form entered into by and among Beijing Rongqiniu Information Technology Co., Ltd., RDD and RDD's previous shareholders on September 29, 2017 was terminated and this new equity pledge agreement was entered into with RDD's new shareholders.

(2) Beijing Kartner Information Technology Co., Ltd. was formerly known as Beijing Xiaokayingjia Technology Co. Ltd.

19

**Form of Power of Attorney**

Date: [Execution Date]

We, [Name of the VIE Shareholders] (with Identification Card No.: ******************), citizens of the People's Republic of China ("<u>China</u>"), and joint holders of 100% of the entire registered capital in [Name of VIE] ("<u>Our Shareholding</u>"), hereby irrevocably authorize [Name of WFOE] (the "<u>WFOE</u>") to exercise the following rights relating to Our Shareholding during the term of this Power of Attorney:

The WFOE is hereby authorized to act on behalf of ourselves as our exclusive agent and attorney with respect to all matters concerning our Shareholding, including without limitation to: 1) propose, convene and attend shareholders' meetings of [Name of VIE]; 2) exercise all the shareholder's rights and shareholder's voting rights I am entitled to under the laws of China and [Name of VIE]'s Articles of Association, including but not limited to the sale or transfer or pledge or disposition of our Shareholding in part or in whole; 3) designate and appoint on behalf of ourselves the legal representative (chairperson), the director, supervisor, the chief executive officer (or general manager) and other senior management members of [Name of VIE]; and 4) obtain the information with respect to the operation, business, clients, finance, employees and other relevant information of [Name of VIE] and inspect related records and materials.

Without limiting the generality of the powers granted hereunder, the WFOE shall have the power and authority under this Power of Attorney to execute the Transfer Agreements stipulated in Exclusive Purchase Option Agreement, to which we are required to be a party, on behalf of ourselves, and to effect the terms of the Equity Pledge Agreement and Exclusive Purchase Option Agreement, both dated the date hereof, to which we are parties.

All the actions associated with Our Shareholding conducted by the WFOE shall be deemed as our own actions, and all the documents related to Our Shareholding executed by the WFOE shall be deemed to be executed by me. When acting in respect of any and all of the aforementioned matters, the WFOE may act at its own discretion and does not need to seek our prior consent. We hereby acknowledge and ratify those actions and/or documents by the WFOE.

The WFOE is entitled to re-authorize or assign its rights related to the aforesaid matters to any other person or entity at its own discretion and without giving prior notice to us or obtaining our consent.

So long as we are shareholders of [Name of VIE], this Power of Attorney shall be irrevocably and continuously valid and effective from the date of its execution, unless the WFOE issues adverse instructions in writing. Once the WFOE instructs us in writing to terminate this Power of Attorney in whole or in part, we will immediately withdraw the authorization herein granted to the WFOE and execute power(s) of attorney in the same format of this Power of Attorney, granting to other persons nominated by the WFOE the same authorization under this Power of Attorney.

During the term of this Power of Attorney, we hereby waive all the rights associated with Our Shareholding, which have been authorized to the WFOE through this Power of Attorney, and shall not exercise such rights by ourselves.

This Power of Attorney is written in Chinese and English with equal legal validity; in case there is any conflict between the Chinese version and the English version, the Chinese version shall prevail.

[The space below is intentionally left blank.]

---

Name:

By: _____

**Schedule of Material Differences**

The VIE Shareholders of each VIE as set out below grant power of attorney to Beijing Rongqiniu Information Technology Co., Ltd. or Beijing Rongsanliuling Information Technology Co., Ltd., as applicable, the WFOE, using this form. Pursuant to Instruction ii to Item 601 of Regulation S-K, the Registrant may only file this form as an exhibit with a schedule setting forth the material details in which the executed agreements differ from this form:

| No. | Name of WFOE | Name of VIE Shareholder | Name of Variable Interest Entity (the "VIE") | Execution Date |
|-----|--------------|-------------------------|---------------------------------------------|----------------|
| 1 | Beijing Rongqiniu Information Technology Co., Ltd. | Ye, Huijing, Lu Jiayan, Liu Caofeng | Beijing Rongdiandian Information Technology Co., Ltd. ("RDD") | April 3, 2019[1] |
| 2 | Beijing Rongqiniu Information Technology Co., Ltd. | Li Hui; Liu Yang | Beijing Kartner Information Technology Co., Ltd.[2] | October 1, 2018 |
| 3 | Beijing Rongsanliuling Information Technology Co., Ltd. | Zhu Xiang; Huang Dan | Beijing Guangkezhixun Information Technology Co., Ltd. | October 1, 2019 |

Notes:

(1) On April 3, 2019, one of the previous shareholders of RDD transferred her equity holdings in RDD to Ye Huijing. Concurrent with the completion of such equity transfer in RDD, the previous power of attorney of the same form granted by RDD's previous shareholders on September 29, 2017 was terminated and this new power of attorney was granted by RDD's new shareholders.

