UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                :

ENRIQUE AFRICA, *individually and on behalf of all*
*other similarly situated,*                      :

                                :

                    Plaintiff,      :                21-CV-1419 (JMF)

                                :

         -v-                     :              <u>OPINION AND ORDER</u>

                                :

JIANPU TECHNOLOGY INC. et al.,         :

                                :

                  Defendant.      :

                                :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      In this putative class action, Lead Plaintiff Enrique Africa brings securities fraud claims

against Jianpu Technology Inc. ("Jianpu" or the "Company"), and two of Jianpu's executives,

David Ye and Yilü (Oscar) Chen (the "Individual Defendants").  Africa alleges that, between

May 29, 2018, and February 16, 2021, Defendants engaged in an unlawful scheme to inflate

Jianpu's stock price and made material misstatements and omissions regarding the Company's

performance and associated risks, in violation of Sections 10(b) and 20(a) of the Securities

Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Securities and

Exchange Commission ("SEC") Rule 10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5.  In a prior

Opinion and Order, familiarity with which is presumed, the Court granted Defendants' motion to

dismiss the First Amended Complaint without prejudice, finding that — among other issues —

Africa's failure to plead scienter required dismissal of all his claims.  *Africa v. Jianpu Tech. Inc.*

("*Africa I*"), 2022 WL 4537973 (S.D.N.Y. Sept. 28, 2022) (ECF No. 61).  Thereafter, Africa

filed the Second Amended Complaint, adding allegations in an effort to cure the defects the

Court identified in the First Amended Complaint.  Defendants now move to dismiss again,

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that, among other

things, Africa still does not establish scienter.  The Court agrees.  Thus, and for the reasons that

follow, Defendants' motion is GRANTED, and the Second Amended Complaint is dismissed.

## BACKGROUND

The following facts are (unless noted) taken from the Second Amended Complaint,

documents it incorporates, and matters of which the Court may take judicial notice; they are

construed in the light most favorable to Africa.  *See, e.g.*, *Kleinman v. Elan Corp., PLC*, 706

F.3d 145, 152 (2d Cir. 2013); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.

2007) (stating that a court may consider "legally required public disclosure documents filed with

the SEC").

Jianpu is a company incorporated in the Cayman Islands with its principal executive

offices in China.  ECF No. 64 ("SAC"), ¶ 19.  Jianpu's American Depositary Shares trade on the

New York Stock Exchange.  *Id.*  Jianpu operates an online platform, Rong360, that connects

consumers with financial service providers in China.  *Id.* ¶¶ 24-25.  Rong360 offers three types

of services: (1) loan recommendation services (the "Loan Segment"), (2) credit card

recommendation services (the "Credit Card Segment"), and (3) advertising and marketing

services (the "Advertising Segment").  *Id.* ¶¶ 25-28.  In the First Amended Complaint, Africa

alleged securities violations with respect to each of these three segments, but he now alleges

violations only with respect to the Credit Card Segment and the Advertising Segment.  *See* ECF

70 ("Pl.'s Opp'n"), at 2 n.4.  The Court will summarize each set of allegations.

**A.  Credit Card Segment**

First, Africa alleges that Jianpu made false or misleading statements relating to the

inflation of its Credit Card Segment revenue through "sham transactions" — thereby allowing

the company to appear to hit its revenue targets despite decreasing performance in its Loan

Segment.  SAC ¶¶ 49-50.  In quarterly earnings calls between the first quarter of 2018 and the

last quarter of 2019, the Individual Defendants reported the rapid growth of their Credit Card

Segment, which generates revenue by recommending credit cards to consumers.  SAC ¶¶ 45, 46.

For example, they stated that, in the first quarter of 2018, credit card volume grew approximately

400% as compared to the same period the prior year; it then grew approximately 6.7% in the

second quarter of 2018.  *Id.* ¶¶ 133, 135.  During the third quarter of 2018, Jianpu announced that

credit card volume increased by approximately 81.8% as compared to the same period the prior

year, and the average fee per credit card increased by 47.7%.  *Id.* ¶ 139.  This reported growth

trend continued through the fourth quarter of 2019.  *Id.* ¶¶ 52, 84, 142, 156, 161, 167, 173.

In several earnings statements, the Company noted that the revenues it had received from

credit card recommendation services increased "due to the increase in both credit card volume

and average fee per credit card" and that it was continuing to see "very sharp growth

momentum" in its Credit Card Segment, "with 25 credit card banks" on the Rong360 platform.