(2) Beijing Kartner Information Technology Co., Ltd. was formerly known as Beijing Xiaokayingjia Technology Co. Ltd.

**Form of Exclusive Business Cooperation Agreement**

Exclusive Business Cooperation Agreement (this "<u>Agreement</u>") is made and entered into by and between the following Parties on [Execution Date] in Beijing, China.

**Party A:**      **[Name of WFOE]**
Address:

**Party B:**      **[Name of VIE]**
Address:

Each of Party A and Party B shall be hereinafter referred to as a "<u>Party</u>" respectively, and as the "<u>Parties</u>" collectively.

**Whereas,**

**(1)**      Party A is a Wholly Foreign Owned Enterprise established in the People's Republic of China ("<u>China</u>"), and has the necessary resources to provide technical services and business consulting services;

**(2)**      Party B is a company with exclusively domestic capital registered in China;

**(3)**      Party A is willing to provide Party B, on an exclusive basis, with technical, consulting and other services (the detailed scope set forth below) during the term of this Agreement, utilizing its own advantages in human resources, technology and information, and Party B is willing to accept such services provided by Party A or Party A's designee(s), each on the terms set forth herein.

Now, therefore, through mutual discussion, Party A and Party B have reached the following agreements:

**1.      <u>Services Provided by Party A</u>**

1.1      Party B hereby appoints Party A as Party B's exclusive services provider to provide Party B with complete business support and technical and consulting services during the term of this Agreement, in accordance with the terms and conditions of this Agreement, which may include all or part of the services within the business scope of Party B as may be determined from time to time by Party A, including, but not limited to, technical services, network support, business consultations, intellectual property licenses, equipment or leasing, marketing consultancy, system integration, product research and development, and system maintenance("<u>Service</u>").

1.2      Party B agrees to accept all the consultations and services provided by Party A. Party B further agrees that unless with Party A's prior written consent, during the term of this Agreement, Party B shall not accept any consultations and/or services provided by any third party and shall not cooperate with any third party regarding the matters contemplated by this Agreement. Party A may appoint other parties, who may enter into certain agreements described in Section 1.4 with Party B, to provide Party B with the consultations and/or services under this Agreement.

1.3     To ensure that the cash flow requirements of Party B's ordinary operations are met and/or to set off any loss accrued during such operations, Party A may elect to, only to the extent permissible under the laws of PRC, provide financing support for Party B, whether or not Party B actually incurs any such operational loss. If Party A elects to provide financing support for Party B, Party B shall accept such financing support provided by Party A. Party A's financing support for Party B may take the form of bank entrusted loans or borrowings. Contracts for any such entrusted loans or borrowings shall be executed separately.

1.4     Service Providing Methodology

    1.4.1   Party A and Party B agree that during the term of this Agreement, both Parties, directly or through their respective affiliates, may enter into further technical service agreements or consulting service agreements, which shall provide the specific contents, manner, personnel, and fees for the specific technical services and consulting services.

    1.4.2   To fulfill this Agreement, Party A and Party B agree that during the term of this Agreement, both Parties, directly or through their respective affiliates, may enter into intellectual property (including, but not limited to, software, trademark, patent and know-how) license agreements, which shall permit Party B to use Party A's relevant intellectual property rights, at any time and from time to time based on the needs of the business of Party B.

    1.4.3   To fulfill this Agreement, Party A and Party B agree that during the term of this Agreement, both Parties, directly or through their respective affiliates, may enter into equipment or property leases which shall permit Party B to use Party A's relevant equipment or property based on the needs of the business of Party B.

    1.4.4   Party A may, at its own discretion, subcontract to third parties part of the services Party A provides to Party B under this Agreement.