*Id.* ¶¶ 142, 145, 156.  During the earnings call for the fourth quarter of 2018, Chen stated that the

Segment comprised about 40% of the Company's total revenue.  *Id.* ¶ 151.  During the earnings

call for the first quarter of 2019, Ye stated that the Company did not "have any concern about the

credit card business growth for the rest of this year."  *Id.* ¶ 42.  Similarly, during the earnings call

for the second quarter of 2019, Ye stated that the growth of its Credit Card Segment was

"outpacing peers," despite a "relatively slower" credit card market.  *Id.* ¶ 52.

On April 30, 2020, Jianpu announced that it would be filing its 2019 Form 20-F forty-

five days late, relying on an SEC Order permitting public companies to delay filing if they could

not meet the deadlines due to COVID-19.  *Id.* ¶ 175.  Instead of filing a late Form 20-F, however,

the Company filed a Notification of Late Filing on June 15, 2020, informing the SEC that the

Company's Audit Committee was "in the process of conducting an internal review of certain

matters relating to transactions between the Company and third-party business entities." *Id.* ¶ 54.

The same day, Jianpu's share price fell 9.5%. *Id.* ¶ 56.

Jianpu released the results of its internal review on February 16, 2021. *Id.* ¶ 59.

According to the disclosure, the review found:

> that **certain transactions involved third-party agents** (including both upstream agents and downstream suppliers) **with undisclosed relationships, and some transactions lacked business substance** ("questionable transactions"). As a result, certain revenue and associated expenses were inflated or inaccurately recorded in the financial statements. Evidence suggested that certain employees from the Credit Card [Business Unit] may have known about or been involved in certain of the questionable transactions that resulted in inflated sales commissions to such employees. In relation to the questionable transactions, the Review found that certain employees improperly altered supporting documents that were provided to the Company's external auditor.

*Id.* The Company further stated that the review had concluded that no member of senior management had known about the questionable transactions other than one business unit head, who had been terminated. *Id.* Jianpu announced that it would be restating its 2018 financials and that "investors must exercise caution" with respect to its 2019 financial statements. *Id.* ¶ 60. Following this announcement, share prices fell 13%. *Id.* ¶ 61.

On April 30, 2021, Jianpu finally filed its 2019 Form 20-F and restated the Credit Card Segment's 2018 revenue as RMB 61.1 million less than the Company had previously disclosed and its 2019 revenue as RMB 163.7 million less. *Id.* ¶¶ 62, 83. The restated revenue meant that Jianpu did not actually meet its revenue targets for the last three quarters in 2019. *Id.* ¶ 88. The restatement also resulted in a decrease in Jianpu's expenses (reported under the "sales and marketing" line item) of RMB 61.1 million in 2018 and RMB 153.0 million in 2019. ECF 69, Ex. E ("2019 Form 20-F"), at 105, F-14. The 2019 Form 20-F further disclosed material weaknesses in Jianpu's internal controls related to three areas. SAC ¶ 62. Specifically, the Company stated that it lacked "effective controls . . . to prevent and detect" misstatements related to the contribution of "third party agents" to the Credit Card Segment, which resulted in

4

"overstated revenue, cost[s] and expenses" in its financial statements for the segment.  *Id.*
Separately, it described a "failure to design and implement controls . . . related to pre-approval of
and complete and accurate disclosures of related party transactions," resulting in "inaccurate
disclosures" in connection with certain 2018 related-party transactions.  *Id.*  Finally, Jianpu noted
its "lack of sufficient competent financial reporting and accounting personnel with appropriate
understanding of U.S. GAAP to design and implement formal period-end financial reporting
policies and procedures" necessary to comply with SEC financial reporting requirements.  *Id.*

In the Second Amended Complaint, Africa adds several new allegations concerning the
Credit Card Segment.  First and most significantly, Africa newly alleges that related-party
transactions with Beijing Rongdiandian Information Technology Co., Ltd. ("RDD"), which is
40% owned by Defendant Ye's wife, led to the restatement.  *Id.* ¶¶ 63, 69-73, 78.  More
specifically, Africa alleges that "Related Party A," which was identified in the Company's 2019
Form 20-F as a related party that charged Jianpu for advertising and marketing, is RDD.  *Id.*
¶ 78.  Africa concludes that Related Party A is the related party "that prompted the restatement"
because, for example, the Company's description of the internal control weakness that allowed
the sham transactions to go unnoticed and its description of Related Party A's operations both
include the word "agents."  *Id.* ¶ 70.  Africa alleges that without the sham revenue generated
from transactions with RDD, Jianpu would not have hit its revenue targets in 2018 and 2019.  *Id.*
¶¶ 85-88.  Africa further alleges that the contribution of sham revenue to the Credit Card
Segment's growth increased after the Company's Loan Segment's performance suffered due to
negative publicity regarding its lending practices.  *Id.* ¶¶ 84-87.