    1.4.5   Party B hereby grants to Party A an irrevocable exclusive right, pursuant to which Party A may, at its sole discretion, within the limits permitted by PRC laws and regulations, purchase any part or all of Party B's assets and business at the lowest price permitted by PRC laws, and the Parties shall enter into a separate transfer agreement of asset or business at that time.

**2.      Calculation and Payment of the Service Fees, Financial Reports, Audit and Tax**

2.1     Both Parties agree that, in consideration of the services provided by Party A, subject to applicable laws of China, Party A is entitled to receive fees (the "Service Fees") from Party B equal to the total net income of Party B. The Service Fees shall be due and payable on a monthly basis. During the term of this Agreement, Party A shall have the right to adjust the above Service Fees at its sole discretion without the consent of Party B. Party B shall (a) deliver to Party A the management accounts and operating statistics of Party B for such month, including the net income of Party B during such month (the "Monthly Net Income"), and (b) pay all of such Monthly Net Income or any other amount as adjusted by Party A, to Party A (each such payment, a "Monthly Payment"). Within 7 days of receipt of such management accounts and operating statistics, Party A shall issue to Party B a corresponding technical service invoice, and Party B shall make payment of the amount of such invoice within 7 days of receipt of the same. All payments shall be transferred into the bank accounts designated by Party A through remittance or in any other way acceptable by the Parties. The Parties agree that such payment instruction may be changed by a notice given by Party A to Party B from time to time.

2.2 Within ninety (90) days after the end of each fiscal year, Party B shall (a) deliver to Party A audited financial statements of Party B for such fiscal year, which shall be audited and certified by an independent certified public accountant approved by Party A, and (b) pay an amount to Party A equal to the shortfall, if any, of the net income of Party B for such fiscal year, as shown in such audited financial statements, as compared to the aggregate amount of the Monthly Payments paid by Party B to Party A in such fiscal year.

2.3 Party B shall prepare its financial statements in satisfaction of Party A's requirements and in accordance with law and commercial practices.

2.4 Subject to a notice given by Party A 5 working days in advance, Party B shall allow Party A and/or its appointed auditor to review, and make photocopies of, the relevant books and records of Party B at the principal office of Party B to verify the accuracy of the income amounts and statements of Party B.

2.5 The Parties undertake to each file and pay, in accordance with law, the taxes involved in the transaction hereunder.

**3. Intellectual Property Rights; Confidentiality Clauses; Non-competition**

3.1 Party A shall have exclusive and proprietary rights and interests in all rights, ownership, interests and intellectual properties arising out of or created during the performance of this Agreement, including, but not limited to, copyrights, patents, patent applications, trademarks, software, technical secrets, trade secrets and others, regardless of whether they have been developed by Party A or Party B.

3.2 The Parties acknowledge that any oral or written information exchanged among them with respect to this Agreement is confidential information. Each Party shall maintain the confidentiality of all such information, and without obtaining the written consent of the other Party, it shall not disclose any relevant information to any third parties, except in the following circumstances: (a) such information is or will be in the public domain (provided that this is not the result of a public disclosure by the receiving Party); (b) information disclosed as required by applicable laws or rules or regulations of any stock exchange; or (c) information required to be disclosed by any Party to its legal counsel or financial advisor regarding the transaction contemplated hereunder, and such legal counsel or financial advisor is also bound by confidentiality duties similar to the duties in this Section. Disclosure of any confidential information by the staff members or agencies hired by any Party shall be deemed disclosure of such confidential information by such Party, which Party shall be held liable for breach of this Agreement. This Section shall survive the termination of this Agreement for any reason.

3.3     Party B shall not engage in any business activities other than those falling within the scope permitted by its Business License and Business Permit, whether directly or indirectly, or any businesses in China, which compete with the businesses of Party A, whether directly or indirectly, including investing in entities operating in businesses which compete with the businesses of Party A, or any other businesses beyond the scope approved in writing by Party A.

3.4     The Parties agree that this Section shall survive changes to, and rescission or termination of, this Agreement.

## 4.     <u>Representations and Warranties</u>

4.1     Party A hereby represents and warrants as follows:

    4.1.1     Party A is a company legally registered and validly existing in accordance with the laws of China.

    4.1.2     Party A's execution and performance of this Agreement is within its corporate capacity and the scope of its business operations; Party A has taken necessary corporate actions and been given appropriate authorization and has obtained the consent and approval from third parties and government agencies, and will not violate any restrictions in law or otherwise binding or having an impact on Party A.