The Second Amended Complaint includes new allegations regarding two other events as
well.  First, a year after the April 2021 restatement, Jianpu disclosed that there were still errors in
those same financials when it reclassified certain expenses in its already re-stated financials.  *Id.*

¶¶120-21, 129-130.  Second, whereas the First Amended Complaint had included the resignation of a Jianpu board member in 2019, *see* CITE; *see also* SAC ¶ 40, the Second Amended Complaint added the resignations of a Jianpu executive, Jiayan Lu, and another Jianpu board member, James Qun, who resigned in June and October 2022, respectively, with Lu going to work at an unnamed related party, *see id.* ¶¶ 131-32.

## B.  The Advertising Segment

Next, Africa alleges that Jianpu failed to disclose the effect on its Advertising Segment of an ongoing criminal investigation by Chinese authorities into Databook Tech Ltd. ("Databook"), a company Jianpu acquired in June 2018.  *Id.* ¶¶ 28-29, 99.  Significantly, the Second Amended Complaint does not include any new factual allegations regarding the Advertising Segment.  Instead, the factual allegations are identical to those that were in the First Amended Complaint.  Specifically, Africa alleges that, in June 2018, Jianpu acquired a 65% stake in Databook — a company that purported to provide products that "help[] financial service providers to enhance their risk management capabilities" — as part of its Advertising Segment.  *Id.* ¶¶ 28-30, 113.  Jianpu recorded the total asset value of Databook as RMB 268.6 million.  *Id.* ¶¶ 28-29.  On the Company's earnings call for the fourth quarter of 2018, Chen noted that the revenue for the overall Advertising Segment increased 152% in 2018.  *Id.* ¶ 149.

In September 2019, Chinese authorities began a criminal investigation into Hangzhou Scorpion Technology Co., Ltd. ("Hangzhou Scorpion"), a subsidiary of Databook, for the unauthorized storage of user accounts and passwords.  *Id.* ¶¶ 28, 99.  On December 9, 2019, in its announcement of third quarter 2019 earnings, Jianpu disclosed an impairment of RMB 250.3 million and did not record revenue for Databook during the third or fourth quarter of 2019.  *Id.* ¶¶ 100, 106, 110.  Jianpu did not disclose the investigation but explained this impairment as "primarily reflect[ing] the impairment of the goodwill and intangible assets related to a

subsidiary acquired in 2018 due to adverse development of its business and change of the

relevant industry background and market conditions." *Id.* ¶ 101.  That day, Jianpu's share price

fell 5.2%.  *Id.* ¶ 102.

On September 10, 2020, the Chinese government filed criminal charges against

Hangzhou Scorpion and two of its employees.  *Id.* ¶ 107, 111.  A few months later, on January

14, 2021, a court entered judgment against the company, imposed a fine of RMB 30 million, and

ordered disgorgement of RMB 30 million in illegal proceeds.  *Id.* ¶¶ 108, 111.  No other entities

owned by Jianpu, and no directors of officers of Jianpu, were charged in connection with the

conduct.  *Id.* ¶ 111.  In its 2019 Form 20-F, released on April 30, 2021, Jianpu disclosed the

criminal investigation of — and judgment against — the Databook subsidiary.  *Id.*  Jianpu

further explained the accounting methodology it applied to record the relevant revenues and

impairment; specifically, the Company noted that it was applying Accounting Study Guide

("ASC") 855, reversed RMB 30 million in revenues from advertising, and recorded RMB 30

million as penalties.  *Id.*

## PROCEDURAL HISTORY

As noted, the Court previously granted Defendants' motion to dismiss the First Amended

Complaint.  Like the parties, the Court focused on Africa's Rule 10b-5 material

misrepresentation or omission claim, which was dismissed on two grounds: first, because "with

two possible exceptions, he [did] not adequately plead a material misrepresentation or omission";

and second, because he did "not adequately allege scienter."  *Africa I*, 2022 WL 4537973, at *5.

As relevant to scienter, the Court concluded first that Africa's "motive and opportunity"

arguments with respect to Jianpu fell short because the First Amended Complaint did not allege

that any Defendant personally benefited from any of the alleged misstatements.  *Id.* at *10-11.

Second, the Court found Africa's "conscious misbehavior or recklessness" allegations wanting.