    4.1.3     This Agreement constitutes Party A's legal, valid and binding obligations, enforceable in accordance with its terms.

4.2     Party B hereby represents and warrants as follows:

    4.2.1     Party B is a company legally registered and validly existing in accordance with the laws of China;

    4.2.2     Party B's execution and performance of this Agreement is within its corporate capacity and the scope of its business operations; Party B has taken necessary corporate actions and given appropriate authorization and has obtained the consent and approval from third parties and government agencies, and will not violate any restrictions in law or otherwise binding or having an impact on Party B.

    4.2.3     This Agreement constitutes Party B's legal, valid and binding obligations, and shall be enforceable against it.

## 5.     <u>Effectiveness and Term</u>

5.1     This Agreement has been entered into as of the date first written above and shall come into force as from such date. This Agreement shall be perpetually valid unless early terminated upon written decision of Party A in accordance with this Agreement or otherwise required in the laws of the PRC.

**6.    Termination**

6.1    If any Party's term of operation expires within the term hereof, such Party shall promptly extend its term of operation to the greatest extent permitted by the laws of the PRC in order for this Agreement to continue to be valid and performed. If a Party's application for extension of term of operation is not approved or consented to by any competent authority, this Agreement shall terminate on the date when such Party's term of operation expires.

6.2    The rights and obligations of the Parties under Articles 3, 7 and 8 shall survive the termination of this Agreement.

6.3    In case of early termination, for whatever reason, or due expiration of this Agreement, payment obligations of either Party outstanding as of the date of such termination or expiration, including without limitation the Service Fees, shall not be waived, nor shall any default liability accrued as of the termination of this Agreement be waived. The Service Fees accrued as of the termination of this Agreement shall be paid to Party A within 15 working days of the termination of this Agreement.

**7.    Governing Law and Resolution of Disputes**

7.1    The execution, effectiveness, construction, performance, amendment and termination of this Agreement and the resolution of disputes hereunder shall be governed by the laws of China.

7.2    In the event of any dispute with respect to the construction and performance of the provisions of this Agreement, the Parties shall negotiate in good faith to resolve the dispute. In the event the Parties fail to reach an agreement on the resolution of such a dispute within 30 days after any Party's request for resolution of the dispute through negotiations, any Party may submit the relevant dispute to the China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration, in accordance with its then-effective arbitration rules. The arbitration shall be conducted in Beijing, and the language used during arbitration shall be Chinese. The arbitration ruling shall be final and binding on both Parties.

7.3    Upon the occurrence of any disputes arising from the construction and performance of this Agreement or during the pending arbitration of any dispute, except for the matters under dispute, the Parties to this Agreement shall continue to exercise their respective rights under this Agreement and perform their respective obligations under this Agreement.

7.4    In case of promulgation or , or any change to or in any Chinese law, regulation or rule, or any change to or in the interpretation or application of the same any time after execution of this Agreement, the following agreement shall apply: (a) if any Party would enjoy more benefits under any changed or new law than under the relevant law, regulation or rule in effect at the date of this Agreement, without any adverse effect upon the other Party, the Parties shall promptly apply for such benefits. The Parties shall make best efforts to procure the approval of such application; and (b) if the aforementioned law change or promulgation causes any direct or indirect material adverse effect to either Party, this Agreement shall be implemented in its original terms and conditions. However, the Parties shall try all lawful means to procure exemption from compliance with such changed or new law provisions. In the event such adverse effect on the economic interest of either Party is unable to be resolved pursuant to this Agreement, the affected Party may give notice to other Party(s), and the Parties shall hold prompt discussion and make all necessary amendments to this Agreement so as to maintain the economic benefits otherwise enjoyed by the affected Party.

**8.** <u>**Indemnification**</u>

Party B shall indemnify and hold harmless Party A from any losses, injuries, obligations or expenses caused by any lawsuit, claims or other demands against Party A arising from or caused by the consultations and services provided by Party A at the request of Party B, except where such losses, injuries, obligations or expenses arise from the gross negligence or willful misconduct of Party A.