Regarding the Credit Card Segment, the Court explained that Africa did not "plausibly allege that any Defendant actually knew about the . . . transactions, which resulted in the Company restating its 2018 and 2019 financial[s]." *Id.* at *11.  And the Court rejected Africa's arguments that Defendants manipulated the Credit Card Segment revenue to make up for falling revenue in the Loan Segment and that Jianpu's "imperfect internal controls . . . amounted to more than negligence" because there was no allegation that "any Defendant knew about the related-party transactions when they made the statements at issue." *Id.* at *12.  Regarding the Advertising Segment, the Court noted that there was no allegation that "any Defendant had access to nonpublic facts about the Databook subsidiary when the Company reported the purchase and valuation of Databook or the financials for the Advertising Segment for 2018 and the first half of 2019." *Id.*  Further, the Court concluded that Africa's allegations that Jianpu violated U.S. Generally Accepted Accounting Principles ("GAAP") in its accounting treatment of the investigation and fine were "insufficient to raise a strong inference of scienter absent other evidence of corresponding fraudulent intent." *Id.* (internal quotation marks omitted).

In the absence of a "primary violation," the Court also dismissed Africa's Section 20(a) "control person" claim.  *Id.* at *13.  Finally, the Court dismissed "Africa's underdeveloped claim for scheme liability" because the complaint alleged only "misstatements and omissions, not 'inherently deceptive conduct'" and therefore failed as a matter of law.  *Id.* (citing *SEC v. Rio Tinto PLC*, 41 F.4th 47, 53 (2d Cir. 2022)).  The Court granted leave to amend.  *Id.*

## LEGAL STANDARDS

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *See Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018).  A court will not dismiss any claims unless the plaintiff has failed to plead sufficient facts to state a claim to relief that is

facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, one that

contains "factual content that allows the court to draw the reasonable inference that the defendant

is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  More

specifically, the plaintiff must allege facts showing "more than a sheer possibility that a

defendant has acted unlawfully."  *Id.*  A complaint that offers only "labels and conclusions" or "a

formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

Further, if the plaintiff "ha[s] not nudged [his] claims across the line from conceivable to

plausible, [those claims] must be dismissed."  *Id.* at 570.

Because Africa alleges securities fraud, he must also satisfy the heightened pleading

requirements of both Rule 9(b), which requires that the circumstances constituting fraud be

"state[d] with particularity," Fed. R. Civ. P. 9(b), and the Private Securities Litigation Reform

Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(2), which requires that scienter — that is, a defendant's

"intention to deceive, manipulate, or defraud" — also be pleaded with particularity, *Tellabs, Inc.

v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks omitted).

Indeed, all of Africa's claims require proof of scienter.  *See Matrixx Initiatives, Inc. v.

Siracusano*, 563 U.S. 27, 37 (2011) (noting that scienter is an element of a Section 10(b) and

Rule 10b-5 claim); *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 108 (2d Cir. 2015)

(dismissing Section 10(b) and Rule 10b-5 claims for failure to adequately plead scienter); *SEC v.

First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (noting that, to state a control-person

claim under Section 20(a), a plaintiff must, at a minimum, plead a plausible "primary violation"

of Section 10(b)); *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co*., 28 F.4th 343, 356-57

(2d Cir. 2022) (dismissing a Section 20(a) claim for failure to plead a "primary violation" of

Section 10(b)); *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 577 (S.D.N.Y.

2016) ("[T]he PSLRA's pleading standard . . . applies to scienter for scheme claims.").

To satisfy Rule 9(b), a plaintiff generally "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).  To satisfy the PSLRA, a complaint must, with respect to each defendant and "'with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *ATSI Commc'ns*, 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(2)); *see, e.g.*, *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 419 (S.D.N.Y. 2020) ("[I]n a case involving multiple defendants, [the] plaintiffs must plead circumstances providing a factual basis for scienter for each defendant . . . ." (cleaned up)); *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 22 (S.D.N.Y. 2016) (noting that a plaintiff must "allege facts supporting a strong inference with respect to *each* defendant" (emphasis added)).  The "strong inference" must be "more than merely plausible or reasonable." *Tellabs*, 551 U.S. at 314.  The necessary inquiry is "inherently comparative." *Id.* at 323.  That is, the Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 324.  A complaint alleging securities fraud will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

In this Circuit, a plaintiff may satisfy the scienter pleading requirement in one of two ways: "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99.  The former requires a plaintiff to allege that the defendant "benefitted in some concrete and personal way from the purported fraud." *ECA, Loc.*

*134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000)).  The latter requires allegations of either actual intent or "conscious recklessness — *i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *Stratte-McClure*, 776 F.3d at 106.  More specifically, a plaintiff must allege conduct by a defendant that is, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal quotation marks omitted).  As a general matter, courts have approved of claims when plaintiffs "have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.  Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak*, 216 F.3d at 308.