**9.** <u>**Notices**</u>

9.1    All notices and other communications required or permitted to be given pursuant to this Agreement shall be delivered personally or sent by registered mail, postage prepaid, by a commercial courier service or by facsimile transmission to the address of such Party set forth below. A confirmation copy of each notice shall also be sent by email. The dates on which notices shall be deemed to have been effectively given shall be determined as follows:

    9.1.1    Notices given by personal delivery, by courier service or by registered mail, postage prepaid, shall be deemed effectively given on the date of delivery or refusal at the address specified for notices.

    9.1.2    Notices given by facsimile transmission shall be deemed effectively given on the date of successful transmission (as evidenced by an automatically generated confirmation of transmission).

9.2    For the purpose of notices, the addresses of the Parties are as follows:

**Party A:**    **[Name of WFOE]**
Address:
Attn:
Phone:

**Party B:**    **[Name of VIE]**
Address:
Attn:
Phone:

9.3 Any Party may at any time change its address for notices by a notice delivered to the other Party in accordance with the terms hereof.

## 10. Assignment

10.1 Without Party A's prior written consent, Party B shall not assign its rights and obligations under this Agreement to any third party.

10.2 Party B agrees that Party A may assign its obligations and rights under this Agreement to any third party upon a prior written notice to Party B but without the consent of Party B.

## 11. Severability

In the event that one or several of the provisions of this Agreement are found to be invalid, illegal or unenforceable in any aspect in accordance with any laws or regulations, the validity, legality or enforceability of the remaining provisions of this Agreement shall not be affected or compromised in any aspect. The Parties shall strive in good faith to replace such invalid, illegal or unenforceable provisions with effective provisions that accomplish to the greatest extent permitted by law and the intentions of the Parties, and the economic effect of such effective provisions shall be as close as possible to the economic effect of those invalid, illegal or unenforceable provisions.

## 12. Amendments and Supplements

Any amendments and supplements to this Agreement shall be in writing. The amendment agreements and supplementary agreements that have been signed by the Parties and that relate to this Agreement shall be an integral part of this Agreement and shall have the same legal validity as this Agreement.

## 13. Language and Counterparts

This Agreement is written in both Chinese and English language in two copies, each Party having one copy with equal legal validity; in case there is any conflict between the Chinese version and the English version, the Chinese version shall prevail.

[The space below is intentionally left blank.]

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Exclusive Business Cooperation Agreement as of the date first written above.

**Party A: [Name of WFOE]**

By: _____
Name:

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Exclusive Business Cooperation Agreement as of the date first written above.

**Party B: [Name of VIE]**


By: _____
Name:

Schedule of Material Differences

Each of the VIEs as set out below entered into an exclusive business cooperation agreement with Beijing Rongqiniu Information Technology Co., Ltd. or Beijing Rongsanliuling Information Technology Co., Ltd., as applicable, the WFOE, using this form. Pursuant to Instruction ii to Item 601 of Regulation S-K, the Registrant may only file this form as an exhibit with a schedule setting forth the material details in which the executed agreements differ from this form:

| | Name of WFOE | Name of Variable Interest Entity (the "VIE") | Execution Date |
|---|---|---|---|
| 1 | Beijing Rongqiniu Information Technology Co., Ltd. | Beijing Rongdiandian Information Technology Co., Ltd. ("RDD") | April 3, 2019 [1] |
| 2 | Beijing Rongqiniu Information Technology Co., Ltd. | Beijing Kartner Information Technology Co., Ltd.[2] | October 1, 2018 |
| 3 | Beijing Rongsanliuling Information Technology Co., Ltd. | Beijing Guangkezhixun Information Technology Co., Ltd. | October 1, 2019 |

Notes:

(1) On April 3, 2019, one of the previous shareholders of RDD transferred her equity holdings in RDD to one of the current shareholders of RDD. Concurrent with the completion of such equity transfer in RDD, the previous exclusive business cooperation agreement of the same form entered into by and between Beijing Rongqiniu Information Technology Co., Ltd. and RDD on September 29, 2017 was terminated and this new exclusive business cooperation agreement was entered into by and between Beijing Rongqiniu Information Technology Co., Ltd. and RDD.

(2) Beijing Kartner Information Technology Co., Ltd. was formerly known as Beijing Xiaokayingjia Technology Co. Ltd.