## DISCUSSION

Defendants once again argue that Africa fails to adequately allege scienter.  *See* ECF 68 ("Defs.' Mem."), at 21-24.  In response, Africa cites four ways in which the Second Amended Complaint alleges either "motive and opportunity" or "conscious misbehavior or recklessness":

- First, it newly alleges that Ye benefited directly from undisclosed related-party transactions that led to the restatement of Credit Card Segment revenue because his wife owned 40% of the company that created the fraudulent transactions;

- Second, it "clarifies . . . the timing and significance of the undisclosed transactions and how they helped Jianpu meet its revenue guidance";

- Third, it adds the "additional 'little r' restatements that followed Jianpu's first restatement"; and

- Fourth, it adds the resignations of two additional Jianpu executives and/or board members.

Pl.'s Opp'n 2.  The Court will address these allegations in turn, focusing — as the parties do in their briefing — on the allegations that Africa added to the Second Amended Complaint.

## A.  Motive and Opportunity

The Court begins with Africa's arguments about "motive and opportunity."  First, Africa argues that Defendants had a motive and opportunity to conceal the related-party transactions because RDD, an entity partially owned by Ye's wife, was involved in them.  Pl.'s Opp'n 19.  It is true that, when "a corporate insider's family member is the" beneficiary of a fraudulent scheme, that can "constitute[] a sufficiently concrete and personal benefit to infer motive." *S.E.C. v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 389 (S.D.N.Y. 2014).  The problem for Africa is that he has not pleaded facts that give rise to a strong inference of Ye's wife's involvement in the transactions that inflated the Credit Card Segment's revenue.[1]

Indeed, Africa's argument is based on a long chain of inferences, each link of which is weaker than the last.  First, he contends that Jianpu would not have restated its Credit Card Segment's revenue absent the related-party transactions — as opposed to transactions between "third-party agents . . . with undisclosed relationships between and among" each other but without any direct connections to Jianpu itself, as Defendants argue.  Defs.' Mem. 13.  Second, he asserts that the related party involved in the Credit Card Segment transaction must be one of the three related parties discussed — but not explicitly named — in Jianpu's 2019 20-F.  *See* SAC ¶¶ 64, 78.  Third, he contends that the most likely candidate is "Related Party A," an entity

---

[1]  In fact, he arguably pleads the opposite.  In reference to the Credit Card Segment, the Second Amended Complaint includes Jianpu's disclosure that an independent investigation "did not find any evidence that other [than one business unit head,] members of senior management . . . knew about or participated in any of the questionable transactions."  SAC ¶ 59.  Africa does not, however, allege that the disclosure was false.  *See Soto v. Disney Severance Pay Plan*, 26 F.4th 114, 120 (2d Cir. 2022) (noting that courts "must dismiss a claim if a plaintiff pleads himself out of court by alleging facts which show that he has no claim" (cleaned up)).

that charged Jianpu for "advertising and marketing expenses," the same category of expense that Jianpu's restated financials adjusted.  Pl.'s Opp'n 3; SAC ¶¶ 71-73.  And finally, he insists that Related Party A is RDD because Jianpu's 2019 20-F states that "we conduct our online advertising business through RDD" and because RDD and Related Party A are both owned, at least in part, "by two founders of the Company."  *Id.* ¶¶ 69, 72.  The upshot, according to Africa, is that Defendants were aware of related-party transactions that led to the need to restate Jianpu's revenue "because the related party at issue is 40% owned by CEO Ye's wife."  *Id.* ¶ 190.

Several of these inferences do not even clear the conventional plausibility standard, let alone the higher standard that applies under the PSLRA.  *See Tellabs*, 551 U.S. at 314.  Take, for example, the proposition that Related Party A was involved in the questionable Credit Card Segment activity.  Africa's support for that proposition stems from the fact that Jianpu reported paying Related Party A for advertising and marketing expenses in the 2019 20-F.  But the mere fact that expenses for Related Party A's services were listed in Jianpu's financial statements under the same high-level category as some expenses that were related to the sham transactions in the Credit Card Segment does not support the inference that Related Party A was involved in the sham transactions.  And more fundamentally, Africa's assertion is fatally undermined by Jianpu's public filings — of which the Court may take judicial notice.  Jianpu disclosed in its 2019 Form 20-F that it had *understated* the expenses for Related Party A in its 2018 Form 20-F by RMB 11.586 million; thus, these expenses were adjusted *upwards* in the 2019 Form 20-F. 2019 Form 20-F, at F-15; *compare id.* at F-43 *with* ECF 69, Ex. D at F-36 ("2018 Form 20-F"). By contrast, Jianpu disclosed that the questionable transactions in the Credit Card Segment caused associated expenses to be *overstated* by approximately RMB 90 million; thus, they were adjusted *downwards* in the 2019 Form 20-F.  *See* ECF 69, Ex. I.