**Exhibit 8.1**

**Principal Subsidiaries of Jianpu Technology Inc.**

**Subsidiaries:**

Jianpu (Hong Kong) Limited, a Hong Kong company
Beijing Rongqiniu Information Technology Co., Ltd., a PRC company
Databook Tech Ltd., a Cayman Islands company
Databook (HK) Limited, a Hong Kong company
Hangzhou Magnet Technology Co., Ltd., a PRC company
Beijing Rongsanliuling Information Technology Co., Ltd. a PRC company
CC Information Limited, a Hong Kong company

**Variable Interest Entities:**

Beijing Rongdiandian Information Technology Co., Ltd., a PRC company
Hangzhou Scorpion Technology Co., Ltd., a PRC company
Beijing Kartner Information Technology Co., Ltd., a PRC company
Beijing Guangkezhixun Information Technology Co., Ltd., a PRC company

**Subsidiary of Variable Interest Entity:**

Shanghai Anguo Insurance Brokerage Co., Ltd., a PRC company

**Certification by the Principal Executive Officer**

**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Daqing (David) Ye, certify that:

1. I have reviewed this annual report on Form 20-F of Jianpu Technology Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: April 30, 2021

By: /s/ Daqing (David) Ye
   Name: Daqing (David) Ye
   Title: Chief Executive Officer

**Exhibit 12.2**

**Certification by the Principal Financial Officer**

**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Yilü (Oscar) Chen, certify that:

1. I have reviewed this annual report on Form 20-F of Jianpu Technology Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: April 30, 2021

By:    /s/ Yilü (Oscar) Chen
      Name:    Yilü (Oscar) Chen
      Title:    Chief Financial Officer

**Exhibit 13.1**

**Certification by the Principal Executive Officer**

**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of Jianpu Technology Inc. (the "Company") on Form 20-F for the year ended December 31, 2019 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Daqing (David) Ye, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: April 30, 2021

By:      /s/ Daqing (David) Ye
Name:    Daqing (David) Ye
Title:   Chief Executive Officer

**Certification by the Principal Financial Officer**

**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of Jianpu Technology Inc. (the "Company") on Form 20-F for the year ended December 31, 2019 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Yilü (Oscar) Chen, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: April 30, 2021

By:        /s/ Yilü (Oscar) Chen
Name:      Yilü (Oscar) Chen
Title:     Chief Financial Officer

# 方 達 律 師 事 務 所

FANGDA PARTNERS

香港 Hong Kong·上海 Shanghai·北京 Beijing·深圳 Shenzhen 广州 Guangzhou

http://www.fangdalaw.com

| | | | |
|---|---|---|---|
| 中国北京市朝阳区光华路一号 | 电子邮件 | E-mail: | email@fangdalaw.com |
| 北京嘉里中心北楼27层 | 电 话 | Tel.: | 86-10-5769-5600 |
| 邮政编码：100020 | 传 真 | Fax: | 86-10-5769-5788 |

27/F, North Tower, Beijing Kerry Centre
1 Guanghua Road, Chaoyang District
Beijing 100020, PRC

**Jianpu Technology Inc.**

21/F Internet Finance Center
Danling Street, Beijing
People's Republic of China

April 30, 2021

Dear Sirs,

We consent to the references to our firm and the summaries of our opinions under "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure—If the PRC government deems that our contractual arrangements with our variable interest entities do not comply with PRC regulatory restrictions on foreign investment in the relevant industries, or if these regulations or the interpretation of existing regulations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations" and "Item 4. Information on the Company—C. Organizational Structure—Contractual Arrangements with the VIEs" in Jianpu Technology Inc.'s Annual Report on Form 20-F for the year ended December 31, 2019 (the "Annual Report"), which is filed with the Securities and Exchange Commission (the "SEC") on the date hereof, and further consent to the incorporation by reference of the summaries of our opinions under these headings into the Registration Statement on Form S-8 (File No. 333-226610) of Jianpu Technology Inc. We also consent to the filing with the SEC of this consent letter as an exhibit to the Annual Report.

In giving such consent, we do not thereby admit that we come within the category of persons whose consent is required under Section 7 of the Securities Act of 1933, or under the Securities Exchange Act of 1934, in each case, as amended, or the regulations promulgated thereunder.

Yours faithfully,

/s/ Fangda Partners

Fangda Partners

**Exhibit 15.2**

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statement on Form S-8 (No. 333-226610) of Jianpu Technology Inc. of our report dated April 30, 2021 relating to the financial statements, which appears in this Form 20-F.

/s/ PricewaterhouseCoopers Zhong Tian LLP

Beijing, the People's Republic of China
April 30, 2021