13

On top of that, there is no solid basis to infer that Related Party A even was RDD.  Far from it.  Jianpu defines RDD as a "variable interest entity," which is the term used for the Company's affiliated "Peoples Republic of China" subsidiaries.  *See* 2019 Form 20-F, at 31-32.  That alone suggests that RDD is not a "related party."  In addition, between the 2018 Form 20-F and the 2019 Form 20-F, revenue for these entities, which Jianpu reported collectively, remained the same.  *Compare* 2018 Form 20-F, at F-14 *with* 2019 Form 20-F, at F-13.  By contrast, as noted, expenses for Related Party A were adjusted upwards.  This strongly suggests, if not proves, that Related Party A is not RDD — breaking another link in Africa's inferential chain.  Africa counters that "the ownership structure and shell game Defendants devised was complex" and that, because Jianpu consolidated the financials of its "variable interest entities," the effect of the restatement may be hidden or have "hit elsewhere."  Pl.'s Opp'n 12-13 & n.13.  But these arguments are neither "cogent" nor "as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  Indeed, "[s]uch a vague allegation" of generalized wrongdoing "barely moves the needle on Plaintiff['s] scienter requirement."  *Schaffer v. Horizon Pharma PLC*, No. 16-CV-1763 (JMF), 2018 WL 481883, at *13 (S.D.N.Y. Jan. 18, 2018); *see also ECA*, 553 F.3d at 201 (holding that "generalized" allegations of motive and opportunity to hide related-party transaction are insufficient to survive a motion to dismiss).  Accordingly, Africa's allegations about RDD do not pass muster.

Nor does Africa get any mileage out of the timing of the reported increase in revenue for the Credit Card and Advertising Segments.  *See* SAC ¶¶ 84-88.  Africa continues to argue that the revenue for these segments was inflated to offset a decrease in revenue in the Loan Segment and suggests that his new pleading "clarifies" that the "sham revenue began to increase at the same time that the Company's Loan Segment revenue began to fall."  *Id.* ¶ 86.  The coincidence of these two trends, however, does not satisfy Africa's burden to provide "factual support to

suggest that Defendants consciously decided to improperly recognize revenue." *Africa I*, 2022 WL 4537973, at *12 (cleaned up).  Instead, Africa simply retreads a theory that the Court previously rejected: that Defendants engaged in fraud to meet revenue targets.  At best, this is a "goal[] that [is] possessed by virtually all corporate insiders," namely the desire to  "sustain the appearance of corporate profitability." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (internal quotation marks omitted).  Thus, it is insufficient as a matter of law. *See id.*; *see also, e.g.*, *Saraf v. Ebix, Inc.*, No. 21-CV-1589 (JMF), 2023 WL 4561655, at *5 (S.D.N.Y. July 17, 2023) (holding that the motive to avoid bankruptcy and pay down debts was insufficient because it is one shared by all corporate insiders); *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 848-49 (S.D.N.Y. 2019) (Nathan, J.) (holding the same with respect to the motive to complete a successful public offering).

In short, the Second Amended Complaint, like the First, fails to create a strong inference that Defendants received a "concrete and personal" benefit from the alleged scheme and, therefore, fails to allege a cognizable motive.  *See ECA*, 553 F.3d at 198.

**B.  Conscious Misbehavior or Recklessness**

Africa's other new allegations, which he argues are probative of conscious misbehavior or recklessness, also fall short.  Notably, because Africa fails to plead that Defendants actually knew about the undisclosed sham transactions or had a motive to hide them, "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142.  They are not.  Indeed, Africa's new allegations — namely, the resignation of two Jianpu executives and/or board members and Jianpu's "little r" restatements, which reclassified expenses under different categories after the issuance of the 2019 Form 20-F — do not come close to getting Africa over the threshold.

Beginning with the Credit Card Segment, Africa argues that the April 2022 retrospective reclassification of certain marketing expenses into a new expense category manifested an "ongoing failure to maintain reporting accuracy . . ." that was so severe Defendants should have noticed and corrected it.  Pl.'s Opp'n 21.  Where courts have found that a restatement contributes to a strong inference of scienter, however, it has been based on the magnitude of an error being unlikely to go unnoticed by company executives.  *See, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001).  And here, as Africa himself alleges, Jianpu made the reclassifications because, "in light of business development, the Company added a financial statement line item named cost of promotion and acquisition."  SAC ¶ 129.  Indeed, the Second Amended Complaint does not even make clear that the expense reclassification was prompted by an error.  Simply reclassifying some previously reported expenses under a new category is not the sort of restatement that evinces recklessness or consciousness of wrongdoing.  And as the Court previously held, even the more significant restatement of revenue in the 2019 Form 20-F does not "suggest that Defendants consciously decided 'to improperly recognize revenue.'" *Africa I*, 2022 WL 4537973, at *12 (quoting *In re Veeco Instruments, Inc. Sec. Litig*, 235 F.R.D. 220, 231 (S.D.N.Y. 2006)).  It follows that the newly alleged smaller reclassifications do not get Africa any further towards showing recklessness or conscious misbehavior.

Relatedly, Africa's recycled argument that Jianpu's imperfect internal controls raise an inference of scienter fails for the reasons articulated in the Court's prior Opinion and Order.  *See Africa I*, 2022 WL 4537973, at *12 (observing that "Africa proffers no allegations that any Defendant had access to nonpublic information, or recklessly disregarded such information," about the Credit Card Segment revenue prior to reporting it (citing *Novak*, 216 F.3d at 308)).  And finally, Africa's allegations regarding resignations do not cut it.  Resignations do not raise a strong inference of scienter "absent additional factual allegations linking the executives'

resignation to the alleged fraud." *In re UBS AG Sec. Litig.*, No. 07-CV-11225 (RJS), 2012 WL 4471265, at *18 (S.D.N.Y. Sept. 28, 2012) (cleaned up), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014); *see also Venkataraman v. Kandi Techs. Grp., Inc.*, 20-CV-8082 (LGS), 2021 WL 4952260, at *5 (S.D.N.Y. Oct. 25, 2021) ("Absent other allegations regarding [the defendants'] culpable state of mind, [the CFO's] resignation does not support an inference of scienter."); *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 414 (S.D.N.Y. 2007) (same).  And here — in contrast to the cases cited by Africa, *see* Pl.'s Opp'n 22-23 — such "additional factual allegations" are lacking.  The three resignations at issue took place over a three-year period (with two occurring more than a year after Jianpu's allegedly corrective disclosures), and Africa alleges nothing to connect them to an alleged fraud; he merely alleges that one of them went to work for an unidentified related party, which is plainly not enough.  *Cf. McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 117 (S.D.N.Y. 2013) (holding that scienter was properly alleged where the company's external auditor's resignation cited the lack of "tangible progress" on corporate governance issues he had previously raised); *Varghese v. China Shenghuo Pharmaceutical Holdings, Inc.*, 672 F. Supp. 2d 596, 603 (S.D.N.Y. 2009) (holding that scienter was properly alleged where a member of the company's board discussed the "poor corporate governance" at the company in his resignation email and gave specific examples).

As noted above, Africa does not add any new factual allegations with respect to his Advertising Segment claim.[2]  Instead, he newly alleges that Jianpu's reporting regarding the Chinese government investigation into Hangzhou Scorpion violated Item 303 of SEC Regulation

---

[2]    That is reason enough for the Court to adhere to its prior conclusion that Africa failed to adequately allege scienter for the Advertising Segment claim too.  *See Africa I*, 2022 WL 4537973, at *10-12.

S-K, which requires "corporate entities to '[d]escribe any known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations.'" *In re Nielsen Holdings PLC Sec. Litig.*, 510 F. Supp. 3d 217, 226-27 (S.D.N.Y. 2021) (quoting 17 C.F.R. § 229.303(a)(3)(ii)); *see* SAC ¶¶ 93-98.  But assuming for the sake of argument that Jianpu's reporting did violate Item 303, Africa still fails to "allege that Defendants were at least consciously reckless" in "their failure to provide adequate Item 303 disclosures." *Stratte-McClure*, 776 F.3d at 106.  Violation of a "clear duty to disclose" is necessary to "establish '*strong* evidence of conscious misbehavior or recklessness'" in this context.  *Id.* at 107 (quoting *Kalnit*, 264 F.3d at 144).  Africa does not provide any evidence that Jianpu or the Individual Defendants had a "clear duty to disclose" the investigation into Hangzhou Scorpion sooner than they did.  There is no allegation that Defendants had access to nonpublic information about Hangzhou Scorpion's data privacy practices during the first and second quarters of 2019 or knew what the likely result of the investigation would be.  And in December 2019, once Jianpu had learned that an investigation had been initiated, it recorded an RMB 250.3 million impairment "reflect[ing] the impairment of the goodwill and intangible assets related to a subsidiary acquired in 2018 due to adverse development of its business and change of the relevant industry background and market conditions."  SAC ¶¶ 100-01.  A company is not required to "accuse itself of wrongdoing," *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), or to predict the outcome of an investigation, *see Richman v. Goldman Sachs Grp. Inc.*, 868 F. Supp. 2d 261, 273-74 (S.D.N.Y. 2012).  Thus, providing more details than Jianpu did in December 2019, before the results of the investigation were known, was not clearly required by Item 303.  "[T]he 'most cogent inference' from these allegations 'is that [Jianpu] delayed releasing information on [the investigation] to carefully review all of the relevant evidence and was *at worst* negligent as to the effect of the delay on investors."  *Nielsen*,

510 F. Supp. 3d at 228 (quoting *Stratte-McClure*, 776 F.3d at 107).  But mere negligence is insufficient to raise a strong inference of scienter.

## C.  Remaining Claims

For the foregoing reasons, Africa fails to state a claim under Section 10(b) and Rule 10b-5(b).  That leaves Africa's scheme claim pursuant to Section 10(b) and Rule 10b-5(a) and (c) and his "control person" claim pursuant to Section 20(a).  Africa's failure to adequately plead scienter dooms them as well.  *See, e.g.*, *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021) (holding that scienter is an element of scheme claims); *Menaldi*, 164 F. Supp. 3d at 577 (same); *First Jersey Sec.*, 101 F.3d at 1472 (noting that, to state a control-person claim under Section 20(a), a plaintiff must, at a minimum, plead a plausible "primary violation" of Section 10(b)).

Africa wisely does not dispute the proposition that a scheme claim fails as a matter of law without adequate allegations of scienter.  Instead, he contends that it would be error to dismiss the claim because Defendants did not challenge the claim.  *See* Pl.'s Opp'n 4-9.  There is no doubt that Defendants could have, and should have, done a better job of addressing the scheme claim in their opening memorandum of law, as they mentioned the word "scheme" only once, and in a footnote no less.  *See* Defs.' Mem. 17 n.5.  But Defendants were explicit, in both their Notice of Motion and their opening memorandum of law, that they were seeking dismissal of the Second Amended Complaint "in its entirety."  ECF No. 67; *accord* Defs.' Mem. 25.  Moreover, a court may dismiss a claim on any basis for which the non-moving party had "notice of the grounds for dismissal and an opportunity to be heard."  *Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 469 (S.D.N.Y. 2014), *aff'd sub nom. Salvani v. InvestorsHub.com, Inc.*, 628 F. App'x 784 (2d Cir. 2015).  And that is plainly the case here.  Africa indisputably had notice of Defendants' argument that he failed to adequately plead scienter and was fully heard on the issue.  Africa

suffered no meaningful prejudice from Defendants' neglect in waiting until their reply memorandum of law to explicitly connect their scienter argument to Africa's scheme claim.[3] Accordingly, the Court rejects Africa's waiver argument as meritless.

## CONCLUSION

In short, Africa still does not adequately plead scienter, and all of his claims must be dismissed.  Thus, Defendants' motion to dismiss must be and is GRANTED.

This time, the Court will deny leave to amend.  Leave to amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), and complaints dismissed under the PSLRA "are almost always dismissed with leave to amend," *Pasternack v. Shrader*, 863 F.3d 162, 175 (2d Cir. 2017) (internal quotation marks omitted).  That said, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993).  Africa has now had two opportunities to amend, and the Court explicitly cautioned in *Africa I* that this would be his "final chance."  2022 WL 4537973, at *13.  In light of the foregoing, the Court concludes that any amendment would be futile.  *See, e.g.*, *Roundtree v. City of New York*, No. 19-CV-2475 (JMF), 2021 WL 1667193, at *6 (S.D.N.Y. Apr. 28, 2021) (citing cases).

One final housekeeping matter remains.  Under the PSLRA, the Court is required to "include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion."  15 U.S.C. § 78u-4(c)(1).  The Court finds that all legal claims and defenses presented throughout this litigation were nonfrivolous under existing law and that all factual contentions had evidentiary support or

---

[3]     If Africa believed otherwise, he could have sought leave to file a sur-reply.  He did not.

were reasonably based on belief or a lack of information.  Accordingly, no sanctions under Rule 11 are warranted.

The Clerk of Court is directed to terminate ECF No. 67, to enter judgment in Defendants' favor consistent with *Africa I* and this Opinion and Order, and to close the case.

SO ORDERED.

Dated: August 23, 2023
       New York, New York

                                    _____
                                            JESSE M. FURMAN
                                         United States District Judge